UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

LEENA VARUGHESE, M.D.,

        Plaintiff,

    -against-

MOUNT SINAI MEDICAL CENTER,
PATRICK LENTO, M.D.,
CARLOS CORDON-CARDO, M.D.,
ADOLFO FIRPO, M.D., and
IRA J. BLEIWEISS, M.D.

        Defendants.

—————————————————————————x

12 Civ. 8812 (CM)(JCF)

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

McMahon, J.:

    Plaintiff Dr. Leena Varughese ("Varughese") has sued Mount Sinai Medical Center ("Mount Sinai") and several of its individual physicians and administrators (collectively "Defendants") in connection with her September 21, 2011 termination from Mount Sinai's residency program.  Now before the Court is Defendants' motion for a summary judgment of dismissal.

    For the following reasons, the motion is GRANTED and all of plaintiff's claims are dismissed with prejudice.

### BACKGROUND

    Mount Sinai is a large medical center located on the upper east side of Manhattan.  From July 1, 2008 until September 21, 2011, Varughese was a resident in its Department of Pathology.

Copies mailed/faxed/handed to counsel on 3/27/15

Each of the individually named defendants served as an attending physician or supervisor in that department during Varughese's residency.

Varughese, a woman of Indian descent, alleges that Mount Sinai subjected her to discrimination and a hostile work environment on the basis of her gender and national origin (Indian); retaliated against her when she complained about discrimination and alleged unsafe practices within the hospital; punished her for failing to confess to nonexistent misconduct; and ruined her job prospects with other employers. Her complaint pleads eleven counts under federal, state, and local anti-discrimination laws; one count of interference with business relations; one count of defamation; one count of breach of her employment contract; one count of breach of the covenant of good faith and fair dealing; one count of whistleblower retaliation under a state health law; one count alleging a violation of 42 U.S.C. § 1981; one count of interference with her rights under the Family and Medical Leave Act; and one count of individual liability. [1] (Docket #66.) She seeks several million dollars in damages, as well as injunctive relief that would both restrain Defendants from disseminating an allegedly defamatory evaluation and require them to provide her with various certifications that would allow her continue her medical training. (*Id.*)

In Defendants' view, Varughese was an insubordinate employee who was disciplined, counseled, and then fired after an escalating series of unprofessional errors and omissions she refused either to acknowledge or to correct. Defendants accuse her of repeated absenteeism, failure to complete assigned tasks, failure to communicate with supervisors and colleagues, ignoring supervisors' directions, using inappropriate language, and behaving rudely and in a manner that called her mental health into question. Ultimately, Mount Sinai terminated Varughese because of

---

[1] Varughese voluntarily dismissed another count for intentional infliction of emotional distress after Magistrate Judge Francis ordered her to submit to a psychiatric evaluation as a condition of maintaining it. *See* Docket #45.

what it deemed repeated, egregiously unprofessional behavior that culminated with her being caught while surreptitiously rifling through files in someone else's office.

Varughese admits to much of the behavior assigned her, although she denies that some of the events underlying these accusations occurred in the manner Defendants describe. She also alleges that similarly situated residents who were not members of her protected class were not disciplined in the same way for the same conduct.

Varughese was originally represented by counsel – for example, her original complaint was drafted by counsel – but she has been *pro se* for some time. She is, of course, required to abide by all the rules of the Court, notwithstanding her *pro se* status. However, she has made errors in her response to Defendants' motion for summary judgment that are common among non-lawyer litigants. Her response to Defendants' Local Civil Rule 56.1 statement is conclusory and repetitive. To the extent that it relies on evidence at all, it relies in large measure on hearsay and other evidence rendered inadmissible by Federal Rules of Evidence 401, 403, 404, 802, and/or 805 – even though a motion for summary judgment must be controverted by admissible evidence.

At times, her response veers into territory that has nothing to do with this lawsuit. For example, Varughese insinuates that the suicide of a colleague's relative was actually a murder for which yet another colleague is somehow responsible, and that Defendants' attorneys are involved in a criminal conspiracy. *See, e.g.*, Varughese 56.1 at ¶¶ 30.7-30.8 ("Residents . . . were involved in what appeared to be the questionable suicide at best (by overdose of propofol of [one resident's] 'best friend' under the most suspicious circumstances . . .The Caucasian leadership did not target . . . [the resident's] rampant suspect conduct including . . . not performing her duties or for suicide or homocide [sic] of her family member etc"); *id.* at ¶ 119.4 (complaining that the wife of one member of an internal appeal board "has the same surname as . . .Rory McEvoy, the lawyers

3

representing the Institution"), ¶ 123.2 ("McEvoy kept insisting . . . that I had alleged a conspiracy against me by the Defendants to commit criminal acts, and to conduct an ongoing discrimination campaign, which, by the way, was obviously exactly what was happening.").

In order to give Varughese the benefit of any and every doubt, the Court has conducted a searching review of the several thousand pages of transcripts and other documents that she submitted in opposition to summary judgment. *DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R.*, 237 F. App'x 642, 646 (2d Cir. 2007) ("a district court has 'broad discretion . . . to overlook a party's failure to comply with local court rules' and may 'opt to conduct an assiduous review of the record' even when one of the parties has failed to file a Rule 56.1 statement") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).

That record consists of: (1) deposition transcripts and several affidavits; (2) documentary evidence including e-mails, performance evaluations, letters and their attachments; (3) transcripts of sworn testimony given in the course of Dr. Varughese's use of Mount Sinai's internal appellate process, which was subject to cross examination; and (4) audiotaped conversations between Varughese and various individual defendants and other administrators at Mount Sinai, and transcripts of these tapes prepared by certified court reporters.[2] As part of its exhaustive review of the record, the Court has both listened to the tapes and reviewed the transcripts.

The content of the lengthy Statement of Facts is drawn from any portion of a party's 56.1 Statement that relies on competent evidence, as well as the accompanying exhibits.

---

[2] Only the transcripts were submitted with the motion. By order dated March 13, 2015 (Docket #215), the Court ordered Varughese to produce the tapes so that I could listen to them myself, rather than merely reading the transcripts or relying on the parties' characterizations of what was said and how. *See Scott v. Harris*, 550 U.S. 372 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of an encounter preserved in audio-visual recordings if court reviews said recordings).

4

As is customary, the facts are viewed most favorably to the non-moving party (Varughese).  Unless otherwise noted, these facts are undisputed, purely conclusory assertions (there are many such) are identified and are not relied on to raise genuine issues of material fact.

## DISCUSSION

### I.    Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see* FED. R. CIV. P. 56(a), (c).  On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006).  The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).  Moreover, not every disputed factual issue is material in light of the substantive law that governs the case.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party.  "Summary judgment is designed . . . to flush out those cases that are

predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir. 2006) (internal citations omitted); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137. The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

In considering the defendants' summary judgment motion, the court liberally construes all submissions by a *pro se* plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted). "This precept is especially important in the summary judgment context, where claims are subject to final adjudication." *S.E.C. v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949, at *6 (S.D.N.Y. Dec. 9, 2013). Indeed, the duty is "particularly strong when a *pro se* plaintiff alleges violation of h[er] civil rights." *Germany v. N.Y.S. D.O.C.S.*, No. 03 CIV. 148, 2003 WL 22203724, at *3 (S.D.N.Y. Sept. 22, 2003) (citing *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)).

The application of this forgiving standard for *pro* se litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."

6

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted); *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 454 (S.D.N.Y. 2012) *aff'd*, 523 F. App'x 53 (2d Cir. 2013). "[A]t some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believed entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case, even where a party proceeds *pro se*." *Mattera*, 2013 WL 6485949, at *6 (quoting *Salahuddin v. Coughlin*, 781 F.2d 24, 29 (2d Cir. 1986)).

Thus, even a *pro se* party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Shah v. Kuwait Airways Corp.*, 653 F. Supp. 2d 499, 502 (S.D.N.Y. 2009) (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 663 (S.D.N.Y. 2009)). That evidence must be admissible under the Federal Rules of Evidence, which apply equally to *pro se* litigants. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (evidence submitted in summary judgment proceedings must be admissible, as required by Fed. R. Civ. P. 56(e)).

## II.    Facts

Varughese was a resident physician in Mount Sinai's Department of Pathology ("the Department") from July 1, 2008 until September 21, 2011. (Defendants' 56.1 at ¶ 1).

During that period, there were two female residents of Indian descent (including Varughese) and three female fellows of Indian descent enrolled in the residency or fellowship program in the Department. (Johnson Decl. at ¶ 2, Defs.' Ex. 1.) All of the female residents and fellows of Indian descent in the Department graduated from the residency or fellowship program, except for Varughese. (Defendants' 56.1 at ¶ 132.)

Job Duties and Employment Contract

As a resident in the Pathology department, Varughese was expected to perform clinical, educational, and administrative tasks in one-month rotations focused on different sub-disciplines of pathology. Some of these rotations occurred at Mount Sinai. Others took place under Mount Sinai's purview but at different hospitals, such as the Bronx Veterans' Affairs Hospital and the Elmhurst Hospital Center.

A series of one-year contracts with Mount Sinai governed Varughese's employment. Each incorporated the provisions of Mount Sinai's House Staff Manual, which provided, in pertinent part, that, "The Program Director [or] the Department Chair . . . may take disciplinary action, including termination for cause, against any [resident] who . . . fails to demonstrate an acceptable level of . . . professionalism." (Defendants' 56.1 at ¶ 148)

The Department was in a state of turmoil during Varughese's employment. (Figur Dep. at 38.) In early 2011, a period of intense activity relevant to this case, the American College of Graduate Medical Education ("ACGME"), which accredits residency programs throughout the United States, cited the Department for various problems with its residency program. The Department's head changed several times during Varughese's tenure, as did its middle management. Its laboratories appear to have struggled to achieve adequate staffing levels. By the fall of 2011, Mount Sinai's director of medical education actually called the Department of Pathology a "zoo." A new director, Defendant Carlos Cordon-Cardo, who was charged with putting it in order, arrived just as long-standing issues involving Varughese came to a head.

<u>The First and Second Years of Varughese's Residency</u>

Varughese's allegations of discrimination, hostile work environment and retaliation concern the way that she was treated beginning with her third year of residency (July 2010-June 2011). However, as background, especially to her hostile work environment claim, she cites to several comments that she testified were made during her first and second years of residency, July 1, 2008- June 30, 2009.

Varughese testified that Dr. Allan Schiller, who chaired the Department from Varughese's arrival until December 2010, (when he remained as an employee but apparently gave over his Chair duties to a female Interim Chair) would say something to the effect of "you don't know the type of things you'll find in India or the crazy things you'll find in India" every time he saw her at a conference or supervised her for an autopsy. (Varughese Dep. at 765-68.) He allegedly used that "line . . . at least four, maybe more times over" for as long as he interacted with her—from the beginning of her residency until Dr. Melissa Pessin-Minsley took over as Interim Chair of the Department in December 2010. (Defendants' 56.1 at ¶¶ 2-3.) There is no evidence that Schiller directly supervised Varughese thereafter except during individual, occasional autopsies. He is not named as a party defendant and has not been deposed.

Varughese appeared out of sorts towards the end of her first year of residency, in a way that other first-year residents were not. A "couple of months" into that first year, Dr. Patrick Lento, the director of the Department's residency program, observed a change in Varughese's demeanor: "she never seemed to smile anymore," and "seemed distracted. When [Lento] would address her to say 'Hello, Leena,' she would not respond, which [Lento] thought was odd." (Lento Dep. at 51-52, 60-61.)

9

Varughese got mixed reviews during her first two years. Some supervisors rated her as superior; others found her work "inconsistent." Interim Chair Dr. Melissa Pessin-Minsley recalled that, when she sat on the residency committee during Varughese's first year, there was a "perception" on the committee "that in the end of [Varughese's] first year . . . she was weak . . . she wasn't performing at the strongest level of a pathology resident who had finished a first year of a pathology residency." (Pessin-Minsley Dep. at 52.)

In October 2009, three months into her second year, Schiller (who was still Chair of the Department) "wanted to see me . . . about my unhappiness. He said that I didn't look happy . . . if you're unhappy that's part of who you are and it's sort of your DNA and so on." (Varughese Dep. at 42.) According to Varughese, Schiller went on to say, "that [when] people were unhappy like that, it's trouble . . . we don't want you to be in trouble." (*Id.* at 10, 43.) He "wanted to know if [Varughese] was speaking to someone, you know, getting help. [She] said no . . . [She] didn't think [she] needed help." (*Id.*) Schiller, who obviously did think she needed therapy, told Varughese to seek professional help and bring back a note attesting that she was under someone's professional care. (*Id.*)

Varughese testified at her deposition that she understood the statement about unhappiness being in her DNA to be a reference to her race/national origin, rather than to any genetic basis of depression, which is a scientific/medical issue. (*Id.*) Varughese did not testify that Schiller made any remark about India or her Indian ancestry during this conversation.

The record contains no suggestion that Varughese told Schiller that any of his comments made her uncomfortable. Nor is there any evidence that she complained about Schiller's comments to anyone else until at least December 2010, by which time he was no longer acting as

Chair and Varughese had received the first of several warnings that she was having performance problems.

From October 2009 through the summer of 2010 (the beginning of her second through the beginning of her third years of residency), the record reveals little about Varughese's on-the-job performance or her experiences. So we turn to her third year of residency. That is when the problems that gave rise to this lawsuit began.

#### The July 2010 Promotions of a Filipino Male and a Woman of Indian Descent

In July 2010, the Department promoted two of Varughese's colleagues to Chief Resident: Drs. Kruti Maniar and Samuel McCash. (*See* Lento Dep. at 13.) Like Varughese, Maniar is a woman of Indian descent. Varughese consistently describes McCash as Caucasian (*see, e.g.*, Varughese 56.1 at ¶ 16.1), but he identifies himself as a Pacific Islander of Filipino descent. (Docket #165, McCash Decl. at ¶ 2.), and there is no evidence that others in the Department (other than Varughese) perceived him as anything other than what he himself claims to be. I view his self-identification as undisputed; there is no evidence in the record that Dr. McCash is not a Pacific Islander of Filipino descent. I will not refer to him as Caucasian.

Chief Residents had the authority to assign tasks to other residents, to instruct them how to perform those tasks, to admonish them if the Chief's expectations were not met, and to control some portions of residents' scheduling. (Pessin-Minsley Dep. at 32-33.)

11

<u>Performance Issues</u>

Varughese began to be criticized for performance issues about this time.

Dr. Ira Bleiweiss, a named defendant and an attending pathologist at Mount Sinai, recalled having issues with her when she was assigned to him on frozen section duty, which is to say, on the shift that analyzes patient tissue samples sent down during surgery: "When you're on frozen section duty, there is an attending [physician] always and a resident who is assigned to be with you. I recall more than one occasion being on frozen section with Leena being the resident assigned to me and she [was] not anywhere to be found." (Bleiweiss Dep. at 54-55.)

In August 2010, a less senior resident, a Caucasian woman named Adrienne Jordan, e-mailed the two Chief Residents to complain about Varughese's work ethic: "How does she function!!!!!!! I just wonder how she gets out of bed in the morning and not hurt herself she is so lazy . . ." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket #205-5 at 2.) Later that same day, Jordan complained that her team was missing a slide from one of Varughese's cases, which Lento needed, "but of course [Varughese] called out 'sick' today." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket #205-5 at 5.)

<u>The September 14, 2010 Altercation with McCash</u>

On September 14, 2010, Varughese had the first of two notable run-ins with McCash.

There is some evidence that Varughese's relationship with McCash was strained from the beginning; Varughese alleges, for example, that McCash gave her menial tasks and overburdened her with work. (Varughese 56.1 at ¶¶ 11.4, 11.13.) But on the day in question, Varughese refused to cover for another resident who was on leave. This prompted an argument between her and McCash. Varughese alleges that McCash became irrationally angry about her refusal, and that he

"screamed . . . shut up, shut up, shut your mouth Leena" at her while "lurching" towards her (Docket #205-4 at 85). He also allegedly "cursed and ranted about" her in public, insulted her professional qualifications, told her that no one liked her, and told her she was lucky to have a job. (Varughese 56.1 at ¶¶ 11.4, 11.13.)

Kruti Maniar -- the woman of Indian descent who was promoted to Chief Resident at the same time as McCash -- was present during McCash's alleged tirade. Interestingly, Maniar contacted Program Director Lento that same day to express her concern that *Varughese* had acted unprofessionally during this encounter. (Lento Dep. at 68, 69, 71.) Varughese contacted Lento after Maniar did, complaining that McCash had been "hostile" to her. (*Id.*) The next morning, Lento met with both women residents. (*Id.*)

Varughese repeated her version of events and said "something to the effect that she was perhaps singled out for coverage," meaning the duty to cover for an absent resident. (*Id.* at 82-84.) Lento asked whether Maniar agreed with Varughese's account; Maniar "pointedly" said no. (Lento Dep. at 75, 77, 90, 91.)

Lento later followed up with attending physician Dr. Melissa Pessin-Minsley, whose office was near where Varughese and McCash had argued. Pessin-Minsley told Lento that she did not hear McCash yelling at Varughese. (*Id.*) In fact, no one who was present in the area of the hospital where the encounter took place corroborated Varughese's story that McCash was yelling at her. (*Id.* at 85-90.)

Varughese claims that Maniar would support her version of the facts. (Varughese 56.1 at ¶¶ 11.5, 136.2.) Her opinion about what Maniar would say is, of course, not admissible evidence. Maniar was not deposed, but Mr. Sinai has submitted a declaration from her, in which she avers that McCash "treated all residents equally and always tried to be fair. I never had any reason to

13

believe that McCash harbored any discriminatory animus towards me or any other female resident because of our gender or, in my case, because I am a woman of Indian descent." (Docket #163 at ¶7.) Maniar also attests that "throughout my tenure at Mount Sinai, both as a medical student and as a resident, I felt encouraged and supported . . . I never felt discriminated against by anyone at Mount Sinai for any reason." (*Id.* at ¶4.)

However, the Hospital responded as though Lento had been able to corroborate Varughese's story. Lento told Varughese that he would speak with McCash, and later did speak to McCash about how to handle similar situations in the future. (Lento Dep. at 82.) Varughese was not satisfied; she asked Pessin-Minsley to obtain an apology from McCash. Pessin-Minsley did not believe Varughese was entitled to an apology. Indeed, her view was that Varughese's unspecified "behavior over the weekend was irresponsible and could have jeopardized patient care." (Docket #205-4 at 2, e-mail of Sept. 15, 2010 from Pessin-Minsley to Lento).

By September 17, 2010, three days after the encounter, Varughese complained to her supervisors that she was being made into a "scapegoat," and that the "hostile environment" McCash was creating caused her "far too much unhealthy mental stress." (Docket #205-5 at 62, e-mail of Sep. 17, 2010 Varughese to Drs. Schiller and Pessin-Minsley.) Varughese did not want to deal with McCash, and on September 23, 2010, she tried to switch rotations with another resident, Jaclyn Hechtman, so she could avoid working with him. (Docket #205-5 at 72, e-mail of Sept. 23, 2010 from Maniar to Hechtman, McCash and Varughese). She was prevented from doing so. (Varughese 56.1 at ¶ 11.6.)

But Varughese did not allege at that time that that "hostile" environment had anything to do with her membership in any protected class, or compare McCash's treatment of her to his treatment of anyone outside her protected groups (female and of Indian descent). Indeed, she did

14

not assign either her gender or her national origin as the reason for McCash's loss of temper. The people to whom she complained about McCash (specifically Lento, Pessin-Minsley, and, at some point, attending physician and Defendant Ira J. Bleiweiss) did not interpret her complaints as complaints about discrimination or hostile work environment based on her gender, her national origin or any protected category – although none of these individuals could recall seeing or being trained in Mount Sinai's anti-discrimination policy, or its anti-harassment policy, or its anti-retaliation policy. (Lento Dep. at 24-25; Pessin-Minsley Dep. at 38-39; Bleiweiss Dep. at 15-16.)

After she complained about the September 14, 2010 incident, Varughese claims that her work materials, including slides of patient tissue, started to go missing. (Varughese Dep. at 824-27.) Varughese allows that she and other residents had always had some problems with misplaced slides – whether the fault of general organizational lapses or specific failures of other departments. (Varughese Dep. at 819.) However, "in terms of it being sort of a problem for me that was in excess of other people's issues, that didn't happen until after like September 2010." (*Id.* at 823.)

### The December 8, 2010 Altercation with McCash

A second and more serious altercation between McCash and Varughese occurred on December 8, 2010.

In and before December 2010, pathology residents could make extra money by "moonlighting," i.e., taking extra shifts within their own department. According to the Defendants, on December 8, 2010, McCash told Varughese to examine certain specimens (the complexity of which are in dispute), but Varughese instead gave that work to Paul Azar, a white male resident who was moonlighting. (Defendants' 56.1 at ¶¶ 9-10).

15

Varughese admits that she gave the work to Azar. (*See* Self-Reflection Essay 1, Docket #205-4 at 86). She contends that she was never clearly told that she had to do the work herself. (*Id.*). She also argues that any instruction would have been discriminatory, since two fellow residents – one a non-Indian female and the other a white male – "routinely assigned very complicated patient cases to moonlighters" and were never prohibited from doing so or disciplined for it. (Varughese 56.1 at ¶ 10.2.)

Whether the work she delegated was complicated or not, the particular work that Varughese delegated to Azar should not have been delegated to a moonlighter – and McCash should not have had to explain that to plaintiff. The samples came from patients of a Dr. Goldfarb. His standing order was that the resident on duty had to examine the particular kind of sample at issue (the margins of an incision into the breast). Dr. Goldfarb did not want the moonlighters doing this work, presumably because they were working extra hours and might not be as alert as the resident on duty. (Figur Dep. at 44-45.) The record is replete with references to "Goldfarb cases" and the particular steps that were to be followed when handling "Goldfarb cases."

There was another reason why Varughese delegating her work to Azar was not appropriate. The Department was trying to cut back on moonlighters in order to achieve budgetary reductions. When Varughese assigned the work to Azar, he was about to leave; Jordan, another resident moonlighting that night, recalled that when she left, "Dr. Azar was supposed to be shortly behind [her] . . . When he wasn't, [she] went back to see what was taking him so long because we were going to walk out together." (Jordan Dep. at 110.) By giving Azar extra work, Varughese increased the amount the Department would have to pay him; McCash testified that this was inappropriate "because it would have been very easy for her [Varughese] to have done that herself and not expend unnecessary resources." (McCash Dep. at 62-63.)

16

When McCash became aware of what had happened, he confronted Varughese. These followed a loud, profanity-laced altercation between Varughese and McCash about Varughese's having failed to follow McCash's instruction. Jordan testified that McCash raised his voice and followed Varughese around the room. (Jordan Dep. at 118-119.) Varughese characterizes McCash's behavior as a "rampage" that was physically intimidating and verbally threatening. (Varughese Dep. at 705-06.)

However, witnesses to the altercation also described Varughese's behavior as out of line, especially after she left the room to try to fetch Dr. Bleiweiss. Bleiweiss, who was on the phone in his office, could see that Varughese was "rather upset . . . she was practically in tears," but when he did not immediately end the call to speak to her (Bleiweiss Dep. at 59, 61.), Varughese returned to the lab and began yelling. (Lento Dep. at 114; *see also* Defendants' 56.1 at ¶ 11.) Some of Varughese's ire was directed at Jordan, the white female resident who had previously complained about Varughese's work ethic (*see supra* at 11); Varughese engaged Jordan in a "one-sided yelling argument where [Varughese] was yelling at [Jordan]." (Jordan Dep. at 116.) Azar advised Jordan to leave, "something to the effect of 'You can't engage with [her]. She's not being rational.'" (Jordan Dep. at 116.)

In interviews conducted after this incident, numerous witnesses to the event – Jordan. Azar, Jaffer, Bleiweiss, a medical student, a technician, and a fellow – told administrators that, while McCash may have lost his composure with Varughese, it was "not to the degree of what the other witnesses described [about] Varughese's behavior." (Figur Dep. at 48.) "They could understand what he [McCash] said. It was logical. It was coherent. Dr. Varughese was described as infantile, incoherent, unintelligible, and the wording was not making any sense to anybody else." (*Id.*) One medical student who was present became so upset that she had to leave the room.

17

Varughese does not dispute that she raised her voice and swore.

Late that evening, McCash e-mailed several supervisors to complain about Varughese's behavior, especially her assignment of the case to her Azar, which "ma[de him] question her work *ethnic*.") (McCash e-mail of Dec. 8, 2010 at 8:16 p.m., Docket #205-6 at 2 (emphasis added).) The e-mail was several paragraphs long and includes no other reference to race, ethnicity, or any other protected category. (*Id.*) Shabnam Jaffer, an attending physician of Indian descent who was present, was carbon copied on the e-mail; Varughese was not. (*Id.*) There is no evidence that anyone noticed or commented on the "n" inserted into what, in the context of the email's entire text, appears to have been intended as "work ethic." At her deposition, Varughese testified that McCash never commented on her Indian background to her or to anyone else, to her knowledge. (Varughese Dep. at 175-176.) Either Varughese did not see this e-mail until after her deposition, or she did not interpret it as McCash denigrating her national origin until well into this lawsuit.

### The Department's Investigation of the December 8 Incident

There were several administrative investigations into the December 8 altercation. Varughese alleges that hospital authorities were consistently and unfairly skeptical of her, and consistently and unfairly trusting of white and/or male employees (including McCash, who does not self-identify as white), during those investigations. Varughese asserts that these attitudes were the proximate cause of several disciplinary actions that were to follow, up to and including her eventual termination.

The Department of Pathology was the first to investigate. During the investigation, Varughese was told to report to Chief Resident Maniar (an Indian woman) rather than McCash. (Varughese Dep. at 179-80.)

As part of the investigation of the December 8, 2010 incident, Lento interviewed Drs. Bleiweiss, Jaffer, and Azar (the moonlighter), as well as a fellow who had been present. (Lento Dep. at 105, 113.) He also reviewed several e-mailed accounts from witnesses. (*Id.* at 105, 113.)

At least some of the people being interviewed had had doubts about Varughese before the December 8 incident. The reader will recall that Bleiweiss had found Varughese to be a no-show for several shifts, and that Jordan had previously complained that Varughese was lazy. They were not the only ones who criticized Varughese's professionalism. A departmental administrator named Eileen Hauptman assessed the December 8 incident as follows: "One person has [a work ethic] (SAM [McCash]), the other (LEENA [Varughese]) doesn't. Since Leena has been here, she has shown great antipathy to any work and least of all to patient care." (Docket #205-6 at 5, e-mail of Dec. 9, 2010 from Hauptman to Pessin-Minsley *et al.* (emphasis in original).)

Prior to the December 8 incident, Varughese's formal evaluations reflected that she was "inconsistent" but were not negative. However, Bleiweiss' evaluation of Varughese for the period including December 8, 2010 (which he submitted on December 18, 2010) ranked her "below expectations" for professionalism. (Bleiweiss Evaluation, Docket #205-7 at 14-15.) Others reviewing her for the same period marked her as satisfactory or slightly above average. (Evaluations, Docket #204-8 at 4-23.)

During the investigation, Varughese refused to acknowledge that she had done anything wrong, that she could have handled her disagreement with McCash and Jordan differently, or that she might benefit from a different approach to conflict resolution. (Pessin-Minsley Dep. at 122.) As Dr. Pessin-Minsley testified, Varughese:

> was very angry. She was not hearing what [administrators] were saying to her and not responding to what we had asked her to do . . . most situations are the fault of more than one side . . . and there was no comprehension or any feeling that she

19

might have had any responsibility or any part of it could have been her fault or she could have mitigated the situation.

(*Id.* at 123-24.) Varughese's attitude, as described by Pessin-Minsley, would surface again and again during the next nine months, as her career imploded. It is undisputed that whenever Varughese was questioned about an incident, she denied any wrongdoing and cast all blame on others, viewing her defensiveness as fully justified because of the unfairness of any and all complaints about her behavior. (*See* Varughese 56.1, *passim.*)

During the Department's investigation, Varughese went to Lento over and over again to complain about McCash's behavior on December 8. She alleges that Lento was unsympathetic to her complaints. However, Varughese did not think this was because of her gender, her national origin, or her membership in any other protected class. Instead, Varughese believed that Lento was hostile to her because she had given him a negative review in a student-to-teacher review of a rotation months earlier. Varughese testified that, during one December 2010 meeting, Lento "indicated to me that in so many words that my rights won't be protected as long as he believed that I wrote a negative evaluation" about the rotation. (Transcript of Internal Appeal at 281-82, Docket #205-31 at 77.)

The negative evaluation is not part of the record, but there is no evidence that it involved any complaint of discrimination, or that it otherwise constituted protected activity.


The December 10, 2010 Altercation with Jordan

Two days after the December 8, 2010 incident, Varughese was in trouble again, this time for ignoring an instruction to let the Department's investigation proceed without interference.

On December 10, 2010, Varughese allegedly confronted Jordan about her role in the December 8 incident. (*See* Docket #205-5 at 10, e-mail of December 10, 2010 from Jordan to

20

Pessin-Minsley, McCash and Lento.)  The parties disagree about who started the confrontation, but Varughese agrees that it occurred at Jordan's desk.

Varughese received a written warning for interfering with the investigation; Jordan did not. Both Jordan and McCash sent e-mails to others in the department publicizing their version of what had happened on December 8. Neither was disciplined for interfering with the investigation.

At her deposition, Interim Chair Pessin-Minsley explained that Varughese alone was disciplined "because there was physical confrontation, as opposed to something put in an e-mail to senior people of a department. . . [e]ven though, I would not have put all of those people in the e-mail." (Pessin-Minsley Dep. at 131-32.)

### December 21, 2010 Notice of Academic Advisement

On December 21, 2010, the Department concluded its investigation and placed Varughese on a form of probation known as an Academic Advisement.  The Department cited Varughese's behavior on both December 8, 2010 (the McCash incident) and December 10, 2010 (the confrontation at Jordan's desk) to justify the imposition of probation. (Dec. 21, 2010 Notice of Academic Advisement, Docket #205-7 at 29.)

Academic Advisement warns a resident that she must improve her performance in accordance with certain guidelines or she will face discipline. (Defendants' 56.1 at ¶ 16.) Associate Director of Graduate Medical Education Scott Barnett testified that academic advisement

> was . . . a very clever invention. Before academic advisement was available, all
> discipline was formal with, uhm, due process rights.  And it didn't give the
> programs the flexibility to create remediation plans that fell short of formal
> discipline.  So this category was created . . . so as to avoid the first step being a
> formal discipline which could potentially be reported to regulatory bodies [such as]

21

licensing authorities, boards [. . . or] the Office of Professional Medical Conduct of New York State.

(Barnett Dep. at 34-35.)

The Notice given to Varughese reads as follows:

This letter is to inform you that you are being placed on Academic Advisement. This decision is based on the investigation of your altercation(s) with other residents while on the Surgical Pathology rotation on Dec 8th and Dec 10th, 2010.

### Brief summary of events

One of the chief residents had specifically discussed with you the need for you to gross specific specimen(s). Instead, you had one of the moonlighters handle the specimen(s). When confronted with this by the chief, you became loud and verbally abusive to his authority and advisement as chief. This altercation was upsetting to those present (including other residents in the gross room [ i.e., the area where residents "grossed" (analyzed) patient tissue samples and slides], an attending (Dr. Jaffer) and a medical student, who felt she needed to leave the area as a direct result of the altercation) and disruptive to the Department's operations. You are also noted to have gotten into an argument with one of the moonlighting residents (Dr. Jordan) that evening and continued to harass her about it on another day. In addition, it was noted that you had failed to appropriately gross in cases that should have been taken care of that day.

### Problematic areas identified

o   Failure to demonstrate an appropriate level of professionalism

o   Patient care related lapse (grossing-related responsibilities)

These are critical areas fundamental to successful completion of your training.

### Plan of action

After discussions with you, Dr. Pessin[-Minsley] and [nonparty] Dr. Stimmel, we hope the following plan with help you overcome these deficits:

o   Meeting with the Program Director or, as needed, interim chair/chair or others in authority within the Department of Pathology, every 3-4 weeks for continued assessment and advisement

22

- o Continued performance of assigned resident duties under the guidance of Pathology Chief resident(s), Pathology faculty and/or Program Director

- o Self-Reflection exercise (to be handed in to me within 4 weeks) – You are expected to write down your account of the situation and describe how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance.

- o Reading exercise – You are expected to read the book entitled <u>Practicing excellence: A physician's manual to exceptional healthcare</u> [sic] by Stephen Beeson during the 3 month period of academic advisement (we can obtain a copy for you if necessary).

### Follow up

We will meet again in 3 months to review your progress. Your performance will be closely monitored for improvement in the areas of professionalism and patient care as outlined above. We expect that you will perform your duties in a manner that is professional, appropriate and non-threatening to others. We are hopeful that this plan of action will allow you to overcome the difficulties outlined and succeed in our training program.

We must make it clear, however, that if you are unable to improve your performance or if any future incidents involving poor professionalism recur, you may be subject to discipline up to and including termination from the Program.

(Docket #205-7 at 29-30.)

McCash was not placed on Academic Advisement. (Varughese 56.1 at ¶ 7.1.) He was, however, disciplined. Lento testified that, as was his "standard," he applied an "individualized" and informal approach to disciplining McCash for his role in the December 8 incident. (Lento Dep. at 28-31.) McCash's informal discipline required him to accept "training" from supervisors "about how to handle situations like [this one] better in the future." (Varughese 56.1 at ¶ 14.3; Defendants' 56.1 at ¶ 144.) Further, in the months that followed, HR "actively follow[ed] up with McCash regarding his wrongdoing, and he apologized" to several supervisors. (Varughese 56.1 at ¶ 23.1.)

Lento believed, however, that he needed to use a more "formal" approach to discipline with Varughese, because her behavior had been so extreme, and because less formal reprimands

23

had not been effective thus far at convincing her that her behavior had been inappropriate. (Lento Dep. at 28-31.)

When Lento informed Varughese that she was being placed on Academic Advisement on December 21, it seemed to him that she "lack[ed] insight into what happens and still blames others for what occurred." (*See* Lento Notes, dated December 21, 2010, Docket #205-7 at 30.)

And indeed, on December 23, 2010, Varughese sent a written response to the Notice of Academic Advisement contesting its version of events and identifying several "Problem areas. . .: (1) Public humiliation by Dr. McCash[;] (2) Potential immediate danger[;] (3) Possible retaliatory action to this complaint . . . (4) Negative consequences of this event on my health." (Docket #205-9 at 11, e-mail and attachment of Dec. 23, 2010.) Among the recipients of this communication was Associate Director of Graduate Medical Education Scott Barnett. After reading it, he wrote to Pessin-Minsley, expressing concern that, if Varughese's "allegations regarding Sam [McCash] are true, he may need to be counseled and placed on" Academic Advisement himself. (Docket #205-9 at 17, e-mail of Dec. 23, 2011 at 3:50 p.m.). Pessin-Minsley responded to Barnett based on her belief that none of Varughese's allegations were true:

I have witness documentation that there was no physician intimidation or abuse by Sam [McCash] . . . All accounts indicate that his response to Leena not following his direction was appropriate. He was firm, but not loud or physical. Leena's account seems to be a figment of her imagination or at the very least, a significant exaggeration.

(Docket #205-9 at 9, e-mail of Dec. 23, 2010 at 3:56 p.m.,) Pessin-Minsley's information came from Azar (the moonlighter) and Jordan. (Pessin-Minsley Dep. at 151-53.)

24

### Varughese Complains to HR

In addition to protesting her Academic Advisement within the Department, Varughese submitted substantially the same grievance to Human Resources. This caused Caryn Tiger-Paillex of HR to begin a second, independent investigation.

Tiger-Paillex first met with Varughese. At that meeting, Varughese expressed concern that McCash was, "going out of his way to micromanage [her]" and questioned whether it was "because he is a guy?" (Tiger-Paillex Dep. at 30-32, 38, 41.) This was the first and only indication that Varughese might have perceived McCash's behavior as motivated by her gender; even this was backhanded, though, since the statement literally indicates that Varughese correlated a negative behavior (micro-managing) with being a man.

During the meeting Varughese did not (1) allege that McCash treated other women or other people of Indian descent similarly, (2) allege that he treated men better or differently than he treated women, or (3) allege anything at all about her national origin.

Varughese testified that Lento began treating her coldly after she complained to HR. She alleges that, on January 10, 2011, Dr. Lento admonished Varughese for taking matters "outside the Department." (Varughese 56.1 at ¶ 35.1.) Varughese claims that this comment was part of a pattern of Lento's becoming progressively more "aggressive" toward her in person, but she does not identify any other acts that demonstrated this. (Varughese 56.1 at ¶ 37.2.)

### Varughese Fails to Fulfill the Requirements of the Academic Advisement

Varughese did not fulfill the terms of her Academic Advisement. Her self-reflection essay was due on January 18, 2011. She did not ask for an extension; she simply did not submit it. (Defendants' 56.1 at ¶ 35.)

25

While Varughese met with supervisors "three, four times" in the period of her Advisement (Varughese Dep. at 270-71), she did not meet with them each time she was required to do so. (Defendants' 56.1 at ¶ 37).

At her deposition, Varughese testified that she was excused from complying with the Advisement by virtue of complaining to the Department and to HR. (Varughese Dep. at 274.) No one ever told her that complaining excused compliance, and she never bothered to ask anyone whether the effect of her complaints was to lift the Advisement. (*Id.*) In fact, her complaint had no effect on her Advisement, which was part of the training component of her residency.

On January 19, 2011, the day after she was supposed to have submitted the self-reflection, Varughese told administrators that Lento was being hostile to her. Again, she ascribed that hostility to her negative review of Lento's rotation, not to retaliation for any protected activity. (*See* Notes entitled "LV – 1/19/11 – w/SB," Docket #205-9 at 32.)

On January 21, 2011, Varughese reported that someone had broken into her locked desk at work; she found a drawer that was normally locked was open; the lock was broken. (Docket #205-21 at 11, Jan. 21, 2011 e-mail from Varughese to Maniar.)

### Varughese Accuses McCash and Jordan of Drinking on the Job

In a January 24, 2011 meeting with Caryn Tiger-Paillex, Varughese injected a new issue into her complaints about McCash and Jordan: she accused them of drinking alcohol at work. (*See* Tiger-Paillex Notes of Jan. 24, 2011, Docket #205-7 at 5; *see also* Docket #205-10 at 2, e-mail of Apr. 25, 2011 (referencing Jan. 24 meeting as her first complaint on the subject).) Specifically, she accused McCash and Jordan of drinking Captain Morgan rum at work, "right before AP [anatomic pathology] call." (Tiger-Paillex Notes of Jan. 24, 2011, Docket #205-7 at 5.) Varughese also accused other residents of conducting happy hours on work premises in the evenings. (*Id.*)

26

There is some evidence that residents, including McCash, engaged in a social drinking activity called "dementia rounds," on hospital premises. (*See* Docket # 205-3 at 8-18: e-mail of Sept. 9, 2009 from McCash to Michael Mikulasovich; e-mail of Oct. 7, 2010 from McCash to fellow residents; e-mail of Nov. 4, 2010 from McCash to fellow residents; e-mail of Dec. 1, 2010 from McCash to fellow residents). In organizing what appear to be weekly or monthly "dementia rounds" – normally on a weeknight in a hospital conference room – various residents either offered to bring alcohol or asked others to do so, in the form of beer, wine, or simply "booze." (*See* Docket # 205-3 at 19, e-mail from Jessica French to other residents; *id.* at 20, e-mail of March 4, 2009; *id.* at 21, e-mail of August 3, 2010.) There is also some evidence that dementia rounds occurred during, and not merely after, residents' shifts. For example, McCash promised to come to one evening of dementia rounds as a way to "tak[e] a *break* from grossing," meaning analyzing patients' tissue samples. (Docket #205-3 at 16, e-mail of June 3, 2010 from McCash to other residents (emphasis added).) At his deposition, McCash denied ever having returned to work after drinking, and if McCash dropped in on a dementia round in mid-shift, that does not mean that he imbibed. Varughese testified that he did, but she did not explain how she knew this – whether she observed it personally, heard it from third parties, or simply inferred it from McCash's presence at an event. Whatever, simply having alcohol on hospital premises was at a minimum unwise and more than likely a violation of hospital protocol; it was not behavior that could or should be ignored.

27

The Physician Wellness Committee

After Varughese had been placed on Academic Advisement, and while the HR investigation into the December 8, 2010 incident was open, Interim Chair Pessin-Minsley referred her to the Physician Wellness Committee ("PWC").

The PWC is a hospital-wide resource that assists physicians suspected of being impaired for behavioral, psychiatric or physical reasons. (Defendants' 56.1 at ¶ 30.) Significantly for our purposes, if the PWC makes a request of any physician at Mount Sinai, immediate compliance is mandatory, on pain of termination.

Pessin-Minsley told Dr. Arthur Figur, the chair of the PWC's investigative arm, that she was making the referral because Varughese was "insubordinate, loses control, and shouts and screams when confronted with issues that she needs to address." (Figur Dep. at 24-25.)

Varughese alleges that the act of referring her to the PWC was a Kafka-esque attempt to humiliate and discredit her, even as she was managing thousands of cases for the hospital, caring for patients, and covering for other residents. (Varughese 56.1 at ¶¶ 30.2-30.3, 34.1.)

When the referral was made, Figur did something he has never done before or since – he investigated whether the referral to the PWC was itself appropriate. He did this, "Because the department was in turmoil." (Figur Dep. at 38.) He wanted to be sure that Varughese's behavior was appropriate for referral to the PWC, and that Varughese was not being made a casualty of departmental dysfunction. (*Id.*)

Figur conducted his own investigation of the events of December 8, interviewing more or less the same witnesses that the Department had interviewed and that HR was interviewing. He eventually concluded that McCash was "loud" with Varughese and "pressed the issue that she

28

should be responsible and perform her duties," but that Varughese had lost control entirely. (Figur Dep. at 43, 48.)

Figur did not investigate the earlier September incident "because having interviewed other people, they have had similar experiences with Dr. Varughese. And there were issues of lateness coming in, not calling in when she would not – was sick, at the appropriate times, not listening to other chief residents." (Figur Dep. at 48-50.) Such reports – of Varughese's lateness or absenteeism, and her failure to tell people where she was – pepper the record.

After conducting his own inquiry, Figur concluded that the referral was in fact appropriate. "We felt she had difficulties; we are here to help. And that it was not an administrative disciplinary type of issue, but something that could possibly be corrected." (Figur Dep. at 38.)

It took a long time to convince Varughese that she had no choice but to meet with the PWC; she failed to respond to messages and at first refused to cooperate with the referral. When she finally agreed, on pain of termination, she immediately gave the PWC cause for concern.

Because the PWC had reports that Varughese's behavior was erratic, Figur asked her to submit to a toxicology screen, which:

> was negative, but she wanted to drink an excessive amount of water. When [Figur] told her no, [he] took her over and the nurse at employees health would also refuse to give her more water and she admitted that she is on [certain] medications [including a sleep aid and possibly a stimulant] . . . I would then be very concerned and would mandate that she give us a prescription from her current treating [physician] who gave her these medications because I'm always concerned about self-medicating by physicians.

(Transcript of Internal Appeal at 242-244, Docket #205-31 at 68.) In other words, Varughese admitted that she was taking medications (which might well have been as unwise or inappropriate as participating in dementia rounds). Her desire for excessive amounts of water prior to screening is consistent with flushing any residue out of her system before the toxicology screen; the Court is

29

familiar with this gambit from criminal cases, where drug users use water to dilute evidence of drugs in their urine. Varughese's insistence on drinking lots of water while being screened for drugs was itself of concern to the PWC, and justifiably so.

It was standard for the PWC to refer physicians to the staff psychiatrist, and Figur thought it was particularly appropriate that Varughese see someone, because her "behavior at various times during the past was inappropriate. She lost control of herself. Not being a psychiatrist," Figur "put down the pattern of behavior . . . that she may have anger management issues, that she certainly does not deal [well] with authority." (Figur Dep. at 47.)

On April 11, 2011, Figur referred Varughese to a staff psychiatrist, Dr. Madeleine Fersh. In the referral, Figur explained to Fersh that:

> most [of Varughese's] workplace behavioral issues can be summarized as inappropriate outbursts . . . instead of collegial discussions . . . by not accepting the hierarchy of delegated authority. The presenting behavior: shouting, screaming, incoherent rants in the hallway in response to an admonishment by a chief resident . . . She did not admit to us that she was out of control although numerous unbiased witnesses agreed that she behaved in that manner. . . The outbursts are 'unpredictable' and over 70% of the time she is collegial.

(Docket #205-24 at 55.)

Varughese did eventually see Dr. Fersh, although she cancelled her first appointment, came

to the second at the last second and



30

 (This paragraph will be redacted from the published decision.)

### Jordan is Promoted to Chief Resident

By mid-February 2011, Lento had promoted Jordan to be the third acting Chief Resident. Varughese's summary judgment opposition papers allege – again, for the first time in this litigation – that Jordan's promotion over her was discriminatory, presumably because of her national origin, since Jordan, like Varughese, is a woman. (The reader will recall that one of the Chief Residents, Dr. Maniar, was a woman of Indian descent).

Jordan's promotion *was* unusual in one sense; she was only in her second year of residency. (*See* Docket #205-9 at 57, e-mail of Feb. 17, 2011 from attending physician Dr. Tamara Kalir to colleagues; Jordan Tr. at 14.) One professor found "the matter of bypassing seniors to be very troubling. It has hurt resident morale – significantly . . . Bypassing senior housestaff [i.e., residents] gives them the message that we don't believe in them. I feel very uncomfortable, not to mention a little embarrassed about this." (*Id.*)

However, Varughese does not explain why she was as or better qualified for the position than Jordan, and the undisputed evidence. The very fact that Varughese had difficulty dealing with colleagues, which is not in any genuine dispute, would appear to disqualify her from serious consideration. So would the fact that Varughese was on Academic Advisement, as well as the fact that she was resistant to being assessed by the PWC. Jordan suffered under none of these

---

[3] Varughese herself provided this document to the Court in a public filing. *See* Docket #205-24.

impediments. While Varughese points to difficulties Jordan had managing certain administrative responsibilities once she became a Chief Resident, she presents no evidence that Jordan had performance issues before the promotion.

There is no evidence that either Schiller (who allegedly referred to Varughese's national background in the early years of her residency) or McCash (whose e-mail referred to Varughese's "work ethnic") was involved in the decision-making process.

### Varughese Persists in Refusing to Fulfill the Terms of the Academic Advisement

On March 30, 2011, Varughese finally submitted the self-reflection essay that her Academic Advisement required. It was two and a half months late.

The reflection was hardly reflective. It is in fact highly defensive. It goes on for several pages about McCash's alleged wrongs. A representative sampling, beginning with the first words that appear in the reflection:

> I was verbally intimidated by Samuel McCash in a very aggressive and confrontational manner on September 12th 2010 . . . [after meeting with Lento about the September 12 incident], I believed that the evaluations which, were to be completely anonymous were not in fact anonymous, and realized or suspected that they may pose a threat to residents if anyone were to negatively evaluate a rotation . . .on December 8, 2010, there was a second incident with Samuel McCash, very much to my dismay . . . Samuel McCash became verbally abusive towards me . . . The next day, I sensed that there was much whispering and talking amongst the attendings and others regarding this event, and I felt humiliated and thoroughly distressed that I was in the midst of this situation . . . I feel that I have attempted to remedy these situations to the best of my ability by utilizing the appropriate authoritative channels and giving Drs. Pessin and Lento the benefit of the doubt but these have only led to what seems to be additional complaints and accusations (i.e. insubordination on 12/21/2010) to be launched against me, even after several months after these incidents . . . Samuel McCash has exhibited volatile, aggressive and dangerous behavior towards me twice already . . . However I now find that I have to defend myself from not only avoiding and preventing abusive behavior from Samuel McCash but also to defend myself from complaints of unprofessionalism at how I handled a difficult situation to blatantly false aaccusations of insubordination when presented with the Notice of Academic

32

Advisement . . . Despite these incidents, I have completed my assigned rotations without taking time off to deal with the traumatic and abusive nature of these incidents."

Toward the end of the essay, Varughese wrote that, "finally," she was "apologetic that I did not find a better way to navigate [the September and December] incidents." (Self-Reflection Essay 1, Docket #205-4 at 88.), but she did not admit to having done anything wrong, explain what she could have done differently, or express how she could have better handled the confrontations. (Defendants' 56.1 at ¶¶ 35-36.)

Significantly for this lawsuit, Varughese's document mentions nothing about discrimination and does not suggest that her race or gender figured into the incidents she was describing.

When Pessin-Minsley read the reflection, she was not pleased. She wrote to HR that the essay "was supposed to be [Varughese's] reflection on how SHE would have handled herself differently. . . Clearly she is incapable of any self-reflection." (Docket #205-9 at 25, e-mail of Mar. 30, 2011 at 3:42 p.m.) She also wrote that Varughese had "twisted all the events and much is blatantly not true," and complained that "both Dr. McCash and Dr. Lento (as well as [her]self) [were] being harassed and slandered." (Docket #205-9 at 25, e-mail of Mar. 30, 2011 at 2:58 p.m.)

During this time, Varughese alleges that the workplace environment was becoming unbearable for her. She alleges that Dr. Lento "was erratic and threatening" towards her (Varughese 56.1 at ¶ 18.3), and that McCash and Jordan "continued to harass" her and disrupt her work (id. at ¶ 18.1). She offers no evidence about specific instances or behaviors to support those conclusory assertions. And indeed, Varughese had no contact with McCash at all from and after December 8, 2010 – a fact that she admitted to Tiger-Paillex. (Varughese Dep. at 142.) So he could not possibly have been making life difficult for her during this period.

33

### HR Concludes its Investigation and Permanently Removes Varughese from McCash's Supervision

On April 5, 2011, Tiger-Paillex told Varughese that the investigation had concluded and that she would continue to report to Maniar, rather than to McCash. (Varughese Dep. at 131, 133.) Either at that meeting or on the phone shortly thereafter, Varughese told Tiger-Paillex that she had had no direct interaction with McCash since December 2010. (*Id.* at 142.)

On April 7, 2011, Varughese asked for a copy of Tiger-Paillex's written summary of her investigation. (Docket #205-9 at 13, e-mail of Apr. 7, 2011.) She also asked to "move on in my life. These continued investigations and interrogations have taken a toll on my physical and mental well-being. I find that I am relieving [sic] this event [sic] over and over again with each new interview, now nearly 4 months after the incident . . . Under NYC law, workplace harassment and retaliation are crimes." (*Id.*)

That same day, Varughese forwarded an e-mail regarding a proposed "dementia round" to an attending physician, Mary Fowkes, to "voice my concern" that people should not "drink and 'drive'," i.e., drink and return to work. (*See* Docket #205-3 at 13, e-mail of Apr. 7, 2011 from Varughese to Fowkes).

On April 11, 2011, HR sent Varughese a letter saying that it had been unable to substantiate her claim that McCash had engaged in inappropriate behavior on December 8, 2010. (Defendants' 56.1 at ¶ 23.) Nevertheless, HR confirmed that Varughese was to continue to report to Maniar, rather than McCash. (Defendants' 56.1 at ¶ 24.)

Of course, Maniar had been plaintiff's direct supervisor since December 8, and this had not solved any of Varughese's problems. As a supervisor, Maniar – an Indian woman, just like Varughese – was no more pleased with Varughese's professionalism than McCash had been. In her declaration, Maniar described Varughese as a problem employee who "would call out

34

unexpectedly and for multiple days and it would be difficult for me to find coverage." (Docket #163, Maniar Decl. at ¶ 8.) Maniar recalled one specific occasion on which Varughese said she would not be available to cover for another resident even before she knew what date the other resident would be absent. (*Id.*)

### Varughese Explicitly Complains About Gender Discrimination

On April 25, 2011, Varughese e-mailed the HR department, and, for the first time, explicitly asserted that McCash had discriminated against her because of her gender. (Defendants' 56.1 at ¶ 26). Her

> perception was and is that I am being threatened and berated by a male resident because I am a woman. I doubt that he would yell or attempt to physically intimidate a male resident . . . My complaint is that of being discriminated against by the male chief resident based on the fact that I am a woman . . .

(Docket #205-10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger-Paillex.) By the time she made this complaint, Varughese had long since ceased reporting to McCash; by her admission, she had had no dealings with McCash since December 8, 2010.[4]

Varughese's April 25, 2011 complaint also mentioned that Schiller had "said that there is something wrong with my DNA and asked me to see a therapist." (*id.*) This appears to refer to Varughese's discussion with Schiller in the fall of 2009, discussed above. (*See supra* at 9-10). Varughese did not suggest that this comment had anything to do with her race or gender.[5]

---

[4] In May 2011, after she made this complaint, Varughese was on rotation at the VA Hospital in the Bronx. (Varughese Dep. at 127-128.) McCash was also there. (*Id.*) There is no evidence that he had any supervisory authority over Varughese, and it is undisputed that he and Varughese were kept apart. (*Id.*) While Varughese reports that McCash "glared" at her or "stomped" around her workplace, she did not report this to anyone. (*Id.*)

[5] There is no evidence in the record that Schiller had any role in guiding the course of the Department's investigation of the December 8 incident. The record is also devoid of evidence that Schiller had any role in placing Varughese on Academic Advisement.

35

Finally, Varughese reported that she "had witnessed . . . McCash and . . . Jordan drinking . . . liquor at work at 5 pm . . . while still involved in patient care related duties, this situation was relayed to Dr. Figur and [departmental administrator] Paul Johnson at the second [PWC] interview." (Docket #205-10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger-Paillex.)

In response to Varughese's explicit complaint of discrimination on the basis of her sex, Tiger-Paillex of HR asked to meet with Varughese to discuss the matter further. Varughese refused; she thought that it would be a "waste of time." (Varughese Dep. at 177-79).

### Varughese is Given a Fresh Start

On April 1, 2011, Dr. Carlos Cordon-Cardo joined Mount Sinai as Chair of the Department of Pathology, taking over from Interim Chair Pessin-Minsley. (Final Warning Letter, Docket #205-7 at 33.) He had never before interacted with Varughese; he had no involvement in her Advisement.

Cordon-Cardo turned his attention to Varughese one month into his tenure. He met with her on May 3, 2011 to follow up on her original Academic Advisement. He told her that he wanted to give her a fresh start with him – a chance to rewrite the self-reflection and otherwise complete the terms of the Advisement, which she had thus far failed to complete. (Defendants' 56.1 at ¶ 40.)

Varughese surreptitiously taped that meeting; she has submitted both a copy of the audiorecording and a transcript. (*See* Docket #205-24, beginning at 13.) The conversation began with Lento asking Varughese whether she had read the book on professionalism she was required to read as part of her Academic Advisement. (*Id.* at 14-15.) She claimed to have read the book, but could not recall the name of its author or any of its content beyond its title. (Docket #205-24 at 5.) It was obvious to Lento – and to anyone who has listened to the tape – that she was not

36

truthful when she said she had read the book, and indeed, at her depositrion, she admitted to having lost, not one, but two copies of it. (Varughese Dep. at 281-82.)

The tape reveals that Varughese evaded questions with further questions. (Docket 205-24, Transcript at 6, 8). When Lento admonished her for rolling her eyes after Lento commented that she had "some anger issues regarding what happened," she neither apologized nor denied what she had done, but said, "Let's just ignore that." (*Id.* at 6, 8.) Even as her supervisors tried to focus her on how she would handle conflict in the future, Varughese kept rehashing the December 8, 2010 incident. (*See, e.g., id.* at 19.) She repeatedly interrupted her supervisors. (*See, e.g., id.* at 3, 14, 22, 23, 31.) To a listener, she does not come across well.

And still the hospital tried to work with her. An administrator who was present asked Varughese to rewrite her self-reflection, actually read the book and come back in two weeks. (*Id.* at 29.)

> If you can complete these processes and actually do them in the right way not just, okay, I'll read the book, you know, go through the motions. Actually do it the right way and come back to us in two weeks and say yes, I reflected, this is how I could have handled it differently. Really try and look at it from a different perspective. Not just go through the motions. I understand it's an exercise that probably nobody would want to go through, but this is where we are right now and how we're going to address it . . . Give us an essay that . . . to put aside all of these things and to be creative . . . forward thinking.

(*Id.* at 29, 32.)

Varughese was supposed to submit the revised reflection prior to the May 24 follow-up meeting and no later than May 23, 2011. (Final Warning Letter, Docket #205-7 at 33.)

## Varughese Again Complains about Drinking in the Hospital

On May 5, 2011, two days after their first meeting, Varughese e-mailed Cordon-Cardo with a host of complaints. (*See* Docket #205-24 at 47-48, e-mail of May 5, 2011 from Varughese

to Cordon-Cardo.) She reiterated her complaint that McCash had discriminated against her because of her sex, and also complained for the first time about retaliation: "It has become apparent to me that the [disciplinary] actions taken thus far have been in retaliation to my complaints of harassment. . . " (*Id.* at 48.) Varughese also characterized Lento's treatment of her as "unfair," but in contrast to her accusation that McCash's behavior was "based on gender bias," she did not ascribe that unfair treatment to discrimination or to retaliation. (*Id.*)

Varughese also revisited the topic of McCash and Jordan's drinking. This time, she said "'dementia rounds' . . . had never been an issue" (Docket #205-24 at 44, e-mail of May 5, 2011 from Varughese to Cordon-Cardo.) – an odd thing for her to say, since dementia rounds was exactly what she had been complaining about. Instead, she complained that McCash and Jordan had been drinking while "involved with patient care duties on several evenings including November 23 [2010]." (*Id.*)

This allegation led to yet another internal investigation – conducted in part by Figur of the PWC. The investigation turned up a bottle of Captain Morgan rum on hospital premises. Without finally concluding who brought it, administrators immediately sent a hospital-wide e-mail forbidding anyone from bringing alcohol to work or drinking on hospital grounds. (*See* Johnson Dep. at 133-35.)

### The Second Essay

Rather than submit her second self-reflection essay by the May 23 deadline, as instructed, Varughese submitted her second essay at the May 24 follow-up meeting. (Defendants' 56.1 at ¶¶ 44-45.)

38

The second essay was, if possible, less "reflective" than the first. Varughese complained that Defendants' request that she re-write the essay was itself retaliatory. She asserted that, even though she had "apologized for anything that I had done that was not perceived as positive or professional by Dr. Lento . . . I had not done anything except defend myself in a difficult situation." (Self-Reflection Essay #2, Docket #205-10 at 8.) She continued to dispute Defendants' version of events on December 8, 2010, accused others of being "unprofessional," unreasonable and "retaliatory," and "stand by my decision[s]" thus far. (*Id.*) There is no suggestion in the essay that Varughese ever did anything inappropriate or that she could have done anything differently. (*See id.*) Rather, reflecting her refusal or inability to understand why she was on Academic Advisement, Varughese stated, "I have been professional throughout." (*Id.* at 9.)

Varughese alleges that, at the May 24, 2011 meeting, Cordon-Cordo instructed her to stop complaining about doctors drinking on the job. (Varughese 56.1 at ¶ 42.1). A verbatim transcript of that meeting and the tape show Dr. Cordon-Cardo telling her that "the best way. . . to move on is not with this attitude. You can come here with another attitude and to say. . . I'm going to drop all of this nonsense of people drinking . . ." (Docket #205-24 at 40.) Varughese interrupts him to say that those are important matters "that need to be addressed," and Cordon-Cardo responds

We are addressing these people. . .we are taking these matters very seriously today. We . . . have a lot of work to to do . . . but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems . . .You can't keep going back and forth . . . coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking and to be honest with you . . .

39

(*id.* at 40-41.) At that point Varughese interrupted her supervisor with a long rambling speech about matters far afield from her conduct in issue. (*Id.*)[6]

The tape of the May 24, 2011 follow-up meeting is otherwise at variance with Varughese's account that she never engaged in unprofessional behavior. (*See* Docket #205-24, beginning at 32.) The conversation begins with Varughese alternately speaking indiscernibly and swearing. (*See id.* at 33.) In response to the question "How are you?" Varughese launches into the following:

> this is rather silly given that I've already written a reflection . . . and I apologized for whatever I had done [no apology is reflected in the transcripts of the May 3, 2011 or the May 24, 2011 meetings] . . . I even changed my mind as to how I feel regarding everything, but . . . You're retaliating against me for making a complaint. . . Yeah. I already said I apologized. . . Every single time there's a meeting there's something. And I'm supposed to go back and reflect. . . What's happened has happened and that's that.

(*Id.* at 32-33.)

Varughese characterized her first essay as describing what she could have done differently in that it describes what she *did*. She appeared not to comprehend that she was supposed to identify things she should not have done or things did *not* do that she could and perhaps should have done. (*Id.* at 35-36.)

The essay ends with an apology, "if I . . . offended anyone else in any way, shape or form."

(*Id.* at 40.)

---

[6] It begins, "Well, we need some honesty and transparency then because, you know, you can't just have one person, you know, saying whatever they want and doing whatever they want, such as on the moonlighting nights - I'm the primary moonlighter, really, then why does the schedule say somebody else is the primary moonlighter? You know, these are issues like, you need to address, like if you are going to have integrity you're going to have integrity across the board, if not, you're not." (*Id.*) It goes on for another paragraph in the transcript.

40

Varughese's Job Performance Continues to be Problematic

During May and June 2011, Varughese alleges that she was still actively working on various rotations, analyzing patients' slides for diagnosis, teaching medical students, and otherwise doing her job. (Varughese 56.1 at ¶ 43.2.)

Her supervisors did not see it that way. In the hours following the morning meeting of May 24, 2011, Chief Resident Elizabeth Morency (an African American woman) wrote to Cordon-Cardo regarding "the ongoing problems we have been having with Leena Varughese." (Docket #205-24 at 71-72, e-mail of May 24, 2011 from Elizabeth Morency to Cordon-Cardo.) She described Varughese's getting into arguments with Physicians' Assistants ("P.A.s"), in which she demanded that those P.A.s do more of her work in the grossing room. (*Id.*) "These disagreements have been escalating in the past couple of days and I had to stop grossing myself to help diffuse a disagreement between [a P.A.] and Leena this afternoon . . . that was witnessed by several other residents and was completely unfounded." (*Id.*) After the argument, Morency related that Varughese left early, leaving work undone. (*Id.*) At her deposition, Morency testified that Varughese, "raised her voice and w[as] disproportionally angry to the situation at hand and . . . [was] not calm and it was over grossing a specimen. It just seemed over the top." (Morency Dep. at 54.)

While Cordon-Cardo explained that Varughese had had a stressful morning (i.e. meeting with him), Morency went on that this was "just one example of an issue that has come up in the past couple of weeks." (*Id.* at 72.) She asked for a meeting "to discuss Leena's increasingly erratic behavior and her future in our program. I am becoming increasingly concerned, not only for [Varughese's] well-being, but for the well-being and morale of the other residents and PAs that are also affected by her behavior." (*Id.*)

41

After her outbursts, Lento asked several people to help Varughese with her work so that she could get "back on track." (*See* Docket #205-24 at 82-83, e-mail chain of May 26, 2011.) It seemed to work; with assistance, one supervisor found Varughese to have shown "SIGNIFICANT improvement." (Docket #205-24 at 93, e-mail of Jun. 2, 2011 from Kalir to Lento.)

Nevertheless, Varughese continued to have difficulties through June 2011. To be fair, she was not the only one; several people in Varughese's program were behind in their work. A white female resident had "about 15 cases from the middle to end of May that ha[d] yet to be signed out. Last week [a male resident of Asian descent] had 6 placentas that were 3 weeks late." (Docket #205-11 at 17, e-mail of Jun. 10, 2011 from Jordan to Lento, Bleiweiss and Morency) Jordan was having trouble completing her responsibilities – a supervisor had to "ask[] her to let [the supervisor] know when she is required elsewhere, so we can try and make provisions in her absence." (Docket #205-11 at 18, e-mail of Jun. 13, 2011 from Kalir to Lento.)

Varughese's issues, however, were more intractable than others'. (*See* Tiger-Paillex Dep. at 105-106.) At some point in June, Cordon-Cardo asked whether they could hold Varughese accountable for failing to make certain data entries. (*Id.*) Tiger-Paillex asked whether others had the same issue and were going to be held accountable as well. (*Id.*) In the end, Tiger-Paillex concluded that Varughese was in a different situation from the othr residents, because she submitted her data entries later than everyone else. (*Id.* at 109.)

### Varughese Retains Counsel

On June 10, 2011, Varughese's newly-retained counsel wrote a letter to Tiger-Paillex, advising her "that this firm has been retained . . . to prosecute claims of sex/gender discrimination, perceived disability discrimination, and retaliation in violation of the [sic] Title VII . . . the

42

[NYSHRL] and the [NYCHRL]. . . during [Varughese's] employment . . . her supervisor Samuel

McCash verbally and physically intimidated her . . ." and referencing Varughese's April complaint

as the first time she had complained about gender discrimination. (*See* Docket #205-10 at 12.)

It is worth noting that counsel did not advance any race discrimination claim.

Counsel demanded a response by July 6, 2011, failing which it would take legal action.

(*Id.*) The record does not contain any evidence of a response directed to counsel.

<u>Final Warning and the Supervision of Defendant Firpo</u>

The Department issued Varughese a Final Warning letter on July 15, 2011. (Docket #205-

7 at 32 (it is dated July 1, 2011, but Varughese actually received it on July 15).) The Warning

was:

> To inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic Advisement and your behavior at the follow up meeting on May 24, 2011.
>
> The Academic Advisement required you:
>
> (1) To prepare a written self-reflection by January 18, 2011
> (2) To meet with [Lento] periodically to assess your progress
> (3) To read [the book]
>
> Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection . . . long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were 'really swamped' that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.
>
> Although the Academic Advisement required a self-reflection on 'how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance,' your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician

43

professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior, a failure to understand the role of physician professionalism – regardless of how others behave – or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we 'need' to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported 'miscommunication,' you made no effort to contact me – your supervisor – to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon-Cardo . . . was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon-Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting . . . When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon-Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him [Varughese disputes this fact], and continued to be flippant and disrespectful throughout this meeting.

During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

44

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. [It provides an address to which to send the request.] If you do not appeal this action, it will become final at the end of the appeal period.

(Docket #205-7 at 32-34.)

Varughese did not appeal the Final Warning.

Firpo, the doctor with whom she would now be required to meet, was new to the institution. Once again, Varughese had a chance to make a fresh start.

Varughese's Performance Problems in August 2011

When Varughese began a two-week rotation in the Cytogenetics lab in August 2011, she allegedly caused "the worst teaching experience" in the thirty-year career of her supervisor, Dr. Vesna Najfeld. (Najfeld Decl., Docket #164 at ¶ 19). Najfeld is a woman; the record does not reveal her race or national origin.

Some of the underlying facts are contested, but Varughese does not dispute that she could not be reached when she was supposed to be available, and that she refused to provide coverage for her colleagues even when she was available to do so. (Najfeld Decl., Docket #164 at ¶ 17; Varughese Dep. at 465.) Varughese used her blackberry while Najfeld was teaching (Varughese says she was taking notes), but when Najfeld asked that Varughese stop using the blackberry, Varughese admits that she disobeyed. (Varughese Dep. at 417.)

Varughese failed to complete some assignments in that rotation (Najfeld Decl., Docket #164 at ¶ 16), and performed poorly on others. The straw that broke the camel's back for Najfeld was one particular assignment: Varughese was told to make a presentation to her colleagues and other physicians on a particular form of leukemia. Najfeld told plaintiff to provide her with the slides for the presentation in advance, so she could review them. Varughese waited until 4 p.m. on

45

the day before the scheduled presentation to e-mail the slides to Najfeld. (*Id.* at ¶¶ 4-12). Najfeld

e-mailed her back five minutes later that there were "major problems" with the presentation, asking

that Varughese call her "a.s.a.p." (*Id.*) But Varughese did not check her e-mail before leaving

campus, so she did not see Najfeld's response, until she got home (an hour away from the hospital),

where she could do nothing to fix her presentation. (Varughese Dep. at 380-84.)

When she finally called Najfeld, Varughese was directed to "Please send an e-mail that the

conference will not be held." (*Id.*) Varughese took that to mean that she should e-mail Najfeld to

confirm that she would not be presenting. But that was silly; Najfeld already knew the conference

would not be held, because she had decided to cancel it. Najfeld obviously wanted Varughese to

e-mail the attendees of the conference to ensure that no one would show up for a presentation that

had been cancelled. (*Id.* at 392.) Needless to say, Varughese did not notify other conference

attendees of the cancellation; as a result, people showed up for the canceled conference early the

next morning when they need not have shown up at all. (Defendants' 56.1 at ¶ 62.)

At her deposition, Varughese blamed everything on Najfeld. She complained that Najfeld

should have called or paged Varughese in addition to e-mailing her. (*Id.* at 384.) Varughese also

claimed to be "shock[ed]" that Najfeld did not "explain herself" in the first email by giving reasons

as to why the presentation was inadequate, rather than asking Varughese to call her. (*Id.*)

During the same period, Varughese was insubordinate towards now-Chief Resident Jordan.

On August 4, 2011, Varughese refused a coverage assignment. She claimed to be injured, but

refused to provide a doctor's note. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 37.)

On August 12, 2011, Varughese ignored page after page from Jordan and Lento. (Termination

Letter of Sept. 21, 2011, Docket #205-7 at 38.) Ultimately, Lento was able to reach her only by

46

calling Najfeld and asking Najfeld to bring Varughese to the phone so that he could speak with her. (*Id.*) Although Lento instructed Varughese to contact Jordan, she did not do so. (*Id.*)

At her deposition, Varughese admitted that, when Jordan asked her to confirm that she would provide coverage on that day, she did not respond, saying it was because she "did not have time." (Varughese Dep. at 465-66.) She also complained that asking her to confirm coverage was "outrageous," "a travesty" and "harassment." (*Id.*)

At her deposition, Varughese maintained that her behavior during the rotation with Najfeld was completely professional, and that she had done nothing untoward. (Varughese Dep. at 625-26.)

### Transfer Request

Scheduling residents' various rotations was no small feat, requiring complex coordination among multiple departments. The schedule depended in part on residents' requests. Residents were responsible for ensuring that they had sufficiently broad and deep experience to graduate in a timely fashion.

For her October 2011 rotation, Varughese initially requested a rotation in GI Pathology. She apparently submitted this request before a July cut-off date. (The reader will recall that July was the beginning of Mount Sinai's academic year.)

The overall schedule was then finalized.

After the schedule was finalized, Varughese changed her mind. She asked instead to be allowed to do a Dermatophatology rotation. She spoke to Firpo about her request, and he said he would see what he could do.

Firpo did follow up for Varughese, but the request required Firpo to go through several steps, including assessing its "possible impact on the existing schedule." (Jul. 13, 2011 e-mail from

47

Firpo to Morency, Jordan et al., Docket #205-17 at 19-20.) Even in July, Firpo described the
request as "very late and [thus] . . . in violation of the established policy." (*Id.* at 20.) Then again,
Firpo described Varughese's request as having a "minor impact on the overall program" to a
supervisor in the rotation that Varughese wanted to switch into, and that supervisor in return wrote
to Firpo that Varughese would be welcome in the rotation. (E-mail Chain of Aug. 4, 2011 and
Aug. 9, 2011, Docket #205-28 at 3.)

Apparently, there were more problems with scheduling than Firpo anticipated in August.
Varughese's scheduled roration "coincided with necessary coverage. . . and alternative coverage
could not be identified." (Termination Letter of Sept. 21, 2011, Docket #205-7 at 38.) While Firpo
apparently went to bat for Varughese and tried to get her a scheduling change, it was too late to
get another resident to cover Varughese's scheduled rotation, and a first-year resident's illness and
associated absence made scheduling even tighter. (*See* e-mail chain of Aug. 24, 2011, Docket
#205-27 at 171.) Moreover, while Varughese apparently told Firpo that another resident, Mabel
Ko, had agreed to switch rotations with her, Ko denied that that she had agreed to the switch – she
had already completed the rotation that Varughese wanted her to cover. (*See* Ko e-mail to Firpo of
Sept. 7, 2011, Docket #167-1 at 3.)

According to Firpo, when he told Varughese on September 7, 2011, that her transfer request
had been denied, she became irate and accusatory, and continued to complain and seek a rotation
change through late September. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 38-39.)
No matter what Firpo told her, Varughese went to others to renew her transfer request, fired off
several e-mails, and complained to Associate Director of Graduate Medical Education Scott
Barnett at a September 12, 2011 meeting. (*See* Transcript of Sept. 12, 2011 Conversation, Docket
#205-28 at 35.)

48

### Varughese's Poor Record of Attendance and Failures at Remediation

In August 2011, Varughese was notified that she was failing to meet the hospital's attendance requirement for educational conferences. (Defendants' 56.1 at ¶¶ 91-92.) The hospital required residents to be present at 80% of weekly conferences on different subjects relevant to their chosen discipline. Firpo had told Varughese that she should attend conferences that interested her. Varughese claims to have understood this to mean that she only need attend 80% of the conferences that interested her, rather than attending 80% of all conferences, with her choices of what to eliminate being guided by her interests. (Varughese Dep. at 495.)

In keeping with the Pathology Department's policy for residents who fell behind in conference attendance, Morency told Varughese on August 29, 2011, that plaintiff would have to present a lecture at the conference scheduled for September 14, 2011. (Defendants' 56.1 at ¶ 93.)

From then on, it appeared to Morency that Varughese "just seemed increasingly agitated, and, to some degree, unstable and unpredictable." (Morency Dep. at 51.) These impressions came from Morency's observations of Varughese getting into "altercations" "in the residents' room, in the gross room[; Varughese] just didn't seem to get along with people in general." (*Id.* at 65.) By September 2011, Morency wrote to her supervisors that simply having Varughese around was "emotionally taxing." (*Id.* at 167.) At her deposition, she explained that, "having to deal with a resident who continually is unprofessional, unreliable, erratic at best, can be emotionally taxing when nothing is being done about it." (*Id.*)

On September 12, 2011, Varughese met with Scott Barnett, the Associate Director of Graduate Medical Education to complain about her treatment and ask for the same transfer that Firpo had already told her would not be granted. Varughese told Barnett, in essence, that everyone

49

who had ever criticized her had been wrong and unfair. (*See generally* Transcript of Sept. 12, 2011 conversation, Docket #205-28 at 35-112.) She ascribed the unfairness to petty politicking rather than to discrimination. And she continued with her fixation on the December 8 incident, which she would not view as closed until the Hospital came around to her point of view about what had occurred. For example, she complained that her relationship with Lento had deteriorated after she gave Lento a negative evaluation. Lento "wouldn't discuss the whole incident [the December 8 incident] with Sam. And [Lento]'s like, oh, I'll speak to [McCash]. And then [Lento] said, oh, well, you know, that's too bad because why would you write a diatribe of an evaluation against surgical pathology rotation here?" (*Id.* at 82.)

While they were discussing her two inadequate self-reflective essays, Varughese alleges that Barnett asked "how dare you write that shit?" (Varughese 56.1 at ¶ 34.1.) The tape of that conversation – and its transcript – reveals that her memory is not accurate. (*See* Docket #205-28 at 35-112.) In fact, Barnett said this about Varughese's self-reflections:

> If one of my kids were to read that, I would have screamed at them, how dare you write that? How dare you write that? It was one-sided. It was not an attempt in any way to address the program's concern[] . . . It was a rehashing of issues that they were trying to put behind you. And it was not – my mind that was not a good faith attempt to do what they were asking you to do. And, basically, you got pissed off and you just threw some shit against the wall and hoped it would stick. That's what it was.

(Transcribed Conversation of Sept. 12, 2011 at 58, Docket #205-28 at 64.)

On September 13, the day before her scheduled presentation, Varughese called in sick. That afternoon, she had a conversation with Jordan about the next day's scheduled presentation. When told that she really did have to present at a make-up conference, Varughese responded that she did not "feel well, won't be able to present tomorrow." Jordan, hoping to avoid a repeat of the cancelled Najfeld conference, notified others who were supposed to be in attendance that

50

Varughese would "be out sick tomorrow." Varughese took great offense at this, emailing Jordan, "Why are you stating that I will be calling out tomorrow?" (*See* Docket #205-29 at 30-32, e-mail chain of Sept. 13, 2011.). Jordan was unnerved by Varughese's response, especially as plaintiff did in fact call in sick on September 14, 2011. (Docket #205-29 at 80, e-mail of Sept. 14, 2011.) (Defendants' 56.1 at ¶¶ 95-96.) Jordan e-mailed Firpo to say that she was "terrified to be at work right now" and was "afraid that at any moment [Varughese] will lash out at me or worse, hurt me or the residents around me." (Docket #205-29 at 51, e-mail of Sept. 14, 2011.)

The cancelled conference was rescheduled for September 15. The program instructed Varughese to provide proof that she had in fact been sick on September 13 and 14, the days when she had called in sick. She failed to provide any proof. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 39.) Varughese does not contend otherwise, but alleges that unidentified "others" were not required to bring doctors' notes for absences. (*See* Varughese 56.1 at ¶¶ 74.1-74.3.) There appears to be some disagreement among Mount Sinai's witnesses about the hospital's policy on providing doctor's notes to confirm illness,[7] but whatever the policy in the ordinary course, it is undisputed that Varughese failed to comply with a direct order from a supervisor. Furthermore, the fact that she was still on Academic Advisement, and that she called out sick on a day when she was required to make a presentation – itself a make-up for a presentation for her

---

[7] Jordan testified that a doctor's note was required whenever an absence prevented a resident from fulfilling a departmental requirement *or* whenever the resident is out for three or more days (Jordan Dep. at 162); Morency testified that a note was not required unless the absence was longer than three days. (*See* Transcript of Internal Appeal at 158, Docket #205-31 at 47.) Specifically, Morency was asked whether she ever asked Varughese "for proof of illness since her absences precluded her from fulfilling a task?" She answers "No, because the policy is you have to miss three consecutive days and she only missed two, so I didn't ask her." (*Id.*)

51

previous failures to attend educational conferences – place her is a different category than a resident who had no special professional obligations on a day when she called in sick.

### Varughese Fails to Make Her Presentation and Inquires About Taking FMLA Leave

Varughese did come to work on September 15, but she arrived late to the conference and she did not make her presentation. She stayed for fifteen minutes, left without giving her lecture, and did not return until everyone else had gone. (Defendants' 56.1 at ¶ 97.)

Bleiweiss, who was at the conference that morning, could not "recall ever having a[nother] situation where someone who was scheduled to present just simply walked out without saying a word, without any explanation or apology." (Bleiweiss Dep. at 90.)

Varughese has offered two excuses for her absence at various times. At her administrative appeal following her termination from the residency program, she said that she "never agreed" to give the lecture. (Transcript of Internal Appeal at 160-61, Docket #205-31 at 47.) At her deposition, she claimed that she had had a stomach virus. (Varughese Dep. at 540.)

On the afternoon of September 15, Firpo and Patel met with Varughese to discuss her latest vanishing act. Varughese raised the issue of taking FMLA leave. According to Firpo, Varughese told Firpo she felt overwhelmed and unable to concentrate or do any work. (Defendants' 56.1 at ¶¶ 99-101.) Patel thought Varughese "didn't seem like herself . . . depressed, kind of . . . out of it." (Patel Dep. at 68.) Varughese told Patel that "she didn't feel like herself, and she didn't feel like she could perform the tasks at hand." (Patel Dep. at 70.)

Varughese actually contends that this meeting did not occur, and now claims that she had no such concerns about her health or ability to work. (Varughese 56.1 at ¶ 100.4-100.5.) She

52

admits, however, that she asked about the possibility of taking FMLA leave and that Patel discussed the issue with her. (Defendants' 56.1 at ¶¶ 102-104.)

At the end of the day on September 15, Varughese told Firpo that she wanted to continue working until she could be assessed by a doctor. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 39.) She said that she had a doctor's appointment the next day. (*Id.*)

In view of her behavior over the preceding few days, Varughese's suggestion was not acceptable to the Hospital. On September 16, Firpo e-mailed Varughese and directed her not return to work until the issue of FMLA leave was resolved. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 39.)

Over the next few days, administrators repeatedly tried to contact Varughese to ask about her health and also to inquire whether she would be making a formal request to take FMLA leave. Varughese did not respond to any of these inquiries.

Varughese disregarded Firpo's written directive not to come to work; she came to work on September 16 and 19. (Defendants' 56.1 at ¶106.) She felt free to ignore a direct order not to come in because she was dissatisfied with the Hospital's reason for telling her to stay home:

> because it was completely opposite of the day before and I did not know what the – what the issue was here. It was not really explained to me. . . It seems very irregular.
>
> Q. Whether it was irregular, whether you understood why, I take it you understood that he told you not to come back to work.
>
> A: Well, I'm a contracted employee. He has to provide me with a logical explanation as to why.

(Varughese Dep. at 563-64.)

### Varughese Rifles Through an Administrator's Files

53

On September 20, 2011, Varughese – in defiance of two direct orders from her supervisors (one to provide a doctor's note and one to remain at home until the leave issue, which she had raised, was resolved) – decided to report for work. She stopped into a Starbucks on her way to work. (*See* Termination Letter of Sept. 21, 2011, Docket #205-7 at 40.) Administrator Shema Patel (a woman of Indian descent, like Varughese) and her husband happened to be there. Varughese alleges that Patel was stalking her on behalf of the Hospital: her Rule 56.1 Statement says, "The Defendant Institution utilized Patel to confront me and stalk me because she was a woman of Indian descent, and I cannot ascribe Patel's presence at Starbucks on 96th and Lexington as an innocent coincidence with her husband in tow." (Varughese 56.1 at ¶ 107.1). Varughese offers no evidence to suggest that Patel had any way of knowing that Varughese would be in the Starbucks at 96th and Lexington at that precise moment, or otherwise to support this wholly conclusory allegation; Patel was deposed when Varughese still had counsel. Not surprisingly, counsel did not raise or otherwise explore Varughese's current stalking theory, but Patel simply testified that she was at the Starbucks with her husband when Varughese approached her. (Patel Dep. at 96.)

Patel knew that Varughese was not supposed to be at work until she provided a doctor's note. When Varughese said she was on her way to the hospital, Patel told Varughese to come to her office. (Defendants' 56.1 at ¶¶ 107-109.)

Shortly after they arrived, Patel was called away. She left Varughese alone in her office. (Defendants' 56.1 at ¶¶ 113.) When Patel returned, she saw Varughese looking through a file on her desk labeled "Pathology." (Defendants' 56.1 at ¶ 114). When the supervisor told Varughese the files were confidential and asked her to explain herself, Varughese asked, "What's the big deal?" and told her to "chill out." (Defendants' 56.1 at ¶¶ 115-116.)

At her deposition, Varughese admitted (reluctantly, and only after repeated questioning) that she had in fact looked at a file on Patel's desk while Patel was absent from the room:

Q. Were there files on Ms. Patel's desk?

A. No, there were no files.

Q. Was there anything on Ms. Patel's desk?

A. There was one folder, I believe.

Q. And while Ms. Patel was out of the office did you look through that folder?

A. I picked it up, but I didn't really look through it.

Q. Did you open it?

A. Yes.

Q. Did you look through the pages?

A. Yes.

(Varughese Dep. at 581-82.) While admitting what she did, Varughese tried to minimize her conduct at deposition and currently characterizes what she did as a "mistake." She claims to have believed that the folder was her own. (Varughese 56.1 at ¶ 113-115.)

Varughese was then shepherded into Tiger-Paillex' office. She recorded the ensuing conversation and the Court has heard the tape. After talking through the still unresolved leave issue and making sure Varughese knew she would have to see the PWC again, Tiger-Paillex asked Varughese what had happened in Patel's office. Plaintiff refused to respond, saying, "I don't have anything to say about that." Varughese then accused Patel of simply "assuming" that Varughese had snooped into her files; when Tiger-Paillex told Varughese that there was no assumption, that Patel personally observed Varughese looking through the file – "there is a witness and [Patel] is the witness – Varughese told Tiger-Paillex that Patel should not have left someone alone in her

55

office if confidential files were in the office. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 40-41.) Once again, the problem was of someone else's making, not hers.

No other resident has been caught rifling through an administrator's confidential files. (Cordon-Cardo Dep. at 220.)

### Varughese's Termination from the Residency Program

Varughese was summarily terminated the next day.

Varughese was handed a termination letter (Docket #205-7, beginning at 36). It explained that the Hospital was terminating her: "because your performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients." (*Id.*) The letter referred to the behavior recounted in the July 1 Final Warning and then went on to say, "[S]ince the final warning was issued, you have continued to demonstrate unprofessional behavior." (*Id.*) The next four pages recount the various performance and professionalism issues that had arisen in just the previous six weeks. (*Id.* at 37-40.)

The letter concluded by noting that Varughese had "exercised extremely poor judgment in accessing Ms. Patel's file [and] lied several times when questioned about it." (*Id.* at 40.)

### Internal Appeal to the House Staff Affairs Committee

As was her right, Varughese appealed her termination to the Mount Sinai School of Medicine House Staff Affairs Committee (the "Staff Affairs Committee") within ten days of receiving the termination letter.

56

Under Hospital rules, Varughese was permitted to review which Committee members would hear her appeal and to ask that members be removed from her panel. She challenged several members and they were removed from the panel at her request. (Varughese Dep. at 639-40.)

The Staff Affairs Committee held an appeal hearing regarding Varughese's termination on November 14, 2011. (*See generally*, Transcript of Internal Appeal at 284, Docket #205-31 at 7-94.) It heard sworn testimony from seven physicians and three administrators, including Varughese. Varughese had the opportunity to cross-examine all witnesses, to present her own witnesses, to submit exhibits, and to make opening and closing statements. She was permitted to bring a friend with her, a practicing pathologist at a different hospital. While a lawyer for the hospital was present, Dr. Firpo, not counsel, presented the Department's case.

At the hearing, Varughese steadfastly maintained that she had done nothing wrong. Regarding her self-reflection essays, she testified that, "the reflection does accurately reflect what happened" on December 8, and also said it "accurately reflected with appropriate amount of insight [sic]." (*Id.* at 78.) She argued that her "defensive tone" was "necessitated" by "the actions taken against me instead of some acknowledgment and mediation." (*Id.*)

This defensiveness continued at the hearing. For example, Varughese cross-examined Jordan about why Jordan had forwarded Varughese's e-mail that Varughese would be out on the morning of September 13, 2011, asking: "Why did you state I was not presenting? I mean why did you state that I would not come into work?" (*Id.* at 43.) Then, in a comment addressed to the panel hearing her appeal, Varughese complained that Jordan "calls out sick for me on my behalf, how rude and obnoxious is that?" (*Id.* at 144), and, addressing Jordan, "Do you think you're warranted to call out for me?. . . To make a statement for me on my behalf, as the Chief Resident?" (*Id.* at 145.)

57

Regarding her decision to defy instructions to stay home until a doctor declared her fit for duty, she acknowledged that several supervisors and HR representatives "all sent me e-mails, left voice mails and so on stating that their sentiment regarding my right to be at work is that I do not have the right to be at work." (*Id.* at 84.) Nevertheless, "In this particular circumstance [she] felt the best course of action for me was to follow hospital policy and be present at work." (*Id.*)

On the question of opening Ms. Patel's files, she alleged neither that it was a mistake (as she does in her sworn submissions to the Court, *see* Varughese 56.1 at ¶ 111.2), nor that she thought the file was her own (as she did at her deposition, *see supra*), but rather that "as I waited there, there was a folder on her desk next to where I placed my coffee which I leafed through with no ulterior motive." (Docket #205-31 at 85.) Given the opportunity to cross-examine Patel at the hearing, Varughese asked her whether it was "appropriate" to leave people alone in her office "when you have confidential documentation or documents in your office." (*Id.* at 60.) She went on to state that, when Patel came back into the office and admonished her for looking through the file, "I was once again bewildered by the incongruency of the situation," (*Id.* at 85) – "incongruency" that she obviously did not believe was her fault.

When Varughese said that she wanted to conclude the hearing, she was asked if she had "any objection to the proceedings that took place today, anything that – the conduct of this hearing that you want to put on the record?" (*Id.* at 91.) She responded "no." (*Id.*)[8]

The Staff Affairs Committee issued its post-hearing decision on December 2, 2011. (Defendants' 56.1 at ¶¶ 118-121; Letter of Dec. 2, 2011, Docket #205-7 at 43). It found "that there

---

[8] Varughese's claim that the Staff Affairs Committee was a kangaroo court (*see* Varughese 56.1, *passim*), must be assessed in light of her contemporaneous refusal to put any objection to the conduct of the proceedings when those objections could have been addressed.

58

is ample evidence to demonstrate that the [termination] . . . was not arbitrary and capricious."

(Findings and Conclusions of the Staff Affairs Committee, Docket #205-7 at 46.)

It found that the "underlying facts" set forth in the September 21, 2011 Termination letter

were clearly established by the Department with testimony and documentary evidence. For example, Dr. Vesna Najfeld . . . testified . . . and confirmed . . . facts . . . including Dr. Varughese's inadequate responses concerning her case conference presentation, her absenteeism, and her unprofessional interactions with faculty and staff . . . Dr. Jordan . . . and Dr. Lento . . . testified to the facts set forth in the September 21, 2011 letter concerning coverage . . . Lento, in particular, described a pattern of non-responsiveness to emails and pages that he sent to Dr. Varughese . . . ("One of the difficulties that I have had with Leena is she virtually never responded to my pages and infrequently responded to my e-mails.") . . .

The Committee finds Dr. Varughese's presentation unpersuasive. She took issue with virtually every witness who testified and in some instances questioned their authority to make the decisions they did. Yet the testimony and evidence clearly demonstrate a continuing pattern of unprofessional conduct in the face of a final warning that put her on notice that further incidents of unprofessional conduct could lead to her dismissal. It is clear to the Committee that Dr. Varughese lacks insight into her behavior and her role as a resident in the Department as evidenced by the extensive testimony and documents presented to the Committee. Indeed, at the conclusion of the hearing, *Dr. Rocco, one of the two residents on the Committee, asked Dr. Varughese: 'Do you take responsibility or do you feel remorse involving any of the things that you've talked about . . . ? . . Dr. Varughese's response was argumentative and she never acknowledged responsibility for any of the events as to which there was ample testimony and evidence.*

It is also clear from the testimony and other evidence that the Department gave Dr. Varughese multiple opportunities to correct her behavior and to become a constructive part of the Department's residency program . . . Unfortunately . . . Dr. Varughese's lack of insight into her behavior was such that she was unable to make the constructive changes to her behavior needed to fulfill her responsibilities . . .

In sum . . . based on the testimony and evidence presented, the Committee unanimously finds and concludes that the Department's actions to suspend and terminate Dr. Varughese from the Pathology Residency Program were clearly supported by the testimony and other evidence.

(*Id.* at 48-50 (emphasis added).)

Internal Appeal to Mount Sinai's Appeal Committee

Varughese took another appeal, to Mount Sinai's Appeal Committee. (*See* Defendants'

56.1 at ¶¶ 122-124.) The Appeal Committee was made up of three senior faculty members,

including the Chief Medical Officer and Senior Vice President for Medical Affairs. (*Id.*)

On March 7, 2012, the Appeal Committee upheld the Staff Affairs Committee's

determination. (*See* Letter and Decision of Mar. 7, 2012, Docket #205-8.)

The Committee emphasized that *any* impairment of a Pathology resident can present a

significant danger to patients. In its final determination upholding Varughese's termination,

Mount Sinai's Appeal Committee wrote that:

> The Pathology Department at Mount Sinai is the largest in any single comparable
> academic institution in New York City. Pathology residents are given a great deal
> of responsibility. Though attending physicians supervise residents, the need for
> skilled performances by residents cannot be overemphasized. . . A physician who .
> . . displays physical signs of impairment to a degree that others fear for the
> physician's wellness . . . clearly should not be charged with such critical
> responsibilities.

(Final Appeal Decision, Docket #205-8 at 11.)

The Appeal Committee reviewed the transcript of Varughese's initial hearing and all of the

exhibits submitted. On the basis of that review, it found fault with Varughese's behavior outright.

For example, it found that Varughese "was argumentative with Dr. Jordan . . . [and] unwilling[] to

accept instructions from those in positions of authority;" and that she "intentionally ignored . . .

instructions." (Docket #205-8 at 7.) It explained why Varughese's radio silence in response to

coverage requests was so problematic, and why her refusal to acknowledge wrongdoing regarding

that issue was so baffling:

> Dr. Varughese's claim that her lack of response [to a request for coverage] signified
> that she affirmatively agreed to cover and that she did not have to respond to emails
> that simply stated facts is incomprehensible. Dr. Jordan could, under no
> circumstances, make an assumption that Dr. Varughese would cover surgical
> service and patient safety and care would be preserved. Patient care could not be

60

left to supposition. The chaos that resulted from Dr. Varughese's inaction is clear from the numerous emails.

(*Id.* at 8.) The Appeal Committee further found that Varughese tried to "subvert[] Dr.s Lento and Firpo" by repeatedly going to others to try to get a rotation change (*id.* at 8), and that these actions were "insubordinate." (*Id.*) It found Varughese's communications to Jordan and Morency regarding the remedial presentation to be "argumentative" and to have "challeng[ed] the authority of her Chief Residents." (*Id.* at 9.) Varughese's "continued insistence that Dr. Firpo exempted her from the 80% conference attendance policy, her refusal to adhere to departmental attendance policy, her failure to respond to and recognize the authority of her chief Residents, her refusal to present on a[] topic from a list selected by her Chief Residents, and her departure from the September 15 conference without presenting or saying a word to anyone . . . among other actions, clearly indigate that Dr. Varughese has an issue with authority and an inability to abide by the rules." (*Id.* at 9-10.) Regarding Varughese's behavior on September 15, "Varughese herself admitted at the time that she was unable to work and indicated that she may need to take a leave. The fact that she lacked and continues to lack insight that her impairment could have posed a risk to others in the work environment, including patients, is extremely problematic." (*Id.* at 11.) It found that Varughese's blaming Patel for leaving her alone with confidential files "showed that [Varughese] continued to fail to grasp the inherent wrongness of her actions." (*Id.* at 12.)

In sum, the Appeal Committee, which reviews Staff Affairs Committee findings to ensure that they have a "reasonable basis," found that there was indeed a reasonable basis for the Staff Affairs Committee's finding that firing Varughese was neither arbitrary nor capricious. (*Id.* at 13-14.)

Mount Sinai subsequently gave Varughese a final "summative evaluation," a standard document within the world of graduate medical education, which marked her as "unsatisfactory"

in three of six categories (professionalism, interpersonal and communication skills, and patient care). She was assessed as not ready to practice without supervision. The document stated that Varughese had been promising in her first two years but that, in her third, her supervisors had found her performance to be "substandard" "unprofessional" and "unsatisfactory." (Docket #162-6 at 39-40.)

There is no evidence whatever that the final summative evaluation was ever provided to anyone except Varughese herself. There is absolutely no evidence that Mount Sinai ever provided it to any potential employer. It was shown to a witness, Dr. Fyfe of Robert Wood Johnson Hospital, at a deposition in this case.

### Varughese's Job Search

Meanwhile, Varughese – armed with support from Mount Sinai attending Tamara Kalir – had been looking for other employment. She actually secured an offer from Robert Wood Johnson Hospital ("RWJ") in New Jersey on January 31, 2012. (Varughese 56.1 at ¶ 1.4.) That offer was contingent on Mount Sinai's verification of certain records. A Dr. Fyfe of RWJ contacted Lento to request them. The administrative appeals were still pending, so Lento explained that he was unable to provide RWJ with any documentation at that time, because Varughese had "legal proceedings" ongoing with the hospital.

By the time Varughese's appeal concluded in March 2012, RWJ had hired another candidate. Dr. Fyfe considered the person hired to be less academically qualified than Varughese

At her deposition, Dr. Fyfe testified that she still might have offered Varughese the job, even if she received a bad report from Mount Sinai. In light of Dr. Kalir's recommendation, Dr. Fyfe thought further investigation would have been required. "In looking at [the summative

62

evaluation for the first time at her deposition], I know that my first response would have been to try to get a little bit more information . . . any specifics. These are general . . . I would like . . . to try to find out more of what was actually going on." (Fyfe Dep. at 48-49.)

The interim chair of RWJ's Department of Pathology and Laboratory Medicine, a Dr. Cadoff, only recalls that, "there were some kind of discussions because there was a reason that Dr. Varughese was leaving Mount Sinai that had to do with something at Mount Sinai. That's as much as I knew at the time." (Cadoff Dep. at 22.)

Varughese filed this lawsuit on December 4, 2012.

## III. The Complaint

Varughese's Second Amended Complaint (Docket #66) includes 21 counts.

Varughese alleges that Defendants discriminated against her on account of her sex and her race and/or national origin in Counts 1, 2, 5, 6, 9, 10 and 18. These counts invoke the New York City Human Rights Law, New York State Human Rights Law, Title VII, and § 1981.

Varughese alleges that she suffered a hostile work environment on account of her race and gender in counts 3, 7, 11 and 18. They invoke Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.

Varughese alleges that Defendants subjected her to retaliation for protected complaints about discrimination in counts 4, 8, 12 and 18. Those counts invoke Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.

In count 17, Varughese alleges a violation of the New York State healthcare whistleblower law.

Counts 15 and 16 accuse the Defendants of breaching their employment contract with Varughese and also violating the implied covenant of good faith and fair dealing.

63

Counts 13 and 14 allege that Defendants tortiously interfered with Varughese's offer of employment from RWJ Hospital, and that the summative evaluation Defendants issued is defamatory.

Count 19 alleges violations of the Family and Medical Leave Act ("F.M.L.A.").

Count 21 pursues individual liability for all of the foregoing against individual defendants Lento, Cordon-Cardo, Firpo and Bleiweiss.

Varughese voluntarily dismissed Count 20, a claim for intentional infliction of emotional distress, after Judge Francis told her she would have to submit to a psychiatric evaluation in order to pursue it.

## IV. The Motion for a Summary Judgment is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18 (Gender and Race/National Origin Discrimination under Title VII, the NYCHRL, the NYHRL, and 42 U.S.C. § 1981).

Varughese argues that Mount Sinai and the individual defendants – Lento, Cordon-Cardo, Firpo and Bleiweiss – subjected her to disparate treatment on the basis of her gender and Indian ancestry during the nine-month period from December 2010 to her termination on September 21, 2011.

Discrimination claims brought under Title VII, § 1981, the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") all are analyzed under the burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216-17 (2d Cir. 2005) (applying *McDonnell Douglass* to NYSHRL and NYCHRL discrimination claims).

That framework requires a plaintiff to establish a *prima facie* case of discrimination. *Holcomb*, 521 F.3d at 138. To do so, the plaintiff must submit evidence that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802). "The burden of establishing a *prima facie* case is not onerous, and has frequently been described as minimal." *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997).

After a *prima facie* case is established, a presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Holcomb*, 521 F.3d at 138.

Once the defendant provides such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks and citations omitted), *superseded on other grounds by* N.Y.C. Local L. No. 85.

A plaintiff who establishes both a *prima facie* discrimination case and pretext must still, in order to survive summary judgment, demonstrate that she can meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her." *Schnabel v. Abramson*, 232 F.3d 83, 90-91 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

While the *McDonnell Douglass* burden-shifting framework applies to all of Varughese's claims, her discrimination claims under the NYCHRL, *i.e.* counts 9 and 10, "must be reviewed independently from and more liberally than their federal and state counterparts" in light of the

65

local statute's "uniquely broad and remedial' purposes." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66-69 (1st Dep't 2009)). There is thus a "one way ratchet" at work, under which "interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall." *Id.*

The NYCHRL's uniquely broad and remedial purpose requires courts to construe the statute "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York*, 16 N.Y.3d 472, 477–478 (N.Y. 2011); *see also* Administrative Code § 8–130. In doing so, courts have noted two differences between the NYCHRL and its state and federal counterparts that bear mentioning at the outset.

First, to make out a *prima facie* case under state or federal law, the plaintiff must submit proof that she "endure[d] a 'materially adverse change' in the terms and conditions of her employment." *Galabya v. NYC Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 446 (2d Cir. 1999).

> To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d at 136. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

*Id.* (internal quotations and citations omitted).

By contrast, the NYCHRL does not require that the offending employment action be "materially adverse." *See, e.g.*, *Williams*, 872 N.Y.S. 2d at 34 (holding there is no material adversity requirement for a retaliation claim under the NYCHRL); *Margherita v. FedEx Exp.*, No. 07 CV 4826, 2011 WL 5024577, at *8 (E.D.N.Y. Oct. 20, 2011) (no material adversity requirement

for a discrimination claim under the NYCHRL). Rather, "In order to make out the [adverse action] prong of a *prima facie* case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Williams v. Regus Mgmt. Group, LLC,* 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011) (describing development of NYCHRL case law since legislation removed the materiality requirement from the NYCHRL's adverse action prong in 2005).

Second, the NYCHRL places a burden with the defendant that rests with the plaintiff under state and federal law. Under state and federal law, a plaintiff may pursue a "mixed-motive" theory that discriminatory animus was "a motivating factor" in the adverse action, rather than its but-for cause. *See Univ. of Texas Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2526 (2013) (recounting the evolving jurisprudence of Title VII's causation requirement). Under a mixed-motive theory, a plaintiff may

> obtain declaratory relief, attorney's fees and costs, and some forms of injunctive relief based solely on proof that race, color, religion, sex, or nationality was a motivating factor in the employment action; but the employer's proof that it would still have taken the same employment action [in the absence of the impermissible motivating factor] would save [the employer] from monetary damages and a reinstatement order.

*Id.*

Under federal and state law, plaintiffs pursuing this "mixed-motive" theory must have particularly strong evidence of discriminatory animus. "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173-74 (2d Cir. 2006) (internal citation omitted).

Under the NYCHRL, however, it is not plaintiffs who must show their proof deserves a mixed-motive analysis, but defendants who must show that the proof precludes mixed motive

67

liability. Claims under the NYCHRL should be dismissed at the summary judgment stage "only if the *defendant* demonstrates that it is entitled to summary judgment under both" the *McDonnell Douglas* analysis and also the "mixed motive" analysis. *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 113 (N.Y. App. Div. 1st Dep't 2012) (citing *Albunio*, 16 N.Y.3d at 477-78) (emphasis added).

Notwithstanding these important analytical differences, the state courts have cautioned that "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Lytle v. JPMorgan Chase*, No. 08 Civ. 9503, 2012 WL 393008, at *19 (S.D.N.Y. Feb. 8, 2012) *report and recommendation adopted sub nom. Lytle v. JP Morgan Chase*, No. 08 CIV. 9503 DAB, 2012 WL 1079964 (S.D.N.Y. Mar. 30, 2012) *aff'd*, 518 F. App'x 49 (2d Cir. 2013) (quoting *Williams*, 2011 WL 6073560, at *6 (quotation marks and citations omitted)). Thus, "The mere fact that [plaintiff] may disagree with her employer's actions or think that her behavior was justified does not raise an inference of pretext." *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 121 (1st Dep't 2012). So too, for a plaintiff to raise an inference of discrimination through comparative analysis, the NYCHRL requires the plaintiff to show that she is "similarly situated in all material respects" to the coworker to whom she compares herself. *Shah v. Wilco Systems, Inc.*, 27 A.D.3d 169, 169 (N.Y. App. Div. 1st Dep't 2005)

Moreover, "a plaintiff must still link the adverse employment action to a discriminatory motivation" to withstand summary judgment on her NYCHRL claim. *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012) *aff'd*, 713 F.3d 163 (2d Cir. 2013) (citing *Williams*, 872 N.Y.S.2d at 34–35). "Where a plaintiff cannot do so, her claims fail." *Id.*

68

That is, local law mirrors state and federal law in that "the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff," *Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO*, 6 N.Y.3d 265, 271 (N.Y. 2006).

Construed liberally, Varughese's papers suggest eight separate instances of discrimination in violation of the NYCHRL, the NYSHRL, Title VII and § 1981:

(1) The July 2010 failure to promote Varughese to Chief Resident, rather than McCash;

(2) The December 2010 altercation with McCash;

(3) The December 21, 2010 Academic Advisement;

(4) The January 2011 failure to promote Varughese to Chief Resident, rather than Jordan;

(5) The Winter 2011 Referral to the PWC

(6) The July 15, 2011 Final Warning

(7) The August-September 2011 Denial of Transfer

(8) The September 21, 2011 Termination

Varughese argues that each of these actions was individually discriminatory, and that all of them collectively contributed to a hostile work environment, which is itself a form of discrimination.

Again, Title VII, the NYSHRL and § 1981 (which I shall refer to collectively as "state and federal anti-discrimination laws") are all subject to the same *McDonnell Douglas* analysis. *Ruiz*, 609 F.3d at 491.

Varughese's NYCHRL claims, however, must be analyzed under the more lenient modification of the *McDonnell Douglas* burden shifting analysis set forth above.

### Failure to Promote Varughese to Chief Resident

Varughese argues that she has a claim for discriminatory failure to promote her to the position of Chief Resident, both when McCash took the position in July 2010 and again when

69

Jordan was promoted in January 2011. The former implicates both sex and national origin discrimination, the latter only national origin discrimination.

This specific allegation is not asserted in the complaint – in fact, the first time it has come up during this lawsuit, at least in the court's memory, is in Varughese's response to the Defendants' motion for summary judgment. No one has provided Varughese's administrative charge to the Court, so I have no idea whether the charge was administratively exhausted. No one has analyzed this issue, so I assume that it was; otherwise, any challenge to administrative exhaustion appears to have been waived.

In any event, the hospital is entitled to summary judgment on the merits.

To make out a *prima facie* case of discriminatory failure to promote, a plaintiff

ordinarily must demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

*Yu v. New York City Hous. Dev. Corp.*, 494 F. App'x 122, 124-25 (2d Cir. 2012) (citing *Estate of Hamilton v. City of New York*, 627 F.3d 50, 55 (2d Cir.2010) (applying NYCHRL) (internal citation and quotations omitted). "Of course, the fourth element is also established if the employer fills the position with 'a person outside the protected class who was similarly or less qualified than' the plaintiff." *Id.* at n.4 (citing *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010).

Varughese fails to make out a *prima facie* case, because she offers no evidence that Defendants filled the position with "a person outside the protected class *who was similarly or less qualified* than" Varughese was. *See id.* She alleges in conclusory fashion that McCash was less qualified than she was, but she provides the Court with no actual evidence to support that assertion. I have been provided no evidence whatever of McCash's evaluations, nor his performance before his July 2010 promotion to Chief Resident. It is impossible to draw an inference of discrimination

70

in a failure to promote claim where the available evidence provides no foundation for comparison between the plaintiff and the person promoted. *See Sareen v. Port Auth. of N.Y. & N.J.*, No. 12 Civ. 2823 (PAE), 2013 WL 6588435, at \*9 (S.D.N.Y. Dec. 16, 2013) (granting summary judgment where plaintiff "[did] not offer any evidence on which to assess [the allegedly similarly situated employee's] qualifications"). Varughese's personal opinion about McCash's qualifications is irrelevant.[9]

Moreover, it is not clear that Varughese can make the requisite showing under the second prong of a *prima facie* case of failure to promote. Normally, a specific application is required to satisfy the second element of such a claim. *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004). A narrow exception to this requirement, exists, however, where a plaintiff can

> demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.

*E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 846 (S.D.N.Y. 2013) (analyzing claim brought under Title VII, the NYSHRL, and the NYCHRL) (internal quotation and citation omitted).

Varughese has made no such showing with respect to the Chief Resident position. It does not appear to have been posted; rather, it appears to have been offered at regular intervals. But Varughese has not even alleged – let alone offered evidence – that she lacked knowledge of the position; nor has she testified that she ever expressed any interest in it. Indeed, the record suggests that one of Varughese's colleagues turned down the Chief Resident position before it was offered to Jordan. I cannot simply assume that anyone offered the job would have taken it.

---

[9] I cannot fault the Hospital for failing to make records available if it did not do so, since this claim has arisen at the last possible moment, long after the close of discovery.

71

Even under the NYCHRL, failure to express interest in a promotion or otherwise invoke an exception like the ones above is fatal to a failure to promote claim. *Henry v. Metro. Transp. Auth.*, No. 07 CIV. 3561 DAB, 2014 WL 4783014, at \*15 (S.D.N.Y. Sept. 25, 2014) (failure to submit proof of interest in the position or proof that others were promoted without expressing interest fatal to the *prima facie* case under the NYCHRL).

Finally, assuming arguendo that Varughese had made out a *prima facie* case on this point, Defendants would still prevail on their motion, because no evidence in the record suggest that the failure to promote her was occasioned by her gender or her race/national origin. Indeed, her assertion is particularly weak because McCash was not the only person promoted to Chief Resident in July 2010. Kruti Maniar, a woman of Indian descent, was also promoted; they were named co-chief residents. When a woman of Indian descent got the job instead of plaintiff, no reasonable trier of fact could possibly conclude, that Varughese lost out because of her gender or her national origin.

At the third *McDonnell Douglas* stage, it is not enough for the plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class." *Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250, 2010 WL 1372686, at \*8 (S.D.N.Y. Mar. 30, 2010) (citing *Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." (internal quotations omitted)); *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir. 2001)). That logical fallacy is also insufficient to sustain plaintiff's claim under § 1981 for national origin discrimination. *See Kantrowitz v. Uniondale Union Free Sch. Dist.*, 822 F. Supp. 2d 196, 215

(E.D.N.Y. 2011) ("employment discrimination claims brought pursuant to Sections 1981 and 1983 are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*" (internal citations omitted)). The NYCHRL must of course be interpreted as liberally as is "reasonably possible," but even under that statute, acceding to the logical fallacy of *post hoc ergo propter hoc* is not reasonable.

Varughese's summary judgment papers also argue that Defendants' failure to promote her to Chief Resident in January 2011 was a discriminatory adverse act. Again, this claim is raised for the first time in her opposition to the motion for summary judgment.

This claim is slightly different from Varughese's other failure-to-promote claim, because we know at least one way in which Jordan's and Varughese's qualifications differed in a manner favorable to plaintiff: Jordan was only in her second year of residency, while Varughese was in her third. At least one member of Mount Sinai's Pathology staff, attending physician Tamara Kalir, questioned the propriety of promoting Jordan over more senior residents, of whom Varughese was one.

However, Varughese has again failed to make out the second prong of a *prima facie* case even under the NYCHRL. That is, she submits no testimony that she was interested in the position or would have accepted it had it been offered.

Assuming arguendo that she did make out a *prima facie* case, she also fails at the third step in the *McDonnell Douglas* analysis: there is no evidence that Jordan was promoted over Varughese in circumstances giving rise to an inference that national origin was any part of the motivation. As noted above, one of the (now) three Chief Residents was an Indian woman, so Mount Sinai had plainly established a willingness to promote someone who belonged to both of plaintiff's protected classes. There is no evidence that any person involved in the decision to promote Jordan had ever

73

expressed any bias toward Varughese or anyone else on the basis of national origin. Gender, of course, is irrelevant where Jordan's promotion is concerned. [10] Finally, at the time Jordan was promoted, Varughese was on an Academic Advisement (with which she was not cooperating), was the subject of numerous complaints and had been referred to the PWC. There is no evidence that Jordan labored under similar constraints.[11] Under those circumstances, no reasonable trier of fact could find that the promotion of Jordan ahead of Varughese was the product of discrimination, in whole or in part.

Defendants' motion for summary judgment dismissing Counts 1, 2, 5, 6 and 18 is GRANTED insofar as addressed to plaintiff's assertion that the failure to promote her was discriminatory.

### December 8, 2010 Incident with McCash

Varughese's first claim of gender discrimination was her statement to HR in April 2011 that McCash would not have acted the way he did on December 8, 2010 – yelling at her and moving toward her in a way she found threatening (though she makes no claim that McCash touched her) – but for her gender. She has added a claim that the December 8 incident was motivated by racism in the course of this lawsuit.

---

[10] Lento appears to have been responsible for Jordan's selection as Chief Resident. Varughese submits only her own conclusory assertions of bias as against him. There is no evidence that McCash had anything to do with the decision, and Schiller was no longer acting as Chair.

[11] These facts could also demonstrate that Varughese failed to meet her burden, at McDonnell-Douglas Stage One, of proving, as part of her prima facie case, that she was qualified for the position. It really does not matter, however, whether one analyzes this as a Stage One or a Stage Three issue: there were significant differences between Jordan and Varughese that easily overcame her lesser experience.

74

Under federal and New York State antidiscrimination laws, "yelling at an employee . . . does not amount to an adverse action." *E.E.O.C. v. Bloomberg, L.P.*, 967 F. Supp. 2d 816, 873 (S.D.N.Y. 2013) (citing *Sekyere v. City of N.Y.*, No. 05 Civ. 7192, 2009 WL 773311, at *3 (S.D.N.Y. Mar. 18, 2009)). Therefore, Defendants are entitled to summary judgment dismissing Counts 1, 2, 5, 6, and 18 insofar as those counts relate to the December 8, 2010 incident.

As I have explained, the NYCHRL has a more lenient definition of what constitutes an "adverse action" for purposes of establishing a *prima facie* case of discrimination than federal law has. Judge Gleeson has explained that, "A plaintiff who is treated worse, in a nontrivial way, because of [her race or gender] is subject to an adverse employment action for purposes of the CHRL." *Forgione v. City of New York*, No. 11-CV-5248, 2012 WL 4049832, at *6 (E.D.N.Y. Sept. 13, 2012). In *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 78-79 (N.Y. App. Div. 1st Dep't 2009), the New York Appellate Division, First Department, held that "a focus on unequal treatment based on gender regardless of whether the conduct is 'tangible' (like hiring or firing) or not—is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute." Thus, many acts that would not constitute "adverse actions" under federal law have been held to suffice under the NYCHRL. *See Kellman v. Metro. Transp. Auth.*, No. 07 Civ. 3561, 2014 WL 1243698 (S.D.N.Y. Mar. 26, 2014) (denial of training constituted an adverse action under the NYCHRL even though it did not affect plaintiff's wages or chances of promotion); *Williams*, 836 F. Supp. 2d at 175–76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); *see also Forgione v. City of New York*, No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept. 13, 2012) (holding that defendants' referral of plaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely

trivial" under NYCHRL); *Sotomayor v. City of New York,* 862 F. Supp. 2d 226, 255, 257–58 (E.D.N.Y.2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

However, the NYCHRL, like Title VII, is not a "general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013). Thus, one state court found that the NYCHRL's "adverse action" requirement was not met even where an employer "(i) told [plaintiff] that his "medicine was wrong"; [and] (ii) made fun of his accent." *Hanna v. New York Hotel Trades Council*, 18 Misc. 3d 436, 440-41 (Sup. Ct. 2007). The state trial court found that, "Although making fun of an employee's accent is offensive and inappropriate, it does not constitute an adverse employment action [under the NYCHRL]." *Id.*

Varughese has not managed to make out a *prima facie* case, even under the extremely lenient standard of the City Human Rights Law. A single instance of being addressed publicly in an inappropriate fashion (assuming that yelling at a subordinate is always inappropriate) does not rise to the level of being "treated worse in a non-trivial way" – especially in light of the hospital's immediate corrective action of removing Varughese from McCash's supservision.[12]

---

[12] One might ask whether the hospital's immediate corrective action is enough to save it from liability under the NYCHRL. After all, it immediately removed Varughese from McCash's supervision and separated them moving forward. The answer is no, at least in the context of sexual harassment. *See Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 477, 928 N.E.2d 1035, 1037-38 (2010). In *Zakrzewska*, the state high court returned to the language of the city statute to find that "the affirmative defense to employer liability articulated in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) [does not] apply to sexual harassment and retaliation claims under section 8–107 of the New York City Administrative Code." *Id.* (answering certified question from the Second Circuit in the negative). Of course, there is no Faragher-Ellerth defense under federal law to claims of discrimination, as opposed to harassment/retaliation CHECK; the pertinence of the Hospital's action is that the employer did not discriminat

However, even if Varughese were able to make out a *prima facie* case under city law, her claim still would fail.

Defendants articulate a legitimate and non-discriminatory reason for McCash's behavior: Varughese earned his ire by disobeying a direct instruction from a supervisor. The burden thus shifts back to Varughese to prove both (1) pretext; and (2) that the real reason McCash yelled at her was her membership in a protected class.

To prove pretext, Varughese (1) claims that no clear instruction was given as to the need for her to do the work; and (2) points to some direct evidence of McCash having a discriminatory bias against her: his December 8, 2010 complaint regarding her "work ethnic."

There is no genuine issue of fact as to the first of these issues. The slides in question came from a Dr. Goldfarb, and that doctor had a standing instruction that the resident on duty, not a moonlighter, was to examine all of his breast slides. Varughese was the duty resident; Azar was a moonlighter. Varughese, like all residents, was charged with knowing about standing orders from doctors and obeying them. She offers no evidence to the contrary. Therefore, the issue is not whether McCash was sufficiently specific; he did not need to be, because no resident, not even the Chief Resident, could countermand Dr. Goldfarb.

As to the second: rather than discussing this issue in the context of a *prima facie* case, where the plaintiff's burden is light, I will skip to the third *McDonnell Douglas* step – where I conclude that there is simply no genuine issue of fact as to the question whether discriminatory animus motivated McCash on December 8, 2010. Drawing all inferences in Varughese's favor,

---

no reasonable trier of fact could possibly conclude that McCash yelled at Varughese because she was a woman or because she was of Indian descent.

This is not a close question.

The only evidence offered by Varughese to show that there was any discriminatory animus behind McCash's behavior on December 8, 2010 is the "n" in "work ethnic" in McCash's e-mail. I must draw all *reasonable* inferences in Varughese's favor, but the only *reasonable* inference here is that McCash made a very unfortunate typo. His lengthy e-mail is rendered offensive by the insertion of a single letter. The Court has reviewed *many* e-mails from McCash, to Varughese and to others, and this is the only one with any language that is even arguably discriminatory. There is no reference at all to Varughese's gender in the e-mail, and when she complained of McCash's behavior, she believed it to be motivated by her sex. There is no evidence in the record that McCash ever said or did anything derisivie about persons of Indian ancestry; indeed, the record reveals no instance in which he so much as commented about anyone's ancestry.

Furthermore, McCash sent this particular e-mail to numerous recipients, including Shabnam Jaffer, a woman of Indian descent who was an attending physician *and his supervisor*. Without some other evidence, there is no reason to believe that McCash decided to do something that might amount to professional suicide by uttering a slur that would have tended to be offensive to someone who shared membership in Varughese's protected classes. (Incredibly, McCash was not asked about this e-mail at his deposition by either side, and Defendants did not submit any declaration from him except one explaining that he is Filipino, so we have no way of knowing what he would say about it).

Moreover, McCash's conduct on December 8 is colored by the history he shared with Varughese: they had a difficult relationship. There had been a confrontation between them in

78

September, and she was repeatedly insubordinate to him. "Mere personality conflicts must not be mistaken for unlawful discrimination." *Taylor v. New York Univ. Med. Ctr.*, 871 N.Y.S.2d 568, 571-72 (N.Y. App. Term 1st Dep't 2008).

There is no evidence that McCash had any problems working with other women, other people of Indian descent, or with women who were also of Indian descent. There certainly is no evidence that he had any problems with his co-Chief Resident, a woman of Indian descent; she has averred that he was never discriminatory toward anyone. The only fair inference is that McCash had a problem with Varughese – the same problem lots of other people had.

In short, no reasonable jury could find by a preponderance of the evidence that discriminatory animus, whether based on race or gender, was behind McCash's loss of temper. So even under city law, the claim that this outburst was an instance of either gender-based or national origin-based discrimination must be dismissed.

### The December 21, 2010 Academic Advisement

Varughese alleges that Defendants placed her on Academic Advisement on account of her sex and her race.

I assume without deciding that an Academic Advisement could constitute an adverse employment action under city, state and federal law. This is not immediately apparent under federal and state law. *See Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) ("courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."); *Uddin v. City of N.Y.,* 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (quotation omitted); *see also Weeks v. New York State,* 273 F.3d 76, 86 (2d Cir. 2001) ("It

79

hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds, National R.R. Passenger Co. v. Morgan*, 536 U.S. 101, 122 (2002).

On the question whether Defendants have offered a legitimate, non-discriminatory reason for that Advisement, Judge Cote's analysis in *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441 (S.D.N.Y. 2012), *aff'd sub nom. Nolley v. Swiss Reinsurance Am. Holding Corp.*, 523 F. App'x 53 (2d Cir. 2013), a case brought under the same suite of city, state and federal anti-discrimination laws at issue here, is instructive. The employer placed Nolley on a "Performance Improvement Plan" ("PIP") after customers complained that Nolley was aggressive and confrontational. The PIP required Nolley to improve his professionalism, or else. When he did not improve, but rather, reacted to the PIP with yet more hostility and aggressively confronted his superior, he was terminated. Once in court, Mr. Nolley contested the truth of the customer complaints but could not dispute that they had in fact been made – that customers had deemed his conduct offensive and unprofessional. The fact of the complaints alone was enough to constitute a legitimate, non-discriminatory justification that satisfied the employer's burden at the second stage of the *McDonnell Douglas* analysis – even if, as Nolley insisted, the complaints were entirely unwarranted.

So too here. Defendants received multiple reports that Varughese was erratic and disruptive. Administrators received reports that Varughese lost the faculty of cogent speech on December 8, 2010, that she accosted Jordan on December 10, 2010, and that she refused to address her own role in the December 8 fracas. They also heard that she had been insubordinate to McCash, ignoring a clear instruction to do certain work herself, which instruction was grounded

80

in a general need to cut costs and also the instructions of a particular surgeon. Varughese disagrees that her conduct was worthy of complaint, but she does not raise any genuine issue about whether complaints were in fact made.

The receipt of these complaints that Varughese was disruptive and insubordinate – from her fellow residents, her two Chief Residents, two attending physicians, a lab technician and a medical student – are enough to satisfy Defendant's burden at the second stage of the *McDonell Douglas* analysis, even if they are unfounded, and without considering in any way Varughese's admission that she raised her voice and swore on December 8, 2010.

In sum, Defendants offer what the Second Circuit has found to be a legitimate and non-discriminatory reason for adverse employment actions against an employee: "gross insubordination." *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991); *see also Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 172 (E.D.N.Y. 2011) (recognizing insubordination as a legitimate non-discriminatory reason in the NYCHRL context).

Because defendants have produced a legitimate, nondiscriminatory reason for the Advisement, the presumption of discrimination raised by her *prima facie* case simply "drops out of the picture." *Cifra v. General Electric*, 252 F.3d 205, 215 (2d Cir. 2001) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)); *see also See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 553 (2d Cir. 2010).

The question now is whether Varughese has provided sufficient evidence for a factfinder to conclude that Defendants' purported rationale for the Advisement was actually a pretext for discrimination on the basis of either her gender or her national origin. *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 158-59 (S.D.N.Y. 2011). The plaintiff must not simply produce "some" evidence, but "sufficient evidence to support a rational finding that the

81

legitimate, nondiscriminatory reasons proffered by the defendant[s] were false, and that more likely than not [discriminatory animus] was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir. 1994)). Alternatively, the plaintiff may show that the defendants' non-discriminatory justifications for the adverse action "were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotation and citation omitted).

In order to show pretext, a plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the relevant adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer" to undertake it. *Dhar v. NYC Dep't of Transp.*, No. 10-CV-5681, 2014 WL 4773965, at *10 (E.D.N.Y. Sept. 24, 2014) (internal citations omitted).

Varughese again fails to raise any genuine issue of material fact as to whether it is more likely that a discriminatory reason motivated Defendants to place her on Academic Advisement. After the December 8 incident with McCash, witness after witness came forward to complain, not only that Varughese had completely lost control of herself, but also to voice apparently longstanding complaints about her reliability and work ethic. Varughese may and obviously does disagree with those assessments, but she cannot deny that hospital administrators had to weigh her word alone against the word of at least five witnesses (not including McCash or Jordan), all of whom attested that she was out of control. Whether those witnesses were right is not the point. The point is that the hospital had every non-discriminatory reason in the world to be concerned about Varughese's behavior, and so to place her on an Academic Advisement.

82

Varughese complains that Defendants took everyone else's word over her own because Lento and others "wanted to believe" that McCash, a white male (only according to Varughese – recall that he self-identifies as an Asian Pacific Islander of Filipino descent, and that this Court does not find any genuine dispute that he is correct), had done nothing wrong. But she offers no *evidence* to support that wholly conclusory assertion. None whatever.

Disparate treatment – which may serve to both raise an inference of discrimination in the first step of the *McDonnell Douglass* burden-shifting analysis and establish pretext at the third[13] – occurs where an employer "treat[s] [the plaintiff] . . . less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (*citing Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15 (1977)).

To benefit from a disparate treatment analysis, however, the plaintiff needs someone to whom she can reasonably compare herself. She need not show that the person to whom she compares herself is identical to her, but she must show that she and her proposed comparator are similarly situated in "all material respects." *Id.* at 39–40; *see also Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997); *Shah v. Wilco Systems, Inc.*, 27 A.D.3d 169, 169 (N.Y. App. Div. 1st Dep't 2005) (applying same standard to NYCHRL claims). Where there is too much dissonance between a plaintiff's circumstances and her proposed comparator's, the employer's "treatment of th[at] [other] employee[] ha[s] no logical relevance to the plaintiff's claims" and thus cannot give rise to an inference of discrimination. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also LeBlanc v. United Parcel Service*, No. 11 Civ. 6983, 2014 WL 1407706,

---

[13] *McDonnell Douglas*, 411 U.S. at 804; *see also Ellis v. Long Island Rail Road Co.*, No. 05–CV–3847, 2008 WL 838766, at \*4 (E.D.N.Y. Mar. 31, 2008) (*citing Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002)).

83

at *15 (S.D.N.Y. Apr. 11, 2014) (applying same standard to analysis whether plaintiff has raised triable issue regarding a "similarly situated" coworker under the NYCHRL).

In the particular context of this motion, a court examining a discrimination claim only compares two employees' treatment when those employees are "similarly situated in all material respects." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (*citing Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15 (1977)). The Circuit has recognized that "[w]hat constitutes 'all material respects' [ ] varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40.


Varughese argues that Defendants showed their discriminatory hand by placing her on Academic Advisement while failing to place McCash on Academic Advisement. But McCash ws not similarly situated to Varughese in all material respects. McCash was Varughese's *supervisor* at that time. Leaving aside the disputed factual question of who yelled more loudly or struck more fear into coworkers' hearts on December 8, 2010, a supervisor yelling at his subordinate is something quite different from a subordinate yelling at her supervisor. Varughese admits that she yelled at McCash. She also admits to yelling at coworker Jordan – while McCash is not alleged to have yelled at anyone other than his subordinate (Varughese). Any workplace's standard regarding insubordination will inherently be more onerous toward a subordinate's behavior, because the supervisor cannot be "insubordinate" to the subordinate.

Moreover, there is no dispute that the evidence before the Hospital decision-makers did not indicate that Varughese's and McCash's conduct was of comparable seriousness. The

84

unbiased third party witnesses all told administrators that Varughese's behavior was more seriously out of line than McCash's. Again, the issue is not whether or not that is true; it is whether the evidence to that effect was given to the Hospital.

Finally, in the fortnight between the December 8, 2010 incident and the December 21 advisement, McCash acknowledged wrongdoing and submitted to counseling. Varughese, by contrast, categorically refused to do so. During those same 12 days, Varughese interfered with the investigation by getting into a confrontation with Jordan; McCash did no such thing.

So McCash and Varughese are simply not "similarly situated in all material respects." For that reason the decision to discipline McCash more leniently (and remember, he was disciplined), while placing Varughese on Academic Advisement, does not lend itself to an inference of either gender or national origin discrimination.

There is evidence in the record of an instance when the hospital put a male resident on Academic Advisement when the male resident behaved in a manner similar to Varughese. In the summer of 2011, a male resident of Asian descent threw a temper tantrum and yelled at a technician who was trying to help him with a dictation machine. That resident was placed on Academic Advisement. He did not react to being on Advisement in the same way as Varughese, however; he apologized profusely, revised his written apology twice to make it more personal and self-reflective, and met with supervisors for months to talk about professionalism.

Varughese also seeks to raise an inference that discrimination motivated the Academic Advisement by pointing to Schiller's comments from 2008-2009 and McCash's December 2010 "work ethnic" e-mail. Assuming arguendo that Schiller's comments can be deemed evidence of ethnic bias (I have already address why McCash's email with its obvious typo cannot), this argument gets plaintiff nowhere, because Schiller played no role in the December 8 incident and

85

there is no evidence that he was involved in the decision to put Varughese on Academic Advisement. Melissa Pessin-Minsley had taken over as Interim Chair of the Department by that time. There is no evidence in the record that Schiller was even consulted about the Advisement. Nor is there any evidence that anyone involved in the decision to place Varughese on Advisement knew about Schiller's comments; Varughese herself had not yet complained about them.

As for McCash, the Chief Resident, he too played no role in making the decision about Academic Advisement, and Varughese was removed from his supervision.

Schiller's stray remarks and McCash's email, assuming any of them to be offensive, thus have no bearing on attitudes displayed by anyone who actually made the decision to place Varughese on Academic Advisement. That means they are not evidence of pretext on the part of those decisionmakers and Mount Sinai. "Statements by nondecisionmakers or statements by decisionmakers unrelated to the decision process itself" are insufficient to establish discriminatory intent, even under city law, and certainly under federal and state law. *Taylor v. New York Univ. Med. Ctr.*, 871 N.Y.S.2d 568, 572 (N.Y. App. Term 1st Dep't 2008) (quoting *Forrest v. Jewish Guild*, 3 N.Y.3d at 308); *Bir v. Pfizer, Inc.*, 510 F. App'x 29, 31-32 (2d Cir. 2013) (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).

Ultimately, Varughese's attempt to prove pretext through a disparate treatment analysis fails with respect to the Academic Advisement because she relies on only on her own conclusory accusations of bias and a disparate treatment analysis that fails for lack of a real comparator. She offers nothing else, and the Court's exhaustive review of the record reveals nothing else.

By contrast, Defendants have presented voluminous evidence from multiple sources to show that Varughese was placed on Advisement for perfectly legitimate reasons having nothing whatever to do with her membership in any protected class.

86

No reasonable jury could find that the Advisement was imposed as a pretext for discrimination. Plaintiff fails to carry her burden at Step 3. Counts 1, 2, 5, 6, 9, 10, 16 and 18 are dismissed insofar as they are predicated on Varughese's allegation that the Academic Advisement was imposed as an act of discrimination.

### Referral to the PWC

Varughese also suggests that she views her referral to the PWC as a distinct discriminatory act.

The referral is not cognizable under state or federal antidiscrimination law because it is not "materially" adverse. She was required to meet with Dr. Figur and Dr. Fersh, and to submit to a toxicology screen. The referral did not cause her to lose any benefits, to lose any responsibilities, to have a lesser title, to disclose the fact of her referral to coworkers, or indeed do anything beyond meet with a few doctors whose job it was to help her. Forcing someone to seek medical or psychological help is not itself an adverse employment action where it is not accompanied by any diminution of the benefits or responsibilities of employment or some actual adverse consequence to the terms or conditions of employment. To the extent that Varughese claims that the referral itself constituted discrimination in violation of state or federal statutes, that claim is dismissed because it was not an adverse employment action.

However, Judge Gleeson has specifically found that referring a plaintiff for psychological evaluation, while not materially adverse under federal or state law, is not "merely trivial" under the NYCHRL. *Forgione v. City of New York*, No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept. 13, 2012). I must agree.

87

Nevertheless, I cannot agree that Varughese's claim should proceed to trial because, in support of her claim that the referral was *discriminatory*, Varughese has presented only her own conclusory allegations. *See, e.g.*, Varughese 56.1 at ¶ 32.3 ("The PWC is paranoid about their illegal fraudulent conduct against minority women . . ."). She has not presented any evidence.

In particular, on this claim Varughese has presented no testimony that anyone was similarly situated to her – i.e. any other resident or doctor who behaved in the erratic and disruptive way that multiple witnesses described to Hospital administrators – was not referred to the PWC. The hospital has submitted evidence that it referred a black female resident to the PWC when she persisted in making inappropriate advances towards another employee.

Varughese's unconvincing "comparator" analysis asks the Court to conclude that her referral to the PWC was discriminatory insofar as Dr. Najfeld was not also referred to the PWC. Varughese claims that the PWC should have been called to investigate Najfeld after Najfeld criticized Varughese for her failure to prepare an adequate presentation. It should go without saying that a supervisor reprimanding Varughese for her deficient performance does not constitute "erratic" behavior but rather, a natural consequence of Varughese's own performance problems.

Further, Varughese has not presented any direct evidence that the person who made the referral (Pessin-Minsley) or the person who did his own research to confirm the propriety of the referral (Figur) harbored any discriminatory animus against her, based on either her gender or her national origin. Notwithstanding Varughese's unsupported assertions in her Rule 56.1 statement that Figur has been the subject of some unspecified other litigation, there is no evidence in the record of gender or ethnicity-based comments or prior actions by either of them.

No reasonable jury could find fault with the decision to refer a physician who had exhibited obvious signs of distress, and whose behavior was causing severe disruptions in her department, to an administrative body designed to assist troubled physicians,.

Varughese's claim that her referral to the PWC constituted gender or national origin discrimination is dismissed under the City Human Rights Law as well.

### The July 15, 2011 Final Warning

Next, Varughese alleges that Defendants discriminated against her on the basis of her sex and her national origin by issuing her a Final Warning on July 1, 2011.

Defendants' reasons for issuing the Final Warning – detailed in the warning itself (*see supra* at 43-45) – are on their face perfectly legitimate and completely nondiscriminatory. They are also entirely true. The Department accused her of failing to comply with the terms of her Academic Advisement; Varughese admits that she failed to comply with the terms of her Academic Advisement. The Department accused her of missing required appointments; she admits that she missed appointments required under her advisement. The Department accused her of failing to submit her self-reflective essay; she admits that she submitted her essay on professionalism two and a half months late, and that she also submitted the revised essay after its due date. The Department accuses her of failing to respond to pages, refusing to cover for other residents, being late with assignments, and being late to work; she admits to it all. The list goes on and on.

That she has excuses and what seem to her explanations matters not. Defendants' burden of production at this second stage of the *McDonnell Douglass* analysis is satisfied.

At Stage Three, Varughese offers no evidence that those stated reasons are pretextual. She submits a sampling of e-mails showing that other residents were sometimes late, or could not cover

a shift. The most notable thing about those e-mails, however, is that they are proof that other residents actually communicated to others about when they would be absent, when Varughese routinely failed to do so. Varughese also submits the admissions of Morency, Jordan, and others that they were not always in perfect health and sometimes took time off and were unable to cover for other residents. This is unsurprising, to say the least.

Varughese presents *no* evidence that any other resident had an extensive history of stubborn insubordination and absenteeism without notice, i.e. a history comparable to her.

Varughese also fails to come to grips with the difference between her behavior when counseled by administrators and the behavior of others. After the December 8, 2010 incident, McCash accepted counseling and apologized; Varughese did not. The male resident was placed on Academic Advisement, apologized profusely and met with supervisors for months to talk about professionalism; Varughese refused to acknowledge that she had ever exhibited unprofessional behavior.

Varughese is similar to the plaintiff in *Shekhem' El-Bey v. City of New York, et al.*, 419 F. Supp. 2d 546 (S.D.N.Y. 2006). In that case, Mr. Shekhem' El-Bay complained that his termination must have been the product of discrimination discriminatory because, even though he filed fraudulent tax returns, others who did so were not fired. The Court found him to be without comparators, because:

> not one of the DOC employees cited in plaintiff's complaint was even remotely similarly situated to plaintiff with respect to the disciplinary action taken by the DOC. Mr. El–Bey, in addition to having filed fraudulent tax documents, was found guilty of numerous other disciplinary violations while employed with the DOC, *e.g.*, countless sick leave violations and excessive absenteeism. Nowhere does the complaint allege that even one of the purportedly similarly situated corrections officers was guilty of committing a single act of misconduct other than filing fraudulent tax documents.

90

419 F. Supp. 2d at 551 (internal citations omitted). Varughese has too many strikes against her to compare her to those with just a one or even a few.

It also bears noting that, according to the record, the only other resident who was persistently absent without an adequate excuse – a white male – was also put on final warning. He improved his punctuality and attendance, and successfully graduated from the residency program.

Varughese's claim that Defendants subjected her to illegal discrimination by issuing the Final Warning is dismissed.

### Fall 2011 Refusal to Transfer

Varughese also alleges that Defendants discriminated against her by refusing her request to allow her to switch rotations in October 2011. This incident would not seem to be of any moment; since Varughese was kicked out of the residency program nine days prior to October 2011, so she could not have assumed a different rotation even if the switch had been authorized.

The However, the Department's refusal was communicated to her multiple times – including on September 7, 2011, and certainly before she was sent a Termination Letter, so I will analyze whether she has raised a genuine issue of fact about the reason why her rotation was not changed. She has not.

I will accept, for purposes of this analysis, that not being allowed to change rotations could be an adverse employment action – although I can think of many reasons why that might not be so. However, the Hospital has advanced a legitimate and non-discriminatory reason why it did not authorize the change in her schedule: Varughese missed the July 1, 2011 deadline to request a scheduling change (a fact that is not in dispute) and granting her request would have had a ripple effect on the schedules of others that would have been too difficult to manage, since no one could

91

be found to cover the rotation to which Varughese was assigned – which, by the by, was the rotation she had requested during the period when requests were being accepted.

The question then becomes, at Step Three, whether Varughese has raised a genuine issue of fact going to either pretext or to the real reason for the decision's being discrimination. She has not. Varughese submits no evidence that the decision to deny her change of schedule request was a mere pretext for anything, let alone for discrimination. Defendants note, as they did when they denied the request in in September 2011, that 8 out of 10 residents' requests for schedule changes" that came after that July 1, 2011 deadline were denied. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 38.) Varughese has not submitted any evidence that Defendants granted any transfer requests that were as untimely as hers. Her own conclusory assertion that her request must have been denied because of her gender and/or national origin is woefully insufficient.

Varughese's claim that Defendants violated federal, state, and local antidiscrimination law by refusing her belated schedule change request is dismissed.

### The September 21, 2011 Termination

I come now to the heart of Varughese's claim: that Defendants should not have kicked her out of Mount Sinai's residency program on September 21, 2011.

I will assume that she makes out a *prima facie* case and ignore the obvious argument that her performance issues rendered her unqualified for her position.

The letter notifying her of her summary suspension reveals multiple, independent, legitimate and nondiscriminatory reasons to have terminated Varughese.

I begin with the most obvious: she rifled through an administrator's files when left alone in that administrator's office. Varughese admits (reluctantly) that she did so. There can be little

92

dispute that this conduct would provide a legitimate, nondiscriminatory reason for termination in any workplace.

There is no evidence that Varughese's secret examination into the file on Patel's desk was simply seized on as pretextual cover for an action Defendants were prepared to take for reasons related to Varughese's gender or her national origin. No one else who was guilty of similar misconduct has even been identified; Cordon-Cardo has testified, without contradiction, that there is no such person. It thus stands to reason that no one has ever been allowed to get away with such serious misconduct.

Varughese offers no evidence, direct or even circumstantial, that anyone involved in the decision to fire her (a group that does not include either Schiller or McCash) had ever exhibited any sort of discriminatory attitude, toward her or anyone else. The fact that she was in Patel's office only by accident (because Patel encountered her at Starbucks that morning) negates any notion that she might have been "set up;" the fact that she was caught in the act eliminates any possible suggestion that she was singled out. Where, as here, a plaintiff fails

> to rebut specific, credible evidence offered in support of an employer's articulated reason for their firing, [she] cannot maintain claims that [her] firing[s] w[as] discriminatory.

*Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 310 (S.D.N.Y. 2000) (internal citations omitted) (analyzing case brought under Title VII, the NYSHRL, and the NYCHRL).

Varughese's argument that she should have kept her job despite her snooping relies on her own conclusory and unsubstantiated assertions that Defendants were engaged in a discriminatory "conspiracy" of some kind. But her unsubstantiated and conclusory allegations that there was discrimination "in the air," and that Defendants engage in "plantation politics," do not meet her third stage burden of producing evidence to raise any genuine issue of fact that would require a trial. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to

93

defeat a properly supported motion for summary judgment." *Bickerstaff*, 196 F.3d at 451–52 (restating principle that to defeat summary judgment, plaintiffs', "affidavits must be based upon concrete particulars, not conclusory allegations") (citing, *inter alia, BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996)). *See also Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence); *Lytle*, 2012 WL 393008, at *19 ("the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.").

The analysis might stop there. But inquiring into the hospital's other justifications for terminating Varughese – and her rejoinders – only strengthens Defendants' case.

The termination letter cited six additional reasons why she was being fired. First, there was her disastrous performance on Najfeld's rotation. Varughese admits that, during that rotation, she disobeyed instructions to stop fiddling with her phone, failed to follow Najfeld's instructions on how to prepare a presentation, provided Najfeld with an incomplete presentation only an hour before the close of business the day before the presentation was to be made, and failed to notify others that the presentation conference was being canceled. Varughese submits no evidence that anyone else engaged in similar conduct. Nor does she submit any evidence that Najfeld, a woman, complained about Varughese because of plaintiff's gender or her national origin, rather than because of her admitted bad conduct.

Next is Varughese's insubordinate behavior towards Jordan on August 5, 2011 and August 12, 2011. Varughese admits that, on those dates, she failed to respond to Jordan's e-mails and pages. Indeed, she admits that she failed to respond to Jordan even after Lento explicitly told her to do so. Varughese submits no evidence that anyone else was allowed to engage in a similar

94

pattern of disobeying instructions and failing to communicate with supervisors regarding coverage. Nor does she submit any direct evidence that Jordan, Lento or Najfeld – the three persons who testified about these incidents – had any bias against her because of her gender or national origin.

Third is Varughese's "Unprofessional Response to Request for Change of Elective Rotation," referring to Varughese's refusal to accept the Department's decision not to consent to her untimely request to switch rotations. Varughese does not dispute that, when one administrator denied her request, she went to supervisor after supervisor to renew her request, failing in each instance to tell anyone that it had already been denied by others. Varughese points to no one else who engaged in similar conduct. Nor does she submit any direct evidence of discriminatory animus by any of the administrators involved, i.e. Firpo, a Dr. Harpaz, Scott Barnett, and Paul Johnson.

Fourth, the Department cited her for her poor conference attendance. When a male resident was told that he was below the 80% conference attendance requirement, he gave a make-up presentation without complaint. (*Id.* at 72-73). When Varughese was told the same thing, she procrastinated, objected, and then walked out of her scheduled presentation with neither explanation nor apology. She never made the presentation.

Fifth is Varughese's "poor communication regarding leave of absence." Varughese does not dispute that she herself asked about taking F.M.L.A. leave on September 15, 2011. Nor she does dispute that Defendants encouraged her to take a leave and gave her materials so she could make such a request. In the days that followed, several hospital administrators tried to reach Varughese to inquire about whether she would in fact be making a leave request, as well as to ask about her health. She did not respond to any of these queries, although she admits that she read them. She showed up at work despite having been being told – by Lento, in writing – *not* to come

95

to work. Varughese submits no evidence that anyone else engaged in similar behavior. Nor does she submit evidence that Lento or anyone else demonstrated animus toward women or anyone because of national origin.

Sixth, all of this behavior occurred in the brief six week period following Varughese's receipt of a Final Warning telling her that she had to start acting more professionally or she would be fired. None of this behavior is particularly professional. All of it is either petulant or insubordinate.

Varughese may take issue with what it meant to behave "professionally" at Mount Sinai, but she cannot get around the fact that, "an employer is permitted to set its own performance standards" including standards . . . so long as they are not discriminatory." *Nolley*, 857 F. Supp. 2d at 441 (analyzing case under federal law, state law, and the NYCHRL). As neither the Final Warning nor the Advisement was discriminatory, Defendants cannot be faulted for firing Varughese when she failed to abide by their terms.

Whether summary judgment is appropriate always depends on "'the strength of the plaintiff[s'] *prima facie* case, the probative value of the proof that the [defendants'] explanation is false, and any other evidence' that supports the defendants' case." *Lizardo v. Denny's, Inc.*, 270 F.3d at 103 (2d Cir. 2001) (quoting *Reeves*, 530 U.S. at 148–49). Having reviewed the entire record as submitted by Varughese, I conclude that Varughese has failed to mount an evidentiary carry her burden of production at the third stage of the analysis and her ultimate burden of persuasion. On the evidence in the record, no reasonable juror could find Varughese to have overcome the overwhelming evidence that Defendants disciplined and terminated her, not because of her sex or her ethnicity, but because of her own admitted behavior – behavior that her employer found unprofessional and inappropriate.

96

In *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141 (S.D.N.Y. 2011), the

Court dismissed a Title VII plaintiff's claims because it was not disputed that she

> engaged in a loud argument with her boss and called her a "racist" and a "liar."
> Whatever occurred, it required the presence of building security, the NYPD, and
> EMS. This is not acceptable office behavior, and a complaint of racial
> discrimination does not shield an employee from termination when she acts
> inappropriately.

*Id.* at 161 (analyzing claims brought under, *inter alia*, the NYCHRL). Throughout the final year

of her residency, Varughese engaged in unacceptable workplace behavior. By her own admission,

she yelled, she swore, she interrupted, she rolled her eyes, she was late, absent, and – in

conversations she recorded and submitted to the Court – by turns confrontational and evasive. The

very tape recordings she made – and the pacing and aggressive tone of voice they reveal – confirm

the testimony of others about her attitude and her behavior. This court can hardly ignore what is

on the tapes for anyone to hear. *See Scott v. Harris*, 550 U.S. 372 (2007) (appropriate for a court

to take judicial notice of facts regarding intangible circumstances of encounter preserved in audio-

visual recordings if court reviews said recordings).

Yet despite her protracted confrontational conduct, Defendants appear to have bent over

backwards to assist Varughese. She received counseling from the Department, from the hospital's

overarching Office of Graduate Medical Education, from Human Resources, and from the PWC.

Several administrators came in from outside Mount Sinai and were prepared to offer her a clean

slate, which she promptly sullied. Even if the Department was, at times, in disarray, anti-

discrimination law "does not make [defendants] liable for doing stupid or even wicked things; it

makes them liable for *discriminating*." *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998)

(analyzing ADEA claim) (emphasis in original). There is no evidence on which a reasonable jury

could conclude that Defendants *discriminated* against Varughese on the basis of her race or her

gender.

97

*Nolley* again proves instructive. When Mr. Nolley was given a PIP and told to improve his professionalism, he broke the standards set forth in that PIP by aggressively confronting his superior about what he thought were lies in the customers' complaints that had prompted the PIP in the first instance. He ultimately was fired because he could not handle professionally the complaints about professionalism. It did not matter whether the initial complaints were truthful, it mattered that he was unable to resolve his differences with his employer peacefully and professionally.

Varughese's case suffers from the same defect. As in *Nolley*, "Any deceitful conduct by [Jordan or McCash] or deficiencies in [her supervisors'] performance *do not create an issue of fact regarding [Varughese's] own performance* during [the months-long disciplinary process] or [Defendants'] motives in firing [her] for [her] failure to perform as [her] employer expected and as outlined in the [Academic Advisement."(emphasis added). She has therefore failed to raise a genuine issue of material fact that her termination or any of the supposedly adverse actions preceding it were pretextual or that they were motivated, in whole or in part, by any desire to discriminate against her, on any ground. She *Nolley*, 857 F. Supp. 2d at 460.

Varughese has also been unable to point to any circumstantial evidence of discriminatory animus because she has identified *no one* who was similarly situated to her in all material respects – material respects including being on Academic Advisement, having been referred to the PWC, and being on Final Warning. No one else whose existence is disclosed in the record had a similarly pockmarked record of chronic lateness, absenteeism, refusal to follow instructions, and explosive anger. No one else simply refused to comply with the terms of an Academic Advisement or made up silly excuses for not doing so, like "I complained to HR so I don't have to comply." Any

mistakes made by other residents to which Varughese points are either less severe, less frequent, or more willingly remedied by their perpetrators – and in most instances, all three.

Rather than point to others outside her protected class who engaged in similar conduct and received preferential treatment, Varughese blames others for her own conduct. She failed to plan an acceptable presentation? That was Najfeld's fault, for not telling her soon enough that it was unacceptable – never mind that Varughese did not send it to her supervisor until an hour before the close of business on the day before she was scheduled to present. (Varughese Dep. at 384.) Varughese was caught going through the files on someone else's desk? That was Patel's fault, for leaving her in an office with files on the desk. (Internal Appeal Hearing, Docket #205-31 at 60.) Varughese failed to confirm that she could not cover for a sick resident? That was Jordan's fault, for asking her to provide coverage in the first place – the very request constituted "outrageous harassment." (Varughese Dep. at 465-66.)

There is no evidence in the record that any other resident acted out in such a way. Moreover, even under the NYCHRL, a plaintiff cannot "establish pretext "by rationalizing her errors or by blaming others." *Melman*, 98 A.D.3d at 121 (N.Y. App. Div. 1st Dep't 2012) (internal citations omitted).

There are a few instances when Varughese is able to point to other residents who engaged in single bad acts, or who had bad weeks. But the record contains no evidence that anyone else had her lengthy record of persistently bad behavior. While other residents were cited for inappropriate attitudes or isolated angry outbursts, Varughese's lapses in professionalism were chronic and cumulative. (Firpo Dep. at 43, 170-74.) Varughese submits no evidence of anything different.

As the New York Court of Appeals has found, "it matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory." *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 308 n. 5 (N.Y. 2004). Varughese has submitted no evidence that discrimination played any part – even a small part – in the decisions to discipline or terminate her. *Kerman–Mastour v. Fin. Indus. Regulatory Auth.,* 814 F.Supp.2d 355, 367 (S.D.N.Y.2011) ("[E]ven under the more liberal NYCHRL, summary judgment will still be appropriate where a plaintiff does not adduce sufficient evidence of a link between her termination and a discriminatory motive . . . "); *see also Jeune v. City of New York,* No. 11 Civ. 7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (collecting cases). She has done little more than recount that she was subjected to adverse actions and that she was a member of two protected classes. More is required. *Dhar,* 2014 WL 4773965, at *7.

The motion for a summary judgment of dismissal is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18.

## V. The Motion for Summary Judgment is GRANTED as to Counts 3, 7, 8, and 11 (Hostile Work Environment under Title VII, NYHRL and NYCHRL).

Varughese claims – in counts 3, 7, 8 and 11 – that Defendants subjected her to a hostile work environment on the basis of her race and gender, in violation of state, local and federal law.

### A. Varughese's State and Federal Claims

To defeat a motion for summary judgment on a claim of racially or sexually hostile work environment under federal and state law, a plaintiff must produce evidence that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be," *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006), "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions

100

of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment, but may if sufficiently severe. *See id.*; *Kemp v. A & J Produce Corp.*, 164 Fed. Appx. 12, 14 (2d Cir. 2005); *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000).

In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Varughese's hostile work environment claims are based on an accumulation of discrete indignities. In addition to the matters she assigned as discrimination – all of which make up part of her hostile work environment claims – these include (1) Schiller's few sporadic comments during the first two years of her residency, (2) her desk was broken into (although she does not know by whom), (3) the lab slowed processing of her patient slides, (4) other people whispered about her, (5) McCash yelled at her before she was removed from his supervision, and "stomped around" afterward. For purposes of this motion, I will presume that all of these things happened.

101

*Varughese Has Failed to Present Any Evidence Connecting These Any of These Events to Her Membership in a Protected Class.*

The principal reason why the Hospital is entitled to summary judgment dismissing Varughese's hostile work environment claim under federal and state law. Varughese has not presented any evidence from which a reasonable jury could infer that that any of those events – let alone all of them collectively – occurred under circumstances giving rise to an inference of discrimination.

While "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. Coll. of Staten Island,* No. 01–CV–7550, 2003 WL 21143076, at \*2 (E.D.N.Y. Mar.23, 2003) (citing *Gregory v. Daly*, 243 F.3d 687, 694– 95 (2d Cir. 2001)). "Everyone can be characterized by . . . race . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id.* at 378.

Varughese points to no evidence that would allow a jury to conclude that she was subjected to any purported indignity because of either her race or her sex. As discussed above, when analyzing Varughese's discrimination claims, there is no evidence in the record to connect any of the eight adverse actions she identified as discriminatory to Varughese's being a woman or being

102

of Indian descent. That lack of evidence does not change when those activites are viewed through the prism of hostile work environment analysis.

Varughese also submits no evidence connecting the other incidents described – such as the broken lock on her desk, or the lab's pace in processing her slides – to her membership in any protected class. None whatever.

So her hostile work environment claim under state and federal law rises and falls on whether Schiller and McCash's comments created a hostile work environment for her. They do not. They were the quintessence of "stray remarks" – neither so many nor so frequent as to alter her workplace in any material way. This is without regard to the fact that at least two of the comments – Schiller's DNA remark and McCash's "work ethnic" e-mail – could not be understood by any reasonable trier of fact as the ethnic slurs Varughese makes them out to be.

It is not clear that these allegedly scurrilous remarks were made more than 300 days before plaintiff filed her charge with the EEOC: Schiller's remarks were made during the first two years of her residency. Nevertheless, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)).

Schiller's alleged comments about the "crazy things you'll find in India" were perhaps impolitic but they are hardly "severe" or "pervasive" enough to create a hostile work environment, since they are alleged to have occurred four times over the course of her employment. That is by definition not "pervasive."

103

Schiller's DNA remark was made early in Varughese's second year of residency, in the fall of 2009. It was a one-off remark. It contained no reference to her ethnicity or national origin. In context, it was a remark about the genetic basis of depression, which was the subject under discussion – Varughese's mental health, her perceived depression. Schiller directed Varughese to obtain mental health counseling, not because of her gender or her ethnicity, but because she presented as depressed in the workplace. Many people, including doctors, believe that there is a genetic (i.e., DNA-based) component to depression. *See, e.g.*, Eileen P. Ryan, D.O., "What Psychiatry, Developmental Psychology, and Neuroscience Can Teach Us About at-Risk Students," 17 Wash. & Lee J. Civil Rts. & Soc. Just. 59, 64-65 (2010). Schiller's comment cannot reasonably be understood in any manner other than this.

As for McCash's e-mail, it was discussed extensively above. It does not refer to Varughese's status as a person of Indian descent. The insertion of the letter "n" into the phrase "work ethic" is an obvious typographical error. For that reason it does not evidence a hostile work environment on any forbidden basis.

But there is another reason why this email is not evidence of a hostile work environment. Varughese did not become aware of it until long after she stopped working for Defendants. Varughese was not carbon copied on the "work ethic" e-mail. At her deposition (which occurred after her termination), she denied knowing about any discriminatory comments ever uttered by McCash. Only now does she allege that this email contributed to the purportedly hostile environment she faced.

A plaintiff need not herself be the target of discriminatory comments in order for those comments to contribute to a hostile work environment; nor does the plaintiff need to hear such comments first-hand. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69-70 (2d Cir.

104

2000); *see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir. 1997) ("Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."); *Cruz,* 202 F.3d at 571 (finding that, even if plaintiff were not present when some comments were made, "a jury plausibly could find that [defendant's] persistently offensive conduct created an overall hostile or abusive environment" which "exacerbated the effect of the harassment [plaintiff] experienced individually" (internal quotation marks and citations omitted))..

But, to rely on discriminatory comments in pursuit of a hostile work environment claim, a plaintiff must at least have been generally *aware* that such comments were uttered. The *Whidbee* court examined the totality of the circumstances and found that "the plaintiffs were subjected to, *or at the very least aware of,* a stream of racially offensive comments." 223 F.3d at 70 (emphasis added). The *Whidbee* court relied on *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir. 1997). In *Schwapp,* the court explained that, "The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim" *because* "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." 118 F.3d at 111.

Here, Varughese did not learn of the "work ethnic" comment even second-hand. She was not aware of the email at all during the period while she was a resident at Mount Sinai. It would be difficult indeed for a comment to alter the conditions of Varughese's employment if she was unaware of it until well after she stopped being employed. "A plaintiff need not be the recipient of [racially] offensive material for it to contribute to a hostile work environment. Nevertheless, if the material is not publicly displayed or disseminated, and is not something [she was] . . . generally

105

aware of, its contribution to a hostile work environment may be negligible. *Ortiz-Moss v. New York City Dep't of Transp.*, 623 F. Supp. 2d 379, 401 n.19 (S.D.N.Y. 2008); *cf. Patane v. Clark*, 508 F.3d 106, 114 (2d Cir.2007) (plaintiff's regular observation of male employee watching pornographic videos, and her being required to handle pornographic material herself in opening supervisor's mail, were relevant to assessing whether her work environment was objectively hostile to women). Here, where there is literally no other evidence of ethnic slurs (as there was in *Whidbee*), and no other evidence of compromised behavior on McCash's part, the probative value of the email is not just negligible; it is nil.

The "work ethnic" e-mail is the *only* comment with any nexus whatsoever to the treatment she describes as hostile that occurred within the statutory period, in that it has a connection to the December 8, 2010 incident. There is no other evidence of discriminatory comments or other direct evidence of animus that relates to the treatment of which she complains. I therefore cannot consider the comment as but one instance of a general atmosphere of discriminatory hostility, particularly in view of the circumstances under which the comment was made – i.e. that it would be reasonable to consider it a scrivener's error.

Moreover, when Varughese complained about McCash's behavior in December (i.e., at the time he composed the e-mail), Defendants removed her from his supervision and ensured that they did not have to work together, even as colleagues, thus shielding her from whatever hostility she alleges. She now claims that McCash "stomped around" her desk on a subsequent rotation, but admits that she did not have to work with him and that she never notified anyone that she was still having problems with him.

Under federal and state laws, to prevail on a hostile work environment claim, plaintiffs must show not only severe or pervasive harassment but also "a specific basis . . . for imputing the

106

conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir. 1996). Because the "stomping" was by a co-worker (as she no longer reported to him) and not a supervisor, Varughese must demonstrate that Defendants "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (internal quotation marks omitted). "[A]n employer will be liable in negligence for a racially . . . hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson*, 180 F.3d at 446 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, (1998)); *see Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir. 1998).

In the end, "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Cruz,* 202 F.3d at 570. Here, the totality of the circumstances do not even remotely suggest that Varughese was the victim of a hostile work environment, either because she was a woman or because she was of Indian descent. If there is any suggestion of hostility at all – a proposition very much in dispute – the entirety of the evidence points to Varughese's uncooperative, insubordinate attitude as its root cause. The statutes she invokes do not protect Varughese from the consequences of her own behavior. Varughese has failed to provide evidence from which a reasonable jury could conclude that any dislike was based on her race or her sex.

Consideration of the totality of Varughese's employment does not yield any evidence of an environment severely or pervasively infected with discriminatory hostility on the basis of her gender and/or her race. It merely reveals that, when she acted out, there were consequences, and that she happened to be a woman of Indian descent. But again, "I am a member of a protected class; my workplace was hostile; it must have been because of my protected class," is a logical

107

fallacy that does not insulate a plaintiff from summary judgment where the undisputed facts warrant dismissal of her claims as a matter of law.

While "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999), Varughese's evidence of McCash's e-mail, Schiller's interest in India, and Schiller's concern that her depression might be DNA-based are neither "severe" nor "continuous" nor "concerted," *Cruz,* 202 F.3d at 570 (internal quotation marks omitted) – and so will not sustain a hostile work environment claim under federal or state law. There is *no* evidence in this record that Varughese was subjected to repeated indignities (or even to one particularly egregious indignity) *because of either her race or her gender*.

Not a single piece of evidence even *alludes* unfavorably to Varughese's gender. Plaintiff did not complain that she was experiencing a hostile work environment based on her gender until April 2011. But when she did so, she accused McCash of creating the hostile work environment. But the record contains evidence of only two run-ins between McCash and Varughese – in September 2010 and again in December 2010 – which is too sporadic to create a hostile work environment. After that, the hospital removed Varughese from McCash's supervision – five months before she uttered her first complaint. In short, there is not a scintilla of support for her claim of a gender-based hostile work environment.

And so we turn to national origin. Schiller's comments about things one might find in India were, *at worst*, subject to interpretation – and both few in number and sporadic. They were also made well before Varughese's workplace problems began. Even if these were racially insensitive remarks, his comments cannot be attributed to others, and he ceased being chairman of the

108

Pathology Department before the December 8 incident, the Academic Advisement or the PWC referral.

Schiller's comment about depression's being associated with DNA cannot logically be construed as a comment on Varughese's national origin except under some sort of utterly unreasonable, Oliver Stone-like "conspiracy theory" And McCash's "work ethnic" e-mail almost certainly contains a typographical error, given the complete lack of any other evidence suggesting that McCash was insensitive or worse toward anyone on the basis of their race or national origin. At worst, it is at worse a single stray remark – which, under federal and state law, is insufficient to prove hostile work environment. And of course, Varughese *never* complained that she was being subjected to a hostile work environment on the basis of her race during her tenure at Mount Sinai. Even when she retained counsel in June 2011, her lawyers claimed that the hospital was discriminating against her because of her *gender*.

What remains are only Varughese's conclusory allegations that everyone in the hospital was a racist, a sexist, or both. That is not enough.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 3, 5, and 18, i.e. Varughese's state and federal hostile work environment claims.

### B. Varughese's Hostile Work Environment Claim under the NYCHRL

Having dismissed Varughese's hostile work environment claim under state and federal law, I now consider whether Varughese's city law claim of hostile work environment can survive Defendants' motion for summary judgment.

The NYCHRL has a more forgiving standard for hostile work environment claims than federal or state laws do. There is no "severe or pervasive" requirement under city law, and "while

109

courts may still dismiss 'truly insubstantial cases,' even a single comment may be actionable in the proper context." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (citing *Williams*, 872 N.Y.S.2d at 41 & n.30).

Nevertheless, the NYCHRL "is not a general civility code," and "summary judgment is still appropriate in NYCHRL cases . . . if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Id.* (internal citations omitted). In this case, the record establishes precisely that. Varughese offers no evidence connecting the incidents she now perceives as hostile to bias related either to her race or to her gender. Her wide-ranging, conclusory assertions that there was discrimination in the air do not withstand any level of scrutiny.

Count 11 is dismissed.

## VI.     The Motion for Summary Judgment is GRANTED as to Counts 4, 8 and 12 (Retaliation under Title VII, NYHRL and NYCHRL).

Varughese alleges – in counts 4, 8 and 12 of her Second Amended Complaint – that she was disciplined and terminated in retaliation for engaging in the protected activity of complaining about discrimination.

Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any . . . employee [ ] . . . because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). Retaliation claims are cognizable under § 1981. *See Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 43–44 (2d Cir. 1984).

To survive summary judgment with respect to her claim of retaliation, Varughese must raise a genuine issue of fact whether "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there existed

110

a causal connection between the protected activity and the adverse action." *Patane,* 508 F.3d at 115 (citing *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004)). The NYCHRL against has no "materiality" requirement; it forbids any form of retaliatory action.

It is well-established that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks omitted). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Moreover, as the Supreme Court has explained, any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" may constitute retaliation. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

In this Circuit, the analysis of a retaliation claim follows the same *McDonnell-Douglas* framework discussed in Part III, *supra. Kemp v. A & J Produce Corp.*, 164 F. App'x 12, 15-16 (2d Cir. 2005). Thus, "once the plaintiff has made out a *prima facie* case of retaliation, the defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the challenged action. If the defendant meets that burden, the plaintiff must then demonstrate that there is sufficient evidence upon which a reasonable jury could find the proffered legitimate reason merely a pretext for impermissible retaliation." *Id.* (citing *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998)).

With respect to retaliation, Varughese does not get past the first step of the inquiry.

111

Varughese's 56.1 Statement repeatedly claims that she complained about "discrimination" earlier than April 2011, but *nothing* in the record supports that assertion. Certainly she complained about a "hostile environment" at work as early as September 2010, and described others' behavior as "offensive," but she never gave anyone any reason to suspect that the hostile or offensive environment she was complaining about had anything to do with either her race or gender. She did not mention her sex or her ethnicity in her complaints. She did not complain about any allegedly racist or sexist comments. She did not ascribe what she perceived as mistreatment to her membership in any protected class. She did not compare the way she was being treated to the way Caucasians or males were treated. The people explicitly contradicting her versions of events were often members of one or both of the same protected categories as she – including Drs. Jaffer and Maniar, women of Indian descent, both of whom were outranked her and one of whom outranked McCash. Maniar, who Varughese believes would support her version of events, denied that Varughese had ever complained to her about discrimination or retaliation. (Docket #163 at ¶10.)

When Varughese complained about "retaliation" before April 2011, she explicitly linked the alleged retaliation to non-protected activities - principally to having given Lento's rotation a negative internal review or making general allegations about unfair treatment and workplace bullying. Her first reflection explicitly declined to ascribe McCash's behavior to any motive at all: "*I will not claim to know why Samuel McCash treats me the way he does*, nor will I need to understand why . . . But I feel that he is resentful of any success or well-being I may exhibit." (Self-Reflection Essay #1, Docket #205-10 at 19.)(emphasis added) Not until April 25, 2011 did Varughese explicitly assert that McCash's behavior toward her was based on her gender. (E-mail from Varughese to Tiger-Paillex of Apr. 25, 2011, Docket #205-10 at 2.) The letter written by her attorney to Mt Sinai in June 2011 (*See* Docket #205-10 at 12) identifies a December 23, 2010

112

email as containing an earlier complaint that she was being discriminated against on the basis of her gender and/or some perceived disability (which is not a claim asserted in this lawsuit). However, that December 23 email asserts nothing about discrimination: she complained about what she characterizes as abusive behavior and public humiliation. Neither her gender nor her national origin is mentioned; there is nothing in the email to alert the recipient (Tiger-Paillex) that these were the basis of her complaint.

Thus, notwithstanding Varughese's conclusory assertions in her 56.1 Statement, there is no *evidence* that she engaged in any protected activity prior to being placed on Academic Advisement.

Instead, all of her statutorily protected activity began in April 2011 – well after her December 21, 2010 Academic Advisement, well after McCash's and Jordan's promotions to Chief Resident, and well after Pessin-Minsley's referral of Varughese to the PWC. None of those issues can be chalked up to retaliation for any complaint about discrimination based on gender or national origin.

Of course, her Final Warning and ultimate termination occurred after Varughese engaged in protected activity. But those adverse actions cannot be chalked up to retaliation, either, because they were part and parcel of a course of conduct that began well before any protected activity took place. Under federal and state law, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery,* 248 F.3d at 95. The same is true under the NYCHRL. *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 129, 946 N.Y.S.2d 27, 42 (2012) ("an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because,

113

in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct . . .") (internal citations omitted).

Varughese thus "cannot establish a *prima facie* case of retaliation based on the temporal proximity between the adverse employment actions and her protected activity, even though some of the things about which [she] complains occurred after she engaged in protected activity" in April 2011. *Williams v. Woodhull Med. & Mental Health Ctr.*, 891 F. Supp. 2d 301, 315 (E.D.N.Y. 2012).

Bending over backward to try to find some way to keep Varughese's claim of retaliation alive, the Court has considered whether her off-hand question to Tiger-Paillex in late December 2010 or January 2011 whether McCash wanted to micromanage her "because he is a guy?" qualifies as protected activity. First, let us assume that this actually qualifies as a complaint of gender-based treatment, rather than evidence of Varughese's own gender bias. However, even assuming that it qualifies as protected, Varughese only raised the concern *after she had already been placed on Academic Advisement.* It does not get her out from under the rule announced above.

The totality of the evidence simply does not admit of an inference that Defendants retaliated against Varughese for engaging in any protected activity.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 4, 8 and 12.

## VII. The Motion for Summary Judgment is GRANTED as to Count 17 (Whistleblower Retaliation).

Varughese claims that Defendants violated New York Labor Law § 740, New York's whistleblower statute, by penalizing her for reporting McCash and Jordan for drinking on the job.

114

Presumably, Varughese invokes § 740 because it provides the only private right of action for enforcing § 741, New York's Health Care Whistleblower statute.

Section 741 specifically protects healthcare providers who "disclose[] or threaten[] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer . . . that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or objects to, or refuses to participate in" any such activity, policy or practice. N.Y. Labor Law § 741(a)-(b). An employer may not take any adverse personnel action against an employee "because" she engages in protected activity. N.Y. Labor Law § 740.

Relying on a 2010 Appellate Division decision, Defendants argue that Varughese's whistleblower retaliation claim should be dismissed because she has "failed to identify a specific law, rule or regulation" that the alleged drinking purportedly violated. *See* Defs. Mem., Docket #172 at 24-25, *citing Deshpande v. Medisys Health Network, Inc.*, 70 A.D.3d 760, 762 (2d Dep't 2010).

The case on which Defendants rely is no longer good law. The New York Court of Appeals expressly directed that it not be followed two months before Defendants filed their brief. *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448, 451 (2014) ("there is no such [identification] requirement. . . [and] Appellate Division authority. . . should no longer be followed for that proposition.").

The Court of Appeals cautioned that "*recover[y]* under a Labor Law § 740 theory" requires an actual violation of law, 23 N.Y.3d at 452-53, but, were Varughese's accusations true, there would have been a violation of actual law. Undertaking the liberal review that I must for a *pro se* plaintiff, it is not difficult to find a regulation that would be violated if Defendants' physicians – the need for whose "skilled performances . . . cannot be overemphasized" (Docket #205-8 at 11)

115

– were becoming intoxicated before assessing whether, say, someone had cancer. Specifically, New York Public Health Law § 230 *et seq.* is clear that a physician "practicing the profession while impaired by alcohol" has committed "professional misconduct" that can lead to the revocation of his or her medical license. N.Y. Pub. Health Law § 230(1) (incorporating by reference the definition of professional misconduct in N.Y. Educ. Law § 6530); *see also* N.Y. Educ. Law § 6530(7).

Defendants' better objection is that there is no evidence that Plaintiff was terminated in retaliation for engaging in conduct protected by the statute.

New York "enacted Section 741 of the Labor Law to encourage employees to report hazards to their supervisors and to protect them from retaliatory personnel actions when they make such reports." *Pal v. New York Univ.*, No. 06 CIV.5892, 2007 WL 4358463, at *7 (S.D.N.Y. Dec. 10, 2007) (citing Sponsor's Mem. (Oct. 23, 2001), N.Y. Bill Jacket, L.2002, ch. 24); *see also Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 263 (S.D.N.Y.2001) (citing *Rodgers v. Lenox Hill Hosp.*, 211 A.D.2d 248, 250-51 (1st Dep't 1995)).

However, to fall afoul of the statute, the adverse action must be taken "because" the employee engaged in protected activity. § 740. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity.

No reasonable jury could conclude that Defendants took any adverse action to retaliate against Varughese for reporting residents' drinking. Indeed, Varughese herself has specifically disclaimed any idea that there is any causal link between her reports of drinking and any adverse action she experienced: "I don't see it as retaliation for a complaint about people drinking on the job." (Varughese Dep. at 748.)

116

Even if Varughese had not waived reliance on this theory, however, the record does not support it.

Every time Varughese reported Dementia rounds or other alcoholic activity, she had just been taken to task for her own behavior – not the other way around. She made the first allegation about drinking after she was placed on Academic Advisement and around the time she was referred to the PWC. Varughese brought the issue up again in April, two days after Tiger-Paillex told her that HR could not substantiate her claims regarding the December 8 incident. Her third allegation – specifically claiming that McCash and Jordan had been drinking while involved with patient-care duties – came two days after her contentious May 3, 2011 meeting with Cordon-Cardo, in which she was told to rewrite her self-reflection.

At the follow-up meeting on May 24, when Varughese submitted her self-reflection late, rolled her eyes and allegedly threw a book on the table, Cordon-Cardo said: "the best way. . . to move on is not with this attitude. You can come here with another attitude and to say. . . I'm going to drop all of this nonsense of people drinking. . ."

> We are addressing these people. . .we are taking these matters very seriously today. We . . . have a lot of work to do . . . but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems . . .You can't keep going back and forth . . . coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking . . ."

(Docket #205-24 at 40-41). When he said that they were indeed taking these matters seriously, he was not kidding. He was obviously referring to Figur's involvement, which led to finding a bottle of Captain Morgan on hospital premises. This in turn led to a hospital-wide e-mail admonishing people to stop bringing alcohol to work. Varughese was not punished for her "whistleblowing" activity; to the contrary, it was followed up on, and things improved. But as with her claims of retaliation under Title VII and the state and city human rights laws, we must look at the totality of

117

the circumstances, as demonstrated by the admissible evidence, rather than conclusion or conjecture.

The totality of the circumstances of this case would not permit any reasonable juror to conclude that the hospital was reacting to Varughese's complaints about alcohol with adverse actions, rather than the other way around. Before she uttered a word about alcohol, Varughese had been put on Academic Advisement, so that very serious disciplinary action cannot be attributed to her whistleblowing. The evidence is undisputed that she failed to comply with the conditions of her Advisement; that was misconduct on her part, which was in no way excused by her whistleblowing. Ample evidence of her behavior at work justifies her being referred to the PWC. And her termination was occasioned by admitted instances of misconduct, the last straw being her admitted rifling through a file on the desk of an HR employee. Engaging in whistleblowing does not insulate an employee from being disciplined or fired for misconduct, and here, there is no genuine issue of fact that misconduct warranting discipline occurred.

The motion for summary judgment is GRANTED as to Varughese's §§740-741 claim (Count 17).

## VIII. The Motion for Summary Judgment Dismissing Count XIX (Family and Medical Leave Act) is GRANTED.

Varughese's FMLA claim is an unusual one.

In September 2011, Varughese herself suggested she might take a leave of absence from work. Defendants encouraged her to do so, provided her with the materials necessary to apply for FMLA leave, and followed up to see how Varughese was doing when she failed to submit an application. Several days after her initial inquiry and (according to her Rule 56.1 Statement) before she had even made a formal request to take leave, she said she wanted to take some leave at a later date and and come back to work. Her FMLA claim is based on the hospital's refusal to allow her

118

to come back to work until she obtained a doctor's assessment that she was fit to return, essentially forcing her to take involuntary leave. *See* Docket #66 at ¶ 56. The undisputed facts also establish that she disobeyed her employer's orders and came to work without permission for several days.

This is not a violation of the FMLA. The claim is dismissed.

FMLA was enacted because Congress believed "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods . . ." 29 U.S.C. § 2601(a)(4). FMLA therefore provides employees with certain substantive rights, with which employers cannot interfere. *Sarno v. Douglas–Elliman*, 183 F.3d 155 (2d Cir. 1999). The Act provides eligible employees the right to take unpaid leave for up to twelve weeks for a serious medical condition as defined by the Act. 29 U.S.C. § 2612(a)(1). It further provides that at the end of that leave the employee is entitled to reinstatement to the former position or an equivalent position. 29 U.S.C. § 2614(a). To ensure the availability of these rights, section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

Forced leave, however, "by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006). The FMLA establishes certain rights, including, inter alia, "to take leave, to restoration of position, and to maintain a civil action," but it "does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress." *Id.*

The Second Circuit has allowed that a cause of action "might" lie under the FMLA if such a forced leave "interfered with, restrained, or denied the exercise or attempted exercise of a right

119

provided under the FMLA." But Varughese does not allege that the requirement that she not come back without a doctor's note interfered with her ability to take leave under the FMLA, or with her ability to communicate with Defendants' HR department and submit her FMLA forms. It didn't even interfere with her ability to work; she ignored orders and reported to work anyway.

There can be no question that the Defendants wanted Varughese to exercise her rights under FMLA; they believed she was unstable and needed to take some leave. They did nothing to prevent her from taking FMLA leave; they encouraged her to take a leave.

There is no evidence in the record that would permit a reasonable juror to conclude that Defendants interfered with any right guaranteed by FMLA by requiring Varughese – who, by her own admission, had been ill frequently to the point of absence, and was extremely anxious – to provide a doctor's certification that she was fit for duty before she returned to making assessments that could affect patients' health. *See Robertson v. Amtrak/Nat'l R.R. Passenger Corp.*, 400 F. Supp. 2d 612, 614 (S.D.N.Y. 2005) (Chin, J.)

Further, even if Varughese had exercised her right to take leave under FMLA, "an employer is entitled to a certification of fitness to return to duty for such absences up to once every 30 days if reasonable safety concerns exist regarding the employee's ability to perform his or her duties, based on the serious health condition for which the employee took" a leave. 29 C.F.R. § 825.312. For a hospital to require a doctor's note certifying the fitness of a physician who has taken, or indicated a desire to take FMLA leave, is a prudent measure for the protection of the public.

To the extent that Varughese claims that Defendants did not require doctors' certifications of fitness from persons not in her protected class, her claim does not lie under the FMLA.

The motion for a summary judgment is GRANTED as to count 19.

120

## IX.    The Motion for Summary Judgment Dismissing Count XV and XVI (Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing) is GRANTED.

Varughese claims that her termination breached her employment contract. The Second Amended Complaint does not specify the alleged breach, but the gravamen of Varughese's contractual claim at her deposition and in her *pro se* papers has been that she was terminated without cause.

Varughese's employment contract provided that: "The Program Director [or] the Department Chair . . . may take disciplinary action, including termination for cause, against any [resident] who . . . fails to demonstrate an acceptable level of . . . professionalism."

Varughese has *admitted* to, *inter alia*, screaming, swearing, rolling her eyes, being absent, being late, ignoring pages, ignoring e-mails, ignoring calls, ignoring instructions, going through the files on someone else's desk, canceling a presentation without notice, and submitting an essay on professionalism two months late. The hospital concluded that the admitted behavior did not demonstrate an acceptable level of professionalism. Two appeals boards upheld that determination.

The hospital, not Dr. Varughese and not a jury, has the right to decide which behavior in a resident physician is sufficiently unprofessional to constitute cause for termination. She was terminated for cause. Her contract was not breached.

Her breach of the covenant of good faith and fair dealing fares no better.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (N.Y.2002); *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir.1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the

121

contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). While the implied covenant of good faith and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244 F.R.D. 204 (S.D.N.Y. 2007) (quoting *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y. 1983); *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (N.Y. 1978)).

To avoid redundancy, "Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes,* 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243–44 (S.D.N.Y.1997); *Murphy,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (holding that the implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties."); *Madison Capital Co., LLC v. Alasia, LLC,* 615 F.Supp.2d 233, 239 (S.D.N.Y.2009).

Here, Varughese has not provided any separate set of facts to support her breach of covenant claim, and the Court's own review of the record suggests none.

The motion to dismiss counts 15 and 16 is GRANTED.

122

## X. The Motion for Summary Judgment is GRANTED as to Count 13 (Tortious Interference with Business Relations).

Varughese alleges that, by failing to provide a summative evaluation to prospective employer RWJ hospital in January of 2011, Defendants engaged in the New York common law tort of interference with business relations, also known as tortious interference with prospective economic advantage.

"To state a claim for tortious interference with prospective economic advantage, a Plaintiff must show that '(1) the Plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *Doe v. White Plains Hosp. Med. Ctr. (WPHMC)*, No. 10 CIV. 5405 GBD, 2011 WL 2899174, at *4 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French*, 458 F. App'x 21 (2d Cir. 2012) (quoting *Catskill Dev., LLC v. Park Place Entm't*, 547 F.3d 115, 132 (2d Cir. 2008)).

Varughese's claim founders on the third element. She has provided nothing other than her own conclusory assertions to prove that Mount Sinai "acted for a wrongful purpose or used dishonest, unfair, or improper means" when it refused to provide RWJ Hospital with a summative evaluation while her appeals were pending.

> The Second Circuit has explained that, under New York law, the phrase "wrongful means"
>
> represent[s] 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract.' " *NBT Bancorp,* 664 N.E.2d at 497, 641 N.Y.S.2d at 586 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632 (N.Y.1980)).
>
> *Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 216 (2d Cir. 2003)

123

There is neither an allegation nor any evidence that Mount Sinai used the means described in *Scutti Enterprises*. Defendants did not wish to release any summative evaluation of Varughese's employment until her internal appeals of her termination had concluded. This decision actually was to Varughese's benefit; when the request was made her status was "terminated for cause," so if her appeal had been successful in overturning that determination, the information Mount Sinai would have provided would have been incorrect. The hospital was prudent to abide the final resolution of the appeals; prudence does not amount to fraud or any of the other improper means listed above.

The motion to dismiss Count 13 is GRANTED.

## XI. The Motion for Summary Judgment is GRANTED as to Count 14 (Defamation and Defamation Per Se).

Varughese alleges that Defendants' act of forwarding the "summative evaluation" to a potential employer would constitute defamation and defamation *per se*. She seeks an injunction preventing Defendants from sending the "summative evaluation" to anyone.

To recover for defamation in New York, Varughese must prove that the Defendants made:

(1) a false statement about the plaintiff, (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher, (4) that either constitutes defamation *per se* or caused 'special damages.'

*Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 173 (E.D.N.Y. 2014), *reconsideration denied* (May 14, 2014) (quoting *Thai v. Cayre Grp., Ltd.,* 726 F.Supp.2d 323, 329 (S.D.N.Y.2010) (internal citations omitted).

124

The claim must be dismissed because there is no evidence in the record that Defendants have actually published the summative evaluation to anyone except plaintiff. Unless there is publication to a third party, there is no defamation.[14]

Varughese's real goal is to obtain an injunction prohibiting Mount Sinai from publishing the evaluation to anyone in the future on the ground that it is defamatory. That claim fails because the statements in the summative evaluation she protests are not statements of fact. They are thus not actionable as defamation.

The "threshold issue which must be determined, as a matter of law, [in a defamation case] is whether the complained of statements constitute fact or opinion." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986): *Cohen v. Google, Inc.*, 25 Misc.3d 945, 887 N.Y.S.2d 424 (N.Y. Sup. 2009). In determining whether a statement constitutes fact or opinion, a court should consider: "(1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (N.Y. 1993) (quoting *Steinhilber*, 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550). A court is to consider the context of the statement as a whole. *Sandals Resorts Intern. Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5 (N.Y. 2011).

---

[14] The evaluation was shown to persons who were deposed, including Dr. Fyfe of Robert Wood Johnson Hospital, but that is a privileged act, taking place in the context of a lawsuit, where the witness (who was identified by Varughese) was being questioned about whether RWJ would have been willing to employ Varughese if the evaluation had been sent (it had not even been written yet when Varughese was discussing possible employment at RWJ). It is not actionable.

125

If the statements are "pure opinion," then they are not defamatory as a matter of law even if they are false and libelous. *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Rinaldi v. Holt, Rinehart & Winston, Inc.* 42 N.Y.2d 369, 380–81, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (Ct.App.1977). "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based." *Steinhiber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550.; *see also Sandals Resorts Intern. Ltd.*, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5. Such statements are not actionable because "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Gross*, 80 N.Y.2d at 154, 589 N.Y.S.2d 833, 603 N.E.2d 938.

The Summative Evaluation is a two-page document consisting of checked boxes marking Varughese as "satisfactory" or "unsatisfactory" in six categories, plus two explanatory paragraphs:

> Dr. Varughese's evaluations over the initial portion of her Pathology residency training at Mount Sinai demonstrated satisfactory development in the six Core Competency domains. In some rotations her performance was considered superior by individual attendings, particularly in the areas of patient care (gynecological pathology) and medical knowledge (VA hospital rotations).

> However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in December 2010, in the middle of her third year of training. While the program advanced Dr. Varughese to her fourth year of training, her substandard performance led the Department Chair to issue her a final warning notice on July 1, 2011. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was summarily suspended pending termination from the program on September 21, 2011. Following Mount Sinai's grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

(Docket #162-6 at 39-40.) The evaluation then checks "no" in response to the prompt "The resident/fellow has demonstrated sufficient competence to enter practice without direct supervision." (*Id.* at 40.)

126

The only factual assertions in that document are ones with which Varughese does not take issue. They recount what other people thought, the dates of various actions that unquestionably took place, and the results of Varughese's appeals.

What Varughese objects to are the characterizations of her work as "unsatisfactory" "unprofessional" and "substandard." But these are matters of *opinion*, not actionable assertions of fact. *See Tasso v. Platinum Guild Int'l*, No. 94 Civ. 8288, 1998 WL 841489, at *5 (S.D.N.Y. Dec. 3, 1998) (finding statements that plaintiff was "unethical, untrustworthy, unprofessional" and "incompetent" to be non-actionable opinion) (citing *Gavenda v. Orleans County,* No. 95–CV– 0215E, 1997 WL 65870, at *8, (W.D.N.Y. Feb. 10, 1997) (statements that plaintiff was "incompetent," and "there had been problems with her before and she wasn't doing her job right" were non-actionable statements of opinion); *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201, 203 (App. Div. 1992) (statements criticizing plaintiff's performance and comparing her unfavorably to other employees as "one of the wors[t]" nonactionable as a matter of law); *Amodei v. N.Y. State Chiropractic Ass'n,* 160 A.D.2d 279, 553 N.Y.S.2d 713, 715–16 (App. Div. 1990), *aff'd,* 77 N.Y.2d 891, 571 N.E.2d 70, 568 N.Y.S.2d 900 (1991) (statement accusing chiropractor of "unprofessional conduct" fails to state an action in defamation); *Hollander v. Cayton,* 145 A.D.2d 605, 606, 536 N.Y.S.2d 790, 792 (App. Div. 1988) (statements allegedly made by president of professional staff that plaintiff-physician was "immoral," "unethical," and had "mismanaged cases" were non-actionable)).

Moreover, as Judge Daniels has explained, "New York courts have consistently held that subjective job evaluations, including those in connection with an employee's termination, are non-actionable opinion." *Doe v. White Plains Hosp. Med. Ctr. (WPHMC)*, No. 10 Civ. 5405, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French*, 458 F. App'x 21 (2d

127

Cir. 2012) (citing *Williams v. Varig Brazilian Airlines*, 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dep't 1991) (memorandum of one supervisor to another and a termination letter from supervisor to Plaintiff are non-actionable opinion); *Ott v. Automatic Connector, Inc.*, 193 A.D.2d 657, 598 N.Y.S.2d 10 (2d Dep't 1993) (unfavorable assessment of work performance in termination letter amounted to a non-actionable expression of opinion). Such statements are non-actionable because "[a]n employer has the right to assess an employee's performance on the job without judicial interference."*Ott*, 193 A.D.2d at 658, 598 N.Y.S.2d 10 (citing *Miller v. Richman*, 184 A.D.2d 191, 592 N.Y.S.2d 201 (4th Dep't 1992); *Williams*, 169 A.D.2d 434, 564 N.Y.S.2d 328; *Goldberg v. Coldwell Banker*, 159 A.D.2d 684, 553 N.Y.S.2d 432 (2d Dep't 1990)). While not a per se rule, courts are reluctant to sustain a claim for defamation for statements made in the context of an employee evaluation or termination because "no workplace . . . can operate effectively unless the employers and employee who work there have the ability to speak freely in evaluating the actions of their employees and co-employees." *Albert v. Locksen*, 239 F.3d 256, 268 (2d Cir. 2001)).

There is no reason to depart from that rule here. Indeed, Varughese presented testimony from her prospective employer essentially discounting the importance of the Summative Evaluation as a mere opinion. Had RWJ Hospital received it earlier, it would have investigated the underlying *facts*. That testimony merely confirms the wisdom of the rule in New York: end-of-job evaluations are generally not actionable in defamation suits.

Defendants' motion for a summary judgment of dismissal is GRANTED as to Count 14.

## XII. The Motion for Summary Judgment is GRANTED as to Count 21 (Individual Liability against Defendants Cordon-Cardo, Firpo, and Lento).

As I have found that Varughese cannot withstand summary judgment on any of her claims, no individual liability can attach as to those claims.

128

The motion for summary judgment is GRANTED as to count 21's claim for individual liability as against defendants Cordon-Cardo, Firpo, Lento and Bleiweiss.

## CONCLUSION

For the foregoing reasons, Defendants' motion for a summary judgment of dismissal as to all counts is GRANTED and the case is dismissed.

The Clerk of the Court is directed to remove Docket No. 161 from the Court's list of pending motions and to close the file.

Dated: March 27, 2015

_____
U.S.D.J.

BY ECF TO ALL COUNSEL