# 15-1328-cv

## United States Court of Appeals

### *for the*

### Second Circuit

M.D. LEENA VARUGHESE,

*Plaintiff-Appellant,*

– v. –

PATRICK LENTO, M.D., M.D. IRA J. BLEIWEISS, JOHN DOES, 1-10,
MOUNT SINAI MEDICAL CENTER, M.D. ADOLFO FIRPO,
M.D. CARLOS CORDON-CARDO,

*Defendants-Appellees,*

ABC CORPORATION, INC., 1-10,

*Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANTS-APPELLEES
### Volume 1 of 3 (Pages AA-1 to AA-220)

RORY J. MCEVOY
AKERMAN LLP
*Attorneys for Defendants-Appellees*
666 Fifth Avenue, 20th Floor
New York, New York 10103
(212) 880-3800

i

# TABLE OF CONTENTS

                                                                    **Page**

District Court Docket Entries .....................................  AA-1

Notice of Motion by Defendants, for an Order
    Granting Summary Judgment, dated
    July 24, 2014...........................................................  AA-36

Declaration of Rory J. McEvoy, for Defendants, in
    Support of Motion, dated July 24, 2014 ...............  AA-38

Exhibit 1 to McEvoy Declaration -
(i) Excerpts of Deposition Testimony of Leena
    Varughese, dated May 23, 2013............................  AA-40

(ii) Excerpts of Deposition Testimony of Leena
    Varughese, dated June 11, 2013............................  AA-68

(iii) Excerpts of Deposition Testimony of Leena
    Varughese, dated June 13, 2013............................  AA-93

(iv) Excerpts of Deposition Testimony of Leena
    Varughese, dated July 8, 2013 .............................  AA-133

(v) Excerpts of Deposition Testimony of Leena
    Varughese, dated August 7, 2013..........................  AA-167

(vi) Various Varughese Deposition Exhibits...........  AA-177

Exhibit 2 to McEvoy Declaration -
Excerpts of Deposition Testimony of Carlos
Cordon-Cardo, M.D., dated October 18, 2013 ......  AA-305

Exhibit 3 to McEvoy Declaration -
Excerpts of Deposition Testimony of Patrick
Lento, M.D., dated October 25, 2013 ....................  AA-313

ii

Page

Exhibit 4 to McEvoy Declaration -
Excerpts of Deposition Testimony of Ira J.
Bleiwess, M.D., dated November 13, 2013 ........... AA-323

Exhibit 5 to McEvoy Declaration -
(i) Excerpts of Deposition Testimony of Arthur
Figur, M.D., dated January 8, 2014 ...................... AA-328

(ii) Figur Deposition Exhibit 3 ............................ AA-339

Exhibit 6 to McEvoy Declaration -
(i) Excerpts of Deposition Testimony of Adolfo
Firpo, M.D., dated October 30, 2013 .................... AA-342

(ii) Excerpts of Deposition Testimony of Adolfo
Firpo, M.D., dated December 17, 2013 ................. AA-375

(iii) Various Firpo Deposition Exhibits.................. AA-399

Exhibit 7 to McEvoy Declaration -
Excerpts of Deposition Testimony of Shema
Patel, dated November 20, 2013 ........................... AA-417

Exhibit 8 to McEvoy Declaration -
Excerpts of Deposition Testimony of Caryn
Tiger, dated December 17, 2013 ........................... AA-423

Declaration of Kruti Maniar, M.D., dated July 18,
2014, filed July 24, 2014 ...................................... AA-430

Declaration of Vesna Najfeld, Ph.D., dated June 27,
2014, filed July 24, 2014 ...................................... AA-433

Exhibit 1 to Najfeld Declaration -
E-mail from Leena Varughese to Vesna Najfeld,
dated August 8, 2011................................................ AA-438

Exhibit 2 to Najfeld Declaration -
E-mail from Vesna Najfeld to Leena Varughese,
dated August 8, 2011, 4:23 p.m. ............................ AA-440

iii

**Page**

Exhibit 3 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 8, 2011,  4:28 p.m. .......................... AA-442

Exhibit 4 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 8, 2011, 4:49 p.m. .......................... AA-444

Exhibit 5 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 8, 2011, 5:42 p.m. .......................... AA-446

Exhibit 6 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 9, 2011, 6:21 a.m.............................. AA-448

Exhibit 7 to Najfeld Declaration -
Email from Leena Varughese to Vesna Najfeld,
dated August 9, 2011.............................................. AA-450

Exhibit 8 to Najfeld Declaration -
Notes of Vesna Najfeld, Ph.D., dated
August 12, 2010....................................................... AA-452

Declaration of Samuel McCash, M.D., dated July
18, 2014, filed July 24, 2014 ................................. AA-455

Declaration of Patrick Lento, M.D., dated July 3,
2014, filed July 24, 2014 ....................................... AA-457

Exhibit 1 to Lento Declaration -
Verification and Summative Evaluation of
Graduate Education/Training, dated
April 14, 2011 ........................................................ AA-459

Declaration of Adolfo Firpo, M.D., dated July 18,
2014, filed July 24, 2014 ........................................ AA-462

iv

**Page**

Exhibit 1 to Firpo Declaration -
Email from Leena Varughese to Adolfo Firpo,
dated September 7, 2011 ........................................ AA-464

Declaration of Paul Johnson, dated July 23, 2014,
filed July 24, 2014 ................................. AA-468

Exhibit 1 to Johnson Declaration -
Mount Sinai's Department of Radiology
Residency Program Report for 2008-2011 ............ AA-471

Exhibit 2 to Johnson Declaration -
Mount Sinai's Department of Pathology Report
for 2008-2011 ........................................ AA-473

Exhibit 3 to Johnson Declaration -
Verification and Summative Evaluation of
Graduate Education/Training, dated
May 15, 2013 ......................................... AA-475

Exhibit 4 to Johnson Declaration -
Exit Summary of Alifia Khan, M.D., for July 1,
2007–June 30, 2008 ................................. AA-478

Exhibit 5 to Johnson Declaration -
Excerpts of Mount Sinai School of Medicine –
House Staff Manual ................................. AA-482

Exhibit 6 to Johnson Declaration -
List of House Staff in Mount Sinai Department of
Pathology as of September 1, 2011 ...................... AA-493

Declaration of Shabnam Jaffer, M.D., dated July 18,
2014, filed July 24, 2014 ........................ AA-495

Declaration of Shema Patel, dated July 15, 2014,
filed July 24, 2014 ................................. AA-497

v

**Page**

Declaration of Anupma Nayak, M.D., dated July 18,
2014, filed July 24, 2014 ...................................... AA-498

Defendants' Rule 56.1 Statement, dated July 24,
2014 ..................................................................... AA-500

Reply Declaration of Rory J. McEvoy, for
Defendants, in Further Support of Motion, dated
January 16, 2015 .................................................. AA-517

Exhibit 1 to McEvoy Reply Declaration -
Excerpts of Deposition Testimony of Patrick
Lento, M.D., dated October 25, 2013 ................... AA-519

Exhibit 2 to McEvoy Reply Declaration -
Excerpts of Deposition Testimony of Adolfo
Firpo, M.D., dated October 30, 2013.................... AA-523

Memorandum Decision and Order Granting
Defendants' Motion for Summary Judgment,
dated March 27, 2015 ........................................... AA-527

Notice of Appeal, dated April 22, 2015 .................... AA-656

AA-1

CLOSED,APPEAL,CASREF,ECF,MEDT5,PRO-SE

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:12-cv-08812-CM-JCF

Varughese v. Mount Sinai Medical Center et al
Assigned to: Judge Colleen McMahon
Referred to: Magistrate Judge James C. Francis
Cause: 42:2000e-2e Job Discrimination (Unlawful
Employment Practices)

Date Filed: 12/04/2012
Date Terminated: 03/31/2015
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**M.D. Leena Varughese**

represented by **Leena Varughese**
531 Olive Terrace
Union, NJ 07083
908/265-7536
Email: leenav@gmail.com
PRO SE

**Ronald Joseph Wronko , Jr.**
Law Offices of Ronald J. Wronko, LLC
96 Park Street
Montclair, NJ 07042
(973) 509-0050
Fax: (973)509-2003
Email: ron@ronwronkolaw.com
*TERMINATED: 02/21/2014*

V.

**Defendant**

**Mount Sinai Medical Center**

represented by **Rory J. McEvoy**
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
212-885-5000
Fax: 212-885-5001
Email: rory.mcevoy@akerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Lynn Weber**
Locke Lord LLP (NYC)
750 Lexington Avenue
New York, NY 10022
(212)-912-2856

AA-2

Fax: (888)-325-9140
Email: jsauer@edwardswildman.com
*ATTORNEY TO BE NOTICED*

**Katherine D Watson**
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
Fax: (212) 885-5001
Email: kwatson@blankrome.com
*ATTORNEY TO BE NOTICED*

**Rachel Beth Jacobson**
Edwards Wildman Palmer LLP (NYC)
750 Lexington Avenue
New York, NY 10022
(212) 912-2937
Fax: (866) 314-8211
Email:
rjacobson@edwardswildman.com
*TERMINATED: 09/18/2013*
*ATTORNEY TO BE NOTICED*

**Defendant**
**M.D. Patrick Lento**                  represented by **Rory J. McEvoy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Lynn Weber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine D Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**M.D. Carlos Cordon-Cardo**            represented by **Rory J. McEvoy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Lynn Weber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine D Watson**

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page9 of 113

AA-3

(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Beth Jacobson**
(See above for address)
*TERMINATED: 09/18/2013*
*ATTORNEY TO BE NOTICED*

**Defendant**
**M.D. Adolfo Firpo**                    represented by   **Rory J. McEvoy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Lynn Weber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine D Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Beth Jacobson**
(See above for address)
*TERMINATED: 09/18/2013*
*ATTORNEY TO BE NOTICED*

**Defendant**
**M.D. Ira J. Bleiweiss**                represented by   **Rory J. McEvoy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie Lynn Weber**
(See above for address)
*ATTORNEY TO BE NOTICED.*

**Katherine D Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Beth Jacobson**
(See above for address)
*TERMINATED: 09/18/2013*
*ATTORNEY TO BE NOTICED*

**Defendant**

AA-4

**ABC Corp.**
*1-10*
*TERMINATED: 11/06/2013*

<u>Defendant</u>

**John Does**
*1-10*
*TERMINATED: 11/06/2013*

represented by **Katherine D Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**ABC Corp 1-10**

<u>Defendant</u>

**John Does 1-10**

represented by **Katherine D Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/04/2012 | 1 | COMPLAINT against ABC Corp., Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Filing Fee $ 350.00, Receipt Number 465401054490)Document filed by Leena Varughese. (jom) (Entered: 12/10/2012) |
| 12/04/2012 | | SUMMONS ISSUED as to ABC Corp., Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (jom) (Entered: 12/10/2012) |
| 12/04/2012 | | Magistrate Judge James C. Francis IV is so designated. (jom) (Entered: 12/10/2012) |
| 12/04/2012 | | Case Designated ECF. (jom) (Entered: 12/10/2012) |
| 12/13/2012 | 2 | ORDER SCHEDULING AN INITIAL PRETRIAL CONFERENCE: If a conforming case management plan is submitted at least two business days prior to the scheduled initial conference and subsequently approved by the Court, the initial conference will be canceled automatically. If a motion has been filed either before or after the case management plan is approved, and the parties desire a conference, a letter must be submitted to the Court via fax specifically asking that the initial conference not be canceled. If the parties fail to agree upon such a plan or fail to submit the plan to the Court within the time provided (at least two business days before the conference date), the parties must appear for a conference on 2/8/2013 in courtroom 14C, at the U.S. Courthouse, 500 Pearl Street, New York, New York 10007 at 10:45 a.m. (Initial Conference set for 2/8/2013 at 10:45 AM in Courtroom 14C, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon). (Signed by Judge Colleen McMahon on 12/13/2012) (djc) (Entered: 12/13/2012) |
| 01/04/2013 | 3 | |

AA-5

| | | |
|---|---|---|
| | | NOTICE OF APPEARANCE by Rory J. McEvoy on behalf of Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Mount Sinai Medical Center (McEvoy, Rory) (Entered: 01/04/2013) |
| 01/04/2013 | 4 | NOTICE OF APPEARANCE by Rachel Beth Jacobson on behalf of Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Mount Sinai Medical Center (Jacobson, Rachel) (Entered: 01/04/2013) |
| 01/08/2013 | 5 | ENDORSED LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated 1/7/2013 re: counsel for Defendants ask that their request for a thirty day extension to move against, answer, or otherwise respond to the Complaint be granted by the Court. ENDORSEMENT: OK-30 day extension is granted. (Signed by Judge Colleen McMahon on 1/8/13) (pl) (Entered: 01/08/2013) |
| 02/01/2013 | 6 | MOTION for Extension of Time *to adjourn the Initial Pretrial Conference currently scheduled for Feb. 8, 2013.* Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 02/01/2013) |
| 02/04/2013 | 7 | MEMO ENDORSEMENT terminating 6 Motion for Extension of Time: I would like to hold the conference to get an early handle on the motion. (Signed by Judge Colleen McMahon on 2/4/2013) (lmb) (Entered: 02/04/2013) |
| 02/06/2013 | 8 | AFFIDAVIT OF SERVICE. Ira J. Bleiweiss served on 12/17/2012, answer due 1/7/2013. Service was accepted by Linda Rodriguez, Receptionist, Security Office, Mount Sinai Medical Center. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 02/06/2013) |
| 02/06/2013 | 9 | AFFIDAVIT OF SERVICE. Mount Sinai Medical Center served on 12/17/2012, answer due 1/7/2013. Service was accepted by Linda Rodriguez, Receptionist, Security Office, Mount Sinai Medical Center. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 02/06/2013) |
| 02/06/2013 | 10 | AFFIDAVIT OF SERVICE. Carlos Cordon-Cardo served on 12/17/2012, answer due 1/7/2013. Service was accepted by Linda Rodriguez, Receptionist, Security Office, Mount Sinai Medical Center. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 02/06/2013) |
| 02/06/2013 | 11 | AFFIDAVIT OF SERVICE. Adolfo Firpo served on 12/17/2012, answer due 1/7/2013. Service was accepted by Linda Rodriguez, Receptionist, Security Office, Mount Sinai Medical Center. Document filed by Adolfo Firpo. (Wronko, Ronald) (Entered: 02/06/2013) |
| 02/06/2013 | 12 | AFFIDAVIT OF SERVICE. Patrick Lento served on 1/7/2013, answer due 1/28/2013. Service was accepted by Mrs. Adolfo Firpo. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 02/06/2013) |
| 02/06/2013 | 13 | AFFIDAVIT OF SERVICE. Service was accepted by Linda Rodriguez, receptionist, Security Office, Mount Sinai Medical Center. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 02/06/2013) |
| 02/07/2013 | 14 | |

| | | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Mount Sinai Medical Center. (Attachments: # 1 Affidavit of Service)(McEvoy, Rory) (Entered: 02/07/2013) |
|---|---|---|
| 02/07/2013 | 15 | MOTION to Dismiss *the Complaint*. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Affidavit of Service)(McEvoy, Rory) (Entered: 02/07/2013) |
| 02/07/2013 | 16 | MEMORANDUM OF LAW in Support re: 15 MOTION to Dismiss *the Complaint*.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Affidavit of Service)(McEvoy, Rory) (Entered: 02/07/2013) |
| 02/07/2013 | 17 | DECLARATION of Rory J. McEvoy in Support re: 15 MOTION to Dismiss *the Complaint*.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Affidavit of Service)(McEvoy, Rory) (Entered: 02/07/2013) |
| 02/07/2013 | 18 | AFFIDAVIT OF SERVICE of MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MOTION TO DISMISS THE COMPLAINT, RULE 7.1 DISCLOSURE and NOTICE OF MOTION with declaration and exhibits annexed thereto served on Ronald J. Wronko, Esq. on February 7, 2013. Service was made by Mail. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 02/07/2013) |
| 02/08/2013 | 19 | CIVIL CASE MANAGEMENT PLAN: This case is to be tried to a jury. Discovery disputes in this case will be resolved by the assigned Magistrate Judge, who is JC Francis. Plaintiff's deposition shall be taken first, and shall be completed by 4/26/2013. All discovery, including expert discovery, must be completed on or before 9/27/2013. A joint pre-trial order in the form prescribed in Judge McMahon's individual rules, together with an other pre-trial submissions required by those rules (not including in limine motions), shall be submitted on or be 11/1/2013. The parties may at any time consent to have this case tried before the assigned Magistrate Judge pursuant to 28 U.S.C. Section 636(c). (Signed by Judge Colleen McMahon on 2/8/2013) (mro) (Entered: 02/08/2013) |
| 02/08/2013 | | Minute Entry for proceedings held before Judge Colleen McMahon: Initial Pretrial Conference held on 2/8/2013. Decision: Conference held. (Submitted By Benjamin A. Gianforti). (mde) (Entered: 02/11/2013) |
| 02/21/2013 | 20 | CROSS MOTION to Amend/Correct *Complaint*. Document filed by Leena Varughese. (Attachments: # 1 Affidavit of Service)(Wronko, Ronald) (Entered: 02/21/2013) |
| 02/21/2013 | 21 | MEMORANDUM OF LAW in Opposition re: 15 MOTION to Dismiss *the Complaint*.. Document filed by Leena Varughese. (Attachments: # 1 Affidavit of Service)(Wronko, Ronald) (Entered: 02/21/2013) |
| 02/21/2013 | 22 | |

|  |  |  |
|---|---|---|
|  |  | MEMORANDUM OF LAW in Support re: <u>20</u> CROSS MOTION to Amend/Correct *Complaint*.. Document filed by Leena Varughese. (Attachments: # <u>1</u> Affidavit of Service)(Wronko, Ronald) (Entered: 02/21/2013) |
| 02/21/2013 | <u>23</u> | DECLARATION of Ronald J. Wronko in Opposition re: <u>15</u> MOTION to Dismiss *the Complaint*.. Document filed by Leena Varughese. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Affidavit of Service)(Wronko, Ronald) (Entered: 02/21/2013) |
| 02/21/2013 | <u>24</u> | DECLARATION of Ronald J. Wronko in Support re: <u>20</u> CROSS MOTION to Amend/Correct *Complaint*.. Document filed by Leena Varughese. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Affidavit of Service)(Wronko, Ronald) (Entered: 02/21/2013) |
| 02/26/2013 | <u>25</u> | ANSWER to <u>1</u> Complaint. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 02/26/2013) |
| 02/26/2013 | <u>26</u> | ORDER OF AUTOMATIC REFERRAL TO MEDIATION (See M-10-468 Order filed January 3, 2011). Please reference the following when corresponding with the Mediation Office. E-mail MediationOffice@nysd.uscourts.gov, telephone (212) 805-0643, and facsimile (212) 805-0647. Mediator to be Assigned by 3/8/2013. (Signed by Judge Loretta A. Preska on 1/3/2011) (rpr) (Entered: 02/27/2013) |
| 02/28/2013 | <u>27</u> | REPLY AFFIDAVIT of RORY J. MCEVOY in Support re: <u>15</u> MOTION to Dismiss *the Complaint*.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3)(McEvoy, Rory) (Entered: 02/28/2013) |
| 02/28/2013 | <u>28</u> | REPLY MEMORANDUM OF LAW in Support re: <u>15</u> MOTION to Dismiss *the Complaint*.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 02/28/2013) |
| 03/08/2013 |  | NOTICE OF MEDIATOR ASSIGNMENT - Notice of assignment of mediator. Mediator Schedule due by 4/8/2013.(cda) (Entered: 03/08/2013) |
| 04/02/2013 | <u>29</u> | NOTICE OF APPEARANCE by Julie Lynn Sauer on behalf of Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center (Sauer, Julie) (Entered: 04/02/2013) |
| 04/03/2013 | <u>30</u> | DECISION AND ORDER: For the reasons set forth above, Defendants' motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(l) is DENIED. Plaintiff's cross-motion for leave to file an amended complaint is GRANTED. Plaintiff's deadline to file a first amended complaint is April 17, 2013. The Clerk of the Court is directed to remove the motions at Docket Nos. 15 and 20 from the Court's list of pending motions. (Signed by Judge Colleen McMahon on 4/3/2013) Copies Sent By ECF By Chambers. (cd) (Entered: 04/03/2013) |
| 04/03/2013 |  |  |

| | | |
|---|---|---|
| | | Set/Reset Deadlines: Amended Complaint due by 4/17/2013. (cd) (Entered: 04/03/2013) |
| 04/10/2013 | 31 | ENDORSED LETTER addressed to Judge Colleen McMahon from Ronald J. Wronko dated 4/8/2013 re: Request to modify the Court's Scheduling Order and that the parties be permitted to mediate the matter. ENDORSEMENT: OK. (Signed by Judge Colleen McMahon on 4/9/2013) (cd) (Entered: 04/10/2013) |
| 04/10/2013 | 32 | ENDORSED LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated 4/9/2013 re: I write to inform the Court that during a recent telephone conference with Magistrate Judge Francis's chambers. I was informed that the case had not been referred to him to address and resolve any discovery issues. ENDORSEMENT: If any discovery disputes arise, you will get your order of reference. (Signed by Judge Colleen McMahon on 4/9/2013) (cd) (Entered: 04/10/2013) |
| 04/11/2013 | | MEDIATOR SESSION SCHEDULED First Mediation Session scheduled for 5/1/13, 2:30PM at 40 Foley Square Courthouse.(ms) (Entered: 04/11/2013) |
| 04/17/2013 | 36 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 30 Order on Motion to Dismiss, Order on Motion to Amend/Correct. (sj) (Entered: 05/08/2013) |
| 04/23/2013 | 33 | CONFIDENTIALITY STIPULATION & ORDER...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Colleen McMahon on 4/23/2013) (cd) (Entered: 04/23/2013) |
| 04/23/2013 | 34 | FIRST AMENDED COMPLAINT amending 1 Complaint against ABC Corp., Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center with JURY DEMAND.Document filed by Leena Varughese. Related document: 1 Complaint filed by Leena Varughese.(ft) (Entered: 04/26/2013) |
| 05/01/2013 | 35 | ANSWER to 34 Amended Complaint,. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(Sauer, Julie) (Entered: 05/01/2013) |
| 05/02/2013 | | Mediator Session Held on 05/01/2013 at 40 Foley Square.(ms) (Entered: 05/02/2013) |
| 05/15/2013 | 37 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Referral for discovery disputes. Referred to Magistrate Judge James C. Francis. (Signed by Judge Colleen McMahon on 5/15/2013) (cd) (Entered: 05/15/2013) |
| 05/15/2013 | 38 | ENDORSED LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated 5/14/2013 re: Having not heard from Mr, Wronko, on May 3, 2013, I e-mailed him and again asked whether he would agree to produce his client for more than one day of deposition. On May 10, 2013, I received a letter from Mr. Wronko which said, in relevant part, that after conferring with his client. "[s]he is unwilling to consent to extend the time period of deposition beyond the federal rule limit." As a result of Mr. Wronko's continued pattern of allowing his client to conduct this litigation, I respectfully request that the |

| | | Court refer the matter to Magistrate Judge Francis to resolve this dispute.. ENDORSEMENT: In light of the fact - intensive nature of this case, exceeding the seven - hour limit for the plaintiff's deposition is well warranted, and the plaintiff's concerns about harassment at the deposition are premature and unsupported. The deposition shall proceed, and counsel may return for a further ruling if and when they disagree about continuing with it. SO ORDERED. (Signed by Magistrate Judge James C. Francis on 5/15/2013) (mt) (Entered: 05/15/2013) |
|---|---|---|
| 06/28/2013 | 40 | ENDORSED LETTER addressed to Judge Colleen McMahon from Ronald J. Wronko dated 6/28/2013 re: Plaintiff consents to defendants request to have until 8/26/2013, to serve a responsive expert report. ENDORSEMENT: Plaintiff's expert report is timely. Defendants' deadline for their expert report is extended to 8/26/2013. (Signed by Judge Colleen McMahon on 6/28/2013) (cd) (Entered: 06/28/2013) |
| 07/11/2013 | 41 | ORDER: Counsel having submitted letters setting forth certain discovery disputes, and a pretrial conference having been held on July 11, 2013, it is hereby ORDERED as follows: 1. By July 15, 2013, counsel shall advise the Court in writing of the terms of any agreement they have reached with respect to a protocol for producing defendants' electronically stored information and of the date by which such information shall be produced as further set forth in this order. (Signed by Magistrate Judge James C. Francis on 7/11/2013) Copies Mailed By Chambers. (lmb) (Entered: 07/11/2013) |
| 07/16/2013 | 42 | LETTER addressed to Magistrate Judge James C. Francis IV. from Ronald J. Wronko dated 7/10/2013 re: Counsel for Leena Varughese, M.D. writes this letter as a summary of plaintiff's position on discovery disputes in this matter in advance of the Court hearing on Thursday, July 11, 2013. Document filed by Leena Varughese.(rsh). (Entered: 07/16/2013) |
| 07/24/2013 | 43 | ORDER: Counsel having submitted letters concerning disputes over the proposed psychiatric examination of plaintiff it is hereby ORDERED that plaintiff appear for the first session of her examination on July 29, 2013, at 9:30 a.m. and for the second session on August 1, 2013. The letter of defendants' counsel dated July 24, 2013 (the "July 24 Letter"), sets forth the methodology that will be followed. The requests of plaintiff to limit the time of the examination to two hours, to limit the scope to plaintiff's claimed emotional injury in this action, to require disclosure now of the psychiatrist's curriculum vitae, to require disclosure of the psychiatrist's report within one week of the examination, and to allow the plaintiff to be accompanied at the examination by a registered nurse are all denied for the reasons set forth in the July 24 Letter. (Signed by Magistrate Judge James C. Francis on 7/24/2013) Copies Mailed By Chambers. (lmb) (Entered: 07/24/2013) |
| 07/26/2013 | 44 | ENDORSED LETTER addressed to Magistrate Judge James C. Francis from Rory J. McEvoy dated 7/25/2013 re: Accordingly, Defendants respectfully request that the Court enter a revised Order that directs Plaintiff to appear on August 1, 2013 at 9:30 am and denies Plaintiff's request to record that examination for the reasons set forth in my letter, dated July 24, 2013. |

AA-10

| | | |
|---|---|---|
| | | ENDORSEMENT: Application granted. SO ORDERED. (Signed by Magistrate Judge James C. Francis on 7/25/2013) (mt) (Entered: 07/26/2013) |
| 07/26/2013 | 45 | ENDORSED LETTER addressed to Magistrate Judge James C. Francis from Ronald J. Wronko dated 7/26/2013 re: Plaintiff respectfully requests that the Court amend the recent Order compelling a psychiatric examination to state that plaintiff is no longer required to appear for such examination in light of her dismissal of the IIED claim and decision to pursue only a garden variety emotional distress claim. ENDORSEMENT: Application granted. The plaintiff is precluded from proffering evidence going to any emotional injury other than a "garden variety" claim of emotional distress. (Signed by Magistrate Judge James C. Francis on 7/26/2013) (lmb) (Entered: 07/29/2013) |
| 07/26/2013 | 46 | LETTER addressed to Magistrate Judge James C. Francis, IV from Rory J. McEvoy dated 7/19/2013 re: On Behalf of our clients, Mount Sinai Medical Center ("Mount Sinai") and the individual defendants, I write regarding Plaintiff's failure to comply with the court's July 11 Order. (ama) (Entered: 07/29/2013) |
| 07/26/2013 | 47 | LETTER addressed to Magistrate Judge James C. Francis, IV from Ronald J. Wronko dated 7/19/2013 re: I write in response to Mr. McEvoy's letter today's date regarding the proposed psychiatric examination of plaintiff. (ama) Modified on 7/29/2013 (ama). (Entered: 07/29/2013) |
| 07/26/2013 | 48 | LETTER addressed to Magistrate Judge James C. Francis, IV from Ronald J. Wronko, Esq. dated 7/24/2013 re: I write in response to Plaintiff's counsel, Ronald J. Wronko's letter to the court, dated July 19, 2013, regarding Plaintiff's proposed psychiatric examination. (ama) (Entered: 07/29/2013) |
| 08/23/2013 | 49 | ENDORSED LETTER addressed to Judge Colleen McMahon from Ronald J. Wronko dated 8/22/2013 re: I represent Leena Varughese, M.D., in the above-referenced matter, I write to request permission to file application under seal to be relieved as counsel in the above-referenced matter. ENDORSEMENT: The Court will conference this matter on September 13, 2013 at 12:15 p.m. Counsel is to make sure Dr. Varughese is present at the conference. (Status Conference set for 9/13/2013 at 12:15 PM before Judge Colleen McMahon.) (Signed by Judge Colleen McMahon on 8/23/2013) (rsh) (Entered: 08/23/2013) |
| 09/13/2013 | | Minute Entry for proceedings held before Judge Colleen McMahon: Status Conference held on 9/13/2013. Decision: Conference held. See unsealed transcript for more details. Submitted By Benjamin A. Gianforti. (Court Reporter Sabrina D'Emidio). (mde) (Entered: 09/13/2013) |
| 09/19/2013 | 50 | DECISION AND ORDER ON MOTION TO BE RELIEVED: Plaintiffs counsel's motion to be relieved is denied. An opinion addressed to counsel and plaintiff has been filed under seal and will be sent to plaintiff and Mr. Wronko. (Signed by Judge Colleen McMahon on 9/19/2013) (ft) (Entered: 09/19/2013) |
| 09/19/2013 | 51 | SEALED DOCUMENT placed in vault.(mps) (Entered: 09/19/2013) |
| 09/26/2013 | 52 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Discovery. Referred to Magistrate Judge |

AA-11

| | | |
|---|---|---|
| | | James C. Francis. (Signed by Judge Colleen McMahon on 9/26/2013) (cd) (Entered: 09/26/2013) |
| 09/26/2013 | 53 | ENDORSED LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated 9/26/2013 re: I write in response to the letter, dated September 25, 2013, from Plaintiffs counsel, Ronald J. Wronko, requesting a four month extension of the discovery cutoff, and as further specified in this letter. ENDORSEMENT: I am referring the entire issue of discovery - what to allow, what not to allow, as to how much to extend deadlines (if at all) - to M.J. Francis. (Signed by Judge Colleen McMahon on 9/26/2013) (rjm) (Entered: 09/27/2013) |
| 09/29/2013 | 54 | LETTER MOTION for Conference *to Address Defendant's Privilege Log, ESI Discovery, and Depositions, and Plaintiff's Request for Extension to Complete Errata Sheets* addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated September 29, 2013. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A - Privilege Log, # 2 Exhibit B - Meet and Confer Letter, # 3 Exhibit C - Copy of Opinion)(Wronko, Ronald) (Entered: 09/29/2013) |
| 10/04/2013 | 55 | FIRST LETTER MOTION for Extension of Time to Complete Discovery addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated October 4, 2013. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A - Letter dated September 25, 2013 to Hon. Colleen McMahon from Ronald J. Wronko, Esq., # 2 Exhibit B - Letter dated September 26, 2013 to Honorable Colleen McMahon from Rory McEvoy, Esq., # 3 Exhibit C - Letter dated September 26, 2013 to Hon. Colleen McMahon from Ronald J. Wronko, Esq.)(Wronko, Ronald) (Entered: 10/04/2013) |
| 10/04/2013 | 56 | LETTER RESPONSE to Motion addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated October 4, 2013 re: 54 LETTER MOTION for Conference *to Address Defendant's Privilege Log, ESI Discovery, and Depositions, and Plaintiff's Request for Extension to Complete Errata Sheets* addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A - Letter from Rory McEvoy, Esq. to Honorable James C. Francis, U.S.M.J., dated September 30, 2013, # 2 Exhibit B - Letter from Ronald J. Wronko, Esq. to Hon. James C. Francis, U.S.M.J., dated October 1, 2013)(Wronko, Ronald) (Entered: 10/04/2013) |
| 10/04/2013 | 57 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated Oct. 4, 2013 re: supplements letter of Sept. 30, 2013 regarding a number of outstanding discovery issues. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 10/04/2013) |
| 10/07/2013 | 58 | ORDER denying 54 Letter Motion for Conference. Where the parties dispute the applicability of privilege, it is not appropriate simply to request that the court review in camera the entire universe of documents. If she wishes, plaintiff shall make a formal motion to compel, specifically identifying each contested document and the basis for objecting to the assertion of privilege. Costs will be shifting to the extent that I find that either the assertion of |

AA-12

| | | privilege or the motion to compel is without substantial justification. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 10/07/2013) |
|---|---|---|
| 10/07/2013 | 59 | ORDER granting in part and denying in part 55 Letter Motion for Extension of Time to Complete Discovery. Extension granted to November 29, 2013 only. Discovery due by 11/29/2013. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 10/07/2013) |
| 10/15/2013 | 60 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated 9/30/13 re: Counsel writes in response to counsel for plaintiff's letter to the Court, dated 9/29/13, to request an in-person conference to discuss the discovery issues raised in that letter as well as Plaintiff's failure to produce her medical records which were requested on 6/4/13 and her improper attempt to change her sworn deposition testimony by making numerous substantive changes to that testimony in her errata sheets. Document filed by Mount Sinai Medical Center. ***Accepted for filing as a docket and file by Chambers. (mro) Modified on 10/18/2013 (mro). (Entered: 10/18/2013) |
| 10/15/2013 | 61 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated 10/1/13 re: Counsel writes in response to Mr. McEvoy's 9/30/13 letter. Document filed by Leena Varughese. ***Accepted for filing as a docket and file by Chambers. (mro) Modified on 10/18/2013 (mro). (Entered: 10/18/2013) |
| 10/23/2013 | 62 | SECOND MOTION to Amend/Correct. Document filed by Leena Varughese. (Attachments: # 1 Affidavit of Service)(Wronko, Ronald) (Entered: 10/23/2013) |
| 10/23/2013 | 63 | MEMORANDUM OF LAW in Support re: 62 SECOND MOTION to Amend/Correct.. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 10/23/2013) |
| 10/23/2013 | 64 | DECLARATION of Ronald J. Wronko, Esq. in Support re: 62 SECOND MOTION to Amend/Correct.. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A)(Wronko, Ronald) (Entered: 10/23/2013) |
| 10/29/2013 | 65 | ORDER granting 62 Motion to Amend/Correct upon consent. Defendant need not file a separate Answer to the Second Amended Complaint, as its Answer to the First Amended Complaint addresses all pertinent allegations. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 10/29/2013) |
| 10/29/2013 | | Minute Entry for proceedings held before Magistrate Judge James C. Francis: Telephone Conference held on 10/29/2013. (sc) (Entered: 10/30/2013) |
| 11/06/2013 | 66 | SECOND AMENDED COMPLAINT AND JURY DEMAND amending 34 Amended Complaint, against ABC Corp., Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center, ABC Corp 1-10, John Does 1-10 with JURY DEMAND. Document filed by Leena Varughese. Related document: 34 Amended Complaint, filed by Leena Varughese.(djc) (Entered: 11/06/2013) |
| | | |

AA-13

| 11/08/2013 | 67 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT** - MOTION to Quash *the subpoenas of three non-party witnesses pursuant to Fed. R. Civ. P. 45(c)(3)*. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Affidavit of service)(McEvoy, Rory) Modified on 11/12/2013 (db). (Entered: 11/08/2013) |
|---|---|---|
| 11/12/2013 | 68 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 12, 2013 re: Response to Plaintiff's further insistance that she be permitted to conduct the seven depositions that Defendants oppose. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/12/2013) |
| 11/12/2013 | 69 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 12, 2013 re: Pending Motion to Quash. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 11/12/2013) |
| 11/12/2013 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Rory J. McEvoy. Document No. 67 Letter. This document is not filed via ECF. The Court permits the filing of letters including certain types of letter motions, a Motion to Quash must be formally filed. (db)** (Entered: 11/12/2013) |
| 11/13/2013 | 70 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 8, 2013 re: move to quash the subpoenas of three non-party witnesses. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/13/2013) |
| 11/14/2013 | 71 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MEMORANDUM OF LAW in Opposition re: 67 MOTION to Quash *the subpoenas of three non-party witnesses pursuant to Fed. R. Civ. P. 45(c)(3)*. MOTION to Quash *the subpoenas of three non-party witnesses pursuant to Fed. R. Civ. P. 45(c)(3)*.. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Affidavit of Service)(Wronko, Ronald) Modified on 11/15/2013 (db). (Entered: 11/14/2013) |
| 11/14/2013 | 72 | LETTER MOTION for Extension of Time to Complete Discovery *and for Discovery Conference to Address Pending Discovery Issues* addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 14, 2013. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Affidavit of Service)(Wronko, Ronald) (Entered: 11/14/2013) |
| 11/15/2013 | 73 | LETTER MOTION for Extension of Time to File Response/Reply *to Plaintiff's opposition to Defendants' motion to quash and for a protective order; and to file papers in response to Plaintiff's motion to extend discovery cutoff.* |

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page20 of 113

AA-14

|            |    |                                                                                                                                                                                                                                                                                        |
|------------|----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |    | addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 15, 2013. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/15/2013)                                     |
| 11/18/2013 | 74 | ORDER granting 73 Letter Motion for Extension of Time to File Response/Reply. Response/reply due by 11/21/2013. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 11/18/2013)                                                            |
| 11/21/2013 | 75 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 21, 2013 re: Opposition to Plaintiff's Request for a Discovery Extension. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/21/2013) |
| 11/21/2013 | 76 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 21, 2013 re: Reply in Further Support of Motion to Quash Subpoenas or for a Protective Order. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/21/2013) |
| 11/22/2013 | 77 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 22, 2013 re: Plaintiff's Request for Oral Argument and to Submit a Sur Reply on Defendants' Motion to Quash. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 11/22/2013) |
| 11/22/2013 | 78 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 22, 2013 re: Rory McEvoy, Esq.'s November 22, 2013 Letter Containing Inappropriate Personal Attacks. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 11/22/2013) |
| 11/22/2013 | 79 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 22, 2013 re: Plaintiff's request for leave to file a sur-reply and oral argument on motion to quash. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/22/2013) |
| 11/22/2013 | 80 | MEMO ENDORSEMENT on re: 73 LETTER MOTION for Extension of Time to File Response/Reply *to Plaintiff's opposition to Defendants' motion to quash and for a protective order; and to file papers in response to Plaintiff's motion to extend discovery cutoff* filed by Adolfo Firpo, Mount Sinai Medical Center, Ira J. Bleiweiss, Carlos Cordon-Cardo, Patrick Lento. ENDORSEMENT: Ok. (Signed by Judge Colleen McMahon on 11/21/2013) (tn) (Entered: 11/22/2013) |
| 11/25/2013 | 81 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** REPLY MEMORANDUM OF LAW in Support re: 72 LETTER MOTION for Extension of Time to Complete Discovery *and for Discovery Conference to Address Pending Discovery Issues* addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 14, 2013.. Document |

AA-15

| | | |
|---|---|---|
| | | filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Wronko, Ronald) Modified on 11/26/2013 (db). (Entered: 11/25/2013) |
| 11/25/2013 | 82 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT** - AMENDED REPLY MEMORANDUM OF LAW in Support re: 72 LETTER MOTION for Extension of Time to Complete Discovery *and for Discovery Conference to Address Pending Discovery Issues* addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 14, 2013.. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wronko, Ronald) Modified on 11/26/2013 (db). (Entered: 11/25/2013) |
| 11/26/2013 | 83 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 26, 2013 re: requests until December 4 to respond to counsel for plaintiff's latest missive to the Court, dated November 25, 2013, seeking to prolong ediscovery. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 11/26/2013) |
| 11/26/2013 | 84 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 26, 2013 re: Request for Scheduling of In-Person Appearance and Opposition to Rory McEvoy's Filing of a Sur Reply. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 11/26/2013) |
| 11/26/2013 | 85 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated November 26, 2013 re: responds to Ronald Wronko's latest missive to the Court opposing the Defendants' request to file a response to his letter, dated November 25, 2013, raising issues for the first time regarding Defendants' most recent production of ESI. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 11/26/2013) |
| 11/26/2013 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Ronald Joseph Wronko to RE-FILE Document 81 Reply Memorandum of Law in Support of Motion. Use the event type Letter found under the event list Other Documents. (db)** (Entered: 11/26/2013) |
| 11/27/2013 | 86 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 25, 2013 re: Reply In Support of Letter Motion to Extend Discovery and for Discovery Conference. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wronko, Ronald) (Entered: 11/27/2013) |
| 11/27/2013 | 87 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko, Esq. dated November 25, 2013 re: Amendment to Reply Letter in Support of Discovery Extension and Conference On Recent ESI Documents Served. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Wronko, Ronald) (Entered: 11/27/2013) |
| 12/03/2013 | 88 | |

| | | |
|---|---|---|
| | | ORDER granting <u>72</u> Letter Motion for Extension of Time to Complete Discovery: Defendants' application for a protective order preventing plaintiff from deposing Dr. Samuel McCash, Dr. Adrienne Jordan, and Dr. Elizabeth Morency is denied, as further set forth. Defendants' applications for a protective order preventing the plaintiff from deposing Dr. Paul Azar and for an order quashing the deposition subpoenas of Dr. Shabnam Jaffer, Renato Valentin, and Dr. Robert Guarino are granted, as further set forth. Defendants shall produce documents regarding attendance at mandatory morning conferences for the period post-dating plaintiff's termination, as further set forth. Defendants shall produce all documents relating to the basis for the Academic Advisement issued to Dr. Jonathan Yao and its implementation. Defendants agree to produce the summative evaluations of Dr. Juli Chepovetsky and Dr. Jaclyn Hechtman. Defendants agree to produce the ACGME citations. Plaintiff's applications in connection with defendants' production of electronically-stored information are denied without prejudice to renewal after the parties have met and conferred in light of the defendants' most recent production, as further set forth. Discovery due by 1/15/2014. However, counsel are advised to keep in mind the sanctions available under 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying proceedings. This order resolves Docket nos. 67, 70, and 72. (Signed by Magistrate Judge James C. Francis on 12/3/2013) Copies Mailed By Chambers. (tn) (Entered: 12/03/2013) |
| 12/13/2013 | <u>89</u> | MOTION for Reconsideration re; <u>88</u> Order on Motion for Extension of Time to Complete Discovery,,,,,,.. Document filed by Leena Varughese. (Attachments: # <u>1</u> Affidavit of Service)(Wronko, Ronald) (Entered: 12/13/2013) |
| 12/13/2013 | <u>90</u> | MEMORANDUM OF LAW in Support re: <u>89</u> MOTION for Reconsideration re; <u>88</u> Order on Motion for Extension of Time to Complete Discovery,,,,,,.. Document filed by Leena Varughese. (Attachments: # <u>1</u> Affidavit of Service) (Wronko, Ronald) (Entered: 12/13/2013) |
| 12/16/2013 | 91 | ORDER denying <u>89</u> Motion for Reconsideration. Plaintiff has filed to "'point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" Space Hunters, Inc. v. United States, 500 F. Appx 76, 81 (2d Cir. 2012) (quoting Shrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995)). Even if reconsideration were appropriate, I would adhere to my prior determination. (HEREBY ORDERED by Magistrate Judge James C. Francis) (Text Only Order) (Francis, James) (Entered: 12/16/2013) |
| 12/24/2013 | <u>92</u> | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated 12/24/2013 re: application for fees under Rule 30.1. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 12/24/2013) |
| 12/26/2013 | <u>93</u> | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated December 26, 2013 re: Defendant's application for fees under Rule 30.1. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 12/26/2013) |
| 12/27/2013 | <u>94</u> | |

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page23 of 113

AA-17

| | | |
|---|---|---|
| | | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated 12/27/2013 re: response to plaintiff letter opposing Jordan telephonic deposition. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 12/27/2013) |
| 12/30/2013 | 95 | MEMO ENDORSEMENT on re: 92 Letter, filed by Adolfo Firpo, Mount Sinai Medical Center, Ira J. Bleiweiss, Carlos Cordon-Cardo, Patrick Lento. ENDORSEMENT: Application denied. The need to show the witness multiple documents would make a videoconference cumbersome; the parties have disparate resources; and Pennsylvania is not Australia. (Signed by Magistrate Judge James C. Francis on 12/27/2013) (tn) (Entered: 12/30/2013) |
| 01/06/2014 | 96 | LETTER MOTION for Extension of Time to Complete Discovery , for modification of Confidentiality Order and Stipulation, and to compel more specific answers to Request for Admissions addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated January 6, 2014. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wronko, Ronald) (Entered: 01/06/2014) |
| 01/06/2014 | 97 | MOTION to Compel Defendants to to Produce Documents Withheld As Privileged for In Camera Review and Production. Document filed by Leena Varughese. (Attachments: # 1 Affidavit of Service)(Wronko, Ronald) (Entered: 01/06/2014) |
| 01/06/2014 | 98 | MEMORANDUM OF LAW in Support re: 97 MOTION to Compel Defendants to to Produce Documents Withheld As Privileged for In Camera Review and Production.. Document filed by Leena Varughese. (Wronko, Ronald) (Entered: 01/06/2014) |
| 01/06/2014 | 99 | DECLARATION of Ronald J. Wronko in Support re: 97 MOTION to Compel Defendants to to Produce Documents Withheld As Privileged for In Camera Review and Production.. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Wronko, Ronald) (Entered: 01/06/2014) |
| 01/09/2014 | 100 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated January 9, 2014 re: Supplementation of Request to Extend Discovery and Adjournment of Adrienne Jordan, M.D. Deposition. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Wronko, Ronald) (Entered: 01/09/2014) |
| 01/09/2014 | 101 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated 01/09/2014 re: Opposition to plaintiff's request for extension of discovery cutoff and other discovery requests. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 01/09/2014) |
| 01/10/2014 | 102 | SUPPLEMENTAL LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated 01/10/2014 re: Opposition to plaintiff's request for extension of discovery cutoff and other discovery requests. Document filed |

AA-18

| | | by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 01/10/2014) |
|---|---|---|
| 01/10/2014 | 103 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated January 10, 2014 re: Reply in Support of Plaintiff's Request to Extend Discovery, modify Confidentiality Order, and compel Request for Admissions. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Wronko, Ronald) (Entered: 01/10/2014) |
| 01/10/2014 | 104 | AMENDED LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated January 10, 2014 re: Reply in Further Support of Plaintiff's Application to Extend Discovery, modify Confidentiality Stipulation and Order, and compel responses to Request for Admissions (corrected version with proper date in header). Document filed by Leena Varughese. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Wronko, Ronald) (Entered: 01/10/2014) |
| 01/13/2014 | 105 | MEMORANDUM OF LAW in Opposition re: 97 MOTION to Compel Defendants to to Produce Documents Withheld As Privileged for In Camera Review and Production.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 01/13/2014) |
| 01/13/2014 | 106 | DECLARATION of RORY J. MCEVOY in Opposition re: 97 MOTION to Compel Defendants to to Produce Documents Withheld As Privileged for In Camera Review and Production.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(McEvoy, Rory) (Entered: 01/13/2014) |
| 01/14/2014 | 107 | ORDER. It is hereby ORDERED as follows: 1. The discovery deadline is extended to February 15, 2014, solely for purposes of taking the depositions of Dr. Jordan, Dr. Morency, and two witnesses from the Robert Wood Johnson Medical School. 2. with respect to the Requests for Admissions propounded by plaintiff: (a) defendants have responded adequately to Requests nos. 54-58; (b) defendants shall provide a substantive response to Request no. 60; and (c) defendants' objection to Request no. 70 is sustained. 3. Plaintiff's application to release to the Office of Professional Medical Conduct (the "OPMC" ) documents deemed confidential by defendants in this litigation is denied without prejudice. I am skeptical that the OPMC would consider the documents in question relevant to its proceedings, but if it requests the disclosure of the documents, I will reconsider the issue. (Discovery due by 2/15/2014.) (Signed by Magistrate Judge James C. Francis on 1/14/2014) Copies Mailed By Chambers. (rjm) (Entered: 01/15/2014) |
| 01/15/2014 | 108 | LETTER addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated January 15, 2014 re: Reply In Further Support of Plaintiff's Motion to Compel In Camera Inspection of and Production of Documents Withheld By Defendants As Privileged. Document filed by Leena Varughese. (Attachments: # 1 Exhibit A)(Wronko, Ronald) (Entered: 01/15/2014) |

| 01/28/2014 | 109 | LETTER addressed to Judge Colleen McMahon from Ronald J. Wronko dated January 28, 2014 re: Renewed Request to Be Relieved As Counsel. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 01/28/2014) |
|---|---|---|
| 01/28/2014 | 110 | MEMO ENDORSEMENT on 109 Letter filed by Leena Varughese. ENDORSEMENT: Make a motion file under seal submit the exhibits under seal. (Signed by Judge Colleen McMahon on 1/28/2014) (ft) (Entered: 01/28/2014) |
| 01/29/2014 | 111 | EMERGENCY LETTER MOTION for Extension of Time to Complete Discovery *or Alternatively to Stay Litigation Pending Outcome of Plaintiff's Application to Be Relieved As Counsel* addressed to Magistrate Judge James C. Francis IV from Ronald J. Wronko dated January 29, 2014. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 01/29/2014) |
| 01/30/2014 | 112 | ORDER granting as unopposed 111 Letter Motion for Extension of Time to Complete Discovery. All discovery, including the pending depositions of Dr. Jordan and Dr. Morency, is stayed pending determination of the application of plaintiff's counsel to be relieved. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 01/30/2014) |
| 01/30/2014 | | Minute Entry for proceedings held before Magistrate Judge James C. Francis: Telephone Conference held on 1/30/2014. (sc) (Entered: 01/31/2014) |
| 01/30/2014 | 113 | ENDORSED LETTER addressed to Clerk of Court, from Ronald J. Wronko, dated 1/30/2014, re: Enclosed is an original and three (3) copies of the following documents for filing under seal: Notice of Motion of Ronald J. Wronko to be Relieved as Counsel; Declaration of Ronald J. Wronko; and Certification of Service. ENDORSEMENT: Dr. Varughese must respond to the MOTION IN WRITING by February 14, 2014. If she does not respond she will be deemed to consent. She should file her response UNDER SEAL. I will address the matter. (Responses due by 2/14/2014) (Signed by Judge Colleen McMahon on 1/30/2014) (ja) Modified on 1/31/2014 (ja). (Entered: 01/31/2014) |
| 01/31/2014 | 114 | MEMORANDUM AND ORDER granting 97 Motion to Compel: Therefore, within three days of the date upon which the current stay of discovery is lifted, the defendants shall submit copies of the documents still at issue in this motion. If any of those documents have been produced to the plaintiff in redacted form, the defendants shall provide me with both redacted and unredacted copies of the documents. I will then rule on whether some or all of the documents are protected by the attorney-client privilege. This resolves the motion filed as Docket no. 97. (Signed by Magistrate Judge James C. Francis on 1/31/2014) Copies Mailed By Chambers. (tn) (Entered: 01/31/2014) |
| 02/05/2014 | 115 | SEALED DOCUMENT placed in vault.(nm) (Entered: 02/05/2014) |
| 02/12/2014 | 116 | ORDER: The Court today received an emergency phone call from Dr. Varughese requesting an adjournment of her February 14, 2014 deadline to file a response to her attorney's pending motion to be relieved as counsel. In light of the impending weather event in the New York area, an adjournment is granted until 5:00 PM on February 18, 2014. Set Deadlines/Hearing |

| | | |
|---|---|---|
| | | ( Responses due by 2/18/2014) (Signed by Judge Colleen McMahon on 2/12/2014) (mro) (Entered: 02/13/2014) |
| 02/18/2014 | 117 | NOTICE OF PRO SE APPEARANCE by Leena Varughese. (sc) (Entered: 02/19/2014) |
| 02/18/2014 | 119 | PRO SE CONSENT TO RECEIVE ELECTRONIC SERVICE. The following party: Leena Varughese consents to receive electronic service via the ECF system. Document filed by Leena Varughese.(man) (Entered: 02/21/2014) |
| 02/20/2014 | 118 | LETTER addressed to Judge Colleen McMahon from Ronald J. Wronko dated February 20, 2014 re: Status of Motion to Be Relieved As Counsel in Light of Plaintiff's Pro Se Appearance and Request to Submit Reply On the Motion to be Relieved. Document filed by Leena Varughese.(Wronko, Ronald) (Entered: 02/20/2014) |
| 02/21/2014 | 120 | ORDER RELIEVING COUNSEL: I thus grant the motion and relieve Mr. Wronko effective immediately. Dr. Varughese has 60 days to retain new counsel, or she will be required to finish trial preparation, respond to any dispositive motions made by Defendants, and take the case to trial (assuming it survives dispositive motions) herself. All deadlines previously imposed are extended by 80 days. I understand that Dr. Varughese has visited the ProSe Office and filed a notice of appearance; she is expected to register so that she can use the ECF system for filings and notifications if she intends to proceed pro se, and she should notify chambers by communicating through the Pro Se office. The Clerk of the Court is directed to remove the motion at Docket No. 113 from the Court's list of active motions. (Signed by Judge Colleen McMahon on 2/21/2014) Copies Mailed By Chambers. (jar) (Entered: 02/21/2014) |
| 03/06/2014 | 121 | LETTER addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 3/4/14 re: Plaintiff informs the Court that she would like to proceed with discovery and conduct depositions of the two witnesses, Drs. Adrienne Jordan and Elizabeth Morency; and that delaying discovery until past May 2014 will limit her ability to depose the witnesses if they leave their current employment and geographic locations etc. Document filed by Leena Varughese.(sc) (Entered: 03/06/2014) |
| 03/13/2014 | 122 | MEMO ENDORSEMENT on re: 121 Letter, filed by Leena Varughese. ENDORSEMENT: Dr. Varughese can take the depositions of these two witnesses before 5/1/2014 without regard to any previously imposed stay. She will have to arrange for a court reporter (and pay for same). The depositions will be taken here in the U.S. Courthouse so the Magistrate Judge can be available to rule on objections. (Signed by Judge Colleen McMahon on 3/13/2014) Copies Mailed By Chambers. (ja) (Entered: 03/13/2014) |
| 03/13/2014 | | Set/Reset Deadlines: Deposition due by 5/1/2014. (ja) (Entered: 03/13/2014) |
| 03/19/2014 | 123 | ORDER re: 122 Memo Endorsement. Pursuant to the order of the Honorable Colleen McMahon, U.S.D.J., dated March 13, 2014, a deposition is scheduled to take place at the United States Courthouse, 500 Pearl Street, New York, NY, on March 27, 2014, beginning at 10:00 a.m. Participants shall assemble in the |

AA-21

| | | |
|---|---|---|
| | | jury room of Courtroom 18-D. On or before March 25, 2014, plaintiff pro se is directed to inform the Court, by fax or phone, of the name of the Court Reporter so that an order can be issued granting permission for the Court Reporter to bring any necessary equipment into the courthouse. (Signed by Magistrate Judge James C. Francis on 3/19/2014) Copies e-mailed By Chambers (djc) Modified on 3/19/2014 (djc). (Entered: 03/19/2014) |
| 03/19/2014 | | Set/Reset Deadlines: Deposition due by 3/27/2014. (djc) (Entered: 03/19/2014) |
| 04/03/2014 | 124 | MOTION for Permission for Leena Varughese, M.D. to participate in electronic case filing in this case. Document filed by Leena Varughese.(man) (Entered: 04/08/2014) |
| 04/03/2014 | 125 | LETTER addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 4/3/14 re: Plaintiff submits this letter to the Court because she suspects that deposition testimony was altered, and she requests a court order which would release the voice recording from the Veritext, Inc. or the court reporter, Patricia A. Sands, who transcribed the deposition(s) in question, immediately. Document filed by Leena Varughese.(sc) (Entered: 04/08/2014) |
| 04/03/2014 | 127 | LETTER addressed to Magistrate Judge James C. Francis IV from Leena Varughese, M.D. dated 4/2/14 re: Plaintiff requests to the Court that if there is an ongoing stay of discovery, the stay is lifted for the purpose of progressing the file with regard to in camera review etc. Document filed by Leena Varughese.(sc) (Entered: 04/08/2014) |
| 04/03/2014 | 131 | LETTER addressed to Magistrate Judge James C. Francis IV from Leena Varughese dated 4/3/2014 re: I am writing to inquire about the results of the in camera review of the documents on the Electronically Stored Information (ESI) privilege log that Your Honor agreed to conduct on January 31, 2014 (Docket #114). Document filed by Leena Varughese.(sac) (Entered: 04/09/2014) |
| 04/08/2014 | 126 | MEMO ENDORSEMENT granting 124 Motion for Permission for Electronic Case Filing. ENDORSEMENT: So Ordered. (Signed by Judge Colleen McMahon on 4/8/2014) Copies Mailed By Chambers. (tn) (Entered: 04/08/2014) |
| 04/08/2014 | 128 | ENDORSED LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated 4/8/2014 re: Counsel for The Mount Sinai Hospital and the individual defendants, writes in response to Plaintiff's letter, dated 4/3/2014, which asks the Court to order the release of "voice recordings" of unspecified depositions taken by her former counsel, Ronald J. Wronko. ENDORSEMENT: As stated on Dr. Varughese's letter, she is free to issue a subpoena for production of the audio tapes. The Court cannot and will not compel their production. They belong (if they exist) to the Reporter. If they are subpoenaed, and if the reporter does not contest the subpoena, the tapes should be sent to me, not to Dr. Varughese. Errata sheets are entirely normal. (Signed by Judge Colleen McMahon on 4/8/2014) Copies Mailed By Chambers. (tn) (Entered: 04/08/2014) |
| 04/08/2014 | 129 | MEMO ENDORSEMENT on re: 125 Letter, filed by Leena Varughese. ENDORSEMENT: If Dr. Varughese wants to subpoena voice recordings she |

| | | |
|---|---|---|
| | | may do so, but I doubt any exist. The reporter is an independent third party. If Dr. Varughese believes mistakes were made in transcription she is welcome to send suggestions to the reporter. This has nothing to do with defendants. PS-Court reporters are almost always of unimpeachable character, so I am skeptical of any suggestion of impropriety. (Signed by Judge Colleen McMahon on 4/8/2014) Copies Mailed By Chambers. (tn) (Entered: 04/08/2014) |
| 04/08/2014 | 130 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated April 8, 2014 re: responds to the letter from Plaintiff to the Court, dated April 3, 2014, regarding Defendants' privilege log. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 04/08/2014) |
| 04/09/2014 | 132 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated April 9, 2014 re: responds to letter from Plaintiff to the Court, dated April 2, 2014, and requests that the Court deny any request by the Plaintiff to take additional discovery and reaffirm its January 14, 2014 Order. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 04/09/2014) |
| 04/10/2014 | 133 | FIRST LETTER MOTION for Conference addressed to Magistrate Judge James C. Francis IV from Leena Varughese, M.D. dated 4-10-2014. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 04/10/2014) |
| 04/10/2014 | 136 | ORDER re: 130 Letter, filed by Adolfo Firpo, Mount Sinai Medical Center, Ira J. Bleiweiss, Carlos Cordon-Cardo, Patrick Lento. Plaintiff having submitted a letter dated April 8, 2014, asking that the Court proceed with the in camera review outlined in my January 31, 2014 1 Order and asking to "submit additional documents into discovery, it is hereby ORDERED as follows: 1. Proceeding with the in camera process will move this case toward final resolution; accordingly, by April 15, 2014, defendants shall submit to my chambers the documents identified in the January 31, 2014, Order. 2. To the extent that in referring to submitting additional documents plaintiff means supplementing her own production of documents, she may do so. To the extent that is she is seeks to take additional discovery of the defendants beyond that permitted by my January 14, 2014, Order, the application is denied. (Signed by Magistrate Judge James C. Francis on 4/10/2014) Copies Sent By Chambers (djc) Modified on 4/11/2014 (djc). Modified on 4/11/2014 (djc). Modified on 4/11/2014 (djc). (Entered: 04/11/2014) |
| 04/11/2014 | 134 | ORDER denying 133 Letter Motion for Conference. Plaintiff's request is effectively an application for reconsideration of my January 14, 2014 Order and, as such, is untimely. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 04/11/2014) |
| 04/11/2014 | 135 | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 04/11/2014) |
| 04/14/2014 | 137 | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 04/14/2014) |

AA-23

| | | |
|---|---|---|
| 04/15/2014 | 138 | LETTER MOTION for Extension of Time *to submit the documents for in camera review that are the subject of the Court's January 31, 2014 Order from April 15 to April 24, 2014* addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated April 15, 2014. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 04/15/2014) |
| 04/15/2014 | 139 | ORDER: Pursuant to the order of the Honorable Colleen McMahon, U.S.D.J., dated March 13, 2014, a deposition is scheduled to take place at the United States Courthouse, 500 Pearl Street, New York, NY, on April 25, 2014, beginning at 10:00 a.m. Participants shall assemble in the jury room of Courtroom 18-D. On or before April 24, 2014, plaintiff pro se is directed to inform the Court of the name of the Court Reporter so that arrangements can be made for the Court Reporter to bring any necessary equipment into the courthouse. The plaintiff has asked for permission to bring a general purpose computing device into the courthouse to aid her in conducting the deposition. However, Revised Standing Order M10-468 does not permit authorization for non-attorneys to bring such devices into the courthouse. ( Deposition due by 4/25/2014.) (Signed by Magistrate Judge James C. Francis on 4/15/2014) (djc) (Entered: 04/15/2014) |
| 04/15/2014 | 140 | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 04/15/2014) |
| 04/16/2014 | 141 | ORDER denying 138 Letter Motion for Extension of Time. No further affidavit is necessary or appropriate; the Court will rule on the documents based on in camera review as previously indicated. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 04/16/2014) |
| 04/16/2014 | 142 | MEMORANDUM AND ORDER: In a motion filed in January 2014, plaintiff Leena Varughese, M.D., contended that certain documents withheld by the defendants(collectively, "Mt. Sinai") are not protected by the attorney client privilege and sought to compel their submission for in camera review. I granted the motion (Memorandum and Order dated Jan. 31, 2014, at 5-6) and later ordered the defendants to provide the documents for my review notwithstanding a blanket deadline extension that had been imposed when Dr. Varughese's former attorney was relieved as counsel (Order dated Feb. 21, 2014; Order dated April 10, 2014). I have now reviewed the documents, which are identified by their entry number on the defendants' privilege log, and rule as further set forth herein. (Signed by Magistrate Judge James C. Francis on 4/16/2014) Copies Mailed By Chambers. (djc) (Entered: 04/17/2014) |
| 04/17/2014 | 143 | LETTER MOTION for Extension of Time addressed to Magistrate Judge James C. Francis IV from Varughese, Leena dated 04/17/2014. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 04/17/2014) |
| 04/17/2014 | 144 | EX PARTE LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 04/17/2014) |
| 04/18/2014 | 145 | ORDER denying 143 Letter Motion for Extension of Time. No extension of time to seek reconsideration is warranted. Plaintiff can move to amend her |

| | | complaint at any time; however, plaintiff is cautioned that a frivolous motion could result in the imposition of sanctions including an assessment of the attorneys' fees incurred by defendants in opposing the motion. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 04/18/2014) |
|---|---|---|
| 04/18/2014 | 146 | ENDORSED LETTER addressed to Magistrate Judge James C. Francis IV from Leena Varughese, M,D, dated 4/17/2014 re: I am writing to inquire whether or not the defendants should produce documents identified during deposition of Elizabeth Morency and possibly, from Adrienne Jordan's upcoming deposition? Please clarify this issue given Your Honor's April 10, 2014 decision. ENDORSEMENT: Plaintiff may request documents identified at the deposition, subject to objection by defendants. SO ORDERED. (Signed by Magistrate Judge James C. Francis on 4/18/2014) (ama) (Entered: 04/18/2014) |
| 04/24/2014 | 147 | MOTION for Reconsideration. Document filed by Leena Varughese. (Attachments: # 1 Affidavit, # 2 Exhibit)(Varughese, Leena) (Entered: 04/24/2014) |
| 04/25/2014 | 148 | ORDER denying 147 Motion for Reconsideration. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 04/25/2014) |
| 04/29/2014 | 149 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated April 29, 2014 re: Defendants request that the Court direct Plaintiff to produce copies of exhibits marked at the deposition of Dr. Adrienne Jordan.. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 04/29/2014) |
| 06/04/2014 | 150 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated June 4, 2014 re: requests Court to issue an Order that precludes Plaintiff from relying on any documents produced after the Court's January 15, 2014 deadline to complete discovery, and requests that the Court set a briefing schedule for Defendants' motion for summary judgment. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 06/04/2014) |
| 06/05/2014 | 151 | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 06/05/2014) |
| 06/05/2014 | 152 | MEMO ENDORSEMENT on re: 150 Letter, filed by Adolfo Firpo, Mount Sinai Medical Center, Ira J. Bleiweiss, Carlos Cordon-Cardo, Patrick Lento. ENDORSEMENT: Defendants shall move for summary judgment by July 18, 2014; Plaintiff shall answer the motion by August 15, 2014; defendants shall reply by August 29, 2014. Defendants' preclusion motion is denied without prejudice to (1) their objecting to evidence proffered by plaintiff in response to the summary judgment motion and (2) renewal of the defendants' application if their summary judgment motion is not granted. (Signed by Magistrate Judge James C. Francis on 6/5/2014) (djc) (Entered: 06/06/2014) |

| 06/05/2014 | | Set/Reset Deadlines: Motions due by 7/18/2014. Responses due by 8/15/2014. Replies due by 8/29/2014. (djc) (Entered: 06/06/2014) |
|---|---|---|
| 06/10/2014 | 153 | LETTER MOTION for Local Rule 37.2 Conference *Other Discovery and Non-Dispositive Pretrial Disputes.* addressed to Magistrate Judge James C. Francis IV from Varughese, Leena dated 06-10-2014. Document filed by Leena Varughese. (Attachments: # 1 Exhibit 1)(Varughese, Leena) (Entered: 06/10/2014) |
| 06/13/2014 | 154 | LETTER addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated June 12, 2014 re: responds to Plaintiff's letter to permit production of documents identified by Dr. Morency and Dr. Jordan at their depositions. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 06/13/2014) |
| 06/20/2014 | 155 | ORDER denying 153 Letter Motion for Local Rule 37.2 Conference. Plaintiff's application to compel the production of documents is denied. Discovery has long since closed. While plaintiff has permitted to request documents identified at the depositions of Dr. Jordan and Dr. Morency, she has not linked any request for a specific document to the testimony of these witnesses. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 06/20/2014) |
| 07/02/2014 | 156 | EMERGENCY LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 07/02/2014) |
| 07/16/2014 | 157 | LETTER MOTION for Extension of Time *for defendants to file a motion for summary judgment from July 18 to July 24, 2014* addressed to Magistrate Judge James C. Francis IV from Rory J. McEvoy dated July 16, 2014. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 07/16/2014) |
| 07/17/2014 | 158 | COUNTER LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 07/17/2014) |
| 07/18/2014 | 159 | ORDER granting 157 Letter Motion for Extension of Time. Defendant shall file its motion for summary judgment by July 24, 2014; plaintiff shall answer the motion by August 21, 2014; defendant shall reply by September 4, 2014. (HEREBY ORDERED by Magistrate Judge James C. Francis)(Text Only Order) (Francis, James) (Entered: 07/18/2014) |
| 07/18/2014 | 160 | MEMO ENDORSEMENT on re: 156 Letter filed by Leena Varughese. ENDORSEMENT: Construing this letter as an application for reconsideration of my June 19, 2014 Order, the application is denied. (Signed by Magistrate Judge James C. Francis on 7/18/2014) (djc) (Entered: 07/18/2014) |
| 07/24/2014 | 161 | MOTION for Summary Judgment . Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 162 | |

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page32 of 113

**AA-26**

| | | |
|---|---|---|
| | | DECLARATION of RORY J. MCEVOY in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit Ex. 1 Pt. 1, # 2 Exhibit Ex. 1 Pt. 2, # 3 Exhibit Ex. 1 Pt. 3, # 4 Exhibit Ex. 1 Pt. 4, # 5 Exhibit Ex. 1 Pt. 5, # 6 Exhibit Ex. 1 Pt. 6, # 7 Exhibit Ex. 2, # 8 Exhibit Ex. 3, # 9 Exhibit Ex. 4, # 10 Exhibit Ex. 5, # 11 Exhibit Ex. 6, # 12 Exhibit Ex. 7, # 13 Exhibit Ex. 8)(McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 163 | DECLARATION of KRUTHI MANIAR, M.D. in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center, Leena Varughese. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 164 | DECLARATION of VESNA NAJFELD, PH. D in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4, # 5 Exhibit Ex. 5, # 6 Exhibit Ex. 6, # 7 Exhibit Ex. 7, # 8 Exhibit Ex. 8)(McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 165 | DECLARATION of SAMUEL MCCASH, M.D. in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 166 | DECLARATION of PATRICK LENTO, M.D. in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit Ex. 1)(McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 167 | DECLARATION of ADOLFO FIRPO, M.D. in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit Ex. 1)(McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 168 | DECLARATION of PAUL JOHNSON in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4, # 5 Exhibit Ex. 5, # 6 Exhibit Ex. 6)(McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 169 | DECLARATION of SHABNAM JAFFER, M.D. in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 170 | DECLARATION of SHEMA PATEL in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page33 of 113

AA-27

| 07/24/2014 | 171 | DECLARATION of ANUPNA NAYAK, M.D. in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
|---|---|---|
| 07/24/2014 | 172 | MEMORANDUM OF LAW in Support re: 161 MOTION for Summary Judgment . . Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 173 | RULE 56.1 STATEMENT. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 174 | NOTICE of to Pro se Litigant re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/24/2014 | 175 | AFFIDAVIT OF SERVICE. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 07/24/2014) |
| 07/28/2014 | 176 | OPPOSITION BRIEF *to seal documents filed in motion for summary judgement*. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 07/28/2014) |
| 08/19/2014 | 177 | FIRST LETTER MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgement* addressed to Judge Colleen McMahon from Varughese, Leena dated 08/19/2014. Document filed by Leena Varughese. (Varughese, Leena) (Entered: 08/19/2014) |
| 08/19/2014 | 178 | ORDER granting 177 Letter Motion for Extension of Time to File Response/Reply re 161 MOTION for Summary Judgment: Granted. Plaintiff's opposition brief due 10/8/2014. Responses due by 10/8/2014. (Signed by Judge Colleen McMahon on 8/19/2014) (tn) (Entered: 08/19/2014) |
| 09/30/2014 | 179 | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 09/30/2014) |
| 10/03/2014 | 180 | MEMO ENDORSEMENT on re: 179 Letter filed by Leena Varughese. ENDORSEMENT: OK (Signed by Judge Colleen McMahon on 10/3/2014) Copies Mailed By Chambers. (kgo) (Entered: 10/03/2014) |
| 10/03/2014 | | Set/Reset Deadlines: Responses due by 10/27/2014. (kgo) (Entered: 10/03/2014) |
| 10/23/2014 | 181 | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 10/23/2014) |
| 10/24/2014 | 182 | LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated October 24, 2014 re: response to Plaintiff's October 23, 2014 letter to the Court. Document filed by Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 10/24/2014) |

| 10/27/2014 | 183 | ORDER DENYING MOTION FOR DISCOVERY SUBPOENAS: Before the court is a letter motion from the plaintiff - who was formerly represented by counsel but who is now proceeding pro se - asking that the court issue subpoenas to compel two doctors at Mr. Sinai, Kruti Maniar and Shabnam Jaffer - both of whom have submitted declarations in support of defendant's long-pending motion for summary judgment- to speak with her. (Docket #181). The court understands (if Dr. Varughese does not) that a subpoena would require the doctors to attend a pre-trial deposition at which a court reporter (retained by Dr. Varughese) would take their testimony under oath. One cannot use a subpoena to force someone to have a non-testimonial conversation. During the period when Dr. Varughese was represented by counsel, Magistrate Judge Francis, supervising discovery, had occasion to consider whether Dr. Jaffer had to be deposed.The learned Magistrate Judge concluded that Dr. Jaffer would not be deposed and quashed the subpoena that had been served on her, on the grounds that she played no role in the decision-making process that led to Dr. Varughese's termination from her residency program and that her testimony would be cumulative. No appeal was taken from that order. The fact that Dr. Jaffer submitted a declaration in support of the motion for summary judgment is of no moment, given its contents. The declaration - which is exactly four paragraphs long - includes only the following information: her job titles during her tenure at Mt. Sinai and the dates she held each job, her gender and her national origin. Placing that information before the court in admissible form does not suggest that Dr. Jaffer - contrary to the Magistrate Judge's finding-has information about Dr. Varughese's case that is or more than what Judge Francis called "marginal value." Dr. Maniar was not even subpoenaed prior to the close of discovery. It is too late to do so now. Dr. Varughese has asked for yet another extension of time to respond to the pending motion. I will grant her request to be given until November 24. I will not extend her time any longer. By that time this motion will have been on the court's docket for five months. It has to be decided. This constitutes the decision and order of the court. (Signed by Judge Colleen McMahon on 10/27/2014) Copies Mailed By Chambers. (kgo) (Entered: 10/27/2014) |
| 10/27/2014 | | Set/Reset Deadlines: Responses due by 11/24/2014. (kgo) (Entered: 10/27/2014) |
| 10/29/2014 | 184 | COUNTER LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 10/29/2014) |
| 10/29/2014 | 185 | AMENDED LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 10/29/2014) |
| 11/14/2014 | 186 | FINAL LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Colleen McMahon from Varughese, Leena dated 11-14-2014. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 11/14/2014) |
| 11/17/2014 | 187 | ORDER granting 186 Letter Motion for Extension of Time to File Response/Reply re 186 FINAL LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Colleen McMahon from Varughese, Leena dated 11-14-2014. Dr.Varughese- I will give you one more extension, to |

AA-29

| | | |
|---|---|---|
| | | Dec. 15, I will not extend your time any further. Responses due by 12/15/2014. (Signed by Judge Colleen McMahon on 11/17/2014) (ama) (Entered: 11/17/2014) |
| 11/20/2014 | 188 | EMERGENCY LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 11/20/2014) |
| 11/25/2014 | 189 | MEMO ENDORSEMENT on re: 188 Letter filed by Leena Varughese. ENDORSEMENT: Dear Dr. Varughese - I regret to disappoint you, but I cannot meet privately with you or discuss "sensitive matters related to [your] case" until you ex parte. I would violate the Code of Judicial Conduct by doing so. Please respond to the motion on the schedule I have set. (Signed by Judge Colleen McMahon on 11/25/2014) (kgo) (Entered: 11/25/2014) |
| 12/12/2014 | 190 | EMERGENCY LETTER MOTION for Conference addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 12/12/2014., LETTER MOTION for Extension of Time addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 12/12/2014. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 12/12/2014) |
| 12/15/2014 | 191 | LETTER RESPONSE in Opposition to Motion addressed to Judge Colleen McMahon from RORY J. MCEVOY, ESQ. dated 12/15/2014 re: 190 EMERGENCY LETTER MOTION for Conference addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 12/12/2014. LETTER MOTION for Extension of Time addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 12/12/2014. . Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 12/15/2014) |
| 12/15/2014 | 192 | COUNTER LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 12/15/2014) |
| 12/16/2014 | 193 | ORDER denying 190 Letter Motion for Conference ; granting 190 Letter Motion for Extension of Time. (1) Dr. Varughese had until today to respond to the motion. I said in November "no more extensions." I will give you until Friday 12/19. No more. Not another second. (2) I will not reopen discovery. Dr. V has had since discovery closed in February 2014 to examine all materials produced. (3) Subpoenas cannot be used to "compel statements." If you get past this motion you can subpoena for trial - though you and I have a difference of opinion over what constitutes relevant testimony. (4) No need for any meeting. Respond to the motion with evidence. (Signed by Judge Colleen McMahon on 12/15/2014) Copies Mailed By Chambers. (kgo) (Entered: 12/16/2014) |
| 12/16/2014 | | Set/Reset Deadlines: Responses due by 12/19/2014. (kgo) (Entered: 12/16/2014) |
| 12/16/2014 | 194 | EMERGENCY LETTER MOTION for Extension of Time to File Response/Reply *Motion for Reconsideration* addressed to Judge Colleen McMahon from Varughese, Leena dated 12/16/14. Document filed by Leena Varughese. (Attachments: # 1 Supplement Explanation)(Varughese, Leena) (Entered: 12/16/2014) |

| 12/19/2014 | 195 | ORDER denying 194 Letter Motion for Extension of Time to File Response/Reply. Dr. Varughese - Please stop sending me letters. I do not litigate by letter or allow parties to do so. You should be spending your time responding to the motion for summary judgment since you will not get another extension. You keep making the same requests. I am not going to grant them. (Signed by Judge Colleen McMahon on 12/18/2014) Copies Mailed By Chambers. (kgo) (Entered: 12/19/2014) |
| --- | --- | --- |
| 12/19/2014 | 196 | FINAL LETTER MOTION for Extension of Time addressed to Judge Colleen McMahon from Leena Varughese, M.D. dated 12/19/2014. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 12/19/2014) |
| 12/30/2014 | 197 | LETTER MOTION for Extension of Time addressed to Judge Colleen McMahon from Varughese Leena dated 12/30/2014. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 12/30/2014) |
| 12/30/2014 | 198 | ORDER denying 197 Letter Motion for Extension of Time. DENIED. (Signed by Judge Colleen McMahon on 12/30/2014) (kgo) (Entered: 12/30/2014) |
| 12/30/2014 | 199 | EMERGENCY LETTER MOTION for Extension of Time to File Response/Reply *reconsideration* addressed to Judge Colleen McMahon from Varughese dated 12/30/14. Document filed by Leena Varughese.(Varughese, Leena) (Entered: 12/30/2014) |
| 12/31/2014 | 200 | RESPONSE to Motion re: 161 MOTION for Summary Judgment . *Exhibits*. Document filed by Leena Varughese. (Attachments: # 1 Exhibit 1-2, # 2 Exhibit 3-4, # 3 Exhibit 5, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7) (Varughese, Leena) (Entered: 12/31/2014) |
| 12/31/2014 | 201 | EMERGENCY LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 12/31/2014) |
| 12/31/2014 | 202 | LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated December 31, 2014 re: seeks guidance from the Court regarding Defendants' motion for summary judgment. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 12/31/2014) |
| 01/05/2015 | 203 | ORDER: In view of whatever software difficulties plaintiff encountered, on December 31, plaintiff asked for an extension until today, January 5, to file her already overdue papers. Because plaintiff is already in default, the request ought by rights be denied. This court has given Dr. Varughese every consideration, in light of her pro se status. However, there comes a point when even a pro se litigant is required to comply with court orders or face the consequences -- just like any represented party. In the last few weeks, Dr. Varughese has repeatedly refused to follow the court's clear instructions about responding to a motion that was filed last spring. The defendants are entitled to a decision on that motion. Any papers that are received by the court and by Mt. Sinai's counsel (assuming they are relevant, as many of Dr. Varughese's submissions are not) by 5 PM today, January 5, 2015, will be considered as I decide the motion. Mt. Sinai has until January 16 to put in whatever reply it deems necessary. No excuses will be accepted, including excuses relating to |

AA-31

| | | |
|---|---|---|
| | | software issues or "electronic content perimeters." No papers that reach this court and Mt. Sinai's counsel after 5 PM today will be considered; they will be stricken from the record. There should be no need for the court to enter any further order in this regard; Mt. Sinai's counsel should not keep writing for clarification. If the papers show up tomorrow or the next day, they will NOT BE CONSIDERED. (Signed by Judge Colleen McMahon on 1/5/2015) Copies Mailed By Chambers. (kgo) (Entered: 01/05/2015) |
| 01/05/2015 | 204 | AFFIRMATION of Leena Varughese, M.D. in Opposition re: 161 MOTION for Summary Judgment .. Document filed by Leena Varughese. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit)(Varughese, Leena) (Entered: 01/05/2015) |
| 01/05/2015 | 205 | AFFIRMATION of Leena Varughese, M.D. in Opposition re: 161 MOTION for Summary Judgment .. Document filed by Leena Varughese. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Supplement, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit)(Varughese, Leena) (Entered: 01/05/2015) |
| 01/06/2015 | 206 | DECLARATION of Varughese, Leena in Opposition re: 161 MOTION for Summary Judgment .. Document filed by Leena Varughese. (Attachments: # 1 Supplement, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit)(Varughese, Leena) (Entered: 01/06/2015) |
| 01/08/2015 | 207 | DIRECTIVE TO THE CLERK'S OFFICE: The court having denied the plaintiff's several requests for extensions of time by order dated January 5, 2015 (Docket# 203), the Clerk is directed to remove the following letter motions for extensions of time from the court's list of open motions: Docket #196 and Docket #199. (Signed by Judge Colleen McMahon on 1/8/2015) Copies Mailed By Chambers. (kgo) (Entered: 01/08/2015) |
| 01/14/2015 | 208 | NOTICE of Law Firm Name Change. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Weber, Julie) (Entered: 01/14/2015) |
| 01/16/2015 | 209 | REPLY MEMORANDUM OF LAW in Support re: 161 MOTION for Summary Judgment . . Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 01/16/2015) |
| 01/16/2015 | 210 | AFFIDAVIT OF SERVICE of Defendants' reply papers served on Pro Se Plaintiff on 1/16/15. Service was made by Mail and ECF. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (McEvoy, Rory) (Entered: 01/16/2015) |
| | | |

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page38 of 113

AA-32

| 01/16/2015 | 211 | DECLARATION of RORY J. MCEVOY in Support re: 161 MOTION for Summary Judgment .. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, Adolfo Firpo, Patrick Lento, Mount Sinai Medical Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(McEvoy, Rory) (Entered: 01/16/2015) |
|---|---|---|
| 01/30/2015 | 212 | ORDER TO SEAL CERTAIN DOCKET ENTRIES: Late on January 5, 2015 and on January 6, 2015, pro se plaintiff Leena Varughese untimely filed several hundred pages of documents in support of her opposition to Defendants' motion for summary judgment. (See Docket ## 205-06.) Defendants have notified the Court that some portions of these filings divulge confidential information which should have been placed under seal. They are exhibits 1, 15, 16, 18 and 30 to Docket No. 205. These exhibits shall be sealed immediately. (Signed by Judge Colleen McMahon on 1/30/2015) Copies Mailed By Chambers. (kgo) (Entered: 01/30/2015) |
| 01/30/2015 | | Transmission to Sealed Records Clerk. Transmitted re: 212 Order, to the Sealed Records Clerk for the sealing or unsealing of document or case. (kgo) (Entered: 01/30/2015) |
| 02/14/2015 | 213 | COUNTER LETTER Document filed by Leena Varughese. (Attachments: # 1 Exhibit 1)(Varughese, Leena) (Entered: 02/14/2015) |
| 03/04/2015 | 214 | NOTICE OF CHANGE OF ADDRESS by Rory J. McEvoy on behalf of All Defendants. New Address: Blank Rome LLp, 405 Lexington Avenue, N.Y., N.Y., USA 10174, 212-885-5000. (McEvoy, Rory) (Entered: 03/04/2015) |
| 03/13/2015 | 215 | ORDER TO PROVIDE THE COURT WITH AUDIORECORDINGS: In opposing Defendants' motion for summary judgment (Docket #161), Plaintiff Leena Varughese has submitted the transcripts of several audiotapes. These transcripts purport to reflect conversations Varughese had with administrators at Defendant Mount Sinai, as well as internal hearings regarding Mount Sinai's termination of Varughese's employment. The Court has not been provided with the actual recordings. Whoever is in custody of the actual recordings is hereby ordered to submit them to the Court no later than close of business on Tuesday, March 17, 2015. Either the original recordings or true copies thereof are acceptable. (Signed by Judge Colleen McMahon on 3/13/2015) (kgo) (Entered: 03/13/2015) |
| 03/17/2015 | 216 | LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated March 17,2015 re: In response to the March 13 Order. Document filed by Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, John Does 1-10, Patrick Lento, Mount Sinai Medical Center.(McEvoy, Rory) (Entered: 03/17/2015) |
| 03/17/2015 | 217 | NOTICE OF APPEARANCE by Katherine D Watson on behalf of Ira J. Bleiweiss, Carlos Cordon-Cardo, John Does, Adolfo Firpo, John Does 1-10, Patrick Lento, Mount Sinai Medical Center. (Watson, Katherine) (Entered: 03/17/2015) |
| 03/18/2015 | 218 | MEMO ENDORSEMENT on re: 216 Letter, filed by Adolfo Firpo, Mount Sinai Medical Center, Ira J. Bleiweiss, John Does 1-10, Carlos Cordon-Cardo, |

| | | |
|---|---|---|
| | | Patrick Lento, John Does, re: In response to the March 13 Order. ENDORSEMENT: Plaintiff to provide a copy of the CD that she sent to the Court to counsel for Mt. Sinai. If there is a transcript of the hearing it should be provided. (Signed by Judge Colleen McMahon on 3/18/2015) Copies Mailed by Chambers. (ajs) Modified on 4/23/2015 (ajs). (Entered: 03/19/2015) |
| 03/23/2015 | 219 | LETTER addressed to Judge Colleen McMahon from Rory J. McEvoy dated March 23, 2015 re: to March 18 Order directing Defendants to produce the transcript of the internal medical staff hearing. Document filed by Mount Sinai Medical Center. (Attachments: # 1 Appeal hearing of Dr. Leena Varughese) (McEvoy, Rory) (Entered: 03/23/2015) |
| 03/27/2015 | 220 | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT granting 161 Motion for Summary Judgment. For the foregoing reasons, Defendants' motion for a summary judgment of dismissal as to all counts is GRANTED and the case is dismissed. The Clerk of the Court is directed to remove Docket No. 161 from the Court's list of pending motions and to close the file. (Signed by Judge Colleen McMahon on 3/27/2015) (kgo) (Entered: 03/27/2015) |
| 03/27/2015 | | Transmission to Judgments and Orders Clerk. Transmitted re: 220 Order on Motion for Summary Judgment, to the Judgments and Orders Clerk. (kgo) (Entered: 03/27/2015) |
| 03/27/2015 | 222 | SEALED DOCUMENT placed in vault.(mps) (Entered: 03/30/2015) |
| 03/28/2015 | 221 | COUNTER LETTER Document filed by Leena Varughese. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Varughese, Leena) (Entered: 03/28/2015) |
| 03/31/2015 | 223 | CLERK'S JUDGMENT: Now before the Court is Defendants' motion for summary judgment of dismiss, and the matter having come before the Honorable Colleen McMahon, United States District Judge, and the Court, on March 27, 2015, having rendered its Memorandum Decision and Order granting Defendants' motion for summary judgment of dismissal as to all counts, dismissing the case, and directing the Clerk of the Court to close this file, it is, ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Decision and Order dated March 27, 2015, Defendants' motion for summary judgment of dismissal as to all counts is granted and the case is dismissed; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/31/2015) (Attachments: # 1 Right to Appeal Attachment part 1, # 2 Right to Appeal Attachment part 2)(mro) (Entered: 03/31/2015) |
| 03/31/2015 | | Transmission to Docket Assistant Clerk. Transmitted re: 223 Clerk's Judgment,,,, to the Docket Assistant Clerk for case processing. (mro) (Entered: 03/31/2015) |
| 04/23/2015 | 224 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL** - FIRST NOTICE OF APPEAL. Document filed by Leena Varughese. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Varughese, Leena) Modified on 4/24/2015 (tp). (Entered: 04/23/2015) |
| 04/24/2015 | | |

|  |  |  |
|---|---|---|
|  |  | ***NOTE TO ATTORNEY REGARDING DEFICIENT APPEAL. Note to Attorney Varughese, Leena to RE-FILE Document No. 224 Notice of Appeal. No Order being appealed was selected. Re-file the document as a Corrected Notice of Appeal event and select the correct Order being appealed. (tp) (Entered: 04/24/2015)** |
| 04/24/2015 | 225 | FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR - AMENDED NOTICE OF APPEAL from 220 Order on Motion for Summary Judgment, 223 Clerk's Judgment. Document filed by Leena Varughese. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Varughese, Leena) Modified on 4/24/2015 (tp). (Entered: 04/24/2015) |
| 04/24/2015 |  | ***NOTE TO ATTORNEY REGARDING DEFICIENT APPEAL. Note to Attorney Varughese, Leena to RE-FILE Document No. 225 Notice of Appeal. The filing is deficient for the following reason: the Wrong Event Type was selected. Re-file the document and select the appropriate Appeal event. (tp) (Entered: 04/24/2015)** |
| 04/24/2015 | 226 | FIRST CORRECTED NOTICE OF APPEAL re: 225 Notice of Appeal, 224 Notice of Appeal, 220 Order on Motion for Summary Judgment, 223 Clerk's Judgment,,,. Document filed by Leena Varughese. (Varughese, Leena) (Entered: 04/24/2015) |
| 04/24/2015 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 226 Corrected Notice of Appeal. (tp) (Entered: 04/24/2015) |
| 04/24/2015 |  | Appeal Fee Due: for 226 Corrected Notice of Appeal. Appeal fee due by 5/8/2015. (tp) (Entered: 04/24/2015) |
| 04/24/2015 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 226 Corrected Notice of Appeal filed by Leena Varughese were transmitted to the U.S. Court of Appeals. (tp) (Entered: 04/24/2015) |
| 05/07/2015 |  | FILING ERROR - DEFICIENT DOCKET ENTRY - Appeal Fee Payment: for 226 Corrected Notice of Appeal. Filing fee $ 505.00. (Varughese, Leena) Modified on 5/7/2015 (nd). (Entered: 05/07/2015) |
| 05/08/2015 | 227 | REQUEST TO PROCEED IN FORMA PAUPERIS ON APPEAL. Document filed by Leena Varughese. (Attachments: # 1 Supplement)(Varughese, Leena) (Entered: 05/08/2015) |
| 05/11/2015 | 228 | MEMO ENDORSEMENT on re: 227 Request to Proceed In Forma Pauperis on Appeal filed by Leena Varughese. ENDORSEMENT: Magistrate Judge Francis and I both believe that Dr. Varughese is married, but no income from a spouse is listed. Dr. Varughese must certify under oath that she is not married or provide spousal income information before I will act on this application. This is of importance because the appeal, in the opinion of this court, raises no substantial question. (Signed by Judge Colleen McMahon on 5/11/2015) Copies Mailed By Chambers. (kgo) (Entered: 05/11/2015) |
| 06/10/2015 | 229 |  |

Case 15-1328, Document 176-1, 03/01/2017, 1979649, Page41 of 113

AA-35

| | | LETTER Document filed by Leena Varughese.(Varughese, Leena) (Entered: 06/10/2015) |
|---|---|---|
| 08/07/2015 | 230 | ORDER DENYING IN FORMA PAUPERIS RELIEF re: 227 Request to Proceed In Forma Pauperis on Appeal filed by Leena Varughese. Because of Ms. Varughese's unwillingness to plainly state whether she is married, I am denying her request for in forma pauperis relief. However, that does not doom Ms. Varughese's application. Under Federal Rule of Appellate Procedure 24(a)(5), Ms. Varughese has the right to ask the appellate court for in forma pauperis relief. She should do so within thirty days of the date of this order, which is being sent to her via both United States mail, and via electronic mail, using the address with which she has previously corresponded with the Court's deputy. (As further set forth in this Order.) (Signed by Judge Colleen McMahon on 8/6/2015) Copies Mailed By Chambers. (tro) (Entered: 08/07/2015) |
| 04/14/2016 | 231 | ORDER of USCA (Certified Copy) as to 226 Corrected Notice of Appeal filed by Leena Varughese. USCA Case Number 15-1328. Scott A. Korenbaum moves to be relieved as pro bono counsel for the Appellant. Upon due consideration, it is hereby ORDERED that the motion is GRANTED. It is FURTHER ORDERED that the portion of this Court's October 22, 2015 order granting Appellant's pro se motion for the appointment of counsel on appeal is hereby VACATED. Appellant shall be permitted to continue with the appeal of her remaining claims pro se. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 04/14/2016. (nd) (Entered: 04/14/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 02/22/2017 09:34:09 | | | |
| PACER Login: | AkermanNYC:2958559:4681483 | Client Code: | 99996-623160 |
| Description: | Docket Report | Search Criteria: | 1:12-cv-08812-CM-JCF |
| Billable Pages: | 27 | Cost: | 2.70 |

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Julie L. Weber
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com
jlweber@edwardswildman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEENA VARUGHESE, M.D.,

                 Plaintiff,

        v.

MOUNT SINAI MEDICAL CENTER, PATRICK
LENTO, M.D., CARLOS CORDON-CARDO, M.D.,
ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D., and
ABC Corp. 1-10, and JOHN DOES 1-10,

                 Defendants.

---

12 Civ. 8812 (CM) (JCF)

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that upon the annexed Declarations of Rory J. McEvoy, Esq.,

sworn to on July 24, 2014; Kruthi Maniar, M.D., sworn to on July 18, 2014; Vesna Najfeld,

Ph.D., sworn to on June 27, 2014; Samuel McCash, M.D., sworn to on July 18, 2014; Patrick

Lento, M.D., sworn to on July 3, 2014; Adolfo Firpo, M.D., sworn to on July 18, 2014; Paul

Johnson, sworn to on July 23, 2014; Shabnam Jaffer, M.D., sworn to on July 18, 2014; Shema

Patel, sworn to on July 15, 2014 and Anupna Nayak, M.D., sworn to on July 18, 2014; and the

exhibits thereto; the annexed Rule 56.1 Statement; the accompanying memorandum of law; and

all prior proceedings had herein, Defendants Mount Sinai Medical Center, Patrick Lento, M.D.,

Carlos Cordon-Cardo, M.D., Adolfo Firpo, M.D. and Ira Bleiweiss, M.D. (collectively

"Defendants") will move this Court at the United States Courthouse, 500 Pearl Street, New

York, New York, on a date and time to be determined by the Court, for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting Defendants' motion for summary judgment and dismissing the Second Amended Complaint with prejudice, and granting such other and further relief, including costs and attorneys' fees, as this Court deems just and proper.

Date:   New York, New York
      July 24, 2014

EDWARDS WILDMAN PALMER LLP

By: _____
        Rory J. McEvoy
        Julie L. Weber
Attorneys for Defendants
750 Lexington Avenue
New York, NY 10022
212.308.4411
rmcevoy@edwardswildman.com
jlweber@edwardswildman.com

TO:    Leena Varughese, M.D.
       *Pro se* Plaintiff
       904 River Road
       Piscataway, NJ 08854
       908.265.7536
       leenav@gmail.com

AA-38

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Julie L. Weber
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com
jlweber@edwardswildman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEENA VARUGHESE, M.D.,

    Plaintiff,

  v.

MOUNT SINAI MEDICAL CENTER, PATRICK
LENTO, M.D., CARLOS CORDON-CARDO, M.D.,
ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D., and
ABC Corp. 1-10, and JOHN DOES 1-10,

    Defendants.

12 Civ. 8812 (CM) (JCF)

**DECLARATION OF**
**RORY J. MCEVOY**

---

   RORY J. MCEVOY, pursuant to 28 U.S.C. § 1746, declares under penalty of

perjury that the following is true and correct:

   1. I am a member of the firm of Edwards Wildman Palmer LLP, attorneys

for Defendants The Mount Sinai Medical Center ("Mount Sinai"), Dr. Patrick Lento, Dr. Carlos

Cordon-Cardo, Dr. Adolfo Firpo, and Dr. Ira Bleiweiss (collectively "Defendants") and I am

fully familiar with this proceeding as well as the specific matters set forth herein.  I make this

declaration in support of Defendants' motion for summary judgment.

   2. Exhibit 1 hereto is a copy of relevant excerpts and exhibits from the

deposition transcripts of Plaintiff Dr. Leena Varughese ("Plaintiff"), which I conducted on

May 23, 2013, June 11, 2013, June 13, 2013, July 8, 2013 and August 7, 2013.

3.   Exhibit 2 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Dr. Carlos Cordon-Cardo, which I defended on October 18, 2013.

4.   Exhibit 3 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Dr. Patrick Lento, which I defended on October 25, 2013.

5.   Exhibit 4 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Dr. Ira Bleiweiss, which I defended on November 13, 2013.

6.   Exhibit 5 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Dr. Arthur Figur, which I defended on January 8, 2014.

7.   Exhibit 6 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Dr. Adolfo Firpo, which my Partner, Ira Greenberg, defended on October 30, 2013 and December 17, 2013.

8.   Exhibit 7 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Shema Patel, which my Partner, Ira Greenberg, defended on November 20, 2013.

9.   Exhibit 8 hereto is a copy of relevant excerpts and exhibits from the deposition transcript of Caryn Tiger-Paillex, which my Partner, Ira Greenberg, defended on December 17, 2013.

Dated: New York, New York
       July 24, 2014

Rory J. McEvoy

AA-40

Leena Varughese, M.D.

v.

Mt. Sinai Medical Center

May 23, 2013

Witness: Leena Varughese

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344
Fax: (212) 983-9149
office@crinyc.com

**1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

LEENA VARUGHESE, M.D.,

        Plaintiff,

    vs.        12 Civ. 8812(CM)

MOUNT SINAI MEDICAL CENTER,
PATRICK LENTO, M.D. CARLOS
CORDON-CARDO, M.D., ADOLFO
FIRPO, M.D., IRA J. BLEIWEISS,
M.D. and ABC CORP. 1 10, and
JOHN DOES 1-10,

        Defendants.

-------------------------------X

          May 23, 2013

          10:07 a.m.

      Deposition of LEENA VARUGHESE, held at
the offices of Edwards Wildman Palmer LLP, 750
Lexington Avenue, New York, New York, pursuant
to Notice, before Thomas R. Nichols, a
Registered Professional Reporter and a Notary
Public of the State of New York.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**3**

      IT IS HEREBY STIPULATED AND AGREED, by
and between the attorneys for the respective
parties herein, that filing and sealing be
and the same are hereby waived.

      IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.

      IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized to
administer an oath, with the same force and
effect as if signed and sworn to before the
Court.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**2**

A P P E A R A N C E S :

LAW OFFICES OF RONALD J. WRONKO, LLC
Attorneys for Plaintiff
    134 Columbia Turnpike
    Florham Park, New Jersey 07932
BY:  RONALD J. WRONKO, ESQ.


EDWARDS WILDMAN PALMER LLP
Attorneys for Defendants
    750 Lexington Avenue
    New York, New York 10022
BY:  RORY J. McEVOY, ESQ.
      JULIE L. SAUER, ESQ.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**4**

1             Varughese
2  L E E N A   V A R U G H E S E,  residing at 531
3    Olive Terrace, Union, New Jersey 07085,
4    called as a witness, having been duly sworn
5    by a Notary Public, was examined and
6    testified as follows:
7  EXAMINATION BY
8  MR. McEVOY:
9      Q.   Dr. Varughese, let me take a second to
10  explain to you what we're doing today.  As I think
11  you know, I am Rory McEvoy and I am one of the
12  attorneys representing Mount Sinai.  This is my
13  colleague Julie Sauer, and we are representing the
14  hospital in the lawsuit that you have brought
15  against them.
16      What we're going to do today and on a
17  couple of days in the future is take your
18  deposition, and that is, I will ask you a series
19  of questions about your employment at Mount Sinai,
20  about the claims in your lawsuit.
21      Everything that you say, I say,
22  Mr. Wronko says, will be taken down.  A transcript
23  will be prepared.  You will get a chance to review
24  the transcript, make any changes, correct any
25  mistakes, that the transcript is the only official

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**5**

Varughese

recording of this deposition.

You know that you're under oath so that we need full, complete and accurate answers. You have to answer verbally. You can't nod your head or say "uh-huh," because the court reporter can't take that down.

If you don't hear a question that I ask you, ask me to repeat it. If you don't understand a question, tell me that you don't understand it and we'll make sure that you understand the question, because I only want you to answer questions that you understand.

If at any point you get tired, you want to take a break, let me know and we'll do that. Let me finish my question before you answer it. I'll let you finish your answer before I ask you the next question.

Do you understand all those rules?

20     A.   Yes.

      Q.   Is English your native language?

      A.   Yes.

23     Q.   Are you taking any medication, either prescribed or unprescribed, that in any way will affect your memory or your ability to answer the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**6**

Varughese

questions that I ask?

      A.   I have been having seasonal allergies, and I did take a Benadryl last night.

      Q.   You're the doctor. Is Benadryl a medication that affects your memory?

      A.   Well, it crosses a blood brain barrier and has some effect on the histamine receptors in the brain, so it may. It tends to make me a little bit groggy, but I believe the effects have worn off.

      Q.   Just so you understand, it serves neither your purpose nor mine to sit here for a day and take your deposition then have you say later, you know, my memory was impaired or I didn't understand or I was groggy.

So I need you to be sure that you can understand and answer the questions or else this will become a pointless exercise for both of us.

      A.   Yes.

      Q.   So you tell me.

22     A.   I believe I can answer the questions.

      Q.   OK.

Dr. Varughese, where did you go to medical school?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**7**

Varughese

      A.   New Jersey Medical School.

      Q.   And when did you graduate?

      A.   2008.

      Q.   Before you graduated did you apply f a residency program?

      A.   Yes.

      Q.   Did you go through "the match" as it's called?

      A.   Yes.

      Q.   And did you apply for residency at Mount Sinai?

      A.   Yes.

      Q.   And was that where you were matched?

      A.   Yes.

      Q.   Was that your first choice?

      A.   I'm not sure now.

      Q.   When did you start your residency at Mount Sinai?

      A.   2008.

      Q.   And under the residency program at Mount Sinai did you sign a residency contract?

      A.   Yes.

      Q.   And how long was that contract for?

      A.   It renews each year and it runs from

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**8**

Varughese

July 1st to June 30th.

      Q.   So let me just show you a few documents and let me explain to you what we do when we show you a document. What I'm going to show you now, so you know, are the residency contracts that you signed.

      A.   OK.

      Q.   The way it works is I will show you the document, ask you to look at it and tell me if you know what it is. Not what it says, but what it is. Because we have to identify them.

      A.   OK.

      Q.   Then if you say yes, I know what this is. I'll say, OK, what is it? You will say hopefully, well, this is my residency contract. And then the court reporter will mark it as an exhibit so we know we had testimony about it and you identified it. OK?

      A.   Correct.

MR. McEVOY: Mark this is as Defendants' 1.

(Defendants' Exhibit 1, document headed "The Mount Sinai Hospital Resident's Contract," dated 6/30/08 and 6/12/08, Bates

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**9**

Varughese

Nos. P90 through P95, marked for
identification, this date.)

Q.   Let me show you as an exhibit that
document.  Would you look at that and tell me if
you can identify it for me.

A.   This is the Mount Sinai Hospital
resident's contract.

Q.   Is this the resident's contract that
you signed in June of 2008, if you look at the
last page?

A.   Yes.

Q.   Let me show you what we'll mark as
Defendants' Exhibit 2.

(Defendants' Exhibit 2, document
headed "The Mount Sinai Hospital Resident's
Contract," for the academic year July 1st,
2009 to June 30, 2010, Bates Nos. D-36
through D-42, marked for identification,
this date.)

Q.   The same question Dr. Varughese.  Do
you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's the Mount Sinai Hospital's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**10**

Varughese

resident's contract.

Q.   This is the one that you signed for
the academic year July 1st, 2009 to June 30, 2010?

A.   I believe it is.

Q.   Let me show another document which
we'll mark as Defendants' Exhibit 3.

(Defendants' Exhibit 3, document
headed "The Mount Sinai Hospital Resident's
Contract," for the PGY-3 year July 1st, 2010
until June 30, 2011, Bates Nos. P264 through
P270, marked for identification, this date.)

Q.   I ask you again to take a look at it.
Can you tell me what this document is?

A.   It's yet another Mount Sinai Hospital
resident's contract.

Q.   And your signature is on the last
page?

A.   Yes.

Q.   This is for your PGY-3 year 2010/2011?

A.   Yes.

Q.   Thank you.

MR. McEVOY:  And lastly, mark this as
Exhibit 4.

(Defendants' Exhibit 4, document

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**11**

Varughese

headed "The Mount Sinai Hospital Resident's
Contract," for the PGY-4 year July 1st, 2011
until June 30, 2012, Bates Nos. P992 through
P998, marked for identification, this date.)

Q.   The same question.  Can you tell me
what this document is?

A.   This is the Mount Sinai Hospital
resident's contract.

Q.   And is your signature on the last
page?

A.   Yes.

Q.   And this is the contract that you had
for your PGY-4 year from 2011 to 2012?

A.   Yes, I believe it is.

Q.   OK.  Doctor, you were a resident in
the pathology department; is that correct?

A.   Correct.

Q.   I realize that your responsibilities
may have changed from year to year, but generally
what were you were responsibilities as a pathology
resident?

A.   It varied depending on the rotation or
service that was being covered by myself.

Q.   So let's focus on the PGY-3 year, just

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**12**

Varughese

picking one.  What were your responsibilities
during that year?

A.   Once again, it varied widely.

Q.   Tell me how they varied.

A.   With the service that I was on.

Q.   What services were you on?

A.   If I recall correctly, I believe I was
on several months of surgical pathology at
Elmhurst, Mount Sinai Medical Center, VA.  That's
the Veteran's Administrative Affairs Hospital.  As
well as I believe I'm on the clinical chemistry
and perhaps a month of blood banking.

Q.   Blood banking.

A.   Blood banking.  And I'm not certain
now what the other.  I would have to look at my
schedule.

Q.   I understand.  So in surgical
pathology what were your job responsibilities?
What did you do?

A.   That involved, surgical pathology
involves prosecting specimens which are removed
from patients during surgery and submitting that
for histological analysis, followed by reviewing
of the histology under the microscope and then

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-44

---

13

Varughese

signing out the case with the attending
pathologist.

Q.    Anything else that you did during the
surgical pathology service?

A.    In a similar vein there is also
biopsies.

(Reporter asked witness to repeat.)

Q.    Just so you understand, the court
reporter sometimes won't hear what somebody says
and they will say I didn't hear you.  A lot of
times people think they want you to say something
more than that.  They just want to know what it is
that you said because they didn't hear what you
said.  OK?

A.    Correct.

Q.    You were saying in a similar vein
biopsies.

A.    Correct.

Q.    What about biopsies?

A.    Biopsies are also tissue acquired from
the patient and that's not processed by the
resident, but we do review it histologically under
the micro -- we review it under the microscope for
histology and then sign out those cases as well.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

14

Varughese

Q.    Anything else?  Any other job
responsibilities in surgical pathology?

A.    Yes.  At Mount Sinai Hospital I was
responsible for organizing the slides, the
paperwork, following on missing blocks, missing
slides and correcting or insuring correct gross
descriptions.

Q.    I take it you're familiar with the
grossing of specimens?

A.    Yes.

Q.    How does that work?

MR. WRONKO:  Form objection.

Q.    When I ask you how does that work,
what's the process by which specimens are grossed?

A.    It's simply examining the specimen
with your eye and making a determination of the
measurements, the size, sometimes the weight, and
making a note of any lesions that are there.

Q.    So at Mount Sinai now, not at Elmhurst
or the VA, where is grossing of specimens done?

A.    At Mount Sinai Hospital the grossing
of the specimens are done in what is known as the
grossing room.

Q.    And where is the grossing room?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

15

Varughese

A.    It's on the 15th floor in the
Annenberg building.

Q.    When you were grossing specimens in
the grossing room, where did the slides come fro
How did you get them?

A.    The slides were processed by the
histology staff in an adjacent lab and they had
several machines there that processed the blocks
that would be submitted overnight or for several
hours for -- and then it was embedded and then
further processed by the technicians.

Q.    Would they then send the slide to you
or to the grossing room?

A.    Yes.  They would usually put the
slides in a box.  We had boxes labeled with our
initials and last name, I believe, at this point
and it would be placed there.

Q.    How did you know which specimens you
were supposed to review as opposed to one of your
colleagues was supposed to review?

A.    It usually was determined by the cases
assigned to you, whether it is at the time that
you began your work for the day, by myself or by
the PA who was working.  So that's...

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

16

Varughese

Q.    Who would assign you the case?

A.    As far as I know, there was not a
formal assignment of cases.

Q.    So what types of specimens were being
grossed?  And by that I mean did they fall into
categories?  Were there breast specimens, prostate
specimens?  What were the categories?

A.    Yes, they did fall into a lot of
different categories.  I believe at some point the
program tried to organize it according to category
and divide the group into I believe two groups.
So people would only gross specimens from, let's
say, the knee or bone and soft tissue specimens
and GI and then the other group, the group two,
would be responsible for specimens that were
removed, breast specimens or lung specimens.
Those were common things that we --

Q.    When did that take place, that attempt
to categorize and set up two groups?

A.    I am not sure now.

Q.    What group were you in?

A.    I'm not sure if I participated in the
group in that particular group assignment.

Q.    Do you know why you didn't participate

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**17**

Varughese

2 in that group assignment?

    **A.** I believe there was a constant change

of method of approaching grossing there. So it

changed frequently.

    **Q.** What role, if any, did the chief

residents play in assigning grossing specimens to

8 other residents?

    MR. WRONKO: Form objection. You can

answer.

11     **A.** They did not play any role as far as I

knew.

14     **Q.** Now, when you completed grossing the

specimen what was your responsibility then? What

did you do after you were finished?

17     **A.** After finishing grossing just, you

know, submitting the blocks, the tissue blocks,

you submitted the specimen back into Formalin and

in the properly labeled container and just put it

20 for storage.

    **Q.** Was there any report that you were

supposed to generate or other paperwork that you

23 were supposed to generate?

    **A.** You're supposed to enter the blocks

and enter the gross description.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**18**

Varughese

1     **Q.** What could the gross description be?

What were the possible descriptions? Or give me

4 examples of what the descriptions might be.

    MR. WRONKO: Form objection. You can

answer.

7     **A.** Gross description just is the

measurement, like I mentioned before, weight,

lesions, and the block submitted.

10     **Q.** And I think you said that you looked

at the specimens visually.

    **A.** Yes.

13     **Q.** Did you look at them under a

microscope?

    **A.** Usually we did have a magnifying glass

16 we used on occasion if there was a -- for certain

types of lesions we would use it and examine it

under the microscope to see where the lesion was,

19 and, um, but other than that, no. Gross specimens

are not examined under microscope.

    **Q.** And the magnifying glass is not a

22 microscope, correct?

    **A.** No.

    **Q.** During your PGY-3 year who was or were

25 the chief residents?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**19**

Varughese

2     **A.** During the PGY-3 year it was Kruti

Maniar, Samuel McCash. Later in the year it was

transitioned into Elizabeth Morency and Adrienne

5 Jordan.

    **Q.** Were Drs. Jordan and Morency the chief

residents in your PGY-4 year?

8     **A.** Right, Morency was the PGY-4

resident.

10     **Q.** Was Dr. Jordan a PGY-4 year as well?

11     **A.** Dr. Jordan was a PGY-3 year.

12     **Q.** She was a PGY-3.

13     **A.** Right.

14     **Q.** When was she the co-chief resident?

What year of your residency was she the co-chief

16 resident?

17     **A.** Well, I wasn't sure if she was

co-chief resident until she has been referred to

as such now. But OK, I was a fourth-year resident

when she was one of the chief residents.

21     **Q.** When you were a third-year resident it

22 was Dr. McCash and Kruti Maniar.

23     **A.** For the majority of that year.

24     **Q.** When did that change? And by your

25 third year I assume we're talking about from July

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**20**

Varughese

2 1st of 2010 to June 30th of 2011. That's your

3 third year.

4     **A.** Correct.

5     **Q.** When did either Dr. McCash or

Dr. Maniar stop being the chief resident during

7 that period of time if you know?

8     **A.** I can't recall off the top of my head.

9     **Q.** OK. Did you know Dr. McCash prior to

his becoming the chief resident in your third

11 year?

12     **A.** Yes. He was a fellow resident in the

13 program.

14     **Q.** I think we all know that at a certain

15 point in time you had problems with Dr. McCash.

16     **A.** Right.

17     **Q.** And we'll get to that in a minute.

And the first of them I understand was in -- are

19 you OK?

20     **A.** Oh, yes.

21     **Q.** And the first of them I believe was in

22 September of 2010; is that correct?

23     **A.** Yes. I believe that's correct.

24     **Q.** So before September 2010 during the, I

25 guess the two years that you were both

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-46

---

### 29

Varughese

1  
2  shoulder and said I would like to talk to you  
3  later, yes?  
4      A.   Yes.  
5      Q.   Did you talk to Dr. McCash after the  
6  conference?  
7      A.   Yes, I did.  
8      Q.   Where did that conference take place?  
9      A.   It took place in the same conference  
10  room.  
11      Q.   Were other people present or was it  
12  just you and Dr. McCash?  
13      A.   It was just me and Dr. McCash.  
14      Q.   What did he say to you, what did you  
15  say to him during this conversation?  
16      A.   He stated those things that you just  
17  restated from the complaint. And I -- that's --  
18  what I stated to him was, you know, just I'm just  
19  trying to do my work. I don't know why you feel  
20  like or you feel entitled to say these things to  
21  me.  
22      Q.   Did he say to you why he was saying  
23  the things? I won't repeat them, but the things  
24  that you allege that he said?  
25      A.   He said he was saying it for my own  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

---

### 30

Varughese

1  
2  good and to help me.  
3      Q.   So any other discussion or  
4  conversation between you and Dr. McCash during  
5  this meeting that you had after the CP Call  
6  Conference?  
7      A.   None at all. That was it. I just  
8  walked out.  
9      Q.   So after this conversation or whatever  
10  it was both during the conference or -- I'm sorry,  
11  before the conference took place and where the  
12  group was present and then after the conference,  
13  just you and Dr. McCash, did you tell anybody at  
14  Mount Sinai about this incident?  
15      A.   Well, I was in the hall and Dr. Pessin  
16  was waiting for the elevator and I just, you know,  
17  I didn't think she was in any way aware of what  
18  happened in the conference room. So I just said,  
19  you know -- I don't recall exactly what I said to  
20  her.  
21      Q.   In substance, what did you say to her?  
22  I know you don't remember the exact words, but  
23  what was the substance of what you said to her?  
24      And before we get there, just so we  
25  have it on the record, who was Dr. Pessin at the  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

---

### 31

Varughese

1  
2  time?  
3      A.   She was I believe the acting interim  
4  chair of the department.  
5      Q.   Of pathology.  
6      A.   Yes.  
7      Q.   So what did you say to Dr. Pessin  
8  when you saw her after your conversation with  
9  Dr. McCash?  
10      A.   I believe I did not inform her of what  
11  happened. I just -- I believe I was just, you  
12  know, just said hello.  
13      Q.   Did you tell anybody at Mount Sinai  
14  about this, I'll use the word "incident," the  
15  incident with Dr. McCash?  
16      A.   Yes, I did.  
17      Q.   Who did you tell?  
18      A.   I spoke to Dr. Lento the following  
19  day.  
20      Q.   Who's Dr. Lento at the time?  
21      A.   He was a program director at that  
22  time.  
23      Q.   The program director of the residency  
24  program in pathology.  
25      A.   Correct.  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

---

### 32

Varughese

1  
2      Q.   And where did you speak to Dr. Lento?  
3      A.   I spoke to him in the autopsy suite.  
4  There's a small office, a suite.  
5      Q.   Was anybody else present?  
6      A.   Yes, Kruti Maniar was there.  
7      Q.   Anyone else?  
8      A.   No.  
9      Q.   And what did you say to Dr. Lento  
10  during this meeting in the autopsy suite?  
11      A.   I just simply told him, you know, what  
12  had happened and how I did not, you know,  
13  appreciate McCash's behavior and there was no  
14  place for it and I would like for him to intercede  
15  at this point or intervene in some way that would  
16  be productive.  
17      Q.   And what did Dr. Lento say?  
18      A.   He just said, I wasn't there. I don't  
19  know. I don't know what happened. And he said,  
20  Well, nobody really can corroborate that.  
21      And I believe at that point Maniar was  
22  there and she said, Well, you know, we discussed  
23  this incident before and even McCash admits that  
24  he was, you know, he lost his cool or temper.  
25      Q.   When Maniar said that we discussed  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

---

**37**

Varughese

Q.   What's Rob's last name, do you know?

A.   I believe it's Celantano.

Q.   So other than Mr. Celantano and Dr. McCash, any other colleagues that you thought were verbally abusing you as of September 14, 2010?

A.   Yes.   There was one of my, well, I, well, one of the supervisors, one of the supervisory attendings and I believe even Dr. Schiller.

Q.   Well, who was the supervisory attending?

A.   John Fallon.

Q.   Fallon?

A.   Fallon.

Q.   Is that the supervisory attending? The supervisory attending that you just referred to, that's Dr. Failon.

A.   Right.

Q.   And Dr. Schiller, who was Dr. Schiller in September of 2010?

A.   September.   I believe at that time he was the former chairman.

Q.   Of pathology, correct?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**38**

Varughese

A.   Correct.

Q.   Anybody else?

A.   Nothing stands out right now.

Q.   And the PA, how did he verbally abuse you?   What did he do?

A.   Well, I was simply working next to him and I don't know what I said to him now.   I believe it was just, I think I was on GYN rotation during my second year or -- I'm not quite sure what year.   I believe it was the second year.   And I simply asked him if he was busy or if he had time to help out before he left for the day, which is commonplace.   And he got very upset and just sort of started flailing his arms and shouting at me.

Q.   What did he say?

A.   I think he just said I'm sick and tired of your B.S. and just, you know, I don't want to -- I hate working here.   This place is horrible and just -- but just a lot of flailing of the arms.   He is like a six-foot five tall person and he's sort of a little bit broad and it's just a little -- it's intimidating to have someone so tall and just shouting and flailing

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**39**

Varughese

their arms around and that's what occurred.

Q.   And did you report that incident to anybody?

A.   I just simply -- I thought I should not report it because I didn't think he was going to really help at that time.   So one of my colleagues was, um, I believe at that time she was a first year resident and she just got very concerned.   So she reported it to I believe first Dr. Nagi and then to Dr. Schiller.

Q.   Who was your colleague in the first year who reported it?

A.   It was Jacqueline Hecthman.

Q.   How did Dr. Fallon verbally abuse you? What did he do?

A.   Well, I was on surgical pathology rotation and I was on the seventh floor of the Guggenheim building performing frozen sections, which are intraoperative consultations for surgery, when he called me to come upstairs to the 15th floor on Annenberg and when I arrived he had some slides, unlabeled slides and he said they were my cases that I had not labeled.   So -- there was a label.   It was written in pencil, but there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**40**

Varughese

wasn't a sticker.

So I assumed they were my slides because, I mean, I didn't have time to check, and I was like, well, OK, I'm sorry.   Like I'll just take them and I'll label them, and but he was just very upset saying, you know, Well, these are not labeled.   Nobody is labelling slides here.

And then -- he just got upset and then he had that, Oh, just take this tray out of my lap and go label them now.   And I was like, excuse me. Don't take that.   So I was just shocked and offended.

Q.   Why were you offended?

A.   Because he told me to take a tray of slides off his lap.   I thought it was just highly inappropriate.

Q.   What is the procedure for labelling slides?

A.   It's simply just putting the last name, first initial, and the frozen section number.

Q.   But you said that she seemed to be upset about the fact that there weren't stickers on the slide as opposed to however they had been

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**41**

Varughese

2  labeled by you or someone else.
    A.    Right.
    Q.    Are they supposed to have stickers?
    A.    Yes, for official filing we need to
have a sticker on it. So the frozen section slide
labelling process went through I guess three
8  rounds of labelling: One with a written pencil
and number with a name and the number of frozen
section number, then your own sticker with the
11  frozen section number and the name and then the
block number. And then the third round when it
was officially filed they would put the final
14  sticker on it.
    Q.    Who puts the first sticker on, the one
that's in pencil?
17    A.    I do.
    Q.    Who puts the second sticker on that
has the sticker label?
20    A.    Right. I do that too.
    Q.    And the third one, the last one?
    A.    The third one is put by the staff, one
23  of the technicians.
    Q.    So other than this occasion that you
just described did Dr. Fallon verbally abuse you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**42**

Varughese

1  on any other occasion?
    A.    No.
4    Q.    How did Dr. Schiller or when did
Dr. Schiller verbally abuse you? What did he do?
    A.    Well, this is my second year, and he,
7  um, he wanted me to meet with him out of the blue
when I was working. I'm not sure what I was doing
that day. I just -- his secretary came to me and
10  said, Oh, he wants to speak to you. I said, About
what? And so I went over and I spoke to him.
    Q.    What did he tell you he wanted to see
13  you about? What did he say?
    A.    He told me that he wanted to see me
about, you know, about my unhappiness. He said
16  that I didn't look happy. I wasn't smiling
enough. Like what's going on? So on.
    I believe he did say something about,
19  you know, the way you -- if you're unhappy that's
part of who you are and it's sort of your DNA and
so on. I was -- once again, I was very shocked
and offended.
    Q.    Did Dr. Schiller say anything else
during this meeting?
25    A.    Right. And he thought that, you know,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**43**

Varughese

1  oh, he also said that people were unhappy like
that, it's trouble and I feel like it's going to
be a lot of, you know, you're in trouble or we
4  don't want you to be in trouble.
    I was just very sort of confused with
this line of logic, but I was -- I listened to him
7  and then I thought I should speak to someone and
then he wants a note and --
    Q.    You should speak to someone. Did he
10  say who you should speak to?
    A.    He said I should speak to a
psychiatrist or somebody. He wanted to know if I
13  was speaking to someone, you know, getting help.
I just said no. I mean, I didn't think I needed
help.
16    Q.    And he wanted a note from who about
what?
    A.    He wanted a note saying that I'm happy
19  and -- I am not sure what he wanted a note from
and why. I did not feel like I had the need to
see anybody, but he wanted me to see someone and
22  get a note.
    Q.    And did Dr. Schiller say anything else
during this meeting?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**44**

Varughese

2    A.    That's all I recall right now.
    Q.    And what did you say?
4    A.    I was just like, Why do you think
that? And did anybody say anything to you to make
you think that I'm unhappy?
7    And he did not have, you know, he did
not say anything. He did not mention anybody, did
not say anything, and he just said, Just go, go
10  see somebody and go see a psychiatrist.
    Q.    Where did that meeting take place?
    A.    It took place in his office.
13    Q.    Was anyone else present?
    A.    No.
15    Q.    How long did it last?
    A.    I believe maybe like fifteen minutes,
ten, fifteen minutes.
18    Q.    Were you unhappy at the time you met
with Dr. Schiller?
20    A.    No.
    Q.    After that meeting did you speak to
anybody about what Dr. Schiller had said? I don't
23  mean did you go see a psychiatrist. I mean did
you talk to anybody at the hospital.
25    A.    Yes, I did. I didn't talk to any of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**65**

Varughese

1
2  was already done and I had, you know, three or
3  four cases still remaining to complete. So I
4  asked him to gross a few more things.
5      Q.   And what types of specimens were
6  those?
7      A.   Can you elaborate?
8      Q.   Sure. You said you were grossing, you
9  had three or four specimens to work with. Were
10  they GI, prostate, breast, some other work?
11      A.   Correct. I believe there were some
12  mastectomy specimens, some GI, complicated GI
13  specimens. There was liver, complicated liver
14  surgery specimens, and I believe colon cancers and
15  noncancer, but surgical specimens from the GI
16  tract.
17      Q.   So is the way that it worked that
18  Dr. Jordan took responsibility for whatever
19  specimens she took responsibility for and then she
20  would assign certain specimens to Dr. Azar?
21          MR. WRONKO: Form objection. Do you
22      mean on this one occasion?
23          MR. McEVOY: Yes.
24      Q.   On this occasion. Because I thought
25  you said before, Dr. Varughese, that Dr. Azar was

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**66**

Varughese

1  doing specimens that Jordan had given him to do.
2  That's why I'm asking you that question.
3      A.   Well, she had started moonlighting
4  much earlier than the time that we usually have
5  allotted for moonlighters to begin moonlighting.
6      Q.   You mean earlier that day.
7      A.   Earlier that day. So she had gone
8  under way with beginning to gross or prosect the
9  specimen.
10      Q.   Was there any disagreement between you
11  and Dr. Jordan as to who would do one particular
12  type of specimen as opposed to another type of
13  specimen?
14      A.   I don't remember having a disagreement
15  with her.
16      Q.   Did Dr. McCash come into the grossing
17  room at some point?
18      A.   Yes, he did.
19      Q.   And did Dr. McCash have a discussion
20  with you or say anything to you about what
21  specimens he wanted you to do and what specimens
22  he wanted Dr. Jordan to do?
23      A.   He wanted -- I'm not sure if he had
24  that discussion on what he wants me to do versus

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**67**

Varughese

1  Jordan.
2      Q.   Did he tell you that he wanted you to
3  do certain breast cases and he wanted Dr. Jordan
4  to do the prostate cases?
5      A.   Well, I had a lot of breast specimens
6  that day, so I assumed he meant the mastectomy
7  and --
8      Q.   What do you recall him saying about
9  what specimens you should do?
10      A.   That's -- well, I just recall him
11  saying, Oh, let the prostates be done by the
12  moonlighters. Because I believe there were two
13  and I had already done one or something that day.
14  So I believe he wanted them to do that.
15      Q.   What did he want you to do?
16      A.   I assume he wanted me to do the
17  mastectomies and some of the other breast
18  specimens.
19      Q.   And after Dr. McCash had that
20  discussion did he leave the gross room or the
21  grossing room?
22      A.   Yeah, I'm not sure if it was -- I
23  don't think we had that discussion in the grossing
24  room.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**68**

Varughese

1      Q.   Where did you have it?
2      A.   I believe it was in the resident work
3  area that's outside the grossing, where the
4  computers and everything else is situated.
5      Q.   Wherever it took place, after
6  Dr. McCash said he wanted the moonlighter to do
7  the prostate cases and you to do the breasts cases
8  that you just described, he left, he went
9  somewhere.
10      A.   Right, he went -- I don't know where
11  he went. I mean, that was the only time I saw him
12  that day before 6 p.m.
13      Q.   And did you do all of the breast cases
14  or did you give one or more of them to the
15  moonlighters to do?
16      A.   Well, I mean, I was doing my work and
17  Paul Azar was finishing his grossing and I simply
18  asked, you know, told him if he would be able to
19  do, some of the breast specimens. Very small
20  ones. That wasn't complicated, just...
21      Q.   So then I take it that somehow
22  Dr. McCash learned that Dr. Azar was doing some of
23  these breast cases?
24      A.   Correct.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

69

Varughese

Q. Do you know how he found out?

A. Well, I believe he found out because Adrienne Jordan had just left following my conversation with Azar, and I assumed she said something to him.

Q. So your belief is that you gave, you asked Dr. Azar to help with these breast cases. Dr. Jordan was there when it happened and you think she went and told Dr. McCash.

A. Right. I asked -- correct.

Q. I'm just asking what you believe. So after you asked Dr. Azar to help on the breast cases and after Dr. Jordan left, did Dr. McCash come back to the grossing room?

A. I'm sorry?

Q. You said you asked Dr. Azar to help with the breast cases.

A. Right.

Q. You said you saw Dr. Jordan leave the grossing room.

A. Uh-huh.

MR. WRONKO: You have to verbalize.

Q. You can't say "uh-huh" because he can't take that down. So is that yes?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

70

Varughese

Let's do it this way. You asked Dr. Azar to help with breast cases, yes?

A. Yes.

Q. And at some point after Dr. Azar began to help with the breast cases Dr. Jordan left the grossing room, correct?

A. Yes.

Q. After Dr. Jordan left the grossing room did Dr. McCash return?

A. Yes, Dr. McCash appeared for the first time in the grossing room that day when I was there as well.

Q. So when Dr. McCash came back into the grossing room --

A. Correct.

Q. -- at this point in time that we're talking about --

A. Correct.

Q. -- what, if anything, did Dr. McCash say to you?

A. He -- I believe he approached Azar first and he asked him what was he doing, what kind of specimens are you doing. And Dr. Azar said, Oh, just a few margins.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

71

Varughese

And then McCash approached me and said, What are you doing? You're supposed to do them.

And I tried to explain to him I had several other cases that were piled up right next to me one by one for which I needed to complete the "grossing process" and submit blocks so I can get everything -- I mean, technically there's no rush, but I like to finish as much work as I can on the first day in order to prevent backup the following day and the day after.

So I tried to explained to him that's what I was doing, simply, you know, going through my work flow so I can...

Q. Right. And what else did Dr. McCash say?

A. He just insisted that I shouldn't be doing that and I tried to find a reason why. I was like, Why do you think that? And he's like, I don't think he should do it. I think you should do it.

And at this point Azar offered to put the specimens back. He said, Well, listen, just about put it back. It's not a big deal.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

72

Varughese

I said I'll do it. Once I'm done with whatever was in front of me, I'll do it.

Q. What else did Dr. McCash say?

A. Then I just, and he was just very still very upset and glaring at me and so I just said this is ridiculous. So I just want to the back of the gross room, which is about 30 feet in length, and I tried to remove my gown and my gloves and mask and my, you know, voice-over dictation software and tried to leave.

Because I was concerned that, you know, this is very unusual for him to be this upset. So I was just concerned about his, you know, insistence that I do it. Even after saying that I would do it he would not let the situation be completed.

But then I took off my gown and gloves and I was going to the back and I was just removing everything and he starts approaching me. He starts charging at me and says, How could you -- you don't just listen to me. Why do you not listen to me?

And then he just follows me around like pointing to me and just invading my personal

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**81**

Varughese

2 of the room, took off your grown, took off your
3 gloves. At that point in time was there still
4 work that you were doing that remained undone?
5     **A.** Yes. I was in the middle of finishing
6 several cases for the day.
7     MR. McEVOY: Off the record.
8     (Discussion off the record.)
9     **Q.** So the work that was undone when this
10 happened, do you know if it got done?
11     **A.** Yes.
12     **Q.** How did it get done?
13     **A.** I completed it.
14     **Q.** Did you complete it after this
15 incident took place?
16     **A.** Yes.
17     **Q.** You came back and did it?
18     **A.** I completed just the initial
19 evaluation of several specimens and insuring that
20 they would be appropriately processed by fixing it
21 in formalin.
22     **Q.** My only question is, did you do that
23 after this incident took place or before?
24     **A.** I'm not sure.
25     **Q.** And putting it another way, after the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**82**

Varughese

1 incident took place and after you spoke to
2 Dr. Bleiweiss and after whatever else took place
3 that we'll get to, did you go back to the grossing
4 room to do any further work on specimens?
5     **A.** Yes.
6     **Q.** What did you go back to do?
7     **A.** I went back to complete the work that
8 I had remaining for that evening.
9     **Q.** Once you completed it you put whatever
10 labels or stickers needed to go on it and sent it
11 wherever it needed to go.
12     **A.** Yes.
13     **Q.** OK. Now we'll go to Bleiweiss. So
14 you get to Dr. Bleiweiss's office and tell me what
15 happened there.
16     **A.** I told him that, you know, McCash was
17 harassing me and threatening me and I would like
18 for him to come and speak to me.
19     **Q.** And what did Dr. Bleiweiss say?
20     **A.** He just shooed me away because he was
21 on the phone.
22     **Q.** Tell me what happens. You get down
23 the hall to Dr. Bleiweiss's office. Is his door
24 opened or closed?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**83**

Varughese

2     **A.** His door is open.
3     **Q.** And you walk in.
4     **A.** Right. Here's like a small waiting
5 area where the secretary sits and she does the
6 transcription and then there's an inner door and
7 that was, um, I believe it was open.
8     **Q.** So you came into what I'll call the
9 outer office.
10     **A.** Right.
11     **Q.** Was the secretary there?
12     **A.** No.
13     **Q.** So then did you go into
14 Dr. Bleiweiss's office?
15     **A.** No, I didn't go in. I just spoke to
16 him while waiting in that area.
17     **Q.** So you stood outside his door?
18     **A.** Right.
19     **Q.** He was inside?
20     **A.** Right, he was on the phone.
21     **Q.** Were you talking to him while he was
22 on the phone?
23     **A.** I -- well, I wasn't sure. I didn't
24 see he had the phone on him, so I just -- he was
25 like yes. So I, you know.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**84**

Varughese

2     **Q.** So you said what you just told me you
3 said to him and then he kind of you said shooed
4 you away because he was on the phone.
5     **A.** Yes, he was like, OK, and I believe,
6 that's -- yeah.
7     **Q.** So what happened after that?
8     **A.** And I think I did not go back
9 immediately. Actually, what did happen after that
10 is just -- oh, I know what happened. I just went
11 back to the gross room, because I was concerned
12 about the work that needed to be done. So I
13 thought perhaps I should just go back and I went
14 back.
15     **Q.** Other than you're saying whatever you
16 said to Dr. Bleiweiss and his shooing you away,
17 did you talk to Dr. Bleiweiss after he got off the
18 phone?
19     **A.** Well, I went back. Then later on in
20 the evening I spoke to him.
21     **Q.** But at the time you didn't.
22     **A.** At that time, no.
23     **Q.** Did you speak to anybody else at that
24 time?
25     **A.** At that time I don't think I spoke to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**85**

Varughese

1 anyone. Perhaps I called my sister or something.
2 **Q.** No, I don't mean family.
3 Do you know who Dr. Jaffer is?
4 **A.** Yes.
5 **Q.** Who is Dr. Jaffer?
6 **A.** She's an attending pathologist.
7 **Q.** Did you speak to Dr. Jaffer at around
8 the time that you were trying to go in to see
9 Dr. Bleiweiss?
10 **A.** No, I did not.
11 **Q.** So you go to see Dr. Bleiweiss. You
12 say what you say you said. He's on the phone.
13 **A.** Right.
14 **Q.** He shoos you away. You go back to the
15 grossing room to finish the work that you
16 described.
17 **A.** Right.
18 **Q.** Then what happens?
19 **A.** And I had a minute to gown up again,
20 put on just a plastic apron and put on my gloves
21 and sort of figure out with the dictation,
22 headphone and get back to my station when
23 Dr. Jaffer and I believe it was Dr. Jaffer and
24 McCash appeared. And I believe Dr. Jaffer just
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**86**

Varughese

1 showed up first and McCash followed soon after.
2 **Q.** Did Dr. Jaffer say anything to you?
3 **A.** She said, Hey, like what's going on?
4 Is everything OK?
5 **Q.** What did you say?
6 **A.** I was like, Well, you know, something
7 happened. I was beginning to getting into
8 explaining what happened when McCash interrupted.
9 **Q.** What did Dr. McCash say then?
10 **A.** I think he was saying that I wasn't
11 doing my work. I was putting off my work. I was
12 trying to avoid doing my work, and so on. And I
13 said, Well, that's not true. I'm doing my work
14 right now.
15 **Q.** And did you say anything else? During
16 this conversation that took place between you and
17 Dr. Jaffer and Dr. McCash.
18 **A.** Well, I said, you know, just stop
19 lying and saying that I'm not doing my work when I
20 am and I'm managing all my responsibility. So I
21 just asked him to stop saying what he was saying.
22 **Q.** What else, if anything, did Dr. McCash
23 say?
24 **A.** Dr. McCash just kept badgering me even
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**87**

Varughese

1 though the attending was there. I felt that he
2 was badgering me.
3 **Q.** What did he say?
4 **A.** Insisting that I wasn't doing my work
5 and me insisting that no, I am doing my work. I
6 have this number of cases still remaining to
7 gross, to -- some things I had grossed which I had
8 to take sections from for histology, that I had to
9 wait until it was in Formalin for about a few
10 hours because it made the tissue more firm. So I
11 had to wait for that.
12 So I pointed out I have so many cases
13 here that still need to be cut because it takes
14 some hours to process.
15 **Q.** And during this conversation that
16 Dr. Jaffer was part of did you raise your voice?
17 **A.** I don't remember raising my voice.
18 **Q.** Did Dr. McCash raise his voice?
19 **A.** I believe the conversation may have
20 gotten, in this course of back and forth, the
21 conversation perhaps had gotten heated.
22 **Q.** What did Dr. Jaffer say while you and
23 Dr. McCash were going back and forth as you
24 described it?
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**88**

Varughese

1 **A.** Dr. Jaffer was just, you know, like
2 no, no, no. She didn't want the argument. So she
3 was just like -- she was saying, you know, don't
4 argue.
5 **Q.** Do you know how Dr. Jaffer came to see
6 you? You said Dr. Jaffer came into the grossing
7 room and asked you what was going on.
8 **A.** She told me that Dr. Bleiweiss had
9 asked her.
10 **Q.** How did the conversation between you
11 and Dr. McCash and Dr. Jaffer end?
12 **A.** You know, I was still in the middle of
13 doing the work and I got very frustrated and then
14 I told him to back off, and he was like, No, I'm
15 the chief, and so on. I said, Well, I'm trying to
16 do my work here. This is my career and this is
17 important to me as well. So please back off. And
18 he insisted on not backing off. I may have
19 used -- I'm not sure if I had cursed now, but I
20 may have.
21 **Q.** So that's when you may have told him
22 to "fuck off"?
23 **A.** I may have.
24 **Q.** So again, how did this, I mean, you're
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

89

Varughese

2 saying go away and leave me alone. He's saying,
3 I'm not going anywhere. This battle you describe.
4     I'm assuming at some point this
5 conversation came to an end, since you're not
6 still there arguing with Dr. McCash. So how did
7 it come to an end? Did Dr. Jaffer put an end to
8 it? Did Dr. McCash finally walk away? What
9 happened?
10     A.     It was equally heated, a heated debate
11 or argument about, you know, the work I'm doing
12 versus the work I wasn't doing. Finally I was
13 like just leave me alone and go away. And then,
14 you know, he said something and he just I think --
15 I don't know. I mean, this is like a very painful
16 event and --
17     Q.     I understand. So if you don't
18 remember how it ended, you can just tell me you
19 don't remember how it ended.
20     Did he walk away at some point?
21     A.     I believe I just -- I believe he and I
22 both walked away. I just left.
23     Q.     Was Dr. Jaffer there for this whole
24 conversation up until the point that it ended?
25     A.     I believe this event, yes. I believe

*Computer Reporting NYC Inc.*
*(212) 986-1344*

90

Varughese

1 she was there. Or she was there, I'm pretty sure.
2     Q.     So then you said you finished the work
3 that you still had to do. Yes?
4     A.     Yes.
5     Q.     What happened next in terms of this
6 incident? You said you spoke to Dr. Bleiweiss
7 that evening.
8     A.     Right.
9     Q.     Did you talk to anybody other than
10 family, friends, et cetera? Did you talk to
11 anybody at Mount Sinai about the incident between
12 the end, your completing the end of your work and
13 when you saw Dr. Bleiweiss that evening?
14     A.     No. I believe I just left the floor
15 and I went downstairs.
16     Q.     Where did you go downstairs?
17     A.     There's like a cafe area. So I just
18 wanted to take myself out of the situation. I
19 just left there for a minute.
20     Q.     So then the next thing that happened
21 regarding this incident is you spoke to
22 Dr. Bleiweiss that you recall.
23     A.     Right. Then I eventually came back.
24 I may have been on the phone with someone

*Computer Reporting NYC Inc.*
*(212) 986-1344*

91

Varughese

1 discussing the issue, the incident.
2     Q.     When you say talking to somebody, is
3 that like somebody a friend or family member as
4 opposed to somebody at Mount Sinai?
5     A.     Right.
6     Q.     So when did you see Dr. Bleiweiss?
7 That day, but what time?
8     A.     I saw Dr. Bleiweiss when -- I went
9 back to the gross room and this was perhaps like
10 40 minutes or 45 minutes later. And I was just
11 trying to wrap everything up for the evening,
12 because it was already -- it was already rather
13 late, and he just approached me to see what had
14 happened or what was going on.
15     Q.     Was anyone else present other than you
16 and Dr. Bleiweiss when you had this conversation?
17     A.     I don't remember, but I believe --
18 well, actually, the PA, Renato. Renato was there
19 though the entire time.
20     Q.     So you had a conversation with
21 Dr. Bleiweiss in the grossing room.
22     A.     Right, very brief conversation.
23     Q.     So tell me what he said and you said.
24     A.     He just said, What happened? And I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

92

Varughese

1 said, Well, you know, McCash was harassing me. I
2 find this is a pattern of his behavior. I find it
3 is unacceptable. You need to talk to him. I
4 cannot be treated this way. That's what I said to
5 him.
6     Q.     And what did he say?
7     A.     He said, Yeah, OK, I'll talk to him.
8 I'm going to go talk to him right now. And he
9 walked out and he said he was going to go talk to
10 him.
11     Q.     Do you know whether he did?
12     A.     No, I did not witness him discussing
13 anything with McCash.
14     Q.     So what is the next thing that
15 happened regarding this incident? What did you do
16 next, if anything?
17     A.     The same evening?
18     Q.     The same evening, next day, whenever.
19 Whenever the next event was.
20     A.     Oh, no, I just finished up my work and
21 I remained there and the other residents appeared
22 again. It was Paul Azar, Adrienne Jordan and
23 McCash and they -- apparently they were told to
24 get involved with grossing anything that I needed

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

113

Varughese

1
2  regarding my work I should delegate it to -- well,
3  I should bring it to her attention.
4      Q.   Her being Kruti?
5      A.   Kruti Maniar, yes, bring it to her
6  attention, and she just asked me if I'm OK to
7  work.
8      Q.   Where did that meeting take place?
9      A.   That was in Dr. Pessin's office.
10     Q.   Did you ask Dr. Pessin to do anything
11  about the incident?
12     A.   Yes.  I asked her to have McCash step
13  down as chief resident or take some actions
14  against him, because he was making it difficult
15  for me to perform my work and actually interfering
16  with me when I was performing work.
17     Q.   As far as you know, did Dr. McCash's
18  tenure as chief resident end sooner than it should
19  have?
20     A.   No.
21     Q.   So he was chief resident until the end
22  of his year.
23     A.   Correct.  He was, I mean, they
24  transitioned the chief residency over to the, um,
25  the chief residents will be chief the following

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

114

Varughese

1
2  year in the middle of the year.
3      Q.   That's the normal procedure.
4      A.   That's the normal procedure, but
5  essentially yes, he served out his full term.
6      Q.   Well, putting it a different way, your
7  request that he step down as chief resident didn't
8  happen.
9      A.   Yes, I asked that some action be taken
10  against him.
11     Q.   You told me that, but you also told me
12  you wanted him to step down as chief resident.
13     A.   I believe I asked her that he should
14  be removed as chief resident.
15     Q.   And he was not removed as chief
16  resident.
17     A.   No.  Only for a short period, but
18  never officially.  No, he wasn't removed.  He
19  wasn't removed as chief.
20     Q.   Who was the next person you spoke to
21  at Mount Sinai about the December 8th incident?
22     A.   Actually, I forgot to add Dr. Stimmel.
23  I did speak to Dr. Stimmel on December 9th right
24  after I spoke with Dr. Schiller and Dr. Bleiweiss,
25  and that was on December 9th as well and I just

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

115

Varughese

1
2  reiterated what had happened and how I remember
3  Dr. Schiller and this is what he said to me.
4      I mean, the majority of my
5  conversation with Dr. Stimmel concerned what
6  Dr. Schiller said.
7      Q.   On the 9th.
8      A.   And me briefly mentioning the McCash
9  incident.
10     Q.   When you spoke to Dr. Stimmel on the
11  9th did that take place in his office?
12     A.   Yes.
13     Q.   The purpose of you seeing Dr. Stimmel
14  on that day was to talk about the conversation you
15  had with Schiller and Bleiweiss?
16     A.   Well, I was going to inform him about
17  what had happened anyway, but it was just so
18  that -- but since the Schiller incident occurred
19  it became about me reporting about McCash and then
20  the Schiller and Bleiweiss meeting.
21     Q.   On the 14th when you met with
22  Dr. Stimmel it was more about the letter that you
23  had received on the 13th from Lento and Pessin.
24     A.   Right.  After I received the letter my
25  discussion with Dr. Stimmel was about the letter.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

116

Varughese

1
2      Q.   So who's the next person you spoke to
3  at Mount Sinai about the December 8th incident?
4      A.   After that I didn't -- I don't think I
5  spoke to anyone.
6      Q.   Do you know Caryn Tiger-Paillex?
7      A.   Yes.
8      Q.   Who is Ms. Paillex?
9      A.   She is the director of human
10  resources.
11     Q.   Did there come a time when you
12  communicated with her about this incident?
13     A.   Yes.
14     Q.   When did you do that?
15     A.   December 23rd.
16     Q.   I will show you a document.
17         MR. McEVOY:  Let's have it marked as
18  Exhibit 8.
19         (Defendants' Exhibit 8, e-mail dated
20  December 23, 2010 from Leena Varughese to
21  Ms. Tiger-Paillex with attachment, Bates
22  Nos. D-856 and 857, marked for
23  identification, this date.)
24     Q.   Have you had a chance to look that
25  over, Dr. Varughese?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**117**

Varughese

2   A.   Yes.
3   Q.   Do you recognize it?
4   A.   Yes.
5   Q.   Can you tell me what it is?
6   A.   It's a letter I wrote to the director
7   of human resources, Caryn Tiger-Paillex.
8   Q.   I think it's actually an e-mail,
9   but it's --
10   A.   E-mail, correct.
11   Q.   It's from you to Caryn Tiger-Paillex
12   dated December 23, 2010, and it has a one-page
13   attachment labeled "Grievance," correct?
14   A.   Correct.
15   Q.   So why did you send this to
16   Ms. Paillex?
17   A.   Because I was concerned about
18   retaliation by the department for reporting, um,
19   what had happened to me and perhaps speaking to
20   Dr. Stimmel and...
21   Q.   Was that fear of retaliation just a
22   concern you had or had anything happened or
23   anybody said anything that made you come to that
24   conclusion?
25   A.   Well, my fear of retaliation was based

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**118**

Varughese

2   on the academic advisement.
3   Q.   We'll come to that, but when were you
4   placed on academic advisement?
5   A.   I was placed on academic advisement --
6   well, I was informed of academic advisement on
7   December 20th.
8   Q.   So you received the academic
9   advisement, and like I said, we'll talk about that
10   more another time, but you received or you were
11   told about academic advisement on December 20th.
12   A.   Correct.
13   Q.   Was the receipt of the academic
14   advisement what prompted you to send this e-mail
15   to Ms. Tiger?
16   MR. WRONKO:   Form objection.  You can
17   answer.
18   A.   To some degree, yes.  But also I was,
19   I wanted to report the incident as it had
20   occurred.
21   Q.   So you sent this to Ms. Tiger-Paillex.
22   Did you either follow up with her or receive a
23   response from her to this e-mail and the
24   attachment, what I will now call "the grievance."
25   A.   Can you repeat that question?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**119**

Varughese

2   Q.   Sure.  After you sent this e-mail to
3   Ms. Tiger-Paillex on December 23, 2010, did you
4   either follow up with her or did she communicate
5   with you about the grievance?
6   A.   Right.  She sent me an e-mail and
7   communicated with me.
8   Q.   Let me show you, it's an e-mail
9   string, I believe, if you will take a look at
10   that.
11   MR. McEVOY:   The reporter can mark it
12   as Defendants' Exhibit 9.
13   (Defendants' Exhibit 9, e-mail string,
14   Bates Nos. P866 and 867, marked for
15   identification, this date.)
16   Q.   Have you had a chance to look at it?
17   A.   Yes.
18   Q.   So do you recognize it?
19   A.   Yes.
20   Q.   Can you tell me what it is?
21   A.   It's an e-mail chain that originated
22   in December 23rd.
23   Q.   So at the moment I'm only going to ask
24   you about a couple of the e-mails and I will come
25   back to the others later.  But the first e-mail in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**120**

Varughese

2   the chain which is as usual is at the bottom is
3   the e-mail we just looked at that you sent to
4   Ms. Tiger-Paillex on December 23rd, correct?
5   A.   Correct.
6   Q.   And then the next e-mail in the chain
7   is from December 24th from Ms. Tiger-Paillex to
8   you in which you basically says she's received
9   your document and she wants to meet with you to
10   discuss the incident.  She won't be in until after
11   first of the year and please call to schedule an
12   appointment.
13   A.   Correct.
14   Q.   Did you call and schedule an
15   appointment with Ms. Tiger-Paillex?
16   A.   Yes, I did.
17   Q.   When was that appointment?
18   A.   Sometime after the new year.
19   Q.   Did you meet with Ms. Tiger-Paillex?
20   A.   Yes, I did.
21   Q.   Where did that meeting take place?
22   A.   In her office.
23   Q.   Was anyone else present besides you
24   and her?
25   A.   No.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

121

Varughese

2     Q.   Tell me what happened at that meeting
3 and what you said to her, what she said to you.
4     A.   I just recounted the events as had
5 occurred to Tiger-Paillex and she asked me some
6 questions and I responded honestly to her and --
7     Q.   So to make it a little easier, did you
8 tell Ms. Tiger-Paillex about what had happened on
9 December 8th?
10     A.   Yes.
11     Q.   Did you tell her about the meetings
12 you had had with, putting it a different way, what
13 had occurred after the actual incident took place?
14 Did you tell her about the conversation between
15 you and Dr. Jaffer and Dr. McCash?
16     A.   Yes. I believe she asked me who was
17 there and what happened and she wanted the full
18 sequence of events. So I believe I would have
19 told her.
20     Q.   Did you also tell her about your
21 conversations with Dr. Petersen and Dr. Stimmel
22 and Dr. Schiller and Bleiweiss?
23     A.   I believe I told her about speaking to
24 Dr. Stimmel already. And I'm not certain if I
25 talked about Dr. Schiller and Dr. Bleiweiss,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

122

Varughese

1 meeting, but I did -- I talked about meeting with
2 Dr. Pessin and, you know, how I reported the
3 incident and then I also discussed academic
4 advisement and just what has ensued and my concern
5 that I was being singled out and targeted for
6 discipline while McCash was not.
7     Q.   What, if anything, did
8 Ms. Tiger-Paillex tell you what happened next as a
9 result of your filing this grievance?
10     A.   Well, she said that she will speak to
11 the different parties involved and she would -- I
12 believe she -- I'm not sure if she said that, but
13 she definitely did say she will follow up with me
14 and she will investigate.
15     Q.   Do you know whether Ms. Tiger-Paillex
16 or someone at her request conducted an
17 investigation into the incident between you and
18 Dr. McCash?
19     A.   Um, I wasn't sure if she was
20 conducting an investigation, but I was requested
21 to meet with Dr. Figur and Paul Johnson at some
22 point in January after I met with Caryn
23 Tiger-Paillex.
24     Q.   And we'll come back to that, but other

*Computer Reporting NYC Inc.*
*(212) 986-1344*

123

Varughese

1 than being asked to meet with Dr. Figur, which is
2 figure without the E, Dr. Figur and Paul Johnson
3 who is not a doctor, do you know what, if
4 anything, else Ms. Tiger did to investigate your
5 grievance?
6     A.   I do not know what she did.
7     Q.   Do you know whether anybody else
8 participated in the investigation of your
9 complaint?
10     A.   Well, other than Dr. Figur and --
11     Q.   Other than the meeting you had with
12 Dr. Figur and Paul Johnson.
13     A.   No.
14     Q.   After the incident with Dr. McCash,
15 and the incident I'm referring to is the
16 December 8th incident, was any effort made or were
17 you ever told about who you should deal with going
18 forward?
19         And by that I mean, was there some
20 decision made that you were informed of to have
21 you report as your chief more to Kruti than to
22 Sam?
23     A.   Yes.
24     Q.   How did that come about? How did you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

124

Varughese

1 learn about that?
2     A.   I spoke to Caryn Tiger-Paillex and she
3 told me that I can talk to, instead of talking to
4 Dr. Lento and Sam, just talk to Kruti and have,
5 you know, go through her instead of going through
6 Sam and Dr. Lento for your requests or problems.
7     Q.   So what Ms. Tiger-Paillex told you was
8 going forward. Was this at the meeting that took
9 place sometime in January?
10     A.   No.
11     Q.   It was later?
12     A.   It was in April.
13     Q.   So in April of 2011 now, I guess,
14 Caryn Tiger said to you that going forward you
15 could deal with her instead of with Dr. Lento as
16 the program director.
17     A.   Yes.
18     Q.   Right?
19     A.   Yes.
20     Q.   And in terms of your day-to-day work
21 you could deal with Kruti Megier (phon) instead of
22 Sam McCash, right?
23     A.   It's Maniar, M-a-n-i-a-r.
24     Q.   I'll have it right by the time we're

*Computer Reporting NYC Inc.*
*(212) 986-1344*

125

Varughese

1   done. And the question is, going forward you
2   dealt with Dr. Maniar, not with Dr. McCash.
3       A.   Right. After April at some point
4   that's what she wanted me to do.
5       Q.   Is that what you did?
6       A.   Well, that's not really an option
7   available to me, because the program director is
8   Patrick Lento.
9       Q.   But in terms of Dr. McCash, did you
10  then deal with Dr. Maniar?
11      A.   I tried my best not to interact with
12  him.
13      Q.   After the December 8th incident were
14  there any other incidents with Dr. McCash?
15      A.   Any other incidents with Dr. McCash?
16      Q.   And by any other incidents, I mean any
17  other incidents in which he yelled at you or in
18  your view harassed you or mistreated you in some
19  way.
20      A.   As far as I recall, he became more
21  aggressive around me. He would always stomp his
22  feet when he was walking around me. He would just
23  close the door really, you know, forceably when he
24  was going out of the room that was right next to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

126

Varughese

1   my desk. He would, you know, stomp his feet and
2   make shows of disapproval.
3       Q.   Other than stomping his feet and
4   closing the door in the manner you described, how
5   else, if at all, did he manifest his disapproval?
6       A.   He, when I was on GYN pathology, he
7   was assigned for moonlighting duties for two days
8   and he would not assist me or he would not assist
9   me with my specimens that were, that could have
10  been grossed by the moonlighter, and he was on
11  moonlighting duty and he refused to do any of
12  those cases, gross any of those cases.
13      Q.   When you say he refused, did you ask
14  him?
15      A.   No, because I was afraid of him.
16      Q.   So did anyone else ask him?
17      A.   No. I left a note saying this is for
18  moonlighter. So I just put the specimens to the
19  side and I left a note saying this was for
20  moonlighter.
21      Q.   So he didn't do them.
22      A.   Yes, he did not do them.
23      Q.   Do you know whether Dr. McCash was
24  told anything about how he should interact with

*Computer Reporting NYC Inc.*
*(212) 986-1344*

127

Varughese

1   you going forward after the incident?
2       A.   No, I have no idea.
3       Q.   So other than stomping the feet and
4   closing of doors and what you just described about
5   the specimens, any other way in which Dr. McCash
6   expressed disapproval of you?
7       A.   Right. So while I was at the veterans
8   administrative affairs hospital and he was also
9   assigned there, he was not allowed to be in the
10  same work space as me.
11      Q.   How do you know that?
12      A.   Well, because Dr. Lento said he is not
13  allowed to be in the same work station as you.
14      Q.   When did Dr. Lento tell you that?
15      A.   Well, he didn't say that exactly. He
16  said, I'll talk to Sam. That's what he
17  said and they said they won't be sharing an
18  office.
19      Q.   When did Dr. Lento tell you that?
20      A.   Sometime in May.
21      Q.   Of 2011?
22      A.   Uh-huh.
23      Q.   So you're saying you're both at the
24  VA's office.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

128

Varughese

1       A.   Uh-huh.
2       Q.   You can't do uh-huh. You've got to --
3       A.   Yes.
4       Q.   So you started to tell me that you
5   were at the VA.
6       A.   Uh-huh.
7           MR. WRONKO: You've got to verbalize.
8       A.   Yes, yes, yes.
9           THE WITNESS: Do you mind if I get
10  something for my --
11          MR. McEVOY: Be my guest. Off the
12  record.
13          (A very brief recess was taken.)
14      Q.   So tell me what happened at the VA
15  with Dr. McCash.
16      A.   He was not allowed to be in the same
17  work space as me, but he would often leave his
18  things next to me in my, you know, that work area.
19      Q.   Anything else that Dr. McCash did that
20  you interpreted as being disapproving of you or --
21      A.   No, just glaring, the usual stomping.
22      Q.   Did you complain to anybody about the
23  stomping, the door closing, the specimens or
24  leaving his stuff near your work site?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

129

Varughese

**A.**    At that point I just felt that whatever I said would not be believed and it was futile for me to complain any further.

**Q.**    So I take it the answer is no.

**A.**    Yes.

**Q.**    No, you didn't complain to anybody.

**A.**    No.

**Q.**    If you go back to the document that I had just given you, and we'll just do these couple of things and then we can break for lunch. Turn that over, Dr. Varughese, the one in front of you.

So we looked at the e-mail where Ms. Tiger-Paillex asks you to set up the meeting with her. You set up the meeting, you have the meeting.

The next e-mail as you go up the chain is from you to Caryn Tiger-Paillex on March 30, 2011. Do you see that?

**A.**    Yes.

**Q.**    And it basically says that, you know, you're e-mailing her about the incident with McCash which you discussed about almost three months ago. "The situation have progressed and continues to ensue and is very negative for my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

130

Varughese

well-being. I would like to meet with you at this point to discuss my concerns."

Between the meeting with Caryn Tiger-Paillex in January of 2011 and this e-mail at the end of March had you had any communications with her about the complaint you had filed or the grievance you had filed?

**A.**    No. I don't think I spoke to her again after that first interview.

**Q.**    When you say the situation has "progressed and continues to ensue in a way that is very negative for my well-being," what were you referring to?

**A.**    The situation I was referring to was the, you know, several meetings with Dr. Figur and Paul Johnson, problems with work, when I was on the floor, in terms of having access to work material that I needed, referral to the Physician Wellness Committee which I thought he was very, you know, just very involved.

It was just, you know, I'm supposed to be a doctor who is taking care of patients, but I am in all these meetings every so many days. I'm sort of fearful to be at work to some degree and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

131

Varughese

it just -- it was becoming very hostile I believed.

**Q.**    So you've asked to meet with Ms. Tiger-Paillex and the next e-mail going up the chain says, and this is from Ms. Tiger-Paillex to you, it says, I'm "sorry to hear that you cancelled our meeting scheduled for yesterday. Please call my office to reschedule so that I can discuss the outcome of my fact finding. Thank you."

Then I take it that you met with Ms. Tiger-Paillex on April 5th, correct?

**A.**    Yes. I believe I met with her one of those days. I'm not sure --

**Q.**    Well, if you look at the first e-mail it's from you to Ms. Tiger-Paillex, it says "Thank you for taking the time to meet with me on Tuesday April 5th." So --

**A.**    Yes, but sometimes I mess up the dates.

**Q.**    We'll assume at least for the moment that you didn't. Whether it was April 5th or some other day, you met with Ms. Tiger-Paillex sometime around April 5th, right?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

132

Varughese

**A.**    Yes.

**Q.**    So tell me what happened at that meeting. What did you say to her, what did she say to you?

**A.**    I just talked to her about, you know, whether or not she had her fact, you know her fact-finding was complete and if she had documentation or any kind of documentation regarding what her findings were. And we discussed some of the, you know, we discussed a lot of her -- we discussed whatever I had said that we had discussed at the meeting, whatever I stated we discussed in this e-mail.

**Q.**    What else took place? What else did you say? What else did Ms. Tiger-Paillex say?

**A.**    Um -- can we take a break now?

MR. WRONKO: He's in the middle of a question. So you have to answer the question.

**Q.**    We just have to finish. Let's do this if this is OK. Then you can take a break. Just finish telling me about what happened at the meeting and then we'll take a break. We'll break for lunch. When we come back we'll talk about

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

133

Varughese

1 your e-mail. So just tell me what was said at the
2 meeting.
3 A. She said she thought that McCash was
4 not allowed to interact with me anymore. She
5 thought, her impression was that he wasn't
6 supposed to be, you know, overseeing me or at
7 least Dr. Lento was not supposed to be overseeing
8 me either, and I was very confused because she
9 thought -- and then she also said that McCash
10 didn't feel like he did anything wrong and he
11 isn't capable of apologizing to me because he
12 feels like he didn't do anything wrong. And she
13 said that was where she -- that was her finding.
14 Q. Well, OK. And so did you say anything
15 else at this meeting?
16 A. I just reported what else was going
17 on.
18 Q. What else was going on?
19 A. In terms of the PWC, Physician
20 Wellness Committee and my concerns regarding that.
21 And my concerns regarding how I felt like I was
22 being treated differently than everybody else and
23 I just kind of want, you know, this whole like
24 institutional like actions to stop against me

*Computer Reporting NYC Inc.*
*(212) 986-1344*

134

Varughese

1 because I felt like I'm just trying to do my work
2 and I want to be treated like everyone else and
3 I'm not.
4 Q. Anything else that you recall
5 happening or being said at this meeting?
6 A. (After pause) I can't remember right
7 now, but if I recall something.
8 MR. McEVOY: So we'll break for lunch
9 now.
10 Let me say one thing to you and I
11 think Mr. Wronko will confirm that. It's
12 fine for you to have some later
13 recollection, OK? But I would encourage you
14 to think about the things that we're talking
15 about, because if when you get the
16 transcript a month from now or whatever it
17 is you suddenly say, oh, here are ten things
18 I didn't remember, here are ten names I
19 didn't remember, you're going to wind up
20 coming back here because I will have
21 questions about it.
22 So this is really the time, and we're
23 going to come back on other days. So this
24 is really the time to try to refresh your

*Computer Reporting NYC Inc.*
*(212) 986-1344*

135

Varughese

1 recollection. But I just wanted to let you
2 know that, so that -- I don't want to
3 mislead you about if you say, oh, I recall
4 something later. Later is a relevant
5 concept. OK?
6 So with that we can take a break.
7 (A luncheon recess was taken at
8 1 p.m.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

136

Varughese

1 A F T E R N O O N   S E S S I O N
2 (Time noted: 2:09 p.m.)
3 L E E N A   V A R U G H E S E, resumed and
4 testified further as follows:
5 EXAMINATION BY (Cont'd.)
6 MR. McEVOY:
7 Q. So Dr. Varughese, if you look at the
8 top e-mail in the chain, Defendants' Exhibit 9, I
9 think it is, why did you send Ms. Tiger-Paillex
10 this e-mail?
11 A. Just to note that I had met with her
12 and review the content of our conversation that
13 afternoon to some degree. It's not a complete
14 discussion of what occurred at that meeting.
15 Q. You say in the e-mail, about the
16 second or third sentence, it says, "You indicated
17 that in addition to your investigation, Dr. Pessin
18 had conducted her own investigation, and
19 Dr. Bleiweiss had complained to regarding grossing
20 of a mastectomy specimen on December 8th 2010,
21 which resulted in a 3rd investigation by the
22 Physician Wellness Committee."
23 Do you see that sentence?
24 A. Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

137

Varughese

2    Q.   Did Ms. Tiger-Paillex tell you what in
3 particular Dr. Bleiweiss had complained about
4 regarding the grossing of the mastectomy specimen
5 on December 8th?
6    A.   She said she thought there was some
7 sort of patient care related labs related to that
8 specimen and she complained, and that's what she
9 thought.
10    Q.   That's what she thought Bleiweiss was
11 complaining about?
12    A.   Right. And she thought that's why I
13 was referred to the Physician Wellness Committee.
14    Q.   Did she tell you what that lapse was?
15    A.   No.
16    Q.   Did she tell you that Dr. Bleiweiss
17 thought you were responsible for that lapse?
18    A.   Well, actually, I'm not sure if she
19 said there was some sort of lapse. What I think
20 her understanding was there was some sort of
21 lapse, but not exactly why or I don't know if she
22 said it was delayed even. Maybe she thought she
23 said it was delayed. I'm not sure.
24    Q.   What did she say about this complaint
25 by Dr. Bleiweiss resulting in your being referred

*Computer Reporting NYC Inc.*
*(212) 986-1344*

138

Varughese

2 to the Physician Wellness Committee?
3    A.   Can you repeat that?
4    Q.   Sure. Did she say anything about how
5 this complaint by Dr. Bleiweiss about this
6 mastectomy specimen resulted in you being referred
7 to the Physician Wellness Committee?
8    I know that's what the document,
9 that's what you say in your e-mail, but what did
10 she say, Ms. Tiger-Paillex, say to you about how this
11 complaint resulted in your being sent to the
12 Physician Wellness Committee?
13    A.   She just said that that was a reason I
14 was sent to the Physician Wellness Committee.
15    Q.   Then you also say in the e-mail that
16 during the meeting with Ms. Tiger-Paillex she told
17 you that she would provide you with a document
18 which outlined her findings about, I guess as to
19 your grievance. And then you say, it's April 7th,
20 we still haven't received it.
21    Did you get a document or e-mail or
22 something from Ms. Tiger-Paillex that set forth
23 her findings?
24    A.   Well, she was supposed to provide it
25 to me, but she did not.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

139

Varughese

2    Q.   She didn't do it by the date that you
3 say in here she said she would. But did you get
4 it eventually?
5    A.   Eventually she did give me a
6 paragraph.
7    Q.   Let me show you a document.
8    If you would look at that while the
9 reporter marks it as Defendants' Exhibit 10.
10    (Defendants' Exhibit 10, letter dated
11 April 11, 2011, to Dr. Varughese from Caryn
12 Tiger-Paillex, Bates No. P533, marked for
13 identification, this date.)
14    Q.   Have you had a chance to review it?
15    A.   OK.
16    Q.   It appears in the form of a letter.
17 Is this the letter you received from
18 Ms. Tiger-Paillex?
19    A.   Yes.
20    Q.   It's dated April 11, 2011. Is that
21 the day you received it?
22    A.   Yes.
23    Q.   Now, the first part says basically
24 that she's been unable to corroborate your claims
25 against Dr. McCash, correct? Yes?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

140

Varughese

2    A.   Yes.
3    Q.   The second part says, "In any event,
4 after the incident, the Acting Chairman and
5 Program Director acted immediately to defuse the
6 situation by requesting that the Chief Resident
7 who was not involved in the incident, supervise
8 and address your assignments and schedules
9 whenever possible."
10    Is that in fact what happened?
11 Because we talked a little bit before about --
12    A.   Correct.
13    Q.   -- your relationship with Dr. McCash
14 and Dr. Venya (phon) going forward.
15    MR. WRONKO: Form objection. You can
16    answer.
17    A.   OK. Well, was that exactly what
18 happened? No.
19    Q.   So what did exactly happen?
20    A.   Well, I was only told that McCash was
21 not overseeing me as a chief resident for that
22 week when I was in surgical pathology. But after
23 that there was no discussion about what his role
24 would be towards me and what kind of -- there was
25 no regulation of any interaction I would have with

*Computer Reporting NYC Inc.*
*(212) 986-1344*

141

Varughese

1 them and nobody reported to me that he was not
2 supposed to provide or manage my schedule or
3 assignments.
4     Q.   Do you know whether the chairman or
5 the acting chairman or the program director told
6 Dr. Maniar that she should supervise and address
7 your assignments and schedules whenever possible?
8     A.   I believe no.
9     Q.   Why do you believe no?
10     A.   Because I had to contact her and let
11 her know after HR told me that's what was supposed
12 to happen, that's what she was supposed to be
13 doing.
14     Q.   Did she indicate to you that that came
15 as news to her, she didn't know that?
16          Well, let's put it this way.  When you
17 contacted her what did she say?
18     A.   I don't think she e-mailed me back.
19 She didn't respond to me.  But I think she had a
20 discussion of that with someone because I, um, I
21 mean, she indicated that she was going to talk to
22 someone about the e-mail.  She didn't respond back
23 to me, but she said, Oh, I'll speak to the program
24 director about that e-mail.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

142

Varughese

1     Q.   Are you saying that she didn't e-mail
2 you, but she spoke to you?
3     A.   Yes.  I spoke to her in person.
4     Q.   And then it goes on to say that "You
5 have confirmed that since December, Dr. McCash and
6 you have had no direct interactions and that no
7 additional incidents have occurred."
8          Is that correct?  Is that what you
9 told Ms. Tiger-Paillex?
10     A.   That was what I called Caryn Tiger,
11 yes.
12     Q.   Then it finally says, or other than in
13 a final sense, "Additionally, the GME office
14 and the Physician Wellness Committee are working
15 with your Program Director to address issues
16 surrounding your academic progress," and we'll
17 come back to that.
18          So after you received this e-mail, or
19 letter rather, from Caryn Tiger-Paillex, were you
20 satisfied with what her findings were?
21     A.   No.
22     Q.   Why not?
23     A.   Because at the meeting this is not
24 what she had said initially.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

143

Varughese

1     Q.   And are you referring to the April 5th
2 meeting?
3     A.   Right.
4     Q.   What did she say at the April 5th
5 meeting that you thought was different than what's
6 reflected in or what's stated in the April 11th
7 letter?
8     A.   Well, she didn't say that she could
9 not substantiate my claims.  She rather said that
10 McCash's behavior, you know, he doesn't consider
11 himself to be at fault and he has refused to
12 apologize to you in any way and he's not capable
13 of doing that.
14          So she was wondering how she could
15 prevent me from having to interact with him in any
16 meaningful way because of that.
17     Q.   Anything else that she said to you at
18 the April 5th meeting that you thought was
19 inconsistent with what she said in the April 11th
20 letter?
21     A.   After that meeting I have not, you
22 know, let's see.  Right, and the GME office and
23 the Physician Wellness Committee, I didn't realize
24 that they were collaborating on my surrounding

*Computer Reporting NYC Inc.*
*(212) 986-1344*

144

Varughese

1 academic issues.  I thought they were entirely
2 independent.  The PWC, Physician Wellness
3 Committee, is nondisciplinary and not involved in
4 academic issues.  It has more to do with physician
5 impairment.
6     Q.   Any other way in which you thought
7 that what Caryn said to you at the, um, Caryn
8 Tiger that is, at the April 5th meeting was
9 inconsistent or different from what's in her April
10 11th letter?
11     A.   Yes, and she also thought that -- she
12 was concerned that Adrienne Jordan would be the
13 chief resident.
14     Q.   What concern did she express about
15 that?
16     A.   She was concerned that it would pose a
17 problem for me, a risk for me, if she were the
18 chief resident.
19     Q.   What, if anything, did
20 Ms. Tiger-Paillex say about Dr. Jordan's becoming
21 the chief resident posing a risk for you?
22     A.   Well, I guess if she wasn't given the
23 position -- she didn't elaborate herself when she
24 said that.  She didn't elaborate on her point, and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-62

---

169

Varughese

A. Right.
Q. After the first of the year.
Yes?
A. Yes.
Q. OK. After the e-mails that I just showed you that were April 12th and April 15th, did you have any other or any further communication with Ms. Tiger-Paillex about the Sam McCash situation?
A. Other than April 15th?
Q. Yes, after April 15th.
A. Yes, I spoke to her again.
Q. When was that?
A. I'll not sure if I spoke to her again at the end of April and then again at the beginning of May.
Q. Let me show you a document. Maybe that will help you.
Take a look at that while the reporter marks this as Defendants' Exhibit 12.
(Defendants' Exhibit 12, e-mail dated April 25, 2011 to Caryn Tiger-Paillex from Leena Varughese, Bates No. P1121, marked for identification, this date.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

170

Varughese

Q. Just let me know when you've finished.
A. OK.
Q. So can you tell me what this document is?
A. This is, it's an e-mail to Caryn Tiger.
Q. From you.
A. Yes.
Q. Dated Monday, April 25, 2011?
A. Yes.
Q. Now, there's obviously a number of things in this e-mail and we'll come back to a number of them. But just generally, Dr. Varughese, why did you send this e-mail to Ms. Tiger-Paillex on April 25th?
A. To explain my position regarding what's happened and I just wanted her to understand that this is, really this is what I was complaining about and just inform her if she wasn't informed.
Q. So let me just ask you about one part of it in particular at the moment.
In the fourth paragraph, the one that starts "I filed a grievance with human resources."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

171

Varughese

Do you see that?
A. Yes.
Q. In the third line, second line rather: "My perception was and is that I am being threatened and berated by a male resident because I am a woman."
Do you see that?
A. Yes.
Q. "I doubt that he would yell or attempt to physically intimidate a male resident and now I am fearful because since my complaint and request for mediation in December, over approximately 4 months ago."
Do you see that too?
A. Yes.
Q. What's the basis for your perception that you were being threatened and berated, I presume by Dr. McCash, because you're a woman?
A. Because he repeatedly intimidated me at least on two occasions. Then he stomped his feet around me and then he slammed doors and all these actions, you know, acts of aggressiveness --
Q. So is it fair to --
A. -- that --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

172

Varughese

Q. I'm sorry.
A. -- that I felt were based on my gender, so that's why I said that.
Q. Do you think that Dr. McCash liked you?
A. Well, I don't think that --
MR. WRONKO: Form objection. You can answer.
A. I don't think gender discrimination has to do with whether or not --
Q. I didn't ask you what you thought about gender discrimination. I asked you whether you thought Dr. McCash liked you.
A. Well --
MR. WRONKO: Form objection. You can answer.
A. I don't know what he thought.
Q. So why do you think that -- accepting everything you say, Dr. Varughese, about how Dr. McCash behaved towards you on the two incidents, the stomping of feet, everything else that you've told me, what's the basis for your belief that he did that because you're a woman as opposed to maybe he just didn't like you?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

173

Varughese

A. Well, in terms of whether or not he liked me, I got very interesting mixed signals from him. There have been times that he would shout at me one minute, tell me I'm a failure, I'm not going to succeed. Then a month later he would ask me if I wanted patio furniture. Then a month later he would stomp his feet around again, then yell at me again, threatened me and tell me I'm not going to succeed. And then, you know, that's like a week before he decided he wants to be friends with me.

So frankly I'm not -- I'm very confused by the signals that he is sending me.

Q. Did Dr. McCash ever say anything to you about the fact that you were a woman, express any dislike for you because you're a woman?

A. I felt that his actions spoke louder than his words.

Q. That very well may be. But my question is, did Dr. McCash ever make any comment to you about the fact that you were a woman or that he felt that you were, you know, unqualified or whatever he said to you because you're a woman?

A. Well, I feel that he may have been

Computer Reporting NYC Inc.
(212) 986-1344

174

Varughese

motivated by my gender. He was motivated by my gender and likely my race, the fact that I'm a minority.

Q. Third time, Dr. Varughese. Did Dr. McCash ever say anything to you about your gender?

A. I can't recall.

Q. Did anybody ever tell you that Dr. McCash had said something negative about you because you were a woman?

A. Well, yes.

Q. Who?

A. It was implied.

Q. OK.

A. It was implied it was because I was a woman.

Q. Who implied that?

A. Just other residents.

Q. Who?

A. Well, Paul Azar thought, you know, I should be nice to him and --

Q. I'm not concerned about what Paul Azar thought.

A. I'm sorry. Can you repeat that

Computer Reporting NYC Inc.
(212) 986-1344

175

Varughese

question?

Q. Sure. Did anybody ever come up to you, Dr. Varughese, and say, you know what, Leena, I just was talking to Sam McCash and he said, I don't like Leena because she's a woman. A woman shouldn't be here. She's just some annoying female.

Did anybody ever tell you Dr. McCash said any negative comments about you because of your gender?

A. I don't recall.

Q. Did Dr. McCash ever make any comments to you or make any comment about the fact that you're of Indian national origin?

A. Not directly to me.

Q. Did anyone tell you he had made them to anyone else?

A. No.

Q. So just to be clear, as you sit here today you can't recall any comment that Dr. McCash made to you about the fact that you're a woman or the fact that you're of Indian descent, correct?

A. I can't recall.

Q. And similarly, you don't have any

Computer Reporting NYC Inc.
(212) 986-1344

176

Varughese

recollection of anybody ever telling you that Dr. McCash made comments about your gender or national origin.

A. No.

Q. Then you go on to say in here that you "doubt that he would yell or attempt to physically intimidate a male resident."

What's the basis for that belief?

A. Well, I never saw him intimidate a male resident.

Q. Did you spend every hour of every working day with Dr. McCash?

A. No.

Q. Do you see every interaction Dr. McCash has with every other resident?

A. No.

Q. Did Ms. Tiger-Paillex respond to your e-mail that we just looked at? The April 25th e-mail I believe it is.

A. This one?

Q. Yes, the one you're looking at.

A. She may have, yes.

Q. Let me show you a document. So you take a look at that document, Dr. Varughese, while

Computer Reporting NYC Inc.
(212) 986-1344

---

177

Varughese

1
2 I ask the reporter to mark it as Defendants'
Exhibit 13.
(Defendants' Exhibit 13, letter dated
April 29, 2011 to Dr. Varughese from Caryn
Tiger-Paillex, Bates No. P534, marked for
identification, this date.)
8    A.   OK.
   Q.   Have you had a chance to look at it?
10   A.   Yes.
11   Q.   Do you recognize it?
   A.   Yes.
14   Q.   Can you tell me what it is?
   A.   Let's see. It's a letter that Caryn
Tiger addressed to me.
   Q.   So it's a letter dated April 29, 2011.
17   A.   Yes.
   Q.   Sent from Caryn Tiger-Paillex to you.
   A.   Correct.
20   Q.   How did you receive it?
   A.   I physically picked it up.
   Q.   And in this letter in the first bullet
23 point Ms. Tiger-Paillex says, among other things,
that "Mount Sinai has strict policies prohibiting
workplace discrimination or retaliation, and takes

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

178

Varughese

1
2 such complaints very seriously. To enable me to
investigate this complaint fully, please contact
my office at" whatever the number was, "to arrange
for a time for us to meet."
Do you see that? The end of the first
7 bullet point.
   A.   Yes.
   Q.   Yes?
10   A.   Yes.
   Q.   Did you arrange a meeting or contact
Ms. Tiger-Paillex to follow up on this complaint?
13   A.   No.
14   Q.   Why not?
   A.   I just felt that any further
16 complaining about workplace harassment and
retaliation would be futile and it would not be
taken seriously and I felt the contact prior to
19 this letter by my superiors and HR and PWC
informed me of that. And I just did not think it
would be in my best interest.
22   Q.   Did you think that Ms. Tiger-Paillex
was willing to investigate your complaint?
   A.   Well, I felt that the complaint would
25 still return to the events on December 8th and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

179

Varughese

1
2 what had occurred the next day, and, you know, and
the letter on December 13th and I just didn't
think it would really change anything and it would
be entirely a waste of time.
   Q.   In the second bullet point
7 Ms. Tiger-Paillex says that during your meeting
on, I presume on April 5th, she told you that it
was her understanding that Dr. Pessin had
previously told you that you should feel free to
11 interact with Dr. Maniar rather than with
Dr. McCash.
13     Did Dr. Pessin tell you that?
14   A.   Dr. Pessin told me that on
December 10th.
16   Q.   Then in the third bullet point it
says, Your suggestion that your schedule should
have been changed so that you and Dr. McCash not
19 work at the VA at the same time is perplexing.
20 You currently work in the same hospital as
Dr. McCash, and by your own account you have had
no further incidents. Moreover, at the VA you
23 will be on two separate rotations and Dr. McCash
will not be supervising you, so you're not likely
25 to interact."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

180

Varughese

1
2 While you were at the VA were you and
Dr. McCash on two separate rotations?
4   A.   Yes.
   Q.   And I take it, was Dr. McCash
6 supervising you at the VA?
7   A.   No, he was not supposed to be.
   Q.   Now, one other thing, two other things
and then we'll take a little break. They should
10 both be relatively short.
11     Let me show you a document. While
you're looking at it we'll mark it as Defendants'
13 Exhibit 14.
14     (Defendants' Exhibit 14, One-page
document bearing heading "Specimens grossed
16 on 12-08-2010," marked for identification,
this date.)
18   Q.   Have you had a chance to look at that?
19   A.   Yes.
20   Q.   I will say just for the record that
it's a document that was produced by Mr. Wronko in
response to the hospital's discovery request. So
23 can you tell me what it is?
24   A.   Yes, these are the specimens that were
25 grossed by me from 12/8/2010 and the following

*Computer Reporting NYC Inc.*
*(212) 986-1344*

185

Varughese

Q. Administrator of what?

A. For the department of pathology, but she works for some other department. I'm not sure about that.

Q. So where did this meeting take place?

A. This took place in Freda Burstyn's office.

Q. Other than you and Dr. Lento and Ms. Burstyn, anybody else present?

A. No.

Q. What was said at this meeting about the incident with Dr. McCash on December 8, 2010?

A. What was said? Just they said that even though -- even if I disagree with the academic advisement I am still on academic advisement and I'm expected to understand that I'm still on academic advisement.

Q. Did they say anything else about the incident in December other than that you're still on academic advisement?

MR. McEVOY: Excuse me one second.

(A very brief recess was taken.)

(A portion of the record was read.)

A. Yes, just that I couldn't appeal the

Computer Reporting NYC Inc.
(212) 986-1344

186

Varughese

academic advisement. I'm expected to be on it, understand that I'm in on it. They're going to investigate again and the investigation's findings have not been determined yet.

Q. The investigation about the December 8th incident.

A. Right.

Q. Anything else said at the meeting?

A. Dr. Lento said I was being very professional and that's what's expected of me and I believe he may have made some comment about you're smart, professional. I mean, I don't know if he said I'm smart, but he definitely said I was being professional.

Q. What did you say, if anything?

A. Strike that from the record that he may have said I'm smart.

Q. He can't strike anything from the record. You can correct it, but you can't strike it. Everything that gets said gets taken down.

A. OK.

Q. Did you say anything at the meeting?

A. I spoke very little.

Q. What did you say?

Computer Reporting NYC Inc.
(212) 986-1344

187

Varughese

A. What did I say at the meeting? I think I just reiterated that, you know, about what my concerns were and that's it.

Q. One other quick thing which I didn't show you before. I will show it to you now.

Take a look at that, Dr. Varughese, and let me know when you've had a chance to review it.

MR. McEVOY: In the meantime we'll mark it as Defendants' Exhibit 16.

(Defendants' Exhibit 16, e-mail dated December 23, 2010 from Leena Varughese to Lento and Pessin-Minsley, with attachment, Bates Nos. D-853 and 854, marked for identification, this date.)

Q. Do you recognize this document?

A. Yes.

Q. Can you tell me what it is?

A. It's e-mail I sent to Dr. Lento and Dr. Pessin on December 12, 2010.

Q. Is it December 12th or December 23rd?

A. December 23, 2010, excuse me.

Q. It attaches the summary of, your summary of the incident with Dr. McCash.

Computer Reporting NYC Inc.
(212) 986-1344

188

Varughese

A. Yes.

Q. So did you send this to Dr. -- and I'm not trying to trick you. You sent this to Dr. Pessin and Dr. Lento the same day you sent it to Caryn Tiger, correct?

A. Yes.

Q. And the attachment is, although the heading is different, one says grievance and this says Drs. Lento and Pessin-Minsley, the substance of that, the content is the same, correct?

A. Yes.

Q. Last question before I take a break. Other than the people that you've told me about who you told about the incident involving Dr. McCash, and you sent the complaint, I'll call it the complaint or the grievance, to Drs. Lento and Pessin and to Ms. Tiger-Paillex, do you know who, if anyone, they told about your complaint?

A. They told about my complaint?

Q. Yes. So for example, do you know whether Ms. Tiger-Paillex or Dr. Pessin or Dr. Lento told Dr. Morency about your complaint?

A. I know Dr. Pessin had spoken to Dr. Stimmel at some point, because he had said so.

Computer Reporting NYC Inc.
(212) 986-1344

193

Varughese

2  is tired, is having difficulty
3  concentrating. So rather than go forward
4  under those circumstances we've agreed to
5  adjourn the deposition now at 3:30 which is
6  an hour earlier than we agreed to before.
7  We've agreed that the next day will be on
8  June 11th and we also have June 12th and
9  13th set aside if we need them. I suspect
10  we may.
11  BY MR. McEVOY:
12  Q.  So the only one other question if I
13  can just ask you that. You had mentioned before
14  that you had a therapist that you couldn't go to
15  see because you had moved from Manhattan to
16  Brooklyn.
17  A.  Yes.
18  Q.  What's the name of the therapist?
19  A.  I'd rather not disclose that
20  information.
21  MR. WRONKO: No, you have to. You
22  have to.
23  Q.  Because what's going to happen is I'm
24  going to send to Mr. Wronko HIPAA releases for you
25  to sign so that I can get all of your medical

*Computer Reporting NYC Inc.*
*(212) 986-1344*

194

Varughese

1
2  records from every doctor you've ever seen, and
3  I'm entitled to that because in your lawsuit you
4  have put into issue your mental state. You are
5  seeking damages for emotional distress, et cetera,
6  so I'm entitled to inquire into that.
7  So you have really one of two choices,
8  and I'm not asking you to make them. I'm just
9  telling you. If you want to not have me look at
10  all that information, then you would have to
11  dismiss any claims for emotional distress or
12  mental anguish or things like that, at which point
13  it's no longer an issue and I wouldn't be entitled
14  to see it.
15  So if you were to decide in
16  consultation with Mr. Wronko to dismiss any claims
17  for mental anguish, emotional distress, any kind
18  of damages related to your mental state, then I
19  wouldn't be entitled nor would I be interested in
20  that information. But so long as you're going to
21  pursue those claims, I'm entitled to get that
22  information.
23  So I think that I need you to -- at
24  the moment it's in the case, so I need the name of
25  your therapist. But just so you don't think I'm

*Computer Reporting NYC Inc.*
*(212) 986-1344*

195

Varughese

1
2  going to dial up your therapist and say, What can
3  you tell me about Dr. Varughese? the only reason
4  I want it is I'm going to put it into what they
5  call a HIPAA compliant release. I'm going to send
6  those to Mr. Wronko. If you decide to abandon
7  your claims for mental anguish you can tear it up
8  and throw it out. If you don't, I need it signed
9  and returned to me so I can get that information.
10  MR. WRONKO: Since we have a
11  protective order in the case, I will mark
12  your testimony identifying who it is as
13  confidential.
14  MR. McEVOY: It's fine with me.
15  Q.  (Continuing) I tell you, I'm not going
16  to make any effort to contact nor will anybody
17  else make any effort to contact this person until
18  I get a signed HIPAA release back. So you don't
19  have anything to be concerned about in that
20  regard. So what is the name of your therapist?
21  A.  Can I just divulge that information to
22  Mr. Wronko later?
23  Q.  No, because it's going to delay this
24  process. Because here's what's going to happen.
25  I can't finish your deposition.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

196

Varughese

1
2  A.  OK, I will tell you the name.
3  Rubinstein.
4  Q.  First name?
5  A.  Laura.
6  Q.  Where does Dr. Rubinstein practice?
7  A.  She practices on the Upper West Side.
8  MR. McEVOY: OK. So we're done for
9  the day. I will see you on the 11th.
10  (Time noted: 3:49 p.m.)
11
12
13  LEENA VARUGHESE
14
15  Subscribed and sworn to before me
16  this ____ day of _____, 2013.
17
18  _____
19
20
21
22
23
24
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-67

197

<pre>
 1

 2                    C E R T I F I C A T E

 3     STATE OF NEW YORK      )

 4                            : ss.

 5     COUNTY OF SUFFOLK      )

 6

 7              ·   I, THOMAS R. NICHOLS, a Notary Public

 8         within and for the State of New York, do

 9         hereby certify:

10              That LEENA VARUGHESE, the witness

11         whose deposition is hereinbefore set forth,

12         was duly sworn by me and that such

13         deposition is a true record of the testimony

14         given by the witness.

15              I further certify that I am not

16         related to any of the parties to this action

17         by blood or marriage, and that I am in no

18         way interested in the outcome of this

19         matter.

20              IN WITNESS WHEREOF, I have hereunto

21         set my hand this 2nd day of June, 2013.

22

23

24

25                        THOMAS R. NICHOLS
</pre>

AA-68

Leena Varughese, M. D.,

v.

Mount Sinai Medical Center

June 11, 2013

Witness: Leena Varughese

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344
Fax: (212) 983-9149
office@crinyc.com

200

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

LEENA VARUGHESE, M.D.,

    Plaintiff,

    vs.        12 Civ. 8812(CM)

MOUNT SINAI MEDICAL CENTER,
PATRICK LENTO, M.D., CARLOS
CORDON-CARDO, M.D., ADOLFO
FIRPO, M.D., IRA J. BLEIWEISS,
M.D. and ABC CORP. 1-10, and
JOHN DOES 1-10,

    Defendants.

----------------------------------X

June 11, 2013

10:34 a.m.

Volume II

Continued deposition of LEENA
VARUGHESE, held at the offices of Edwards
Wildman Palmer LLP, 750 Lexington Avenue, New
York, New York, pursuant to Notice, before
Thomas R. Nichols, a Registered Professional
Reporter and a Notary Public of the State of
New York.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

201

A P P E A R A N C E S :

LAW OFFICES OF RONALD J. WRONKO, LLC
Attorneys for Plaintiff
   134 Columbia Turnpike
   Florham Park, New Jersey 07932
BY:  RONALD J. WRONKO, ESQ.

EDWARDS WILDMAN PALMER LLP
Attorneys for Defendants
   750 Lexington Avenue
   New York, New York 10022
BY:  RORY J. McEVOY, ESQ.
    JULIE. L. SAUER, ESQ.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

202

              Varughese

1

2  L E E N A  V A R U G H E S E , called as a

3    witness, having been duly sworn by a Notary

4    Public, was examined and testified further

5    as follows:

6  EXAMINATION BY (CONT'D.)

7  MR. McEVOY:

8    Q.   So Dr. Varughese, remember you have to

9  give oral responses so the court reporter can take

10  down what is being said.

11    A.   Correct.

12    Q.   And as I asked you the last day, are

13  you taking any medication of any type --

14    A.   No.

15    Q.   Let me finish. -- that would affect

16  your ability to answer the questions?

17    A.   No.

18        MR. WRONKO:  Just remember, let him

19    finish his question before you give your

20    response.

21    Q.   So Dr. Varughese, are you familiar

22  with the Physician Wellness Committee?

23    A.   Yes.

24    Q.   And what is the Physician Wellness

25  Committee?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

203

              Varughese

1

2    A.   It is a committee set up by the

3  hospital to assist physicians who may be having

4  some sort of problems, either substance abuse,

5  which is what I really thought what their purpose

6  was, to intervene in those kinds of situations.

7    Q.   Let me show you a document, and it's a

8  document that you actually produced in discovery,

9  and take a look at it.

10        MR. McEVOY:  Mark it as Exhibit 17.

11        (Defendants' Exhibit 17, Mount Sinai

12    Medical Center's Policies and Procedures,

13    Subject No. A4-125, marked for

14    identification, this date.)

15    A.   OK.

16    Q.   What is this document?

17    A.   This is I believe HR or the hospital's

18  policy and procedure A4-125, and this is something

19  that Dr. Figur made me aware of because he sent

20  this document to me.

21    Q.   So you got this from Dr. Figur?

22    A.   Yes.

23    Q.   When did you get it from Dr. Figur?

24    A.   I believe it was when I was

25  interviewing with him under his, you know, role or

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-70

---

220

Varughese

1                Varughese
2 some point about their findings, but that never
3 occurred.
4       **Q.**   Do you know, Dr. Varughese, whether
5 Dr. Figur or Mr. Johnson conducted an
6 investigation into the incident involving you and
7 Dr. McCash in December of 2010?
8       **A.**   I believe that was -- the line of
9 questioning involved that incident.
10      **Q.**   I understand that, but do you know
11 whether apart from the meeting than they had with
12 you or the meetings they had with you, do you know
13 whether Dr. Figur or Mr. Johnson did anything else
14 to investigate the incident involving you and
15 Dr. McCash in December of 2010?
16      **A.**   I'm not sure if they had interviewed
17 other people or there were further, you know,
18 other interviews with other people in the
19 department.
20      **Q.**   Now, did there come a time when -- let
21 me take a step back. You said that this meeting
22 with Dr. Figur and Mr. Johnson was not in
23 connection with a referral to the PWC, correct?
24      **A.**   Well, they informed -- I believe they
25 informed me about the PWC.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

221

Varughese

1                Varughese
2      **Q.**   But this wasn't a meeting that took
3 place within the parameters of the PWC program as
4 you understood it.
5      **A.**   Right. Well, Dr. Figur explicitly
6 made a disclaimer that even though he had been
7 referred, insubordination or whatever complaint
8 Dr. Pessin made is not for -- it's not within the
9 realm of PWC.
10      **Q.**   Did there come a time when you were
11 referred to the PWC?
12      **A.**   Well, I was referred to the PWC by the
13 department leadership, which is
14 Dr. Pessin-Minsley. So there's no question that
15 I, you know, there have been several times when
16 I've been referred to the PWC, that being one of
17 the first.
18      **Q.**   After that time did there come another
19 time when you were referred to the PWC after
20 January 2010 when you met with Dr. Figur and
21 Mr. Johnson?
22      **A.**   Right, I was referred to them sometime
23 in February of 2011.
24      **Q.**   Who referred you?
25      **A.**   I believe it was Dr. Lento.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

222

Varughese

1                Varughese
2      **Q.**   And how did you learn that it was
3 Dr. Lento that had referred you to the PWC?
4      **A.**   How did I learn that? Well, because
5 they sent me an e-mail, Dr. Figur sent me an
6 e-mail saying that I had been referred to the PWC
7 and he would like to meet with me like on
8 February, I believe it was 18, or I believe it was
9 around that time.
10      **Q.**   Did Dr. Figur in that e-mail say that
11 Dr. Lento had referred you?
12      **A.**   Well, I just -- I made that assumption
13 because he was cc'd on that e-mail.
14      **Q.**   New, let me show you a document,
15 Dr. Varughese, and I will tell you that it is a
16 fairly long and a little difficult to follow
17 e-mail string, but if you would look at it while
18 we mark it as Defendants' Exhibit 18 then I will
19 ask you some questions about it.
20       (Defendants' Exhibit 18, e-mail string
21      commencing with Bates No. D-1397 and ending
22      with Bates No. D-2129, marked for
23      identification, this date.)
24      **A.**   OK.
25      **Q.**   Have you had a chance to look at that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

223

Varughese

1                Varughese
2      **A.**   Yes. It seems to be an e-mail
3 spanning a number of days or weeks.
4      **Q.**   The first part of it, which are Bates
5 numbers D-1397 to D-1402, is an e-mail string. It
6 starts with an e-mail from Dr. Figur to you dated
7 Monday, February 28, 2011, and ends with an e-mail
8 from you to Dr. Figur dated April 7, 2011.
9       And this e-mail string is a little
10 unusual in that the earliest e-mail is in the
11 front, not in the back. So the earliest one is on
12 the first page.
13       The second part of this e-mail string
14 is on Bates stamp numbers D-2128 to 2129, and it
15 is an e-mail string that now goes in the usual
16 reverse order, with the earliest one being a
17 Monday, March 28, 2011 e-mail from Dr. Figur to
18 you and the last one being an April 1, 2011 e-mail
19 again from Dr. Figur to you.
20       So, Dr. Varughese, if you look at the
21 first page which is the one numbered 1397, that's
22 an e-mail from Dr. Figur to you dated Monday,
23 February 28, 2011.
24       Do you see that?
25      **A.**   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

---

**256**

Varughese

1
2 and Adrienne Jordan, they knew.
3     Q.    How do you know that Dr. McCash knew
4 that you were being referred to the PWC?
5     A.    How did I know?
6     Q.    Yes.
7     A.    I'm making an assumption, because
8 Dr. Lento I believe confides or speaks to them on
9 a regular basis and Adrienne Jordan and Samuel
10 McCash have a direct line to Dr. Lento.
11     Q.    Any other basis for your belief that
12 Dr. Jordan and Dr. McCash knew that you had been
13 referred to the PWC?
14     A.    Well, I don't have any concrete
15 evidence, so I can't really guess or make comment
16 on.
17     Q.    So Dr. Varughese, do you know of any
18 other physician other than you that's been
19 referred to the PWC?
20     A.    No.
21     Q.    I take it that's because that's the
22 sort of information that you wouldn't normally be
23 privy to.
24         MR. WRONKO:  Form objection.
25     A.    Right.  I believe like coworker

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**257**

Varughese

1
2 referrals to Physician Wellness Committee and such
3 should be kept confidential no matter what.  Even
4 if there's a chief residence it should be kept
5 confidential from them as well.
6     Q.    Do you know whether every physician
7 who is referred to the PWC is asked to take a
8 toxicology screen?
9     A.    I believe referral to the PWC does not
10 automatically ensure toxicology screen.
11     Q.    What's the basis for that belief?
12     A.    I believe toxicology screen is done at
13 the discretion of Dr. Figur or Dr. Hughes.
14     Q.    And do you know what criteria are used
15 by Dr. Figur or Dr. Hughes to determine whether a
16 physician referred to the PWC should undergo a
17 toxicology screen?
18     A.    No, they never explained their
19 criteria.
20     Q.    And similarly, do you know whether
21 every physician who's referred to the PWC is asked
22 to undergo a psychiatric evaluation?
23     A.    I believe that would also be left to
24 the discretion of Dr. Figur and Dr. Hughes.
25     Q.    Assuming that belief is correct, do

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**258**

Varughese

1
2 you know what criteria they used to make that
3 determination?
4     A.    No, they did not explain their
5 rationale.
6         MR. McEVOY:  Take a five-minute break.
7         (A recess was taken from 11:41 a.m. to
8     11:50 a.m.)
9 BY MR. McEVOY:
10     Q.    Dr. Varughese, before you met with
11 Dr. Figur in January of 2011 had you ever met him
12 before?
13     A.    No.
14     Q.    And before you met with Dr. Hughes had
15 you ever met with him before?
16     A.    No.
17     Q.    Had you ever met Paul Johnson before?
18     A.    Yes.
19     Q.    Was that in his capacity as the
20 director of graduate medical education?
21     A.    No.
22     Q.    How did you meet Mr. Johnson?
23     A.    He used to work with graduate medical
24 education.  I believe he was made director at some
25 point in March or April of 2011.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**259**

Varughese

1
2     Q.    You met him before he became the
3 director.
4     A.    Right.
5     Q.    Now, Dr. Varughese, were you placed on
6 academic advisement in December of 2010?
7     A.    Yes.
8     Q.    I'm showing you a document.
9         MR. McEVOY:  We'll mark this as
10     Exhibit 20.
11         (Defendants' Exhibit 20, notice of
12     academic advisement dated December 21, 2010,
13     to Leena Varughese from Patrick Lento,
14     marked for identification, this date.)
15     Q.    Have you had a chance to look at that,
16 Dr. Varughese?
17     A.    Yes.
18     Q.    Is that the notice of academic
19 advisement that you received in December of 2010?
20     A.    Yes.
21     Q.    And it's dated December 21, 2010?
22     A.    Correct.
23     Q.    Is that when you received it?
24     A.    Yes.
25     Q.    How did you get it?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

268

1    Varughese
2  director.  I met with him several times, we
3  discussed professionalism and he had informed me
4  that I'm professional.
5        In fact, on January 10th, 2011, I met
6  with him and Freda and he said, Oh, I'm very
7  impressed with your progress and you're so
8  professional and everything is wonderful here.
9        Q.    So you met with Dr. Lento on January
10  10th to discuss professionalism.
11       A.    Not exactly.  I met with Dr. Lento on
12  January 10 because I contested the notice of
13  academic advisement and the summary of events as
14  it was described did not explain my point of view.
15  I met and they met with me to say that I was,
16  despite my concerns about this document, I was
17  still on academic advisement.
18       Q.    Dr. Varughese, can you contest an
19  academic advisement?
20       A.    Frankly any disciplinary action that's
21  taken against a professional can be contested,
22  especially within the, you know, medical
23  profession.
24       Q.    Is it your understanding that this is
25  a disciplinary action?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

269

1    Varughese
2       A.    This is a variation of a disciplinary
3  action.
4       Q.    Is it a disciplinary action?
5       MR. WRONKO:  Form objection.
6       A.    Dr. Lento said it was.
7       Q.    Do you know whether that's correct or
8  not?  Do you know whether this is a disciplinary
9  action under the hospital's policy?
10       A.    The hospital did have a policy on
11  academic advisement that has since -- I cannot
12  assess.  I believe they removed that policy from
13  their manual or whatever it was that they had it
14  in.  But this is a form of disciplinary action and
15  it can be contested.
16       Q.    And what's the basis for your belief
17  that an academic advisement can be contested?
18       First of all, before you answer that
19  question, contested how?  How do you believe it
20  can be contested?
21       A.    Well, I wrote to the department.  It's
22  an internal form of discipline that's taken by the
23  department of pathology against me.
24       So I wrote to the department, I
25  explained my point of view and reiterated my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

270

1    Varughese
2  concerns.  That's essentially contesting or
3  requesting that my concerns be reexamined.
4       Q.    So going back to the meetings every
5  three to four weeks, how long was the academic
6  advisement for?
7       A.    Well, it says here how long it was
8  supposed to be for.
9       Q.    If you look at the second page under
10  "Follow up," it says, "We will meet again in three
11  months to review your progress."
12       A.    Right.
13       Q.    So does three months sound right?
14       A.    It sounds right.
15       Q.    So between December 21st of 2012 and
16  March 21st -- of 2010 rather and March 21st of
17  2011, during that three-month period, how many
18  times did you meet with Dr. Lento to discuss your
19  progress under the academic advisement?
20       A.    Right, so I met with him on January
21  10th where they informed me that I continued to be
22  on academic advisement.  Therefore moving the
23  scale or the time period pushing it forward from
24  January 10th to February, March, April 10th of
25  2011 technically.  That's the period of academic

*Computer Reporting NYC Inc.*
*(212) 986-1344*

271

1    Varughese
2  advisement, I believe, and then I met with him
3  perhaps three, four times in that time period.
4       Q.    To discuss the academic advisement.
5       A.    Yes, that was also discussed.
6       Q.    The second bullet point says,
7  "Continued performance of assigned resident duties
8  under the guidance of Pathology Chief resident(s),
9  Pathology faculty and/or Program Director."
10       And during the three-month period of
11  the academic advisement did you continue to
12  perform your assigned resident duties?
13       A.    Yes, of course.
14       Q.    Did anybody tell you that you hadn't
15  performed your resident duties?
16       A.    No.
17       Q.    Then says write a "self-reflection
18  exercise (to be handed in to me within 4 weeks).
19  You are expected to write down your account of the
20  situation and describe how you could have
21  approached things in a better fashion, including
22  commentary on physician professionalism and its
23  role in this circumstance."
24       Do you see that, the third one?
25       A.    Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

272

Varughese

2    Q.    Did you hand in your self-reflection
3  essay to Dr. Lento within four weeks of the
4  academic advisement?
5        A.    No.
6    Q.    Why not?
7        A.    Because there was several other
8  investigations going on. I was still meeting with
9  the Physician Wellness Committee and I was meeting
10  with, um, what is it? the graduate medical
11  education. I had met with HR.
12        So there were other investigations
13  going on, which is why I was surprised Dr. Lento
14  would place me back on academic advisement given
15  that there was an investigation that was going to
16  take place regarding the summary of events even,
17  which is false obviously.
18    Q.    Dr. Varughese, how does all of what
19  you just said, assuming it's all true, how does
20  all of that excuse you from handing in your
21  self-reflection evaluation by the deadline set by
22  Dr. Lento?
23        MR. WRONKO: Form objection.
24        A.    How? Because the self-reflection
25  exercise is, um, assumes that I had done something

Computer Reporting NYC Inc.
(212) 986-1344

273

Varughese

2  wrong here and how I could approach things in a
3  better fashion and not Samuel McCash. My concern
4  was that, you know, he had something, he had done
5  something wrong and he has a pattern of behavior
6  that is deeply troubling and extends into physical
7  intimidation.
8    Q.    Was Dr. Lento the program director at
9  that time?
10        A.    I believe he was, yes.
11    Q.    And as the program director, to put it
12  in an overly simplistic way, he was your boss?
13        A.    Right, but he never e-mailed me or
14  contacted me. He also did not follow up
15  frankly with --
16    Q.    Dr. Varughese, is there anything that
17  you don't understand about hand in a
18  self-reflection essay within four weeks?
19  .    Q.    MR. WRONKO: Form objection.
20    Q.    Really, I assume, Dr. Varughese, that
21  we can both calculate four weeks from December
22  21st, correct? Yes?
23        A.    Frankly --
24    Q.    Yes or no, can you calculate four
25  weeks from December 21st?

Computer Reporting NYC Inc.
(212) 986-1344

274

Varughese

2        MR. WRONKO: Form objection. You can
3  answer.
4        A.    Can I do that? Yes.
5    Q.    And Dr. Lento who's your program
6  director and your boss told you to hand in a
7  self-reflection evaluation in four weeks and you
8  didn't do it.
9        So my question to you is, why do you
10  think that the other things you described excused
11  you from following the direction of your program
12  director?
13        A.    Frankly, I had contested it and
14  because of that, one; two, he did not stipulate to
15  me that the academic advisement still stood as it
16  did. But him wanting the self-reflection, he did
17  not inform me as such.
18        I met with him on January 10. He
19  didn't say, well, within two weeks I would like
20  that self-reflection exercise. I mean, he's my
21  boss. He should know what is required and he
22  didn't do that.
23    Q.    Did anybody ever tell you that you
24  weren't on academic advisement regardless of
25  whether you contested it or not?

Computer Reporting NYC Inc.
(212) 986-1344

275

Varughese

2        A.    Did anybody tell me I wasn't?
3    Q.    Yes.
4        A.    No. They only told me on January 10th
5  that I definitely was on academic advisement.
6    Q.    Dr. Varughese, do you have any doubt
7  when you got the December 21st notice of academic
8  advisement that you were on academic advisement
9  whether you thought it was fair or not?
10        A.    Yes, I did have some doubt about that.
11    Q.    What was your doubt? What was the
12  basis of your doubt?
13        A.    Well, my basis of my doubt was that
14  all the concerns that I had brought up. It was
15  completely ignored. They did not answer my
16  question about McCash and if any actions were
17  being taken against him.
18        And I had also spoken to Dr. Stimmel,
19  who was ombudsman at the hospital. And I wanted
20  to discuss this document with him as well to see
21  what his opinion was.
22    Q.    So because you disagreed with him and
23  thought it was unfair you thought it was
24  ineffective.
25        MR. WRONKO: Form objection.

Computer Reporting NYC Inc.
(212) 986-1344

276

Varughese

1 Varughese
2 Mischaracterizes her testimony.
3 MR. McEVOY: That' what I am asking
4 her.
5 A. That's not what I said.
6 Q. You got the notice of academic
7 advisement, right? It says, "This letter is
8 to" -- first sentence. "This letter is to inform
9 you that you are being placed on Academic
10 Advisement."
11 Is that the first sentence?
12 A. Yes. This is just essentially a
13 retaliation document.
14 Q. I didn't ask you what you think it is.
15 A. Retaliatory document.
16 Q. Is that what it says, Dr. Varughese,
17 that you're being placed on academic advisement?
18 Yes?
19 A. "This letter is to inform you."
20 That's what it states, the first sentence.
21 Q. And so regardless of why you thought
22 you were given it, whether it was retaliatory or
23 not, why would you have any doubt that you were on
24 academic advisement as of December 21, 2010,
25 simply because you didn't agree with it or you

Computer Reporting NYC Inc.
(212) 986-1344

277

1 Varughese
2 thought it was retaliatory, or whatever it is you
3 thought about it?
4 MR. WRONKO: Form objection. You can
5 answer.
6 A. Well, I had informed Dr. Pessin and
7 Dr. Lento that I would be speaking to Dr. Stimmel
8 regarding this particular document and I would
9 have to get some advice or counsel regarding my
10 options.
11 So yes, there was some -- and they
12 agreed with that. They did not say, well, just
13 because we gave you this you're automatically,
14 even though it says this, it's something that I
15 have to agree because it is a course of action
16 for --
17 Q. So you thought you were free to
18 disregard that plan of action.
19 MR. WRONKO: Form objection.
20 A. That's not what I said.
21 Q. I am trying to understand what you're
22 saying, Dr. Varughese.
23 A. Well, what I said was I would speak to
24 Dr. Stimmel and obtain some counsel and I would
25 get back to them.

Computer Reporting NYC Inc.
(212) 986-1344

278

1 Varughese
2 Q. And you never signed the academic
3 advisement, correct?
4 A. No, because it's a false set of events
5 and I found this to be extremely retaliatory.
6 Q. Retaliatory for what?
7 A. And discriminatory.
8 Q. Let's do one at a time. Retaliatory
9 for what?
10 A. Retaliatory because I had complained
11 about McCash was harassing me. He has a record of
12 harassing me. And instead of taking any actions
13 or obtaining some mediatory meeting to make sure
14 that there is like a functional work environment,
15 that they did not do that. Rather they took
16 actions against me.
17 Q. And in what way do you think this is
18 discriminatory?
19 A. Well, Dr. McCash is a white male and I
20 felt that they were inherently favoring him and
21 his future.
22 Q. And --
23 A. As opposed to me.
24 Q. I'm sorry. And other than the fact
25 that he is white male is there any other basis for

Computer Reporting NYC Inc.
(212) 986-1344

279

1 Varughese
2 your belief that it was discriminatory?
3 A. Right. Then it says here that, you
4 know, somehow Dr. Jordan is now involved in this
5 whole situation and, I mean, I felt like she's
6 also, you know, a Caucasian female and I felt like
7 they were just, you know, by default, they felt
8 that they need to protect her future and her
9 career at an expense to me.
10 Q. Because she is a white female.
11 A. Well, at that point I did not make
12 that conclusion, but, you know, in retrospect I
13 believe that's true.
14 Q. Did you ever prepare the
15 self-reflection evaluation?
16 A. Yes, I did prepare self-reflection.
17 That is my account. "Write down your account," so
18 I wrote down my account of the situation.
19 Q. When did you submit that to Dr. Lento?
20 A. I submitted that on March 30th.
21 Q. I show you a document.
22 MR. McEVOY: We'll mark this as
23 Exhibit 21.
24 (Defendants' Exhibit 21, e-mail from
25 Leena Varughese to Lento and Barnett dated

Computer Reporting NYC Inc.
(212) 986-1344

AA-75

---

**280**

Varughese

1
2  March 30, 2011, with attached reflection for
3  the Notice of Academic Advisement, marked
4  for identification, this date.)
5      Q.   Have you had a chance to look at it,
6  Dr. Varughese?
7      A.   Yes.
8      Q.   Is this the self-reflection essay that
9  you submitted to Dr. Lento on March 30th?
10     A.   Yes.
11     Q.   And do you believe that this
12 self-reflection essay meets the requirements for
13 the essay that was set out in the Notice of
14 Academic Advisement?
15     A.   Yes.
16     Q.   Why did you submit it on March 30th?
17     A.   I submitted it because I was
18 encouraged by Dr. Figur to submit it.
19     Q.   Any other reason that you submitted it
20 on March 30th other than because Dr. Figur
21 encouraged you to do so?
22     A.   I also felt that I felt more
23 threatened at work.
24     Q.   What?
25     A.   Threatened and afraid to be at work

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**281**

Varughese

1
2  because of the Physician Wellness Committee and I
3  just felt extremely harassed and harangued by the
4  hospital and its leadership and all this. So I
5  felt I -- and I was also encouraged to submit it
6  at that time, the reflection, so for those reasons
7  I submitted the reflection at that time.
8      Q.   The fourth bullet point which is on
9  the next page, is entitled "Reading Exercise."
10     A.   Right.
11     Q.   "You are expected to read the book
12 entitled Practicing excellence: A physician's
13 manual to exceptional health care by Steven Beeson
14 during the 3 month period of academic advisement,"
15 and then in parentheses it says "we can obtain a
16 copy for you if necessary."
17     A.   Correct.
18     Q.   Did you read the book during the three
19 months of academic advisement?
20     A.   Yes, I did.
21     Q.   Did you have a copy of it?
22     A.   Yes, I did have a copy of it.
23     Q.   So you didn't have to purchase one or
24 ask the hospital to purchase one for you?
25     A.   Well, eventually I had one and I lost

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**282**

Varughese

1
2  it and then I had it repurchased and, yeah, which
3  the copy I lost again.
4      Q.   When did you read the book?
5      A.   I read the book during that time.
6      Q.   When during that time?
7      A.   During that three-month period.
8      Q.   When?
9      A.   When?
10     Q.   Yes.
11     A.   It was, um, I believe it was like
12 February or March.  I read it during that time.
13     Q.   I show you another document.
14         MR. McEVOY:  We'll mark this as
15 Exhibit 22.
16         (Defendants' Exhibit 22, e-mail string
17 dated February 17, 2011 between Leena
18 Varughese and Patrick Lento, marked for
19 identification, this date.)
20     Q.   Have you had a chance to look at that?
21     A.   Yes.
22     Q.   And it's an e-mail from Dr. Lento to
23 you dated February 17, 2011 at 2:53 p.m. saying
24 "Leena, I need to meet with you tomorrow.  Please
25 let me know of potential available times," signed

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**283**

Varughese

1
2  "Pat."
3          You responded the same day at 3:47
4  p.m. saying "I can meet with you at 5:30 p.m.
5  tomorrow.  May I ask you what is the meeting
6  regarding?"
7          And Dr. Lento e-mails you back at 4:56
8  p.m. on the same day, saying, "Well, 2 things:  I
9  was hoping we could look at one of your autopsy
10 cases that we have together and also follow up on
11 the academic advisement stuff."
12     Q.   Did you meet with Dr. Lento on
13 February 18th?
14     A.   The -- we may have met.  I'm not sure.
15     Q.   So you don't recall whether the
16 meeting took place or not.
17     A.   Well, I did meet with him several
18 times.
19     Q.   No, February 18th.
20     A.   February 18th I may not have met with
21 him.
22     Q.   Other than Dr. Lento did you meet with
23 anybody else during that three-month period to
24 talk about your academic advisement?
25          And by anybody else, did you meet with

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

AA-76

---

284

Varughese

1
2 Dr. Pessin? Did you meet with Dr. Bleiweiss? Did
3 you meet with anybody other than Dr. Lento?
4     A.    No.
5     Q.    Now, in the spring of 2011 did the
6 chair of the department change?
7     A.    Yes.
8     Q.    And was there a new incoming chair?
9     A.    Right, I believe Dr. Pessin was the
10 interim chair and she left.
11     Q.    And who replaced her?
12     A.    Cordon-Cardo, Carlos Cordon-Cardo.
13     Q.    When did Dr. Cordon-Cardo become the
14 chair of the pathology department?
15     A.    I'm not sure. Like I think April,
16 April 1st, 2011.
17     Q.    And before Dr. Cordon-Cardo came to
18 Mount Sinai did you know him?
19     A.    No.
20     Q.    Had you ever met him?
21     A.    Well, he gave several lectures.
22     Q.    Gave several lectures when?
23     A.    I believe February and March of 2011.
24     Q.    Where were those lectures?
25     A.    They were in the conference room.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

285

Varughese

1
2     Q.    And when did you learn that
3 Dr. Cordon-Cardo was going to become the chair?
4     A.    I believe after those lectures they
5 decided to hire him. I'm not sure. I'm not sure
6 that's the story. I don't know.
7     Q.    And prior to Dr. Cordon-Cardo
8 officially becoming the chair at the beginning of
9 April of 2011 did you speak to him at all?
10     A.    No.
11     Q.    Did you ever have any conversations
12 with him prior to then?
13     A.    No.
14     Q.    When was the first time that you spoke
15 to Dr. Cordon-Cardo?
16     A.    When did I speak to him first? I
17 spoke to him May 3rd or -- believe it was May 3rd
18 or 4th of 2011.
19     Q.    Where did that conversation take
20 place?
21     A.    In his office.
22     Q.    Who was present?
23     A.    It was Dr. Lento and Mr. Castaldi.
24     Q.    Who is Mr. Castaldi?
25     A.    Andrew Castaldi I believe was interim

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

286

Varughese

1
2 chair. I'm sorry, he was interim department
3 administrator or the hospital administrator. I
4 believe he used to work for the department of
5 genetics before.
6     Q.    And how did that meeting come about?
7     A.    Because I got an e-mail from Dr. Lento
8 saying that he would like to meet with me and the
9 period of academic advisement ended and then I
10 believe Mr. Castaldi e-mailed me stating that they
11 would also like to meet with me, meaning
12 Cordon-Cardo and Castaldi. So that's what
13 happened.
14     Q.    Now, when you submitted the
15 self-reflection essay on March 30th of 2011, had
16 you had any communications with Dr. Cordon-Cardo
17 about that?
18     A.    No.
19           MR. WRONKO:  Do you need a moment?
20           THE WITNESS:  No.
21     Q.    I show you a document.
22           MR. McEVOY:  Mark this is as Exhibit
23     23.
24           (Defendants' Exhibit 23, e-mail chain,
25     May 2011, to Leena Varughese from Castaldi

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

287

Varughese

1
2 and Cordon-Cardo, marked for identification,
3 this date.)
4     Q.    Have you had a chance to look at that
5 document?
6     A.    Yes.
7     Q.    And can you tell me what it is?
8     A.    It's an e-mail chain from Cordon-Cardo
9 to me May 9th and another e-mail from Andrew
10 Castaldi May 17th.
11     Q.    So the first e-mail from
12 Dr. Cordon-Cardo to you, the May 9th one, says,
13 "Dear Leena: As a follow-up to the message below,
14 we would like to confirm that we will be meeting
15 on the agreed May 24th at noon. In preparation
16 for this meeting, you should send us the written
17 'reflection' by May 23rd so we have time to review
18 it."
19           Do you see that?
20     A.    Right.
21     Q.    Had there come a point where you had
22 been asked to rewrite the written reflection, the
23 self-reflection?
24     A.    Yes.
25     Q.    Who asked you to do that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

288

Varughese

1
2    A.    Castaldi, Lento and Cordon-Cardo.
3    Q.    When did they ask you to rewrite the
4 self-reflection?
5    A.    When I met with them on May 3rd.
6    Q.    And did they tell you why they wanted
7 to you review the self-reflection?
8    A.    Yes. They said it just didn't -- it
9 wasn't what they wanted and --
10    Q.    Who said that?
11    A.    Mr. Castaldi.
12    Q.    And what else happened at that May
13 4th, I think you said? May 4th meeting?
14    MR. WRONKO:    May 3rd.
15    Q.    I'm sorry.
16    A.    May 3rd or 4th. I'm not sure.
17    Q.    Either one, May 3rd or 4th. What else
18 happened? They talked about the self-reflection.
19    A.    Right, they talked about the
20 self-reflection. I mean, they were just very
21 aggressive and rude and unprofessional towards me.
22    Q.    Again, Dr. Varughese, I'm not
23 interested so much in your conclusions about their
24 behavior. I'm interested in what they said to you
25 at the moment.

Computer Reporting NYC Inc.
(212) 986-1344

289

Varughese

1
2    So what else did they say to you other
3 than that they wanted you to rewrite the
4 self-reflection essay?
5    A.    Right, they were -- gosh, I have to
6 think about this for a minute.
7    Q.    Take your time.
8    A.    OK. Right. I mean, what I remember
9 now is they asked me if I had met the requirements
10 and I told them that I thought I met the
11 requirements for academic advisement and the
12 reflection and they said that I did not.
13    And they said they didn't want to know
14 what my point of view was because they already
15 knew and it wasn't essentially relevant. And
16 which was what I was told all along. And just
17 they continued reiterating that point.
18    Q.    What did you say during the meeting on
19 May 4th?
20    A.    Well, I just said that I thought I
21 had, um, did what I was asked to do and I wrote
22 the reflection and I thought that it reflected
23 that adequately. And that's -- let me see what
24 else I said.
25    Well, I mean, I really didn't say

Computer Reporting NYC Inc.
(212) 986-1344

290

Varughese

1
2 much. Really that's all. I just thought I had
3 met the requirements and I did what I was supposed
4 to do.
5    Q.    Let me show you another document.
6    MR. McEVOY:    Mark 24 as Exhibit 24.
7    (Defendants' Exhibit 24, e-mail from
8    Cordon-Cardo to Varughese dated May 4, 2011.
9    Bates Nos. P1119 and 1120, marked for
10    identification, this date.)
11    Q.    Did you have a chance to look at that
12 document?
13    A.    Yes.
14    Q.    It's an e-mail to you from
15 Dr. Cordon-Cardo dated May 4, 2011, with copies to
16 Dr. Lento and Mr. Castaldi, correct?
17    A.    Right. Yeah.
18    Q.    Now, when did Mr. Castaldi come to
19 Mount Sinai?
20    A.    I don't know. He may have been
21 working there for a very long time, but I didn't
22 know him though. I just met him.
23    Q.    So prior to the May 4th meeting you
24 hadn't met Mr. Castaldi?
25    A.    No.

Computer Reporting NYC Inc.
(212) 986-1344

291

Varughese

1
2    Q.    The e-mail says, "Dear Leena: Thank
3 you for your time yesterday. I believe we had a
4 productive discussion. As per our agreement, you
5 will be reading the assigned book and re-write the
6 assigned personal reflection essay modeling into
7 future constructive developments. We also agreed
8 that you would be able to do such exercises during
9 the upcoming two to three weeks. You should
10 purchase the book, and the Department will
11 reimburse you. We look forward to meeting with
12 you again on May 24th, at noon. Please, let me
13 know if this is a convenient date and time for
14 you, and do not hesitate to contact my office if
15 you need further information."
16    So as of May 3rd when you met with
17 Dr. Cordon-Cardo had you read the book that you
18 had been assigned?
19    A.    Yes.
20    Q.    So then was there some reason that you
21 know of that Dr. Cordon-Cardo was under the
22 impression that you hadn't read the assigned book?
23    A.    Well, that was a conclusion that they
24 made even though I said I had read the book.
25    Q.    So you told them you read the book.

Computer Reporting NYC Inc.
(212) 986-1344

308

Varughese

Did you constantly roll your eyes?

**A.**   Not that I'm aware of.

**Q.**   And I take it you don't think you had a poor attitude during the meeting.

**A.**   No, I don't think so.  I think I was very friendly and open minded.

**Q.**   Now, you said that you had been asked to rewrite your self-reflections, correct?

**A.**   Right.

**Q.**   And had you been given a deadline by which to submit it?

**A.**   Right.  I was given a deadline.

**Q.**   And what was that deadline?

**A.**   It was, I believe it was before the previous, um, the next meeting.

**Q.**   And the next meek was scheduled for May 24th.

**A.**   Right.

**Q.**   And in the e-mail that we looked at from Mr. Castaldi to you it said:  Please also be sure to e-mail us your essay by May 23rd to have ample time to read it before our meeting.

**A.**   Yes.

**Q.**   Did you submit it to Dr. Cordon-Cardo

*Computer Reporting NYC Inc.*
*(212) 986-1344*

309

Varughese

and Mr. Castaldi on May 23rd?

**A.**   No.

**Q.**   Why not?

**A.**   Because I was experiencing an increased sense of anxiety and fear and I didn't think my opinion or my reflection would be welcome.

**Q.**   Did you ever submit the self-reflection essay, the second one?

**A.**   Yes, I did.

**Q.**   When did you submit it?

**A.**   I submitted it at the meeting.

**Q.**   So on the 23rd you were unable to submit it because of fear and anxiety, but on the morning of the 24th you had overcome your fear and anxiety?

**A.**   Well, I did not have a choice in the meeting with the department leadership, so -- and I enjoyed my work, so I also have other engagements and work where I am responsible to the patients.  So I had multiple things going on during all this time between like December and, you know, June and July and August.

**Q.**   The meeting takes place, the first

*Computer Reporting NYC Inc.*
*(212) 986-1344*

310

Varughese

one, on May 3rd, correct?

**A.**   Yes.

**Q.**   And on May 3rd you're asked to rewrite the essay.

**A.**   Uh-huh.

**Q.**   And on May 17th Mr. Castaldi says be sure we have it by May 23rd.

So did you think, Dr. Varughese, that you had a choice?  You said you didn't have a choice whether to meet with them.  Did you have a choice as to the deadline for submitting the essay?

**A.**   Well, I was afraid to submit an essay.  I felt like they would probably take some actions against me or -- I wasn't sure what the course of action would be and I was afraid.

**Q.**   But you submitted it on the 24th.

**A.**   Right.

**Q.**   Let me show you a document and ask you to take a look at it.

MR. McEVOY:  Mark it Defendants' 26.

(Defendants' Exhibit 26, document bearing title "Reflection #2 and an addendum to Reflection #1," marked for identification, this date.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

311

Varughese

**Q.**   Did you have a chance to look at that document?

**A.**   Yes.

**Q.**   It's entitled "Reflection #2 and addendum to Reflection #1."

**A.**   Yes.

**Q.**   Is this the, I'll just call it the second self-reflection essay that you submitted?

**A.**   Yes.

**Q.**   And this is the one you submitted to Dr. Cordon-Cardo and Mr. Castaldi at the May 24th meeting?

**A.**   Yes.

**Q.**   And again, do you believe that this essay, self-reflection essay, complies with the terms of the academic advisement?

**A.**   I think at this point the terms of the academic advisement didn't apply as far as I knew.

**Q.**   And why didn't they apply?

**A.**   Because they said it's a fresh start.  It's a fresh start, so -- I don't know what that meant.  That's what their opinion was.

**Q.**   When they asked you to rewrite the essay at the meeting, did they tell you why they

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**316**

Varughese

1
2 A F T E R N O O N   S E S S I O N
3    (Time noted:  2:02 p.m.)
4 L E E N A   V A R U G H E S E, resumed and
5    testified further as follows:
6 EXAMINATION BY (Cont'd.)
7 MR. McEVOY:
8    Q.    Dr. Varughese, when you met with
9 Dr. Cordon-Cardo and Mr. Castaldi on May 24th did
10 you bring the book with you that you were supposed
11 to read?
12    A.    Yes, I did.
13    Q.    And during that meeting did
14 Dr. Cordon-Cardo ask you whether you had read the
15 book?
16    A.    Yes.
17    Q.    And what did you say?
18    A.    I said I read the book.
19    Q.    Did you toss the book on the table in
20 front of you?
21    A.    No.
22    Q.    Did you put the book on the table in
23 any way?
24    A.    Yes, I placed the book on the table.
25    Q.    In front of you or --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**317**

Varughese

1
2    A.    Yes.
3    Q.    -- in front of him?
4    A.    In front of me.
5    Q.    In front of you.  All right.
6          Now, did there come a time when you
7 were placed on final warning?
8    A.    Yes.
9    Q.    When was that?
10    A.    On July 14, 2011.
11    Q.    I will show you a document we are
12 going to mark.
13    MR. McEVOY:  Mark this as Defendants'
14 Exhibit 27.
15    (Defendants' Exhibit 27, so called
16 "Final warning" letter dated July 1, 2011,
17 to Dr. Varughese from Dr. Cordon-Cardo,
18 Bates Nos. P859 through P861, marked for
19 identification, this date.)
20    Q.    Did you have a chance to look at that?
21    A.    Yes.
22    Q.    Can you tell me what it is?
23    A.    This is as you described earlier, the
24 final warning.
25    Q.    And it's dated July 1st, 2011?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**318**

Varughese

1
2    A.    That's the date on this document, yes.
3    Q.    And you said you received it on
4 July 14th?
5    A.    Yes.
6    Q.    How did you receive it?
7    A.    I was asked to meet with
8 Dr. Cordon-Cardo on July 13th by Allene Carter.
9    Q.    Who is Allene Carter?
10    A.    He is a program coordinator.
11    Q.    And did you meet with Dr. Cordon-Cardo
12 on July 14th?
13    A.    Yes.
14    Q.    Was anyone else present?
15    A.    Yes.
16    Q.    Who else was present?
17    A.    Shema Patel.
18    Q.    And who is Ms. Patel?
19    A.    Shema Patel is, she was an interim
20 department administrator.
21    Q.    Anyone else present?
22    A.    Anyone else present?  No.
23    Q.    And where did the meeting take place?
24    A.    In Dr. Cordon-Cardo's office.
25    Q.    And who spoke first at the meeting?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**319**

Varughese

1
2    A.    I'm sorry?
3    Q.    Who spoke first at the meeting?
4    A.    I'm not sure.
5    Q.    What did Dr. Cordon-Cardo say during
6 the meeting?
7    A.    What did he say during the meeting?
8 He said, um, he said, Here's a letter, and it was
9 in an envelope and he just gave me the envelope.
10          And I said, What is in it?
11          He said, You'll find out when you read
12 it.
13          And I said, Well, I have legal counsel
14 that has contacted the hospital previously.  I
15 think it would be more prudent for him to, you
16 know, approach my attorney regarding the matter at
17 hand, especially if it pertains to what has
18 occurred in the past six, seven months.
19          And he said, No, I don't think so, and
20 he didn't want to do that.  He just said, You read
21 it at your time, at your leisure.
22    Q.    Did you read it during the meeting?
23    A.    No.
24    Q.    Did Ms. Patel say anything?
25    A.    I believe she didn't say much, no.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**368**

Varughese

MR. WRONKO: Form objection.

    **A.**    What is it? It's essentially a field of pathology where you characterize tumors based on cytogenetic rearrangements that can be visualized at a microscopic level.

    **Q.**    Had you been on a rotation in tumor cytogenetics prior to August 2011?

    **A.**    Right, I was on a two-week rotation prior to the rotation in August.

    **Q.**    I think you may not have heard my question. How long was the tumor cytogenetics rotation for?

    **A.**    Oh, two weeks.

    **Q.**    And it started on August 1st of 2011, correct?

    **A.**    Correct.

    **Q.**    Had you done a rotation in tumor cytogenetics prior to August 1st of 2011?

    **A.**    Yes.

    **Q.**    When did you start a rotation before?

    **A.**    I don't recall what the date is exactly now, but it was probably a year prior.

    **Q.**    Was that at Mount Sinai or was that one of the affiliates?

Computer Reporting NYC Inc.
(212) 986-1344

---

**369**

Varughese

    **A.**    It was the same laboratory, Dr. Najfeld.

    **Q.**    So you had worked with Dr. Najfeld before?

    **A.**    No, I hadn't worked with her because at that time she was working on a grant and she did not want to spend any time with me.

    **Q.**    So when you had the rotation the year before you had not worked with Dr. Najfeld.

    **A.**    No.

    **Q.**    During the rotation in August of 2011, the one that started on August 1st, who was your supervisor during that rotation?

    **A.**    Well, Dr. Najfeld is the supervisor, but she didn't want to work with me.

    **Q.**    When you say that she didn't want to work with you, why do you say that?

    **A.**    Because she said she was working on a grant and she couldn't work with me. That's what she said to me.

    **Q.**    When did she say that?

    **A.**    During the first week of that rotation.

    **Q.**    Did Dr. Najfeld work with you during

Computer Reporting NYC Inc.
(212) 986-1344

---

**370**

Varughese

the rotation?

    **A.**    No.

    **Q.**    Were you scheduled during that rotation to give a clinical case presentation?

    **A.**    During that rotation, no.

    **Q.**    No?

    **A.**    The first two-week rotation?

    **Q.**    Between August 1st of 2011 and August 12th of 2011.

    **A.**    The second part --

    **Q.**    That's what we're talking about now.

    **A.**    OK.

    **Q.**    So during that rotation, were you scheduled to give a clinical case presentation?

    **A.**    Yes.

    **Q.**    Who assigned that presentation to you?

    **A.**    Who assigned the presentation? It was Dr. Najfeld.

    **Q.**    How did she assign it to you?

    **A.**    She told me that I should do a presentation on, what is it? CML, I believe.

    **Q.**    What is CML?

    **A.**    Chronic myelocytic leukemia. Or chronic myeloid leukemia.

Computer Reporting NYC Inc.
(212) 986-1344

---

**371**

Varughese

    **Q.**    When did she assign that to you?

    **A.**    I believe it was Thursday.

    **Q.**    Thursday?

    **A.**    The 4th.

    **Q.**    The 4th?

    **A.**    Right.

    **Q.**    And after she assigned the case presentation to you, what did you do to prepare the presentation?

    **A.**    I just looked up background data. I looked up the basic information, and that's it.

    **Q.**    Did you prepare a presentation?

    **A.**    I did.

    **Q.**    When was the presentation due to be presented?

    **A.**    It was due to be presented on Tuesday, the following week.

    **Q.**    That was August 9th?

    **A.**    Correct. If that's a Tuesday.

    **Q.**    And when did you send the presentation to Dr. Najfeld for her review?

    **A.**    I went to her office. She wasn't there. So I was prepared to discuss the presentation in person with her.

Computer Reporting NYC Inc.
(212) 986-1344

---

---

**372**

Varughese

Q. When you say --
A. On Monday.
Q. Monday, August 8th.
A. Right, she wasn't there on Friday, August 5th. She was working from home she said and she was not to be bothered.
Q. So you went to her office on August -- when did you complete the presentation?
A. I completed the presentation on --
MR. WRONKO: Form objection.
A. I'm not sure now.
Q. It was assigned to you on the 4th.
A. Right.
Q. Did you complete it by the 5th?
A. Did I? I probably did, yes. It wasn't that complicated.
Q. And then you said you went to see Dr. Najfeld on Monday, the 8th, but she wasn't in her office.
A. Right, she wasn't in her office. She wasn't in her office for a good period of time.
Q. What time did you go to see Dr. Najfeld?
A. I believe around 1 p.m.

---

**373**

Varughese

Q. When she wasn't in her office what did you do, if anything, to get in touch with Dr. Najfeld?
A. I spoke to her, one of her, you know, one of the people who worked there and I just told her I'll be back. So I came back an hour or two later and at that point she still had not returned. So I left a message with, you know, the employee there and then I left.
I mean, I came back again I believe around like 4 and she wasn't there. So after that I, um, that's it. I believe I e-mailed her at that time. I e-mailed her the presentation at that time.
Q. When you say you left, you left to go where?
A. Nowhere, just back to the residents' office space or work area.
Q. And you said you sent an e-mail. So let me show you a document.
MR. McEVOY: Mark as Exhibit 28.
(Defendants' Exhibit 28, e-mail from Leena Varughese to Vesta Najfeld dated August 8, 2011, Bates No. D-882, marked for

---

**374**

Varughese

identification, this date.)
Q. Have you had a chance to look at that?
A. Yes.
Q. Is this the e-mail that you sent to Dr. Najfeld on August 8th?
A. Right.
Q. At 4:18 p.m., correct?
A. Correct.
Q. It says: "Dr. Najfeld, I am including a CML presentation for CP case conference."
A. I think we can read.
Q. Good, I'm glad you can read.
"It is pretty much complete but I will have to polish it up a bit before tomorrow morning. Please let me know if you want to change anything in any major way. Thank you."
Did you mention in this e-mail that you had tried to see Dr. Najfeld on several occasions that afternoon?
A. No, I did not mention that.
Q. What time was the presentation scheduled for the next day?
A. 9 a.m.
Q. And did you think that sending

---

**375**

Varughese

Dr. Najfeld the presentation at 4:18 on August 8th gave her sufficient time to review it and to give comments to you to make it by 9 o'clock the next morning?
A. Well, the only reason I'm even sending this to her is because she requested that I do so. There's numerous occasions where I do write up a presentation. It's not reviewed by the attending pathologist.
So, I mean, Dr. Najfeld wanted to see this presentation, so I sent it to her, and I felt that perhaps if there's anything that needs to be polished up she would give me some sort of advice on it.
And from the time I made this presentation to, you know, what was submitted to her to what I presented, it was not changed in any major significant -- The content was not changed in any significant manner.
Q. When did Dr. Najfeld tell you that she wanted to see it before you gave the presentation?
A. She didn't give me a specific time.
Q. Not when she told you that she wanted you. When did she first say to you,

---

AA-82

376

Varughese

2 Dr. Varughese, I want to see this presentation?
3    A.    I don't remember when she said that.
4    Q.    Now, you sent this e-mail to
Dr. Najfeld at 4:18 p.m., correct?
6    A.    Correct.
7    Q.    Where were you when you sent this
8 e-mail?
9    A.    Where was I?  I was -- I'm not sure
10 where I was.
11    Q.    Were you in the hospital?
12    A.    Probably, yes.  I mean, I would have
13 to attach my presentation and then send it, so I
14 would have to be at a computer terminal.
15    Q.    Let me show you another document.
16    MR. McEVOY:  Mark this as Exhibit 29.
17    (Defendants' Exhibit 29, e-mail from
18 Dr. Najfeld to Dr. Varughese dated August 8,
19 2011, Bates No. D-883, marked for
20 identification, this date.)
21    Q.    Have you had a chance to look at that?
22    A.    Yes.
23    Q.    This is an e-mail from Dr. Najfeld to
24 you which says, "Can you come over now?"
25    A.    Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

377

Varughese

2    Q.    And did you come over now?
3    A.    No, I didn't.
4    Q.    Why not?
5    A.    Because I didn't get this e-mail.
6    Q.    Why didn't you get it?
7    A.    Why?  Because I logged out of my
8 computer, that's why.
9    Q.    So you sent this e-mail at 4:18.
10    A.    Right, and I logged out within the
11 next five minutes.  That's not a crime.
12    Q.    I didn't say it was.  But as you
13 correctly point out, Dr. Najfeld sent you a
14 response five minutes later at 4:23.
15    A.    Well, I eventually noted that she did.
16    Q.    So why did you log out of your
17 computer when you sent her the presentation?
18    A.    Why would I not log out of my
19 computer?
20    Q.    I don't know.  You tell me.
21    A.    What are you suggesting here?  I'm
22 sorry.  I fail to see a big plan of --
23    Q.    I'm not suggesting anything.
24    MR. WRONKO:  Form objection.  Just
25 listen to his question and answer his

*Computer Reporting NYC Inc.*
*(212) 986-1344*

378

Varughese

2 question.
3    Q.    Why did you log out of your computer
4 after you sent the presentation to Dr. Najfeld?
5    A.    I logged out of my e-mail most likely
6 because I had sent the e-mail and I was probably
7 doing something else.
8    Q.    In the e-mail that you sent to
9 Dr. Najfeld at 4:18 when you say "Please let me
10 know if you want me to change anything in any
11 major way," how did you expect Dr. Najfeld to get
12 in touch with you if she had suggestions or wanted
13 to make changes if you logged out of your e-mail
14 as soon as you sent it?
15    A.    Right, she could have just sent me an
16 e-mail, like a letter.
17    Q.    But you wouldn't have gotten it,
18 Dr. Varughese, because you just told me you logged
19 out of your e-mail account.
20    A.    Right, she could have just said, Oh, I
21 want you to change X, Y and Z.  She didn't do
22 that.  She didn't make any effort here.  She just
23 said, "Can you come over now?"
24    Q.    No, no, Dr. Varughese.  You said to
25 me, you said in your e-mail, "Please let me know

*Computer Reporting NYC Inc.*
*(212) 986-1344*

379

Varughese

2 if you want me to change anything in any major
3 way," correct?
4    A.    Right.  She didn't say that in this
5 e-mail.  She doesn't say come over now.
6    MR. WRONKO:  Hold on.  You've got to
7 let him ask the question.
8    Q.    And the presentation is 9 o'clock
9 tomorrow morning, right?  It's 9 o'clock the next
10 morning, right?
11    A.    Yes, the presentation is at 9 a.m.
12    Q.    So regardless of what she said in the
13 e-mail you never got or didn't get at the time,
14 how did you expect Dr. Najfeld to get in touch
15 with you if you logged out of your e-mail account
16 as soon as you sent the e-mail at 4:18?
17    MR. WRONKO:  Form objection.  You can
18 answer.
19    A.    I'm sorry, this is beyond ridiculous.
20    OK, let me tell you something.
21    Q.    Dr. Varughese, could you do me a
22 favor.  Editorial comments are not appropriate at
23 the deposition.  I ask the questions; you answer
24 the questions.  Your lawyer gives you whatever
25 direction you want.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-83

---

380

Varughese

2 My question is, how did you expect
3 Dr. Najfeld to get in touch with you in response
4 to your e-mail if you logged out of your e-mail
5 account?
6 A. Like she got in touch with me later,
7 by calling me and sending me a page.
8 Q. So she could have called --
9 A. Which she has alternative methods of
10 contacting me.
11 Q. I show you another document.
12 MR. McEVOY: Mark this as Exhibit 30.
13 (Defendants' Exhibit 30, e-mail dated
14 August 8, 2011, from Dr. Najfeld to
15 Dr. Varughese, Bates No. D-884, marked for
16 identification, this date.)
17 Q. You can take a look at it.
18 A. OK.
19 Q. Have you had a chance to look at that?
20 A. Yes.
21 Q. This is an e-mail from Dr. Najfeld to
22 you at 4:28 p.m. on August 8th, which is five
23 minutes after the one we just looked at.
24 It says: "There are some major
25 problems with your presentation. Please come over

Computer Reporting NYC Inc.
(212) 986-1344

---

381

Varughese

2 asap."
3 Did you get this e-mail?
4 A. Eventually I did, yes.
5 Q. Did you get it --
6 A. At 4:28 p.m? No.
7 Q. Is that because you had logged out of
8 your system?
9 A. Yes.
10 Q. Were you still in the hospital at
11 4:28?
12 A. I believe that I was, yes.
13 Q. I show you another document.
14 MR. McEVOY: Mark this as Exhibit 31.
15 (Defendants' Exhibit 31, e-mail dated
16 August 8, 2011, from Dr. Najfeld to
17 Dr. Varughese, Bates No. D-885, marked for
18 identification, this date.)
19 Q. Have you had a chance to look at it?
20 A. Yes.
21 Q. And this is an e-mail from Dr. Najfeld
22 to you, also dated Monday, August 8, 2011, at 4:49
23 p.m. which is 21 minutes after the one we just
24 looked at that says, "Please call me. This
25 presentation cannot go as is."

Computer Reporting NYC Inc.
(212) 986-1344

---

382

Varughese

2 A. Yes.
3 Q. Did you get this e-mail on or around
4 4:49 p.m.
5 A. No, I believe I got this e-mail much
6 later. I think I didn't get any of these e-mails
7 till like 6 p.m.
8 Q. Why did you get them at 6 p.m.?
9 A. Because I probably logged into my
10 computer and into the e-mail account.
11 Q. So why would you log out at 4:18 or
12 thereabouts and log back in at 6 p.m.?
13 A. Because I was working on something
14 else after I sent the e-mail and I didn't get any
15 pages or calls and then I went home at like 4 -- I
16 probably started walking to the train like around
17 five. So I was underground after that for like --
18 Q. Did you think it likely,
19 Dr. Varughese, if you e-mailed Dr. Najfeld that
20 she would respond by e-mail?
21 A. I wasn't sure if she would or not.
22 Q. Did you think that since you weren't
23 sure whether she should or not, you should have
24 not logged out of your e-mail account so you would
25 get an e-mail if she sent you one?

Computer Reporting NYC Inc.
(212) 986-1344

---

383

Varughese

2 MR. WRONKO: Form objection. You can
3 answer.
4 A. No. I mean, if I'm just going to not
5 log out of computer system, you know, paralyzed to
6 my desk because I expect somebody to e-mail me,
7 that's ridiculous. I cannot do my work. That's
8 imposing undue requirements on me that's not
9 imposed on everybody else there. There were
10 people who were not even at the hospital.
11 Q. And part of your work that day was to
12 prepare a presentation for the next morning,
13 correct?
14 MR. WRONKO: Form objection.
15 A. No, it wasn't part of my work that
16 day. No.
17 Q. I show you another e-mail, another
18 document.
19 MR. McEVOY: Mark this as Exhibit 32.
20 (Defendants' Exhibit 32, e-mail dated
21 August 8, 2011, from Dr. Najfeld to
22 Dr. Varughese, Bates No. D-886, marked for
23 identification, this date.)
24 Q. Have you had a chance to look at that?
25 A. Right. So --

Computer Reporting NYC Inc.
(212) 986-1344

---

**384**

Varughese

1
2      Q.    Let's identify what it is first.  It's
3  another e-mail from Dr. Najfeld to you, again on
4  August 8th, this one at 5:42 p.m., a little less
5  than an hour after the one we just looked at.
6            And I don't want to characterize the
7  e-mail, but suffice it to say that Dr. Najfeld now
8  says that this presentation is not ready for
9  tomorrow, correct?
10     A.    She doesn't make that statement until
11 this e-mail, right?
12     Q.    Sure.
13     A.    She actually makes that statement
14 before.  But then she actually explains herself,
15 which she did not explain at 4:23 p.m., which is
16 shocking to me.  I mean, if you really thought
17 that from the git-go, why didn't you just say, you
18 know, these are my concerns.
19     Q.    Maybe because she thought you would
20 call her back or e-mail her.
21     A.    I can't read her mind.
22     Q.    And I can't read hers either.
23           MR. WRONKO:  Now everybody is making
24 editorial remarks.  Let's see if we can keep
25 it question/answer.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**385**

Varughese

1
2           MR. McEVOY:  I agree with you.
3      Q.    "Leena, the presentation I received at
4  4pm today by e mail is not really ready for
5  tomorrow.
6            "You were supposed to take the
7  patients' images on Friday from my staff and you
8  had the whole day today and never came to take the
9  images.  The reason we present cases is for
10 educational purpose and the patient's images are
11 presented as a part of this learning experience.
12           "If I was not here at 3 p.m. when you
13 stopped by, you should have write me a note and I
14 would have called you the moment I came in.
15 Meanwhile I left since 4:18 pm a number of e mails
16 and messages only to find that you left at 5pm and
17 would not return to Sinai to work with me on this
18 presentation.  I was willing to work with you
19 until 6 p.m.
20           "I think a lot more work needs to go
21 into this presentation and let's try for the next
22 week."
23           Dr. Najfeld says in there that she
24 sent you a number of e-mails which she looked at
25 and messages which suggests that she attempted to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**386**

Varughese

1
2  communicate with you in some way other than
3  e-mail.
4            To your knowledge did she attempt to
5  communicate with you by page or phone call or some
6  method other than e-mail?  And we're talking about
7  this time period, between 4 and 5 p.m. on August 8th.
8      A.    Well, I called her at like 5:40 or
9  5:45 p.m.  As soon as I got her e-mails I called
10 her.
11     Q.    I understand that.  But she says here,
12 I left you "a number of e-mails and messages."
13     A.    I didn't get any messages.  I think
14 she is referring to the e-mails, and she doesn't
15 say that she paged me either.  She didn't page.  I
16 don't think she paged me.
17     Q.    You said when you finally got finally
18 these e-mails.  You said around 6 o'clock you got
19 them; is that right?
20     A.    Like 5:40, 5:45, that's when I saw
21 these e-mails.
22     Q.    And so this e-mail that we're looking
23 at, the one that's dated August 8 th, 5:42 p.m.,
24 you saw this one at around 5:45 as well as the
25 others that we've looked at?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**387**

Varughese

1
2      A.    I may have gotten other e-mails first
3  and I called her and I think she sent me this
4  e-mail after I spoke to her.
5      Q.    It certainly doesn't appear that way
6  from the face of the document.  So do you know
7  whether you received this e-mail, and by this
8  e-mail, I mean the one dated August 8th, 5:42
9  p.m., do you know whether you got this e-mail
10 before or after you spoke to Dr. Najfeld?
11     A.    I think it may not have been -- I
12 think I got this e-mail after I spoke to her.
13     Q.    And when you spoke to her, you called
14 her?
15     A.    Right, I called her office like the
16 number that's right here, 241-8801.  So I called
17 that number and I spoke to her.  I said, you know,
18 what the problem is with them.
19     Q.    And what did she tell you?
20     A.    With the presentation she said, Oh,
21 it's not the patient -- I mean, she said it's not
22 ready.  You know, you're discussing the patient.
23           I think she had a problem with the way
24 I structured the presentation.  She wanted me to
25 discuss either the background information or --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-85

---

**388**

Varughese

1
2 oh, no, she wanted me to discuss the patient
3 first, then discuss the diagnosis. I went into
4 the background information about CML and the
5 presenting diagnosis to sort of kind of present it
6 as sort of, well, could this really be CML kind of
7 thing. That was my stylistic preference. She
8 didn't like that. That's what she said to me.
9     Q.    Did she also talk to you about what
10 she says in the e-mail, that "you were supposed to
11 take the patient images on Friday from my staff
12 and you had the whole day today and never came to
13 take the images"?
14     A.    Did I talk to? I don't know if I --
15 when I was on the phone with her I had that
16 discussion with her. But for all intents and
17 purpose I knew the case and I knew the patient's
18 cytogenetics finding and I used a comparable image
19 because I did not have access to the computers
20 that they utilized for cytogenetics. Because
21 that's like a different system and I don't have a
22 password to sign in for that system.
23         And the technician that I worked with
24 she left. She went on vacation on Thursday or
25 something. Wednesday or Thursday she went on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**389**

Varughese

1
2 vacation. So I had worked on this case prior to
3 that. I didn't have an image of the cytogenetics
4 findings. So I just used a comparable image.
5     Q.    It says, "You were supposed to take to
6 take the patient images on Friday from my staff
7 and you had the whole day today and you never came
8 to take the images."
9         So is what you just told me the reason
10 why you didn't take the images?
11     A.    What?
12     Q.    It says, the first sentence of the
13 second paragraph, "You were supposed to take the
14 patient's image on Friday from my staff and you
15 had the whole day today" --
16     A.    Oh, that's not true. She wouldn't
17 know about that because she wasn't there that day.
18 So I don't know why she is making these assertions
19 when she wasn't even at work on Friday.
20     Q.    So she's wrong when she says that.
21     A.    Right, she wasn't at work on Friday.
22     Q.    When Dr. Najfeld told you that the
23 presentation needed to be changed in the way you
24 just described, did you agree with Dr. Najfeld or
25 not?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**390**

Varughese

1
2     A.    Well, if she wanted me to present it
3 that way that was fine with me. I agreed to
4 change it immediately. It's not a problem for me.
5     Q.    Did Dr. Najfeld when you spoke to her
6 tell you that she was willing to stay late and ask
7 you to come back to the hospital to work on the
8 presentation?
9     A.    Right, she gave me an ultimatum that I
10 had to get there before 6 p.m. and I told her
11 there's no way I can come back to New York City,
12 Upper East Side, in 20 minutes from downtown
13 Brooklyn. It's impossible.
14     Q.    And you were living in downtown
15 Brooklyn at the time?
16     A.    Right. And not only that, my coworker
17 also did a presentation on CML the following week.
18 He did the histology aspect because he was also
19 working on the same case. I was working on the
20 cytogenetics component and he was working on just
21 the histology, which is regular, you know,
22 histology stuff.
23         So he also presented the following
24 week and it was a team effort really. It was an
25 effort between, you know, that involved me and my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**391**

Varughese

1
2 co-resident.
3     Q.    Was the presentation that was
4 scheduled for August 9th cancelled?
5     A.    Correct.
6     Q.    By you. Your presentation.
7     A.    My presentation was cancelled and
8 apparently my co-resident did not have to cancel
9 or anything, but it was understood that his
10 presentation was cancelled without him doing
11 anything.
12     Q.    Did Dr. Najfeld tell you to let the
13 people who were going to attend the meeting to
14 know that the presentation was cancelled?
15     A.    Right, she did.
16     Q.    I show you a document.
17         MR. McEVOY: Mark this as Exhibit 33.
18         (Defendants' Exhibit 33, e-mail dated
19 August 9, 2011, from Dr. Najfeld to
20 Dr. Varughese, Bates No. D-890, marked for
21 identification, this date.)
22     Q.    Did you have a chance to look at that,
23 Dr. Varughese?
24     A.    Yes.
25     Q.    Is this the communication you were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

392

Varughese

1
2 just referring to, the e-mail from Dr. Najfeld to
3 you dated August 9th at 6:21 a.m.? It says,
4 "Please send an e mail that the conference will
not be held."
6     **A.**    Yes.
7     **Q.**    You got this e-mail?
8     **A.**    Yes, I got that like when I was in
9 conference.
10     **Q.**    And what did you understand
11 Dr. Najfeld wanted you to do?
12     **A.**    Right, so this is all she said. So I
13 e-mailed her back and I said, Of course, I'm not
14 going to hold the presentation anymore as per
15 discussion yesterday.
16     **Q.**    Did you understand that either from
17 this e-mail or from your conversation with
18 Dr. Najfeld that she wanted you to tell the people
19 who were attending the conference that it was
20 being cancelled?
21     **A.**    Well, you know, I didn't make that
22 connection at that time. So I just thought she
23 wanted me to just confirm with her that I won't be
24 presenting.
25         And then the other thing is, on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

393

Varughese

1
2 Tuesdays at 9 a.m. when they have these CP call or
3 follow-up conferences, there are multiple
4 conferences. These are very informal events.
5 It's not e-mail everyone, let them know what the
6 presentation is, what the topic is. It's a very
7 informal event where people bring questions or
8 have questions or discuss any issues that came up
9 in CP or is there anything interesting that
10 happened that week in clinical pathology.
11         So it's a time for people to bring all
12 sorts of relevant issues to the table. This is
13 not about just making a presentation. So aside
14 from my presentation there could have been other
15 presentations that week. Like the following week
16 I presented, you know, cytogenetics on CML with a
17 co-resident who also presented histology on CML.
18     **Q.**    When Dr. Najfeld spoke to you by phone
19 and when you received the e-mail at 5:42 that
20 basically said in her view this presentation
21 couldn't be made tomorrow, right?
22         MR. WRONKO:  You're referring to
23 Defendant's Exhibit 32.
24         MR. McEVOY:  I am.
25     **Q.**    Did you have any doubt that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

394

Varughese

1
2 Dr. Najfeld knew that this presentation wasn't
3 going to take place tomorrow?
4         MR. WRONKO:  Form objection.  You can
5     answer.
6     **A.**    She said it needs a lot more work.
7     **Q.**    And "let's try for next week."
8     **A.**    Yes.
9     **Q.**    So you knew that she knew that she
10 didn't want you to present this tomorrow.
11     **A.**    Right.  Well, that didn't stop me from
12 working on my presentation.
13     **Q.**    I didn't say it did.  And then she
14 sends you an e-mail the next morning.  It says,
15 "Please send an e mail that the conference will
16 not be held."
17         Given the conversation you had with
18 her and the e-mail you got from her the previous
19 day, it really thought that the response to this
20 was to tell her that you knew that the thing
21 wasn't going to be presented?  Is that how you
22 interpreted her e-mail?
23         MR. WRONKO:  Hold on.  Form objection.
24     I think you're arguing with the witness.
25         MR. McEVOY:  No.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

395

Varughese

1
2         MR. WRONKO:  She already asked and
3     answered that.
4         MR. McEVOY:  I am asking her whether,
5     now having looked at the e-mail at 5:42 and
6     what it says, that her interpretation of the
7     e-mail on August 9th at 6:21 a.m. from
8     Dr. Najfeld was to confirm with Dr. Najfeld
9     that you weren't going to present.  That's
10     all I want to know.
11         MR. WRONKO:  Form objection.  You're
12     asking whether or not today she has a
13     different viewpoint on it?
14         MR. McEVOY:  No, what she thought when
15     she got this e-mail on August 9th.  I am not
16     really interested in what she thinks today.
17         MR. WRONKO:  Form objection.
18     **A.**    Initially I thought she just wanted me
19 to confirm that I won't be presenting.
20     **Q.**    Confirm to who?
21     **A.**    Confirm to her.  Because I wasn't sure
22 there would be other conferences that morning
23 either.
24     **Q.**    Let me show you another document.
25         MR. McEVOY:  Mark this as Exhibit 34.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**396**

Varughese

(Defendants' Exhibit 34, e-mail dated August 9,20111, from Dr. Varughese to Dr. Najfeld, Bates No. D-891, marked for identification, this date.)

Q. Have you had a chance to look at that?

A. Yes.

Q. Is this the e-mail you sent in response to the e-mail from Dr. Najfeld that you received at 6:21 on August 9th?

A. Right. I think I -- I don't know, it says, you know, her name and information, but yeah, "I won't be doing the cytogenetics presentation until next week."

Q. It's an e-mail from you to her dated August 9th at 829 a.m. It says, "I won't be doing the cytogenetics presentation until next week."

A. Right.

Q. And did you notify anybody else other than Dr. Najfeld that you wouldn't be doing the presentation on August 9th?

A. No. I just informed her, confirmed that I won't be doing the cytogenetics presentation until the following week.

Q. Let me show you another document.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**397**

Varughese

MR. McEVOY: Mark this as Exhibit 35.

(Defendants' Exhibit 35, e-mail dated August 9, 2011, from Dr. Najfeld to Dr. Varughese, Bates No. D-892, marked for identification, this date.)

Q. Have you had a chance to look at that?

A. Yes.

Q. Did you receive this e-mail from Dr. Najfeld?

A. Yes.

Q. Did you send your presentation or the revised presentation to her the next day on August 10th as she had requested?

A. Actually I met with her Tuesday afternoon and I went over my presentation and we agreed on how it should be presented. So she was aware of my, she knew exactly what was my presentation at that time.

Q. When you met with her and you discussed it with her, she approved the presentation?

A. Yes.

Q. And did you notify faculty and chief residents as well as the educational director of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**398**

Varughese

your upcoming presentation next week?

A. Yes. I mean, I don't know if the same requirements were placed on Jonathan Chow. He did a presentation as well that week. I don't know exactly what requirements were placed on him to inform, and so on. I don't think any of those requirements were placed on him.

Q. Do you know what, if any, requirements were placed on him?

A. No, he was just allowed to come in with the presentation that he wanted and present whatever he wanted.

Q. During the tumor cytogenetics rotation with Dr. Najfeld, was she critical of your time in attendance?

A. She wasn't very critical of my time in attendance, no. But she did berate me in front of her employees or the employees of the hospital and they thought she was being extremely aggressive and unprofessional towards me.

Q. When did she berate you?

A. She berated me several times over the second week. The first week she was very benign. She didn't have much to say to me. She was

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**399**

Varughese

working on some equipment and what not.

Then she got an e-mail from Firpo about cytogenetics requirements and what she has to do. Then after that she became very, um, she started having a different attitude towards me. Started becoming very aggressive, very mean, berating me wherever she saw an opportunity, just being frankly unprofessional despite the fact that I am a licensed medical doctor in New York and she should really watch how she speaks to me. But she would have none of that.

Q. You say she received an e-mail from Dr. Firpo.

A. Yes.

Q. When did she receive an e-mail from Dr. Firpo?

A. I believe it was Thursday.

Q. How do you know she received an e-mail from Dr. Firpo?

A. Because she told me and I think I was cc'd on some e-mails.

Q. What did the e-mail that she told you about or that you saw say?

A. It just said that she was to meet with

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**416**

Varughese

the required information about cytogenetics. It's
not available in that laboratory.
    Q.   So did you think that rotation was a
waste of your time?
    A.   No, I don't think it was a waste of my
time. I enjoyed cytogenetics. I enjoyed my two
weeks. I did not know about this evaluation that
you're looking at. I'm sure you will present it
to me at some point. But I did not know about
this evaluation until the house staff affairs
hearing. Nobody informed me that this was the
evaluation that was submitted.
    Q.   Did you call in sick on August 11th?
    A.   Yes, I did.
    Q.   Did there come a time when Dr. Najfeld
asked you to stop using your BlackBerry during
tutorials?
    A.   Right. I don't have a BlackBerry.
    Q.   Was there some other device you were
using?
    A.   Right, I did have a phone, a smart
phone.
    Q.   So did there come a time when
Dr. Najfeld asked you to stop using your smart

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**417**

Varughese

phone during the tutorial?
    A.   Right, she did, because I was taking
notes. She wanted me to look up certain
cytogenetic rearrangements. She was being very
specific and picky about the tumor rearrangements
and such, which, you know, takes some time to
memorize and learn about. So I was taking notes
to remind myself that this is what I needed to
know.
    Q.   And then did she tell you to stop
using the smart phone?
    A.   Right, she wanted me to stop using it.
She just wanted me to listen to her.
    Q.   And did you stop using it?
    A.   Right, I did.
    Q.   And did you start using it again
despite being told not to use it?
    A.   I may have tried to use it again on a
different day to take some notes, but not to, you
know, not to specifically spite her or whatever
she thinks that I was doing.
    Q.   Did the technologist also tell you
that you shouldn't use the smart phone --
    A.   No, not at all. I did not have any

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**418**

Varughese

such discussion with any technologist. They are
all young, they all have their own smart phones
too.
    Q.   Did Dr. Najfeld ever tell you, and I'm
not talking about what she said at the medical
staff hearing or what you learned later, but
during the rotation between August 1st and
probably closer to August 12th did Dr. Najfeld
ever tell you what her overall assessment of your
performance during the rotation was?
    A.   No.
    Q.   Was there a policy, Dr. Varughese,
about coverage for residents who are out sick or
otherwise unavailable?
    A.   Yes, there is a policy.
    Q.   What is your understanding of that
policy?
    A.   It's just some --
       MR. WRONKO: Form objection. You can
answer.
    A.   So it was some sort of revolving list,
I believe, which nobody had access to except for
the chief resident, I believe.
    Q.   And when you say a revolving list,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**419**

Varughese

what do you mean?
    A.   Well, they said that we're going to
take people from different rotations and I guess
circulate the pool that's available to cover.
    Q.   Was it a list of residents so that
everybody would in essence be required to cover
and so that the burden wouldn't fall too heavily
on some residents while others didn't cover?
    A.   Well, I don't know if that's really
the reason for having a policy. I think it was
just more to ensure that the work gets done and
there's no, you know.
    Q.   In August, particularly August 4th of
2011, did Dr. Jordan contact you about covering
the frozen section room on August 5th?
    A.   Yeah, she e-mailed me on August 4th, I
believe.
    Q.   What did she tell you?
    A.   She wanted me to cover.
    Q.   She wanted you to cover what?
    A.   Frozen sections.
    Q.   Did she say why?
    A.   She said the resident who was on
service was going to be out sick.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-89

420

Varughese

1
2    Q.    Let me show you a document.
3        MR. McEOY:  Mark this as Exhibit 36.
4        (Defendants' Exhibit 36, multipage
5    e-mail string, Bates Nos. D-896 through
6    D-901, marked for identification, this
7    date.)
8    Q.    Have you had a chance to look at that?
9    A.    Yes.
10    Q.    It's an e-mail string.  The first
11    e-mail is on page D-901 from Sarah Blowe to
12    Dr. Bleiweiss, Dr. Lento, D. Firpo, Dr. Jordan
13    dated 8/4/2011 at 4:18 p.m.  The last e-mail,
14    which is page 896, is from Dr. Jordan to you with
15    copies to several folks on August 6, 2011 at
16    10:47, correct?
17    A.    Yes.
18    Q.    The first e-mail from Dr. Blowe says
19    she's "not feeling well and will be out sick
20    tomorrow."
21        And the second e-mail, which is from
22    Dr. Jordan to Dr. Morency with a number of people
23    copied on it, including you, "Sarah will be out
24    sick tomorrow.  Julie and Justin were pulled today
25    to help out.  So moving down the list of residents

*Computer Reporting NYC Inc.*
*(212) 986-1344*

421

Varughese

1
2    who can cover, tomorrow I need Leena to cover
3    frozens in the afternoon.  So that I do not have
4    to pool another resident from their rotation, I am
5    asking that the attendings sign out biopsies on
6    their own in the morning.  I want to thank
7    everyone (especially the attendings who will be
8    signing out on their own and Leena who will be
9    giving up her time) for their patience and
10    understanding."
11        And then you respond to that e-mail,
12    also on August 4th at 9:23 p.m., saying, "Sorry, I
13    can't cover frozen sections tomorrow afternoon."
14        Do you see that?
15    A.    Yes.
16    Q.    Why couldn't you cover frozen sections
17    on August 5th?
18    A.    I just had an arm injury and I had
19    numbness down my arm.  That's why I couldn't cover
20    it.
21    Q.    And then Dr. Jordan responds on August
22    5th at 9:20 in the morning and it says, and I
23    won't read the whole thing, but it basically says
24    that she understands your situation, but she
25    expects that you will cover.  Right?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

422

Varughese

1
2    A.    Right.  I don't know why she said
3    that, but I guess that's what she wrote.
4    Q.    And you write back, saying a little
5    later that morning, 10:28 a.m., "You did not ask
6    me to cover because if you had, then you would
7    have known that I had injured my left arm.
8    Additionally, I have responsibilities on other
9    rotations that I may not be able to drop off at
10    the very last minute.  I was courteous enough to
11    let you know via email last night that I could not
12    cover, thereby enabling you to find the adequate
13    amount of time to find a replacement.  Please be
14    considerate of others time and prior commitments
15    before you send out an email assuming coverage.
16    All right, Adrienne good luck on your away
17    rotation."
18        Then Dr. Jordan e-mails back to you a
19    few minutes later, 10:49 a.m. on August 5th.  It
20    says:  "The new policy was in the packet of
21    information I put into your mailbox since you were
22    unable to attend the resident meeting due to
23    vacation."
24        And then it says "you would know what
25    the policy is," that "Liz and I," referring to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

423

Varughese

1
2    Dr. Morency, "are not required to 'ask' residents
3    to cover."
4        It goes on to explain the policy and
5    then asks you, "Does your injury preclude you from
6    doing frozen sections?  If so, we need a note from
7    a doctor indicating how long you will be unable to
8    perform this task so that we can make alternate
9    arrangements for coverage today as well as an AP
10    call you may have.  Otherwise you are expected to
11    comply with department policy and cover frozens
12    this afternoon."
13        So did you provide a -- well, let's
14    finish the e-mail string first.  Then you e-mail
15    back, "I cannot cover frozen sections this
16    afternoon.  If I cannot cover call next week, I
17    will find coverage."
18        And then you say about the policy and
19    if you didn't have the wrist/hand injury you would
20    be happy to oblige the request for coverage.
21        Then Dr. Jordan e-mails you and says,
22    again, talking about the policy, that was put in
23    the mailbox, the acknowledgment, and then you
24    e-mail her saying, "Why don't you email all the
25    residents who could possibly cover for another

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**424**

Varughese

resident calling out sick? This was what was done
in the past and it would be much more practical."
        You go on to further discuss I guess
your view of how that coverage issue should be
done. And then Dr. Jordan e-mails you again on
August 6th, the next day, again talking about the
policies and how things should be done.
        So did you cover the frozen sections
on August 5th?

A.    No.

Q.    Did you ever bring a doctor's note
regarding the arm injury you said you had?

A.    No, I didn't.

Q.    Why not?

A.    Because I was at work and I could not
go out and find a doctor to examine a neuroinjury,
numbness. I mean, what is he going to say? I
believe you that you have this injury? It seems
outrageous.

        I mean, the hospital policy also is
that if you cannot cover a call and you miss it I
think at the last minute or something, I think
you're supposed to bring in a doctor's note to
show that you had a good reason to miss call. But

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**425**

Varughese

for everything else it's not that specific.
        And this new policy was not going to
go into effect until August 15th. It wasn't due
until August 15th.

Q.    Well, was it not in effect by
August 15th or did you have to sign and return the
acknowledgement by August 15th?

A.    Right. Well, I was on vacation again
for two weeks before this whole thing took place.
I wasn't part of any of the discussions of the new
policy. I wasn't at any of these residents
meetings for the past like three months, and
suddenly they have not one policy, but five or six
new policies in excess my contract. That is
just outrageous.

Q.    So Dr. Varughese, did you think --

A.    No, no. I didn't have any opinion
about it.

        MR. WRONKO: Hold on. You have to let
him ask the question.

Q.    Did you think it was outrageous for
the hospital to implement new policies that you
were required to follow?

A.    My contract is by the board of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**426**

Varughese

trustees. So it's one thing if the board of
trustees decided to implement new policy for the
department.

Q.    Wait, wait, stop. I want to
understand. Is it your view that the only changes
that could be made to the policies that applied to
you because you had a resident's contract had to
be approved by the board of trustees?

A.    Well, if I felt --

Q.    No, no. Is that Your belief? That's
the answer I want. Because you just told me that
your contract is with the board of trustees. So
if they approved policies/changes it was OK.

        I really want to know, Dr. Varughese,
whether you think that the only changes to
policies in the department of pathology that you
were obliged to follow pursuant to your contract
was ones that were improved and implemented by the
board of trustees of the hospital. Is that what
you think?

        MR. WRONKO: Form objection.

A.    What I think is that --

Q.    Is that what you think, that only the
board --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**427**

Varughese

A.    Let me answer.

Q.    Answer it. The answer to that
question Dr. Varughese, is yes you think it --

A.    If you've going to intimidate me and
shout at me I cannot answer your question.

Q.    I have not intimidated or shouted at
you once.

A.    You're shouting at me right now.

Q.    -- because you won't answer the
question. And the question --

        MR. WRONKO: Hold on.

        MR. McEOY: No, wait.

Q.    And the answer to the question --

        MR. WRONKO: Counsel, first of all,
don't lean across my clients.

        MR. McEOY: I am leaning to look --

        MR. WRONKO: Sit back. It's been a
long day.

        MR. McEOY: You can't tell me where to
sit or how to sit.

        MR. WRONKO: You will. You're a
better attorney than this, Mr. McEvoy. You
don't have to lean forward in order to make
your point. So I'd appreciate it if you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

436

Varughese

1
2     Q.     Did you tell Dr. Najfeld that you had
3  suffered this injury?
4     A.     Dr. Najfeld was not at work that day.
5     Q.     Well, you said it lasted for several
6  days.
7     A.     Oh, like Wednesday or Thursday.
8     Q.     Did you tell Dr. Najfeld at any point
9  in time that you had suffered this injury?
10    A.     No, I did not say anything to her.
11    Q.     Did you tell any of the technicians in
12  the cytogenetics lab that you had suffered this
13  injury?
14    A.     No.  Why would I?
15    Q.     I don't know.  Did you tell anybody
16  that you had suffered this injury before you told
17  Dr. Jordan you couldn't cover because of the
18  injury?
19    A.     Yes, I told people that I normally
20  speak to about my personal health issues, yes.
21  My family.
22    Q.     Other than your family and your
23  friends and whoever else, did you tell anybody at
24  Mount Sinai, any coworker, any supervisor, anybody
25  in GME, anybody, that you had suffered this

*Computer Reporting NYC Inc.*
*(212) 986-1344*

437

Varughese

1
2  injury?
3     A.     Yeah, I may have told some of my
4  coworkers.
5     Q.     Who?
6     A.     I believe I told the coworker who was
7  sitting next to me, Mabel Cole and probably
8  Jonathan Chow and....
9     Q.     Other than Mabel Cole and Jonathan
10  Chow, anybody else that you remember that you
11  told?
12    A.     No, I didn't tell anybody else,
13  because Adrien Jordan wasn't there.  She was in an
14  away elective in Pennsylvania without a working
15  pager or a cell phone or whatever she did not
16  have.  Who knows?
17    MR. McEOY:  So it is close to twenty
18  to five or thereabouts.  We had agreed
19  previously that we would stop around 4:30 to
20  accommodate Mr. Wronko's travel back to
21  New Jersey and I guess Dr. Varughese's
22  travel back to New Jersey.
23    As I told Mr. Wronko before we started
24  today, unfortunately we can't go forward
25  tomorrow because some judge has commanded my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

438

Varughese

1
2  appearance.  So we'll resume on Thursday.
3  Thank you.
4     (Time noted:  4:35 p.m.)
5
6     _____
7         LEENA VARUGHESE
8
9  Subscribed and sworn to before me
10  this ____ day of _____, 2013.
11
12  _____
13
14
15
16
17
18
19
20
21
22
23
24
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

439

C E R T I F I C A T E

STATE OF NEW YORK    )
                     :  ss.
COUNTY OF SUFFOLK    )

        I, THOMAS R. NICHOLS, a Notary Public
within and for the State of New York, do
hereby certify:

        That LEENA VARUGHESE, the witness
whose deposition is hereinbefore set forth,
was previously duly sworn and that such
deposition is a true record of the testimony
given by the witness.

        I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto
set my hand this 25th day of June, 2013.


        _____
          THOMAS R. NICHOLS


*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-92

439

C E R T I F I C A T E

STATE OF NEW YORK      )

                       : ss.

COUNTY OF SUFFOLK      )


          I, THOMAS R. NICHOLS, a Notary Public

within and for the State of New York, do

hereby certify:

          That LEENA VARUGHESE, the witness

whose deposition is hereinbefore set forth,

was previously duly sworn and that such

deposition is a true record of the testimony

given by the witness.

          I further certify that I am not

related to any of the parties to this action

by blood or marriage, and that I am in no way

interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 25th day of June, 2013.


                    THOMAS R. NICHOLS

Leena Varughese, M. D.,

v.

**Mount Sinai Medical Center**

**June 13, 2013**

**Witness: Leena Varughese**

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344
Fax: (212) 983-9149
office@crinyc.com

443

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------X

LEENA VARUGHESE, M.D.,

        Plaintiff,

    vs.        12 Civ. 8812(CM)

MOUNT SINAI MEDICAL CENTER,
PATRICK LENTO, M.D., CARLOS
CORDON-CARDO, M.D., ADOLFO
FIRPO, M.D., IRA J. BLEIWEISS,
M.D. and ABC CORP. 1-10, and
JOHN DOES 1-10,

        Defendants.

-----------------------------X

          June 13, 2013

          10:14 a.m.

          Volume III

     Continued deposition of LEENA

VARUGHESE, held at the offices of Edwards

Wildman Palmer LLP, 750 Lexington Avenue, New

York, New York, pursuant to Notice, before

Thomas R. Nichols, a Registered Professional

Reporter and a Notary Public of the State of

New York.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

444

A P P E A R A N C E S :

LAW OFFICES OF RONALD J. WRONKO, LLC
Attorneys for Plaintiff
    134 Columbia Turnpike
    Florham Park, New Jersey 07932
BY:  RONALD J. WRONKO, ESQ.

EDWARDS WILDMAN PALMER LLP
Attorneys for Defendants
    750 Lexington Avenue
    New York, New York 10022
BY:  RORY J. McEVOY, ESQ.
      JULIE L. SAUER, ESQ.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

445

1             Varughese
2  L E E N A  V A R U G H E S E,  called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified further
5    as follows:
6  EXAMINATION BY (CONT'D.)
7  MR. McEVOY:
8      Q.   So the usual question, Dr. Varughese.
9  Have you taken any medication, consumed any drugs
10  or alcohol, prescribed or unprescribed, or that in
11  any way would affect your ability to answer the
12  questions I'm going to ask you today?
13      A.   No.
14      Q.   Dr. Varughese, on Tuesday you told me
15  that you called in sick on August 11, 2011,
16  correct?
17      A.   Well, I think you informed me that I
18  did, so I just say yes, I probably did.
19      Q.   After you called in sick on that day
20  did you receive any communication from Dr. Jordan
21  regarding that absence?
22      A.   I don't recall.
23      Q.   I show you a document.
24      MR. McEVOY:  Mark this as Exhibit 39.
25      (Defendants' Exhibit 39, two e-mails

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

446

1             Varughese
2  dated August 2011, Bates Nos. D-1177 and
3  1178, marked for identification, this date.)
4      MR. McEVOY:  And if you would review
5  the document, Dr. Varughese, and let me know
6  when you've had a chance to do that.
7      A.   OK.
8      Q.   The first e-mail or the earlier of the
9  two e-mails is to you and others from Dr. Jordan
10  dated August 11, 2011 at 2:55 p.m.
11      Did you receive that e-mail?
12      A.   I believe I did eventually receive the
13  e-mail.
14      Q.   The e-mail essentially says that the
15  policy for absence coverage requires you to e-mail
16  both chief residents, both program directors,
17  Dr. Lento and Dr. Firpo, Allene Carter and the
18  director of the rotation you're on all in the same
19  e-mail when you were calling out sick.
20      And then it talks about when the
21  policy was discussed at the last resident meeting,
22  and "Today when calling out sick you failed to
23  e-mail Dr. Lento and both chief residents," and
24  then it goes on to say you're getting a verbal
25  warning for not having complied with the policy.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

447

Varughese

2    Did you e-mail Dr. Lento, Dr. Jordan
3  and Dr. Morency that you were going to be out on
4  August 11th?
5    A.   I probably did, yes.
6    Q.   And when you say you probably did, why
7  do you say you probably did?
8    A.   Well, I don't recall now, it was so
9  long ago.
10    Q.   Were you aware that the policy
11  required you to e-mail the individuals that
12  Dr. Jordan identifies in her e-mail?
13    A.   Well, yes, the policy that's in
14  defectus (phon) of 15, then some -- which she
15  attached here it seems.
16    Q.   There's an e-mail at the top of the
17  page dated five days later, August 16th at 1:54,
18  and that's an e-mail that you sent?  Is that
19  correct?
20    A.   Yes.
21    Q.   Why did you send this e-mail?
22    A.   Why did I send this e-mail?  Because I
23  was being harassed at work with this e-mail.  Even
24  though she claims that I hadn't informed X, Y and
25  Z people, which she claims is Dr. Lento, herself

*Computer Reporting NYC Inc.*
*(212) 986-1344*

448

Varughese

2  and Morency, that's what this e-mail implies.  But
3  it seems that they have been informed nonetheless.
4  And it seems she's just sending this e-mail
5  because she doesn't have anything better to do
6  with her time or something along those lines or be
7  malicious towards me.
8    Because, I mean, this e-mail does not
9  really obtain any sort of meaningful purpose or
10  anything other than to intimidate me and further
11  marginalize me within the program by a junior
12  resident, Adrienne.  So I e-mailed the GME because
13  I was concerned about this behavior, being a
14  fourth-year resident to her third year.  And I
15  just let them know what was going on.
16    Because she refers to both program
17  directors.  According to the ACGME guidelines
18  we're only supposed to have one program director
19  that the residents are informed about and we know
20  who to go to regarding issues.  Now she is
21  referring to two program directors, which has been
22  sort of mentioned here and there.  The GME says
23  there are no two program directors, there's only
24  one.  Adrienne Jordan insists there are two
25  program directors, and so on and so forth.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

449

Varughese

2    I mean, this program is in complete
3  disarray.  It's completely disorganized.  On top
4  of that they are going out of their way to harass
5  me with this nonsense even though everyone seem:
6  informed about whether or not I'm there or not
7  that day.
8    And then so I sent this e-mail.  And I
9  just informed them what was going on.  Then I, you
10  know, stated what my understanding was for the
11  guidelines for a program, residency program in
12  pathology, and also I was concerned about
13  instituting new policies and I said, "How can I
14  access the department policy?"
15    What I meant by that was how can I
16  access the policy when changing policy within the
17  department, which I think I clarified to the GME
18  at some point as well.  Because there hasn't been
19  any oversight.  It just seems willy-nilly.  People
20  are changing policies.  One e-mail said you can do
21  this.  The next e-mail a few days later said
22  something else.  This has been going on since the
23  beginning of third year really, and a lot of it, I
24  don't know who was changing the policy.
25    Adrienne Jordan was sending these

*Computer Reporting NYC Inc.*
*(212) 986-1344*

450

Varughese

2  e-mails out.  Nobody else was really sending those
3  e-mails out.  So it was just very concerning that
4  a third year or second-year resident at that time
5  and then a third-year resident would have such
6  freedom to do whatever she wanted.  It seemed
7  really really strange frankly.
8    Q.   In the e-mail, your e-mail, you say in
9  the third sentence:  "Also, I and many of the
10  residents in the program are concerned regarding a
11  policy for instituting new policies --
12    A.   Right.
13    Q.   -- "in addition to those already
14  existing within the hospital and the department."
15    A.   Right.
16    Q.   What residents other than you were
17  concerned about policies?
18    A.   Well, I for a fact, this was in June
19  and July.  So I was working at the VA and I
20  believe Amanda Blevin was there and Paul Azar was
21  working with me for some time, and also my
22  colleagues, Jonathan Chow, and we were all deeply
23  disturbed by the newly instituted policies and
24  such.  And the junior residents also, Diane
25  Crewness, Mabel Ko.  I mean, we had some concerns.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

451

Varughese

1
2  We talked amongst each other and we thought this
3  was strange.
4      Q.  Did you get a response to your e-mail
   of August 16th?
6      A.  We did eventually, I did eventually
7  get a response, yes.
8      Q.  I will show you a document.
9          MR. McEVOY:  Let's mark this as
10     Exhibit 40.
11     A.  (Continuing) To note, also this e-mail
12  further, you know, reiterates my concern that I'm
13  not getting the minimum CP training time, which
14  whether or not whoever feels that's the case, that
15  wasn't the case. I was not getting the minimum CP
16  time, clinical pathology training time.
17     Q.  What is the minimum CP time?
18     A.  It's minimum is 18, but it can be
19  more.
20     Q.  18 what?
21     A.  18 months and it can be more than 18
22  months with electives, and so on. But that wasn't
23  an option that was offered to me at any point. In
24  fact, beginning with my third year I constantly
25  had to struggle to make sure I was being educated

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

452

Varughese

1
2  in a similar fashion to my comparators, such as
3  Jordan and McCash.
4      Q.  How much CP time had you had by August
5  of 2011? How many months?
6      A.  I believe it may have been nine and a
7  half months.
8      Q.  Did you know what the plan was or what
9  your schedule was going to be to have additional
10  CP training during the coming year?
11     A.  Yes, I did.
12     Q.  How much?
13     A.  Well, I was not satisfied with the
14  schedule. I was not satisfied with the
15  assignments I was given, which were excess months
16  of microbiology at the VA and excess months of
17  Englewood Hospital, which wasn't technically
18  clinical pathology. I mean, it just isn't. It
19  wasn't clinical pathology.
20     Q.  Was it clinical pathology in the eyes
21  of the -- did the program consider it to be
22  clinical pathology?
23     A.  The program considered it as elective
24  time and one month of the two months that we were
25  required as for this elective that we spent there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

453

Varughese

1
2  to be counted as clinical pathology, but not
3  beyond the one month. I had already done one
4  month of clinical pathology elective at Englewood.
5  So that was done.
6      Q.  So I understand that you were unhappy
7  with your schedule, but with the schedule that you
8  were assigned at the end of your fourth year would
9  you have had 18 months of clinical pathology in
10  the view of the program?
11     A.  In the view of the program? No.
12     Q.  And why do you say that?
13     A.  Because it did not meet the minimum
14  requirements. Englewood is not clinical
15  pathology. And to have excess months of
16  microbiology, which I have already completed at
17  the VA, and to have excess months of whatever else
18  that they assigned me at that time, which may have
19  been -- which I don't even recall anymore, but
20  they were not really in keeping with the
21  curriculum that was promised when I started this
22  residency program in 2008.
23     Q.  So if you look at this document, which
24  we'll mark Exhibit 40. Let me know when you're
25  done.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

454

Varughese

1
2      (Defendants' Exhibit 40, e-mail dated
3      August 16, 2011, from Paul Johnson to Leena
4      Varughese, Bates Nos. D-1176 and 1177,
5      marked for identification, this date.)
6      Q.  Have you had a chance to look at it?
7      A.  Yes.
8      Q.  So this is an e-mail from Paul Johnson
9  to you with copies to several other individuals
10  dated August 16, 2011 at 7:28 p.m.
11          Did you get this e-mail,
12  Dr. Varughese?
13     A.  Yes.
14     Q.  In this e-mail Mr. Johnson says,
15  "Dr. Lento is the Program Director and Dr. Firpo
16  is the Director of Educational Activities. Both
17  have responsibilities in overseeing residency
18  education."
19          Did that address your concern about
20  there being two program directors?
21     A.  No, not at all.
22     Q.  Why not?
23     A.  Because it doesn't explain what the
24  role of Dr. Firpo is. It's a made up position,
25  Director of Educational Activities. I never heard

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

455

Varughese

1 of anything before Dr. Firpo was hired for this
2 position. It did not exist before that as far as
3 I knew. It's simply made up by the institution.
4 Q. Who made it up?
5 A. I don't know. You have to ask them.
6 Q. And are you saying that Mount Sinai
7 can't create new positions?
8 A. Did I say that?
9 Q. Well, you said it was made up and
10 you'd never heard of it before.
11 A. I haven't, yes.
12 Q. So do you have any --
13 A. I defer that I am not going to answer
14 that question.
15 Q. Of course you're going to answer that
16 question?
17 A. No, I'm not. That's not what I am
18 saying. I'm saying they probably made it up.
19 That's my position. I have no opinion on whether
20 or not they can make of a position or not. That's
21 not within my jurisdiction or my authority to say
22 or do. But I am of that opinion that they made it
23 up that year.
24 Q. When you say made it up, what do you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

456

Varughese

1 mean by made it up?
2 A. That was a position that did not exist
3 before as far as I knew.
4 Q. Did you communicate with Mr. Johnson
5 in any way after you received his e-mail to get a
6 further clarification of the respective duties of
7 Dr. Lento as the program director and Dr. Firpo as
8 the director of educational activities?
9 A. Did I? I may have. I'm not sure at
10 this point. But clearly this e-mail does not
11 answer my concerns in any significant way. I
12 mean, it just says that Dr. Lento is program
13 director which we still figured he was. It
14 doesn't say that Dr. Firpo is not. I mean, that
15 would be an appropriate way of going about things.
16 Then it doesn't really address my
17 policy, I mean, my concern about policies being
18 changed by the department and the chief residents.
19 It doesn't go into that at all. Then it
20 doesn't -- then it says that if I was out sick
21 during a call assignment, then I had to bring in
22 proof, which wasn't the case either.
23 Q. What wasn't the case?
24 A. I wasn't out ill when I was on a call

*Computer Reporting NYC Inc.*
*(212) 986-1344*

457

Varughese

1 assignment.
2 Q. What's your definition of a call
3 assignment?
4 A. Call assignment is when you're
5 scheduled for anatomic pathology or clinical
6 pathology call and you don't -- they call you,
7 they page you and you don't come in to perform the
8 work.
9 Q. On August 11th you were still on the
10 cytogenetics rotation, correct?
11 A. Correct.
12 Q. And your calling in sick that day
13 prevented you from working in that rotation that
14 day, correct?
15 A. However do you mean?
16 Q. If you were sick and not at work you
17 weren't at work in the cytogenetics rotation,
18 correct? You weren't at the hospital that day.
19 A. Well, that's one way of looking at
20 things.
21 Q. Well, what's your way of looking at
22 things?
23 MR. WRONKO: Form objection. You can
24 answer.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

458

Varughese

1 A. My way of looking at things is that I
2 was ill and I could not make it to work.
3 Q. And the fact that you were ill and
4 couldn't make it to work, did that prevent you
5 from taking a call assignment?
6 A. No, it did not prevent me from taking
7 a call assignment.
8 Q. Why not?
9 A. I was not on call on August 2011.
10 Q. Then the e-mail talks about "Dr. Firpo
11 and Dr. Lento have been carefully monitoring all
12 residents' CP experience and are taking pains to
13 ensure that everyone receives the necessary 18
14 months."
15 Then it goes on to say that "Any
16 concerns about meeting this requirement or any
17 others should first be brought to the program
18 leadership for resolution. If the program has not
19 addressed your concerns, you can always bring them
20 to Scott," referring to Dr. Barnett I assume,
21 "Dr. Stimmel, or me, and we will work with you and
22 the program to find the best way forward."
23 After you received Mr. Johnson's
24 e-mail August 16th did you communicate in any way

*Computer Reporting NYC Inc.*
*(212) 986-1344*

459

Varughese

1
2  with either Dr. Lento, Dr. Firpo, Mr. Johnson,
3  Dr. Barnett or Dr. Stimmel about your concerns
4  about having a sufficient number of CP experience?
5       A.   Yes, I communicated to Dr. Firpo.
6       Q.   Any of the others or just Dr. Firpo?
7       A.   Well, I communicated to Dr. Firpo
8  because I was told Dr. Lento was not technically
9  allowed to interact with me.
10      Q.   So when did you speak to Dr. Firpo
11 that about your concerns about the CP experience?
12      A.   About the CP?  I spoke to him the next
13 day, August 17th.
14      Q.   Where did that meeting take place?
15      A.   In Dr. Firpo's office.
16      Q.   Anybody else present?
17      A.   Shema Patel.
18      Q.   Tell me what you said and what
19 Dr. Firpo said and what Ms. Patel said at this
20 meeting.
21      A.   Well, I just brought up my concern
22 about me not meeting 18 months and what
23 specifically were my concerns about that in terms
24 of the breakdown of the CP clinical pathology
25 rotations that I was assigned and what I would

Computer Reporting NYC Inc.
(212) 986-1344

460

Varughese

1
2  like to see be addressed and changed in order for
3  me to be satisfied with my clinical pathology
4  training at Mount Sinai Medical Center.
5       Q.   And what changes did you want to make?
6       A.   Well, I would have liked some
7  additional months of hematology and less months of
8  microbiology at the VA.
9       Q.   What did Dr. Firpo say?
10      A.   Dr. Firpo said he has to look at the
11 schedule again. I'm bringing up a serious
12 concern. He has to look at the schedule. He has
13 to talk to Dr. Lento, but he has been told that my
14 training requirements were being met. He said
15 that's what he was informed at some point.
16      Q.   Anything else discussed at this
17 meeting?
18      A.   Yes. We went over some of those
19 things yesterday.
20      Q.   Oh, that was the meeting you talked
21 about yesterday.
22      A.   Yes.
23      Q.   Was your schedule changed?
24      A.   Was my schedule changed?  No, it was
25 not changed.

Computer Reporting NYC Inc.
(212) 986-1344

461

Varughese

1
2       Q.   So the concerns that you raised about
3  wanting more hematology and less microbiology,
4  were the schedules changed in any way to
5  accommodate your concerns?
6       A.   No, the schedule was not changed in
7  any way to accommodate my request.
8       Q.   Dr. Varughese, I think you were
9  telling me why it is that you thought this e-mail
10 did not address the concerns you raised in your
11 August 16th e-mail and I wanted to be sure that
12 you had finished telling me what you wanted to
13 about your reaction to Mr. Johnson's e-mail.
14      A.   Correct, I had went to an authority
15 figure within the institution outside of the
16 department at this point, and that's technically
17 the course of action that we are supposed to take
18 according to the ACGME guidelines even.  You go to
19 the program director and then you have to go to
20 someone within the institution before you take any
21 further action.
22      Q.   And who had you gone to?
23      A.   Well, I e-mailed Mr. Paul Johnson and
24 Dr. Barnett. So I would imagine if they would be
25 able to address this issue without me having to

Computer Reporting NYC Inc.
(212) 986-1344

462

Varughese

1
2  return to Dr. Firpo or Lento or whoever else.
3       Q.   When Mr. Johnson says in this e-mail
4  that "Dr. Firpo is the Director of Educational
5  Activities," you said a few minutes ago it doesn't
6  say that he's not the program director.
7            After you got this e-mail were you
8  still uncertain about whether Dr. Firpo was or
9  wasn't a program director?
10      A.   Frankly, I was certain that he wasn't
11 the program director, because according to the
12 guidelines there can be only one program director
13 that oversees the residency program. Particularly
14 residency programs such as pathology, there can
15 only be one.
16           And Dr. Firpo being the director of
17 educational activities I wasn't sure what his
18 responsibilities were. As far as I knew I was the
19 only person who was meeting with him and having to
20 confer with him on a biweekly basis, and so on.
21      Q.   Now, on August 12, 2011, did
22 Dr. Jordan ask you to cover for Dr. Blau?
23      A.   August what?
24      Q.   12, 2011.
25      A.   Right, I believe she sent me e-mail

Computer Reporting NYC Inc.
(212) 986-1344

463

Varughese

2 that day, the night before, the evening before
3 asking me to -- telling me to cover it.
4    Q.   I'm sorry, Dr. Varughese, so
5 Dr. Jordan e-mailed you to tell you that she
6 wanted you to cover for Dr. Blau?
7    A.   Correct.
8    Q.   And when did she do that?
9    A.   The evening prior to August 12th. So
10 that would be August 11th.
11    Q.   And did you respond to that e-mail?
12    A.   Yes. Oh, no, I did not respond to
13 that e-mail. It just said "please cover." So I
14 just assumed that I was going to cover for
15 Dr. Blau.
16    Q.   Did you receive any additional
17 communications or further e-mails from Dr. Jordan
18 regarding covering for Dr. Blau on August 12th?
19    A.   Not on August 12th. I'm sorry, on
20 August 12th I did receive some e-mails in the
21 afternoon at some point.
22    Q.   Did you respond to those e-mails?
23    A.   I am not sure.
24    Q.   I will show you a document.
25       MR. McEVOY: Mark this as Exhibit 41.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

464

Varughese

2       (Defendants' Exhibit 41, e-mail string
3       dated August 12, 2011, Bates Nos. D-908
4       through 910, marked for identification, this
5       date.)
6    Q.   Have you had a chance to look at it?
7    A.   Yes.
8    Q.   The first e-mail in the string, the
9 earliest e-mail in the string, is to you and a
10 number of others from Dr. Jordan dated August 12,
11 2011 at 8:50 a.m., and a portion of the e-mail is
12 addressed to you and asks you to cover for
13 Dr. Blau on the surgical service that day; is that
14 correct?
15    A.   Yes. So she was on surgical service,
16 yes.
17    Q.   Is this the first e-mail that you
18 received from Dr. Jordan asking you to cover?
19    A.   Right, this is the e-mail I received,
20 yes.
21    Q.   And you said you didn't respond to it.
22 Then there's another e-mail from Dr. Jordan on the
23 same day at 10:31 a.m., an hour and 40 minutes
24 later. It says: "Leena, it is 10:30am. Please
25 verify that you are in receipt of this e-mail so

*Computer Reporting NYC Inc.*
*(212) 986-1344*

465

Varughese

2 that I know coverage is taken care of and I can
3 focus on my own rotation as well as let the rest
4 of the surgical team know."
5       Did you respond to this e-mail?
6    A.   No.
7    Q.   Why not?
8    A.   Well, I was in this midst of my own
9 duties and I simply could not respond to her
10 e-mail at that time.
11    Q.   Did you ever respond to it?
12    A.   Did I ever? Well, I was being
13 bombarded by pages, phone calls, various other
14 duty responsibilities, and so on. I did not have
15 the time to respond to her that day.
16    Q.   Did --
17    A.   I mean, I'm a doctor in my own right
18 as is Dr. Jordan. She wants to focus on her own
19 rotation and whatever, whatever, and she's in
20 Pennsylvania somewhere, OK, great. But you know
21 what? I have work to do too. It is simply
22 impossible for me to deal with this kind of
23 harassment every single day. When I arrive at
24 work this is what I have to deal with.
25    Q.   I want to be sure I understand. So

*Computer Reporting NYC Inc.*
*(212) 986-1344*

466

Varughese

2 you think that Dr. Jordan asking you to confirm
3 that you're going to cover for an absent resident
4 is harassment.
5       MR. WRONKO: Form objection.
6    A.   In this manner, yes. Constant
7 bombardment of e-mails, and so on. I mean, what
8 is she really going to do even if -- first of all,
9 there's a chief resident who gets paid in excess
10 of three grand every year to simply be chief
11 resident. What are her duties? Simply making
12 administrative, you know, e-mailing a few things
13 here and there. Instead, I have this new, you
14 know, responsibilities added to her. She is
15 giving us verbal warnings and -- it's outrageous.
16 It's -- it's -- I'm at a loss of words to describe
17 this. It's outrageous. It's a travesty.
18    Q.   Did Dr. Lento attempt to page you on
19 the morning of August 12th?
20    A.   Yes, and I returned his page.
21    Q.   Did you also speak to him by phone?
22    A.   I did.
23    Q.   Do you see the next e-mail in the
24 chain which is dated August 12, 11:33? It says:
25 "I spoke to Dr. Najfeld who said Leena is there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

467

Varughese

1
2 and would be released at noon. I tried paging
3 Leena to confirm with her that she was to help
4 cover on surgicals today since Sarah was out sick,
but she has not returned my page yet."
6      So did you not return Dr. Lento's
7 page?
8      A.   Clearly I had already spoken to him.
9 I have no idea what he's speaking about. He's
10 once again exaggerating beyond belief. Like I
11 spoke to him already. He confirms that I had
12 spoken to him. Now he is saying that I haven't
13 returned his page yet? It doesn't make any sense
14 on its face, come on.
15      Q.   Well, if Dr. Lento paged you and you
16 didn't respond to his page and then he called the
17 cytogenetics lab because he knew you were there
18 and spoke to you by phone --
19      A.   Right, because he know I was doing
20 my work.
21      MR. WRONKO:  Hold on. Let him finish
22      his question.
23      Q.   -- and he spoke to you by phone, then
24 he called you because you didn't respond to his
25 page, right?

Computer Reporting NYC Inc.
(212) 986-1344

468

Varughese

1
2      A.   No, I responded to his page. He
3 probably did not pick up his phone and then he
4 found me in cytogenetics and I spoke to him. And
5 he was on the phone with Dr. Najfeld. When I
6 arrived there she said, I'm on the phone with
7 Dr. Lento. I said, OK, I'll give you a minute to
8 finish up your conversation and then we'll
9 continue.
10      It's not my fault he was otherwise
11 occupied on his phone line. There's no way he
12 could have received my call even if I -- even when
13 I did call him.
14      And this e-mail is ridiculous. "I
15 tried paging Leena to confirm"? And then she
16 said, um, she said, well, "to help cover on
17 surgicals today." But then he says that I haven't
18 returned his page. Come on. It's farcical at
19 best.
20      Q.   Do you know why --
21      A.   Ridiculous.
22      Q.   Are you done?
23      A.   It's ridiculous.
24      Q.   Are you done?
25      Do you know why Dr. Lento was calling

Computer Reporting NYC Inc.
(212) 986-1344

469

Varughese

1
2 Dr. Najfeld? You said when you walked in they
3 were on the phone. Do you know why he called him?
4      A.   Well, it seemed like the
5 administration was intent on my, you know, intent
6 on, you know, creating a story having some context
7 for pretextual termination at some point and they
8 were frankly harassing my supervisors. Like I
9 already mentioned yesterday, and I'm going to
10 mention it again, this has been going on for some
11 time and this was more of the same.
12      Q.   When you spoke to Dr. Lento on the
13 morning of August 12th did Dr. Lento tell you to
14 call Dr. Jordan to let her know that you were
15 going to cover surgicals?
16      A.   I don't recall.
17      Q.   Did you call Dr. Jordan?
18      A.   No.
19      Q.   Dr. Varughese, how are elective
20 rotations -- I'll put it this way. How do you go
21 about selecting your electives? What's the
22 process?
23      A.   Selecting the electives?
24      Q.   An elective rotation.
25      A.   Well, that process has changed over

Computer Reporting NYC Inc.
(212) 986-1344

470

Varughese

1
2 the past three, four years I was there. The
3 process has changed --
4      Q.   So you know what time frame we're
5 talking about, in the beginning of your fourth
6 year. So in that August 2011 period going
7 forward. So it would have been your PGY-4 year.
8 How were elective rotations selected?
9      A.   Well, I don't know what happened in my
10 PGY-4 year as to elective selection at that time,
11 but what I do recall was one e-mail from Dr. Lento
12 saying that we have to confirm that we still want
13 to be on that particular elective rotation within
14 a 60-day period, otherwise we're going to lose the
15 elective time.
16      I mean, I don't know. It was all
17 sorts of ridiculousness. The entire program was
18 chaotic and disorganized. It was being run by a
19 second year and Dr. Lento it seems like along with
20 Dr. McCash. It was --
21      Q.   Dr. Varughese --
22      A.   It was purely --
23      Q.   Here's the problem. Let me tell you
24 what the problem is. The problem is, trust me, I
25 understand how you feel about this. You've told

Computer Reporting NYC Inc.
(212) 986-1344

475

Varughese

2 options in terms of changing my electives and such
3 because of the overt negativity and antagonism
4 that I was experiencing, and then I also
5 experienced a great deal of maliciousness from
6 Adrienne Jordan, and frankly my only option was to
7 speak to Dr. Firpo. I felt that was my only
8 option.
9     Q. I understand that. But are you aware
10 of a procedure or a process that you were supposed
11 to follow to change an elective?
12     A. Do you mean some futile procedure that
13 I am supposed to follow that doesn't yield any
14 results?
15     Q. Whether it's futile or not, Dr.
16 Varughese, are you aware of a policy or procedure
17 that you're obliged to follow?
18     MR. WRONKO: Objection, form.
19     A. Dr. Firpo eventually informed me that,
20 you know, on August 24th or so he sent this e-mail
21 and said that, you know, sent an e-mail to the
22 chief resident saying, well, we understand,
23 there's a policy now, and so on and so forth.
24     I thought since I had concerns about
25 meeting requirements and getting a similar

*Computer Reporting NYC Inc.*
*(212) 986-1344*

476

Varughese

2 training that would be on par with my peers, and
3 that would be acceptable to the American Board of
4 Pathology, not some arbitrary decision made by the
5 program director who clearly was not acting in my
6 best interest.
7     So I did do what I thought was the
8 best way to approach this problem, which was to
9 speak to Dr. Firpo, who apparently was the
10 Director of Educational Activities as confirmed by
11 Graduate Medical Education in Exhibit 40 here.
12     Q. So had you elected GI pathology as one
13 of your rotations for your fourth year?
14     A. Well, in January or February I had
15 indicated that would be an area that I should have
16 the same degree of training as my peers.
17 Therefore, I said I should do that. Not as an
18 elective, but just even as a rotation I should
19 have done that.
20     Q. When you received your schedule for
21 your fourth year was GI pathology on your
22 schedule?
23     A. Yes, it was.
24     Q. And did there come a time when you
25 wanted to change from the GI pathology elective to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

477

Varughese

2 dermatopathology?
3     A. Yes, I wanted to change my elective to
4 dermatopathology.
5     Q. When did you first communicate your
6 desire to make that change? You said you spoke to
7 Dr. Firpo. When did you first speak to Dr. Firpo
8 about that?
9     A. August 17th and perhaps even
10 August 2nd. I believe I told him on August 2nd as
11 well that I would like to change my elective to
12 dermatopathology.
13     Q. Where did you have that conversation
14 with Dr. Firpo?
15     A. In his office.
16     Q. Anybody else present?
17     A. Shema Patel.
18     Q. What did you say to Dr. Firpo, what
19 did he say to you during that meeting about your
20 wanting to change your elective from GI pathology
21 to dermatopathology?
22     A. He said he's going to speak to the
23 appropriate supervisors for those rotations and to
24 follow up.
25     Q. Do you know who the supervisors were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

478

Varughese

2 that he was intending to talk to?
3     A. Right, so eventually he stated that he
4 spoke to Dr. Berzhai, and then he was going to
5 speak to Dr. Harpaz.
6     Q. Did he say anything else during this
7 meeting?
8     A. Well, he indicated it shouldn't be
9 such a problem, and so on.
10     Q. And what did you say?
11     A. I said, Great. So I look forward to
12 having my schedule and assignments that I need to
13 complete my training.
14     Q. And did Ms. Patel say anything during
15 the meeting?
16     A. I don't recall what she said or may
17 not have said.
18     Q. Did Dr. Firpo communicate with you
19 about your request to change your elective after
20 this meeting?
21     A. Right. After August 17th I did not
22 hear from him at all. So I eventually called him
23 roundabout I guess, around, um, excuse me,
24 roundabout, around August 23rd, 24th, that time.
25 And I had a phone conversation with him regarding

*Computer Reporting NYC Inc.*
*(212) 986-1344*

479

Varughese

2 what he was doing to accommodate my request.
3      Q.   What did he say?
4      A.   He essentially said that he still has
5 not spoken to the appropriate personnel and he is
6 not going to or he will eventually. He wasn't
7 very clear and he seemed very -- seemed to be
8 sidestepping as much as possible this issue that I
9 had brought forward. If for no reason other than
10 to just, you know, be malicious towards me.
11      Q.   And did Dr. Firpo get back to you at
12 some point to let you know whether your request
13 had been granted or denied?
14      A.   Right. So after that day he sent me
15 an e-mail, you know, that was cc'd. The chief
16 residents were cc'd on it. And then after that I
17 didn't hear from him. But I did speak to
18 Dr. Harpaz at that time.
19      I was on call I believe on August 24th
20 and I spoke to Dr. Harpaz very briefly about
21 possibly changing my schedule so that I'm not on
22 his rotation. He seemed OK with it. He didn't
23 seem to think it was a big issue because he had
24 said that he already thought that I had done GI
25 rotation and he wasn't particularly concerned that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

480

Varughese

2 I didn't have training in that area or not.
3      And at this time, you know, this is
4 like six, seven months later since the initial
5 elective request, I did obtain a decent amount of
6 exposure to GI, gastrointestinal pathology, at
7 that time through various lectures, meetings and
8 conferences, as well as my own experience at the
9 Bronx VA and Elmhurst Medical Center.
10      So I felt it was OK for me to get out
11 of this, you know, not be on gastrointestinal
12 pathology as an elective, and Dr. Harpaz didn't
13 seem to mind. He said it should not be a problem
14 as long as there is enough adequate personnel.
15      Q.   Let me show you a document.
16      MR. McEVOY: Mark this as Exhibit 42.
17      (Defendants' Exhibit 42, e-mail string
18 dated September 7, 2011, Bates Nos. D-1172
19 through 1174, marked for identification,
20 this date.)
21      Q.   So Dr. Varughese, this is an e-mail
22 string consisting of two e-mails. There's an
23 e-mail from Dr. Firpo to you dated September 7,
24 2011 at 12:07 p.m., and among other things, it
25 says in number 3: "I must also inform you that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

481

Varughese

2 your request for dropping off the elective GI
3 rotation with Dr. Harpaz was denied. You will
4 report to begin that rotation as scheduled."
5      And then there's an e-mail from you,
6 the same day, about an hour and 45 minutes later
7 at 1:46 p.m., that responds to Dr. Firpo's e-mail.
8      When you received the e-mail from
9 Dr. Firpo dated September 7th it said your request
10 to drop the GI rotation was denied. Was this the
11 first time that Dr. Firpo had told you that the
12 request was denied?
13      A.   Yes.
14      Q.   And had you spoken to Dr. Harpaz prior
15 to September 7th?
16      A.   Yes, I had spoken to him at least once
17 regarding the rotation that I was scheduled for.
18      Q.   In any of your communications with
19 Dr. Harpaz prior to September 7th, before
20 September 7th, did you tell him that you had
21 arranged for another resident to cover the GI
22 pathology rotation?
23      A.   I believe I did not say that to him at
24 all, no.
25      Q.   Did you try to find a resident who

*Computer Reporting NYC Inc.*
*(212) 986-1344*

482

Varughese

2 would do the GI pathology rotation?
3      A.   Right. So I spoke to the fellow who
4 was the GI pathology fellow at that time and I
5 spoke to her regarding, you know, my interest in
6 dropping the GI rotation or even staying on but
7 being able to attend to some of the educational
8 needs that I had. And we discussed this for a
9 while and she thought that it should not be a
10 problem, because she said that she was going to be
11 on the GI rotation that month and it should not be
12 an issue.
13      So if you want to drop it, it should
14 not be a problem, because we do have some medical
15 students and residents and herself who was going
16 to be there, and she said, you know, I should not
17 concern myself with finding coverage, and so on.
18      And she also said if I needed to go to
19 the Osler review course in Tampa for a week or so
20 it should not be a problem as well, because she
21 was going to be there and she didn't foresee any
22 issues.
23      As far as she could tell, she didn't
24 foresee any issues and I find that interesting
25 because she was a former chief resident. We're

*Computer Reporting NYC Inc.*
*(212) 986-1344*

### 483

Varughese

2  talking about Yvelisse Suarez. She was a chief
3  resident for a year. I mean, she clearly knows
4  what she's talking about.
5      Q.  You said you had spoke to "her" and
6  "she" a number of times. Who are you referring
7  to?
8      A.  Yvelisse Suarez.
9      Q.  Did you ever talk to Dr. Mabel Ko
10  about covering the GI pathology rotation?
11      A.  Well, that is an interesting question,
12  because Dr. Firpo e-mailed some accusatory e-mail
13  saying that she had agreed to something, and so
14  on, which was quite shocking to me, but I did
15  speak to Mabel at a resident meeting. There were,
16  I know, I don't know how many people were there
17  at that meeting, perhaps about ten of us.
18      And Mabel -- my schedule indicated
19  that I was on GI elective or rotation period two
20  or something along those lines. And at that time
21  I indicated, well, I don't want to do GI elective.
22  Is it a possibility that I can drop this elective
23  at this point? That was sometime in May 2011.
24      And Mabel volunteered and said, Well,
25  I would like GI elective. What I didn't realize

*Computer Reporting NYC Inc.*
*(212) 986-1344*

### 484

Varughese

2  was that she was actually on GI elective already
3  for that year, but she was assigned a few months
4  later. What she wanted was to jump into my slot
5  that I had already elected, I had already chosen.
6  So what they did was essentially to put Mabel into
7  my slot and put me into Mabel's GI slot.
8      So that's basically what happened and
9  it can be proven through the schedule changes.
10  Easily proven.
11      Q.  After you received the e-mail from
12  Dr. Firpo on September 7th that denied your
13  request to drop the GI rotation and then you
14  e-mailed him back, did you have any further
15  meetings, discussion s, communications with
16  Dr. Firpo about the elective rotation issue?
17      A.  After August 24th and then --
18      Q.  No, after the September 7th meeting.
19      A.  After September 7th?
20      Q.  Yes.
21      A.  Did I have any further communications?
22  Yes, I did speak to him.
23      Q.  When did you speak to him?
24      A.  I spoke to him I believe like an hour
25  or so after I received this e-mail.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

### 485

Varughese

2      Q.  So on September 7th.
3      A.  Correct.
4      Q.  And where did you speak to Dr. Firpo?
5      A.  I spoke to him in his office.
6      Q.  Did you go to his office?
7      A.  Right.
8      Q.  And did you meet with Dr. Firpo?
9      A.  Yes.
10      Q.  Was anybody present other than you and
11  Dr. Firpo?
12      A.  No.
13      Q.  Tell me what happened at this meeting.
14  What did you say to him, what did he say to you in
15  particular about the elective rotation issue?
16      A.  I just asked him why, you know, like
17  why he was informing me at this late date
18  regarding not dropping the elective rotation
19  and/or, you know, not allowing me to switch out of
20  this rotation even though Dr. Harpaz indicated it
21  shouldn't be a problem. I had spoken to Yvelisse
22  Suarez.
23      And then I went on to talk about, you
24  know, the very other issues that were addressed
25  here, hemepath, and what my responsibilities were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

### 486

Varughese

2  and what I was doing and how I was working with
3  Dr. Petersen who I've already worked with and who
4  was also my advisor. So, I mean, we discussed a
5  variety of things.
6      Q.  What did Dr. Firpo say?
7      A.  Dr. Firpo said, Well, OK. I don't
8  know, he didn't say -- he said a few things. What
9  did he say? He said, Oh, this is what they want
10  to do. I talked with Dr. Harpaz. He accused me
11  of going above him and contacting Dr. Harpaz right
12  away. He indicated that I'm not allowed to speak
13  to my mentors or my supervisors, potential
14  supervisors without consulting him first.
15      It was outrageous and unprofessional,
16  just more of the same.
17      Q.  Let's take a step back. Did you tell
18  Dr. Firpo at this meeting that even though the
19  request had been denied that you intended to
20  contact other residents directly to see if someone
21  else was willing to take your place in the GI
22  elective?
23      A.  No. I said, you know, normally if
24  there is somebody who is interested in doing the
25  GI elective and they would like to switch in,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

487

Varughese

2 that's a possibility to accommodate my request.
3 So that I can do derm path, which I was interested
4 in, or something else like hematology or clinical
5 pathology rotation that I was interested in.
6      Q.   But did you tell Dr. Firpo that you
7 intended even after you had received his e-mail to
8 go and talk to residents to get them to --
9      A.   No, I didn't want to do that. And I
10 simply told him that's a possibility that can be,
11 that's an approach to see if anybody else was
12 interested. But he -- I didn't say that I was
13 going to do that, no.
14      Q.   Did Dr. Firpo tell you it would be
15 inappropriate to do that because your request had
16 already been denied?
17      A.   No. That wasn't -- I did not say that
18 I would do that. So if he had said that, I don't
19 know. He was making some assumptions. That's
20 not....
21      Q.   Did you tell Dr. Firpo that it's your
22 right to seek a change in your schedule?
23      A.   Was it my right?
24      Q.   Yes.
25      A.   Well, I can seek a change in my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

488

Varughese

2 schedule, yes.
3      Q.   But I take it, Dr. Varughese, that you
4 were not permitted to change your elective.
5      A.   Well, this went on to become sort of
6 like yes, you're allowed to change if you can get
7 a certain individual to agree and you may have
8 hematology perhaps. Yes, this has evolved into
9 something else at that point. But that's -- it
10 wasn't a, you know, eventually it came out that I
11 may be allowed to change my schedule.
12      Q.   You say eventually it came out that
13 you might be allowed to change your schedule. How
14 did it eventually come out?
15      A.   Well, it was that I was told to e-mail
16 or approach certain residents or what not.
17      Q.   Who told you that?
18      A.   Adrienne Jordan.
19      Q.   Was this before or after you spoke to
20 Dr. Firpo on September 7th?
21      A.   Yes, after I spoke to Firpo.
22      Q.   Did Dr. Jordan know that your request
23 had been denied?
24      A.   I'm not sure --
25         MR. WRONKO: Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

489

Varughese

2      A.   -- what she is informed of or not
3 informed of.
4      Q.   Did Dr. Jordan in your view, not in
5 your view, but did Dr. Jordan have the authority
6 to override a decision made by Dr. Firpo regarding
7 your elective?
8         MR. WRONKO: Form objection. You can
9 answer.
10      A.   No, she did not have that authority.
11 I mean, technically chief residents should not
12 have that authority at all to make decisions about
13 another resident's education. It should be left
14 to the discretion of the program director and --
15 not left to the discretion, but it should be
16 determined by the resident who is in training and
17 the residency program.
18      Q.   After you spoke to Dr. Firpo in his
19 office on September 7th about your request to drop
20 the GI elective, did you have any further
21 discussions with Dr. Firpo about that request?
22      A.   Not after August 7th --
23      Q.   September 7th.
24      A.   September 7th, no, I did not speak to
25 him any further.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

490

Varughese

2      Q.   Did you have any further conversations
3 with Dr. Harpaz?
4      A.   No.
5      Q.   With anybody in the GME office?
6      A.   No. I said, well, if I have to do a
7 GI elective, GI as a rotation it's not the end of
8 the world. I'll do it. I mean, I had my concerns
9 about it, but, you know, if the program needed me
10 to cover for a particular month or a rotation, I
11 was open to doing it even though it wasn't what I
12 was interested in.
13      Q.   Dr. Varughese, is there a policy
14 regarding poor conference attendance?
15      A.   Yes, there was a policy instituted
16 regarding poor attendance, conference attendance.
17      Q.   What was the conference attendance
18 requirement?
19      A.   Conference attendance requirements had
20 changed over the years significantly.
21      Q.   We're talking now about your PGY-4
22 year.
23      A.   PGY-4 year I believe it was a google
24 of 80 percent attendance required.
25      Q.   What conferences counted towards the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

491

Varughese

1
2  80 percent standard?
3      A.   I am not a hundred percent sure what
4  counted.  But my understanding was introductory
5  lectures or basic pathology lectures were not
6  required, and -- what else?  Certain lectures were
7  not required.  Like the clinical pathology call
8  conference was not a requirement.
9      Q.   So you could miss those lectures and
10  they wouldn't count against the 80 percent
11  attendance standard.
12      A.   Yes, I believe.  But it wasn't very
13  clear about what lectures were specifically -- I'm
14  not sure if autopsy conference, meet and confer
15  conference on Fridays were a requirement or not
16  when they were often cancelled.
17      Q.   Let me show you a document.
18          MR. McEVOY:  Mark this as Exhibit 43.
19          (Defendants' Exhibit 43, document
20      titled "Policy for Morning Conference
21      Attendance," Bates No. D-1185, marked for
22      identification, this date.)
23      Q.   Have you had a chance to look at that?
24      A.   Yes.
25      Q.   Is this the policy for morning

Computer Reporting NYC Inc.
(212) 986-1344

---

492

Varughese

1
2  conference attendance?
3      A.   It appears that it is.
4      Q.   Sorry?
5      A.   It is.
6      Q.   At the bottom it says "Updated on
7  July 27, 2011."
8          Do you see that?
9      A.   Correct.
10      Q.   It says in Roman numeral II, among
11  other things, that "The minimum requirement for
12  successful completion of training requirements in
13  pathology will include, but are not limited to,
14  the resident's participation in at least 80
15  percent of all required 8 a.m. didactic
16  presentations, average over a 4 week period
17  (hereafter referred to as a 'block')."
18          Do you see that?
19      A.   Yes.
20      Q.   What is an 8 a.m. didactic
21  presentation?
22      A.   8 a.m. didactic presentations are
23  scheduled conferences that discuss a variety of
24  subject matters in pathology.
25      Q.   And how often are these 8 a.m.

Computer Reporting NYC Inc.
(212) 986-1344

---

493

Varughese

1
2  presentations given?
3      A.   Well, the quote unquote, didactic
4  presentations are given or scheduled for 8 a.m. on
5  Monday, 8 a.m. on Tuesday, 8 a.m. Wednesday, 8
6  a.m. Thursday and 8 a.m. Fridays are the autopsy
7  presentations.  So I would imagine Monday through
8  Thursday are considered didactics.
9      Q.   And it was those didactic
10  presentations that you were required to attend 80
11  percent of?
12      A.   Correct, we were required to attend
13  non-basic pathology lectures if that was being
14  presented.
15      Q.   And then as you said before, 80
16  percent was the standard, and if you fell below 80
17  percent, between 60 and 80 percent, the policy
18  requires the resident to "prepare one lecture on a
19  topic covered at a lecture they missed."
20          Do you see that?
21      A.   Right.
22          MR. WRONKO:  Form objection.
23      Q.   Was that your understanding of what a
24  resident was required to do if they fell below the
25  80 percent requirement?

Computer Reporting NYC Inc.
(212) 986-1344

---

494

Varughese

1
2          MR. WRONKO:  Form objection.  You can
3      answer.
4      A.   Right.  It seems that that's what it
5  says here, yes.  If you attend 60 to 80 percent
6  then you had to prepare one lecture on a topic
7  that was covered at the lecture that they missed.
8  I don't know, something.
9      Q.   What don't you know?
10      A.   Well, that's what it says here.  It
11  seems like if you missed a lecture then you had to
12  present on that lecture that you miss.
13      Q.   Or on one of the lectures that you
14  missed.
15      A.   On one of the lectures that was
16  missed, right.
17      Q.   So in August 2011, were you notified
18  that your attendance had dropped below the 80
19  percent threshold?
20      A.   Yes, there was an allegation made that
21  I had missed.
22      Q.   Had you attended less than 80 percent
23  of the required lectures?
24      A.   I believe not.  I believe I attended
25  80 percent, at least 80 percent, if not more.

Computer Reporting NYC Inc.
(212) 986-1344

495

Varughese

1
2    Q.    When you say you attended 80 percent
3 of the required lectures are you referring to the
4 8 a.m. didactic presentations that you testified
5 about a few minutes ago?
6    A.    Right.  So there were the 8 a.m.
7 didactic presentations.  But in addition I was
8 also at a different institution that also had its
9 own didactics that I was required to attend.
10 Dr. Firpo had indicated to me I may attend
11 conferences as I saw fit.
12        And in my opinion, being as that I was
13 a fourth-year resident and a licensed medical
14 doctor in the State of New York, I had a good
15 inclination as to what lectures and educational
16 requirements I needed to attend to at that level
17 of training.  And I had sought out whatever
18 educational conferences I can, I had went to it,
19 as was offered within the training that was
20 provided at Mount Sinai Medical Center.
21    Q.    So is it your view, Dr. Varughese,
22 that you got to decide which lectures counted
23 towards the 80 percent requirement?
24    A.    Right.  The issue was prior, in the
25 years prior, fourth year residents rarely, if

*Computer Reporting NYC Inc.*
*(212) 986-1344*

496

Varughese

1
2 ever, attended any of these 8 a.m. didactic
3 lectures.  Year after year they are the same exact
4 lectures that are scheduled over and over again.
5        Over the course of the three, four
6 years I have been there, I attended nearly every
7 single lecture and I can honestly testify that I
8 know what the presentations were about.  I know
9 what the lectures were about.  I was very well
10 aware and well versed in those subject matters.
11    Q.    So my question is still, is it your
12 view, Dr. Varughese, you got to decide which
13 lectures did or didn't count towards the 80
14 percent requirement?
15    A.    In my view and in terms of my
16 understanding of my contract and policies, yes, as
17 a fourth-year resident I should be able to make
18 that decision.
19    Q.    So when you say that you met the 80
20 percent requirement, are you saying that you met
21 the 80 percent requirement because you went to the
22 lectures that you just described or because you
23 went to 80 percent of the 8 a.m. didactic
24 presentations?
25    A.    Right.  I'm actually saying I went to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

497

Varughese

1
2 the 8 a.m. didactic presentations.  Even though I
3 disagreed with this policy and I had some concerns
4 regarding it and it's expectations of me as a
5 fourth-year resident, I still went to the
6 lectures.
7    Q.    Was attendance taken at the lectures?
8    A.    Yes.
9    Q.    How was attendance taken?
10    A.    Well, I am not sure how the attendance
11 was taken, but I kept a note of all the lectures
12 that I attended.
13    Q.    Regardless of whatever records you
14 kept, was there a sign-in sheet that you had to
15 sign?
16    A.    Right, there usually is a sign-in
17 sheet.  I mean, being as we didn't have chief
18 residents on service for a month of so on, I'm not
19 sure exactly what happened to this sheet and what
20 was going on with that.
21    Q.    But if there was a sign-in sheet did
22 you sign it?
23    A.    Right, I would sign it, yes.
24    Q.    Let me show you another document.
25        MR. McEVOY:  Mark this as Exhibit 44.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

498

Varughese

1
2        (Defendants' Exhibit 44, series of
3 e-mails, marked for identification, this
4 date.)
5    Q.    Have you had a chance to look at that?
6    A.    Yes.
7    Q.    The first e-mail or at least the
8 earliest e-mail is from Dr. Morency to you dated
9 August 29, 2011 at 4:50 p.m.  It Basically says,
10 Unfortunately for the last block you have fallen
11 below the 80 percent required morning conference
12 attendance cutoff for Period 2.  As a result you
13 will need to prepare a presentation based on one
14 of the lectures you have missed, per the new
15 conference attendance policy.  You will be
16 scheduled to present your lecture on the topic of
17 your choice on Wednesday, September 14th at 8 a.m.
18 Thank you for your cooperation and compliance."
19        Do you see that?
20        Did you receive this e-mail,
21 Dr. Varughese?
22    A.    Yes.
23    Q.    And when you received the e-mail what
24 was your reaction to it?
25    A.    When I received it?  I don't know.  I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

499

Varughese

1
2 don't remember now.
3 **Q.** What was you relationship like with
4 Dr. Morency?
5 **A.** My impression was it was cordial.
6 **Q.** After you received this August 29th
7 e-mail did you respond to it?
8 **A.** Did I respond? It seems this appears
9 as though I have.
10 **Q.** The e-mail immediately above it is
11 from you to Dr. Morency dated September 13, 2011.
12 Did you respond to Dr. Morency either
13 by e-mail or some other way between August 29th
14 and September 13th?
15 **A.** I'm not sure.
16 **Q.** Is there some reason that you would
17 have waited two weeks to respond to her e-mail?
18 **A.** I'm not sure.
19 **Q.** Let me show you another document.
20 Don't put that one away yet. They're kind of
21 interrelated.
22 MR. McEVOY: Mark this as Defendants'
23 Exhibit 45.
24 (Defendants' Exhibit 45, series of
25 e-mails, Bates Nos. D1151 through 1154,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

500

Varughese

1
2 marked for identification, this date.)
3 **Q.** Have you had a chance to look at that?
4 **A.** Yes.
5 **Q.** At the moment, Dr. Varughese, I'm
6 interested only in the e-mail that is at the top
7 of the e-mail string. It's an e-mail from
8 Dr. Jordan to you and Dr. Firpo with copies to
9 Dr. Lento and Dr. Morency dated September 9, 2011.
10 And it says in part: "To my
11 knowledge, you have also not yet responded to
12 Dr. Morency's e-mail about the topic of your
13 presentation for this Wednesday's conference. Due
14 to your lack of response, a topic was not able to
15 be posted on the weekly schedule and residents
16 will not have time to pre-read for lecture.
17 Please respond with your lecture topic so that I
18 may e-mail the residents this weekend and those
19 who choose to do so can prepare."
20 Do you see that?
21 **A.** Yes.
22 **Q.** So on September 9th when you received
23 this e-mail from Dr. Jordan, had you e-mailed
24 Dr. Morency or anyone else regarding the topic of
25 your presentation for Wednesday the 13th?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

501

Varughese

1
2 **A.** No, first of all, it's assuming that I
3 missed 80 percent. I don't think I did. And then
4 two -- no. I did not e-mail about a topic of the
5 presentation at this time, no.
6 **Q.** Why not?
7 **A.** Because I hadn't missed 80 percent
8 required morning attendance conferences.
9 **Q.** Dr. Varughese, you were told by
10 Dr. Morency in the August 29th e-mail that you
11 had. So if you disagreed with that, if you
12 thought that was wrong, did you raise that with
13 anybody between August 29th and September 9th?
14 **A.** No, I just felt like they were
15 retaliating against me because I had taken -- I
16 did not come into work on August 29th because I
17 was out ill, and I felt this e-mail was in
18 response to the fact that I was out ill that day.
19 Not because I hadn't, you know, fallen --
20 **Q.** So Dr. Morency was retaliating
21 against you for --
22 **A.** No, I don't believe it was a
23 unilateral decision by Dr. Morency by any means.
24 **Q.** So did you feel you were sort of free
25 to ignore this e-mail?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

502

Varughese

1
2 **A.** What are you talking about?
3 **Q.** You said I didn't think I missed 80
4 percent. I didn't think I had to make a
5 presentation. I didn't respond to this e-mail. I
6 didn't submit a topic to be presented on
7 September 13th.
8 So since you didn't do any of those
9 things did you feel that you could just ignore
10 this e-mail because you didn't agree to it?
11 MR. WRONKO: Form objection. You can
12 answer.
13 **A.** Clearly I did not ignore this e-mail.
14 **Q.** What did you do to not ignore this
15 e-mail? What did you do?
16 **A.** What did I do?
17 **Q.** Yes.
18 **A.** I looked into my schedules and looked
19 at all the attendance that I attended, I mean, all
20 the conferences that I had attended, and it was
21 clear to me that I had attended at least 80
22 percent of the required didactic lectures that
23 were presented that was for my level of training,
24 and I frankly did not know what to say to this.
25 Because it was clearly a fabrication and I did not

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---