AA-108

503

Varughese

1  know how to address this at that time.
2      Q.  So you just chose to ignore it.
3          MR. WRONKO:  Form objection.
4      A.  Well, I didn't ignore it.
5      Q.  You told me that you satisfied
6  yourself that you had attended 80 percent of the
7  lectures.  But I asked you what you did to respond
8  to the e-mail from Dr. Morency and the request
9  that you submit a topic for presentation between
10 August 29th and Dr. Jordan's e-mail on
11 September 9th.
12     A.  Right.  I had spoken to Dr. Morency
13 after that.  I believe I indicated to her that I
14 had attended at least 80 percent of the
15 conferences.  And I requested the attendance sheet
16 be produced and that did not occur.
17     Q.  So I understand that you continue to
18 challenge the notion that you hadn't attended 80
19 percent of the lectures, but did you do anything
20 to comply to the request that you submit a topic
21 to be presented by you on September 13th?
22         MR. WRONKO:  Form objection.
23     A.  Right, I spoke to Dr. Morency in
24 person.

504

Varughese

1      Q.  You told me to spoke to Dr. Morency to
2  tell me that you in fact attended 80 percent of
3  the lectures and you wanted the attendance sheets,
4  et cetera, I heard you.
5      A.  Right.
6      Q.  My question is, did you do anything
7  to comply with the request that you submit a topic
8  to be presented --
9      A.  No, I did not submit a topic to be
10 presented.
11     Q.  Thank you.
12     A.  And I was not even sure what they
13 thought I missed.  Because, I mean, this is
14 completely arbitrary.  They did not even indicate
15 that I missed a particular conference at that time
16 and a lot of those conferences during that month
17 were scheduled, cancelled, reassigned, and so on
18 and so forth.  It was a completely disorganized
19 hodgepodge of conferences that month.
20     Q.  So if you go back to the
21 other document, the first document I showed you,
22 number 44, on September 13th at 9:41 in the
23 morning you sent an e-mail to Dr. Morency,
24 Dr. Lento, Dr. Jordan, Dr. Peterson, Dr. Firpo,

505

Varughese

1  that says, "I understand that I did not attend
2  every conference but I have attended conferences
3  that I thought would be useful for me on a daily
4  basis.  Also, am I the only resident who has to
5  make this presentation?  I was attending many of
6  the conferences and have noted that other
7  residents were not there when I was there.
8          "Two, I attended several conferences
9  that were valuable and useful to me and would like
10 to count them.  I spoke to Dr. Firpo regarding
11 this matter and he said it would be fine for
12 me [to] -- I inserted the word "to" -- to "attend
13 alternate educational conferences.  In fact, I
14 would like to request for someone, perhaps
15 Ms. Carter, to have an updated hospital wide
16 conference list for all available daily
17 conferences including tumor board.
18         "Finally, I am happy to present a
19 conference or lecture on cytology review tomorrow.
20 It will be hodgepodge of all the lectures that I
21 missed from cytology."
22         That's the e-mail, correct?
23     A.  Correct.
24     Q.  And so Dr. Varughese, why did you send

506

Varughese

1  an e-mail to Dr. Morency and others the day before
2  your presentation was due offering to present a
3  hodgepodge of all the lectures that you missed
4  from cytology?
5      A.  Because I kept receiving e-mails
6  saying that you'd better present at conference or
7  you'd better present a lecture.  I just felt
8  lectured all the time and I felt like I was being
9  threatened nonstop.
10     Q.  Dr. Varughese, let me stop you one
11 second.
12     A.  And I felt like I had no choice --
13     Q.  OK, I'm sorry.  Go ahead.
14     A.  -- but to present a lecture or that
15 some action was going to be taken against me.  It
16 would just become a nuisance and headache to me.
17 I just thought even if I disagreed with them the
18 best way to appease the situation was to do
19 whatever I had to do.  Because it was this
20 constant abuse directed at me.
21         I just could not like just do my work
22 with the sense of being able to just do my work.
23 It was this constant like, you know, requirements
24 placed on me that seemed really extraordinary to

507

Varughese

2  me.
3      Q.   I have seen an e-mail dated August 29th
4  from Dr. Morency to you that we discussed and I've
   seen an e-mail on September 9th from Dr. Jordan to
6  you that I've discussed.  There have been probably
7  well over 4,000 pages of documents produced in
8  this case.  These are the only two e-mails I have
9  seen to you from anyone asking you to present on
10  September 14th.
11          Are you aware any other e-mails other
12  than these two asking you to make a presentation
13  on September 14th?
14          MR. WRONKO:  Form objection.  You can
15      answer.
16      A.   Yes.  In fact, there were numerous
17  e-mails about asking me to present.
18      Q.   And where might those e-mails be?
19      A.   Well, I would like to know why those
20  weren't produced.
21      Q.   Maybe because they don't exist.
22          MR. WRONKO:  Form objection.
23      Q.   It wasn't really a question.  All
24  right, Dr. Varughese --
25      A.   No, that's not really necessary.  You
            *Computer Reporting NYC Inc.*
                *(212) 986-1344*

508

Varughese

2  don't know what exists or doesn't exist.
3      Q.   That's why I said maybe it doesn't
4  exist.
5      A.   OK, good.
6      Q.   You offered to present a --
7          MR. McEVOY:  Is there something you
8      want to say?
9          MR. WRONKO:  I repeat what I had said
10      during the second day.  Let's try to on both
11      sides keep the editorial comments to a
12      minimum and let's get back to question and
13      answer.
14      Q.   So did you think, Dr. Varughese, that
15  offering to present a hodgepodge of the lectures
16  you missed was an appropriate response to the
17  request that you present a lecture on a topic that
18  you had missed?
19      A.   Well, at that time I was willing to
20  say anything to subdue this or avoid this madness
21  it seemed.  So I felt like I had to do whatever it
22  took to prevent the continued claims and
   harassment.  I mean, that's what I was dealing
24  with.
25          I did not have to do anything for them
            *Computer Reporting NYC Inc.*
                *(212) 986-1344*

509

Varughese

2  to find something, find me at fault for something.
3  It just seemed as if they were looking for
4  anything.  It was a constant witch hunt it seemed.
5      Q.   What lectures had you missed from
6  cytology?
7      A.   I don't know.  I mean, frankly, I had
8  attended a lot of these conferences.  It's not as
9  if....
10      Q.   You say in your e-mail that the
11  lecture or conference that you were willing to
12  present or happy to present, quote, will be a
13  hodgepodge of all the lectures that I missed from
14  cytology.
15          So since you wrote it, what lectures
16  were you referring to that you missed?
17      A.   I don't know.  Adrienne Jordan had
18  sent an e-mail saying that I had missed some
19  cytology lectures and I assumed -- I don't know
20  where that e-mail is, it's not here in this
21  string, but it does exist.  And so, you know, I
22  just thought perhaps I could do something along
23  those lines.
24      Q.   Prior to your e-mail that we were just
25  looking at dated September 13th had you e-mailed
            *Computer Reporting NYC Inc.*
                *(212) 986-1344*

510

Varughese

2  or communicated any topic or subject that you were
3  prepared to present on?
4      A.   Sorry, can you repeat that question?
5      Q.   Sure.  On September 13th you said you
6  would present on the cytology lectures you had
7  missed.  Prior to September 13th had you had any
8  communication with Dr. Jordan about topics for a
9  presentation?
10      A.   No, I did not.  She claims in this
11  e-mail that I have not given her a topic and she
12  cannot post the topic.
13      Q.   That's on September 9th, right?
14      A.   Right.  So I had not contacted her
15  regarding any of that.
16      Q.   But between September 9th and
17  September 13th did you have any contact with her
18  on this topic?
19      A.   On this topic?  No.
20      Q.   Let me show you a document.
21      A.   At least that's what I believe.  I'm
22  not sure.  Let's see.
23          MR. McEVOY:  Mark this as Exhibit 46.
24          (Defendants' Exhibit 46, e-mail string
25      between Adrienne Jordan and Leena Varughese,
            *Computer Reporting NYC Inc.*
                *(212) 986-1344*

511

Varughese

1
2 dated September 12, 2011, Bates Nos. D1378
3 and 1379, marked for identification, this
4 date.)
5  **Q.** Have you had a chance to look at that?
6  **A.** Correct.
7  **Q.** The first e-mail is from Dr. Jordan to
8 you dated September 12th at 3:20 and it says
9 "Dr. Varughese." It's addressed to you rather,
10 and one of the issues addressed in the e-mail is:
11 "What is your topic for Wednesday conference? I
12 now, in addition to residents asking, "It's going to be
13 attendings asking as well. We must have this
14 information today."
15      Do you see that?
16  **A.** Correct.
17  **Q.** Did you get that e-mail from
18 Dr. Jordan?
19  **A.** Yes.
20  **Q.** So I stand corrected, there were three
21 e-mails, not two. And the response on the next
22 page, an e-mail from you, says, "It's going to be
23 review on grossing of several different types of
24 specimens of interest to me and gross pictures of
25 common malignancies. That is the lecture I am

*Computer Reporting NYC Inc.*
*(212) 986-1344*

512

Varughese

1
2 interested in presenting."
3  **A.** Yes.
4  **Q.** Did you send that e-mail to
5 Dr. Jordan?
6  **A.** Right, I sent it to everybody, I
7 believe.
8  **Q.** And then Dr. Jordan e-mails you back
9 and says, "This is not an appropriate lecture
10 topic. We have had 8 grossing lectures already
11 where this topic was discussed in great detail.
12 Additionally, the attendings are covering this
13 during their normal histology lectures. Lastly,
14 the policy states you must give a lecture on a
15 topic that you missed. I have taken the liberty
16 of looking at your absences and these are the
17 areas that you missed." And then she lists one,
18 two, three, four, five areas.
19      "Additionally you missed several
20 autopsy conferences. Several suggestions for
21 topics I have for you are," and then she makes
22 several suggestions. "I am sorry that you have to
23 create another presentation, but this is why
24 Dr. Morency and I asked you several weeks ago your
25 topic."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

513

Varughese

1
2  Do you see that?
3  **A.** Correct.
4  **Q.** So when you got this e-mail from
5 Dr. Jordan what was your reaction to her and
6 Dr. Morency's rejection of the topic you had
7 proposed and asking you to present on something
8 else?
9  **A.** I don't remember what my reaction was.
10  **Q.** And then the e-mail that we just
11 looked at that you sent the next day, on
12 September 13th at 9:41, we've already talked
13 about, but when Dr. Jordan says at 3:20 in the
14 afternoon on Monday, September 12th, that they
15 need the information on your topic today -- never
16 mind, strike that. OK.
17      Did you select one of the topics for
18 presentation that Dr. Jordan had suggested in her
19 e-mail?
20  **A.** Did I? I think I tried to select one,
21 which is a hodgepodge on cytology review. Because
22 the claim was that I missed all the cytology
23 lectures.
24  **Q.** So if we go back to Dr. Jordan's
25 e-mail, correct me if I'm wrong, the three

*Computer Reporting NYC Inc.*
*(212) 986-1344*

514

Varughese

1
2 cytology topics that she suggests are cytology GYN
3 infections, cytology GYN dysplasia and cytology
4 squamous cell carcinoma. Correct?
5  **A.** Correct.
6      MR. McEVOY: Let's take a five-minute
7  break.
8      (A recess was taken from 11:40 a.m. to
9  11:51 a.m.)
10 BY MR. McEVOY:
11  **Q.** Dr. Varughese, what did you need to
12 prepare for this presentation that you offered to
13 make on September 13th?
14      MR. WRONKO: Form objection. You can
15  answer.
16  **A.** Well, the presentation was supposed to
17 be for September 14th, I believe, and --
18  **Q.** You are correct. What did you need to
19 do to prepare --
20  **A.** Right, so I needed to obtain some
21 cytology images or whatever images. I had to get
22 images that correlated with the cytology or with
23 the pathology finding and have a discussion on the
24 findings. That's essentially what pathology is.
25  **Q.** Did you think you had enough time

*Computer Reporting NYC Inc.*
*(212) 986-1344*

519

Varughese

2     Q.   So when you said you didn't feel well,
3 is that what you meant, what you just said, you
4 were afraid to go and present the lecture?
5     A.   No, that's not, I mean, I wasn't
6 feeling well. That's a different story, but....
7     Q.   Then it says: "As you well know, I'm
8 not qualified to give any real core lectures as
9 such because I am a resident in training."
10       What did you mean by that?
11     A.   What did I mean by that? I don't
12 know. I mean, it just means that I'm not an
13 attending pathologist at this point. I'm
14 basically learning along with everybody else and I
15 -- I don't know. I think that's essentially what
16 I was trying to convey.
17     Q.   And then it says: "What happened to
18 the cytology lecture that should be scheduled for
19 tomorrow?"
20     A.   Correct.
21     Q.   What cytology lecture are you
22 referring to?
23     A.   Usually it's Wednesday mornings that
24 are scheduled for cytology conferences, which are
25 cytology didactic lectures that are usually

*Computer Reporting NYC Inc.*
*(212) 986-1344*

520

Varughese

2 presented by the cytology fellow. I mean, I don't
3 know why that was being ignored and a lecture
4 wasn't scheduled at that time.
5     Q.   Did you come to work on September 14th?
6     A.   13th, 14th, no, I didn't.
7     Q.   The next e-mail in this string is from
8 Dr. Jordan to you, Dr. Peterson, Dr. Firpo,
9 Ms. Carter, Dr. Morency at 2:02 on the afternoon
10 of September 13th, which says simply: "Leena will
11 be out sick tomorrow. Please see her e-mail
12 below."
13     A.   Right.
14     Q.   That then results or that e-mail
15 results in your sending an e-mail to Dr. Jordan
16 that evening at 8:56 and Dr. Jordan responding to
17 your e-mail about an hour and a half or so later.
18       Why did you respond to Dr. Jordan's
19 e-mail? Why did you say what you said? Rather
20 than go through this line by line, just tell me,
21 Dr. Varughese, how you reacted to Dr. Jordan's
22 e-mail and why you sent the e-mail you sent.
23       MR. WRONKO: Form objection. You can
24 answer.
25     A.   Why did I -- first of all, I never

*Computer Reporting NYC Inc.*
*(212) 986-1344*

521

Varughese

2 said I was going to be out sick tomorrow. I mean,
3 this is Tuesday, September 13th at 2:02 p.m. I
4 never claimed I wasn't going to come to work. I
5 said I don't feel like I should do this
6 conference. I'm just expressing that I don't feel
7 well. I don't know if I'm going to be able to do
8 this presentation for tomorrow. I mean, that's
9 really all I'm saying here. I didn't say I was
10 going to be out sick tomorrow.
11       Adrienne Jordan goes out of her way to
12 make this decision for me and says that I'm going
13 to be out sick the next day. Based on what? I'm
14 not sure. She has her own imaginings about what
15 I'm saying and she tends to make these decisions.
16 I don't know if she's making the decisions or
17 Dr. Lento is. I'm not sure.
18       But the fact of the matter is, I
19 didn't call out sick. But she states that I'm
20 calling out sick and she writes to the program
21 coordinator Allene Carter stating as such.
22     Q.   So in response to that you send an
23 e-mail and in that e-mail you say, after you say,
24 Why are you stating I will be calling out
25 tomorrow? Two, you weren't here for period 2,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

522

Varughese

2 which means as the chief resident in service you
3 were not available to the residents who may need
4 you for any reason."
5       And I take it this is the time that
6 Dr. Jordan was on the away rotation?
7     A.   Correct, she was in Pennsylvania
8 somewhere without a working pager or cell phone or
9 e-mail, and so on, for a month.
10     Q.   When you say that because you weren't
11 here as the chief resident "you were not available
12 to the residents who may need you for any reason,"
13 was that because she didn't have a pager or
14 working cell phone?
15     A.   Correct, I mean, she wasn't also on
16 site. Coverage for absent residents, and so on,
17 it is sort of the duty of the chief resident to
18 step in and cover.
19       Frankly, if I was given chief resident
20 position my fourth year that's what I would do.
21 If a resident wasn't there and I could not find
22 somebody else to cover, I would probably end up
23 doing the work. I mean, I do get paid extra, you
24 get paid extra. That's the kind of stuff you have
25 to do when you're a chief resident. That's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

535

Varughese

1 wrote it. Was it your intention or your
2 suggestion that you not have to deal with
3 Dr. Jordan going forward, that you deal directly
4 with Dr. Firpo?
5          A.   Right, I wanted to deal with just, you
6 know, because I'm getting bombarded by these
7 e-mails. She is here calling out sick for me even
8 though she has no idea whether or not I'm going to
9 be out sick or not the next day. I mean, she is
10 overstepping her boundaries.
11         Frankly, like this is not a decision
12 for her to make. She's a third-year resident who
13 for some reason was made chief resident. It is
14 beyond me why. And then she goes on to like I
15 felt constantly berate me, intimidate me, be
16 malicious towards me. And I was frankly becoming
17 afraid to be at work and be around her.
18         I mean, this goes to hemepath. When
19 I'm there she will go out of her way to pick up
20 paperwork or my cases and say, This is yours. Do
21 you realize this is yours? What are you doing?
22         Like, would you stop? Like I'm doing
23 my work. I'm perfectly capable of getting
24 whatever paperwork, and so on, that I need. I'm

*Computer Reporting NYC Inc.*
*(212) 986-1344*

536

Varughese

1 getting my work done. But she was imposing
2 herself on me at work.
3          Q.   So your preference was to deal with
4 Dr. Firpo.
5          A.   Well, I did not have many choices. If
6 I went to the GME, Graduate Medical Education,
7 they would say, Well, you have to work with
8 Dr. Firpo. You have to make things work with him.
9 It's between you and him and this program.
10         It was a very bad situation for me. I
11 mean, they put me on all these disciplinary
12 actions, and so on and so forth. And they put me
13 in a very bad situation where I did not have a lot
14 of options and I could not appeal even in a
15 logical manner or in a reasonable manner to the
16 powers that be and get some results.
17         Q.   So I think you testified,
18 Dr. Varughese, that you did not come to work on
19 September 14th, correct?
20         A.   Correct.
21         Q.   Now, with regard to the presentation
22 that you were supposed to make, was that
23 presentation rescheduled for September 15th?
24         A.   Correct, I was told on the 14th that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

537

Varughese

1 it would be rescheduled for the following day, on
2 the 15th.
3          Q.   Who told you that?
4          A.   I believe this e-mail, this
5 September 13th e-mail.
6          Q.   Let's look. In the e-mail that
7 Dr. Jordan sent to you on September 13th at 10:38
8 p.m. responding to the e-mail that, your e-mail
9 that we were just discussing, in number 10 of that
10 e-mail she says: "Your lecture is rescheduled for
11 this Thursday morning." Correct?
12         A.   Right.
13         Q.   And so did you present the lecture,
14 make the presentation rather, on September 15th?
15         A.   September 15th, no, I did not. I did
16 not make the presentation on September 15th.
17         Q.   Why not?
18         A.   Why not? It was still not adequate
19 time for me to present, one. Two, I felt like I
20 was being continued to be targeted. It was
21 illogical to really reassign a presentation from
22 Wednesday to Thursday when in fact there was a
23 person who was already scheduled to present on
24 Thursday morning, which was Robert Guarino, a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

538

Varughese

1 white male.
2          And guess what? No actions was taken
3 against him when he cancelled the presentation.
4 Apparently he was allowed to cancel his
5 presentation on Tuesday at 10:30 p.m. it seems.
6          Q.   How do you know that?
7          A.   That's what it says here. Because as
8 of Monday morning he was still scheduled to
9 present on Thursday. And as of Tuesday he is no
10 longer presenting and I'm supposed to make a
11 presentation at this grand rounds no less of
12 pathology, and grand rounds according to
13 Dr. Lento's own words.
14         I mean, I don't know if that's to
15 humiliate me. It seems like it was to humiliate
16 me, that they want to reassign this presentation
17 for me on Thursday when it's a grand rounds
18 quality presentation.
19         Q.   Did you communicate to anybody after
20 you got Dr. Jordan's e-mail that you would be
21 unable to present on September 15th?
22         A.   Did I communicate to anybody? Well,
23 don't know when I got this e-mail. I may have
24 gotten this at some point later.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**539**

Varughese

2  Q.  Did you get it, Dr. Varughese,
3  sometime before September 15th?
4  A.  Right.  I may have gotten it.  I'm not
5  sure now.  The thing is I -- ah, just scratch
6  that.
7  Q.  So my question is, did you communicate
8  with anybody about the fact that you would be
9  unable to present on September 15th?
10  A.  Did I communicate with anybody?  I am
11  not sure.
12  Q.  You said that a Dr. Guarino was also
13  scheduled to present.
14  A.  Yes.
15  Q.  And that that presentation was
16  cancelled?
17  A.  Correct.
18  Q.  Do you know why it was cancelled?
19  A.  I do not know, because how would I
20  know?  I'm not privy to that information.
21  Q.  But when you arrived at work, and were
22  you at work on September 15th?
23  A.  Right, I did arrive at work on
24  September 15th and I went to the conference that
25  was being held and I saw Dr. Guarino there.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**540**

Varughese

2  Q.  When you went to the conference, did
3  you know -- you knew that you were supposed to
4  present at the conference; is that right?
5  A.  I am not sure if I knew at that point.
6  Q.  What happened at the conference?
7  A.  What happened?  Nothing happened.  I
8  went to the conference.  I heard Dr. Jeremy
9  Clapper give his presentation.
10  Q.  Did you stay for the whole conference?
11  A.  Right.  I had to run to the bathroom,
12  so I left.  Because I had a stomach virus.
13  Q.  So does that mean you did or didn't
14  stay for the whole conference?
15  A.  Well, I had to leave because I had to
16  run to the bathroom.
17  Q.  Once you left to go to the bathroom
18  did you come back?
19  A.  Did I come back?  I did, but there was
20  no one in the conference room at that time.
21  Q.  So the conference was over.
22  Presumably.
23  A.  I presume it was over at that time,
24  yes.
25  Q.  Now, on September 15th, Dr. Varughese,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**541**

Varughese

2  after you left the conference that morning, did
3  you remain at work for the rest of the day?
4  A.  Yes.
5  Q.  And during the day did you see and
6  speak to Dr. Firpo?
7  A.  Right.  I did speak to him because he
8  came to my desk.
9  Q.  And what time did he come to your
10  desk?
11  A.  I don't recall now.
12  Q.  When he came to your desk was anyone
13  else present other than you and Dr. Firpo?
14  A.  I don't recall right now.
15  Q.  When he came to your desk, what, if
16  anything, did Dr. Firpo say to you?
17  A.  What did he say to me?  I just
18  remember him saying that Dr. Jordan or somebody
19  was very upset and he wanted to know what was
20  going on.
21  And I said, Well, this is what's going
22  on.  I'm here.  I wasn't feeling well and now I'm
23  feeling a little better.  So, you know, work.
24  That's what I said.
25  Q.  Did you tell Dr. Firpo that you didn't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**542**

Varughese

2  make the presentation because you were unwell,
3  unable to fulfill your duties and you needed to
4  take a leave of absence?
5  A.  No, that's not what I said.  I felt
6  that I was being harassed and antagonized
7  and intimidated by my coworker who seems to have a
8  free pass to say or do whatever she wanted, and I
9  felt it was the program director who was also
10  condoning these actions and I felt harassed.
11  That's what I told him.
12  Q.  Did you say anything to Dr. Firpo
13  during this meeting about that you needed to take
14  a leave of absence?
15  A.  Yes, I said I would like to consider
16  taking a leave of absence from FMLA if it can
17  be approved by my treating physician.
18  Q.  What did Dr. Firpo say about that?
19  A.  He said that's something I have to go
20  through a request from I believe it's HR or
21  administration and get the form.
22  Q.  And that same day, September 15th, did
23  you meet with Dr. Firpo again?
24  A.  I believe I spoke to him again, yes.
25  I think I did.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

543

Varughese

2    **Q.**   When did you speak to Dr. Firpo the
3 second time on September 15th?
4    **A.**   Well, I believe Shema Patel had
5 arrived at that time and it was with Shema Patel.
6    **Q.**   You said the first meeting was at your
7 desk because he approached you.
8    **A.**   Right, it's like a common area. There
9 are about twenty plus, 23 desks, I don't know.
10 Maybe even 30 desks. It is a very common area.
11 Anybody can hear the conversation.
12    **Q.**   And the second conversation that you
13 said you had with Dr. Firpo, now I gather
14 Ms. Patel was present. Where was that
15 conversation?
16    **A.**   That was also in the same area.
17    **Q.**   During the second conversation with
18 Dr. Firpo and Ms. Patel how long after the first
19 discussion was the second discussion?
20    **A.**   I believe not long after. Maybe half
21 an hour, 40 minutes or so.
22    **Q.**   What happened during the second
23 conversation with Dr. Firpo and now Ms. Patel?
24 What did you say, what did they say?
25    **A.**   I didn't -- I don't think I said that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

544

Varughese

2 much. I just said, you know, I'd like to take
3 this leave as I had requested and I needed to
4 speak to my physicians and I need some forms to
5 fill out.
6    **Q.**   At this meeting did Ms. Patel give you
7 the paperwork that you needed to complete?
8    **A.**   No, she did not.
9    **Q.**   Did you ever get the paperwork you
10 needed to complete from anyone at Mount Sinai?
11    **A.**   That afternoon Shema Patel delivered
12 some paperwork to me.
13    **Q.**   And was that paperwork paperwork that
14 needed to be completed in connection with your
15 request to take an FMLA leave?
16    **A.**   Right, it was in connection with FMLA.
17    **Q.**   I will show you a document.
18    MR. McEVOY: Mark this is as Exhibit
19 47.
20    (Defendants' Exhibit 47, e-mail dated
21 September 15, 2011, from Adolfo Firpo to
22 Dr. Varughese, Bates No. P426, marked for
23 identification, this date.)
24    **Q.**   Have you had a chance to look at that?
25    **A.**   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

545

Varughese

2    **Q.**   Do you recognize it?
3    **A.**   Right.
4    **Q.**   Tell me what it is.
5    **A.**   It's an e-mail to myself from Adolfo
6 Firpo.
7    **Q.**   Did you receive this e-mail?
8    **A.**   Yes.
9    **Q.**   And what was your reaction to this
10 e-mail?
11    **A.**   I don't know what my reaction to this
12 e-mail was now.
13    **Q.**   Well, it says in here that "I am glad
14 you felt well enough to come to work today. I am
15 also very glad we had an opportunity to discuss
16 your concerns openly and with candor. I was
17 delighted to hear that you had decided to request
18 a leave of absence from the program as I myself
19 had become concerned over the obvious high stress
20 levels that you are experiencing.
21    "As I promised to do, I discussed your
22 concerns with Ms. Patel and we together consulted
23 Ms. Tiger-Paillex at the HR office, Dr. Scott
24 Barnett and [Mr.] Paul [Johnson] of the GME
25 office, to find information about the appropriate

*Computer Reporting NYC Inc.*
*(212) 986-1344*

546

Varughese

2 process to follow.
3    "I reiterate to you that everyone's
4 primary concern in our Department and at Mount
5 Sinai is your well-being and health. We wish you
6 well. Ms. Patel obtained the information packet
7 to apply for the leave of absence and she will be
8 happy to go over it with you at your convenience.
9 We also talked with Dr. Bruce Petersen, you[r]
10 faculty mentor and current rotation supervisor at
11 hematopathology who also expressed his concern and
12 willingness to excuse from the rotation for health
13 reasons. I am sorry you could not get an
14 appointment with your physician sooner than next
15 week since your health is paramount to all of us.
16 Please meet with Dr. Petersen and discuss this
17 situation candidly. As your Advisor he should be
18 able to provide valuable counsel and guidance at
19 this difficult and stressful time. As you asked
20 of me I will wait to instruct the chief residents
21 to remove [you from] the rotation schedule until
22 you obtain and provide your doctor's note.
23 Please, keep in mind that you may be excused from
24 your duties at any time you feel it necessary for
25 your health and well-being, please keep

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-115

547

Varughese

2 Dr. Petersen informed of your activities and
3 decisions so he may make the necessary adjustments
4 in his service responsibilities.
5         "Please take care of yourself and be
6 well." Signed by Dr. Firpo.
7         MR. WRONKO: I want to note for the
8    record that counsel adjusted the reading to
9    make everything grammatically correct.
10        MR. McEVOY: I did.
11        MR. WRONKO: There are some typos.
12        MR. McEVOY: There are. Mr. Johnson
13    is Ms. Johston for example. You are
14    correct, I did.
15        Q.    So Dr. Varughese, when you received
16 this from Dr. Firpo did you think he was being
17 sincere in his expressed concern for you?
18        A.    Did I? I don't know if I thought
19 that.
20        Q.    On September 15th when you had these
21 two conversations with Dr. Firpo and then one with
22 Ms. Patel did Dr. Firpo change or adjust your
23 responsibilities that day?
24        A.    Dr. Firpo?
25        Q.    Yes.

Computer Reporting NYC Inc.
(212) 986-1344

548

Varughese

2        A.    No.
3        Q.    Did anyone?
4        A.    No.
5        Q.    Did Dr. Firpo tell you during either
6 of those conversations that he didn't want you to
7 come to work until you had resolved the issues
8 regarding your request for a leave?
9        A.    No.
10        Q.    Did Dr. Firpo tell you either during
11 one of these discussions or in this e-mail that
12 you could be excused from your duties if you so
13 wanted, if you requested?
14        A.    He may have expressed that I can be
15 excused if I wanted to be.
16        Q.    Did you indicate or say to Dr. Firpo
17 whether you wanted to be excused or whether you
18 wanted to continue to work?
19        A.    I did not express any such, any
20 affirmative or negative response to any of those
21 questions.
22        Q.    Did you make a doctor's appointment to
23 seek certification for your FMLA leave?
24        A.    Did I seek a doctor's? Yes, I did, I
25 did speak to my treating physicians, right.

Computer Reporting NYC Inc.
(212) 986-1344

549

Varughese

2        Well, anyway, that's assuming this
3 FMLA leave is for myself. At this point all that
4 was not very clear.
5        Q.    Dr. Varughese, you said you wanted to
6 take a leave.
7        A.    Right. It could be for myself or
8 somebody else.
9        Q.    Were you seeking, did you express an
10 interest in taking a leave for somebody else?
11        A.    I didn't make any specific --
12        Q.    I understand that. I'm asking you
13 now --
14        A.    -- reasons for my request at that
15 time.
16        Q.    I understand that. I understand
17 that's what you said. When you asked Dr. Firpo or
18 told Dr. Firpo that you wanted to take a FMLA
19 leave, was the leave intended for you or for
20 someone else regardless of what you said to
21 Dr. Firpo?
22        A.    Well, now I can tell you that the
23 leave was intended for me, for some personal FMLA.
24        Q.    And that was your intent back in
25 September of 2012, to take a leave for you.

Computer Reporting NYC Inc.
(212) 986-1344

550

Varughese

2        A.    Correct, which Adolfo Firpo did not
3 really know of, right? Because it is my --
4        Q.    Only Dr. Firpo can tell you what he
5 knew or didn't know.
6        A.    Well, he would only know what I told
7 him also, so....
8        MR. WRONKO: Wait.
9        Q.    Let's go back to the questions and
10 answers. You made an appointment you said with
11 your treating physicians.
12        Did you make an appointment with one
13 doctor or more than one doctor?
14        A.    Well, I made an appointment with at
15 least two doctors.
16        Q.    Were they both medical doctors or was
17 one a psychiatrist?
18        A.    Right, they are both medical doctors
19 and my one appointment I could not keep with my
20 medical doctor because we could not be -- we had
21 some concerns and the second doctor I could not
22 meet with until the following week.
23        Q.    When you say you couldn't keep your
24 appointment because we had some concerns, what
25 concerns are you talking about?

Computer Reporting NYC Inc.
(212) 986-1344

555

Varughese

1  did not occur.
3      Q.    Because you were terminated before you
could make the appointment.
6      A.    Correct.
6      Q.    Did you ever obtain medical
7  certification for FMLA leave?
8          MR. WRONKO: Form objection.
9      A.    Excuse me?
10     Q.    Did you ever obtain medical
11 certification for an FMLA leave in September of
12 2011?
13     A.    I was terminated before I could
14 completely follow up on my FMLA leave request.
15     Q.    Did anybody at Mount Sinai offer to
16 make a doctor's appointment for you with a
17 physician who could provide medical certification?
18     A.    No.
19     Q.    I will show you another document.
20         MR. McEVOY: Mark this as Exhibit 48.
21         (Defendants' Exhibit 48, e-mail dated
22 September 16, 2011, from Adolfo Firpo to
23 Leena Varughese, Bates Nos. D934 and 935,
24 marked for identification, this date.)
25     Q.    Have you had a chance to look at that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

556

Varughese

2      A.    Correct.
3      Q.    This is an e-mail from Dr. Firpo to
4  you, copied to several other people, dated
5  September 16, 2011, correct?
6      A.    Yes.
7      Q.    Finish reading.  Let me know when
8  you're done.
9      A.    OK.
10     Q.    This e-mail says a number of things,
11 but the thing that I want to direct your attention
12 to is towards the bottom of the first page.
13 The last little sentence says:  "I
14 must also ask you not to return without the
15 doctor's note and assessment for the leave of
16 absence."
17         Do you see that?
18     A.    Right.
19     Q.    And the doctor's note that Dr. Firpo
20 is referring to is mentioned in the sentence that
21 says, the second sentence of that paragraph that
22 says:  "The fact is that you are required to
provide proof of illness for the absences of
24 Monday and Tuesday since they prevented you" --
25 again, it says "form," it should be from -- from

*Computer Reporting NYC Inc.*
*(212) 986-1344*

557

Varughese

1  "fulfilling a professional and academic
2  responsibility of the residency program."
4          The next sentence says:  "You must
5  also provide a medical note to proceed with the
6  application for leave of absence you are
7  requesting."
8          Do you see that?
9          So Dr. Varughese, in this e-mail did
10 you understand that Dr. Firpo was telling you not
11 to come to work until you had provided the note
12 for your absence and completed the paperwork
13 necessary for the FMLA?
14     A.    Right, this is an e-mail that is sent
15 to me at noontime on Friday after I had already
16 showed up to work saying that I should not be
17 there.  It seemed really outrageous.  I don't know
18 where it's coming from.  It just seemed it's the
19 institution's determination to retaliate against
20 me.
21     Q.    Regardless of how you interpret it,
22 the motive behind it --
23     A.    It didn't make any sense to me on its
24 face.
25     Q.    What doesn't make sense to you,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

558

Varughese

2  Dr. Varughese, when your boss basically says don't
3  come back to work without a doctor's note or an
4  assessment for your leave of absence?  What
5  doesn't make sense to you?
6      A.    Well, it doesn't make any sense
7  because, first, I was already at work on Thursday.
8  There weren't any issues.  I don't know what
9  the performance expectations are of the chief
10 resident, but in terms of my performance it was
11 quite adequate.  I worked with Dr. Petersen who is
12 my mentor and advisor and I did not have any
13 problems.  I worked with Dr. Strauchen as well.
14 We did not have any issues.
15         It seems as if this is a fabrication
16 by Adolfo Firpo and the leadership of the hospital
17 to insinuate such defamatory statements and state
18 that I should not, you know, be at work, and also
19 the hospital policy technically is how -- you have
20 to explain your leave, you know, absence if you
21 are out for three days or if you miss a call
22 assignment.
23         So I don't know, I mean, given that
24 I'd spoken to Dr. Firpo the day before, he had
25 already sent me an e-mail that was put in as

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-117

559

Varughese

1  Exhibit 47, you know, it just seemed sort of at
2  odds with what he was saying to me from the day
3  before to the following day.
4       Q.    If you look at the first sentence of
5  that last paragraph it says: "After our last
6  encounter yesterday afternoon I followed up
7  with" -- again, it should be GME, not GEM -- "the
8  [GME] office about your situation and asked for
9  guidance on the best way to proceed in conformity
10 with federal laws, programmatic and institutional
11 regulations."
12      Do you see that?
13      A.    Correct.
14      Q.    Regardless of what Dr. Firpo did or
15 didn't say to you when you spoke to him on the
16 15th, he is saying here that after you met and
17 spoke he talked to the people in the GME office,
18 right?
19      A.    Right, that implicates them as being
20 involved in this.
21      Q.    Clearly they are involved in it. So
22 do you understand, Dr. Varughese, that Dr. Firpo
23 is saying something different than you say he said
24 the day before because he spoke to people who gave

*Computer Reporting NYC Inc.*
*(212) 986-1344*

560

Varughese

1  him guidance as to what should happen going
2  forward?
3       MR. WRONKO:  Form objection.
4       A.    I don't know if that's really what
5  he's saying.
6       Q.    What don't you understand about "I
7  followed up with the [GME] office about your
8  situation and asked for guidance on the best way
9  to proceed"?  What's unclear to you about those
10 words?
11      MR. WRONKO:  Form objection.
12      A.    He is just merely saying that -- what
13 is he saying?  He is merely saying that he
14 inquired with the GME office.  Then he is claiming
15 that I was absent on Monday and Tuesday, which was
16 clearly false because I was present at work on
17 Monday and absent Tuesday and Wednesday.
18      Q.    So he's mistaken about the days of the
19 week, but not --
20      A.    Correct.  And then --
21      Q.    Let me finish.  -- but not the number
22 of days you were absent, correct?
23      A.    Well, if he doesn't claim the number
24 of days here --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

561

Varughese

1       Q.    Monday and Tuesday is two.  Would you
2  agree with me about that?
3       A.    Yes, it is two.
4       Q.    And Tuesday and Wednesday is two?
5       A.    Yes, I agree with that too.
6       Q.    I'm glad we agree about something.  So
7  going back to this, OK?  I'm trying to understand,
8  Dr. Varughese, what your perception of your role
9  is and the role of the people who are above you in
10 the program.
11      Dr. Firpo told you in this e-mail
12 pretty clear, I think, "I must also ask you not to
13 return without the doctor's note and assessment
14 for the leave of absence."
15      Now, leaving aside whether you
16 interpreted that to mean whether you should leave
17 on the 16th, did you leave work on the 16th after
18 you got this e-mail --
19      A.    No.
20      Q.    -- at 11:20?  OK.
21      Did you work on Saturday and Sunday?
22      A.    No, I was not on call, so no.
23      Q.    So your next day of work would have
24 been Monday, the 19th?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

562

Varughese

1       A.    Correct.
2       Q.    And then I take it you would have
3  worked Monday, Tuesday, Wednesday, Thursday,
4  Friday of the following week, that was your
5  schedule?
6       A.    Correct.  And I was working with Bruce
7  Petersen who was also cc'd on this e-mail and he
8  did not say that I should not be here nor do my
9  work.  He said he was overseeing my duties and my
10 responsibilities and he was perfectly fine with me
11 working with him.  He did not say I was having a
12 conniption fit, I was not throwing tantrums or
13 whatever.  I don't know what the claim is here.
14 It's illogical.
15      Q.    One of the heads of the pathology
16 department, right?  Dr. Firpo, we talked about his
17 title, right?  You are a resident in the pathology
18 department.  Dr. Firpo told you don't come back to
19 work until you bring a doctor's note and until you
20 bring in the note regarding your leave of absence,
21 right?
22      Did you feel that you could just
23 disregard what he said and come to work anyway?
24      MR. WRONKO:  Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

563

Varughese

1
2      A.    I felt that he was treating me
3  differently from others in the program and he was
4  stipulating to me that I do something that was not
5  regularly done, and I was concerned and
6  Dr. Petersen was also concerned, and we had a
7  discussion regarding this e-mail.
8      Q.    I'll get to that in a second.  So I
9  accept that you felt about it how you say you felt
10  about it, but that's not my question.
11      A.    Which my mentor agreed about.
12      Q.    Well, we'll get to that.  My question
13  is, did you feel that you could disregard
14  Dr. Firpo's direction not to return to work
15  because you disagreed with it or felt that it was
16  unfair in some way?
17          MR. WRONKO:  Form objection.  You can
18  answer.
19      A.    Did I feel like I can disregard
20  Dr. Firpo's e-mails?
21      Q.    Not his e-mails, his instruction to
22  you to not to return to work without the doctors'
23  notes that he mentions.
24      A.    Right.  Because it was completely
25  opposite of the day before and I did not know what

Computer Reporting NYC Inc.
(212) 986-1344

564

Varughese

1  the -- what the issue was here.  It was not really
2  being explained to me.  You know, if -- I mean, I
3  don't know why he was insisting that I should not
4  be at work.  It seems very irregular.
5
6      Q.    Whether it was irregular, whether you
7  understood why, I take it you understood that he
8  told you not to come back to work.
9      A.    Well, I'm a contracted employee.  He
10  has to provide me with a logical explanation as to
11  why.
12      Q.    Where do you get that from, that he
13  has to provide with you a logical explanation for
14  instructing you not to return to work?  What's the
15  basis of that?
16      A.    Otherwise it's simply retaliation
17  against me and treating me differently and
18  marginalizing me and this is in keeping with the
19  institution's attitude and actions towards me in
20  the past.
21      Q.    So based on all that you have said in
22  response to my questions about this direction from
23  Dr. Firpo, I take it from what you said you feel
24  that you were free to disregard it because you
25  didn't agree with it for the reasons that you've

Computer Reporting NYC Inc.
(212) 986-1344

565

Varughese

1  stated.
2
3          MR. WRONKO:  Form objection.  You can
4  answer.
5      A.    I felt that this was further
6  retaliation.
7      Q.    It's not my question.  Let me ask you
8  this.  Well, let me ask you this.  You knew that
9  you were told not to return.  Did you come to work
10  on September 19th, on Monday?
11      A.    Yes, I did come to work on
12  September 19th.
13      Q.    So Dr. Firpo told you not to come to
14  work, but you came to work anyway, correct?
15      A.    Well, it says in the first paragraph
16  that, you know, I'm working with Dr. Petersen.  I
17  had already spoken to him and we were managing our
18  work.
19          So then the second paragraph goes on
20  to explain more of, um, more of something.  Then
21  he makes a claim that I have severe depression and
22  anxiety response to work demands, which I don't
23  know where he got that from.
24          Then he says I'm not meeting the
25  performance expectations of the chief residents,

Computer Reporting NYC Inc.
(212) 986-1344

566

Varughese

1  who are simply my coworkers.  They're not my
2  bosses by any means of the word.  And in fact,
3  they are not any more qualified than me.  So it
4  just seems just outlandish.
5      Q.    You may think so.  It goes back to the
6  sentence, "I must also ask," the next to last
7  sentence in the document, "I must also ask you not
8  to return without the doctor's note and assessment
9  for the leave of absence."
10          And despite that instruction you came
11  to work on your next scheduled workday, which was
12  Monday, September 19th, correct?
13      A.    Right.
14          MR. WRONKO:  Form objection.  Asked
15  and answered.
16      A.    I did come into work the next Monday
17  and I felt this e-mail was extremely harassing and
18  threatening.
19      Q.    So you ignored it.
20      A.    I don't know if I ignored it.
21      Q.    You didn't follow Dr. Firpo's
22  direction.
23      A.    I believe this was an extremely....
24      Q.    You've answered the question.

Computer Reporting NYC Inc.
(212) 986-1344

575

Varughese

1  attempt to contact you?
2
3     A.   No.
4     Q.   And on September 19th did Ms. Patel
5  attempt to contact you?
6     A.   I believe she did contact me in the
7  afternoon.
8     Q.   Now, you said this morning that on
9  September 19th, which was that Monday, you were
10  planning to go to work.
11     A.   I was at work on Monday,
12  September 19th.
13     Q.   Did you work the entire day?
14     A.   Yes.
15     Q.   And when did Ms. Patel contact you on
16  the 19th?
17     A.   At 4, 4:30 p.m.
18     Q.   How did she contact you?
19     A.   I don't recall now.
20     Q.   What did she say when she contacted
21  you?
22     A.   She said she needed to certify the
23  FMLA forms because she had not done so.
24     Q.   What did you say?
25     A.   I said, well, I assumed she should

*Computer Reporting NYC Inc.*
*(212) 986-1344*

576

Varughese

1
2  have done so when she gave me the forms.
3     Q.   Did you have any other conversation
4  with Ms. Patel during that conversation?  Did you
5  say anything else to her, did she say anything to
6  you?
7     A.   No, I just went over and she wanted to
8  meet with me to certify the forms.
9     Q.   And did you go meet with her?
10     A.   Yes.
11     Q.   And did you certify the forms?
12     A.   Right.  She dated it, certified the
13  forms the way she thought she should.
14     Q.   And did you plan to go to work on
15  September 20th?
16     A.   Yes.
17     Q.   And did you in fact go to work that
18  day?
19     A.   I did.
20     Q.   And on your way to work did you see or
21  meet Ms. Patel?
22     A.   I did.
23     Q.   Where did that happen?
24     A.   I met her like on 96th Street and
25  Lexington.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

577

Varughese

1
2     Q.   Did you meet her in a Starbucks?
3     A.   Right, there's a Starbucks at the
4  corner.  I was just getting some coffee.
5     Q.   And when you saw Ms. Patel in the
6  Starbucks did you speak to her, did she speak to
7  you?
8     A.   Right, just said hello and then that's
9  it.
10     Q.   Did Ms. Patel ask you why you were at
11  or near the hospital?
12     A.   I'm not a criminal, by the way, to ask
13  why am I at or near the hospital.
14     Q.   I didn't say you were a criminal.
15     A.   I am perfectly entitled to be at
16  Starbucks.
17     Q.   Did Ms. Patel --
18     A.   At 96th and Lexington.
19     Q.   -- ask you why you were there?
20     A.   At Starbucks?
21     Q.   Yes.
22     A.   No.
23     Q.   Did she ask you whether you were
24  planning to go to work?
25     A.   No.  I informed her that I was on my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

578

Varughese

1
2  way to a conference.
3     Q.   When you told Ms. Patel that you were
4  on your way to a conference did Ms. Patel say
5  anything to you about Dr. Firpo's instruction that
6  you weren't supposed to return to work?
7     A.   No.  She just frantically started
8  making phone calls on her BlackBerry.
9     Q.   While you were still in the Starbucks?
10     A.   Right, right in front of me while I
11  was obtaining my coffee and I tried to leave.
12  Then she followed me.
13     Q.   She followed you from where to where?
14     A.   While I was outside of Starbucks.  I
15  was walking and she insisted that she walk with me
16  and she followed me.
17     Q.   Did Ms. Patel say anything to you
18  while she was following you or walking with you?
19     A.   She said I cannot be here.  I cannot
20  go to work, and so on and so forth.
21     Q.   And did she say anything else?
22     A.   Right, so I asked her why she was
23  saying as such and what her rationale was
24  insisting that I not attend work.
25     Q.   And --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

579

Varughese

1
2    A.    Or attend this conference.
3    Q.    What did Ms. Patel say?
4    A.    She was making phone calls to figure
out what we should say to me.
6    Q.    Did she ultimately say something to
7 you?
8    A.    She ultimately told me that I cannot
9 attend conference and I had to wait with her in
10 her office.
11    Q.    So Ms. Patel wanted you to go with her
12 to her office; is that right?
13    A.    Right.
14    Q.    Did you go there?
15    A.    I did.  I felt like I had no choice.
16    Q.    Did you meet with anybody at
17 Ms. Patel's office?
18    A.    While I was in that office, and I
19 spoke with her for a few minutes, she was
20 frantically making phone calls.  It seemed like
21 she couldn't get in touch with whoever she was
22 trying to call.
23       So I said, Well, let me just go to
24 conference and I will come back later and meet
25 with you later at a later time, and she decided

*Computer Reporting NYC Inc.*
*(212) 986-1344*

580

Varughese

1
2 against it and she wanted me to wait there and
3 essentially detained me in her office for an
4 extended period of time.
5    Q.    How long were you in Ms. Patel's
6 office?
7    A.    I believe an hour, maybe more.
8    Q.    At some point did Ms. Patel step out
9 of her office to assist a visitor?
10    A.    Right, there was a person who was
11 allegedly lost in the small office space.
12    Q.    Do you find that funny?
13    A.    I'm not -- I don't find it funny.  I
14 find it a little unbelievable.
15    Q.    So you don't think there was a person
16 who was actually lost.
17    A.    Well, the person who was lost was -- I
18 don't understand how they could be lost.  They
19 wanted to go to Dr. Davis's office, which I wasn't
20 sure it was even on that, in that space.  I mean,
21 I don't even know if it was in that office space
22 area and I'm not even sure if Mrs. Patel's office
23 is really in the Icahn building on that first
24 floor.
25    Q.    But you were in an office that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

581

Varughese

1
2 Ms. Patel said was her office, correct?
3    A.    Well, she alleged that was her office,
4 yes.  She said that was her office, yes.
5    Q.    Did you think she was not telling you
6 the truth about that?
7    A.    Well, there is like nothing in that
8 office.  It is not as if there are any files or
9 anything there.  All the cabinets and everything
10 was empty.  There wasn't much of anything in
11 there.
12    Q.    So you said that Ms. Patel stepped out
13 of the office to assist the visitor, right?
14    A.    Right.  She said, right, that's right.
15 She did step out.
16    Q.    What did she say to you, if anything,
17 when she was leaving the office?
18    A.    What did she say?  She didn't say
19 anything to me.  She insisted that I stay there, I
20 stay in her office.
21    Q.    How long was Ms. Patel out of her
22 office?
23    A.    How long?  I don't know.
24    Q.    And were there files on Ms. Patel's
25 desk?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

582

Varughese

1
2    A.    No, there were no files.
3    Q.    Was there anything on Ms. Patel's
4 desk?
5    A.    There was one folder I believe.
6    Q.    And while Ms. Patel was out of the
7 office did you look through that folder?
8    A.    I picked it up, but I didn't really
9 look through it.
10    Q.    Did you open it?
11    A.    Yes, I did open it.
12    Q.    Did you look through the pages?
13    A.    Yes.
14    Q.    Did you think it was appropriate for
15 you to open a file on someone else's desk?
16    A.    No, I don't think it's appropriate.
17    Q.    Did Ms. Patel come back to the office
18 at some point?
19    A.    Yes, she did.
20    Q.    What happened after she came back?
21    A.    She accused me of opening her file and
22 her folder.
23    Q.    What did Ms. Patel say about you
24 looking at or through the folder?
25    A.    Well, I was concerned that I was being

*Computer Reporting NYC Inc.*
*(212) 986-1344*

583

Varughese

1 detained against my will and I wanted to leave.
2 She said, well, I had opened her folder and I
3 apologized for it, and I said I would like to
4 leave at this point.
5     Q.    Did you say to Ms. Patel when she
6 asked you about looking through the folder, did
7 you say to her that she should chill out?
8     A.    I don't recall now if I said that.
9     Q.    Did you say to her what's your
10 problem?
11    A.    Did I say that? I don't recall saying
12 that either.
13    Q.    So did you eventually leave
14 Ms. Patel's office?
15    A.    Did I eventually? Yes, I was forced
16 to leave her office when she wanted me to leave
17 her office.
18    Q.    When you left her office where did you
19 go?
20    A.    I mean, she left me in her office for
21 an extended period of time. Then she wanted me to
22 leave her office. This is an administrator who
23 frankly I've never met. All I know is that she
24 works for either Dr. Charney or Dr. Davis and I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

584

Varughese

1 believe she was just placed in a position in the
2 department of pathology so that there would not be
3 any, you know, any appearance of discrimination.
4     Q.    Why do you say she was placed in the
5 department so there wouldn't be any appearance of
6 discrimination?
7     A.    Because she is also a woman of Indian
8 descent as I am. So it would seem as though she
9 was acting in whatever capacity. Doesn't seem as
10 if it's discriminatory.
11    Q.    Are you saying, Dr. Varughese, that
12 you think that Ms. Patel was placed in that
13 position to somehow conceal or make it appear as
14 if you weren't being discriminated against because
15 you're an Indian woman?
16    A.    Yes.
17    Q.    What's the basis for that belief?
18    A.    Because she was in all these meetings
19 since July 14th or so and she did not, she never
20 really said anything. She never made any
21 comments. She did not even acknowledge that she
22 was there technically. She had to be introduced
23 by the person who would be there, which is either
24 Cordon-Cardo or Firpo, and yes, she did not really

*Computer Reporting NYC Inc.*
*(212) 986-1344*

585

Varughese

1 serve in any other role than to, as a second woman
2 of Indian descent.
3     Q.    And other than the fact that she
4 attended the meetings that you just described, any
5 other reason for your belief that Ms. Patel was
6 placed in that position to conceal or make it
7 appear nondiscriminatory in the treatment of you
8 because she was a woman of Indian descent?
9     A.    Right.
10         MR. WRONKO: Form objection.
11 Mischaracterizes her testimony. You can
12 answer.
13    A.    Right, because she could also testify
14 to what happened there and she can directly
15 contradict me, thereby allowing the hospital to
16 make whatever claim they want and say that I'm
17 falsifying something even if I were not.
18    Q.    Any other reason that you --
19    A.    So it would become two against one and
20 one of those individuals would be an woman of
21 Indian descent.
22    Q.    Any other reason you believe that
23 Ms. Patel was placed in that reason for the
24 reasons you've described?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

586

Varughese

1     A.    Those two reasons.
2     Q.    While you were in Ms. Patel's office
3 did you have any discussion with her? Did you
4 talk to her at all?
5     A.    Not very much, just insisting that I
6 be allowed to attend to what I wanted to attend
7 to.
8     Q.    Did you discuss with Ms. Patel at all
9 the scheduling of doctors' appointments?
10    A.    Just mentioned that I am in the
11 process of scheduling or have scheduled. That's
12 it.
13    Q.    Did you tell her when your doctor's
14 appointment was scheduled for?
15    A.    Yes, I believe I did. I mean, I had
16 no reason to hide that fact, by the way.
17    Q.    I didn't say you did.
18         Did you have a meeting with
19 Ms. Tiger-Paillex and Mr. Johnson?
20    A.    I did.
21    Q.    When was that meeting?
22    A.    That was the same morning.
23    Q.    So after you met with Ms. Patel in her
24 office, then you had a meeting with Mr. Johnson?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

587

Varughese

2 A. Yes, she chaperoned me or walked me
3 over to the HR office.
4 Q. Where did that meeting take place?
5 A. In Caryn Tiger's office.
6 Q. Other than you and Ms. Tiger-Paillex
7 and Mr. Johnson was anybody else present?
8 A. Not that I'm aware of.
9 Q. Why? Would you think there was
10 somebody --
11 A. I mean, if there was a conference call
12 or something like that.
13 Q. What was discussed at this meeting?
14 What did you say, what did Mr. Johnson say, what
15 did Ms. Tiger-Paillex say?
16 A. Well, we discussed a variety of
17 things. It was a very long meeting. Amongst the
18 discussed items were my requests for FMLA, my
19 interest in continuing to work, my concerns about
20 how I was being treated. And I mean, I don't
21 know. You must have that tape.
22 Q. Is that another one of the meetings
23 that you taped?
24 A. Right, right.
25 Q. And the tape will say obviously
*Computer Reporting NYC Inc.*
*(212) 986-1344*

588

Varughese

2 whatever it says, but did Mr. Johnson or
3 Ms. Tiger-Paillex ask you why you hadn't responded
4 to e-mails from Dr. Firpo or Dr. Hughes or
5 Ms. Patel?
6 A. Did they say that? Were they
7 wondering why I did not? I just needed to respond
8 or something, what not. I don't know.
9 Q. Do you remember saying that you didn't
10 feel the need to respond to e-mails, that, quote,
11 only stated facts, unquote?
12 A. Did I say that when I was in that
13 meeting?
14 Q. Yes.
15 A. I may have.
16 Q. Did you say in response to a question
17 as to why you had not responded to Dr. Hughes, did
18 you say that you hadn't responded because you had
19 not found the PWC to be helpful in the past?
20 A. In fact, should I elaborate? I found
21 the PWC to be retaliatory, an action that was
22 taken in retaliation to my complaints of
23 discrimination by the pathology and its
24 leadership, by the pathology department and its
25 leadership. Meanwhile, the PWC was not utilized
*Computer Reporting NYC Inc.*
*(212) 986-1344*

589

Varughese

2 against Adrienne Jordan or Samuel McCash.
3 Q. Dr. Varughese, you told me that
4 before. What I'm interested in is what you said
5 at this meeting with Mr. Johnson and
6 Ms. Tiger-Paillex.
7 Did you say that you had not found the
8 PWC to be helpful in the past? Did you say you
9 found it to be retaliatory?
10 A. I found it to be retaliatory and it
11 wasn't helpful to me. It made me feel like I was
12 being antagonized and being discriminated against.
13 Q. Did Mr. Johnson remind you that
14 cooperation with the PWC was mandatory?
15 A. Correct, I believe that is the --
16 that's what he said.
17 Q. And how long did this meeting last?
18 You said it was a long meeting.
19 A. It lasted about 40 minutes, 45
20 minutes.
21 Q. And what did Ms. Tiger-Paillex say
22 during this meeting?
23 A. She said, you know, I don't even know
24 why you requested FMLA and it could be for
25 yourself. It could be for somebody else. It
*Computer Reporting NYC Inc.*
*(212) 986-1344*

590

Varughese

2 could be, you know, given all that, we don't know,
3 we don't know what the reason is, but, you know,
4 just follow up and -- so I was concerned about the
5 request for a doctor's note after only being out
6 for two days.
7 She said, Oh, that's not why we want a
8 doctor's note now, which was sort of contradictory
9 to what Adolfo Firpo had said.
10 So I was getting a lot of conflicting
11 information from the hospital and I felt that the
12 continued actions, whether it's referral to PWC or
13 being detained in Ms. Patel's office or being
14 forced to meet with Caryn Tiger or Paul Johnson,
15 it's all very extremely punitive and intended to
16 retaliate against me. I mean, I had only
17 requested FMLA a few days before and already so
18 many actions were being taken against me.
19 Q. During this meeting did Mr. Johnson
20 say anything about Dr. Firpo's instruction to you,
21 that you were supposed to not to return to work
22 until you had provided doctors' notes?
23 A. So now I was concerned. Dr. Firpo I
24 had already spoken to on Thursday. I had a
25 discussion with him. He clearly knew I was fine.
*Computer Reporting NYC Inc.*
*(212) 986-1344*

623

Varughese

1 sometimes.
2
3         And he said that, you know, this is a
4 decision that was made and, you know, along those
5 lines.
6     Q.    So leaving aside your perception of
7 Dr. Cordon-Cardo's English language skills and
8 enunciation skills, what did he say or do that
9 leads you to make the statement you just made that
10 he behaved in a sexist, chauvinistic and
11 condescending way?  That's all I want to know.
12    A.    Well, he was not interested in what I
13 had to say or hearing my opinion about what was
14 going on, and, you know, he had his own -- and he
15 said read it, and I was trying to read and make
16 comment on the document and they didn't want to
17 hear it.  It was....
18    Q.    What did Dr. Firpo do or say that
19 leads you to the conclusion that he was behaving
20 in a sexist, chauvinistic and condescending way at
21 this meeting?
22    A.    Well, I didn't say Firpo was being
23 chauvinistic.
24    Q.    Just Dr. Cordon-Cardo?
25    A.    No, I mean, I think it's just the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

624

Varughese

1
2 overall attitude and behavior of this institution
3 and its leadership.
4     Q.    I am not talking about the overall
5 attitude --
6         (Cross-talk.)
7     A.    I think I'm trying to answer this
8 question and you're interrupting me.
9     Q.    I won't interrupt you and I'll let you
10 finish, but I am asking you about what happened at
11 this meeting.  Not about the overall atmosphere at
12 the institution.
13         So I would appreciate if you would
14 answer the question about what happened at the
15 meeting.  So go ahead.
16    A.    I mean, just the, you know, obtaining
17 ten different individuals from a variety of
18 departments and administrative levels of the
19 hospital and obtaining Madeleine Fersch.  It's all
20 making a lot of presumptions and being very
21 presumptive about me as a woman.
22         I feel like they were trying to paint
23 a picture of hysteria or some sort of, you know,
24 mental illness or something that just wasn't
25 frankly there.  And it's just I found it, as a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

625

Varughese

1
2 physician and a caregiver, I found it very
3 troubling, the course of action that they were
4 taking to be extremely troubling and not in line
5 with the professionalism that I have come to
6 believe in, exemplify and practice.
7     Q.    Anything else said by you or Dr. Firpo
8 or Dr. Cordon-Cardo at the meeting on
9 September 21st, 2011?
10    A.    I mean, that's all I recall right now.
11    Q.    Let me show you a document.
12         MR. McEVOY:  Mark this is as Exhibit
13 52.
14         (Defendants' Exhibit 52, letter dated
15 September 21, 2011 to Leena Varughese from
16 Carlos Cordon-Cardo and Adolfo Firpo, Bates
17 Nos. P853 through P858, marked for
18 identification, this date.)
19    Q.    Take a look at it and let me know when
20 you're done.
21         Have you had a chance to look at that?
22    A.    Yes.
23    Q.    Is this the letter that
24 Drs. Cordon-Cardo and Firpo gave to you on
25 September 21, 2011 during the meeting we've been

*Computer Reporting NYC Inc.*
*(212) 986-1344*

626

Varughese

1
2 talking about?
3     A.    Yes.
4     Q.    And this is the letter I take it that
5 put you on notice that you had been summarily
6 suspended and terminated from the residency
7 program.
8     A.    Right, summary suspension and
9 termination.
10    Q.    So Dr. Varughese, with regard to the
11 tumor cytogenetics rotation, do you think that
12 during that rotation you did anything wrong or
13 anything unprofessional during your time in that
14 rotation?
15         MR. WRONKO:  Form objection.  You can
16 answer.
17    A.    No, I do not.
18    Q.    And during the two times on August 5th
19 and August 12th of 2011 that you were asked to
20 provide coverage for a sick resident, do you think
21 that you did anything wrong or unprofessional with
22 regard to either, on either of those two
23 occasions?
24    A.    No.
25         MR. WRONKO:  Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

627

Varughese

2 **Q.** And with regard to your request to
3 change your elective from GI pathology to
4 dermatopathology, do you think you did anything
5 wrong or unprofessional in connection with your
6 request to change your elective?
7     MR. WRONKO: Form objection.
8 **A.** No.
9 **Q.** With regard to the conference
10 attendance policy and the request that you make a
11 presentation, do you think that you did anything
12 wrong or unprofessional with regard to those
13 issues?
14 **A.** No.
15 **Q.** With regard to the communications
16 about your leave of absence or your request for
17 leave of absence in September of 2011, do you
18 think that you did anything wrong or
19 unprofessional regarding your request for a leave?
20 **A.** No.
21     MR. WRONKO: Form objection.
22 **Q.** Do you think that you could have been
23 more professional or behaved any differently
24 during any of your meetings with Dr. Firpo?
25     MR. WRONKO: Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

628

Varughese

2 **A.** I was professional in my meetings with
3 Dr. Firpo. He wasn't professional.
4 **Q.** The same question, do you think that
5 you could have been more professional or behaved
6 in some different manner during any of your
7 meetings with Dr. Cordon-Cardo?
8     MR. WRONKO: Form objection. You can
9     answer.
10 **A.** I was very professional in my meetings
11 with Dr. Cordon-Cardo.
12 **Q.** Same question with regard to
13 Dr. Lento.
14 **A.** I was very --
15     MR. WRONKO: Form objection.
16 **A.** I was very professional in all my
17 meetings with all of the representatives of the
18 hospital at all times, including Dr. Barnett.
19 **Q.** I take it that also means Mr. Johnson,
20 Ms. Caryn Tiger, and Dr. Jordan and whoever else?
21 **A.** Absolutely, yes.
22     MR. WRONKO: Form objection.
23 **Q.** And last question on that line. Do
24 you think that with regard to Dr. Firpo's
25 instruction that you not return to work on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

629

Varughese

2 September -- the instruction he gave you on
3 September 16th that you weren't to return to work,
4 do you think that you did anything wrong or
5 behaved unprofessionally with regard to that
6 instruction or what happened or what you did
7 thereafter?
8     MR. WRONKO: Form objection. You can
9     answer.
10 **A.** No.
11 **Q.** In the termination letter that we just
12 looked at, the last paragraph says that "You have
13 a right to appeal your summary suspension and
14 termination by requesting, in writing, a hearing
15 before the House Staff Affairs Committee of the
16 Medical Board within ten days of receiving this
17 notice."
18     Do you see that?
19 **A.** Yes.
20 **Q.** Did you appeal the summary suspension
21 and termination?
22 **A.** Yes, I sent a letter to Dr. Michael
23 Harris and I found some hindrance in terms of
24 obtaining this hearing even.
25 **Q.** I'm sorry? I didn't hear what you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

630

Varughese

2 said.
3 **A.** Hindrance. There was some hindrance
4 in obtaining the hearing, because Dr. Harris
5 apparently did not get the letter and I had to
6 resend the letter. I mean, just to get this
7 hearing it was very difficult.
8 **Q.** Let me show you a document.
9     MR. McEVOY: Mark this as Exhibit 53.
10 **A.** (Continuing) It seemed as though the
11 hospital did not want me to appeal. Although they
12 do say that's a due process right that I have.
13     (Defendants' Exhibit 53; letter dated
14     September 28, 2011, to Dr. Michael T.
15     Harris, from Leena Varughese, MD, Bates No.
16     D-1407, marked for identification, this
17     date.)
18 **Q.** Have you had a chance to look at that?
19 **A.** Right.
20 **Q.** Is this the letter that you sent to
21 Dr. Harris requesting a hearing to appeal the
22 decision of summary suspension and termination?
23 **A.** Yes.
24     MR. McEVOY: We need to get a
25     document. So let's take a couple of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

631

Varughese

1  minutes.
2  MR. WRONKO: OK.
3  (A recess was taken from 3:25 to
4  3:35.)
5  BY MR. McEVOY:
6  Q.  So Dr. Varughese, we just identified
7  that letter and that letter is the one dated
8  September 28th from you to Dr. Harris requesting a
9  hearing.
10  Was a hearing scheduled?
11  A.  Eventually.
12  Q.  When was the hearing scheduled for?
13  A.  It was scheduled for November 14th.
14  Q.  Did it take place on November 14th?
15  A.  Yes, it did.
16  Q.  In front of what body was the hearing
17  held?
18  A.  It was supposed to be an ad hoc
19  committee consisting of a variety of individuals,
20  physicians who were hired in the hospital.
21  Q.  And it's called the House Staff
22  Affairs Committee?
23  A.  Right.
24  Q.  Did there come a point in time when

*Computer Reporting NYC Inc.*
*(212) 986-1344*

632

Varughese

1  you received the decision of the committee?
2  A.  Yes.
3  Q.  When did you receive the decision?
4  A.  December sometime.
5  Q.  I show you a document.
6  MR. McEVOY: Mark this as Exhibit 54.
7  (Defendants' Exhibit 54, letter dated
8  December 2, 2011, from Steven Weinfeld,
9  M.D., to Dr. Leena Varughese, marked for
10  identification, this date.)
11  Q.  Take a look at it and let me know when
12  you've had a chance to do that.
13  A.  OK.
14  Q.  Have you had a chance to look at that?
15  A.  Yes.
16  Q.  Is this the decision of the House
17  Staff Affairs Committee that you received in
18  December of 2011?
19  A.  Yes.
20  Q.  And it says what it says, but the
21  committee found that the Department of Pathology's
22  actions to suspend and terminate you were
23  supported by the testimony and other evidence and
24  were not arbitrary and capricious, correct?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

633

Varughese

1  MR. WRONKO: Objection to form.
2  Q.  Is that what it says?
3  A.  What it says?
4  Q.  Look at page 7 of the document. It's
5  not there. It's on page 7.
6  A.  Right, but it doesn't say that on the
7  cover letter.
8  Page 7? Let's see.
9  MR. WRONKO: I just want to put a
10  general objection on the record. I know my
11  substantive objections are preserved to
12  trial, but just to the extent that I'll make
13  an objection that this document ultimately I
14  don't think would be admissible given the
15  fact that it's a different body making a
16  substantive determination about the issues
17  in dispute.
18  But with that being said, that's
19  reserved till trial. I just wanted to make
20  a note on the record.
21  MR. McEVOY: Suffice it to say, I
22  disagree with you.
23  Q.  So on page 7 it says: "In sum, as
24  indicated above" -- it's the last paragraph on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

634

Varughese

1  page 7, Dr. Varughese. That's where we're
2  looking. Not on that page.
3  A.  OK, yes, yes.
4  Q.  OK? -- "based on the testimony and
5  evidence presented, the Committee unanimously
6  finds and concludes that the Department's actions
7  to suspend and terminate Dr. Varughese from the
8  pathology residency program were clearly supported
9  by the testimony and other evidence and were
10  clearly not arbitrary and capricious."
11  Is that what that says?
12  MR. WRONKO: Objection to form. You
13  can answer.
14  A.  Yes.
15  Q.  Before the hearing took place were you
16  notified as to who the members of the committee
17  would be?
18  A.  Yes, at some point I was, but I was
19  not given a date, but I was notified as to what
20  members would be.
21  Q.  In that same communication that
22  notified you as to who the members of the
23  committee would be, did it also tell you that if
24  you objected to any of the members of the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

## 639

Varughese

Q. Well, they were on the original committee. You made an objection and then they weren't on the next list of committee members that you got, correct?

A. Right. There was a new list of people who was overseeing the committee and -- yes.

Q. So the committee is now constituted by, when you got the new or the reconstituted committee, it was Dr. Weinfeld, right?

And what is Dr. Weinfeld's area of practice?

A. I believe it's orthopedic surgery.

Q. And Dr. Bronheim? What's Dr. Bronheim's area of practice?

A. He's a psychiatrist.

Q. And Dr. Marin?

A. He is a surgeon, vascular surgeon.

Q. Dr. Gila Leiter?

A. She's an OB/GYN doctor.

Q. And Dr. Marissa Raymond-Flesch?

A. She's peds and internal medicine.

Q. And Dr. Melissa Rocco?

A. She's an anesthesiologist.

Q. So were you notified before the

Computer Reporting NYC Inc.
(212) 986-1344

## 640

Varughese

hearing that these were now the members of the committee?

A. Right. I was notified very shortly before the hearing that these were to be the new committee members and also I was not given an adequate time or notice for the hearing.

Q. But that's not what we're talking about here. Did you make any objection to the reconstituted committee, the members that we were just talking about?

A. It was too late at that time and I did not really have time to object.

Q. Did you make any objections to the members of the committee at the hearing?

A. No, I did not. I didn't think that was an option available to me.

Q. When you say you weren't given enough notice of the hearing, when were you given notice of the hearing?

A. I believe just a few days prior to the hearing.

Q. Did you ask for the hearing to be adjourned because you didn't have adequate notice?

A. No. Because I had been insisting that

Computer Reporting NYC Inc.
(212) 986-1344

## 641

Varughese

the hearing take place as soon as possible so it can be determined whether or not they were interested in rehiring me or not.

Q. Dr. Varughese, after you got the decision of the committee, did you appeal that decision?

A. This decision? Yes, I appealed the decision.

Q. Who did you appeal it to?

A. Whoever is listed in this letter as being the individual to direct the appeal to, Dr. Reich.

Q. And I will tell you that it's the cleverly named Appeal Committee.

Did you have a hearing in front of the Appeal Committee?

A. Right. There was a hearing.

Q. And did you attend the hearing?

A. Yes.

Q. Were you represented by counsel at the hearing?

A. Yes.

Q. And did the Appeal Committee render a decision on your appeal?

Computer Reporting NYC Inc.
(212) 986-1344

## 642

Varughese

A. Yes.

Q. Before the hearing were you notified as to who would serve on the committee?

A. Yes.

Q. And did you make any objection to the members of the Appeal Committee?

A. No, I don't think I did.

Q. Let me show you a document.

MR. McEVOY: Mark this as Exhibit 55.

(Defendants' Exhibit 55, cover letter dated March 7, 2012, from Amelie Trahant to Leena Varughese, Bates No. D-971, marked for identification, this date.)

Q. Again, Dr. Varughese, if you would take a look at that document and let me know when you've completed doing so.

MR. WRONKO: Same objection I put on the record to Defendants' Exhibit 55 as I made on 54 without elaborating.

A. OK.

Q. Can you tell me what this document is?

A. This is the decision from the Appeal Committee.

Q. The decision of the Appeal Committee

Computer Reporting NYC Inc.
(212) 986-1344

651

Varughese

1  some sort of transfer from the former program.
2
3      Q.   And that's where I got confused.
4  Because you said that, but then what I thought you
5  said was Dr. Fyfe made a request to Dr. Firpo for
6  your records.
7      A.   Right. So she got on the phone. She
8  said, let me call them right now. We want to hire
9  you.
10         It was a delayed date at that time and
11  for us to go through the, um, what is it? The
12  match process or the ERAS matching process, that
13  matching process we had to, um, they had to put me
14  in the system, that date itself, because it was
15  rather late that I was interviewing with them and
16  they wanted to put me in the system because they
17  were a hundred percent confident that they were
18  going to hire me and they were a hundred percent
19  interested in hiring me.
20         So they simply needed a good faith
21  effort from the former employer, Mount Sinai
22  Medical Center, given that they had already said
23  that they did not want to rehire me, that I am
24  allowed to continue with my residency in another
25  institution.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

652

Varughese

1
2      Q.   So when did you first hear the term
3  "Summative Evaluation"?
4      A.   That was then.
5      Q.   So did you or someone on your behalf
6  make a request for a copy of the Summative
7  Evaluation?
8      A.   My attorney made a request.
9      Q.   And was a copy of the Summative
10  Evaluation provided to you?
11      A.   It was provided to my attorney who
12  then eventually forwarded it to me.
13      Q.   Let me show you a document.
14         MR. McEVOY:  Mark this as Exhibit 56.
15         (Defendants' Exhibit 56, cover letter
16  dated March 15, 2012, from Amelie Trahant to
17  Leena Varughese and Russell Moriarty, Bates
18  No. P938, marked for identification, this
19  date.)
20      Q.   Have you had a chance to look at that?
21      A.   Yes.
22      Q.   And do you recognize it?
23      A.   It appears to be a cover letter.
24      Q.   It's a letter to you at your address
25  in Brooklyn and a letter to Russell Moriarty, who

*Computer Reporting NYC Inc.*
*(212) 986-1344*

653

Varughese

1  I take it was your lawyer at the time. It's from
2  Amelie Trahant, Assistant General Counsel, and it
3  says: "Please find attached the Summative
4  Evaluation of Dr. Varughese's performance during
5  her period of residency at Mount Sinai," correct?
6
7      A.   Yes.
8      Q.   You received that letter?
9      A.   Yes.
10      Q.   Let me show you another document.
11         MR. McEVOY:  Mark this as Exhibit 57.
12         (Defendants' Exhibit 57, document
13  headed "Verification and Summative
14  Evaluation of Graduate Medical
15  Education/Training," Bates Nos. P989 and
16  P990, marked for identification, this date.)
17      Q.   Take a look at that, Dr. Varughese,
18  and let me know when you're done.
19      A.   OK.
20      Q.   Have you had a chance to look at it?
21      A.   Yes.
22      Q.   Do you recognize it?
23      A.   Yes.
24      Q.   Tell me what it is.
25      A.   This is the Summative Evaluation.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

654

Varughese

1
2      Q.   Is this the Summative Evaluation that
3  accompanied Ms. Trahant's letter of March 15,
4  2012?
5      A.   Yes, this was forwarded to me by my
6  attorney at some point.
7      Q.   Before it was forwarded to you by your
8  attorney had you ever seen this document?
9      A.   No.
10      Q.   Did you know that summative
11  evaluations were prepared for residents?
12      A.   No, I did not know until then. That's
13  how it....
14      Q.   Do you know whether this document was
15  ever provided to the Robert Wood Johnson Medical
16  Center?
17      A.   No, I believe it was not.
18      Q.   And what happened to your application
19  for a position at Robert Wood Johnson? I take it
20  you didn't get it.
21      A.   Well, what happened was they said that
22  they needed my records and because of interference
23  they could not hire me.
24      Q.   Who told you that? Dr. Fyfe?
25      A.   Well, Dr. Fyfe indicated as much, that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-128

**655**

Varughese

1 she could not enter me into the system for the
2 ERAS match because of the obstruction that was
3 going on with Mount Sinai Medical Center and their
4 refusal to make that good faith effort, and then
5 too -- so technically they could not hire me
6 because of that. That's what they said.
7     And they said my residency records
8 were not verified by Mount Sinai Medical Center
9 and that was impressed upon me by Dr. Cadoff.
10     Q.    Who is Dr. Cadoff?
11     A.    He is the chairman of the Department
12 of Pathology at Robert Wood Johnson Medical
13 Center.
14     Q.    What did Dr. Cadoff tell you?
15     A.    He just simply said that I couldn't be
16 hired because of Mount Sinai Medical Center's
17 actions.
18     Q.    And what you say Dr. Cadoff told you
19 and Dr. Fyfe told you, did they tell you that
20 orally or in writing?
21     A.    Well, my communication with Dr. Fyfe
22 on the day of the interview was orally. She did
23 leave me a voice mail eventually that evening
24 informing me that she had yet again attempted to
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**656**

Varughese

1 contact Mount Sinai Medical Center and it did not,
2 you know, she could not get the required documents
3 for me.
4     And then I e-mailed Dr. Cadoff and --
5 I actually e-mail Dr. Fyfe again several months
6 later because I was still in the process of
7 obtaining or attempting to obtain a residency at
8 this time, and this was -- I think the match ran
9 from like the 12th onwards or something along
10 those lines. `So I had contacted her again to find
11 out if there was any way she could still, you
12 know, they could reconsider the position and still
13 hire me. So....
14     Q.    Did you ever get anything in writing
15 from anyone at Robert Wood Johnson Medical Center
16 telling you why they couldn't hire you into a
17 position in their pathology residency program?
18     A.    Right. They said it was because the
19 records were not --
20     Q.    Not what they said. Did you ever get
21 something in writing?
22     A.    Yes, I got something in writing that
23 said, yes.
24     Q.    What did you get in writing?
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**657**

Varughese

1     A.    Just a short e-mail saying my records
2 were not being verified by Mount Sinai Medical
3 Center.
4     Q.    Who did that e-mail come from?
5     A.    Dr. Cadoff.
6     Q.    Dr. Varughese, if you look at the
7 Summative Evaluation, do you agree with it?
8     A.    I think this has already been
9 discussed ostensibly as part of this litigation
10 and I think you know about my position.
11         MR. WRONKO:  No, just answer the
12 question.
13     Q.    I can assure you, Dr. Varughese, that
14 I have never asked you anything about this during
15 this deposition. So I don't know what you're
16 talking about. But this is the time to talk about
17 it during your deposition.
18     So do you think that this Summative
19 Evaluation is fair or accurate?
20     A.    No, it's not fair, it's not accurate.
21 It's punitive and it's intended to destroy my
22 prospects as a physician, whether it's in
23 pathology or in any other field.
24     In fact, it's intended to prevent me
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**658**

Varughese

1 from being hired by practically any company or
2 having any -- holding any job in the medical
3 field.
4     Q.    I understand that. Do you think that
5 this Summative Evaluation was prepared, signed by
6 Dr. Firpo, because of the complaint you made about
7 Dr. McCash in December of 2010?
8     A.    Yes.
9     Q.    Do you think it was prepared for any
10 other reason other than because you made that
11 complaint?
12     A.    No.
13         MR. McEVOY:  Why don't we take a
14 few-minute break and we'll see what else, if
15 anything, we can accomplish today.
16     (A recess was taken.)
17 BY MR. McEVOY:
18     Q.    Dr. Varughese, did there come a time
19 when you reported that other residents in
20 pathology were bringing alcohol to the hospital
21 and consuming it at the hospital?
22     A.    Yes, I did report that.
23     Q.    And when did you report that?
24     A.    I reported that sometime in January.
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**675**

Varughese

1  e-mails did you get or were you copied on that was
2  referring to dementia rounds and you said you
3  thought it was about four.
4      So my question is, four over what
5  period of time?
6      A.   Right.  Over the period of time from
7  during my third year as a resident, which was
8  2000 -- or even the late, you know, second year,
9  third year.  Actually, there may have been more.
10  There may have been like ten or maybe even more.
11  I'm not sure.  I wasn't keeping track of each and
12  every e-mail and, I mean, I wasn't attending them.
13  I had no interest in attending these dementia
14  rounds at the hospital when easily I could go out
15  with my coworkers to the local bar on the weekend.
16      Q.   When you say in your complaint, he,
17  referring to Dr. McCash, even admitted to taking --
18  a, quote, break, unquote, from grossing specimens
19  to drink alcohol, when did Dr. McCash admit to
20  taking a break from grossing specimens to drink
21  alcohol?
22      A.   It wasn't an e-mail.  I may have
23  submitted that as part of discovery.  It was, um,
24  when he was grossing, he said I'll take a break
25

---

**676**

Varughese

1  from grossing to attend dementia rounds.  That's
2  what he said.
3      Q.   You said that's an e-mail from
4  Dr. McCash?
5      A.   Right.
6      Q.   That you were copied on?
7      A.   Yes, I think I was copied on that.
8      Q.   So to be sure I understand it, so the
9  source of your knowledge about that allegation
10  comes from this e-mail that Dr. McCash sent.
11      A.   The e-mail and then from what I've
12  heard about people drinking beer, and so on.
13      Q.   We're talking now about Dr. McCash
14  admitting to taking a break from grossing
15  specimens to drink alcohol.
16      You told me you know that because it
17  was in an e-mail that he sent that --
18      A.   Right, he didn't say he was going to
19  drink alcohol at this meeting, but he did say he
20  was going to take a break to go to dementia
21  rounds, which included beer and other forms of
22  alcohol.  So I assumed that he was going to drink.
23      Q.   I understand.  But do you have any
24  other source of knowledge that that is what
25

---

**677**

Varughese

1  Dr. McCash was going to do other than what you saw
2  in that e-mail?
3      A.   Well, I have -- I've been told by
4  other residents that he does drink at these
5  things, and I know for a fact that he drinks a
6  lot.
7      Q.   How do you know for a fact that he
8  drinks a lot?
9      A.   Because I think, you know, several
10  social occasions that I went to he was drinking.
11  And I think he was drinking at work.
12      Q.   Why do you think that?
13      A.   Because like his behavior is just out
14  of -- extremely aggressive, you know, uninhibited.
15      Q.   Did you ever smell alcohol on his
16  breath?
17      A.   I never tried to get that close to
18  him.
19      Q.   Did you ever report Dr. McCash to the
20  Physician Wellness Committee that you thought he
21  might be impaired?
22      A.   Well, I informed the Physician
23  Wellness Committee, which is Dr. Figur, regarding
24  my concerns.
25

---

**678**

Varughese

1      Q.   What did you tell Dr. Figur?  You told
2  me what you told Mr. Johnson.  Did you tell
3  Dr. Figur the same things that you told Mr. Johnson
4  or something different?
5      A.   Well, they were both at the same
6  meeting.
7      Q.   So it was one meeting with the two of
8  them.
9      A.   Yes.
10      Q.   After you met with Dr. Figur and
11  Mr. Johnson, do you know what, if anything, they
12  did to investigate your report about drinking at
13  the hospital?
14      A.   I believe they came up to the 15th
15  floor to observe for themselves whether or not a
16  bottle of alcohol that I mentioned was there.
17      Q.   And do you know whether they
18  discovered the bottle of alcohol you were talking
19  about?
20      A.   Right, there was like nearly an empty
21  bottle of Captain Morgan rum, and I didn't know
22  about the bottle of wine, but that was also there.
23      Q.   Were you there when Dr. Figur and
24  Mr. Johnson came to the 15th floor?
25

---

679

Varughese

2  A.  Right, I was at my desk.  Then I took
3  a picture of the bottle and I sent it to them.
4  Q.  And then what did they do?
5  A.  I believe they did nothing.  They took
6  no actions against the people who were consuming
7  alcohol, but chose to take actions against me for
8  professionalism.
9  Q.  When they discovered, as you say they
10  did, the bottle of Captain Morgan's rum and the
11  bottle of wine, what did they to about the
12  presence of alcohol in the cabinet?
13  A.  Nothing, they didn't take any actions.
14  They left it there.
15  Q.  They just left it there.
16  A.  Yes.  That's the prerogative of the
17  Physician Wellness Committee at this hospital.
18  Q.  Did you observe the bottle of rum and
19  the bottle of wine remaining in the cabinet for
20  some period of time thereafter?
21  A.  I don't know.  I wasn't checking.
22  Q.  Now, when you say that no action was
23  taken against Dr. McCash or Dr. Jordan, what's the
24  basis for that belief?
25  A.  Well, they were being unprofessional

Computer Reporting NYC Inc.
(212) 986-1344

680

Varughese

1  and they were, you know, technically or
2  potentially consuming alcohol during work hours
3  and there was no reprimand given to them.
4  Q.  How do you know that?
5  A.  I know that because they told me that
6  they did not take any actions.
7  Q.  Who told you?
8  A.  Dr. Barnett said if he thought he
9  needed to be slapped around we would slap him
10  around too.
11  Q.  Who is the he Dr. Barnett was
12  referring to?
13  A.  I think he was referring to
14  Dr. McCash.  And then Dr. Figur also confirmed to
15  me that they did not take any actions against
16  Dr. McCash.
17  At the Physician Wellness Committee,
18  the second meeting, when I went to do the urine
19  toxicology screen, ironically I was the only one
20  who had to do a urine toxicology screen, not
21  Dr. McCash, not Dr. Jordan.
22  Q.  So let me understand.  You went to the
23  Physician Wellness Committee to take your
24  toxicology screen and Dr. Figur shared with you

Computer Reporting NYC Inc.
(212) 986-1344

681

Varughese

2  the fact that there had been no action taken
3  against Dr. McCash.
4  A.  Yes.
5  MR. WRONKO:  Form objection.  You c
6  answer.
7  Q.  How did that topic come up?
8  A.  Well, I asked him what was being done
9  about Dr. McCash and his behavior towards me and
10  if any actions or if he is going to be placed on
11  any reprimand.
12  Q.  Well, just so you're clear, we're not
13  talking about Dr. McCash's actions towards you
14  about which --
15  A.  Towards me and his unprofessional
16  behavior and also his loud yelling and screaming
17  at me.
18  Q.  And now what I'm talking about is,
19  we're talking about drinking on the job and having
20  alcohol on the job, and you said to me that no
21  action was taken against Dr. McCash or Dr. Jordan
22  as a result of having alcohol at work or drinking
23  at work.
24  A.  Right.
25  Q.  And I want to know how it is you know

Computer Reporting NYC Inc.
(212) 986-1344

682

Varughese

2  that no action was taken or no reprimand was given
3  to Dr. McCash.
4  A.  Because Dr. Figur told me that that
5  was the case.
6  Q.  Did Dr. Figur tell you that no action
7  had been taken against Dr. McCash based on your
8  complaint about him or no action had been taken
9  against him because of your report of drinking on
10  the job?
11  MR. WRONKO:  Form objection.
12  A.  No, he didn't specify, but he said
13  there was no action taken against him, period.
14  Q.  You said that Dr. Barnett made some
15  comment about Dr. McCash or reprimanding
16  Dr. McCash.  Was that in connection with your
17  complaint about Dr. McCash or in connection with
18  your report of his using alcohol at work?
19  MR. WRONKO:  Form objection.
20  A.  I mean, I have a feeling that they may
21  be intrinsically linked.
22  Q.  You also said that Dr. Jordan wasn't
23  reprimanded for having alcohol at work or drinking
24  at work.  How do you know that she wasn't
25  reprimanded?

Computer Reporting NYC Inc.
(212) 986-1344

683

Varughese

2   A.   I'm sorry?
3   Q.   How do you know that Dr. Jordan wasn't
4   reprimanded, to use your word, for having alcohol
    at work or drinking at the hospital?
6   A.   How do I know? Well, she was promoted
7   in fact shortly after I reported this incident,
8   she was promoted within a day by Dr. Lento to the
9   chief resident position. She was not reprimanded.
10  Q.   So do you draw the conclusion that
11  because Dr. Jordan was promoted to chief resident
12  she wasn't reprimanded about having alcohol at
13  work?
14  A.   Right. As soon as I reported this
15  incident, somehow Dr. Lento chose to promote her
16  to chief resident.
17  Q.   Do you think there's some connection
18  between your reporting Dr. Jordan having alcohol
19  at work and her being promoted to chief resident?
20  A.   Right, I think they did that to
21  protect her, her career and her future, unlike
22  what was done to me which was to discipline me on
23  some premise that I was -- patient (phon) care
24  related lab, which we have already proven to be
25  false.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

684

Varughese

2   Q.   So what's the basis for your belief
3   that Dr. Lento promoted Dr. Jordan chief resident
4   to protect her career? To protect her career from
5   what?
6   A.   Well, to enable her to advance.
7   Q.   Did anybody ever tell you that that's
8   why? I mean, I know that's what you think. Did
9   anybody ever tell you Dr. Jordan was promoted for
10  the reason that you just articulated?
11  A.   I believe Dr. Jordan was promoted for
12  a lot of wrong reasons.
13  Q.   What are the wrong reasons you believe
14  that she was promoted?
15  A.   For one, she was being unprofessional
16  and she played a key role in the incidents of
17  December 8th. She was not involved in the one of
18  September 14th.
19       I don't place any great degree of
20  blame on her, but I think she played a role in
21  what had happened. And, you know, and she had
22  clearly lied about her responsibilities, you know,
    moonlighting. She was not the primary
24  moonlighter, Paul Azar was, as noted in the
25  schedule, and so on.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

685

Varughese

2        So when you already know that somebody
3   is not capable of completely being honest and they
4   essentially choose to promote her and reprimand me
5   knowing full well that's the case.
6   Q.   I take it, Dr. Varughese, that you did
7   not agree with the decision to promote Dr. Jordan
8   to chief resident.
9   A.   No, I did not. Yes, I had my
10  concerns.
11  Q.   And you say in your complaint that
12  there were four other qualified coworkers with
13  seniority over her, and you identified Dr. Chow,
14  Dr. Martinez, Dr. Azar and Dr. Roman as those who
15  are more qualified people.
16  A.   And myself as well.
17  Q.   And you.
18  A.   Yes.
19  Q.   So do you think that either you or one
20  of the coworkers you've identified should have
21  been promoted to chief resident instead of
22  Dr. Jordan?
23  A.   Absolutely.
24  Q.   Was that a position you would have
25  been interested in having?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

686

Varughese

2   A.   It was never offered to me. Although
3   Dr. Morency suggested that perhaps it would be a
4   good idea for me to be chief resident with her,
5   and she informed me that other residents were
6   having issues in the program as well and she
7   didn't seem to be aware of, you know, she thought
8   it would be a good idea for me to be the chief
9   resident with her.
10       So yes, I considered it and I would
11  have liked to have that position if that was ever
12  available to me, but that wasn't an option that
13  was offered to me and it seems like it wasn't
14  offered to several other people in my class, my
15  cohorts. For what reason I do not other than
16  favoritism towards Adrienne Jordan by Dr. Lento.
17       MR. WRONKO:  We're now at 4:45.
18       MR. McEVOY:  I'm almost done.
19  Q.   You said that you reported the
20  drinking on the job to Dr. Fowkes in April.
21  A.   Right.
22  Q.   Tell me the circumstances in which you
23  did that.
24  A.   Well, I felt that the drinking at work
25  was getting out of hand and it was becoming

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-132

688

CERTIFICATE

STATE OF NEW YORK     )

                      : ss.

COUNTY OF SUFFOLK     )


          I, THOMAS R. NICHOLS, a Notary Public

within and for the State of New York, do

hereby certify:

          That LEENA VARUGHESE, the witness

whose deposition is hereinbefore set forth,

was previously duly sworn and that such

deposition is a true record of the testimony

given by the witness.

          I further certify that I am not

related to any of the parties to this action

by blood or marriage, and that I am in no way

interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto

set my hand this 27th day of June, 2013.


                    THOMAS R. NICHOLS

AA-133

Leena Varughese, M.D.

v.

Mount Sinai Medical Center

July 8, 2013

Witness: Leena Varughese

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344
Fax: (212) 983-9149
office@crinyc.com

692

```
 1
 2      UNITED STATES DISTRICT COURT
 3      SOUTHERN DISTRICT OF NEW YORK
 4      ---------------------------X
 5      LEENA VARUGHESE, M.D.,
 6                    Plaintiff,
 7           vs.              12 Civ. 8812(CM)
 8      MOUNT SINAI MEDICAL CENTER,
 9      PATRICK LENTO, M.D., CARLOS
        CORDON-CARDO, M.D., ADOLFO
10      FIRPO, M.D., IRA J. BLEIWEISS,
        M.D. and ABC CORP. 1-10, and
        JOHN DOES 1-10,
11
12                    Defendants.
13      ---------------------------X
14
15                    July 8, 2013
16                    10:07 a.m.
17                    Volume IV
18
19              Continued deposition of LEENA
20      VARUGHESE, held at the offices of Edwards
21      Wildman Palmer LLP, 750 Lexington Avenue, New
22      York, New York, pursuant to Notice, before
23      Thomas R. Nichols, a Registered Professional
24      Reporter and a Notary Public of the State of
25      New York.
```

Computer Reporting NYC Inc.
(212) 986-1344

693

```
 1
 2   A P P E A R A N C E S :
 3
 4   LAW OFFICES OF RONALD J. WRONKO, LLC
 5   Attorneys for Plaintiff
 6       134 Columbia Turnpike
 7       Florham Park, New Jersey 07932
 8   BY:  RONALD J. WRONKO, ESQ.
 9
10   EDWARDS WILDMAN PALMER LLP
11   Attorneys for Defendants
12       750 Lexington Avenue
13       New York, New York 10022
14   BY:  RORY J. McEVOY, ESQ.
15       JULIE L. SAUER, ESQ.
16
17   ALSO PRESENT:
18       RAJIT MALLIAH
19
20
21
22
24
25
```

Computer Reporting NYC Inc.
(212) 986-1344

694

```
 1                    Varughese
 2   L E E N A  V A R U G H E S E,  called as a
 3      witness, having been duly sworn by a Notary
 4      Public, was examined and continued to
 5      testify as follows:
 6   EXAMINATION BY (CONT'D.)
 7   MR. McELROY:
 8       Q.   Dr. Varughese, just to ask you the
 9   questions that we always ask you in a deposition,
10   are you taking any medication prescribed,
11   unprescribed, that would prevent you from
12   remembering and answering my questions?
13       A.   No.
14       Q.   Any other reason you can't answer the
15   questions I'm about to ask?
16       A.   No.
17       Q.   We left off the last day with my
18   asking you when you reported the drinking on the
19   job, as we've come to call it, to Dr. Fowkes and
20   you had started to tell me those circumstances.
21       So when did you report the drinking on
22   the job to Dr. Fowkes?
23       A.   That was April of 2011.
24       Q.   Where did you have that conversation
25   with Dr. Fowkes?
```

Computer Reporting NYC Inc.
(212) 986-1344

695

```
 1                    Varughese
 2       A.   I was on a rotation with her.  I was
 3   on neuropathology at that time and I had spoken to
 4   her while I was on that rotation.
 5       Q.   What did you tell her?
 6       A.   Well, I just told her that, you know,
 7   it was getting more boisterous and interfering
 8   with work on the 15th floor and pathology work in
 9   terms of it being moved downstairs to where others
10   were working and it was very disruptive.
11       Q.   Was anyone else present when you had
12   this conversation with Dr. Fowkes?
13       A.   No.  And I also sent her an e-mail as
14   well as, you know, so there were multiple
15   communications with her.
16       Q.   Did you ask Dr. Fowkes to do anything
17   about the drinking problem?
18       A.   Right.  I had asked her to request
19   that, you know, either it not take place anymore
20   or take it to, you know, an outside, you know,
21   venue such as the local bar or something or
22   something along those lines.  You know, or even
23   rather than it be at work, so....
24       Q.   Do you know whether Dr. Fowkes did
25   anything in response to your telling her about the
```

Computer Reporting NYC Inc.
(212) 986-1344

700

Varughese
1
2  extensive discussions regarding drinking on the
3  job was with Dr. Fowkes, Dr. Figur, Paul Johnson.
4      Q.    In your complaint, Dr. Varughese, it
5  says, referring to paragraph 41, it says "at a
6  follow-up meeting relating to the self-reflection
7  exercise Dr. Cordon-Cardo explicitly requested
8  that Dr. Varughese refrain from making complaints
9  about doctors drinking on the job."
10          Did that happen?
11      A.    Yes.
12      Q.    Tell me the circumstances in which
13  that happened.
14      A.    Well, essentially this was, I think at
15  the first meeting I'm not sure, because there were
16  like about four meetings with Cordon-Cardo. The
17  first meeting was on May 3rd, the second meeting
18  was on May 24th and the third meeting was on
19  July 14th and the next meeting was when I was
20  terminated from the residency program on
21  September 21st. So I met with him four times.
22          At the first meeting I believe he was
23  in, I am not sure if he discussed drinking at the
24  moment. But the second meeting he definitely, on
25  May 24, 2011, he definitely did state that he is

*Computer Reporting NYC Inc.*
*(212) 986-1344*

701

Varughese
1
2  not interested in people drinking this or that. I
3  think that was -- he said "this or that" as being
4  very dismissive about this issue. And he didn't
5  want to, you know, he was not interested in that.
6      Q.    How did it come up?
7      A.    How did it come up? Because, well, I
8  had submitted a second reflection and, well, I
9  mean, I was just basically defending myself. My
10  second reflection, you know, elaborated on my
11  point of view regarding what was occurring and as
12  both my reflections are accurate account of what
13  had happened, and the second reflection also was
14  an accurate account of my perception of what was
15  going on and what had happened to me.
16          And I discussed, you know, drinking as
17  being an issue and I compared myself or I said,
18  well, you know, these people are doing X, Y and Z
19  which is, one, against hospital policy and, two,
20  it's likely, I mean, it's highly unprofessional
21  and he was not interested in that. He was more
22  focused on, you know, what I was writing and how
23  he wasn't happy with what I had written, which was
24  largely unjustified. I mean, you can't really be
25  that critical of someone's self-reflection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

702

Varughese
1
2      Q.    So Dr. Varughese, what I want to do
3  now is ask you some questions about your
4  interrogatory responses. And again, I'm not
5  interested in conversations you had with
6  Mr. Wronko, but do you recall that there were
7  interrogatory -- let me show them to you. It's
8  just as easy.
9          (Defendants' Exhibit 58, Plaintiff's
10          Answers to Interrogatories, marked for
11          identification, this date.)
12      Q.    Dr. Varughese, do you recognize the
13  document I've just handed you?
14      A.    Yes.
15      Q.    If you look at the last page, it's
16  your signature?
17      A.    Right.
18      Q.    So one of the interrogatories that you
19  were asked was to, it's actually number 5, is to
20  identify the individuals who you believe
21  retaliated against you for, and there are three
22  different things, but you're alleged, one,
23  complaints of discrimination; two, complaints
24  under the Whistleblower Law and three, exercise of
25  your rights under the FMLA. OK?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

703

Varughese
1
2          And the response, with regard to one,
3  which is your complaints of discrimination, is all
4  the named defendants.
5          So what I would like you to do is tell
6  me everything that you believe Dr. Lento did to
7  retaliate against you because you complained about
8  discrimination.
9      A.    That Dr. Lento did?
10      Q.    Yes.
11      A.    Well, Dr. Lento, I mean, this is sort
12  of an ongoing issue with Dr. Lento where I
13  reported that I was being, you know, harassed at
14  work by McCash. I mean, there's no reason for me
15  to believe that his motivation, you know, I was
16  convinced that his motivation for directing that
17  harassment at me was based on my gender and now I
18  have come to believe that it may also have been
19  based on my race or the fact that I'm a woman of
20  Indian descent.
21          And I reported this issue of, you
22  know, harassment at work to Dr. Lento who
23  immediately sought to protect Dr. McCash without
24  thinking twice, well, you know, should I intervene
25  at this point? What would possibly prevent this

*Computer Reporting NYC Inc.*
*(212) 986-1344*

704

Varughese

1  from happening again?
2
3          He did not do any of that. Instead he
4  just sought to say, well, you know, I don't know
5  if this happened or not. You're saying this
6  happened, but I don't know.
7          But then Kruti Maniar, a coworker but
8  also a chief resident at that time, also a woman
9  of Indian descent, corroborated what I was saying,
10 which was that McCash was harassing me and McCash
11 also had admitted that his behavior was, you know,
12 essentially harassing towards me and he recognized
13 that as being a problem.
14         But Lento immediately stated that
15 that -- I don't even know if that occurred.
16 Despite being corroborated by another woman of
17 Indian descent.
18         Then my follow-up with Dr. Lento for
19 the next month, two months, did not yield any
20 positive results. In fact, he continued to defend
21 McCash, state that he doesn't know if it occurred.
22 You know, then blamed me, stating that, you know,
23 you deserved to be yelled at. Sometimes people
24 deserve to be yelled at.
25         I mean, it just, that just went on and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

705

Varughese

1
2  he was not willing to intervene in any way to
3  facilitate a transfer out of a particular rotation
4  to a different institution to just avoid, you
5  know, interacting with this person that I felt
6  like was becoming more and more problematic, and
7  this involved just like I had mentioned McCash's
8  behavior of stomping his feet, slamming the doors
9  and just his general attitude and, you know,
10 negative, you know, intimidation, intimidating
11 behavior that was directed at me when I was at
12 work.
13         Then in December, although I was doing
14 my work as is done by everybody else, which is the
15 utilization of the moonlighter and the per diem PA
16 to complete my work for the day, which is why they
17 are there, and McCash, you know, intervenes,
18 harasses me again and he threatens me, he
19 intimidates me. It's not just a simple like, oh,
20 you didn't do it, so I'm going to report you to
21 someone. It's you're doing something I disagree
22 with. I'm going to say something to somebody.
23 But that's not what he did.
24         He took it upon himself to harass me,
25 follow me around, intimidate me and just go on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

706

Varughese

1
2  this rampage essentially which led me to have to
3  leave my work area and report him to somebody who,
4  like Dr. Bleiweiss who I reported him to,
5  reporting McCash to Dr. Bleiweiss in that same,
6  you know, moment essentially, within a few moments
7  of that time I reported to him.
8          Despite me reporting this and
9  reporting this to the hospital as having occurred
10 and reporting this to Dr. Lento as having
11 occurred, because I sent him an e-mail that same
12 day, but he wasn't there. He was on vacation or
13 whatever it was. Then on Monday, the 13th, that
14 was the first time I saw him after the McCash
15 incident, December 8th, and he already knew there
16 was a history and a pattern of behavior with
17 McCash that I already complained about.
18         Like at least before with the first
19 instance in September and then again following
20 that incident and then the second incident he knew
21 there was a pattern. And Dr. Lento did not think
22 to say that, well, you know, I believe you. I
23 understand that this is a problem and I'm going
24 to, you know, intervene or do what you think
25 should be done, which was to intervene, mediate

*Computer Reporting NYC Inc.*
*(212) 986-1344*

707

Varughese

1
2  and prevent this from going any further. And he
3  didn't take those actions.
4          And then he put me on academic
5  advisement while excusing McCash's behavior yet
6  again. And that was treating me differently, and
7  that's, you know, I considered that to be
8  discriminatory based on my gender and race,
9  because I look at McCash and I see why he is being
10 treated better, which is because he is a male
11 Caucasian or white doctor and, you know, I'm a
12 minority Indian physician who, I mean, who
13 Dr. Lento does not feel compelled to support.
14    Q.   Anything else Dr. Lento did that you
15 believe was retaliatory or in retaliation for your
16 making complaints of discrimination?
17    A.   Well, this went on for the rest of the
18 year. So that was like, academic advisement was
19 only the start of, I mean, not even academic
20 advisement, a letter from legal that Melissa
21 Pessin and Patrick Lento, like they signed this
22 letter and they gave me that letter and I don't
23 think they took any actions against McCash and
24 Jordan at that time either. They didn't give them
25 a letter from legal saying don't confront

*Computer Reporting NYC Inc.*
*(212) 986-1344*

708

Varughese

1  Dr. Varughese about anything or don't confront any
2  of your other residents about anything. I mean,
3  it was a blanket statement that was sent to me
4  from legal saying that if I spoke to any of my
5  colleagues that I was going to be terminated.
6      I mean, then after that this just went
7  on and on. Following that there was the academic
8  advisement, which they knew there was reason to
9  believe that what I was saying was true, and given
10  the circumstances, you know, where McCash was also
11  being unprofessional, they didn't take any actions
12  again him. They only chose to take actions
13  against me. And this went on with the Physician
14  Wellness Committee, which they referred me to like
15  in December, because I think they knew Art Figur
16  was on the committee even.
17      I think that was one of the reasons
18  that they referred me to that committee, because
19  somehow I think Melissa Pessin has some sort of
20  relationship with Art Figur. I'm not their
21  friend, so whatever it is. So they referred me to
22  Art Figur for whatever those reasons and he, you
23  know, like and then they would all write e-mails
24  about me behind my back, where I was not cc'd on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

709

Varughese

1  the e-mails.
2      Kruti Maniar who was also a chief
3  resident there was not cc'd on those e-mails
4  either. So, you know, we were not, I mean, they
5  were not -- she was not cc'd on the e-mail. I was
6  not cc'd on these e-mails.
7      And there was all this like back talk
8  that was going on behind my back which I wasn't
9  aware of even with Art Figur. Like there were
10  like ten or twenty e-mails forwarded to Art Figur
11  regarding how terrible I was as an individual and
12  I'm not a doctor or, I don't know, I don't know
13  what the imaginings and delusions were, but that's
14  what was going on.
15      And this is all because like I
16  reported McCash as harassing me and I'm trying to
17  defend myself and have a work environment that is
18  like conducive to what I need too as a, you know,
19  person in a residency program at Mount Sinai
20  Medical Center.
21      And Lento went out of his way to
22  obstruct me from being able to do my work as well.
23  The same, you know, as well as like other people.
24  And if Pat Lento had, as the program director, if

*Computer Reporting NYC Inc.*
*(212) 986-1344*

710

Varughese

1  he had gotten involved then and taken some sort of
2  corrective action I feel like this would not have
3  been an issue. Like, you know, none of this would
4  have occurred.
5      And that's why, I mean, and then going
6  on with following that after PWC there was like
7  the meeting with Cordon-Cardo and Castaldi. That
8  was also very -- Pat Lento is like we don't really
9  care what happened. This is not what we wanted
10  you to write, and so on. I mean, he didn't like
11  my self-reflection.
12      Q.   Who is he? I'm sorry.
13      A.   Patrick Lento. He didn't like my
14  self-reflection. He thought that I can't -- that
15  was not what they needed me to write, and so on,
16  which was to me that was discriminatory and I
17  think that's -- they didn't like it because I
18  spoke about what actually happened.
19      Q.   Anything else Dr. Lento did to
20  retaliate against you for making complaints of
21  discrimination?
22      A.   Right. He said that I was like not on
23  academic advisement anymore and then he was like
24  you're on academic advisement because we didn't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

711

Varughese

1  like your self-reflection. Then he was supposed
2  to follow up with me for like, I don't know,
3  several months.
4      And when I did follow up with him he
5  told me that according to everyone I was doing my
6  work and I was being very professional and
7  everyone was satisfied with the work that I was
8  doing. There weren't any problems. And he claims
9  that I didn't follow up with him, which is
10  ridiculous, when I know that I followed up with
11  him several times over the period of academic
12  advisement, and he had informed me that I was
13  according to everyone who he had spoken to that I
14  was doing my work and satisfactorily and there
15  weren't any complaints.
16      And then he changes that story. As
17  soon as he is with Cordon-Cardo and Castaldi that
18  day, he is like, no, you're not doing your work.
19  You didn't follow up with me. It was up to you to
20  follow up, and so on and so forth, which are all
21  lies because I had already followed up with him
22  regarding a lot of these issues. And he was
23  basically, you know, telling me that it's up to me
24  to decide if the academic advisement is over.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

712

Varughese

1 And then I was like, well, it's over
2 in my mind, and he said it wasn't over, and, I
3 mean, he was giving me like not -- he was not
4 acting as a professional who knew what he was
5 doing in terms of like the ACGME requirements and
6 in terms of educational requirements. He was sort
7 of like all over the place. He had different
8 standards for me. Then he had a different
9 standard for McCash and Adrienne Jordan. I mean,
10 I use these two people as comparators because they
11 were the ones who were directly involved in this
12 incident. And I noticed like he repeatedly, you
13 know, would favor, you know, make favorable
14 decision in their favor while making decisions
15 that were very detrimental to me and my career as
16 a physician.
17 And this goes on to even scheduling
18 issues. I mean, ever since he became program
19 director I found that for me to get the same type
20 of education as McCash or Jordan I would have to
21 make, you know, about ten different requests. I
22 would have to explicitly state that this is what
23 I'm missing. Even though there was a tally and a
24 list of all the different rotations I had, I would
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

713

Varughese

1 have to repeatedly write e-mails, you know, break
2 down the lists and say this is what I'm missing,
3 this is what I need, this is what needs to happen
4 for me to obtain X, Y and Z before I graduate.
5 And I felt like Pat Lento was going
6 out of his way to make sure that I'm not getting
7 the requisite requirements even for pathology
8 training.
9 And then that went on into my fourth
10 year. So that's third year and fourth year I had
11 these problems with Pat Lento, which is pretty
12 disparate if you compared my schedule, and that
13 compared to Adrienne Jordan who was getting all
14 sorts of electives and she was being promoted to
15 chief resident status even though everyone knew
16 she was drinking on the job and she had other
17 problems, you know. So they still promoted her
18 and they were using a different standard for me
19 because if I had done any of those things I would
20 have been fired.
21 Q. Dr. Varughese, just so -- I want you
22 to understand the questions. I will ask you about
23 why you thought you were being discriminated
24 against, which is some of what you're telling me
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

714

Varughese

1 now.
2 What I'm asking you is why you think
3 you were being retaliated against for making
4 complaints of discrimination. I've asked you
5 about Dr. Lento. You may not be finished with
6 your answer about Dr. Lento. I am going to ask
7 you about the other individuals that you've
8 identified as retaliating against you for one
9 reason or another. And I'm not going to interrupt
10 you. I mean, you can tell me whatever it is and
11 testify to whatever you think, but I want you to
12 tell me everything that you believe that Dr. Lento
13 and the others I will ask you about did to
14 retaliate against you for making complaints of
15 discrimination or for some other reason that we'll
16 come to. And you say whatever you want to say
17 about that and then just let me know when you're
18 finished, OK?
19 A. OK.
20 Q. So if you're finished with Dr. Lento,
21 tell me. If not, continue.
22 A. No, I'm not done yet.
23 Q. OK. Go ahead.
24 A. So then after this whole, you know,
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

715

Varughese

1 like with the scheduling, that was another aspect
2 of discrimination and retaliation I felt was
3 occurring. Well, at least fourth year with the
4 scheduling I thought that was somewhat
5 retaliatory, that I was not getting the
6 appropriate assignments for my year.
7 Then in terms of further retaliation,
8 the decision to place me on disciplinary action I
9 felt was further retaliation from Dr. Lento,
10 because that letter is written in his first person
11 narrative which says I as so-and-so, as program
12 director, and it's written sort of like, you know,
13 sort of from his perspective, then it's signed by
14 Cordon-Cardo. So, I mean, that's clearly
15 retaliatory.
16 And then he makes all these statements
17 in there which I know to be false because I had
18 followed up with him several times over the course
19 of the academic advisement period. I have
20 e-mails, text messages, et cetera, from Pat Lento.
21 I have notes from him that he left on my desk to
22 call him at his home phone number no less in the
23 middle of the day. I mean, I was in
24 communications with him. There was never -- there
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

716

Varughese
1  was one miscommunication between me and Pat Lento
2  which was essentially -- what was it? He wanted
3  me to appear to his office just before his
4  vacation. And he had e-mailed me the day prior or
6  something and said I need you to come here. I
7  need to have a meeting with you. And I couldn't,
8  you know, I wasn't sure he wanted to confirm it or
9  not, the meeting. And so there was some issues
10 with that particular meeting. But it was
11 essentially cleared up.
12        Like, I mean, he went on vacation the
13 following week and after he came back he said, oh,
14 OK, like, we were going to meet after he came back
15 from his vacation and I met with him and it wasn't
16 that -- there was really like no big issue there.
17 But he is like making it into this like massive,
18 you know, exaggerating beyond belief about how
19 important that one meeting was when easily the
20 meeting was rescheduled the week after.
21        So but this is the kind of, you know,
22 that's basically the disciplinary action. The
23 disciplinary action just goes on for, you know, I
24 don't even know. It just goes on for like four
25 pages or something about whatever they thought.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

717

Varughese
2  I mean, that was all substantiated in
3  my opinion. And it was really retaliatory. I
4  mean, it was unsubstantiated that I feel like it
5  was completely retaliatory, and that was like in
6  July of 2011.
7        And then after that I found out that
8  he was writing all these e-mails behind my back
9  about me taking advantage of a leave of absence
10 through FMLA to go on some conference or
11 something. And he didn't want my conference paid
12 for because if I'm on leave, so on and so forth.
13 I mean, this is really outrageous. Like, I can't
14 believe this is a professional.
15        If you're professional, you don't
16 conduct yourself like that. You can't sit around
17 and say this person is going to go on leave and
18 take advantage of us.
19        Meanwhile, in my three, four years
20 there I've never asked for a penny from them.
21 I've never asked them to support me on any of my
22 conferences that I attended. I have not asked
23 them to support me monetarily in any other
24 educational ventures.
25        But I know for a fact Adrienne Jordan

*Computer Reporting NYC Inc.*
*(212) 986-1344*

718

Varughese
2  and McCash have been supported to the tune of like
3  maybe ten, $10,000, maybe even 15, $20,000, with
4  their conference attendances, hotel stays and a
5  variety of other issues, and this is my one
6  educational conference in four years where it's
7  essentially a review course that's supposed to
8  remediate material that I've not learned in my
9  residency program because of this disorganization
10 and other problems, and he's acting like, oh, I'm
11 trying to take advantage of them.
12        I mean, that's clearly -- to even make
13 that statement it's retaliatory and, I mean, it
14 just speaks volumes about his professionalism
15 which is like nonexistent.
16        And then with the firing/termination
17 thing, he wanted to have me fired. And
18 essentially because, I mean, I don't even know
19 why. Because I -- he writes some e-mails. I
20 mean, not I don't know why. I mean, I know why.
21 Because he is retaliating against me based on his
22 prejudices against me which is that I am a woman
23 of Indian descent.
24        And he, you know, what does he say?
25 He like, there was some e-mail that Adrienne

*Computer Reporting NYC Inc.*
*(212) 986-1344*

719

Varughese
2  Jordan wrote about how she is afraid of me or
3  something. And next thing I know Pat Lento
4  substantiates that. He immediately substantiates
5  that and says there are intimidation issues here.
6        OK, I was talking about harassed at
7  work which has been corroborated and substantiated
8  by several people and he doesn't think it's
9  serious. I am not even there, not even speaking
10 directly to Adrienne Jordan and he thinks there is
11 some fear and intimidation issues that he's like
12 deluded himself to believe as being true. And
13 then he supports that statement and he encourages,
14 he substantiates it. He probably encourages
15 Adrienne Jordan to say these things, and next
16 thing I know I'm fired.
17        I mean, that's retaliatory. For even
18 to substantiate something so outlandish it is
19 retaliation and extremely defamatory and it's not
20 something anybody ever mentioned to me as her
21 being intimidated by me or terrified of me or
22 threatened by me at work. I mean, I had no idea.
23        And these are all like substantiated
24 by Pat Lento. Even though meanwhile I'm basically
25 being, you know, pretexturally terminated from my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

720

Varughese

1 employment and that's being done by him to a large
2 
3 degree.
4     **Q.**   Are you done yet?
5     **A.**   No, I'm not done yet. Actually, I
6 just remembered something.
7     **Q.**   Go ahead.
8     **A.**   Then at the first hearing he was, what
9 do you say? He said that I never answered his
10 pages and all this nonsense. Like that's all
11 completely defamatory. I've been on call with him
12 for autopsies and a variety of issues over the
13 years. He would page me even though I'm not even
14 the resident who was on call and ask me to do work
15 for like other male residents there. I received
16 at least two or three pages from him when I was
17 working with a number of male residents.
18     This never occurs when I'm partnered
19 with a female resident. I was partnered with the
20 male resident Lanjing Zheng, and he's, I mean, I
21 believe he graduated two years before me from the
22 residency program. And I was partnered with him
23 on some autopsy rotation, and I believe he lives
24 in Westfield, New Jersey. He lived in Westfield,
25 New Jersey at that time.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

721

Varughese

1 
2     And I think Dr. Lento knew that or
3 something, and he knew that the case was coming in
4 because a friend of his said, Oh, my patient died
5 and I -- she died at home or something from
6 metastatic breast cancer, and Pat Lento wanted me
7 to come in and do this case.
8     First, this is a patient who died at
9 home. We shouldn't be doing this case at the
10 hospital. If it needs to be done, it should be
11 referred to the appropriate third party unless we
12 were doing this as a private case. He didn't want
13 to do that.
14     Then he wanted to page me, and I'm
15 like I'm not even on call today. Like you have to
16 call Dr. Lanjing Zheng, and he's like, Well, you
17 know, I want you to do this case. Like why don't
18 you go in.
19     So I like drive myself in. I get
20 there and it's like this case or this woman who
21 died at home and I meet her doctor who is like a
22 friend, personal friend of Dr. Lento's and he's
23 like, Yes, we need this case done. It's a woman
24 who died of metastatic cancer.
25     I was like, well, clearly it's a woman

*Computer Reporting NYC Inc.*
*(212) 986-1344*

722

Varughese

1 
2 who died of metastatic cancer. Like what do you
3 really want me to like diagnose her with at this
4 point?
5     Then, two, I'm not even on call and
6 then, three, I call my attending who's on
7 surgical, I mean, autopsy that day and I talk to
8 him and he's like, Why are we even doing this
9 case? And I'm like, and then I'm like I'm telling
10 him I'm not even on call for this case, but
11 Dr. Lento is like essentially forcing me to do
12 this case because I guess he doesn't want to call
13 Lanjing Zheng in for whatever reason.
14     And then I have to finally call
15 Lanjing Zheng to come in and both Lanjing Zheng
16 and the attending physician are like, Well, we
17 should not do this case, because this is not a
18 case that probably should be referred to us at
19 this point. But this kind of stuff happened all
20 the time with Pat Lento.
21     Oh, there was another time where he
22 wanted me to do, um, take samples of tissue for
23 McCash. He is like, Oh, Dr. McCash is doing some
24 project and I would like you to like just start
25 taking tissue for him to assist him with this

*Computer Reporting NYC Inc.*
*(212) 986-1344*

723

Varughese

1 
2 project.
3     I said, well -- and that was a week
4 when actually McCash was not even at work that
5 week. I was like, well, even if I do it, he is
6 not even at work. McCash has never mentioned to
7 me that he wants me to do any extra work for his
8 project. McCash never mentioned it. But Lento
9 was coming to me and approaching me and asking me
10 to do work for McCash.
11     The same thing with Zheng, me to work
12 for Zheng. Like he wants me to do work for other
13 people, especially like other male residents when
14 I'm on call with them. I mean, he's, you know,
15 like this is just like just the tip of the iceberg
16 with him. Like he just does this kind of cover
17 for male residents, do this for other people.
18     And meanwhile if I make a mention of
19 like me having an issue, he doesn't even intervene
20 or try to find a way to resolve the issue. He
21 finds ways to blame me for something that I didn't
22 even really do.
23     **Q.**   Are you done with Dr. Lento?
24     **A.**   Um, OK.
25     **Q.**   Is that a yes?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

724

Varughese

2   A.   Yes.
3   Q.   What did Dr. Cordon-Cardo do to
4   retaliate against you because you complained about
    discrimination?
6        MR. WRONKO:   Form objection.   You can
7   answer.
8   Q.   Or actually I will accept that.   What
9   do you believe Dr. Cordon-Cardo did in retaliation
10  for your complaints of discrimination?
11  A.   Cordon-Cardo?   Well, I mean, he had
12  just started as I guess the chairman of the
13  department of pathology at Mount Sinai Medical
14  Center on April, in April 2011.   And I, my first
15  meeting with him was on May 3rd, 2011, and, I
16  mean, frankly, he should have tried to figure out
17  what the situation was.
18       I mean, he didn't ask me for my
19  perspective at all.   He was more interested in
20  that I didn't do, I mean, I didn't write a
21  self-reflection that was acceptable to them,
22  without really exploring my concerns.
23       Then he, after that he essentially was
24  actively involved in my termination.   He had
25  written a number of e-mails stating, making

*Computer Reporting NYC Inc.*
*(212) 986-1344*

725

Varughese

2   statements that I should be fired for things that
3   everybody else did too.
4        I mean, to draw an example is, here is
5   the, you know, what is it?   Updating duty hours in
6   New Innovations about, you know, there are about
7   twenty residents in the program.   There are about
8   like six or seven fellows, you know, fellowship
9   programs in residency there.
10       So about 80 percent of the people
11  there don't update duty hours until they have to.
12  That's essentially how it's done.   And he thought
13  I should be fired for that.   I mean, he thought I
14  should not be a doctor anymore because I allegedly
15  did not update my duty hour.
16       Meanwhile I did update my duty hour in
17  a timely manner.   But he thought that was a
18  fireable offense.   I mean, this is like the
19  chairman of the department.   Like come on.
20       Then he, you know, he did not want me
21  to speak about, you know, issues such as drinking
22  on the job or even harassment or retaliation.   He
23  did not want to discuss any of those issues.
24       So he facilitated me being terminated
25  from the residency program.   Even with the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

726

Varughese

2   termination letter, he signed that letter.   I
3   mean, it was written by Pat Lento, Patrick Lento,
4   but it was signed by Cordon-Cardo who was chairman
5   of the department.   And he must have read the
6   letter before he signed it.   And, I mean, that was
7   clearly like, you know, aiding and abetting in the
8   discrimination and retaliation there.
9   Q.   Anything else?
10  A.   Right.   And then when, um, then on
11  July 14th when he gave me the letter he had
12  alleged that he had informed me that I can get
13  some sort of, you know, I can go into the, I guess
14  the committee.
15  Q.   Which letter are you referring to?
16  A.   July 14th.   Disciplinary action, final
17  warning or disciplinary action letter.   He said I
18  can use the committee.
19       But he never made that statement
20  explicitly.   He just gave me the letter.   He said,
21  Oh, it's in the envelope and you can read it when
22  you read it, and so on.
23       I was like, you know what?   I have
24  legal counsel who has already written to the
25  hospital at this point.   I believe they sent a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

727

Varughese

2   letter on June 9th or wherever it was and they had
3   explicitly stated that they felt that I was being
4   discriminated against and that was my concern and
5   we would like that to stop and we would like some
6   communication with legal counsel regarding this
7   matter rather than engaging me directly.
8        And they refused to respect those, you
9   know, requests from my attorney at that time to
10  engage them in any issues that related to what I
11  had already had alleged was discrimination.
12       So Cordon-Cardo knew about that and he
13  did not comply.   And this went on into the
14  termination event.   He didn't, you know, he said
15  Oh, they said they were going to provide me with
16  some, you know, excerpts from the house staff
17  manual and some other manuals regarding my rights,
18  my rights to appeal the termination, but they
19  never did.   They just gave me the termination
20  letter without any other information even though
21  they claimed that they were going to do that.
22       And then after I was terminated they,
23  you know, he made all these statements that were
24  really defamatory and untrue.   And I think that
25  was all retaliatory.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

728

Varughese

Q. Anything else about Dr. Cordon-Cardo?

A. Well, I mean, he is not, you know, he's not a practicing pathologist. He never did a residency like I was doing my residency in anatomic and clinical pathology. He does not have that background or that experience as a physician who has done a residency. So largely he doesn't even know what that entails.

And he is a director of, I mean, he is the chairman of a program that essentially trains 20 plus people every year to be a physician and he is essentially for all intents and purposes a researcher or venture capitalist or -- not a venture capitalist. He is an entrepreneur I think, whatever that is. But he's one of those people who -- I don't know if he really understands the clinical significance of pathology as is and its, you know, application to treating and diagnosing disease.

Because, I mean, he seemed like I don't know. Like he was just not very, like, I mean, he doesn't -- he seemed pretty cool as to what my work was and what I was doing. And, I mean, not cool, but he didn't seem very educated

729

Varughese

about a lot of aspects of medical residency.

Q. Anything else that you believe Dr. Cordon-Cardo did to retaliate against you for making complaints of discrimination?

A. Well, I mean, as the chairman of the department he should be aware of all these things and he should be aware of like being able to apply those same standards across the board.

Like he was basically stipulating that these different standards to me versus Adrienne Jordan or McCash were OK. Like, I mean, even with the whole drinking thing, the drinking issue, he essentially was making a statement that that was OK, but for me to complain about McCash was not OK.

So that is really, you know, I mean, that's retaliatory. Why would you take actions against me only and not want to take actions against something like Adrienne Jordan or McCash or other people who were not presenting? There were a lot of people who did not present their conferences or who did not attend lectures. Why would you not take actions against those people too? Like, why only take actions against me?

730

Varughese

Q. Anything else about Dr. Cordon-Cardo?

A. If I remember anything I'll add to that.

Q. Just so you know, the time to do that is now. So if you want to think about it, take your time, but this is the appropriate time to tell me whatever it is you believe Dr. Cordon-Cardo did that was in retaliation for you making complaints of discrimination.

MR. WRONKO: You mean while the deposition is still open.

MR. McEVOY: Sure.

MR. WRONKO: Right.

Q. So let's move on. What did Dr. Firpo do that you believe was in retaliation for your complaints of discrimination?

MR. WRONKO: Form objection.

A. Adolfo Firpo, he was hired I guess in July or whatever, July 2011, and he was supposed to, you know, I don't know. He was supposed to like -- he was giving me misinformation regarding how I could approach a variety of issues within the residency and he changed, you know, he would one minute tell me I could do things a certain way

731

Varughese

and then meaning I could -- for instance, he told me or indicated to me that I could attend other conferences and make a note of them and have them count towards my conferences. And then he essentially changed his mind on that.

Then in terms of, what is it? The FMLA issue, we had a discussion and he had told me that I could come to work. He was going to accommodate my schedule and, you know, make sure that I wasn't being bothered by or being too harassed by Adrienne Jordan and whatever on one day. The following day he completely changed his story.

And I believe that change of opinion from, you know, Thursday to Friday is retaliatory. I mean, if they were not retaliating against me based on my protected complaints, protected activity, he would not have had such a change of an opinion about from one day to the next about how I should conduct myself with FMLA.

This is just, you know, these are just like two incidents, but this occurred, I mean, I met with Dr. Firpo like three, you know, like, I don't know. He was only there since like July to

732

Varughese

1 September and that was the time period I was
2 there. And that's like a very brief period of
3 time, you know, he was employed by Mount Sinai
4 Medical Center and I had to interact with him as a
5
6 supervisor.
7          And he did so many things in that
8 short time period that was clearly unfair and I
9 felt were, you know, put me in a, um, not put me.
10 What is it? That treated me differently from like
11 my coworkers and that was unfair toward me.
12          What was the other stuff that he did?
13 In terms of the elective schedule change, he said
14 I could change it and then -- and it should not be
15 an issue because he already had approval from at
16 least one of the two people involved, and then it
17 seemed like the second person who was involved in
18 the approval also wanted me to change the
19 schedule. So I was not on that particular, you
20 know, so it would accommodate my request.
21          But Firpo was a limiting issue in
22 this. He was a limiting factor. Him and Pat
23 Lento were limiting factors in this and they both
24 decided not to do it. And that's a way to punish
25 me. Because it wouldn't, I mean, it seemed like

*Computer Reporting NYC Inc.*
*(212) 986-1344*

733

Varughese

1 it didn't matter to anybody else but the two of
2 them.
3
4          So these kind of situations occurred
5 over and over again that led me to believe that I
6 was being retaliated against.
7     Q.   Anything else that Dr. Firpo did that
8 you believe was in retaliation for your complaints
9 of discrimination?
10    A.   Right, so this goes on into, you know,
11 where I was, you know, with the cytogenetics
12 rotation. I had informed him that I had problems
13 with the cytogenetics rotation and I wasn't happy
14 with my experience on that rotation and it was,
15 you know, I found that I was being harassed when I
16 was on the rotation.
17          There were incidents that occurred
18 during the rotation that was concerning to me and
19 he completely ignored it. That's clearly
20 retaliatory in my mind.
21          Then following this whole thing he,
22 you know, with the FMLA like I already mentioned,
23 I felt that was retaliatory, how I should be at
24 work. They were forcing me to change my schedule,
25 change my work, everything, because I had merely

*Computer Reporting NYC Inc.*
*(212) 986-1344*

734

Varughese

1 requested FMLA. That's highly irregular and
2 retaliatory.
3
4          Then he said that I was having petit
5 mal seizures and making all these defamatory
6 statements about me, which is completely false. I
7 have never had a petit mal seizure. That's a --
8 those are symptoms. That's a symptom. Petit mal
9 seizure is a symptom of very serious medical
10 diagnoses.
11          You can't make statements like that
12 about somebody, especially when you're a
13 physician, without thinking that those have severe
14 consequences. It's extremely defamatory and it's
15 retaliatory.
16          You can't -- I would never make a
17 statement like that about someone. Because I know
18 those carry, you know, those are consequential
19 statements. Especially when you're a physician.
20 But that's the kind of statement that he made at
21 the house staff hearing. Then he made these
22 other, you know, further defamatory statements
23 about me at the House Staff Affairs Committee
24 hearing that were false and fabricated.
25          So those were -- that's retaliation

*Computer Reporting NYC Inc.*
*(212) 986-1344*

735

Varughese

1 for protective complaints. I mean, then, you
2 know, paying out of his pocket for a late fee as
3 opposed to just changing my schedule very
4 slightly. I mean, this is the kind of, you know,
5 I mean, that's not just retaliatory. That's
6 outright discrimination. I found that to be
7 extremely, concerning comment as a professional,
8 and like he makes these sort of statements that
9 are really concerning.
10          Then with the summative evaluation,
11 his signature is on it, and I have never worked
12 with him to that capacity of patient care, the
13 patient care and everything else. I never signed
14 out a case with Adolfo Firpo. I had very minimal
15 interaction with him in terms of pathology work
16 actually. I don't even know if he does pathology
17 work. Like that's how very little I know about
18 his background.
19          So for him to say that I'm
20 unsatisfactory in patient care, that's clearly
21 fabricated and that's one of his delusions. Like,
22 I can't, that's retaliatory. Why would he make
23 those statements up if he wasn't like trying to
24 harm me in some severe manner and cause me severe

*Computer Reporting NYC Inc.*
*(212) 986-1344*

736

Varughese

1  injury with my professional career? Why would he
2  do that? There's no other reason. Because he
3  just made it up. And that's all retaliation.
4  **Q.**  Anything else about Dr. Firpo?
5  **A.**  Nothing. No.
6  **Q.**  What do you believe Dr. Bleiweiss did
7  to retaliate against you for your complaints of
8  discrimination?
9  **A.**  Dr. Bleiweiss, I feel like he did not
10  do anything.
11        I'm sorry, I don't want to put that
12  in.
13        THE WITNESS: Can you correct that?
14  **Q.**  He has to take down everything that's
15  said, but you can correct it.
16  **A.**  I need a break actually. I need to
17  gather my thoughts.
18  **Q.**  You can't take a break while there's a
19  question pending. You have to answer the
20  question, then you can take a break.
21        MR. WRONKO: Take your time to gather
22  your thoughts.
23  **Q.**  But you take a minute.
24  **A.**  I just need a minute to gather my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

737

Varughese

1  thoughts here.
2  **Q.**  Fine.
3        MR. WRONKO: Take a minute.
4  **A.**  (After a pause) So with Dr. Bleiweiss,
5  what he did do was, he didn't follow up
6  appropriately to my complaint of harassment when I
7  was on -- when I requested that he assist me, he
8  did not follow up appropriately at that time.
9        Then he -- I thought he had reported
10  me to Dr. Schiller for asking that I be, my
11  schedule be slightly changed to accommodate, you
12  know, my concerns of, regarding what had occurred
13  when I was at, you know, on December 8, 2010.
14        And then following that, he, you know,
15  reviewed me negatively that month. I believe he
16  reviewed me negatively after the rotation was
17  over. And it was, um, so I thought that was
18  largely due to this incident and also because
19  there weren't any other patient care related
20  issues that month.
21  **Q.**  When you say this incident, what are
22  you referring to?
23  **A.**  December 8, 2010.
24  **Q.**  OK.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

738

Varughese

1  **A.**  And he had reviewed me negatively for
2  that month when everybody else had reviewed me
3  favorably. Actually, that work for that month was
4  going fairly well. I didn't have any issues with
5  any of my supervisors. I mean, I worked with
6  like, I don't know, like, when I was at Mount
7  Sinai Medical Center I worked with like it must be
8  like at least 40 plus supervisors.
9        So, I mean, I didn't have -- all the
10  supervisors that I was working with reviewed me
11  favorably for my work that month and Dr. Bleiweiss
12  did not review me favorably, and then his
13  commentary was that, like, you know, sort of
14  diminishing the significance of what had occurred
15  to say that I'm not getting along with my
16  colleagues when in fact that wasn't the problem.
17  I was actually being harassed by my colleagues.
18  And I was requesting that I have some sort of, you
19  know, mediation relating to that or some sort of
20  intervention by a supervisor.
21        And he was a supervisor who was there.
22  And he didn't really intervene and he didn't try
23  to, you know, going forward, he didn't try to
24  assure that that wouldn't occur again.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

739

Varughese

1  **Q.**  Is there anything else about
2  Dr. Bleiweiss?
3  **A.**  Right, so then, going forward, I do
4  suspect that he was actually trying to, um, trying
5  to, I don't know, railroad me. Meaning there were
6  e-mails and stuff he was writing that -- well, at
7  least I only know of the e-mails that I have seen
8  from discovery, but it appears that he has been,
9  you know, pretty involved in like with certain,
10  you know, issues that occurred and that I was
11  cited for, such as the Robert Guarino issue, where
12  Robert Guarino who was working with Dr. Bleiweiss
13  cancels his presentation and it was perfectly
14  fine.
15        I mean, there was no reason why he
16  should have cancelled his presentation. It was
17  something he knew about for like at least a month
18  and it was OK for him to cancel his presentation
19  and I was assigned in his place the day before to
20  present.
21        And then Dr. Bleiweiss, you know,
22  thinks that it was really, you know, he said
23  something about me not presenting. But he never
24  mentioned anything about Robert Guarino not

*Computer Reporting NYC Inc.*
*(212) 986-1344*

740

Varughese

1  presenting at the last minute. Like he is
2  definitely applying a different standard to me.
3      Q.   And other than the e-mail you just
4  referred to or e-mails you just referred to is
5  there any other reason why you suspect
6  Dr. Bleiweiss was trying to, to use your word,
7  railroad you?
8
9          MR. WRONKO:  Form objection.  You can
10  answer.
11     A.   Right, so he was, um, well, he was at
12  that, I don't know, what was it?  Let me think
13  about this for a minute.
14     Q.   Take your time.
15     A.   (After a pause) Dr. Bleiweiss was also
16  involved in the whole GYN -- when I was in GYN
17  rotation in May 2011, he was involved in that
18  incident where he was accosting my supervisor.
19          Yes, Dr. Bleiweiss is my supervisor,
20  but the physicians that, you know, the attending
21  pathologists, board certified pathologists that
22  I'm working with, they are also my supervisors.
23  He does breast pathology.  They do GYN pathology,
24  and essentially at Mount Sinai Medical Center
25  these are separated now.  So it doesn't really

*Computer Reporting NYC Inc.*
*(212) 986-1344*

741

Varughese

1
2  overlap much at all.
3          And Dr. Bleiweiss was going and, you
4  know, accosting my GYN supervisors with claims
5  that I wasn't doing my work and, you know, they
6  had better write a negative evaluation of me.  He
7  was -- he was like actively telling them to write
8  negative evaluations about me, to, you know,
9  informing them that I'm not doing my work.  All of
10  which was false.
11          I mean, but he was creating this
12  environment for me where it was becoming very
13  hostile, where I had one supervisor on one end
14  going to my other supervisor who was doing -- but
15  I'm on a different rotation, merely because I'm in
16  the same hospital to say negative things about me
17  and reporting that I'm not doing my work when I'm
18  already communicating with the GYN people about
19  the work that I'm doing.
20          And there weren't any problems until
21  Dr. Bleiweiss got involved.  Before that we didn't
22  have any issues.  As soon as Dr. Bleiweiss got
23  involved I started having problems on the
24  rotation, with people saying I'm, you know,
25  alleging that I'm not doing my work or whether

*Computer Reporting NYC Inc.*
*(212) 986-1344*

742

Varughese

1  it's, you know, allegations that I'm not doing my
2  work or whether my supervisor is crying at work
3  saying I'm being told to write negative
4  evaluations, that I'm really stressed out and I
5  can't do this.
6          I mean, this is not a good work
7  environment for anyone and Dr. Bleiweiss was
8  causing all these problems.
9      Q.   How do you know that Dr. Bleiweiss
10  asked your supervisors during your GYN rotation to
11  write negative evaluations of you?
12     A.   How do I know?  I was told.  I was
13  told that Dr. Bleiweiss had -- Dr. Kalir told me
14  that Dr. Bleiweiss had approached her when she was
15  at work to, you know, tell her that I didn't do my
16  work one day.
17          And she said, like, Is that true?  I
18  was like, No, of course not.  Because we had
19  already discussed all the work we should do that
20  day.  There was no issue of me not doing any work.
21  And he had said that I hadn't done my work even
22  though he has no clue what goes on in GYN.  He's a
23  breast pathologist.  He doesn't know what goes on
24  in GYN.  And he is like just making up stuff and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

743

Varughese

1
2  going and bothering her.
3          Then she's crying, and then -- what
4  else did he do?  He was very disruptive that
5  month.
6      Q.   My only question, Dr. Varughese, is
7  how do you know that Dr. Bleiweiss instructed your
8  supervisors in the GYN rotation to write negative
9  evaluations and you told me that Dr. Kalir told
10  you that.
11          Other than Dr. Kalir, did anybody else
12  tell you that Dr. Bleiweiss had asked them or
13  others to write a negative evaluation about you?
14     A.   Well, Dr. Kalir was one person
15  definitely.  Are there other people?
16     Q.   Right.
17     A.   Let me see.
18          (After a pause) Um, well, with
19  Dr. Bleiweiss, I've seen him like, what is it?
20  You know, gossiping with Adrienne Jordan on
21  occasion or even with McCash.
22     Q.   I take it that Dr. Jordan and
23  Dr. McCash were not your supervisors in the GYN
24  rotation.
25     A.   Right.  I mean, they're not my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**744**

Varughese

1  Varughese
2  supervisors, but I know that he was, I mean,
3  especially after this incident, after
4  December 8th, like that following week he was, I
5  would constantly find him chitchatting with
6  Adrienne Jordan who is like not even on -- she's
7  not on surgical pathology. She was on neuropath
8  and derm path, I believe. OK? Like and she was
9  moonlighting.
10     Q.  So let me ask the question again,
11  Dr. Varughese, so I'm sure I get the answer.
12  Other than Dr. Kalir did anybody tell you that
13  Dr. Bleiweiss had told them or others to write
14  negative evaluations about you while you were on
15  your GYN rotation?
16     A.  Right. Well, I mean, well, the only
17  two people, other people on GYN rotation was
18  Dr. Deligdish and Dr. Elisen. So, I mean, did
19  they say anything? No. I didn't even know
20  Dr. Elisen was going to do the evaluation. I was
21  by told Dr. Kalir that she was told by
22  administration and Dr. Bleiweiss also told her and
23  all I know is she was very upset and she was
24  crying at work.
25     Q.  Is this Dr. Kalir?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**745**

1  Varughese
2     A.  Yes.
3     Q.  So Dr. Kalir and the other two
4  physicians you just mentioned, they were your
5  supervisors during GYN rotation?
6     A.  GYN rotation. Yes.
7     Q.  Just those three.
8     A.  Yes, and then after GYN rotation I
9  wasn't even at Mount Sinai Medical Center. I went
10  to the VA, Bronx Veterans Administrative Affairs
11  Hospital. So I was even at the VA. So I was
12  actually off site for two months.
13     Then when I returned was when in
14  August I was working with Dr. Najfeld on
15  cytogenetics rotation. That was the two weeks
16  when I was back at Mount Sinai Medical Center. So
17  I did not have a lot of supervisors following that
18  GYN rotation.
19     MR. WRONKO:  I'm sorry to interrupt,
20  but she did ask for a break.
21     MR. McEVOY:  Do you want to take a
22  break?
23     THE WITNESS:  Yes.
24     MR. McEVOY:  OK.
25     (A recess was taken from 11:15 a.m. to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**746**

1  Varughese
2  11:23 a.m.)
3  BY MR. McEVOY:
4     Q.  Dr. Varughese, before the break I
5  asked you to tell me what you believed
6  Dr. Bleiweiss did to retaliate against you for
7  making complaints of discrimination.
8     Is there anything else other than what
9  you already told me?
10     A.  Right. With the, I mean, what I'm
11  really aware of are the evaluation that he
12  submitted, you know, accosting my supervisors on a
13  different rotation, supervisor anyway, Dr. Kalir,
14  and then the third thing was with the presentation
15  where his fellow Robert Guarino who was scheduled
16  to present for over a month was allowed to cancel
17  at the last minute without any consequences and I
18  was asked to present in his place. Those three
19  things.
20     Oh, then the fourth thing was he was
21  writing e-mails about, you know, me that were
22  pretty defamatory to Dr. Lento. It was like
23  e-mails amongst themselves -- Firpo, Lento,
24  Bleiweiss.
25     Q.  Anything else?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**747**

1  Varughese
2     A.  No. That's I think it.
3     Q.  Let me show you a document.
4     (Defendants' Exhibit 59, document
5  headed "Faculty Evaluation of Pathology A
6  Resident/Fellow," marked for identification,
7  this date.)
8     Q.  Have you had a chance to look at that?
9     A.  Yes.
10     Q.  Can you tell he what this is,
11  Dr. Varughese?
12     A.  This is a faculty evaluation of a
13  pathology resident or a fellow. This was
14  evaluated by Ira Bleiweiss and I was the subject.
15     Q.  And is this the, again to use your
16  word, the negative evaluation that you were just
17  referring to?
18     A.  Yes.
19     Q.  So now, Dr. Varughese, would you tell
20  me everything that you believe Dr. Lento did to
21  retaliate against you for making complaints about
22  drinking on the job?
23     A.  Dr. Lento?
24     Q.  Yes.
25     A.  Well, what Dr. Lento did, I mean, I am

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

**748**

Varughese

1  not, I mean, I think the problem here is that a
2  lot of the retaliation was related to my
3  complaints of or me engaging in protective
4  activity.
6            I think drinking on the job was sort
7  of something where my white colleagues were being
8  incriminated, and I think they went out of their
9  way to protect them and treat me. You know, that
10  is the real issue here. It's not that is it
11  retaliation because I complained about people
12  drinking on the job. I don't see it as
13  retaliation for a complaint about people drinking
14  on the job. I see that this like retaliation for
15  engaging in protected activity.
16            And that when I did discuss people
17  drinking on the job, the first knee jerk reaction
18  from them was to protect my white coworkers, not
19  to take actions against them. I mean, this
20  extends to drinking, unprofessionalism, repeat
21  instances of harassment. So it's about how I'm
22  being treated differently than my white
23  colleagues.
24      Q.   Is what you just said, Dr. Varughese,
25  also true with regard to Dr. Cordon-Cardo,

---

**749**

Varughese

1  Dr. Figur and Mr. Johnson?
3            MR. WRONKO: Form objection. You can
4      answer.
5      A.   Is that true for them as well that
6  they did not retaliate against me for -- I mean, I
7  think when it comes to Dr. Cordon-Cardo or
8  Dr. Firpo, um....
9      Q.   Dr. Firpo is not somebody who you
10  identified in response to that part of the
11  interrogatory. So let me make it easier for you.
12      A.   No, no, I can answer that question.
13  Let me just. I will answer that question.
14      Q.   OK. Go ahead.
15      A.   Right. So with Dr. Figur I mentioned
16  the drinking on the job to him in January of 2011.
17  And, I mean, I'm not sure if he thought to himself
18  he needs to intervene as part of Physician
19  Wellness Committee to see if they should enforce
20  this policy that's within the hospital. There's
21  no alcohol to be brought onto hospital premises.
22            If I were the administrator what I
23  would do probably would be to send, you know,
24  request that this kind of activity no longer take
25  place and probably confiscate whatever was there

---

**750**

Varughese

1  and, you know, so there wasn't any confusion about
2  what was going to happen going forward.
4            I didn't see that happen. And I also
5  noted that following those issues Adrienne Jordan
6  was promoted to chief resident position and there
7  was no, you know, there was no disciplinary
8  actions taken against any of these people.
9      Q.   But the question, Dr. Varughese, is,
10  what did Dr. Figur do, if anything, that you
11  believe was in retaliation against you for your
12  reporting to him that these folks were drinking on
13  the job?
14      A.   Right. And I think they were focused
15  on finding me at fault here. I mean, in terms of,
16  you know, the drug tests and all that, I mean, if
17  I'm being drug tested, like I think, you know,
18  McCash should also be drug tested. I think that
19  was retaliatory.
20      Q.   Anything else that you think Dr. Figur
21  did that was in retaliation for your reporting the
22  drinking on the job?
23      A.   Right. Because, I mean, he is the
24  Physician Wellness, he is like heading the
25  Physician Wellness Committee. I would imagine

---

**751**

Varughese

1  that he would want to as a head of that -- they're
2  really involved with physician impairment, drug
3  abuse, those kind of issues generally, they
4  probably would want to test, have McCash and them
5  tested, but they didn't ask them to test.
6      Q.   Right. You told me that now three
7  times. Is there anything else that Dr. Figur did
8  that you think is in retaliation for your --
9      A.   Right. So I was --
10      Q.   Let me finish. Retaliation means
11  something that he did to you. Not what you think
12  he should have done with other people. What he
13  did to you because you reported drinking on the
14  job. Anything else other than making you undergo
15  a drug test?
16      A.   Right, mandating a drug test would be
17  one. The second thing would be like mandating
18  some sort of psychological evaluation at the
19  hospital itself. That was the second thing. I
20  don't think Jordan, I mean, Jordan or McCash or
21  anybody else who was involved in this whole
22  situation were mandated to do so.
23            Then going forward, let's see. I
24  think the protective measures that were taken for

752

Varughese

1 my, these coworkers, I think that, I would
2 consider that as, you know, part of retaliation.
3
4     Q.    Anything else that Dr. Figur did that
5 you think was in retaliation for your reporting
6 drinking on the job?
7     A.    Right. I mean, I was initially
8 referred to Dr. Figur for insubordination or
9 whatever in December. So I think, you know, the
10 hospital was sort of intent on treating me
11 differently and retaliating against me.
12     Q.    But we're talking about Dr. Figur now,
13 not about the hospital.
14     A.    Well, Dr. Figur is really
15 representative of the hospital.
16     Q.    So all I want to know is what
17 Dr. Figur did other than what you told me that you
18 think is in retaliation for you reporting drinking
19 on the job.
20     A.    Yeah, I mean, I find most of what was
21 done to be also retaliation for bringing forward a
22 complaint against, I mean, engaging in protective
23 activity.
24     Q.    Dr. Varughese, that's a legal term.
25 OK? And I don't know what you mean by it. What

753

Varughese

1 I'm asking you is, what else, if anything,
2 Dr. Figur did to you in retaliation for your
3 reporting drinking on the job?
4
5         MR. WRONKO:  Just listen to his
6 question. Is there anything else that
7 Dr. Figur did?
8     A.    Well, I believe, at the House Staff
9 Affairs Committee, he did reveal like, you know,
10 he disclosed what I thought should be like HIPAA
11 protected information regarding my, you know,
12 medical care possibly.
13         I mean, I think he did that to make a
14 point that, make some sort of, you know, statement
15 or point about, I mean, it wasn't really for him
16 to disclose technically to like perfect strangers.
17     Q.    Anything else Dr. Figur did in
18 retaliation for your reporting drinking on the
19 job?
20     A.    Like, I mean, I really can't think of
21 anything else right now.
22     Q.    OK. What did Dr. Cordon-Cardo do, if
23 anything, in retaliation because you reported
24 drinking on the job?
25     A.    Well, he didn't want me to bring the

754

Varughese

1 complaint. He didn't want me to discuss people
2 drinking on the job. Then he didn't, you know,
3 with the -- he actively tried to fine me, fire me
4 from the department. I mean, is it because I
5 complained of, I mean, it is because I complained
6 of discrimination. I'm not sure it's because I
7 reported drinking on the job. But, I mean, the
8 drinking on the job shows that while that's a
9 really serious matter, he was not interested in
10 discussing it.
11     Q.    Anything else that Dr. Cordon-Cardo
12 did in retaliation, that you believe he did in
13 retaliation for your reporting drinking on the
14 job?
15     A.    I think he tried to help them cover it
16 up. He helped, you know, he wanted to help
17 Adrienne Jordan and McCash, help the department
18 cover up this stuff.
19     Q.    Anything else?
20     A.    That's all I can remember.
21     Q.    What did Paul Johnson do, what you
22 believe rather Paul Johnson did to you in
23 retaliation for your reporting drinking on the
24 job?
25

755

Varughese

1     A.    Paul Johnson, I mean, he's part of the
2 hospital administration I believe and, I mean, as
3 such he knows -- well, he allegedly knows all the
4 hospital policies and everything. He didn't take
5 any action.
6     Q.    But what, if anything, did he do to
7 you as a result of your reporting drinking on the
8 job, if anything?
9     A.    Yeah, I can't, I don't really know.
10     Q.    Now, turning to the FMLA, and you
11 mentioned something about this before, so if you
12 want to repeat it you can, but you don't have to.
13 What did Dr. Firpo do in retaliation for your
14 exercise of rights under the FMLA?
15     A.    Who?
16     Q.    Firpo.
17         MR. WRONKO:  I'm sorry, I am just
18 directing her back to 5 (iii).
19     Q.    So just so you know, Dr. Varughese,
20 and the record is clear, the response to number 5
21 (iii) are the four people that you identified as
22 people who you believe retaliated against you for
23 your alleged exercise of your rights under the
24 FMLA.
25

756

Varughese

2     Do you see that?

3     **A.**   Right. Under the FMLA, OK. Yes.

4     **Q.**   What I'm going to ask you, the same way I asked you about the discrimination and the drinking on the job, is I'm going to ask you about each of those people.

8     And starting with Dr. Firpo, who is listed first, what did Dr. Firpo do that you believe was in retaliation for your attempt to exercise your rights under the FMLA?

12     **A.**   Right. Now, who are we talking about? Who is the person you said?

14     **Q.**   Dr. Firpo.

15     **A.**   Firpo, OK. Under the FMLA?

16     **Q.**   Yes.

17     **A.**   Well, essentially I had requested FMLA and he had informed me that I can -- initially he had informed me that, you know, I'm going to be at work and I'm not going to be out until -- I'm going to be taking off from work until -- I was going to inform him and that was the initial understanding.

24     But then he changed this understanding to say that I should not be at work at all and I'm

*Computer Reporting NYC Inc.*
*(212) 986-1344*

757

Varughese

2 not allowed to be at work for just requesting the leave. And he did not explain to me why he thought that was the case.

5     And this essentially went into Monday, Tuesday where I was being told not to be at work, but I was not informed of why I should not be at work when there was no rhyme or reason to that. And I believe that was retaliation against me because that was preventing me from doing my job and it was retaliatory.

12     And then they fired me and he was involved in my firing. He approved the termination letter and then they said that one of the reasons for my termination was my communications regarding the leave of absence through FMLA. I mean, that's retaliatory.

18     **Q.**   Anything else that Dr. Firpo did that you believe was in retaliation for your attempt to exercise your rights under the FMLA?

21     **A.**   Well, those are all the reasons. I mean, as I just mentioned.

23     **Q.**   What did Ms. Patel, rather, what do you believe Ms. Patel did in retaliation for your attempts to exercise your rights under the FMLA?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

758

Varughese

2     **A.**   OK, Ms. Patel was working with Dr. Firpo and she was in contact with administration such as, you know, Caryn Tiger-Paillex, Paul Johnson, Firpo and probably higher ups, because I think she used to work for either Dr. Charney or Dr. Davis.

8     So I mean, she definitely was involved in this whole thing. And she was e-mailing. I mean, she was seemingly confused about how to even proceed with leave. Then she was telling me that I shouldn't be at work. She was also telling me the same thing that Dr. Firpo was stating.

14     **Q.**   So regardless of her involvement in this, what did she do that you believe was in retaliation for your attempt to exercise your rights under the FMLA?

18     MR. WRONKO: Form objection. You can answer.

20     **A.**   She was doing the same that Dr. Firpo was stating, which was stating that I should (sic) be at work.

23     She was detaining me in my office against my will on September 20th. She was, you know, she was involved in this whole incident in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

759

Varughese

2 that way.

3     **Q.**   Anything else that Ms. Patel did that you believe was in retaliation for your attempt to exercise your rights under the FMLA?

6     **A.**   That's all I can think of right now.

7     **Q.**   What did Ms. Tiger-Paillex do or you believe that she did in retaliation for your alleged exercise of your rights under the FMLA?

10     **A.**   Right. Well, I spoke to Caryn Tiger-Paillex on September 20th, 2011 after I was detained in Shema Patel's office and I had informed her regarding what I was trying to do to follow up on the leave of absence. And she, you know, she basically -- after that they made a decision to fire me. Even before I could, you know, go see my doctor they made a decision to fire me that day. Even though she knew that I was doing what I should do to follow up.

20     And then she wanted me to be not at work, which was, you know, I don't know why. I mean, I didn't -- like just because I requested family medical leave doesn't mean I cannot show up to work the next day or I should be requested that I not show up to work.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

760

Varughese

Q. Anything else that Ms. Tiger-Paillex did that you believe was in retaliation for your exercise of your rights under the FMLA?

A. Well, that's what I can think of right now.

Q. Lastly, you identified Marina Lowy. Who is Ms. Lowy?

A. She is one of the in-house counsel.

Q. At Mount Sinai?

A. Right.

Q. What did Ms. Lowy do that you believe was in retaliation for your attempts to exercise your rights under the FMLA?

A. I think she was, well, I assumed she was involved because on Friday -- the Thursday e-mail from Adolfo Firpo said this is what you're supposed to do. You're supposed to work with your mentor Dr. Petersen who is also your supervisor right now and you shouldn't change your work schedule, so on, on Thursday.

On Friday it was a different story and Marina Lowy was cc'd on all these e-mails. So I assumed she had something to do with the decisions that were being made.

---

761

Varughese

Q. Anything else you believe Ms. Lowy did in retaliation for your efforts to exercise your rights under the FMLA?

A. Well, she is in-house counsel, so, you know.

Q. You told me that. Anything else that you believe she did that was in retaliation for your attempts to exercise your rights under the FMLA?

A. That's all I can think of right now.

Q. So now, Dr. Varughese, if you'd look at what is now number 4 on the same page I think you're on, that interrogatory asks you to identify the individuals who you believe discriminated against you based upon your race, national origin and gender, and I think you've talked about your being an Indian woman a number of times.

Just so I understand before I ask you the question, is that the basis on which you believe you were discriminated against, because you were an Indian woman?

A. Yes, woman of Indian descent.

Q. I just wanted to make the questions easier. If you look at number 4, on the page

---

762

Varughese

here, those are the individuals who you identified who you believed discriminated against you based on the fact that you're a woman of Indian descent. I'm going to ask you the same question I just asked you about retaliation.

What did Dr. Lento do or you believe that he did to discriminate against you because you're a woman of Indian descent?

A. Dr. Lento?

Q. Dr. Lento.

A. Dr. Lento, he was treating me differently than he was treating Dr. McCash and Dr. Jordan who were receiving much more favorable treatment in terms of the residency aspects in terms of aspects related to my complaints. In terms of discipline, I was being disciplined for the same thing, you know, things that they were also guilty of. I mean, they were definitely guilty of, and for violating various policies, they were not, you know, McCash and Jordan were not disciplined and I was being disciplined. So I think that has to do with the fact that I'm a woman of Indian descent.

Q. Anything else that Dr. Lento did that

---

763

Varughese

you believe was discriminatory towards you because you're a woman of Indian descent?

MR. WRONKO. Form objection. You can answer.

A. Yes. I think that academic advisement, that was discriminatory. Because that highlights disparate treatment compared to how Dr. McCash was treated where he wasn't disciplined at all.

It also states that Dr. Jordan feels something or, you know, feels a certain way and it defends Dr. Jordan's statements without ever addressing them with me. I mean, that's disparate treatment. That has to do with the fact that they're white doctors and I'm a doctor of Indian, a woman doctor of Indian descent. And this sort of treatment continued throughout the next year. And I had also mentioned some other incidents in one of the questions previously. I mean, I think those apply to this question as well.

Q. Dr. Varughese, I know you did make reference to that before.

A. Right.

Q. I'm not asking you nor do I really

---

764

Varughese

1 want you to repeat what you told me before. But
2 anything you've said previously that was
3 discrimination as opposed to retaliation is on the
4 record, you've said it, and because you don't say
6 it again doesn't mean you haven't already said it.
7 So it's on the record. You've said it. So it's
8 really anything else about Dr. Lento that you
9 haven't already told me either in response to this
10 question or in response to a previous question.
11          I just want to have your testimony
12 complete about what it is you believe Dr. Lento
13 did to discriminate against you because you're a
14 woman of Indian descent, OK?
15    A.    OK.
16    Q.    So we're done with Dr. Lento or not?
17    A.    (After a pause) OK.
18    Q.    I'm sorry?
19    A.    I think we're done for now.
20    Q.    What did Dr. Cordon-Cardo do that you
21 believe was discriminatory because you're a woman
22 of Indian descent?
23    A.    I think what I mentioned previously.
24    Q.    Anything else or is that it for the
25 moment?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

765

Varughese

1
2    A.    I think that's it.
3    Q.    What did Dr. Firpo do that you believe
4 was discriminatory against you because of the fact
5 that you're a woman of Indian descent?
6    A.    I mean, same things as I mentioned
7 previously.
8    Q.    And what did Dr. Bleiweiss do that you
9 believe was discriminatory against you because
10 you're a woman of Indian descent?
11    A.    Well, the evaluations and then, I
12 mean, what I had mentioned previously and that's
13 all I can think of right now.
14    Q.    What did Dr. Schiller do that you
15 believe discriminated against you because you're a
16 woman of Indian descent?
17    A.    Well, he did make, you know, he made
18 commentary on India, and he said that, Oh, you
19 don't know the type of things you'll find in India
20 or the crazy things you'll find in India.
21          He basically said that almost every
22 time I made an autopsy -- I was involved in
23 autopsy presentation. He would say something like
24 that. Even though like none of my cases had to do
25 with India or any patients from India. I don't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

766

Varughese

2 think I even had a single patient from India on
3 any single autopsy, and he would make this
4 commentary. It is really derogatory and
5 discriminatory and racist and I actually had
6 several medical students who I was working with at
7 the time approach me and say they were offended
8 because it was racist.
9    Q.    And who were they?
10    A.    They were medical students who were
11 working with me on autopsy service.
12    Q.    And what were their names?
13    A.    Their names? They're long gone now.
14    Q.    That may be, but do you remember their
15 names?
16    A.    I think it was a Dr. Klein and I
17 remember Dr. Dickinson, Andrew, and several other
18 medical students.
19    Q.    You told me that there were medical
20 students of Indian descent who were offended.
21    A.    No, no, it wasn't medical students --
22    Q.    Just medical students.
23    A.    No, medical students were not of
24 Indian decent, would be offended.
25          (Cross-talk.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

767

Varughese

2    Q.    I got you.
3    A.    Medical students of Indian decent
4 probably may not be as clued in.
5    Q.    In your complaint in paragraph 23 you
6 say "Dr. Schiller remarked to Dr. Varughese during
7 a conference presentation in random fashion and
8 without any benefit to the presentation, 'you
9 don't know the crazy things you find in India.'"
10 All right?
11    A.    Right.
12    Q.    When was that? When was that
13 conference?
14    A.    That was over the -- he didn't just
15 say that once. He said that repeatedly over the
16 number of years that I was there and I was
17 involved in autopsies.
18    Q.    Because in the complaint it refers to
19 a conference. Not multiple times. I am just
20 trying to understand whether he said this once or
21 as I think I just heard you say more than once.
22    A.    Yeah, he definitely did say that more
23 than once. I remember him saying that like as
24 early as my first year of residency and I thought
25 maybe that's just like a random one time thing,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

768

Varughese

1
2 he's going to say it just because he is trying to
3 be humorous.
4     But then he would say that every time
5 at a conference and he would essentially say that
6 to the point where I, you know, people thought,
7 people assumed that he sort of had some sort of
8 prejudice or bigotry issues.
9     Q.    So how many times would you estimate
10 that Dr. Schiller made a comment, either this
11 comment or similar comment, "you don't know the
12 crazy things you find in India"?
13     A.    I was on autopsy for six months to
14 seven months in a period of three years.  So he
15 must have made that comment, I mean, I think I was
16 working with Eric and -- what's his name?  And
17 Andrew.  That must have been like my junior year.
18 So that's my third year in working with them.
19     Q.    So how many times would you estimate
20 he made that comment during the times you were
21 working with Dr. --
22     A.    So he must have made this comment at
23 least like four, maybe more times over the
24 three-year period.
25     Q.    And where would he make that comment?

Computer Reporting NYC Inc.
(212) 986-1344

769

Varughese

1
2 By that would he make it during a conference?  Did
3 he make it while he was talking with people in the
4 hallway?  Where would he make that comment?
5     A.    No, this was actually in a follow-up
6 conference.  It was like a small classroom-like
7 room.  And there would be the pathology residents,
8 some doctors who may have had a patient who had
9 autopsy, and, you know, a few medical students and
10 I would -- since it was an informal event, I would
11 just bring the case and everything for review and
12 Dr. Schiller would, you know, so he made these
13 comments when he was, when I was presenting and he
14 was, you know, overseeing the conference.
15     Q.    So during these conferences, these
16 four or more conferences when he made the
17 statements you attribute to him, you said he made
18 them while you were making a presentation?
19     A.    Right.
20     Q.    Did he always make them when you were
21 presenting?
22     A.    Right, but I also think he would make,
23 if I was there, like he would see me or whatever,
24 I think he would like make a comment on Indians or
25 India.  He did that like, I mean, I think I wasn't

Computer Reporting NYC Inc.
(212) 986-1344

770

Varughese

1
2 even presenting once and he saw me and he was
3 like, Oh, you know, India, you know.  Just the
4 crazy stuff you see in India.  Just those general
5 like racist-type comments.
6     Q.    Other than "you don't know the crazy
7 things you find in India," what, if any, comments
8 did he make about India other than "you don't know
9 the crazy things you find in India"?
10     A.    That was like his line.  Like he has
11 the same line.  He has a routine that he does.  So
12 he doesn't do like much out of his routine.  He
13 sticks to one or two racist commentary.  He is not
14 a -- he doesn't have a large array of commentary
15 about anything.
16     Like, every conference he would like
17 stick a scalpel in the spine, of the autopsy case,
18 like, say, well, this person does or doesn't have
19 osteoporosis.  He does that with every case.  It
20 is sort of like that's what he does.
21     Q.    I just want to understand.  So in
22 these four or more conferences either when you
23 were presenting or when he would see you and talk
24 to you on four or more occasions, he made the
25 comment about "you don't know the crazy stuff you

Computer Reporting NYC Inc.
(212) 986-1344

771

Varughese

1
2 find in India."
3     A.    Right.
4     Q.    Did Dr. Schiller make any other
5 comments about India or about your being a woman
6 of Indian descent?
7     A.    Well, I think the whole DNA thing.
8     Q.    You told me about that on a previous
9 day.
10     MR. WRONKO:  Form objection.  You can
11 answer.
12     Q.    But you can tell me again.
13     A.    The whole DNA thing, I felt that was
14 sort of, you know, also ties in with the India
15 thing.  Because DNA is intrinsically part of who
16 you are and I think to make disparaging remarks
17 about or statements about someone's DNA having to
18 do with anything I think is, especially in a
19 negative context, I think that has something to do
20 with being a woman of Indian descent.
21     Q.    Other than the comment about your DNA
22 and the comment about crazy things you find in
23 India, did Dr. Schiller say anything else that you
24 believed or interpreted to be a comment about the
25 fact that you're a woman of Indian descent?

Computer Reporting NYC Inc.
(212) 986-1344

772

Varughese

2    **A.**    Right, then I mean, he didn't really
3  want to know about what happened.  I mean, he
4  didn't want to know about my version of my side of
5  the story.
6    **Q.**    Now we're talking about comments that
7  he made that you interpreted as being about --
8    **A.**    Well, I think to say that I'm not --
9    **Q.**    Go ahead, I'm sorry.
10    **A.**    He is not interested in talking or
11  hearing about what happened from my point of view.
12  I think that all has to do with something to do
13  with me being a woman of Indian descent.  Because
14  that's not what he said to Adrienne Jordan and
15  Samuel McCash.
16    **Q.**    Anything else that Dr. Schiller said
17  that you interpreted or believed was a comment
18  about your being a woman of Indian descent?
19    **A.**    That's all I can think of right now.
20    **Q.**    Other than Dr. Schiller,
21  Dr. Varughese, did anybody else at Mount Sinai,
22  and by anyone else, I mean supervisors, members of
23  administration, the people we have been talking
24  about, did anyone else make any comments about the
25  fact that you're a woman of Indian descent?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

773

Varughese

2    **A.**    Did anybody else?  No, I can't think
3  of anything right now.
4    **Q.**    And just to complete the question,
5  anything else that Dr. Schiller did other than
6  these comments you have just told me about?
7  Anything else that Dr. Schiller did that you
8  believe discriminated against you because you're a
9  woman of Indian descent?
10    **A.**    Dr. Schiller?
11    **Q.**    I'm sorry?
12    **A.**    Dr. Schiller?
13    **Q.**    Dr. Schiller, yes.
14    **A.**    I mean, that whole incident was, I
15  mean, his commentary, running commentary and --
16  what else?  I mean, I did see him at a conference
17  in October of 2011.  I saw him at a conference in
18  Las Vegas.  He was a presenter, whatever, and I
19  just saw him once and he gave me the middle
20  finger.
21    **Q.**    Did you interpret that or believe that
22  to be because you were a woman of Indian descent,
23  that he did that because you're a woman of Indian
24  descent?
25    **A.**    Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

774

Varughese

2    **Q.**    Why did you believe that?
3    **A.**    Well, I mean, I worked in that
4  department for like three years.  I did all my
5  work.  There were never any like patient-related
6  issues.  I did what I was supposed to do.  Look,
7  I'm like basically fired and he must have known
8  like they are not going to rehire me back or
9  whatever.  It seemed like they all knew I was not
10  going to get my job back there and he sees me at a
11  conference and he gives me a middle finger.  Like,
12  I mean....
13    **Q.**    I'm sorry.  Was that before or after
14  you were terminated?
15    **A.**    After I was terminated.
16    **Q.**    Anything else that Dr. Schiller did
17  that you believe was discriminatory because you're
18  a woman of Indian descent?
19    **A.**    Right.  I mean, I think he was trying
20  to influence, I mean, I don't know what degree of
21  influence he has, but I was told that he was fired
22  from the hospital as the chairman, former
23  chairman, he was essentially fired.  He didn't
24  resign or anything.  But he was still like, you
25  know, allowed to be actively involved in patient

*Computer Reporting NYC Inc.*
*(212) 986-1344*

775

Varughese

2  care and stuff at the hospital it seems like.
3          And I mean, I directly observed him
4  just before my first meeting on May 3rd, 2011.  He
5  went and had a discussion with Cordon-Cardo and
6  Castaldi.
7    **Q.**    And do you know if he was talking
8  about you?
9    **A.**    Well, he didn't have a scheduled
10  appointment and I assumed he was talking about me
11  because he gave me this intimidating, I guess like
12  his demeanor was intimidating towards me.
13    **Q.**    Anything else that Dr. Schiller did
14  that you believe was discriminatory against you
15  because you're a woman of Indian descent?
16    **A.**    I can't think of anything else right
17  now.
18    **Q.**    What did Dr. Pessin-Minsley do that
19  you believe was discriminatory against you because
20  you're a woman of Indian descent?
21    **A.**    Well, Dr. Pessin-Minsley did not take
22  into account my side of the issue or incidents.
23    **Q.**    We're talking about December of 2011?
24    **A.**    Yes, December of 2011, and she was, I
25  think she was present for the September 14, 2011

*Computer Reporting NYC Inc.*
*(212) 986-1344*

804

Varughese

1
2 BY MR. McEVOY:
3     Q.   Dr. Varughese, what I would like to do
4 before the lunch break is to ask you some
5 questions about a few of the factual allegations
6 in your complaint that we haven't, I don't think
7 we've talked about before.
8         In paragraph 25 of the complaint you
9 say, and I'll read the whole thing, "Only about
10 four days after her official complaint of
11 discrimination, Dr. Varughese received a hostile
12 and threatening letter from Drs. Pessin-Minsley
13 and Lento. Rather than properly responding to
14 Dr. Varughese's protective complaints, the
15 Hospital began engaging in an institutional
16 practice of retaliation against Dr. Varughese for
17 her complaints. In the letter, Dr. Varughese was
18 told by Dr. Pessin-Minsley and Dr. Lento that they
19 were in the 'process' of investigating her
20 complaints, but that should she confront anyone
21 regarding her discrimination complaint, that she,"
22 in italics, "would suffer, 'removal from service,
23 possibly including termination.'"
24         We had a fair amount of testimony
25 about that letter. And then it goes on in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

805

Varughese

1
2 paragraph 25, to say, "Meanwhile, Dr. Varughese
3 continued to experience increased obstruction such
4 as missing materials necessary to perform
5 Dr. Varughese's duties."
6         And it is that last sentence I would
7 like to ask you about.
8         What are you referring to when you
9 allege that you were experiencing increased
10 obstruction such as missing materials?
11         What materials were you missing
12 necessary to perform your duties in or about
13 December of 2010?
14     A.   Missing materials. Well, for
15 instance, on December 9th I was on, I think I was
16 doing biopsies. I was in the biopsy service in
17 the morning and then I was on frozen sections in
18 the afternoon.
19         So the morning, you know, usually you
20 get a page or, you know, like you check the --
21 check for the slides, the biopsy slides, and/or
22 you get a page from the attending. They get it
23 first.
24         There's no -- like whoever gets the
25 slides first basically informs the other person of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

806

Varughese

1
2 the cases, you know, that have come in that day
3 and the number of cases you want to sign out or
4 work on versus the number of cases you want them
5 to work on.
6         So, I mean, I didn't hear anything
7 like that day. I wasn't getting any pages from
8 anybody regarding cases that I should be working
9 on or I didn't get the slides. Like I checked
10 every thirty minutes or so. The slides, they
11 didn't, you know, essentially I didn't get them.
12         And then going forward, in terms of
13 things like even though immunohistochemistry,
14 stains for more complicated cases, I wasn't
15 getting any of those slides to review.
16         I mean, preview, if it's like a case
17 that needs to be signed out immediately, you know,
18 it's sometimes difficult to coordinate. But even
19 to review afterwards I wasn't getting any of these
20 cases going forward.
21         And when I was on hemepath, you know,
22 I talked to my coworkers. Like, I was on, what is
23 it? Surgical pathology with Jonathan Chow. He
24 wasn't having any of these problems that I was
25 experiencing.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

807

Varughese

1
2         Then on hemepath I continued to have
3 these problems with slides, paperwork, materials
4 relating to flow cytometry. Like, I wasn't
5 getting those same materials as other people were.
6     Q.   Where do those materials come from?
7     A.   I usually just request -- either it's
8 just submitted into my, you know, if I order them,
9 it's submitted into my box.
10     Q.   You order them from where?
11     A.   From the lab. You had to order them
12 from the lab and the lab is supposed to, you know,
13 if you put your initial or put your initial next
14 to those cases, the lab is supposed to like
15 forward the slides to you once it's processed.
16     Q.   On the occasions that you just
17 described, did you order the slides?
18     A.   Right.
19     Q.   And you said you didn't get them.
20     A.   Right, I wasn't getting the slides. I
21 wasn't getting the immunohistochemistry, and
22 oftentimes even blocks I had submitted that were
23 validated as having been submitted, the slides
24 would not be available to me. Even though they
25 were there and a lot of times it was, oh, the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

808

Varughese

2 blocks went missing, the paraffin blocks.
3        And it's impossible for so many blocks
4 from one person to go missing while everybody
5 else's blocks are not going missing. It was my
6 blocks that were going missing.
7    Q.    So the slides, the blocks, et cetera,
8 when you didn't get them or you were told they
9 went missing, did you inquire as to what had
10 happened to them?
11    A.    Yes, I inquired extensively as to what
12 had occurred.
13    Q.    Who did you ask?
14    A.    I followed up with the supervisor for
15 histology laboratories.
16    Q.    Who was that?
17    A.    At that time it was Jonathan Troung,
18 and so he followed up and he reviewed, because
19 every time you submitted blocks, every day they
20 take pictures, Polaroid or digital photographs, of
21 everything that's submitted into the system and
22 everything they have, so they had a record of all
23 the blocks that were submitted.
24        So he then reviewed all the things
25 that were submitted and he says, well, your stuff

Computer Reporting NYC Inc.
(212) 986-1344

809

Varughese

2 is, I mean, there were times when I made a mistake
3 and I obviously had to follow up on that.
4        But more often than not the blocks
5 were there. Everything was submitted or the
6 stains were ordered and my initials were, you
7 know, it was known it was to be assigned to me.
8 But they just were not being given to me or being
9 processed appropriately.
10    Q.    Did the supervisor who you spoke to or
11 anyone else give you an explanation as to why they
12 had gone missing or you weren't getting the things
13 you had ordered?
14    A.    Well, we could not get to the bottom
15 of this because it wasn't, you know, there was no
16 reason they should go missing.
17        It wasn't as if the labels were being,
18 you know, rubbed off or something, because I'm
19 working with very fatty tissue. When I'm on GYN
20 rotation I'm not really working with tissues
21 that's very fatty.
22        So the labels were there. You could
23 clearly identify the labels and everything. They
24 were going missing because somebody -- there was
25 foul play there.

Computer Reporting NYC Inc.
(212) 986-1344

810

Varughese

2    Q.    When you say there was foul play
3 there what do you mean?
4    A.    Meaning somebody was removing them or
5 actively, you know, obstructing my, obstructing me
6 from being able to do my work.
7    Q.    Do you have any belief as to who that
8 person or persons were who were --
9    A.    I think it was like Ira Bleiweiss.
10    Q.    What's the basis for your belief that
11 it was Dr. Bleiweiss?
12    A.    Because he's the one who is like
13 always there and he has access to all the stuff.
14    Q.    Where you say always there, where?
15 The lab?
16    A.    Yes, I think he comes in early.
17    Q.    Anybody else who you think was
18 responsible for you not getting the materials you
19 needed other than Dr. Bleiweiss?
20    A.    Well, I think he was doing that
21 because he was also telling my, you know, other
22 supervisors that I'm not doing my work.
23        I think he was trying to like create a
24 really disorganized environment where I'm always
25 showing up to my supervisors telling them, Hey,

Computer Reporting NYC Inc.
(212) 986-1344

811

Varughese

2 listen, like I submitted like five cases, five
3 major surgeries today for processing, and out of
4 the five surgeries four of my cases are missing
5 slides that are relevant to our signing out the
6 case on time.
7        So essentially all our cases when I
8 was on that service was being delayed at least
9 a day, two days by the simple fact there were
10 slides missing even though it was all submitted.
11 And I think it just becomes aggravation for
12 everyone involved and it just makes me, you know,
13 and I'm the one who is working on the service.
14        It reflects negatively on me. Even
15 though I had nothing to do with it and it's not
16 something I can control, it still reflects
17 negatively on me.
18    Q.    Is there any other reason that you
19 believe Dr. Bleiweiss was the person who was
20 preventing you from getting materials that you
21 needed?
22        MR. WRONKO: Form objection. You can
23    answer.
24    A.    Well, that combined with his
25 complaining to my supervisors, I think I assumed

Computer Reporting NYC Inc.
(212) 986-1344

812

Varughese

1
2  that he was doing that.
3      Q.  Anything else?
4      A.  No.
5          MR. McEVOY:  Why don't we break for
   lunch?  It's about five to 1.
7          (A luncheon recess was taken at
8  12:55 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

813

Varughese

1
2      A F T E R N O O N   S E S S I O N
3          (Time noted:  2:03 p.m.)
4  L E E N A   V A R U G H E S E ,   resumed and
5          testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  BY MR. McEVOY:
8      Q.  Dr. Varughese, in paragraph 30 of the
9  complaint you say, "Following her report of
10  harassment," and there I think you are referring
11  to the December 2010 incident.  So if you look at
12  paragraph 30 of the complaint, it's on page 10, it
13  says, "Following her report of harassment," and
14  again that's referring to the December 2010
15  incident, "Dr. Varughese continued to be subjected
16  to a hostile work environment, including by the
17  department's refusal to provide work materials and
18  support required for Dr. Varughese to perform her
19  work in pathology.  Often, the slides, paperwork
20  and necessary follow-up studies would not be
21  available to Dr. Varughese."
22          Dr. Varughese, is this allegation
23  regarding the same materials that you testified to
24  before the lunch break or does this refer to
25  something different?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

814

Varughese

1
2      A.  Right, this is referring to the same.
3      Q.  And it says that the department
4  refused to provide these materials.
5          Who in the department refused to
6  provide the materials and support that you
7  required to perform your work?
8      A.  Well, this is the residency program.
9  I'm going to say that's Dr. Patrick Lento.  He is
10  supposed to make sure that residency-related
11  materials are supposed to be available.
12      Q.  So anybody other than Dr. Lento who
13  you --
14      A.  I think the chairman of the department
15  should also, I mean, they're responsible, the
16  hospital is responsible.
17      Q.  Just so I understand, is it your
18  testimony that when you say that the department,
19  the hospital, Dr. Cordon-Cardo, Dr. Lento refused
20  to provide work materials and support to you, are
21  you saying they should have because of the
22  positions they held at the hospital?
23      A.  Well, I think what I'm just saying is
24  that, you know, these problems occurred following
25  my complaints and it was to a higher degree than

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

815

Varughese

1
2  before.  I mean, there was problems within the
3  residency program where materials and, you know, I
4  mean, in every meeting minute or resident meeting
5  minute or memo there were discussions about how
6  materials, you know, there were problems with
7  materials and disorganization in general.
8          But I'm specifically referring to my
9  experience where I would order the appropriate
10  slides or studies and they would not arrive ever
11  for me.  I mean, I don't think that was a problem
12  for other people.
13      Q.  Dr. Varughese, if you look at those
14  interrogatory responses we were talking about
15  before, interrogatory number 13 asked you to
16  "Identify the individuals who 'refused to provide
17  work materials and support required for
18  Dr. Varughese to perform her work in pathology'
19  and who 'refused to credit you for the work you
20  performed' and 'removed and tampered with' your
21  'data' referred to in paragraphs 30 and 42 of the
22  Complaint."
23          And you say in that response, after
24  Mr. Wronko makes prior objections, "plaintiff does
25  not know who in the department took such actions."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

816

Varughese

2 Do you see that?

3 A. Right.

4 Q. So --

5 A. Yeah, like I mean, I testified before

6 I thought that Dr. Bleiweiss was responsible, and,

7 I mean....

8 Q. I understand that, but on March 28,

9 2013, when you signed these, you said, you

10 certified that "The foregoing answers and

11 interrogatories are true and correct to the best

12 of my knowledge, information and belief. I am

13 aware that if any of the foregoing statements made

14 by me are willfully false I may be subject to

15 punishment."

16 So I guess my question is, in March

17 you didn't know who had refused to provide you the

18 information. Now are you guessing or do you know?

19 A. Well, I mean, I didn't write that

20 there, but, I mean, I do believe it was likely

21 Dr. Bleiweiss because, I mean, I cannot imagine

22 anyone else doing that unless it's Adrienne Jordan

23 or McCash.

24 Q. Dr. Varughese, this is not really the

25 time for you to sort of speculate about it could

Computer Reporting NYC Inc.
(212) 986-1344

817

Varughese

2 have been Dr. Jordan, it could have been

3 Dr. Bleiweiss, it could have been Dr. Lento. The

4 answer you gave to the question was you don't

5 know.

6 So if you do know, then tell me that

7 you know. If it's your assumption, supposition,

8 guess, that's different.

9 So with that understanding, do you

10 know who refused to provide you with information

11 or materials that you needed to do your job?

12 A. Given the circumstances that I

13 testified to, I mean, they are rather unusual, so,

14 I mean, somebody has to actively do that. I mean,

15 I don't know who would do it, but I'm going to

16 assume that it's going to be Dr. Bleiweiss,

17 Adrienne Jordan or Lento or McCash. I can't

18 imagine anyone else who would do that.

19 Q. And then that paragraph of the

20 complaint goes on to say, "Dr. Varughese reported

21 these instances to hospital administration and

22 appropriate individuals, but no assistance was

23 ever provided to Dr. Varughese."

24 And there, and that's interrogatory

25 number 14, which asked you to identify the

Computer Reporting NYC Inc.
(212) 986-1344

818

Varughese

2 hospital, members of the hospital administration,

3 appropriate individuals to whom you reported,

4 instances when slides, paperwork and necessary

5 follow-up studies would not be available, you

6 identified Dr. Lento, Dr. Barnett and New

7 Innovations.

8 So when did you tell Dr. Lento that

9 you were not being provided with slides, paperwork

10 and necessary follow-up studies?

11 A. Dr. Lento, I informed him -- I

12 informed him early on. Like, he would know. I

13 mean, I talked to Dr. Barnett, informed him about

14 the issues, and Dr. Barnett was aware of a variety

15 of all the issues in the department I think, and I

16 informed him early on, and I know Dr. Barnett

17 usually informs Patrick Lento immediately of any

18 issues. If anybody brings any issues to

19 Dr. Barnett, he will inform Dr. Lento.

20 Q. Did you tell Dr. Lento or do you

21 assume that Dr. Barnett told Dr. Lento?

22 A. No, I had spoken to Dr. Lento like in

23 beginning of the year and I did talk to him about

24 these issues. But In September 2010 I had talked

25 to him about these issues and I had told him like

Computer Reporting NYC Inc.
(212) 986-1344

819

Varughese

2 what the problems were in terms of the, you know,

3 residency. Like after the McCash incident

4 occurred, I had spoken to him about all the stuff

5 and then I talked to him again.

6 Q. Right now we're talking about the

7 slides, paperwork and necessary follow-up studies

8 that would not be available to you.

9 A. Right.

10 Q. When was the first time that you

11 didn't receive slides, paperwork or necessary

12 follow-up studies?

13 A. When was the first time? I don't

14 know.

15 Q. Had it happened before September of

16 2010?

17 A. Had it? No. There was an ongoing

18 problem with like paperwork and issues from the

19 department. But In terms of it being sort of a

20 problem for me that was in excess of other

21 people's issues, that didn't happen until after

22 like September 2010.

23 Like before it was like everyone.

24 Like there was a degree of disorganization and a

25 number of issues within the department that

Computer Reporting NYC Inc.
(212) 986-1344

820

Varughese

1 seemed, it seemed like it wasn't just my problem.
2 Then after September 2010 I know what cases were,
3 I was doing. I knew where the blocks were. Like
4 I know what was submitted. I know what was
5 ordered in the system, and in terms of the
6 material that should have been given to me, given
7 all that, there was a lot of issues producing
8 those materials from them, which doesn't make any
9 sense.
10      Because if somebody else in my same
11 situation, same line of work, and they identified,
12 put X, Y and Z blocks and they have all the cases,
13 I mean, all the slides, not the cases, all the
14 slides for that particular case, they're only
15 missing one or two slides from each case. That
16 was occurring to me a lot. And there was really
17 no explanation to it because, I mean, there
18 wasn't. There just wasn't any explanation for any
19 of that.
20      Q.   So before September of 2010 you said
21 it was an ongoing problem that all the residents
22 experienced?
23      A.   Right. There was, I don't know what
24 they were doing, but, I mean, this is like the lab

*Computer Reporting NYC Inc.*
*(212) 986-1344*

821

Varughese

1 part that processes all the tissues. There were
2 some things going on where they were not producing
3 the materials on time.
4      But then for instance, like May, when
5 I was on GYN rotation --
6      Q.   When was that?
7      A.   May 2011. This is like after
8 September and December. So, I mean, September
9 2010 and December 2011. I mean, excuse me.
10 December 2010. So in May 2011 I was on GYN
11 rotation.
12      I mean, all the cases should have been
13 processed the way it was submitted. But
14 oftentimes I would not receive, like I explained
15 before, like I would submit five different cases.
16 All the blocks and everything would be submitted
17 appropriately. And it's all like representative
18 sections. There's nothing different from one
19 block to the next block really in terms of the
20 tissue that's being processed, but I would not get
21 certain slides from that block, I mean, from those
22 cases.
23      That's not happening -- that's not a
24 happening out of nowhere. That's like somebody

*Computer Reporting NYC Inc.*
*(212) 986-1344*

822

Varughese

1 actively obstructing and actively removing those
2 blocks and not, you know, so that I would not get
3 the slides and the materials.
4      The same thing with the
5 immunohistochemistry, when I was on hemepath, I
6 was not getting a lot of the slides,
7 immunohistochemistry slides. And I talked to my
8 coworkers like Dr. Chow or Martinez, and they said
9 no, we're getting the immunohistochemistry slides.
10 Like, you should be reviewing them because that's
11 what we do and that's part of hemepath. It's not
12 something that's reserved for, you know, the
13 attending pathologist to do only. It's something
14 that I should be doing as well and I should also
15 be reviewing some other studies relating to all my
16 cases.
17      Q.   Dr. Varughese, you told me much about
18 this morning. The question I asked you was prior
19 to September of 2010 were all of the residents
20 experiencing problems with paperwork and with
21 slides and follow-up studies.
22      MR. WRONKO: Form objection. You can
23 answer.
24      A.   I mean, I don't know what all the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

823

Varughese

1 residents were doing.
2      Q.   Were you aware of at least some of the
3 other pathology residents --
4      A.   Well, if you --
5      Q.   Let me finish the question. Were you
6 aware, you personally aware of other pathology
7 residents prior to September 2010 who were having
8 problems receiving necessary slides, paperwork and
9 follow-up studies?
10      A.   Well, I know what's in the meeting
11 minutes of the residents' meeting, and it appears
12 that some people were having issues getting, I
13 mean, there were complaints regarding that.
14      Q.   And after September 2010 are you
15 saying that the frequency with which you
16 encountered those problems increased?
17      MR. WRONKO: Form objection. You can
18 answer.
19      A.   Yes.
20      Q.   And you told me about when you were in
21 the GYN rotation and you were in hemo pathology.
22 Any other occasions after September 2010 when you
23 encountered problems getting slides, paperwork,
24 follow-up studies other than on those two

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**824**

Varughese

1 rotations that you've already told me about?
2     A.   Right, when I was on surgical
3 pathology, it depends on the case that I did. If
4 I did a case that had a lot of, I mean, this is a
5 technical thing. If it had a lot of fatty tissue,
6 they would not process the block. It required
7 longer processing because it doesn't process as
8 easily. So they would process the block for like
9 an extra day or something. So there was an
10 explanation as to why I'm not getting the cases or
11 the slides on time.
12           . Beyond like that, those were the
13 situations when I didn't get the slides on time.
14 Otherwise my slides never used to go missing.
15 Like, I don't know if it happened to other people,
16 but before that in my experience my slides just
17 didn't like come out or just go missing.
18           But after I started, I reported this
19 harassment and such, my slides and everything
20 would just go missing randomly, even though it was
21 all accounted for.
22     Q.   I'm sorry, and that started in
23 September 2010?
24     A.   Right. Before that that didn't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**825**

Varughese

1 happen.
2     Q.   After September 2010 other than the
3 two physicians you mentioned who weren't having
4 the same problems you were having, do you know
5 whether any other pathology residents were having
6 problems getting slides, paperwork, follow-up
7 studies?
8     A.   Well, it was reported to me people, I
9 mean, in terms of the certain type, I mean, people
10 reported to me that they were not having the same
11 issues when they were on certain rotations. Like
12 when they was on GYN rotation or hemepath rotation
13 they were not having those same issues. But
14 people in surgical pathology rotation, I think
15 people were having similar issues with missing
16 slides and all that stuff.
17     Q.   And when you say people reported to
18 you, are those the two doctors you mentioned a
19 couple of minutes ago?
20     A.   Who were the two doctors?
21     Q.   You said -- I don't remember their
22 names off the top of my head, but you said --
23     A.   Oh, Martinez and Chow?
24     Q.   Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**826**

Varughese

1     A.   Right.
2     Q.   OK. Now, going back to your reporting
3 these problems to Dr. -- let's go back to
4 Dr. Lento. You said you spoke to him in Septembe
5 2010?
6     A.   To who?
7     Q.   Lento.
8     A.   Yes, I did.
9     Q.   Where did you talk to Dr. Lento?
10     A.   At the hospital.
11     Q.   Where at the hospital?
12     A.   In his office.
13     Q.   Was anybody else present other than
14 you and Dr. Lento?
15     A.   No.
16     Q.   Tell me what you said to Dr. Lento and
17 he said to you about the problems with your not
18 receiving slides, paperwork, necessary to follow
19 up.
20     A.   I think he said that they were trying
21 to fix these problems or they were trying to do
22 something to fix the issues. I think they were
23 going to hire more people. I don't know. Like
24 they changed their approach to this issue. I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**827**

Varughese

1 mean, they were always trying to hire somebody
2 new. I don't know. I think that's what they were
3 going to do.
4     Q.   After this September 2010 conversation
5 with Dr. Lento about missing slides, paperwork,
6 and follow-up studies, did you talk to Dr. Lento
7 again about that subject?
8     A.   Yeah, I mean, I did report these
9 issues. I wrote evaluations regarding the
10 problems that were there. I mean, I think he knew
11 it was me because like New Innovations, those
12 things were not confidential. We were told they
13 were anonymous and confidential, but they were
14 not. So like apparently our names showed up on
15 all the evaluations and stuff.
16           And so yeah, I mean, Dr. Lento had
17 access to that. So he definitely knew what my
18 complaints were and I was complaining about it.
19     Q.   And he knew about that because you had
20 submitted them in writing through New Innovations?
21     A.   Right.
22     Q.   But did you ever speak to Dr. Lento in
23 person again after September 2010?
24     A.   Yes, I spoke to him like as follow-up

*Computer Reporting NYC Inc.*
*(212) 986-1344*

828

Varughese

1
2  and then he accused me of writing a diatribe,
3  evaluation with New Innovations and submitting it
4  and I'm the only person with such a negative
5  attitude and perception.
6       Q.   Are you referring to your comments
7  about missing slides, paperwork and follow-up
8  studies?
9       A.   Right, yeah, all that stuff.  He said
10  I'm the only person who has a negative perception
11  about, you know, the residency program.  I'm the
12  only person who would write something like that
13  and I'm writing a diatribe.
14      Q.   Did he say that to you in person or
15  did he --
16      A.   Yes, he said that to me in person.
17  And I was asking him if he was going to follow up
18  at all with McCash, and he said -- that's what he
19  said to me.  He didn't say that he is going to
20  follow up.  He just started accusing me of
21  doing all this stuff of writing.
22      Q.   I'm sorry.  What does Dr. McCash have
23  to do with missing slides, paperwork and followup
24  studies?
25      A.   Right, I had this conversation because

*Computer Reporting NYC Inc.*
*(212) 986-1344*

829

Varughese

1
2  I was following up with him, if he was going to
3  talk to Dr. McCash about his attitude, I mean, his
4  verbal outburst and harassment.  And Dr. Lento
5  then accuses me of having a negative attitude and
6  perception of, you know, surgical pathology
7  rotation, which was like completely unrelated.
8  I'm like talking about discrimination here and he
9  wants to talk about some supposed evaluation that
10  I thought was supposed to be anonymous and
11  confidential.
12       And he said I'm the only person who
13  has such a negative attitude.  And I know that a
14  lot of residents in that program were unhappy with
15  the program and the teaching and the way, you
16  know, they felt things were going there.  So, I
17  mean, I don't know why he would think I have such
18  a negative attitude or I'm the only person who has
19  a negative attitude.
20       I think he thinks that because, you
21  know, he is discriminating against me and treating
22  me differently.  Like he would probably want to
23  say that everybody does have a negative attitude.
24  But he doesn't say that.  He says I'm the only
25  person.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

830

Varughese

1
2       Q.   Did you have any other communications
3  either in writing or in person with Dr. Lento
4  about missing slides, paperwork, follow-up
5  studies?
6       A.   Yes, so I had that conversation with
7  Dr. Lento and that's what he said to me.  Then I
8  think I had discussed this with him again at some
9  point.
10      Q.   Do you remember when?
11      A.   (After pause) Right, I was on autopsy
12  rotation in December to January of 2011, December
13  2010 to January 2011, and I would submit, you
14  know, blocks to be processed from autopsies and I
15  wouldn't receive them for like weeks.  I mean, it
16  would just sit there.  I would, you know, submit
17  something and I would expect it within a few days.
18       I mean, autopsy cases, they are not
19  going to process them the next day because they
20  are considered low priority for the laboratory,
21  but they are supposed to be processed within a few
22  days though, and there would be weeks where I
23  would not get the slides back.
24      Q.   Did you talk to Dr. Lento about that?
25      A.   Yes, I did.  I reported that like it's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

831

Varughese

1
2  not because I didn't submit the slides.  It's just
3  simply because the lab hasn't processed it yet.
4       Q.   And what did he say?
5       A.   I don't know.  I think he's supposed
6  to follow up with the laboratory.
7       Q.   And do you know whether he did or he
8  didn't?
9       A.   Yeah, I think he did.
10      Q.   When is the first time that you spoke
11  to Dr. Barnett about missing slides, paperwork and
12  follow-up studies?
13      A.   Well, I spoke to Dr. Barnett in
14  January.
15      Q.   Of what year?
16      A.   January 2011.
17      Q.   Where did you talk to Dr. Barnett?
18      A.   I talked to him in his office.
19      Q.   Was anybody else present?
20      A.   No.
21      Q.   What conversation did you have with
22  Dr. Barnett about missing slides, paperwork and
23  follow-up studies?
24      A.   I just like informed him that I did
25  not get the slides and paperwork like I should in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**832**

1  Varughese
2  a timely manner and it was becoming a problem.
3      Again, in like February of 2011 I
4  spoke to him again about it and I think, what's
5  his name? Paul Johnson was there at that time.
6  He was there during that conversation. And I had
7  informed them like my paperwork, my cases were not
8  being given to me anymore.
9      And it's a problem because like, you
10  know, it's preventing -- like I'm on a service.
11  All I do is like, you know, there's no grossing.
12  There's no grossing on this rotation. And the
13  only thing I had to do was like review cases and
14  come up with diagnoses and do research and I
15  couldn't do it because I didn't have the work
16  materials that I needed.
17      Q.   Is that what you told Dr. Barnett and
18  Mr. Johnson?
19      A.   Yes.
20      Q.   What did they say?
21      A.   They didn't say anything. They were
22  like, well, they just thought I had to go back and
23  talk to somebody else about it. They wanted me to
24  go talk to like Dr. Strauchen or some, you know,
25  they wanted me to go back to the department and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**833**

1  Varughese
2  talk to Dr. Lento and Dr. Strauchen and all these
3  other people in the department where it was a
4  departmental issues, like where I was not getting
5  this material. Him as the associate dean of
6  graduate medical education, it's his job to
7  intervene at that point.
8      Q.   That's Dr. Barnett.
9      A.   Yes.
10      Q.   Why do you think it was his job as
11  associate dean to intervene at that point?
12      A.   Because he is the associate dean of
13  graduate medical education. He is supposed to
14  ensure that education that the hospital promises
15  to provide to anybody who is enrolled in their
16  residency program occurs in a nondisparate manner.
17      And here I am complaining to him, that
18  since I complained, all of these things are
19  happening to me in the department and it's frankly
20  disturbing and, I mean, I felt really sad about
21  it. And I'm telling him about it and he just
22  wants me to go back and talk to the same people
23  who I'm saying is probably creating this issue
24  here.
25      Q.   What's your understanding of New

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**834**

1  Varughese
2  Innovations? What is it?
3      A.   New Innovations is, I mean they called
4  themselves the residency management software. But
5  it's an on-line Internet-based or cloud-based
6  program where you can input the duty hours, your
7  work hours, your conferences, your call.
8      You can review your information
9  regarding, you know, where you stand as personnel,
10  like the postgraduate year of training, or any
11  notes people made regarding licensing, and so on.
12  I mean, and you can compare yourself to other
13  people in your class or other classes on how
14  you're doing in different aspects of your, you
15  know, the six competencies. You can actually
16  compare yourself. So it's like one of those
17  management software for the program.
18      Q.   Was there any information that you
19  were required to enter into New Innovations?
20      A.   Yes, I think we were required to enter
21  into New Innovations the duty hours.
22      Q.   You said in response to interrogatory
23  13 that you were "advised by a representative of
24  New Innovations that only an administrator of the
25  system could delete information."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**835**

1  Varughese
2      Who was the representative of New
3  Innovations that you spoke to?
4      A.   I have her name, but I don't have it.
5  I have to find out what her name is. But, yeah,
6  so I spoke to a friend of mine who is in a
7  residency at another hospital who was the chief
8  resident. And he had informed me that I can call
9  up New Innovations and talk to the people there to
10  figure out, you know, if the information is still
11  in the system.
12      Because I knew they had deleted some
13  of my evaluations and stuff. Like the one
14  Dr. Lento accused me of writing a diatribe, they
15  had deleted all that stuff from New Innovations.
16      Q.   You're getting ahead of me. So wait a
17  minute. So you know who the representative is
18  that you spoke to, but you don't have her name
19  here.
20      A.   Right. I do know who that is, but I
21  don't have it here.
22      Q.   Did she tell you that only an
23  administrator of the system could delete
24  information?
25      A.   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

836

Varughese

2  Q.  What is your understanding of what an
3  administrator is?  Who are the administrators of
4  New Innovations?
5  A.  They are basically superusers who can,
6  you know.  Like I have to have a password to go
7  into my system and that's it.  I'm limited to my
8  account.  If you're an administrator you're going
9  to have blanket access to all different accounts
10  and you can probably change the information in
11  there.
12  Q.  Do you know who the administrators
13  were who had access to New Innovations who were
14  the superusers as you describe it?
15  A.  Well, Dr. Lento and Dr. Barnett were
16  two people who were superusers of New Innovations.
17  Q.  Anybody else that you know was a
18  superuser?
19  A.  No.
20  Q.  And then it says, "The representative
21  confirmed that information had been deleted on the
22  system."
23  Did the representative you spoke to
24  tell you what information had been deleted from
25  the system?

Computer Reporting NYC Inc.
(212) 986-1344

837

Varughese

2  A.  Right.  I had told her it was these
3  evaluations that were submitted, and she confirmed
4  that they were no longer there.  They were
5  definitely deleted.
6  Q.  Wait.  You said to her an evaluation
7  from Dr. Smith, a name I'm making it up, from
8  Dr. Smith was submitted and should be in New
9  Innovations.
10  A.  Right.
11  Q.  And she said it's not there.
12  A.  Right.
13  Q.  So you told her what information you
14  thought should be in there and she confirmed that
15  it wasn't there.
16  A.  She confirmed to me that it wasn't
17  there.  Then I called up my coworkers and I talked
18  to them whether or not the evaluations they had
19  submitted to New Innovations had been missing at
20  all from that particular year.  Because from my
21  first and second year all the evaluations that I
22  submitted are still there.  The only evaluations
23  that have gone missing are the ones from third
24  year.
25  Q.  Are those evaluations that you

Computer Reporting NYC Inc.
(212) 986-1344

838

Varughese

2  submitted, that you personally submitted to New
3  Innovations?
4  A.  Right.
5  Q.  They weren't submitted by the
6  evaluator, but they were submitted by you.
7  A.  Right, I was the evaluator of that
8  particular rotation, yes.
9  Q.  So were these evaluations of you by
10  others?
11  A.  No, it was evaluations of me --
12  Q.  I see.  Evaluations that you had done.
13  A.  I had done of the rotation.  Not of --
14  like surgical pathology rotation.  Not of
15  individuals.  I never evaluated another doctor.
16  Some people had the right to evaluate other
17  doctors.  I was never given that right.  But I
18  know people did evaluate other -- their
19  supervisors.  I never evaluated my supervisors.
20  Q.  Who were the coworkers you spoke to
21  who said they didn't have any problems with
22  missing evaluations that they submitted?
23  A.  Well, I talked to Sara Frost and she
24  confirmed to me that none of her evaluations that
25  she submitted for the year 2010 to 2011 were

Computer Reporting NYC Inc.
(212) 986-1344

839

Varughese

2  missing.
3  Q.  Anybody else other than Dr. Frost?
4  A.  Right, I talked to Paul Azar and a few
5  other people and they all said that, I mean, they
6  said it was all there.
7  Q.  Other than Dr. Frost and Dr. Azar, do
8  you remember the names of any of the other
9  physicians/coworkers that you spoke to?
10  A.  No, there were a few people.  I don't
11  remember now who else I spoke to.
12  Q.  In the same paragraph of the complaint
13  30 that we're looking at on page 10, the last
14  sentence, that "Dr. Varughese was repeatedly
15  humiliated on several instances with comments made
16  regarding her intelligence, and asked if she was,
17  quote, special needs, unquote, when she made the
18  same requests that were routinely made by other
19  residents."
20  In response to the interrogatory
21  number 15 that asked you to identify the
22  individual who asked you if you had special needs,
23  you said that Dr. Kalir advised plaintiff that,
24  quote, people are saying you are, quote unquote,
25  special needs, unquote.

Computer Reporting NYC Inc.
(212) 986-1344

AA-163

---

840

Varughese

1
2          Do you see that?
3     A.    Yes.
4     Q.    So how did this conversation with
5  Dr. Kalir come about?
6     A.    How did this come about?  This is
7  after she was being -- she said that Dr. Bleiweiss
8  was, you know, was saying that she should write
9  negative evaluations about me and she said that he
10  was saying that I wasn't doing my work.  And she
11  was, she said I'm crying at work and all this.
12          Then a day or two later she, you know,
13  we were having a chat and she said, well, because
14  I think -- I didn't know what was going on.  I
15  don't know what the back story is or was at that
16  time.  But now through discovery I discovered that
17  there were some e-mails being written about, you
18  know, grossing or gross room issues that I didn't
19  know about.  And she said, and I guess that's in
20  that context where she said that, you know, people
21  are going, people are saying that you're special
22  needs.
23     Q.    Did she tell you what people were
24  saying that?
25     A.    No, she was referring to like the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

841

Varughese

1
2  residents and the residency program and, you know.
3     Q.    The quote that you attribute to her is
4  "people are saying you are special needs."  So did
5  she tell you the names of the people who she said
6  were saying that?
7     A.    Right.  So the context of this
8  conversation was, you know, the people, I mean,
9  the people meaning like Cordon-Cardo, you know,
10  and I don't know what was being e-mailed because I
11  wasn't part of that e-mail, you know,
12  conversations.  But I know that Ms. Morency had
13  sent out e-mails stating something or other about
14  grossing certain specimens that are supposed to be
15  grossed by PAs and the PAs didn't want to do it
16  for some reason and they were trying to force me
17  to do it.
18          I think this got back to her at some
19  point and then she said, you know, Do you want
20  people to say you're special needs?  I think she
21  was referring to like the coworkers who were
22  there, which is, you know.
23     Q.    Dr. Varughese, I'm not asking you
24  about e-mails that you read at some point later in
25  time.  I'm not asking you about how you connect

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

842

Varughese

1
2  the dots.
3          What I'm asking you is, when you had
4  this conversation with Dr. Kalir did she tell you
5  the names of the people who were saying you are
6  special needs?
7     A.    I am trying to think of one right now.
8     Q.    Take your time.
9     A.    I mean, she didn't say any names.  I
10  think she mentioned like Dr. Bleiweiss.  But she
11  didn't really say any names.
12     Q.    Did she tell you what these people
13  meant by the words "special needs"?
14     A.    Yeah.  I mean, she didn't tell me, but
15  I knew, I know what she meant.
16     Q.    So she didn't tell you.  What did you
17  interpret her to mean?  What was your
18  understanding?
19     A.    She said, Are you special needs?  And
20  I said, what are you, like, you know, what's the
21  problem here?
22          And she said, well, you know, like Why
23  do you need help with grossing or assistance with
24  grossing?
25          And I said because I have a lot of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

843

Varughese

1
2  work to do and you routinely use the PAs and
3  moonlighters to perform some of the work because
4  that's what they're for.
5          And I had implied she was saying that
6  I was slow or that I was, you know, like retarded,
7  mentally retarded or something.
8     Q.    Who said that?
9     A.    She never said that, but I think
10  that's what she was implying by people are saying
11  special needs.  I think that's what was being
12  implied.
13     Q.    So that's what you understood her to
14  mean when she used the words "special needs."
15     A.    Usually "special needs" in a
16  derogatory term, when it's said, that's what it
17  means to anyone, OK?
18     Q.    That's what it meant to you anyway.
19     A.    That's what it was meant to be, yes.
20     Q.    And then it goes on to say that,
21  "asked if she was 'special needs' when she made
22  the same requests," she being you, "when she made
23  the same requests that were routinely made by
24  other residents."
25          What requests did you make that were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

844

Varughese
1
2 routinely made by other residents that resulted in
3 people referring to you as having special needs?
4     A.    Yes, routinely made requests was, you
5 know, obtaining assistance from the PAs, the
6 moonlighters, to do some of the work, you know, to
7 assign some of the work to them, which is done by
8 all the residents and all the fellows.  Like, I
9 see that happening all the time.
10          There are mass e-mails being sent out
11 to the department on any given day about how much
12 work there is to be done and how everybody wants
13 help.  Whether it's Adrienne Jordan, Elizabeth
14 Morency, Robert Grenowe (phon), Jacqueline
15 Hechtman, there's a constant barrage of e-mails.
16 Please help.  I'm too busy today.  Please help.  I
17 need to go to a party and I need work to be done.
18 Please help.  So-and-so is out again today.  So we
19 need help with performing our work.
20          This happens all the time in this
21 residency.  The minute I need to get some help
22 finishing my work, it just becomes this
23 large-scale issue where I'm being talked in this
24 way by my supervisor and being asked if I'm
25 special needs.

Computer Reporting NYC Inc.
(212) 986-1344

845

Varughese
1
2     Q.    Then if you look at paragraph 32,
3 which also starts on page 10, it says
4 "Dr. Varughese was treated differently by the
5 Hospital than her similarly situated peers and in
6 retaliatory fashion.  As for her work in the
7 pathology department, much of Dr. Varughese's work
8 entailed the analysis of slides.  Dr. Varughese
9 would often, for no reason, be delayed by the
10 hospital in receiving slides, and additional
11 studies necessary to perform her work.  Also,
12 Dr. Varughese would oftentimes order special
13 stains which were critical to her research and
14 work.  For no justification, the Hospital refused
15 to provide the necessary stains, intrinsic to
16 making a final diagnosis in pathology.  When
17 Dr. Varughese reported the issues and level of
18 obstruction that she was experiencing on a daily
19 basis to her colleagues, the colleagues denied
20 having similar problems on similar assignments."
21          I assume, but correct me if I'm wrong,
22 that the slides, additional studies, are the ones
23 we have been talking about.
24     A.    Right.
25     Q.    And then are the necessary stains the

Computer Reporting NYC Inc.
(212) 986-1344

846

Varughese
1
2 same ones that you talked about before?
3     A.    Yes.
4     Q.    And it says "the Hospital would refuse
5 to provide the necessary stains."
6          What's the basis for your belief that
7 the hospital refused to provide the stains?
8     A.    OK, when I was on GYN the special
9 studies that I had ordered, they did not arrive at
10 all.
11     Q.    Well, I understand that you said --
12     A.    And then somebody went in there and
13 changed, you know, stuff that I had assigned to my
14 initials to the fellow's initials.  And I was the
15 one who was on the service and they should have
16 been sending all those cases to me.  But there
17 were changes.  Somebody was going in there
18 changing everything to the fellow's initials.
19     Q.    So assuming all that's true, what's
20 the basis for your belief that the hospital
21 refused to provide you with these necessary
22 stains?
23     A.    That's refusing to provide.  If they
24 obliged and provided the studies I would not be
25 changed to somebody else's name, and so on and so

Computer Reporting NYC Inc.
(212) 986-1344

847

Varughese
1
2 forth.
3     Q.    Who is it at the hospital that you
4 believe refused or didn't provide you with the
5 necessary stains?
6     A.    Who at the hospital?  Well, probably
7 Dr. Bleiweiss and the powers that be.
8     Q.    Then when you said in the beginning of
9 that paragraph that you were treated differently
10 by the hospital than your similarly situated
11 peers, and in interrogatory 16 you were asked to
12 identify the similarly situated peers and
13 colleagues, you identified Dr. Chow, Dr. Martinez,
14 Dr. Azar, Dr. Roman, Dr. Morency, Dr. Jordan and
15 Dr. McCash.
16          And while I'm happy to ask you about
17 each of those people individually, let me ask you
18 a question that hopefully will cover them all.
19          Are you saying here that these people
20 didn't encounter those problems in obtaining
21 slides, additional studies, necessary stains that
22 you say you encountered?
23     A.    Right, I'm saying they didn't
24 encounter the degree of obstruction that I
25 encountered with work materials.

Computer Reporting NYC Inc.
(212) 986-1344

868

Varughese

1
2     A.    Yes, Dr. Strauchen was very responsive
3  to any concerns that I had when he was the program
4  director.
5     Q.    In paragraph 31 of the complaint you
6  say "On February 15th, 2011, only Dr. Varughese
7  was required to leave her assigned work post
8  despite the fact that she and her male colleague
9  did not have the requisite clearance known as a
10 mask fit test."
11          You mentioned that briefly on one of
12 the earlier days of the deposition.  But who was
13 the male colleague who you referred to in
14 paragraph 31 of the complaint?
15    A.    Dr. Chow.
16    Q.    Is there anything else you would like
17 to tell me about that incident other than what you
18 already testified to?
19    A.    Well, I think I had already testified
20 that Dr. Chow was asked to remain and I was asked
21 to leave, and this is a department that's run by
22 Mount Sinai Medical Center.
23    Q.    What department are we talking about?
24    A.    Department of pathology.
25    Q.    What is a mask fit test?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

869

Varughese

1
2     A.    It's just simply a test that, I mean,
3  it's simply fitting.  I think I testified to this
4  before as well.
5     Q.    Then don't repeat yourself.  And who
6  asked you to leave?
7     A.    Who asked me to leave?  It was the --
8  I don't remember now.  It was one of the staff
9  there, staff members there.
10    Q.    Was it another physician?
11    A.    No.  It wasn't a physician.
12    Q.    So a staff member.  What staff member,
13 not by name, but by title could have asked you to
14 leave?
15    A.    Well, Dr. Blaisero (phon) who was like
16 the -- he oversees that department there.  He was
17 there, but he didn't like physically come out and
18 ask me to leave.  But I think he told the
19 secretaries to tell me to leave.
20    Q.    So you think he told the secretaries
21 to tell you to leave.
22    A.    Right.  And they insisted that Chow
23 should stay.
24    Q.    Did they say why?
25    A.    Well, I think it was discriminatory

*Computer Reporting NYC Inc.*
*(212) 986-1344*

870

Varughese

1
2  because, you know.
3     Q.    I have no doubt you think that.  My
4  question is, did they say why?
5     A.    Did they say why?  No, they didn't
6  explain themselves.  They were trying to say that
7  he had his test.  And he said, No, I didn't have
8  my test.
9     Q.    As part of the discovery process you
10 or Mr. Wronko were required to provide what are
11 known as Rule 26 disclosures.  One of the things
12 that is required to be disclosed are the names of
13 individuals who are likely to have discoverable
14 information relevant to disputed facts alleged in
15 the operative pleadings, and that's just kind of a
16 fancy way of saying you have to identify people
17 who know something about your case.
18          And 52 people.  52.  Well, really,
19 more like 49 names were disclosed.  So what I am
20 going to do is ask you about some of these people,
21 not all of these people, because I am going to
22 assume that you have told me, and tell me if I'm
23 wrong, that you have told me for example
24 everything, at least so far that I've asked you,
25 everything that Dr. Lento knows about your claims

*Computer Reporting NYC Inc.*
*(212) 986-1344*

871

Varughese

1
2  in your case.
3     Q.    Is that a fair statement?
4     A.    Um --
5          MR. WRONKO:  Form objection.  You can
6  answer.
7     A.    I mean, I'm not sure about that.
8     Q.    Because here are the two choices and
9  I'm happy to do either one.  I can ask you what
10 Dr. Lento knows about the facts alleged in the
11 complaint for example, and you've obviously told
12 me a lot about Dr. Lento over the last number of
13 sessions that we've had.
14          And so I would ask you to tell you
15 anything that you haven't already told me.  So we
16 can proceed that way if it's easier for you.
17          MR. WRONKO:  No, I have to object to
18 the form of that question, because that
19 question, asking her what Dr. Lento knows,
20 how could she possibly know or be inside of
21 his brain to know what exactly he knows?
22          I mean, if you want to ask her has she
23 told you everything about what she observed
24 about Dr. Lento, you know, that I think is a
25 fair question.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-166

923

```
 1

 2                 C E R T I F I C A T E

 3   STATE OF NEW YORK      )

 4                          : ss.

 5   COUNTY OF SUFFOLK      )

 6

 7              I, THOMAS R. NICHOLS, a Notary Public

 8        within and for the State of New York, do

 9        hereby certify:

10              That LEENA VARUGHESE, the witness

11        whose deposition is hereinbefore set forth,

12        was previously duly sworn and that such

13        deposition is a true record of the testimony

14        given by the witness.

15              I further certify that I am not

16        related to any of the parties to this action

17        by blood or marriage, and that I am in no way

18        interested in the outcome of this matter.

19              IN WITNESS WHEREOF, I have hereunto

20        set my hand this 23rd day of July, 2013.

21

22

23              THOMAS R. NICHOLS

24

25
```

AA-167

Leena Varughese, M.D.

vs.

Mt. Sinai Medical Center

August 7, 2013

Witness: Leena Varughese - Vol. 5

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344
Fax: (212) 983-9149
office@crinyc.com

925

```
 1
 2         UNITED STATES DISTRICT COURT
 3         SOUTHERN DISTRICT OF NEW YORK
 4    ----------------------------X
 5    LEENA VARUGHESE, M.D.,
 6                   Plaintiff,
 7         vs.              12 Civ. 8812(CM)
 8    MOUNT SINAI MEDICAL CENTER,
      PATRICK LENTO, M.D., CARLOS
 9    CORDON-CARDO, M.D., ADOLFO
      FIRPO, M.D., IRA J. BLEIWEISS,
10    M.D. and ABC CORP. 1-10, and
      JOHN DOES 1-10,
11
                   Defendants.
12    ----------------------------X
13
14
15              August 7, 2013
16              10:01 a.m.
17              Volume V
18
19         Continued deposition of LEENA
20    VARUGHESE, held at the offices of Edwards
21    Wildman Palmer LLP, 750 Lexington Avenue, New
22    York, New York, pursuant to Notice, before
23    Thomas R. Nichols, a Registered Professional
24    Reporter and a Notary Public of the State of
25    New York.
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

926

```
 1
 2    A P P E A R A N C E S:
 3
 4    LAW OFFICES OF RONALD J. WRONKO, LLC
 5    Attorneys for Plaintiff
 6         134 Columbia Turnpike
 7         Florham Park, New Jersey 07932
 8    BY:  RONALD J. WRONKO, ESQ.
 9
10    EDWARDS WILDMAN PALMER LLP
11    Attorneys for Defendants
12         750 Lexington Avenue
13         New York, New York 10022
14    BY:  RORY J. McEVOY, ESQ.
15         JULIE L. SAUER, ESQ.
16
17    ALSO PRESENT:
18         RAJIT MALLIAH
19
20
21
22
23
24
25
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

927

```
 1                         Varughese
 2    L E E N A  V A R U G H E S E, called as a
 3         witness, having been duly sworn by a Notary
 4         Public, resumed as a witness, was examined
 5         and testified further as follows:
 6    EXAMINATION BY (CONT'D.)
 7    MR. McEVOY:
 8         Q.   So Dr. Varughese, to ask the question
 9    I always ask, are you taking any medication,
10    consumed any drugs or alcohol that will impair
11    your ability to answer the questions that I'm
12    going to ask you today?
13         A.   Well, I did take Benadryl last night
14    for my allergies and I did take something for
15    gastritis as well.
16         Q.   Does either of the things you took
17    affect your memory or --
18         A.   Well, the Benadryl does.  The Benadryl
19    may have some effect.  It makes you tired and
20    groggy.  But I took it last night.  It should have
21    worn off by now.
22         Q.   OK, good.  So Dr. Varughese, I show
23    you a document that has previously been marked as
24    Defendants' Exhibit Number 4.  It is the
25    resident's contract that you signed in March of
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

928

```
 1                         Varughese
 2    2011.
 3              Just confirm for me, if you would,
 4    that that in fact is your resident's contract for
 5    the PGY year 7/1/2011 to 6/30/2012.
 6         A.   Yes.
 7         Q.   Yes?
 8         A.   Yes.
 9         Q.   If you look at paragraph 12, which is
10    on page -- the Bates stamp number P-997.  Do you
11    see that?
12         A.   What is it?
13         Q.   Paragraph 12?
14         A.   Right.
15              MR. WRONKO:  He is referring to the
16         bottom page which is 997.  Go to the next
17         page.  There it is.  See paragraph 12.
18         A.   OK.
19         Q.   It says:  "The parties have entered
20    this Agreement in good faith and acknowledge their
21    respective ethical and legal obligations to
22    fulfill this Agreement until its expiration date.
23    This Agreement may be terminated and other
24    disciplinary action may be imposed in accordance
25    with the House Staff Manual.  The policies and
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

929

Varughese
1
2  procedures concerning disciplinary actions,
3  hearings and appeals are as outlined in the House
4  Staff Manual."
5          Do you see that?  And then it says
6  "see pages 29 to 31."
7      A.    Correct.
8      Q.    I'll show you another document.
9          MR. McEVOY:  Mark this as Defendants'
10    Exhibit 60.
11        (Defendants' Exhibit 60, document
12    entitled "House Staff Manual," marked for
13    identification, this date.)
14      Q.    Dr. Varughese, do you recognize the
15  document that was given to you?
16      A.    Yes.
17      Q.    Can you tell me what it is?
18      A.    It's pages 20, the -- I guess -- what
19  is it?  Table of contents and pages 29 to 33 of
20  the house staff manual.
21      Q.    On page 29 there is a section near the
22  bottom of the page entitled "Disciplinary Action."
23          Do you see that?
24      A.    Yes.
25      Q.    Then there's a Roman numeral I that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

930

Varughese
1
2  says: "Disciplinary action:  The Program
3  Director, the Department Chair, the President of
4  the Mount Sinai Hospital or the Medical Director
5  of the Mount Sinai Hospital of Queens may take
6  disciplinary action, including termination for
7  cause, against any House Staff Officer who:
8          "A.  Fails to demonstrate an
9  acceptable level of professional competence,
10  clinical judgment in the treatment of patients, or
11  professionalism."
12          Do you see that?
13      A.    Yes.
14      Q.    And then if you turn the page, it
15  enumerates four other bases on which disciplinary
16  action can be imposed.
17          B talks about professional misconduct.
18      A.    It says "Commits an act that
19  constitutes professional misconduct under the
20  New York State Education Law or breach of
21  professional ethics."
22      Q.    Correct.  C says "Fails to abide by
23  the By-laws, Rules and Regulations or policies of
24  the hospital or the Medical Staff."
25          D says "Engages in any activities that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

931

Varughese
1
2  are a threat to the welfare or safety of patients,
3  employees, other physicians, or the hospital" and
4  E says "Falsifies any Mount Sinai document, or
5  falsifies or misrepresents prior training or
6  educational experience."
7          That's what C, D and E say, correct?
8      A.    That's what it says.
9      Q.    OK.  Now, if you go to page 33, which
10  talks about job retention, right?  Underneath that
11  there is, again, a Roman numeral I and that says:
12          "A House Staff Officer may be
13  terminated from his or her residency program for
14  failure to abide by the By-laws, Rules and
15  Regulations, or policies of the Medical Center or
16  of the medical staff, for falsification of any
17  Medical Center document; for any activity that may
18  threaten the safety or welfare of a patient,
19  employee, or other physician; or for any action
20  that may be detrimental to Medical Center
21  operations.
22          "As stated above in 'Disciplinary
23  Action,' that's in quotes, a House Staff Officer
24  may be disciplined up to, and including
25  termination of his or her residency program for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

932

Varughese
1
2  failure to abide by the House Staff Manual,
3  By-laws, Rules and Regulations, or policies of the
4  Medical Center; for falsification of any medical
5  center document; any conduct that may threaten the
6  safety or welfare of a patient, employee, other
7  physician, or visitor; or any other conduct that
8  may be detrimental to Medical Center Operations."
9          Did I read that correctly?
10      A.    Yes, and it's part II that you have
11  not read.
12      Q.    "II.  Mount Sinai will notify each
13  affected House Staff Officer immediately:
14          "A.  Of a decision to discontinue any
15  training program for any reason; and/or.
16          "B.  Upon receipt from the
17  Accreditation Council for Graduate Medical
18  Education or the Commission on Dental
19  Accreditation of any notification regarding
20  non-accreditation or probationary status of any
21  training program."
22          That's what 2-A and B say, correct?
23      A.    Right.
24      Q.    Now, in your complaint, and I'm
25  talking about your breach of contract claim at the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-170

933

Varughese

1 moment, you allege that, in paragraph 14, "In each
2 of her years as an employee, Dr. Varughese and the
3 Hospital were parties to an ACGME Resident
4 employment contract (the 'Contract') governing
5 their relationship. The Contract incorporated by
6 reference the Mount Sinai Medical Center house
7 Staff Manual including a section entitled, 'job
8 retention.'"
9        Paragraph 15 says, "Through her date
10 of termination, Dr. Varughese did not commit any
11 acts defined under the 'Job Retention' section for
12 her to have been suspended or terminated from her
13 position in the pathology residency program.
14 Dr. Varughese's contracted employment to Mount
15 Sinai Medical Center could be terminated only if
16 the 'house staff' failed to abide by the By-laws,
17 Rules and Regulations, or policies of the Hospital
18 or of the medical staff, falsified a Hospital
19 document, threatened the safety or welfare of a
20 patient, employee or other physician or for any
21 action that may be detrimental to the Hospital
22 operations."
23        That's what those two paragraphs say.
24        So Dr. Varughese, I'm just trying to

934

Varughese

1 understand, is the basis for your claim that Mount
2 Sinai breached its resident's contract with you
3 that the house staff manual provision dealing with
4 job retention, you did not in your view commit any
5 of the acts that are enumerated in that section?
6 You can look at it again obviously.
7        A.   No.
8        Q.   I'm sorry, no, you did not commit any
9 of those acts?
10        A.   No, I did not.
11        Q.   And the house staff manual also
12 contains obviously the section on disciplinary
13 action that we looked at.
14        A.   Right.
15        Q.   And that also is incorporated into the
16 contract, correct?
17        A.   Right.
18        Q.   And the job retention section makes
19 specific reference to the disciplinary action
20 section.
21        A.   Right.
22        Q.   Is there any other provision of either
23 the resident's contract or the house staff manual
24 that you believe was breached by Mount Sinai other

935

Varughese

1 than the job retention provision that you refer to
2 in the complaint?
3        A.   Yes.  I believe that the hospital
4 breached its responsibility to me to provide
5 references and allowed me to move on with my
6 career in terms of acting in good faith with the
7 work that I had completed absolutely
8 satisfactorily for three years.
9        Q.   So you have the contract.
10        A.   Sure, I have the contract right here.
11 In fact, I will point out which one I'm speaking
12 of in a second.
13        Q.   Please.  Take your time.
14        A.   This is page 996, paragraph 9.  It
15 says here:  "If a training program is discontinued
16 his or her program director will assist the house
17 staff officer in obtaining placement in another
18 approved program."
19        Q.   Sorry, what are you reading from?
20        A.   Page 996, paragraph 9.
21        Q.   I'm not deaf, doctor.  Go ahead.
22        A.   It says, the last sentence of
23 paragraph .9 or paragraph 9 states:  "If a
24 training program is discontinued his or her

936

Varughese

1 program director will assist the house staff
2 officer in obtaining placement in another approved
3 program."
4        Then it also says:  "House staff
5 officers will be notified in writing at least four
6 months before their expiration of their employment
7 if their contracts are not to be renewed for the
8 next year of a given residency program or if they
9 will not be approved for the next postgraduate
10 year of training."
11        They didn't give me my contract for my
12 final year of residency until the end of March.
13 They should have, you know, if they did not want
14 me to be in that program any more, which they
15 really did not, and they were constantly harassing
16 me every day when I was at work, they did not
17 indicate to me that they were not interested in me
18 being there, I could have sought out another
19 residency program elsewhere.  They really did not
20 want me to complete my residency there.
21        Instead of constantly creating
22 pretextual reasons and harassing me at work every
23 day, I could have gone to another residency
24 program.  There were plenty of programs that are

965

Varughese
1
2 in excess of my contract and not in keeping with
3 medicine and medical hierarchy that was so touted
4 by Scott Barnett.
5     Q.    And what's the basis for your belief
6 that the disciplinary policies changed to permit
7 chief residents to discipline other residents?
8     A.    Excuse me?
9     Q.    You said that you thought the
10 disciplinary policy was changed so that chief
11 residents had authority to discipline other
12 residents, right?
13     A.    Right. I think that's what that
14 policy --
15     Q.    I'm sorry, you think it's one of the
16 five policies that came into effect in August of
17 2011?
18     A.    August 15th, right. I understand like
19 in terms of the rest of the hospital there is
20 administration that's an outside-of-residency
21 program, such as nurses and, you know, supervision
22 of nurses and supervision of other employees.
23     But in terms of professionals, MDs,
24 different rules apply for the code of conduct,
25 professionalism, discipline. Chief residents

*Computer Reporting NYC Inc.*
*(212) 986-1344*

966

Varughese
1
2 should not have any say in any of that.
3     Q.    In paragraph 60 of your complaint --
4 do you have the complaint?
5     A.    Yes.
6     MR. WRONKO: I think it's been marked.
7     MR. McEVOY: It is not an exhibit, but
8 I wonder if she has it.
9     A.    Yes, I have it.
10     Q.    So would you read that to yourself and
11 let me know when you're done.
12     A.    OK.
13     Q.    Tell me where it says in the
14 resident's contract that you are to be given, and
15 I'm quoting, notice of any and each failure in a
16 timely manner not in a final write-up or after
17 termination?
18     A.    I mean, that's basically, you know,
19 stipulated. There's supposed to be a four-month
20 notification of -- this is paragraph 9 of the
21 resident contract. It says notification of --
22 notifications of nonrenewal or nonpromotion will
23 include the reason for the action and are subject
24 to the hearing rights found in the house staff
25 manual. Then it says "(see pages 29 to 31)."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

967

Varughese
1
2     It says that here in my contract.
3 Then it says like they're supposed to tell me four
4 months before the expiration of their appointment
5 about the contract. OK, forget that. Don't write
6 that. Anyway, it says that there in terms of like
7 reasons for action, all this stuff.
8     Q.    I'm sorry, where are you looking?
9     A.    This is paragraph 9 of the contract.
10 It says notification of nonrenewal, so on, I just
11 said that. Like I'm supposed to be told that in a
12 timely manner.
13     Anyway, this is a residency program.
14 It is an educational venture to a large degree and
15 the hospital and the residency program has a duty
16 to inform me of my failure as it comes up.
17     Q.    And that was my question. Where does
18 it say that in your contract, and I'm just
19 beginning quoting from the complaint, that you are
20 to be given notice of any and each failure in a
21 timely manner, not in a final write-up or after
22 termination?
23     If you've already told me what you
24 think the basis of that is, that's fine. If
25 there's something else, tell me.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

968

Varughese
1
2     A.    Well, it says here it's guided by
3 ACGME policies. And I believe ACGME says that in
4 terms of educational requirements it's supposed to
5 be constructive criticism, not to be -- you're
6 supposed to inform people of what the issues are
7 as you go along, not, you know, not to be
8 blindsided or pretextually terminated from a
9 program for something that everybody else does.
10     I mean, you want me to point to the
11 contract where it says that? In the contract? Is
12 that what you're asking?
13     Q.    Or any source that you think. Well,
14 what the provision says is --
15     A.    Right, that's based on the ACGME
16 resident contract. It says here on my contract
17 ACGME resident. And I believe there are
18 provisions within the ACGME guidelines that say
19 that's how it's supposed to be.
20     Q.    So now, Dr. Varughese, let me turn to
21 your defamation claim. In the complaint if you
22 look at paragraph 143 --
23     A.    43?
24     Q.    143. And if you read 143 and then
25 also read 144 to yourself and let me know when you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

969

Varughese

2 are done.

3    A.    OK.

4    Q.    So other than Dr. Firpo, did anyone
5 else prepare or was involved in preparing the
6 summative evaluation?

7    A.    I don't know.

8    Q.    Who did Dr. Firpo send or give this
9 summative evaluation to?

10    A.    Well, he sent this to -- I was trying
11 to get my medical license from New Jersey and
12 Pennsylvania to increase opportunities for
13 completing my residency in pathology with the
14 final year of residency in pathology and to make
15 myself a better candidate for residency and he
16 sent this to the FCVS. It's an acronym for
17 something.

18    Q.    What is it the acronym for?

19    A.    It is a medical licensing facilitating
20 agency. They facilitate doctors to get their
21 medical licenses from a variety of states.

22    Q.    Where is it located?

23    A.    I'm not sure where it's located.

24    Q.    All right. And how do you know he
25 sent it there?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

970

Varughese

2    A.    Because I got a copy of the record of
3 all the information that they received and they
4 sent it to me and they showed me that this was
5 what they received and they were concerned about
6 what it said.

7        In fact, when I went through this
8 process with FCVS, the hospital did not, would not
9 submit the forms. They would not submit the form
10 that was being requested for my licensing. It was
11 constantly interfering with my ability to obtain,
12 you know, further my career and obtain appropriate
13 employment. And it took three months. I have
14 these e-mails going back and forth with FCVS about
15 what's going on? Why are you not getting this
16 information.

17        And then they had forged Allene
18 Carter's name no less on a form and sent it to
19 them. And they said, Allene Carter, is she a
20 physician? Because ACGME clearly states only a
21 physician can sign these forms. And FCVS also has
22 rules stating that physicians are supposed to sign
23 this form. Their forms say physicians are
24 supposed to sign this form, MD program director or
25 something.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

971

Varughese

2        And Allene Carter's name is clearly
3 forged on it and then she submits this form that
4 is allegedly the summative evaluation and then
5 this goes on and on back and forth for months.

6    Q.    So when you're referring to a form,
7 Dr. Varughese, are you talking about the summative
8 evaluation or some other form?

9    A.    This is the summative evaluation form
10 that has to be submitted to the FCVS for dispersal
11 to the state licensing boards.

12    Q.    And did FCVS also require other
13 documentation about your time as a resident in
14 addition to the summative evaluation?

15    A.    I'm not sure right now.

16    Q.    And so as I understand it, I just want
17 to make sure I understand, that when you saw what
18 had been submitted to FCVS by Mount Sinai you saw
19 your summative evaluation.

20    A.    Correct.

21    Q.    Where else did Dr. Firpo or anyone
22 else at Mount Sinai send your summative evaluation
23 other than to FCVS?

24    A.    Well, in terms of providing references
25 in a timely manner for Robert Wood Johnson

*Computer Reporting NYC Inc.*
*(212) 986-1344*

972

Varughese

2 employment opportunity, Mount Sinai Medical did
3 not do that in good faith. And that was a lack of
4 good faith and fair dealing. They did not inform
5 Robert Wood Johnson that I had finished three
6 years of my residency satisfactorily and I should
7 be allowed to do my fourth year residency at
8 Robert Wood Johnson where they wanted to hire me
9 as a fourth-year resident.

10        They did not show that good faith and
11 fair dealing in that, um, to give an appropriate
12 reference at that time to allow me to complete my
13 residency. They interfered with my employment
14 opportunity there.

15        Then again with, I believe Oregon
16 State, or someone called, and once again this was
17 after March 8th, and they did not provide
18 appropriate references.

19    Q.    So with regard to Robert Wood Johnson,
20 I take it from what you said that Mount Sinai or
21 Dr. Firpo did not provide the summative evaluation
22 to them, correct?

23    A.    They did not provide summative
24 evaluation to them at that time. When they called
25 for a reference they did not provide the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1029

Varughese

1  were given the runaround?
2  
3      A.    There's this one job I applied to and
4  they called and they did not get the needed
5  references.
6      Q.    What job was that?
7      A.    Well, you know, there were several
8  jobs that happened with. And that was verified,
9  that was sort of inferred to me over the time
10 period that this was happening. Then, yeah.
11     Q.    My question is, which of these
12 institutions or employers, potential employers
13 that you identified --
14     A.    I don't know which one exactly, but
15 this is like happening, you know.
16     Q.    Who verified to you that some of these
17 institutions were calling Dr. Firpo and others
18 about you?
19     A.    Well, like I said, Dr. Kalir told me
20 that she received a phone call and then Dr. Lemp
21 told me she had received phone calls and people
22 who I put as references informed me they had
23 gotten calls back regarding the reference.
24           So I assume Dr. Firpo being the
25 program director, newly made program director for

Computer Reporting NYC Inc.
(212) 986-1344

1030

Varughese

1  this pathology department would also receive the
2  phone calls, because he was on the Summative
3  Evaluations.
4  
5      Q.    So that's your assumption, that they
6  would have called him --
7      A.    Well, program directors --
8      Q.    Let me finish the question. So you
9  know that Dr. Kalir received calls, Dr. Lemp
10 received calls because you gave them as references
11 and they told you they had received calls.
12     A.    Right.
13     Q.    I take it Dr. Firpo never told you he
14 received a call about you.
15     A.    No, he didn't. But people said
16 that -- I was informed that he was called and he
17 was supposed to respond to the requests.
18     Q.    And who informed you of that?
19     A.    Well, for instance, Dr. Fife told me
20 that she had called and she tried to speak to him
21 and he would not respond to her.
22     Q.    And I said to you, other than Robert
23 Wood Johnson. I know that you were there and
24 Dr. Fife called --
25     A.    Oregon State, health, university,

Computer Reporting NYC Inc.
(212) 986-1344

1031

Varughese

1  whatever, they made the same phone calls and they
2  were going to speak to Dr. Firpo because he's a
3  program director. He is the one person who these
4  programs call.
5  
6      Q.    So I'm just trying to understand. Is
7  it your belief that the University of
8  Pennsylvania, Oregon State, for example, called
9  Dr. Firpo because they told you they were going to
10 call Dr. Firpo or the program director or because
11 you believed that that's the person they would
12 have called to get a reference on you?
13     A.    Because by default he's the program
14 director and they are called. Like it doesn't
15 matter. Like five years from now, like they would
16 still call this program director.
17     Q.    So that's your understanding of how
18 the process works.
19     A.    That's how it works, yes. That's
20 absolutely how it works.
21     Q.    Dr. Varughese, we've had a fair amount
22 of testimony about your interest in taking an FMLA
23 leave at various times, sometime in September and
24 I think sometime earlier, and I don't want to ask
25 you to repeat that testimony.

Computer Reporting NYC Inc.
(212) 986-1344

1032

Varughese

1  
2      But there is a claim that Mount Sinai,
3  the individual defendants, interfered with your
4  efforts to exercise your rights under the FMLA.
5           And in the complaint in paragraph 56,
6  if you would like to take a look at that. Have
7  you had a chance to read that paragraph?
8      A.    Yes.
9      Q.    It says that barring you from the
10 workplace, and we've had testimony about that,
11 that barring you from the workplace and asking you
12 to provide a doctor's note are the allegations
13 that support the claim that they were done to
14 interfere with -- I'll quote it, they were, quote,
15 taken to interfere with Dr. Varughese's attempts
16 to exercise her rights under FMLA, unquote.
17           So other than barring you from the
18 workplace and asking for the doctor's note, is
19 there any anything else that the hospital did to
20 interfere with your attempts to exercise your
21 rights under the FMLA?
22     A.    Well, they fired me even before I
23 brought in the doctor's note. They fired me. I
24 met with HR and decided to fire me and they
25 told me to go and get this doctor's note and they

Computer Reporting NYC Inc.
(212) 986-1344

1033

Varughese

1  fired me even before I brought in the doctor's
2  note. They told me to come back with a doctor's
3  note even though they had fired me already. They
4  had made that decision that morning.
5       Q.   Anything else? And the anything else,
6  just so that we're clear, is there anything else
7  that you believe that Mount Sinai or the other
8  defendants did to interfere with your efforts to
9  or attempts to exercise your rights under the
10 FMLA?
11      A.   Right they changed my duties without
12 me -- without knowing, according to HR, according
13 to Caryn Tiger-Paillex, she does not know why I
14 want to take this leave, if it's for me or
15 somebody else. She doesn't know. But the
16 hospital in the meantime decided to tell me not to
17 be at work.
18      Q.   So that's barring you from the
19 workplace. But other than barring you from the
20 workplace, asking you for a doctor's note and
21 terminating you, any other way in which or
22 anything else that you believe the hospital did to
23 interfere with your attempts to exercise your
24 rights under the FMLA?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1034

Varughese

1       A.   Right, and then they had Shema Patel
2  detain me in her office and prevent me from, you
3  know, being able to do what I need to do. Whether
4  it's like going to get coffee or even going to a
5  conference, she was preventing me from doing that.
6  She was physically telling me that I had to
7  physically be in this office space and not go
8  anywhere.
9       Q.   Anything else?
10      A.   I mean, that's clearly counter to like
11 me being able to like exercise my rights.
12           Anything else in terms of the FMLA?
13      Q.   Yes.
14      A.   Well, with the FMLA they said that,
15 you know, I was trying to take the FMLA to pull
16 one off. Lento said that, in some e-mail, that I
17 was trying to take advantage of them by going on
18 FMLA. It wasn't like they didn't even -- they
19 weren't taking me seriously on one level. They
20 were saying I was trying to take advantage of them
21 by going on FMLA.
22           And I was going to take advantage of a
23 conference, Osler conference, which they were not
24 going to pay for me anyway. They had already

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1035

Varughese

1  clearly given me indications they weren't going to
2  pay for my Osler conference. My only hope was
3  that I would get that time to actually attend the
4  conference since I had already paid for it and
5  everything. It would have been a complete
6  financial and monetary waste for me. So I was
7  just simply hoping I could go.
8           And they were saying that, oh, I'm
9  going to take this leave. Then they are going to
10 pay for my conference and it's going to be me
11 taking advantage of them. Because I'm on leave.
12          I mean, this is the kind of, you know,
13 defamatory harassing abusive stuff that I've had
14 to deal with there every single day.
15      Q.   I understand that and right now we're
16 talking about the FMLA, not about defamation.
17          Can you tell me if there is any other
18 way in which you think the hospital interfered
19 with your efforts or attempts to exercise your
20 rights under the FMLA?
21      A.   Right, and then they made me do, you
22 know, they started taking actions against me again
23 with PWC. They were referring me to PWC because I
24 requested FMLA essentially. Because I don't know

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1036

Varughese

1  what the real reason was because I wasn't doing
2  anything wrong. I was there at work. I didn't do
3  anything wrong.
4           I mean, Robert Guarino cancelled his
5  presentation on Wednesday. Was there any action
6  taken against Robert Guarino, the white male
7  resident?
8       Q.   Dr. Varughese, just answer this
9  question. What does Dr. Guarino cancelling his
10 presentation in September have to do with --
11      A.   On September 13, 2011.
12      Q.   I understand that. What does
13 Dr. Guarino's cancelling his presentation have to
14 do with your efforts or attempts to exercise your
15 rights under the FMLA?
16      A.   On September 14, 2011, Robert Guarino
17 cancelled his presentation that he was scheduled
18 to present on September 15, 2011. He was not
19 referred to Physician Wellness Committee for such
20 a late cancellation. Nothing. No actions were
21 taken against them. No consequences for his
22 behavior.
23          Once again, he's a Caucasian doctor
24 being treated completely differently by, within

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1037

Varughese

1 the hierarchy and by the hospital and by the
2 administration. And here I am, I simply do not
3 present and then I'm being constantly harassed at
4 work nonstop and my character being defamed, and I
5 can't even take a leave of absence. I can't even
6 request a leave of absence and follow up because
7 the hospital is going to interfere with it and
8 then tell me that I'm not fit for duty and, you
9 know.
10          They didn't even say that actually.
11 They didn't say I was unfit for duty. They just
12 made me not come in to work. They gave me no
13 reason at all. They just said don't come into
14 work. That's interfering with my ability to take
15 FMLA leave.
16          I mean, that's enough discouragement
17 for anybody asking for a leave of absence to know
18 that their employer is going to go out of his way
19 to defame you, make up all this stuff, refer you
20 to disciplinary psychiatry or Physician Wellness
21 Committee without you requesting any assistance.
22 It's completely defamatory and completely, you
23 know, obstructive of the process of taking FMLA
24 leave.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1038

Varughese

1 Q.   Anything else?
2 A.   Right. I mean, they changed my duties
3 and I felt like my duties would be changed if I
4 did take a leave. They were going to like, you
5 know, defame me and, you know, change my, um,
6 change basically my work and place different
7 requirements on me than others. So that was a
8 threat.
9          I mean, they told me I cannot come
10 into work when I asked for FMLA and I felt they
11 were threatening me and I could not really process
12 the FMLA leave request. I could not follow up
13 with my physicians. Because I was fired even
14 before I could even do any of these things for
15 simply making a request.
16 Q.   Anything else?
17 A.   That's all I can think of now.
18 Q.   Let me show you a document.
19      MR. McEVOY: Mark this as Exhibit 61.
20      (Defendants' Exhibit 61, note from
21 Dr. Jose Barbazan-Silva, dated 9/20/11,
22 Bates No. P883, marked for identification,
23 this date.)
24 Q.   Do you recognize that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1039

Varughese

1 A.   Yes.
2 Q.   Can you tell me what it is?
3 A.   This is the doctor's note that I
4 provided.
5 Q.   And this is the doctor's note dated
6 9/20/11.
7 A.   Right.
8 Q.   Signed by Jose Barbizon-Silva?
9 A.   Yes.
10 Q.   And who did you give the doctor's note
11 to?
12 A.   I gave it to Roberto who is like Caryn
13 Tiger's personal assistant, administrative
14 assistant or personal assistant.
15 Q.   Did you give it to Roberto on
16 September 20th?
17 A.   Right. Yeah, and -- yeah.
18 Q.   What time of day did you give it to
19 him?
20 A.   This was like around noon.
21          I also e-mailed Caryn Tiger telling
22 her that I had the note. I e-mailed Graduate
23 Medical Education also telling them that I had the
24 note.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1040

Varughese

1 But of course they had already made
2 the decision to fire me well before this note ever
3 arrived, so....
4      MR. McEVOY: Just take a two-minute
5 break.
6      (A recess was taken at 12:41 p.m.)
7      MR. McEVOY: This would be a good time
8 to take our lunch break.)
9      (A luncheon recess was taken at
10 12:48 p.m.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

AA-176

1086

1

2                    C E R T I F I C A T E

3   STATE OF NEW YORK      )

4                          : ss.

5   COUNTY OF SUFFOLK      )

6

7            I, THOMAS R. NICHOLS, a Notary Public

8       within and for the State of New York, do

9       hereby certify:

10           That LEENA VARUGHESE, the witness

11      whose deposition is hereinbefore set forth,

12      was previously duly sworn and that such

13      deposition is a true record of the testimony

14      given by the witness.

15           I further certify that I am not

16      related to any of the parties to this action

17      by blood or marriage, and that I am in no way

18      interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20      set my hand this 18th day of August, 2013.

21

22

23                   THOMAS R. NICHOLS

24

25

Pl. Tr. Ex. 4

AA-178

*MC Resident*



THE MOUNT SINAI HOSPITAL RESIDENT'S CONTRACT        64888

Contract dated March 16, 2011 between THE MOUNT SINAI HOSPITAL, (hereinafter the Hospital ) and Leena Varughese, MD, 531 Olive Terrace  Union, NJ 07083, United States (hereinafter the House Staff Officer).

The parties hereto agree as follows:

1.    The House Staff Officer in Mount Sinai - Pathology at PGY 4 agrees.
to serve on the House Staff of the Hospital beginning 7/1/2011 until 6/30/2012.

2.    The House Staff officer agrees to comply faithfully with, and be subject to, the policies, rules and regulations of the Hospital and the Mount Sinai School of Medicine of New York University, (hereinafter "Mount Sinai"). These include but are not limited to the policies found in the House Staff Manual, which may be changed from time to time. The House Staff Officer also agrees to accept the following responsibilities:

(a)    under the supervision of the department head, assume responsibilities for the safe, effective and compassionate care of patients, consistent with the House Staff Officer's level of education and experience;

(b)    participate fully in the educational and scholarly activities of the training program and, as required, assume responsibility for teaching and supervising other House Staff Officers and medical students..

(c)    develop and participate in personal program of self study and professional growth with guidance from the teaching staff;

(d)    participate in institutional programs, committees, councils, and activities involving the medical staff as assigned by the Program Director, and adhere to the established policies, procedures, and practices of the Sponsoring Organization and its affiliated institutions;

(e)    participate in the evaluation of the program and its faculty;

(f)    develop an understanding of ethical, socioeconomic, and medical legal issues that affect the practice of medicine;

(g)    apply cost containment measures in the provision of medical care;

(h)    keep charts, records and reports up to date and signed at all times;

.i)    adhere to ACGME Institutional and Program Requirements;

(j)    meet standards of professional behavior expected of a House Staff Officer.



P992

AA-179

3. The House Staff Officer agrees to abide by Mount Sinai's Patent and Development Policy and any amendments thereto. The House Staff Officer agrees to report all inventions within the scope of the Patent and Development Policy to the Dean of the Mount Sinai School of Medicine, and if requested by Mount Sinai, will assign such invention to Mount Sinai and will execute such documents including patent applications and related papers as may be deemed necessary by Mount Sinai to transfer and secure to Mount Sinai the rights to such invention and to any patent issued or to be issued thereon.

4. The House Staff Officer agrees to abide by Mount Sinai's Drug-Free Workplace Policy and Statement. Mount Sinai has a written policy addressing physician impairment, including impairment due to substance abuse. (See House Staff Manual page 34-36.)

5. During the term of this agreement the House Staff Officer shall receive:

(a) Such salary (see attached Salary Scale), as established by the policies of the Hospital from time to time, which will be paid on a bi-weekly schedule (twice per month or 26 paychecks per year).

(b) Hospital-paid medical, hospitalization and prescription coverage, which are available to all House Staff Officers. The House Staff Officer may purchase medical, hospitalization, and prescription coverage for his/her family. These benefits become effective on the first day of the House Staff Officer's Orientation. The Mount Sinai Benefits Center can provide the House Staff Officer with any information he/she may need.

(c) eligibility for long-term disability coverage for 60% of base salary up to $3,500 per month.

(d) access to counseling and psychological support services (see page 11 of the House Staff Manual).

(e) access to Hospital housing. Occupancy is subject to housing availability. Information regarding on-call rooms, uniforms, and meals is also noted on pages 13, 16, 19, and 20 of the House Staff Manual.

(f) Hospital-paid liability insurance. Mount Sinai's medical malpractice insurance is an occurrence-based policy, with limits of $1,300,000 per occurrence and $7,000,000 in the aggregate. Liability insurance coverage includes Mount Sinai employee as insureds while acting within the scope of their duties as such. The group policy under which the hospital operates has

AA-180

a "tail" provision pertaining to coverage for claims filed after completion of the program.

(g) leaves of absence (sick leave, parental leave, other leave circumstances. Leaves of absence and the effect of leave time on the completion of house staff training and/or eligibility for specialty board examinations will be determined by the provisions of the House Staff Manual currently in effect and the policies and procedures of the Hospital and the training program. While education leave time may be granted, payment of expenses for attending conferences, if any, will be decided by the Program Director.

(h) vacation time, which may be taken at anytime throughout the house staff year subject to the approval of the Program Director. Vacation time must be arranged with the Program Director before the program creates its yearly schedule.

6. Rotation schedules will be maintained in accordance with existing individual service patterns as approved by the Chief of Service. However, such schedules may be modified or changed in accordance with any pressing circumstances that may arise. The House Staff Officer acknowledges that his/her training program may, at the discretion of the Chief of Service, include rotations to other hospitals affiliated with Mount Sinai. Residents rotating to Mount Sinai affiliates agree to comply with and be subject to the policies, rules and regulations of the affiliate institution during assigned rotations.

7. The House Staff Officer represents as follows:

(a) that, prior to the commencement of the term hereof he/she will either (i) have graduated from a medical school offering a medical program accredited by the Liaison Committee on Medical Education or the American Osteopathic Association or registered with the New York State Education Department of Accreditation or by an accrediting organization acceptable to the State Education Department, or (ii) have graduated from a foreign medical school "FMS", and have passed the examination of the Educational Commission for Foreign Medical Graduates (ECFMG) or the Foreign Medical Graduate Examination in Medical Science (FMGEMS) or any predecessor or successor examination, and, with the exception of individuals eligible for licensure under N.Y. Education Law 6528, have completed the clinical component of a program of medical education which (1) included no more than twelve weeks of clinical clerkships in a country other than the country in which the medical school is located, or (2) included clinical clerkships of greater than twelve weeks in a country other than the country

AA-181

in which the medical school is located if the clinical clerkships were offered by a medical school approved by the New York State Education Department for the purposes of clinical clerkships.

(b) that, prior to the commencement of the term hereof, he/she shall provide the Hospital with all credentialing information which the Hospital shall require him/her to provide, including but not limited to medical school diploma and transcript, and, where applicable, currently valid New York State license or limited permit to practice medicine, ECFMG certificate, or Fifth Pathway certificate.

(c) that, where applicable prior to commencement of the term hereof, he/she shall have satisfactorily completed all requirements of the training program in which he/she is enrolled for the preceding academic year, and he/she shall have sent to his/her Program Director a letter of recommendation from his/her present Program Director, by January 30;

(d) that, before commencement of the term hereof the House Staff Officer shall have sustained no disciplinary action, nor have any pending disciplinary action in connection with any medical training program or have any malpractice action commenced against him/her except as disclosed in writing to the Hospital;

8. The House Staff Officer agrees as follows:

(a) that, during the period of his/her appointment as a House Staff Officer at the Hospital, he/she will notify his/her Residency Program Director of, and obtain prior written approval for, any employment or other professional activities outside the Hospital that the House Staff Officer proposes to engage in, such notification to include at a minimum a written description of the nature and hours of all such proposed outside employment or other professional activities, and will comply with the institutional and departmental moonlighting policies. The House Staff Officer is not required to engage in moonlighting. The House Staff Officer must gain written permission to moonlight from his/her Program Director, which will be maintained in the House Staff Officer's file. The House Staff Officer's performance will be monitored to determine the effects of moonlighting activities. Adverse effects on performance of duties as a House Staff Officer may result in the withdrawal of permission to moonlight.

(b) that, even if prior written approval has been obtained from his/her Residency Program Director for employment or other professional activities outside the Hospital, he/she will under no circumstances engage in any

AA-182

employment or other professional activities outside the Hospital when he/she (i) is scheduled to work an average of eighty hours per week over a four week period at the Hospital; or (ii) has, within less than eight consecutive non-working hours, completed either twelve consecutive hours of duty in the Emergency Services Department or twenty-four consecutive hours of duty in any other Department or Service at the Hospital;

(c) that, he/she has the sole responsibility of guaranteeing compliance with the institutional policies and procedures governing resident duty hours worked, in compliance with New York State Hospital Code, Part 405; and with the ACGME Common Program Requirements Part VI;

(d) that, he/she will adhere to his/her delineation of privileges and any other guidelines, regulations or restrictions governing his/her professional activities at the Hospital, and that he/she will perform only those specific treatments and procedures that he/she has been authorized in writing by his/her Residency Program Director to perform.

(e) that, he/she agrees to cooperate fully, upon request, with any quality assurance, risk management or peer review investigations, or any other investigation undertaken by Mount Sinai, including those concerning his/her peers.

9. The House Staff Officer will be reappointed to the next level of training at the Program Director's sole, reasonable discretion. The Program Director will base the reappointment and promotion determinations on the House Staff Officer's successful completion of his/her current training and the absence of pending Disciplinary Action against the House Staff Officer. House Staff Officers will be notified in writing at least four months before the expiration of their appointment (no later than March 1 for appointments commencing July 1) if their contracts are not to be renewed for the next year of a given residency program or if they will not be promoted to the next postgraduate year of training. Notifications of nonrenewal or nonpromotion will include the reason for the action and are subject to the hearing rights found in the House Staff Manual (see pages 29-31). If a training program is discontinued his/her Program Director will assist the House Staff Officer in obtaining placement in another approved program.

10. With respect to foreign nationals or foreign medical graduates, it is understood that this Agreement may be terminated by the Hospital in the event the House Staff Officer does not have appropriate visas, work permits, or other credentials to enable the House Staff Officer legally to carry out his/her duties and responsibilities under this Agreement.

AA-183

ACGME Resident

11. Coverage of service in the interest of patient care must and will be given priority over any and all commitments.

12. The parties have entered into this Agreement in good faith and acknowledge their respective ethical and legal obligations to fulfill this Agreement until its expiration date. This Agreement may be terminated and other disciplinary action may be imposed in accordance with the House Staff Manual. The policies and procedures concerning disciplinary actions, hearings, and appeals are as outlined in the House Staff Manual (see pages 29-31).

13. Mount Sinai shall comply with comprehensive, fair, and reasonable policies regarding grievance procedures and due process, where applicable (see House Staff Manual, pages 13, 29-31 and 36-40). These policies minimize conflicts of interest in adjudication of grievances and include, but are not limited to, grievance procedures and due process for disciplinary actions taken against residents, for resident complaints and grievances related to the work environment, sexual and other harassment, discrimination, and accommodation of House Staff Officers with disabilities.

14. This contract may be terminated by the Hospital if the House Staff Officer has not completed satisfactorily by the effective date of this Agreement any and all prerequisites to this house staff year as stated in 7 (a) (b) and (c) of this contract.

15. This contract is not effective until executed in writing by both the House Staff Officer and an official of Mount Sinai.

16. The House Staff Officer shall at all times comply with all applicable federal state, and local laws, rules, and regulations. In addition, the House Staff Officer shall at all times comply with the policies and procedures of the institution in which such individual is providing services.

17. The parties agree that the Agreement will be governed by the laws of the State of New York without regard to conflicts of law and that they will submit to the jurisdiction of the state and/or federal courts located within the State of New York for the resolution of any dispute that may arise hereunder.

18. This Agreement is the complete understanding between the parties and may not be changed orally.

AA-184

ACGME Resident

IN WITNESS WHEREOF the parties have executed this Agreement as of
the date set forth above.

THE MOUNT SINAI HOSPITAL

_____          _____
Senior Vice President                     House Staff Officer
Human Resources and Labor Relations
The Mount Sinai Hospital


_____          _____
           3/30/11                                 3/24/4
Date                                      Date

AA-185

Pl. Tr. Ex. 8

AA-186

> 
> -----Original Message-----
> From: leena varughese [mailto:leena.varughese@mssm.edu]
> Sent: Thursday, December 23, 2010 2:59 PM
> To: Tiger-Paillex, Caryn
> Subject: Filing a grievance
> 
> Dear Ms. Tiger-Paillex:
> 
> My name is Leena Varughese and I am a third year resident in
Pathology.
> I am attaching a document that notes the event that took place on
> evening of December 8th 2010. I am interested in consulting you
> regarding this situation and obtaining your opinion. I prefer that the
> resolution is worked out by the Program Director and Interim Chair,
> however, I have some serious concerns regarding that possibility.
Please
> call me at 908-265-7536 or e-mail me back. I would greatly appreciate
> your discretion on this matter. Thank you for your time.
> 
> Sincerely,
> 
> Leena Varughese



Leena Varughese, M.D.
The Mount Sinai Medical Center
Department of Pathology
One Gustave L. Levy Place, Box 1194
New York, NY 10029-6574
E-mail: Leena.Varughese@mssm.edu
Pager: 917-641-4268

3

D00856

AA-187

Grievance

To Ms. Tiger-Paillex:

The complaint is regarding Dr. McCash's behavior towards me on the evening of December 8, 2010.

Brief Summary of events:

Dr. McCash berated and physically threatened me. He shouted at me in the gross room which is deemed a public place and followed me around shouting and threatening me with minimal space between him and I. This is an unwarranted and unprofessional action which has led to disruption of my ability to work and it continues to affect me adversely. This was not the first time where he publicly humiliated me but the second. I wrote an e-mail after the first event but it was not addressed in a satisfactory fashion. In short, I spoke to Dr. Lento regarding this event but it was dismissed as trivial at that time. This second time was an even worse situation than the first time with actual imposed sense of danger and violence. I asked him to stop and then had to leave the area in which I was working before this incident. After this second similar but worse case than the first event, mediation by a third party is necessary to ensure that this will not happen again. I tried to obtain a mediatory meeting after the first incident, however, it did not take place. I feel that this is abusive behavior and abuse of power by a de-facto authority.

Problem areas identified:

1. Public humiliation by Dr. McCash
2. Potential immediate danger
3. Possible retaliatory action to this complaint
4. Negative consequences of this event on my health

These are critical areas that must be addressed.

Sincerely,

Leena Varughese, MD

AA-188

Pl. Tr. Ex. 10

AA-189



**MOUNT SINAI SCHOOL OF MEDICINE**

Office of the Dean

Mount Sinai School of Medicine
One Gustave L. Levy Place, Box 1217
New York, NY 10029-6574

April 11, 2011

Dear Dr. Varughese:

I am writing in response to your complaint regarding two separate interactions with your Chief Resident, Dr. McCash, and to let you know the results of my investigation into this matter. After interviewing a number of witnesses to the events at issue, I was not able to confirm your version of events, or to substantiate your claims of harassment, abusive behavior and abuse of power. In any event, after the incident, the Acting Chairman and Program Director acted immediately to diffuse the situation by requesting that the Chief Resident who was not involved in the incident, supervise and address your assignments and schedules whenever possible. You have confirmed that since December, Dr. McCash and you have had no direct interactions and that no additional incidents have occurred. Additionally, the GME office and the Physicians Wellness Committee are working with your Program Director to address issues surrounding your academic progress.

If you have any concerns in the future, please feel free to contact me at 212-241-4097.

Very truly yours,

Caryn Tiger-Paillex
Director, Human Resources
Mount Sinai School of Medicine

PLF
EXHIBIT NO 10          DEFT
FOR ID
          5-23-13    TRN

P. 533

AA-190

Pl. Tr. Ex. 12

AA-191

From: Leena Varughese <leena.varughese@mssm.edu>
Date: Mon, Apr 25, 2011 at 7:25 PM
Subject:
To: "Tiger-Paillex, Caryn" <caryn.tiger-paillex@mssm.edu>

Ms. Tiger-Paillex,

I met with you on Monday evening (4/11/11) and prior to that on 4/6/11. You said that you could provide me with the result of your fact-findings on 4/6/11 or 4/7/11 at the latest but, that did not occur. I made several attempts to obtain this document between 4/6/11 to 4/8/11 but it was delayed until 4/11/11 evening.

On 4/6/11, you mentioned that Samuel McCash and my perspectives were so disparate that he would not be capable of apologizing to me. Additionally, on 4/11/11, you indicated that I could mediate concerns through Kruti Maniar or a mutually acceptable third party without involving the current program director or Samuel McCash. This eased my mind and I accepted the document, even though I disagreed with your findings, out of interest for preserving my well-being, physical and mental health, and obtaining closure as I had made my concerns known to you by filing a grievance on December 23 and met with you in early January. However, I am concerned that Kruti Maniar, Dr. Lento, and Samuel McCash have not been informed of what you have said to me. In addition, I had requested that I would like to see a third party psychiatrist, which has been met with an unusual amount of resistance, suprising given that Physician Wellness Committee is non-disciplinary. So, given what has taken place to me since September and my initial concerns, and a repeat offense by the male chief resident, I am quite concerned that I will continue to be discriminated against. Additionally, no effort has been voluntarily made by Dr. Lento to change my schedule to prevent a future confrontation by Samuel McCash. For instance, I am scheduled for surgical pathology rotation at the VA for period 13, during which period he is also scheduled to be at the VA on microbiology rotation.

The first incident with Samuel McCash took place briefly after I had just submitted the evaluations of surgical pathology rotation, period 2. When I complained to Dr. Lento about Samuel McCash's outburst, he accused me of writing a diatribe of an evaluation against the surgical pathology rotation. To my knowledge, no action, including mediation or discussion, was taken to prevent Samuel McCash from discriminating against me again. Then, he physically intimidated and verbally harassed me in December, while I was delivering patient care. I made a complaint within my department to Dr. Bleiweiss and asked to be switched from the rotation for the final week. At this juncture, I was asked to see the former chairman Dr. Schiller, who said that there is something wrong with my DNA and asked me to see a therapist. Next, I was asked to see Dr. Pessin, who eventually threatened my position in the residency stating that I had supposedly interfered with her investigation.

I filed a grievance with human resources after I was given the Notice of Academic Advisement following my complaint regarding Samuel McCash's discrimination against me. My perception was and is that I am being threatened and berated by a male resident because I am a woman. I doubt that he would yell or attempt to physically intimidate a male resident and now I am fearful because since my complaint and request for mediation in December, over approximately 4 months ago. Please refer to house staff policy manual, pages 36-39 for definitions of harassing or unacceptable behavior.

Also, I had witnessed Samuel Mccash and Adrienne Jordan drinking hard liquor at work at 5 pm on their own accord while still involved in patient care related duties, this situation was relayed to Dr. Figur and Paul Johnson at the second interview. After that, I was not asked to meet with the GME a third time. However, after much delay and at the end of February, I was contacted by the Physician Wellness Committee, which again included Dr. Figur. I feel the actions taken thus far have been retaliatory because I have complained about being discriminated against by the male chief resident who also drinks on the job and the program director has not interceded due to inherent negative attitude towards me for critical evaluations or review.

I would like to finish my training without any further incidents but to my knowledge, actions have not been taken satisfactorily to this effect. My complaint is that of being discriminated against by the male chief resident based on the fact that I am a woman and all discriminatory conduct must cease immediately.

Dr. Varughese
--
Leena Varughese, M.D.
The Mount Sinai Medical Center
Department of Pathology
One Gustave L. Levy Place, Box 1194
New York, NY 10029-6574
E-mail: Leena.Varughese@mssm.edu
Pager: 917-641-4268

PLF.
EXHIBIT NO. 12 (Deffs)
FOR ID
5-23-13 TRN

AA-192

Pl. Tr. Ex. 13

AA-193



MOUNT SINAI
SCHOOL OF
MEDICINE

Office of the Dean

Mount Sinai School of Medicine
One Gustave L. Levy Place, Box 1217
New York, NY 10029-6574

Dr. Leena Varughese
PGY-3 Resident
Department of Pathology
Mount Sinai Medical Center

April 29, 2011



PLF
EXHIBIT NO 13
FOR ID
5-23-13

DEFT

TRN

Dear Dr. Varughese:

I am writing in response to your April 25, 2011 e-mail. While your e-mail largely mischaracterizes our conversations, I will not respond to each and every point. I will, however, address the following issues:

- As you know, a number of separate and independent investigations took place regarding your interactions with Dr. McCash. You (as well as other witnesses) were interviewed as part of these investigations. Your April 25 e-mail was the first time that you alleged that you were subjected to gender discrimination. In fact, when we met on April 11, 2011 I made an effort to explore your April 7 e-mail reference to workplace harassment and retaliation. During our discussion you did not mention that you felt that you were discriminated against because you are a woman. Mount Sinai has strict policies prohibiting workplace discrimination and retaliation, and takes such complaints very seriously. To enable me to investigate this complaint fully, please contact my office at x44097 to arrange for a time for us to meet.

- On April 11, 2011 we did not discuss Kruti Maniar acting as a mediator between you and Dr. McCash. I told you that my understanding was that Dr. Pessin had previously told you that you should feel free to interact with Dr. Maniar rather than with Dr. McCash while Dr. Pessin was investigating your allegations regarding Dr. McCash. In fact, during our conversation on April 11, you confirmed that your dealings with Dr. McCash have in fact been minimal and cordial.

- Your suggestion that your schedule should have been changed so that you and Dr. McCash not work at the VA at the same time is perplexing. You currently work in the same hospital as Dr. McCash, and by your own recent account you have had no further incidents. Moreover, at the VA you will be on two separate rotations and Dr. McCash will not be supervising you, so you are not likely to interact.

The Physician Wellness Committee functions separately and reports to the Hospital's Quality Control Committee. I have referred your comments regarding that process to Dr. Figur for appropriate handling.

Finally, I have not heard anything further from you regarding a leave of absence since sending you the FMLA information you requested. Please let me know if you still plan to take a leave.

Very truly yours,

*Caryn Tiger Paillex*

Caryn Tiger Paillex

AA-194

Pl. Tr. Ex. 16

AA-195

-----Original Message-----
**From:** leena.bookworm@gmail.com [mailto:leena.bookworm@gmail.com] **On Behalf Of** Leena Varughese
**Sent:** Thursday, December 23, 2010 2:35 PM
**To:** Lento, Patrick; Pessin-Minsley, Melissa
**Subject:** Response to notice of academic advisement

Dear Drs. Lento and Pessin-Minsley:

I am including a brief summary of the event on the evening of December 8th 2010 with word document attached to this
e-mail. I have noted some problem areas, which is why I sought advice and assistance that evening itself. I should not
be made to feel responsible for an event that was hardly warranted and verbally abusive, despite whatever the perceived
problem was by the Chief Resident. I would like this situation to be mediated as soon as possible and would have even
agreed to academic advisement if not for the brief summary of events as stated in the notice of academic advisement. I
greatly appreciate and thank you for your time.

Sincerely,

Leena Varughese

--
Leena Varughese, M.D.
The Mount Sinai Medical Center
Department of Pathology
One Gustave L. Levy Place, Box 1194
New York, NY 10029-6574
E-mail: Leena.Varughese@mssm.edu
Pager: 917-641-4268

PLF
EXHIBIT NO 16     DEFT
FOR ID                TRN
5-23-13

1

D00853

AA-196

Drs. Lento and Pessin-Minsley:

I made a specific complaint regarding Dr. McCash's behavior towards me on the evening of December 8, 2010. I have decided that I do not agree with some of the contents included in Notice of Academic Advisement.

Brief Summary of events:

Dr. McCash berated and physically threatened me. He shouted at me in the gross room which is deemed a public place and followed me around shouting and threatening me with minimal space between him and I. This is an unwarranted and unprofessional action which has led to disruption of my ability to work and it continues to affect me adversely. This was not the first time where he publicly humiliated me but the second. I wrote an e-mail after the first event but it was not addressed in a satisfactory fashion. In short, I spoke to Dr. Lento regarding this event and he only consented that "sometimes people yell". This second time was an even worse situation than the first time with actual imposed sense of danger and violence. I asked him to stop and then had to leave the area in which I was working before this incident. After this second similar but worse case than the first event, mediation by a third party is necessary to ensure that this will not happen again. I tried to obtain a mediatory meeting after the first incident, however, it did not take place. I feel that this is abusive behavior and abuse of power by a de-facto authority.

Problem areas identified:

1. Public humiliation by Dr. McCash
2. Potential immediate danger
3. Possible retaliatory action to this complaint
4. Negative consequences of this event on my health

These are critical areas that must be addressed.

Sincerely,

Leena Varughese, MD

D00854

AA-197

Pl. Tr. Ex. 17

AA-198

THE MOUNT SINAI MEDICAL CENTER, NEW YORK

POLICIES AND PROCEDURES
SUBJECT NO. A4-125

DEPARTMENT: ADMINISTRATION

SUBJECT: PHYSICIAN WELLNESS GUIDELINES

Original Date of Issue: 1/8/03

Reviewed
5/04
11/06

Revised
1/05
11/06

EXHIBIT NO 17
FOR ID
6-11-13

DEFT
TRN

Purpose
In furtherance of our commitment to excellence in patient care the following guidelines govern
the investigation of physicians suspected of impairment.

Overview
The Mount Sinai Hospital Physician Wellness Committee (PWC) functions under the auspices of
the Quality Control Committee (QCC), which is a sub-committee of the Patient Care and Quality
Assurance Committee of the Board of Trustees. The Medical Director of The Mount Sinai
Hospital, the Director of Risk Management and Regulatory Affairs (members of QCC), other
Mount Sinai physicians or experienced staff (Employee Assistance Program) and when deemed
necessary a designated psychiatrist are responsible for investigating physicians suspected of
being impaired by drugs or other causes such as behavioral, psychiatric or physical impairments.
The Department of Anesthesia has its own Departmental PWC. Department Chairs at their
discretion may also refer physicians to the Hospital PWC for behavioral, psychiatric or physical
impairment or may investigate their member physicians within their departments except for
suspected drug impairment.

The findings and recommendations of the Hospital PWC will be reported to the QCC for
approval. The final QCC recommendation will be forwarded to the Departmental Chair of the
physician for action. The physician's Chair, with the assistance of the PWC, is responsible for
assuring compliance with the proposed recommendation and plan. The Anesthesia PWC or a
Chair, who investigates a potential impairment intra-departmentally, will bring all findings and
recommendations to QCC. DHL Queens has its own PWC and will report its findings and
recommended actions to QCC.

AA-199

Procedure

1.    When an individual suspects that a physician is impaired, that individual should notify the Hospital PWC immediately through the Medical Director of The Mount Sinai Hospital (x45335), the Director of Risk Management and Regulatory Affairs (x45853 or 917-506-5757), or the Compliance Hotline (1-800-853-9212).

2.    The Hospital PWC should be informed of the following:

Physician's name, faculty status, and duration of appointment at Mount Sinai.
Behavior leading to the suspicion of impairment.
Actual or potential patient care consequences of the physician's behavior.
Past history of impairment or substance abuse, if known.
All other known existing problems with the physician.
Any other relevant information.

3.    When contacted the physician will be asked to report to the Risk Management Department for a Quality issue. No additional information will be disclosed, this is to guarantee an accurate toxicology test.

4.    The Hospital PWC, on behalf of the Department Chair other than for Anesthesia, will attempt to determine whether impairment actually exists by taking steps such as:

Interviewing all relevant staff (peers, potential witnesses, etc.) and rarely patients.
Reviewing the physician's departmental folder and credentials file.
Interviewing the involved physician. (At the start of the interview the physician will be informed of the consequences of not cooperating with the PWC's investigation. The physician will be informed that failure to cooperate, including but not limited to refusal to provide an immediate urine sample, will result in summary suspension and disciplinary action up to and including termination.)

Immediately, or at the time of the interview depending on the urgency/seriousness of the presenting behavior(s), obtaining a urine/blood sample for Toxicological analysis.
If a psychiatric condition requires immediate intervention by the psychiatric emergency room and/or immediate admission to a psychiatric inpatient service, preventing the conduct of a toxicology screen in accordance with the procedures set forth in this policy, the results of any toxicology screens that are obtained in connection with admission must be released to the Chair of the PWC as a condition of returning to work. Refusal by the physician suspected of impairment to release this information will result in summary suspension and termination. Under the unusual circumstance that neither the Medical Director nor the Director of Risk Management and Regulatory Affairs are available, the Chair must interview the physician immediately and request immediate urine sample. The suspected impaired physician must be escorted to the NRC.

AA-200

The Clinical director of the Narcotics Rehabilitation Center (NRC) will be contacted (x46646) and the staff member will be escorted to NRC. Arrangements will be made for the staff member to provide a witnessed specimen, which will be processed under an alias to assure confidentiality. The Clinical Director of the NRC will be made aware if any specific substances are suspected so that they can be added to the routine panel of tests. Additional randomized testing may be requested by the PWC or the Clinical Director of the NRC depending on the diagnostic impression after the interviews and original results have been reported and assessed.

Reports of urine toxicology obtained by the NRC will be sent directly to the Director of Risk Management and Regulatory Affairs if the investigation is being conducted by the Hospital PWC and to the Chair of the Anesthesia PWC, if involved.

5.    Referral for external psychiatric and/or medical evaluation.

As part of its investigation, the staff member may be required to undergo an assessment by a physician or therapist chosen by the Hospital or MSSNY's CPH who is expert in the field of the presenting problem(s) and who is accustomed to diagnosing and treating such impaired physicians. Failure to comply with this request will result in summary suspension and termination.

The findings of the appointed physician or therapist are reported to the Department Chair and to the Director of Risk Management and Regulatory Affairs.

6.    A physician whose behavior in the hospital is so disturbing as to trigger immediate concerns of impairment must be reported to the PWC immediately upon observing the behavior. If it is after working hours the evening/night nursing administrator present on site will take the physician to the ED for immediate evaluation and drug testing. The physician will be reported to the Chair of the PWC the following day. Results of these tests will be given to the Chair of the PWC as soon as reports become available. If the investigation reveals drug abuse the physician will be subject to disciplinary action up to and including summary suspension and termination. If the physician does not cooperate with the nursing administrator and the ED physician will be subject to summary suspension and termination.

7.    If a positive test results the physician will be informed of the outcome and given the opportunity to explain that result.

8.    The PWC, or the Department Chair who conducted the investigation, will report the findings to QCC:

If the physician is determined not to be impaired the PWC shall promptly advise the physician, the Chair and QCC.
If the PWC determines that a physician is impaired either secondary to substance abuse, physical or mental illness or unprofessional behavior the details are reported to QCC and the Department Chair. A decision for action is made which might include but is not limited to the following:
i.        Recommending to the Chair, President, or both the action to be taken with respect to Hospital appointment and privileges.

AA-201

ii.    Recommending an appropriate monitoring procedure.

iii.    Recommending an appropriate treatment plan; which would include criteria for return to partial or full privileges, if suspension has occurred or if the physician was on a Leave of Absence.

iv.    Evaluating the need for long term supervision.

v.    Recommending disciplinary action if applicable. This action can be appealed consistent with Medical Staff Bylaws.

Disciplinary Action

1.    The Hospital President or the President of the Medical Board may decide, consistent with the Bylaws of the Medical Staff, to summarily suspend all or some of the privileges of a physician whose continued presence on the Medical Staff is deemed to present an imminent danger to the health of any individual. Such action need not be exclusive of other disciplinary action.

2.    A physician who refuses to cooperate by refusing an interview and/or to provide a urine sample will be summarily suspended and subject to further disciplinary action, up to and including termination.

3.    Any physician (including a physician other than the one suspected of impairment) who refuses to cooperate in a PWC investigation of his/her peers may be subject to discipline up to and including termination.

Records and Confidentiality

1.    Impaired physicians will be reported to the President of the Hospital or his/her designee and to the Department Chair.

2.    Records of PWC meetings, Investigation Reports and Monitoring Reports will be maintained in the Department of Risk Management Regulatory and Insurance Affairs.

3.    Investigations are undertaken as part of the institution's Quality Assurance Program and as such will be afforded the protection of the laws relating to committees and persons engaged in Quality Assurance Review functions.

4.    Documentation of the monitoring and treatment plan of the impaired physician will be included in the physician's departmental file.

5.    All records will be kept confidential to the extent permitted by law.

Return to Duty

AA-202

1.    A physician who either voluntarily took a medical leave or whose privileges were suspended must notify the Chair in writing of his/her request to resume patient care responsibilities. See Article VI of the Medical Staff By-Laws.

2.    The physician's Chair may decide that the impaired physician may return to the Hospital with no patient care responsibilities and simultaneously notify QCC. The Hospital President will also be informed.

3.    The physician's Chair with input from the PWC shall determine whether the physician may resume patient care responsibilities which by contract is subject to the following conditions:

The physician impaired by substance abuse signs an agreement with the following requirements:

i.    Frequent supervised random urine and/or blood drug monitoring tests will be required for an indefinite period of time. Any refusal to submit to such testing or any attempt to falsify testing in any way will be regarded as equivalent to a positive test result, that is, indicative of the presence of a drug not prescribed by a physician. In the event of a positive drug test, Mount Sinai will take such action as it deems appropriate which may include disciplinary action up to and including summary suspension and termination.

ii.    Total abstinence from mood altering drugs.

iii.    Appropriate behavior and actions and compliance with institutional policies will be expected at all times.

iv.    Close monitoring by a Chair-appointed monitor of:

behavior for its appropriateness and collegiality
narcotic prescribing
in the Anesthesia Department, administration of anesthetics and narcotics and all record keeping and documentation of administered narcotics

v.    Continued participation in a treatment program will be required. The physician must authorize care givers to advise Mount Sinai regarding compliance with the treatment program, relapses, or other information regarding any condition that might present a danger to the welfare of patients or staff should be given to the PWC.

vi.    If the physician self-referred to CPH, the Chair or the PWC must obtain from the physician a release authorizing CPH to inform the Hospital of:

a)    any physician breach of his/her agreement with CPH

b)    information regarding the physician's ability or inability to return to work

1049-4

AA-203

vii.     The treatment program can only be terminated by the treating physician or therapist after notifying the PWC. The PWC may, along with the Department Chair, continue monitoring the physician. The physician patient may not unilaterally stop the treatment program.

viii.     Any violation of the terms of a physician's contract with CPH or of the terms of the return to work agreement with the Hospital will be sufficient cause for summary suspension and termination from the Medical Staff of The Mount Sinai Hospital and/or the Faculty of the Mount Sinai School of Medicine.

b.     Physicians with non-drug abuse impairments must comply with 3a) iii, v, vii above.

Criteria For Decisions In The Event Of Substance Abuse

1.     One relapse of substance abuse after re-instatement upon completion of initial treatment will result in summary suspension and termination from the staff. The physician will have the right to appeal disciplinary action in accordance with the Medical Staff Bylaws.

2.     A physician who seeks advice about an impairment problem and whose behavior has not raised a concern will be referred to CPH but no further action than follow up is required to assure the PWC and the Department Chair that the physician turned to CPH and is participating in an appropriate treatment program.

3.     The physician who is referred to the PWC by a third party and who fully cooperates is referred to CPH. S/he will be granted a leave of absence until the treating therapists, the PWC, and the Department Chair determine that s/he is fit to return to patient care.

4.     A physician, referred to the PWC for behavioral changes, who refuses to cooperate with the PWC by, for example, denying drug use and then refusing urine testing and/or refusing an interview and refusing urine testing will be summarily suspended and terminated from the staff.

5.     A physician who is reported as having a suspected impairment, denies a substance abuse problem but then tests positive, may be subject to discipline up to and including summary suspension termination from the staff.

6.     Physicians who have self referred to either CPH or other providers must be honest in identifying that they have been treated on their re-appointment applications. A conversation with their Chair is required but no disciplinary action will be taken based on past impairment. Falsification of reappointment forms or other Medical Center records will result in disciplinary action up to and including summary suspension and termination from the staff.

Reporting
1.     The President of the Hospital or his/her designee in coordination with the Legal Department will report cases of professional misconduct, as required by law, to the New York State Office of Professional Medical Conduct.

AA-204

2.    The Hospital will report impairment and/or disciplinary cases to the National Practitioner Data Bank as required by law.

Appendix A

Identification of Physician Impairment Secondary to Substance Abuse

Physicians, similar to others who become chemically dependent, ultimately experience a breakdown in function to the extent that the problem becomes obvious. There are subtle signs of early chemical dependency that serve as warning signals. Although each sign in and of itself does not indicate the use of or dependency on a mood altering substance, when viewed as a constellation, they may be helpful in trying to define whether a problem or potential problems are present.

Signal behaviors to assist in the recognition of patterns of impairment include:

·    Mood swings.

·    Inappropriate behavior or a breakdown in logical thought.

·    Arriving late to see patients or failing to remember facts about individual patients

·    Writing inaccurate or "foolish" orders.

·    Failing to accurately record prescriptions or analgesic medications.

·    Insisting on personally administering analgesics or other mood altering drugs to patients rather than allowing nursing staff to carry out orders.

·    Failure to respond while on call or unexplained absences.

·    Behavior often accompanied by some slurring of speech.

·    Appearing in the hospital with alcohol on breath during working hours or intoxicated at social events.

·    Angry denial or defensiveness when confronted with the issue.

·    Unkempt appearance, poor hygiene.
     Complaints by patients and staff.

·    Unexplained accidents or injuries to self.

·    Noticeable dependency on alcohol or drugs to relieve stress.

AA-205

Pl. Tr. Ex. 20

AA-206



Notice of Academic Advisement

December 21, 2010

Dr Leena Varughese
PGY-3 Resident
Department of Pathology
Mount Sinai Medical Center



Dr. Leena,

This letter is to inform you that that you are being placed on Academic Advisement. This decision is based on the investigation of your altercation(s) with other residents while on the Surgical Pathology rotation on Dec 8th and Dec 10th, 2010.

Brief summary of events
One of the chief residents had specifically discussed with you the need for you to gross specific specimen(s). Instead, you had one of the moonlighters handle the specimen(s). When confronted with this by the chief, you became loud and verbally abusive to his authority and advisement as chief. This altercation was upsetting to those present (including other residents in the gross room, an attending (Dr. Jaffer) and a medical student, who felt she needed to leave the area as a direct result of the altercation) and disruptive to the Department's operations. You were also noted to have gotten into an argument with one of the moonlighting residents (Dr. Jordan) that evening and continued to harass her about it on another day. In addition, it was noted that you had failed to appropriately gross in cases that should have been taken care of that day.

Problematic areas identified
- o  Failure to demonstrate an appropriate level of professionalism
- o  Patient care related lapse (grossing-related responsibilities)

These are critical areas fundamental to successful completion of your training.

Plan of action
After discussions with you, Dr. Pessin and Dr. Stimmel, we hope the following plan will help you overcome these deficits:
- o  Meeting with the Program Director or, as needed, interim chair/chair or others in authority within the Department of Pathology, every 3-4 weeks for continued assessment and advisement
- o  Continued performance of assigned resident duties under the guidance of Pathology Chief resident(s), Pathology faculty and/or Program Director
- o  Self-reflection exercise (to be handed in to me within 4 weeks)- You are expected to write down your account of the situation and describe how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance.

AA-207

    o  Reading exercise- You are expected to read the book entitled <u>Practicing</u> <u>excellence: A physician's manual to exceptional healthcare</u> by Stephen Beeson during the 3 month period of academic advisement (we can obtain <u>a copy for</u> you if necessary).

<u>Follow up</u>
We will meet again in 3 months to review your progress. Your performance will be closely monitored for improvement in the areas of professionalism and patient care as outlined above. We expect that you will perform your duties in a manner that is professional, appropriate and non-threatening to others. We are hopeful that this plan of action will allow you to overcome the difficulties outlined and succeed in our training program.

We must make it clear, however, that if you are unable to improve your performance or if any future incidents involving poor professionalism recur, you may be subject to discipline up to and including termination from the Program.

Sincerely,


Patrick Lento, M.D.
Residency Program Director
Department of Pathology


Resident Acknowledgment:


_____
Leena Varughese, M.D. PGY 3

AA-208

Pl. Tr. Ex. 21

AA-209

**Figur, Arthur**

| | |
|---|---|
| From: | leena varughese [leena.varughese@mssm.edu] |
| Sent: | Wednesday, March 30, 2011 11:46 AM |
| To: | Lento, Patrick; Barnett, Scott (MSSM) |
| Cc: | Carter, Allene |
| Subject: | Re: Reflection for the Notice of Academic Advisement |

PLF
EXHIBIT NO 2)
FOR ID

DEF T

TR.N



reflection2.docx
(23 KB)

The document is attached to this email.

```
----- Original Message -----
From: leena varughese <leena.varughese@mssm.edu>
Date: Wednesday, March 30, 2011 11:34 am
Subject: Reflection for the Notice of Academic Advisement
To: "Lento, Patrick" <Patrick.Lento@mountsinai.org>,"Barnett, Scott (MSSM)"
<scott.barnett@mssm.edu>,"Figur, Arthur" <arthur.figur@mountsinai.org>
Cc: "Carter, Allene" <Allene.Carter@mountsinai.org>

> Dear All,
>
> I am attaching the reflection for the Notice of Academic
> Advisement.
>
> Respectfully,
>
> Leena Varughese
>
>
```

1

D02118

AA-210

I was verbally intimidated by Samuel McCash in a very aggressive and confrontational manner on September 12th 2010. He screamed at me, while lurching in his seat, and threatening to get up, he shouted "shut up, shut up, shut your mouth Leena!" These statements were made in the company of other residents during a discussion about a matter of covering the service for a person who was on leave. Then, Samuel McCash had the audacity to come and pat me on the shoulder approximately half an hour later during the CP call conference and request that I speak with him after the conference. During that conversation, I was told in a calm manner that I will not be professionally successful, no one is teaching me, and I am not going to find a job, nobody likes me, and additionally, "I am saying this for your benefit", which when taken together is patronizing and manipulative. I found the content and the manner of this conversation uncouth, degrading, and derogatory and essentially, very offensive. I felt that I was being bullied and intimidated regarding my future and professional career. Therefore, I reported this incident to Dr. Lento, who asked me directly, during a conversation that took place following this event, and when attempting to discuss the situation regarding Samuel McCash's outburst, "why did you write a diatribe of an evaluation"?.

At this point, I believed that the evaluations which, were to be completely anonymous were not in fact anonymous, and realized or suspected that they may pose a threat to residents if anyone were to negatively evaluate a rotation. The incident and my complaint against Samuel McCash were dropped as if it had never happened, and no action was taken against him, nor a mediatory meeting was arranged. Based on this experience, I felt fearful in my work environment and experienced an increased sense of anxiety. However, I continued to work at building a professional relationship with Samuel McCash. He in fact asked if I were interested in his patio furniture and also, at a resident event on December 3rd 2010, pulled up a chair and said he was interested in speaking to me and being friends. I said given the prior situation it seemed a bit odd, but he said that he wants to get to know me better. So we spoke in a friendly manner and casually at this event.

Additionally, I made arrangements with another resident to transfer out of the surgical pathology rotation at Mt. Sinai for another but similar rotation at Elmhurst hospital center. The complicated matter of rotation switches and call changes were made as appropriate or necessary to necessitate the switch, however, Dr. Lento would not allow me to switch, citing financial/ payment reasons. On the part of Dr. Lento, to make matters even more obviously skewed and unfair is the fact that he allowed other residents to make the same type of rotation switch, and that's after telling me that he will not be allowing anyone to make the same switch. Also, I asked that he start investigating a process whereby I can transfer to a different program due to these concerns as stated above and for fear of

D02119

AA-211

retaliation due to the evaluation of the surgical pathology rotation at Mount Sinai. Additionally, when I did ask him for advice regarding transfer or fellowship, he just blatantly blamed the prior Program Directors for not providing him with adequate information. I was disappointed by the program director's failure to respond to my request.

Next, on December 8th 2010, there was a second incident with Samuel McCash, very much to my dismay. I was on a rotation that I had asked to be switched out of the fear of negative consequence due to the perceived negative view that I held of the rotation. However, I thought that the work was going well, and I was trying to learn what I could during the month. My sense of positivity and well-being was to be abruptly and largely destroyed by Samuel McCash and the events that have followed. Samuel McCash became verbally abusive towards me and approached me in a physically intimidating and threatening manner after a perceived disagreement on his part regarding the grossing of specimens by a Moonlighter. Despite what has been said, I was never given a strict directive to gross certain specimens as this is done at the discretion of the grossing resident. I immediately offered to gross these specimens in order to avoid any further confrontation. However, that did not tone down the situation or Samuel McCash and in fact; he became even more obtrusive and loud. The stance of the department to my understanding is still and has always been that the moonlighters are there at the request of the primary resident grossing on surgical pathology and this same primary resident decides what specimens the moonlighters should or should not gross that given day. Therefore, when Samuel McCash purposefully walked into the gross room and started berating and threatening me, I left the gross room when I felt that the situation would become even more explosive and possibly violent. I asked Sam to come with me to meet an attending who may still be around and to discuss what the issue is and have it mediated. However, he chose to remain back in the gross room. Frankly, my insight was due to the similar prior incident with Samuel McCash (I am referring to September 12th 2010 incident). I walked past Dr. Bleiwiess's office, and since he was there, I briefly informed him that Samuel McCash was bullying me and preventing me from completing my work. He was on the phone and could not end his conversation to assist me that at that time. But, given that there were several cases that I was in the process of grossing, I returned to the gross room despite the unpleasant and distressing event that had occurred there. Once again much to my dismay, when I got back to the gross room, Samuel McCash was still there. However, he had toned his voice and demeanor to a more suitable decorum but continued to lie and say that I was "putting off work on others" i.e. moonlighters and that I was "not listening" to him. At this juncture, I used foul language in my frustration at the extenuating circumstances and harassment that I was experiencing. Several others were in the room and it should be duly noted that in fact, I immediately apologized for my language. Finally, Dr. Bleiwiess

D02120

AA-212

intervened and he deemed that it would be appropriate for the moonlighters and the chief resident to assist me in the completion of work for that evening.

The next day, I sensed that there was much whispering and talking amongst attendings and others regarding the event, and I felt humiliated and thoroughly distressed that I was in the midst of this situation. I asked Dr. Bleiwiess that I switch out of the rotation because of the harassment and abuse by Samuel McCash. I spoke to several attending pathologists, professionals, and friends, who all agreed that it would be best for me to leave the negative and overtly malignant environment. However, Dr. Bleiwiess took my request, and complained to the former chair of the department, Dr. Schiller. A meeting with Dr. Schiller and Dr. Bleiwiess ensued that afternoon. The content of the meeting and outcome was by and far extremely inflammatory, and I reported the incident to Dr. Stimmel who offered to mediate at a given point in the future. The next day when I came into work, I was asked to meet with Dr. Pessin, the interim chair of the pathology department, to whom I recounted what had happened and what my concerns were and clearly stated that I would like a meeting with Samuel McCash mediated by a 3rd party and an apology, because I felt that it is possible to work through this issue and work with this fellow resident.

The following Monday, I was asked to meet with Dr. Pessin again, however, this time, she claimed that I was interfering with the investigation and presented me with a letter that threatened dismissal. I reported this to Dr. Stimmel and he thought that it was time for him to step in. I felt it was OK to leave the situation alone since I was only seeking mediation with Samuel McCash and an apology from him for his harassment, in order, to make the work environment non threatening and safer for me. Dr. Pessin also said that he will no longer be Chief Resident during the last week of the surgical pathology rotation. On December 21st 2010, Dr. Pessin and Dr. Lento met with me regarding their outcome of the investigation and attempted to have me sign a "Notice of Academic Advisement" outlining a series of events which were inaccurate. Additionally, Dr. Bleiwiess gave me a poor evaluation which he has never done before. In fact we were working well together prior to this incident. Considered collectively, I think that these incidents following Samuel McCash's aggressive and threatening behavior towards me have been retaliatory and are thus abuses of power. I feel that I have attempted to remedy these situations to the best of my ability by utilizing the appropriate authoritative channels and giving Drs. Pessin and Lento the benefit of the doubt but these have only led to what seems to be additional complaints and accusations (i.e. insubordination on 12/21/2010) to be launched against me, even after several months after these incidents on December 8th and September 12th.

D02121

AA-213

Samuel McCash has exhibited volatile, aggressive and dangerous behavior towards me twice already. These incidents were witnessed by fellow residents and staff. However, I now find that I have to defend myself from not only avoiding and preventing abusive behavior from Samuel McCash but also to defend myself from complaints of unprofessionalism at how I handled a difficult situation to blatantly false accusations of insubordination when presented with the Notice of Academic Advisement. The problem to me is that my complaints have been completely ignored and instead, I am found at fault for having used curse words and raising my voice in a provoked situation, this is mind boggling to several professionals I have spoken to and in fact, to find this as the problem, rather than Samuel McCash's behaviour, which is also a violation of policy set forth in the house staff manual is also stymieing. Rather than pursuing mediation and an end to this conflict, the department has chosen to take retaliatory actions against me it seems. Additionally, there have been many instances where Samuel McCash drank alcohol at work in the resident "fun room". It could be quite possible that alcohol may have contributed to Samuel McCash's attack on me on the day of December 12th 2010 as there was a party in the department that day.

I will not claim to know why Samuel McCash treats me the way he does, nor will I need to understand why, this is like asking victims of abuse, how or why it happened. But I feel that he is resentful of any success or well being I may exhibit, and has attacked me several times, and he may attack me again. I need to feel safe at work, precautions for much of which I had already taken, for example, not to be alone with Samuel McCash. However, I think that it may be to his benefit that he should speak to a psychiatrist, as being explosive and nearly violent towards another resident over grossing of specimen by moonlighter is not at all warranted under any circumstance. For that matter, his speech and demeanor towards me on both September 12th and December 8th, 2010 were completely disproportionate responses to the given situation and were completely out of line and are both in violation of house staff manual policy.

Despite these incidents, I have completed my assigned rotations without taking time off to deal with the traumatic and abusive nature of these incidents. I have performed very well on the resident in-sevice examinations. My evaluations from attending physicians have been positive for the most part throughout my rotations. I feel I have done everything to avoid future conflicts which seem to arise from inconsequential events. I have never made complaints to ACGME and have tried to handle this matter within the confines of the pathology department. I would like to put an end to these issues now and have this matter resolved.

Finally, I am apologetic that I did not find a better way to navigate these two incidents. However, I felt that my going to Dr. Lento after the first incident would

D02122

AA-214

have helped. On the contrary, I felt alienated and he showed much reluctance to discuss the incident. Additionally, he denied my request to transfer out of the rotation, the same request, which he granted for two other residents. During the time of the second incident, he was not available on site and therefore, he could not intervene on my behalf. In all fairness to him, I still would like to believe that he would have intervened and perhaps, he would have understood my request for transfer to another rotation following the second incident. The time frame between 1st and 2nd incident was approximately three months and now, three months later, I still feel uncertain if Samuel McCash will harass me. I think there needs to be a conversation between Samuel and me, and also, recognition of wrong doing and a genuine apology to me from him. I do not wish to pursue legal action at this point, I simply would like some mediation and an apology.

D02123

AA-215

Pl. Tr. Ex. 23

AA-216

*Varughese*

Lowy, Marina

From:        Castaldi, Andrew [andrew.castaldi@mssm.edu]
Sent:        Tuesday, May 17, 2011 1:24 PM
To:          leena.bookworm@gmail.com; Varughese, Leena (MSSM-Imail)
Cc:          Lento, Patrick; Cordon-cardo, Carlos (MSSM)
Subject:     RE: Thank you and follow up

Leena,
Dr. Cordon-Cardo asked that I follow up with you to reiterate that we will be meeting with you next Tuesday, May 24ᵗʰ at noon, in Dr. Cordon-Cardo's office (Annenberg 15-62). We expect you to have completed the assigned tasks, which are to have read the book on professionalism, and also to have completed the "reflection" essay. You should be prepared to discuss both. Please also be sure to e-mail us your essay by May 23ʳᵈ so that we have ample time to review it before our meeting.

Thanks,
Andrew

PLF
EXHIBIT NO 23        DEFT
FOR ID                TRN
6-11-13

From: Cordon-cardo, Carlos
Sent: Monday, May 09, 2011 5:26 PM
To: 'leena.bookworm@gmail.com'
Cc: Lento, Patrick (MSH); Castaldi, Andrew
Subject: RE: Thank you and follow up

Dear Leena: As a follow up to the message below, we would like to confirm that we will be meeting on the agreed May 24ᵗʰ at noon. In preparation for this meeting, you should send us the written "reflection" by May 23ʳᵈ so we have time to review it.

Sincerely,

Carlos Cordon-Cardo, M.D., Ph.D.
Professor and Chairman,
Department of Pathology,
Professor, Department of Genetics and Genomic Sciences,
The Mount Sinai School of Medicine.
Professor and Director,
Department of Pathology,
The Mount Sinai Hospital.
Phone: 212-241-8014
Fax: 212-426-5129
E-mail: carlos.cordon-cardo@mssm.edu

*Office Address:*
Annenberg 15ᵗʰ Floor, Office 15-62
1468 Madison Avenue
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1194
New York, New York 10029-6574

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

1

D00873

AA-217

Pl. Tr. Ex. 24

AA-218

From: Cordon-cardo, Carlos
Sent: Wednesday, May 04, 2011 2:05 PM
To: 'leena.bookworm@gmail.com'
Cc: Lento, Patrick (MSH); Castaldi, Andrew; Cordon-cardo, Carlos
Subject: Thank you and follow up


Dear Leena: Thank you for your time yesterday. I believe we had a productive discussion. As per our agreement, you will be
reading the assigned book and re-write the assigned personal reflection essay modeling into future constructive developments.
We also agreed that you would be able to do such exercises during the upcoming two to three weeks. You should purchase the
book, and the Department will reimburse you. We look forward to meeting with you again on May 24th, at noon. Please, let me
know if this is a convenient date and time for you, and do not hesitate to contact my office if you need further information.


Sincerely,


Carlos Cordon-Cardo, M.D., Ph.D.
Professor and Chairman,

Department of Pathology,

Professor, Department of Genetics and Genomic Sciences,
The Mount Sinai School of Medicine.

Professor and Director,

Department of Pathology,

The Mount Sinai Hospital.

Phone: 212-241-8014

Fax: 212-426-5129

E-mail: carlos.cordon-cardo@mssm.edu


*Office Address:*

Annenberg 15th Floor, Office 15-62

1468 Madison Avenue

New York, New York 10029-6574


*Mailing address:*

One Gustave L. Levy Place, Box 1194

AA-219

New York, New York 10029-6574

---

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

---

AA-220

Pl. Tr. Ex. 26