# 15-1328-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

M.D. LEENA VARUGHESE,

*Plaintiff-Appellant,*

— v. —

PATRICK LENTO, M.D., M.D. IRA J. BLEIWEISS, JOHN DOES, 1-10,
MOUNT SINAI MEDICAL CENTER, M.D. ADOLFO FIRPO,
M.D. CARLOS CORDON-CARDO,

*Defendants-Appellees,*

ABC CORPORATION, INC., 1-10,

*Defendant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPENDIX FOR DEFENDANTS-APPELLEES
### Volume 2 of 3 (Pages AA-221 to AA-440)

RORY J. MCEVOY
AKERMAN LLP
*Attorneys for Defendants-Appellees*
666 Fifth Avenue, 20th Floor
New York, New York 10103
(212) 880-3800

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... AA-1

Notice of Motion by Defendants, for an Order
Granting Summary Judgment, dated
July 24, 2014.......................................................... AA-36

Declaration of Rory J. McEvoy, for Defendants, in
Support of Motion, dated July 24, 2014 ................ AA-38

Exhibit 1 to McEvoy Declaration -
(i) Excerpts of Deposition Testimony of Leena
Varughese, dated May 23, 2013............................ AA-40

(ii) Excerpts of Deposition Testimony of Leena
Varughese, dated June 11, 2013 ............................ AA-68

(iii) Excerpts of Deposition Testimony of Leena
Varughese, dated June 13, 2013............................ AA-93

(iv) Excerpts of Deposition Testimony of Leena
Varughese, dated July 8, 2013 .............................. AA-133

(v) Excerpts of Deposition Testimony of Leena
Varughese, dated August 7, 2013.......................... AA-167

(vi) Various Varughese Deposition Exhibits.......... AA-177

Exhibit 2 to McEvoy Declaration -
Excerpts of Deposition Testimony of Carlos
Cordon-Cardo, M.D., dated October 18, 2013 ...... AA-305

Exhibit 3 to McEvoy Declaration -
Excerpts of Deposition Testimony of Patrick
Lento, M.D., dated October 25, 2013 .................... AA-313

ii

**Page**

Exhibit 4 to McEvoy Declaration -
Excerpts of Deposition Testimony of Ira J.
Bleiwess, M.D., dated November 13, 2013 ........... AA-323

Exhibit 5 to McEvoy Declaration -
(i) Excerpts of Deposition Testimony of Arthur
Figur, M.D., dated January 8, 2014 ...................... AA-328

(ii) Figur Deposition Exhibit 3 ............................ AA-339

Exhibit 6 to McEvoy Declaration -
(i) Excerpts of Deposition Testimony of Adolfo
Firpo, M.D., dated October 30, 2013 .................... AA-342

(ii) Excerpts of Deposition Testimony of Adolfo
Firpo, M.D., dated December 17, 2013 ................. AA-375

(iii) Various Firpo Deposition Exhibits .................. AA-399

Exhibit 7 to McEvoy Declaration -
Excerpts of Deposition Testimony of Shema
Patel, dated November 20, 2013 .......................... AA-417

Exhibit 8 to McEvoy Declaration -
Excerpts of Deposition Testimony of Caryn
Tiger, dated December 17, 2013 .......................... AA-423

Declaration of Kruti Maniar, M.D., dated July 18,
2014, filed July 24, 2014 ...................................... AA-430

Declaration of Vesna Najfeld, Ph.D., dated June 27,
2014, filed July 24, 2014 ...................................... AA-433

Exhibit 1 to Najfeld Declaration -
E-mail from Leena Varughese to Vesna Najfeld,
dated August 8, 2011 .............................................. AA-438

Exhibit 2 to Najfeld Declaration -
E-mail from Vesna Najfeld to Leena Varughese,
dated August 8, 2011, 4:23 p.m. ............................ AA-440

iii

**Page**

Exhibit 3 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 8, 2011,  4:28 p.m. .......................... AA-442

Exhibit 4 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 8, 2011, 4:49 p.m. .......................... AA-444

Exhibit 5 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 8, 2011, 5:42 p.m. .......................... AA-446

Exhibit 6 to Najfeld Declaration -
Email from Vesna Najfeld to Leena Varughese,
dated August 9, 2011, 6:21 a.m............................. AA-448

Exhibit 7 to Najfeld Declaration -
Email from Leena Varughese to Vesna Najfeld,
dated August 9, 2011............................................ AA-450

Exhibit 8 to Najfeld Declaration -
Notes of Vesna Najfeld, Ph.D., dated
August 12, 2010..................................................... AA-452

Declaration of Samuel McCash, M.D., dated July
18, 2014, filed July 24, 2014 ................................. AA-455

Declaration of Patrick Lento, M.D., dated July 3,
2014, filed July 24, 2014 ....................................... AA-457

Exhibit 1 to Lento Declaration -
Verification and Summative Evaluation of
Graduate Education/Training, dated
April 14, 2011 ........................................................ AA-459

Declaration of Adolfo Firpo, M.D., dated July 18,
2014, filed July 24, 2014 ........................................ AA-462

iv

**Page**

Exhibit 1 to Firpo Declaration -
Email from Leena Varughese to Adolfo Firpo,
dated September 7, 2011 ........................................ AA-464

Declaration of Paul Johnson, dated July 23, 2014,
filed July 24, 2014 ................................................ AA-468

Exhibit 1 to Johnson Declaration -
Mount Sinai's Department of Radiology
Residency Program Report for 2008-2011 ............ AA-471

Exhibit 2 to Johnson Declaration -
Mount Sinai's Department of Pathology Report
for 2008-2011 ........................................................ AA-473

Exhibit 3 to Johnson Declaration -
Verification and Summative Evaluation of
Graduate Education/Training, dated
May 15, 2013 ......................................................... AA-475

Exhibit 4 to Johnson Declaration -
Exit Summary of Alifia Khan, M.D., for July 1,
2007–June 30, 2008 ............................................... AA-478

Exhibit 5 to Johnson Declaration -
Excerpts of Mount Sinai School of Medicine –
House Staff Manual ................................................ AA-482

Exhibit 6 to Johnson Declaration -
List of House Staff in Mount Sinai Department of
Pathology as of September 1, 2011........................ AA-493

Declaration of Shabnam Jaffer, M.D., dated July 18,
2014, filed July 24, 2014 ....................................... AA-495

Declaration of Shema Patel, dated July 15, 2014,
filed July 24, 2014 ................................................ AA-497

v

**Page**

Declaration of Anupma Nayak, M.D., dated July 18, 2014, filed July 24, 2014 ...................................... AA-498

Defendants' Rule 56.1 Statement, dated July 24, 2014 ...................................................................... AA-500

Reply Declaration of Rory J. McEvoy, for Defendants, in Further Support of Motion, dated January 16, 2015 .................................................... AA-517

Exhibit 1 to McEvoy Reply Declaration - Excerpts of Deposition Testimony of Patrick Lento, M.D., dated October 25, 2013 ................... AA-519

Exhibit 2 to McEvoy Reply Declaration - Excerpts of Deposition Testimony of Adolfo Firpo, M.D., dated October 30, 2013.................... AA-523

Memorandum Decision and Order Granting Defendants' Motion for Summary Judgment, dated March 27, 2015 ........................................... AA-527

Notice of Appeal, dated April 22, 2015 .................... AA-656

AA-221



PLF
EXHIBIT NO 26 DEFT
FOR ID 6-1-17
TRN

Reflection #2 and an addendum to Relfection #1

I was sent an email by Dr. Lento stating that the period of Academic Advisement had ended on April 26, 2011; this led me to believe that these events have come to an end. At the follow up meeting arranged by Dr. Lento thru the office of the department chair on May 4, 2011, which included Drs. Cordon-Cardo, Lento and Mr. Castaldi, I clearly stated that I was willing to put the incidents as descrbed in the reflection submitted on March 23, 2011 behind me and move forward. I apologized for anything that I had done that was not perceived as positive or professional by Dr. Lento. However, despite my efforts, Mr. Castaldi and Dr. Lento stated that if I did not write a new reflection they would issue me a formal warning, take disciplinary actions against me or that I may be terminated from the residency program. These are again retaliatory threats and are unprofessional. The fact of the matter is that there is no basis for these actions as I had not done anything except defend myself in a difficult situation. In Dr. Lento's opinion, the first reflection did not satisfy the requirements of Academic Advisement. In fact, I do believe my first reflection shows how I had attempted to diffuse the situation and handle things differently in a professional manner by going to an authority figure rather than engaging in an argument. I also described events in my first reflection to explain the reason for requesting mediation and to provide context for my concerns.

The fact of the matter is that Samuel McCash berated and harrassed me on several occassions. I do not consider this behaviour to be admonishment by a chief resident. These are incidents of frank unprofessionalism, public humiliation, harrassment, and are sadistic in nature, and are strictly and explicitly prohibited in the house staff manual. These events exemplify unprofessional behvior by Samuel McCash. I requested mediation due to the egregious nature of the outburst by Samuel McCash where he invaded my personal space and with outright physical intimidation, which is not to be tolerated by any resident in this hospital. My request for mediation and transfer to another rotation for one week were completely ignored. Instead, over the course of the next 4 months Academic Advisement and referral to physician wellness committee have ensued since Decemeber 8th. The sequence of events as outlined in Academic Advisement are incorrect as my concerns that I had mentioned as an issue during the two meetings with Dr. Schiller and Dr. Pessin on December 9th and 10th respectively, were not included. I view these actions as retaliation to my reasonable request for mediation; a process to help me to continue to work in harmony with someone who outright harassed me while delivering patient care. Any definite actions taken to address this matter with Samuel McCash have not been relayed to me. This is inappororiate given the circumstances. Additionally, I am assigned to a hospital where I have to share office space with Samuel McCash next period, I requested that he be transferred to a different rotation. My request has been refused. I am experiencing an increased sense of fear and anxiety regarding this matter due to a potential for physical violence towards me, which I have brought up and which have been completely ignored.

After the issuance of Academic Advisement, I also chose to take a stand to defend myself by filing an official complaint. It was the right thing to do in that given situation and I have to stand by my decision, whether or not things have went in my favor.

AA-222

Additionally, alcohol use by Adrienne Jordan and Samuel McCash in the residents room on their own accord have been a concern that I had brought up. Since then, alcohol use has been prohibited by residents on hospital premises as per an email sent out by Adrienne Jordan based on what she heard from an administrator outside of the department. I would like this confirmed and not to be based on what she heard, because in my experience and many residents over the past two years, we have had to question what she believes is honesty.

I have been bullied to an unacceptable degree this entire year, which has had a negative effect on health, for which I have had to seek therapy. There have been repeated episodes of verbal punishment and harassment by Samuel McCash, which is completely inappropriate in any given situation, even if he precieves that I had not "listened" to him. This is abuse as defined in House Staff policy manual, p. 39, and in addition to my preception that this is discrimination as defined on pp. 37, 38-39 of the house staff manual. Frankly, this is not a "dysfunctional family" as stated by Dr. Lento, the workplace is an organization where professionalism is to be exemplified. These principles are essentially a set of values that should be inherently understood and I understand them and practice them. I have a right to not be publically intimidated, humiliated or physically threatned. I wish for all retaliatory actions against me to come to an end. My conciliatory efforts throughout this process and request for any compromise to help me have not been met.

I have always been mindful of professionalism. I had been professional and had attempted to diffuse the situation immediately. Even after I was verbally abused and physically threatened I continued to perform proper and timely quality patient care duties despite great physical and mental stress. I apologized to Samuel McCash for my use of colorful language but he has not apologized to me for his egregious behavior towards me. I have been professional throughout and I can without any ambiguitiy, affirm to continue to be mindful of professionalism and professional attitudes to handle difficult situations. I have a commitment to carrying out professional responsibilities, adherence to ethical principles, and intend to demonstrate respect, compassion, and integrity. I will continue to the best of my ability be responsive to the needs of patients and society that supercedes self-interest. I will continue to show accountability to patients, society, and the profession; and a commitment to excellence and on-going professional development. I will continue to demonstrate a commitment to ethical principles pertaining to provision or withholding of clinical care, confidentiality of patient information, informed consent, and business practices; demonstrate sensitivity and responsiveness to patients' culture, age, gender, and disabilities.

AA-223

Pl. Tr. Ex. 27

AA-224



Carlos Cordon-Cardo, MD, PhD
Professor and Chairman
Department of Pathology



MOUNT SINAI
SCHOOL OF
MEDICINE

July 1, 2011

Dr. Leena Varughese
Department of Pathology
Mount Sinai Medical Center



PLF
EXHIBIT NO 27
FOR ID
6-11-13

DEFT

TRN

Dear Leena:

I am writing as Director of the Pathology Residency Program to inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic Advisement and your behavior at the follow up meeting on May 24, 2011.

The Academic Advisement required you:

    (1) to prepare a written self-reflection by January 18, 2011
    (2) to meet with me periodically to assess your progress
    (3) to read Practicing excellence: A physician's manual to exceptional healthcare

Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection – a critically important aspect of the Advisement – long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were "really swamped" that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.

Although the Academic Advisement required a self-reflection on "how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance," your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior, a

AA-225

failure to understand the role of physician professionalism — regardless of how others behave — or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we "need" to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported "miscommunication," you made no effort to contact me — your supervisor — to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon Cardo, who was appointed Department Chair on April 1, 2011, was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting regarding the Academic Advisement with me, Dr. Cordon Cardo, and Mr. Andrew Castaldi, Pathology Administrator. When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him, and continued to be flippant and disrespectful throughout this meeting.

During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

AA-226

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. Requests should be directed to Michael Harris, MD, President of The Mount Sinai Hospital Medical Board, in care of the Medical Staff Office at Box 1116. If you do not appeal this action, it will become final at the end of the appeal period.

Sincerely,

Carlos Cordon-Cardo, M.D. PhD
Chair, Department of Pathology

Please sign below to attest that you read and understood the above content and consequences.

Resident Signature:

_____

AA-227

Pl. Tr. Ex. 29

AA-228

From:        Najfeld, Vesna
Sent:        Monday, August 08, 2011 4:23 PM
To:          Varughese, Leena (MSSM-(mall)
Subject:     RE: Presentation

Can you come over now?

Vesna Najfeld, Ph.D.
Professor of Pathology and Medicine
Director
Tumor Cytogenetics and Oncology-
Molecular and Cellular Tumor Markers
The Mount Sinai Medical Center

1428 Madison Avenue Box 1079, Atran 250 New
York, NY, 10029 Tel 212. 241. 8801 Fax: 212. 426. 2427

e-mail: vesna.najfeld@mssm.edu

PLF
EXHIBIT NO 29    DEFT
FOR ID           TRN
     6-1-13

D00883

AA-229

Pl. Tr. Ex. 30

AA-230

Vesna

**From:** Najfeld, Vesna
**Sent:** Monday, August 08, 2011 4:28 PM
**To:** Varughese, Leena (MSSM-(mail)
**Subject:** RE: Presentation

There are some major problems with your presentation please come over asap

Vesna Najfeld, Ph.D.
Professor of Pathology and Medicine
Director
Tumor Cytogenetics and Oncology –
Molecular and Cellular Tumor Markers
The Mount Sinai Medical Center
1428 Madison Avenue
Box 1079, Atran 250
New York, NY, 10029
Tel 212. 241. 8801
Fax: 212. 426. 2427
e-mail: vesna.najfeld@mssm.edu

PLF
EXHIBIT NO 30
FOR ID

DEFT
TRN

6-11-13

D00884

AA-231

Pl. Tr. Ex. 31

AA-232

From:           Najfeld, Vesna
Sent:           Monday, August 08, 2011 4:49 PM
To:             Varughese, Leena (MSSM-Imail)
Subject:        RE: Presentation

Please call me this presentation cannot go as is,

Vesna Najfeld, Ph.D.
Professor of Pathology and Medicine
Director ·

Tumor Cytogenetics and Oncology –
Molecular and Cellular Tumor Markers
The Mount Sinai Medical Center

1428 Madison Avenue
Box 1079, Atran 258
New York, NY, 10029
Tel 212. 241. 8801
Fax: 212. 426. 2427
e-mail: vesna.naifeldPmssrmedu

EXHIBIT NO 31
FOR ID
6-11-13

DEFT
TRN

D00885

AA-233

Pl. Tr. Ex. 33

AA-234

From: "Najfeld, Vesna" <vesna.najfeld@mssm.edu>
Date: Tuesday, August 9, 2011 6:21 am
Subject: Re: Presentation
To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>
Cc: "Lento, Patrick (MSFI)" <patrick.lento@mountsinai.org>, "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>

> Please send an e mail that the conference will not be held

PLF
EXHIBIT NO 33
FOR ID

DEFT

TRN

6/11-13

D00890

AA-235

Pl. Tr. Ex. 34

AA-236

From: leena varughese [mailto:leena.varughese@mssm.edu] >Sent:
Tuesday, August 09, 2011 8:29 AM
To: Najfeld, Vesna
Subject: Re: Presentation

I won't be doing the Cytogenetics presentation until next week.

Vesna

Vesna Najfeld, Ph.D.
Professor of Pathology and Medicine
Director
Tumor Cytogenetics and Oncology -
Molecular and Cellular Tumor Markers
The Mount Sinai Medical Center
1428 Madison Avenue
Box 1079, Atran 250
New York, NY, 10029
Tel 212. 241. 8801
Fax: 212. 426. 2427
e-mail: vesna.najfeld@mssm.edu

PLF
EXHIBIT NO 34
FOR ID
6-11-13

DEFT
TRN

D00891

AA-237

Pl. Tr. Ex. 36

AA-238

PLF
EXHIBIT NO 36 DEFT
FOR ID 6-11-13 TRN

Jordan, Adrienne

From:       Jordan, Adrienne
Sent:       Saturday, August 06, 2011 10:47 AM
To:         Varughese, Leena (MSSM-Imail)
Cc:         Lento, Patrick; Firpo, Adolfo (MSSM); Morency, Elizabeth (MSSM-Imail)
Subject:    Re: Out Sick tomorrow

Leena,

The new policy is Liz and I will not ask residents to cover. It is not optional. When you a resident is up in the rotation, they must cover. Any violation or exception to this policy requires documentation, which is why you must submit either a doctors note or letter outlining your injuries. The reason for this change in policy is so that coverage is distributed evenly among all residents. I strongly urge you to read all of the new policies I put in your mailbox as many things have changed, including the coverage policy and the morning conference attendance policy. These went into effect this past Monday.

As for your suggestion about covering frozens the whole day, this is an excellent suggestion. Once we have our frozen room tech back this will be more feasible. However, I was told that frozen section was particularly busy yesterday and having someone cover the whole day without a tech is a little demanding, particularly for a junior resident. However, I do thank you for your suggestion. Have a good weekend.

Adrienne

Sent from my iPhone

On Aug 5, 2011, at 2:52 PM, "leena varughese" <leena.varughese@mssm.edu> wrote:

> Adrienne,
>
> Why don't you email all the residents who could possibly cover for
> another resident calling out sick? This was what was done in the past
> and it would be much more practical. Obviously, chief residents and
> the program director should be kept informed regarding what days are
> being swapped or how coverage is being payed back and so on. This is
> only one of many approaches to handling a resident calling out sick.
> Alternatively, the resident who is already on frozen could cover the
> entire day but within reason, meaning lunch breaks etc should be
> covered by a PA. I am only making this suggestion because this is
> pretty self-contained and it can be worked out between the two people.
> Anyway, good luck on your away elective rotation.
>
> Leena
>
> ----- Original Message -----
> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
> Date: Friday, August 5, 2011 12:14 pm
> Subject: Re: Out Sick tomorrow

D00896

AA-239

> To: leena varughese <leena.varughese@mssm.edu>
> Cc: "Lento, Patrick" <Patrick.Lento@mountsinai.org>, "Firpo, Adolfo
> (MSSM)" <adolfo.firpo@exchange.mssm.edu>, "Morency, Elizabeth
> (MSSM-Imail)" <elizabeth.morency@mssm.edu>
>
>> And the new policy was placed in your mailbox with the packet that
>> was discussed at the resident meeting. The last page of that
>> packet is an acknowledgement sheet which you are required to sign
>> and turn in to either Liz or myself by August 15.
>>
>> Adrienne
>>
>> Sent from my iPhone
>>
>> On Aug 5, 2011, at 11:44 AM, "leena varughese"
>> <leena.varughese@mssm.edu> wrote:
>>
>>> I cannot cover frozen sections this afternoon. If I cannot cover
>> call next week, I will find coverage. Also, the email you send out
>> noting the meeting minutes of the last resident's meeting said to
>> refer to the attached coverage policy, it was not there. Again, no
>> need to apologize for emailing me regarding coverage. If I did not
>> have the wrist/hand injury, I would have been happy to oblige the
>> request for coverage.
>>>
>>> Dr. Varughese
>>>
>>>
>>> ----- Original Message -----
>>> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
>>> Date: Friday, August 5, 2011 10:49 am
>>> Subject: FW: RE: FW: Out Sick tomorrow
>>> To: "Lento, Patrick" <Patrick.Lento@mountsinai.org>, "Firpo,
>> Adolfo (MSSM)" <adolfo.firpo@exchange.mssm.edu>, "Morency,
>> Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>, "Varughese,
>> Leena (MSSM-Imail)" <leena.varughese@mssm.edu>
>>>
>>>> Leena,
>>>>
>>>> The new policy was in the packet of information I put into your
>>>> mailbox since you were unable to attend the resident meeting
>> due
>>>> to vacation. If you had read the meeting minutes and the new
>>>> policies as required, you would know what the policy is.
>>>>
>>>> Per the new policy, Liz and I are not required to "ask"
>>>residents
>>>> to cover. The point of this policy was to make a set list of

D00897

AA-240

>>>> rotations residents could be pulled from and in what order so
>> that
>>>> residents would not be allowed to say "no" and we would not
>> have
>>>> continuing coverage issues. So to say that I was not
>>>> "considerate" is entirely untrue. I was very considerate of
>> your
>>>> time since I did not pull you yesterday to cover, at which time
>>>> you would have been grossing. Instead, I waited until I had to
>>>> pull you today for you to cover frozen sections, which in my
>>>> opinion, is much better then covering grossing duties. I
>>>> apologize if the e-mail was offensive to you, but again, Liz
>> and I
>>>> are not asking anyone to cover anymore. We are telling people
>>>> that they must cover per the order outlined in the new policy.
>>>>
>>>> Does your injury preclude you from doing frozen sections? If
>> so,
>>>> we need a note from a doctor indicating how long you will be
>>>> unable to perform this task so that we can make alternate
>>>> arrangements for coverage today as well as an AP call you may
>>>> have. Otherwise you are expected to comply with department
>> policy
>>>> and cover frozens this afternoon. If you have any further
>>>> questions feel free to ask or if you'd rather, you may consult
>>>> with Drs. Firpo and Lento, but I assure you I have their
>> support
>>>> since I have followed the new policy exactly.
>>>>
>>>> Adrienne Jordan, M.D.
>>>> Pathology Resident, PGY3
>>>> The Mount Sinai Medical Center
>>>> Department of Pathology- Box 1194
>>>> One Gustave L. Levy Place
>>>> New York, NY 10029
>>>> Cell: 330-327-7339
>>>>
>>>> _____
>>>>
>>>> From: leena varughese [mailto:leena.varughese@mssm.edu]
>>>> Sent: Fri 8/5/2011 10:28 AM
>>>> To: Jordan, Adrienne
>>>> Subject: Re: RE: FW: Out Sick tomorrow
>>>>
>>>>
>>>>
>>>> Adrienne,
>>>>

D00898

>>>> You did not ask me to cover because if you had, then you would
>>>> have known that I had injured my left arm. Additionally, I have
>>>> responsibilities on other rotations that I may not be able to
>> drop
>>>> off at the very last minute. I was courteous enough to let you
>>>> know via email last night that I could not cover, thereby
>> enabling
>>>> you to find the adequate amount of time to find a replacement.
>>>> Please be considerate of others time and prior commitments
>> before
>>>> you send out an email assuming coverage. Alright, Adrienne good
>>>> luck on your away rotation.
>>>>
>>>> Leena
>>>>
>>>>
>>>>
>>>> —— Original Message ——
>>>> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
>>>> Date: Friday, August 5, 2011 9:20 am
>>>> Subject: RE: FW: Out Sick tomorrow
>>>> To: leena varughese <leena.varughese@mssm.edu>
>>>> Cc: "Morency, Elizabeth (MSSM-lmail)"
>>>> <elizabeth.morency@mssm.edu>, "Blowe, Sarah"
>>>> <sarah.blowe@mountsinai.org>, "Firpo, Adolfo (MSSM)"
>>>> <adolfo.firpo@exchange.mssm.edu>, "Lento, Patrick"
>>>> <Patrick.Lento@mountsinai.org>, "Grunes, Dianne"
>>>> <dianne.grunes@mountsinai.org>
>>>>> Leena,
>>>>>
>>>>> I appreciate that being pulled from your regularly scheduled
>>>>> rotation is not ideal. However, the new absence policy distributed
>>>>> at the last resident meeting gives an order of residents to be
>>>>> pulled for covering. Since two residents had to be pulled
>>>>> yesterday for coverage, per the new policy, you are the next
>>>>> person in the cycle of residents to be pulled. If you have an
>>>>> appointment this afternoon which simply cannot be moved, I
>> will be
>>>>> able to pull another resident for an hour in order for you to
>>>>> attend your appointment. Otherwise, you will be expected to cover
>>>>> frozen sections this afternoon.
>>>>>
>>>>> Please remember the only first years who can do frozens are on
>>>>> surgicals right now, two residents were pulled yesterday for
>>>>> coverage, and 6 residents are off site. In accordance with the
>>>>> policy, you are the next resident to be pulled. Thank you for
>>>>> understanding. Adrienne Jordan, M.D.
>>>>> Pathology Resident, PGY3

D00899

AA-242

>>>>> The Mount Sinai Medical Center
>>>>> Department of Pathology- Box 1194
>>>>> One Gustave L. Levy Place
>>>>> New York, NY 10029
>>>>> Cell: 330-327-7339
>>>>>
>>>>> _____
>>>>>
>>>>> From: leena varughese [mailto:leena.varughese@mssm.edu]
>>>>> Sent: Thu 8/4/2011 9:23 PM
>>>>> To: Jordan, Adrienne
>>>>> Cc: Morency, Elizabeth (MSSM-Imail); Blowe, Sarah; Firpo, Adolfo
>>>>> (MSSM); Lento, Patrick; Bleiweiss, Ira; Grunes, Dianne;
>> Harpaz, Noam
>>>>> Subject: Re: FW: Out Sick tomorrow
>>>>>
>>>>>
>>>>>
>>>>> Sorry, I can't cover frozen sections tomorrow afternoon.
>>>>>
>>>>> Dr. Varughese
>>>>>
>>>>> ----- Original Message -----
>>>>> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
>>>>> Date: Thursday, August 4, 2011 5:05 pm
>>>>> Subject: FW: Out Sick tomorrow
>>>>> To: "Morency, Elizabeth (MSSM-Imail)"
>>>>> <elizabeth.morency@mssm.edu>, "Blowe, Sarah"
>>>>> <sarah.blowe@mountsinai.org>, "Firpo, Adolfo (MSSM)"
>>>>> <adolfo.firpo@exchange.mssm.edu>, "Lento, Patrick"
>>>>> <Patrick.Lento@mountsinai.org>, "Bleiweiss, Ira"
>>>>> <Ira.Bleiweiss@mountsinai.org>, "Grunes, Dianne"
>>>>> <dianne.grunes@mountsinai.org>, "Harpaz, Noam"
>>>>> <noam.harpaz@mountsinai.org>, "Varughese, Leena (MSSM-Imail)"
>>>>> <leena.varughese@mssm.edu>
>>>>>> Sarah will be out sick tomorrow. Julie and Justin were pulled
>>>>>> today to help out. So moving down the list of residents who can
>>>>>> cover, tomorrow I need Leena to cover frozens in the
>>>> afternoon. So
>>>>>> that I do not have to pull another resident from their
>>>> rotation, I
>>>>>> am asking that the attendings sign out biopsies on their own
>>>> in the
>>>>>> morning. I want to thank everyone (especially the attendings who
>>>>>> will be signing out on their own and Leena who will be giving up
>>>>>> her time) for their patience and understanding. Adrienne Jordan,
>>>>>> M.D. Pathology Resident, PGY3
>>>>>> The Mount Sinai Medical Center

D00900

AA-243

>>>>>> Department of Pathology- Box 1194
>>>>>> One Gustave L. Levy Place
>>>>>> New York, NY 10029
>>>>>> Cell: 330-327-7339
>>>>>>
>>>>>> _____
>>>>>>
>>>>>> From: Blowe, Sarah
>>>>>> Sent: Thu 8/4/2011 4:18 PM
>>>>>> To: Bleiweiss, Ira; Lento, Patrick; Firpo, Adolfo (MSSM); Jordan,
>>>>>> AdrienneSubject: Out Sick tomorrow
>>>>>>
>>>>>>
>>>>>> I am not feeling well and will be out sick tomorrow.
>>>>>>
>>>>>> Sarah
>>>>>>
>>>>>
>>>>>
>>>>>
>>>>
>>>>
>>>>
>>

D00901

AA-244

Pl. Tr. Ex. 41

AA-245

PLF
EXHIBIT NO  *41*  DEFT
FOR ID
*6-19-13*  TRN

——Original Message——
**From:** Firpo, Adolfo [mailto:adolfo.firpo@mssm.edu]
**Sent:** Friday, August 12, 2011 11:47 AM
**To:** Lento, Patrick
**Cc:** Najfeld, Vesna (MSSM); Jordan, Adrienne; Varughese, Leena (MSSM-Imail)
**Subject:** RE: Sarah Out Sick
**Importance:** High

Dr. Lento:

This is very disconcerting. Do you mean that a resident, in this case Dr. Varughese, has not responded to a page from you? The Residency Program Director?

Dr. Firpo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu


*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1612
ATTN: Dr. Firpo
New York, New York 10029-6574

**From:** Lento, Patrick [mailto:Patrick.Lento@mountsinai.org]
**Sent:** Friday, August 12, 2011 11:33 AM
**To:** Jordan, Adrienne (MSH); Varughese, Leena (MSSM-Imail); Firpo, Adolfo
**Subject:** RE: Sarah Out Sick

I spoke to Dr. Najfeld who said Leena is there and would be released at noon. I tried paging Leena to confirm with her that she was to help cover on surgicals today since Sarah was out sick but she has not returned my page yet.

D00908

AA-246

Sarah Out Sick

Pat

———Original Message———
From: Jordan, Adrienne
Sent: Friday, August 12, 2011 10:31 AM
To: Varughese, Leena (MSSM-Imail); Grunes, Dianne; Lento, Patrick; Firpo, Adolfo (MSSM); Najfeld, Vesna (MSSM); Bleiweiss, Ira; Morency, Elizabeth (MSSM-Imail)
Subject: RE: Sarah Out Sick

Leena,

It is 10:30am. Please verify that you are in reciept of this e-mail so that I know coverage is taken care of and I can focus on my own rotation as well as let the rest of the surgical team know.

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339

From: Jordan, Adrienne
Sent: Fri 8/12/2011 8:50 AM
To: Varughese, Leena (MSSM-Imail); Grunes, Dianne; Guarino, Robert; Lento, Patrick; Firpo, Adolfo (MSSM); Najfeld, Vesna (MSSM); Bleiweiss, Ira; Morency, Elizabeth (MSSM-Imail); Klapper, Jeremy; Rosario-quinones, Frances; Ko, Mabel (MSSM-Imail)
Subject: Sarah Out Sick

Leena,

Sarah is out sick today. According to the "Policy on Absence/Coverage" you are the next resident up to be pulled to cover. She is assigned to grossing today on the Surgical service. I understand that this is your last day of cytogenetics and you must do an exit interview with Dr. Najfeld. Fortunately, Sarah is on the G2 service which is very light grossing. I am also asking that Bob Guarino possibly help by grossing extra breast specimens if he is able. This should dramatically reduce the amount you have to gross and allow you to meet with Dr. Najfeld when she has time.

Dr. Najfeld,
I understand that pulling a resident from your rotation is not ideal because your rotation covers a large amount of material in a very short amount of time. Unfortunately we have a resident who has called out sick several days this month and because of that I have had to pull numerous residents for coverage. Please believe me when I say Dr. Lento, Dr. Firpo, and myself do not consider pulling the resident on your rotation unless we are in dire need, and unfortunately at this point we are. I am deeply sorry for this. Leena will be able to meet with you this morning, however, for her exit interview and any final teaching you may have planned with her.

To everyone else,
I spoke with Dianne this morning. Apparently Sarah still has a significant amount of cases to sign out from yesterday. Dianne is going to try and sign out as much as she can in between grossing today. The remainder she will have to give to either the attendings directly or to the team on sign out today. Because Dianne is trying to keep up with her own service as well as ensure that Sarah's cases get signed out in a timely fashion, I am also asking the resident on GI to help Dianne with some of her GI specimens should the need arise today. Hopefully if we can all work together as a team the work load will be evenly distributed. Thank you all.

Sarah Out Sick

Let me know if there are ANY problems

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339

D00910

AA-248

Pl. Tr. Ex. 43

AA-249

PLF
EXHIBIT NO 43 DEFT
FOR ID L-17-17 TRN

## Policy for Morning Conference Attendance

I. **Purpose:** This policy outlines the responsibilities of the resident with regard to attendance at scheduled training experiences. This policy applies to all Pathology residents in accordance with the *ACGME Program Requirements for Graduate Medical Education in Anatomic and Clinical Pathology Common Program Requirements (IV.A.3)*. The purpose of morning conference is to enhance general knowledge and decision-making skills, and to help prepare for the ABP boards.

II. **Policy:** The goal of the Department of Pathology is to provide a full and varied training experience for the resident training in Pathology. It is the expectation of the department that each resident will attend all scheduled didactic presentations. The minimum requirement for successful completion of training requirements in Pathology will include, but are not limited to, the resident's participation in at least eighty percent (80%) of all required 8:00 am didactic presentations, average over a 4 week period (hereafter referred to as a "block"). When a resident fails to meet the minimal attendance requirements of the department, he/she will be notified of the following actions:

    a. 80-100% Attendance: No action
    b. 60-80% Attendance: Resident will prepare one lecture on a topic covered at a lecture they missed
    c. 40-60% Attendance: Resident will prepare one lecture on a topic covered at a lecture they missed and will be assigned 1 extra weekday AP call
    d. < 40% Attendance: Resident will prepare one lecture on a topic covered at a lecture they missed and will be assigned 1 extra weekday AP call and a letter signed by the program director will be placed in the resident's permanent file

**Note:** If resident attendance falls below 80% for two blocks within an academic year, a letter of reprimand will be placed in the chief resident files.

**Note:** If resident attendance falls below 80% for three blocks within an academic year, a letter of reprimand signed by the program director will be placed in the resident's permanent file.

**Note:** If resident attendance falls below 80% for four blocks within an academic year, the resident can be placed on probation, at the discretion of the residency program director and the department chairman.

**Note:** If resident attendance falls below 80% for five or more blocks during an academic year, the resident can be dismissed from the program, at the discretion of the residency program director and the department chairman.

**Note:** The resident is expected to review the material and power point presentation for any lecture that they miss. Lectures will be available on the G drive.

Updated on July 27, 2011

D01185

AA-250

Pl. Tr. Ex. 44

EXHIBIT
Dept. Ex. 10
in Ev. 11/14/11

**Jordan, Adrienne**

From:          Jordan, Adrienne
Sent:          Tuesday, September 13, 2011 10:38 PM
To:            leena varughese; Morency, Elizabeth (MSSM-lmail); Firpo, Adolfo (MSSM); Lento, Patrick
Subject:       RE: FW: RE: Period 2 conference attendance

PLF
EXHIBIT NO 44        DEFT
FOR ID 1313          TRN

Leena,

There are multiple issues in that e-mail so I will attempt to address them all.

1. It was my assumption that if you were too ill to give a presentation you were too ill to come to work. If that assumption is incorrect, I apologize, but I should point out that Dr. Lento and Dr. Morency also assumed that you were calling out sick tomorrow as well. Please respond ASAP if you are out sick tomorrow.

2. It does not matter where I am in the world, I am the chief resident. I went above and beyond the call of duty to make sure the department over nighted me a national pager once I figured out that my pager did not work in Hershey. During the time my pager did not work I sent CONSTANT e-mails to the residents and faculty to keep them informed of the best way to reach me. Numerous residents needed my attention during that time and were able to reach me. No one will ever accuse me of not being available to our residents. I answer my pager, my cell phone, and e-mails at all hours of the night, including several occasions when residents needed me at 2 and 3 in the morning. If you are going to in any way say I am not available to the residents you better do so with a lot more evidence and not speculation and false accusations. I provided you with proof of your infractions as you requested. You should show me the same respect and provide me with proof of this accusation. Name one instance in which you, or any other resident, attempted to contact me while I was on my away elective and I did not immediately respond.

3. Review the document I sent out about how to log hours in New Innovations. You are required to log conference attendance in New Innovations. This does not count, however, as an actual log of your attendance. The ACGME requires signatures as proof of conference attendance.

4. The attendance sheet was given to a trust worthy resident for the two weeks in which I was on my away elective and Dr. Morency was on vacation. Dr. Morency took care of the attendance sheet the remaining two weeks of Period 2. I know the attendance sheet was out every single morning for conference, even though I was not there. Therefore I know the attendance sheets are an accurate reflection of how many conferences you and every other resident were at. That is my proof. What proof do you offer that "80% of residents are not attending every conference?" If by that statement you mean that not ever resident is attending 80% of lectures within a given period, you are correct. One other person fell below 80% and that resident is also giving a conference. That resident has already informed us of their topic for their conference.

5. Your assertion that Dr. Firpo would only require you to go to conferences which you feel are of educational to you I know is false, but I will allow Dr. Firpo to respond to this since that discussion was with him. Since he has been CC'd on all the e-mails related to your make up conference, I strongly suspect that he would have informed Dr. Morency and me of your excused absences before this point.

. I do not dictate who you can and can not talk to. You are, I assume, referring to the e-mail in which I granted you special permission to switch from your GI elective. I stated in that e-mail that you could only request a switch with the resident via e-mail. This was actually in accordance with Dr. Firpo's wishes. You

AA-252

think that I dictate to you and that I tell you what to do and that shows me that you do not have a sense of what the chief resident job description is. We do not dictate anything. We are charged with enforcing department and hospital policy and everything we do reflects that. In any case, this was the one and only incident in which I stated how you were to communicate with another resident. This in no way impacts your ability to work as you claimed in your e-mail.

7. You got your elective that you requested. No, I did not allow you to change it after the yearly schedule was released. Dr. Morency and I have not allowed ANY schedule changes since the start of the year except in extreme circumstances. This is not unique to you. I refer you to the document I sent you with other resident infractions in which I clearly indicate the rarity of schedule change approvals. I did, however, offer to change another non-resident dependent rotation for you so you could have more exposure to Hematology. You have, not as of yet, responded to my generous offer.

8. I have sent the exact same e-mail about call switches to several other residents. You are not the only one. Again, call changes after the month starts can not be allowed because the page operator has the schedule already. Again, this is department policy which Dr. Morency and I are charged with enforcing. Again, we are not targeting you or anyone else.

9. I have no intention of decreasing or altering my administrative responsibilities in any way shape or form. It is my job as chief resident to enforce policy. It is your job to abide by policy and respond to the chief residents. As Dr. Firpo instructed you last week, you must respond to chief resident communications of all kinds, including e-mails. This is not optional.

10. Your lecture is rescheduled for this Thursday morning. Just so you do not accuse me of targeting you, I cleared this with Dr. Lento prior to rescheduling you. He is in agreement with this decision.

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339

-----Original Message-----
From: leena varughese [mailto:leena.varughese@mssm.edu]
Sent: Tue 9/13/2011 8:56 PM
To: Jordan, Adrienne
Subject: Re: FW: RE: Period 2 conference attendance

Why are you stating that I will be calling out tomorrow? Two, you weren't here for period 2, which means as the chief resident in service you were not available to the residents who may need you for any reason. Also, I

AA-253

don't know who was keeping track of the attendances that period. It may be best to follow all the conferences in new-innovations. Honestly, 80% of the residents are not attending every single conference given either. When the email to present a lecture was send out to me two weeks ago, it was on a day that I had called out sick and the first day of period 3. I had spoken to Dr.Firpo earlier in the period and he had said to that I can go to conferences that are educational to me and to make sure that I make a note of it. I understand you are the chief this year, but the extend to which you are attempting to dictate to me who I should speak to or who I can ask to cover significantly limits my ability to do my work and places an undue amount of stress on me. All

the same, I have tried to be supportive of you despite the fact that you have emailed me to say that I cannot have certain rotations when the schedule first came out, changed any rotation of interest to me to a significant degree since the initial schedule, refused an elective (my one elective in 4 years), reproached me about switching call and so on so on. Whether you realize it or not, you are making it an hostile work environment for me, and I would like for you to stop targeting me. I would suggest that you ask Dr. Firpo to email me or dictate any specifics and decrease your burden of administrative responsibilities as such. I will comply and respond to him promptly, whether it is about giving a lecture or call or rotations and so forth. I thank you in advance for your discretion with this email.

Dr. Varughese


----- Original Message -----
From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
Date: Tuesday, September 13, 2011 2:02 pm
Subject: FW: RE: Period 2 conference attendance
To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>, "Petersen, Bruce" <Bruce.Petersen@mountsinai.org>, "Firpo, Adolfo (MSSM)" <adolfo.firpo@mssm.edu>, "Lento, Patrick" <Patrick.Lento@mountsinai.org>, "Carter, Allene" <Allene.Carter@mountsinai.org>, "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>

> Ms. Carter,
>
> Leena will be out sick tomorrow (please see her e-mail below).
>
> Adrienne Jordan, M.D.
> The Mount Sinai Hospital
> Department of Pathology - Box 1194
> One Gustave L. Levy Place
> New York, NY 10029
>
> Pager (917) 401-5341
> Cell (330) 327-7339
>
>
> -----Original Message-----
> From: leena varughese [mailto:leena.varughese@mssm.edu]
> Sent: Tuesday, September 13, 2011 11:44 AM

AA-254

> To: Firpo, Adolfo (MSSM)
> Cc: Morency, Elizabeth (MSSM-Imail); Lento, Patrick; Jordan,
> Adrienne; Petersen, Bruce; Cordon-cardo, Carlos (MSSM)
> Subject: Re: RE: Period 2 conference attendance
>
> I don't feel well, I won't be able to present tomorrow. As you
> well know, I am not qualified to give any real core lectures as
> such because i am a resident in training. What happened to the
> cytology lecture that should be scheduled for tomorrow?
>
> ----- Original Message -----
> From: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
> Date: Tuesday, September 13, 2011 9:56 am
> Subject: RE: Period 2 conference attendance
> To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>,
> "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>,
> "Lento, Patrick (MSH)" <Patrick.Lento@mountsinai.org>, "Jordan,
> Adrienne (MSH)" <adrienne.jordan@mountsinai.org>, "Petersen, Bruce
> (MSH)" <Bruce.Petersen@mountsinai.org>
> Cc: "Cordon-cardo, Carlos" <carlos.cordon-cardo@exchange.mssm.edu>
>
> > Dr. Varughese:
> >
> > You are welcome to attend as many conference as you want and are
> > able to attend without interference to your responsibilities on
> > each rotation. However, the requirement for attendance to all
> core
> > pathology lectures stands. Please do as other residents have done
> > and comply with this request one and for all.
> >
> > Dr. Firpo
> >
> > Adolfo Firpo, M.D.,M.P.A.,FCAP
> > Professor and Director
> > Pathology Educational Activities
> > Department of Pathology,
> > The Mount Sinai School of Medicine.
> > The Mount Sinai Hospital
> > Phone: 212-659-8214
> > Fax: 212-348-7556
> > E-mail: adolfo.firpo@mssm.edu
> >
> >
> > Office Address:
> > Icahn Medical Institute 8th Floor, Office 8-40, Box-1612 1425
> > Madison Avenue and E98th Street New York, New York 10029-6574
> >
> > Mailing address:

AA-255

>> One Gustave L. Levy Place, Box 1619
>> ATTN: Dr. Firpo
>> New York, New York 10029-6574
>>
>>
>>
>>
>> -----Original Message-----
>> From: leena varughese [mailto:leena.varughese@mssm.edu]
>> Sent: Tuesday, September 13, 2011 9:41 AM
>> To: Morency, Elizabeth (MSSM-Imail); Lento, Patrick (MSH);
> Jordan,
>> Adrienne (MSH); Petersen, Bruce (MSH); Firpo, Adolfo
>> Subject: Period 2 conference attendance
>>
>> All,
>>
>> I understand that I did not attend every conference but I have
>> attended conferences that I thought would be useful for me on a
>> daily basis. Also, am I the only resident who has to make this
>> presentation? I was attending many of the conferences and have
>> noted that other residents were not there when I was there. Two,
>I
>> attended several conferences that were valuable and useful to me
>> and would like to count them. I spoke to Dr. Firpo regarding this
>> matter and he said that it would be fine for me attend alternate
>> educational conferences. In fact, I would like to request for
>> someone, perhaps Ms. Carter, to have an updated hospital wide
>> conference list for all available daily conferences including
> tumor
>> boards. Finally, I am happy to present a conference or lecture
> on
>> cytology review tomorrow, it will be hodgepodge of all the
> lectures
>> that I missed from cytology.
>>
>> Dr. Varughese
>>
>>
>>
>>
>>
>> >>On Mon, Aug 29, 2011 at 4:50 PM, Elizabeth Morency
>> <elizabeth.morency@gmail.com> wrote:
>> Hi Dr. Varughese,
>>
>>   Unfortunately for the last block you have fallen below the 80%
>> required morning conference attendance cutoff for Period 2. As a

> > result you will need to prepare a presentation based on one of
> the
> > lectures you have missed, per the new conference attendance
> policy.
> > You will be scheduled to present your lecture on the topic of
> your
> > choice on Wednesday, September 14th at 8 am. Thank you for your
> > cooperation and compliance.
> >
> >
> > --
> > Elizabeth Morency, M.D.
> > Chief resident, PGY-4
> > Department of Pathology
> > The Mount Sinai Medical Center
> > New York, NY 10029
> > Pager: 917-641-1845
> >
> >
> >
> >
> > --
> > Elizabeth Morency, M.D.
> > Chief resident, PGY-4
> > Department of Pathology
> > The Mount Sinai Medical Center
> > New York, NY 10029
> > Pager: 917-641-1845
> >
> >
> >

AA-257

Pl. Tr. Ex. 45

AA-258



EXHIBIT

*Dept. EX 9*
*Ad. Ev. 11/14/17*

PLF                                    DEFT
EXHIBIT NO *45*
FOR ID                                 TRN
*6-13-13*

**From:** Jordan, Adrienne [mailto:adrienne.jordan@mountsinai.org]
**Sent:** Friday, September 09, 2011 4:38 PM
**To:** Firpo, Adolfo; Varughese, Leena (MSSM-Imail)
**Cc:** Morency, Elizabeth (MSSM-Imail); Lento, Patrick (MSH); Lento, Patrick (MSH)
**Subject:** RE: Resident Meeting Minutes

Dr. Varughese,

Thank you for initialing your acknowledgement of the resident meeting minutes. To my knowledge, you also have not yet responded to Dr. Morency's e-mail about the topic of your presentation for this Wednesday's conference. Due to your lack of response, a topic was not able to be posted on the weekly schedule and residents will not have time to pre-read for lecture. Please respond with your lecture topic so that I may e-mail the residents this weekend and those who choose to do so can prepare. Thank you for your time in addressing this matter.

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY 10029

Pager (917) 401-5341
Cell (330) 327-7339

——Original Message——
**From:** Firpo, Adolfo [mailto:adolfo.firpo@mssm.edu]
**Sent:** Friday, September 09, 2011 2:54 PM
**To:** Varughese, Leena (MSSM-Imail)
**Cc:** Morency, Elizabeth (MSSM-Imail); Lento, Patrick; Jordan, Adrienne; Lento, Patrick
**Subject:** RE: Resident Meeting Minutes

Dr. Varughese:

Please comply with the established policies of the residency program and respond promptly and professionally to all communications from your Chief Residents and Program Director. These requirements are being applied equally to all residents and you are the only one who seems to have difficulty with compliance. These policies were developed and implemented as required by the ASGME RRC for Pathology and are intended to strengthen or residency program by holding everyone equally accountable for their behavior and actions as residents in good standing in our program. You must comply with the rules.

D01151

The following ACGME requirements apply to this request from your Chief Residents who together with the Program Director are your immediate superiors in the residency program:

*(c) Practice-based Learning and Improvement* - Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on <u>constant self-evaluation and life-long learning</u>.
Residents are expected to develop skills and habits to be able to meet the following goals:

    (1) identify strengths, deficiencies, and limits in one's knowledge and expertise;

    (2) set learning and improvement goals;

    (3) identify and perform appropriate learning activities;

    (4) systematically analyze practice using quality improvement methods, and implement changes with the goal of practice improvement;

    (5) incorporate formative evaluation feedback into daily practice;

    (6) locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems;

    (7) use information technology to optimize learning; and,

    (8) participate in the education of patients, families, students, residents and other health professionals.

*(d) Interpersonal and Communication Skills* -Residents must demonstrate interpersonal and communication skills <u>that result in the effective exchange of information and collaboration</u> with patients, their families, and health professionals.
    Residents are expected to:

    (1) communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;

    (2) communicate effectively with physicians, other health professionals, and health related agencies;

    (3) work effectively as a member or leader of a health care team or other professional group;

    (4) act in a consultative role to other physicians and health professionals; and,

    (5) maintain comprehensive, timely, and legible medical records, if applicable.

    (6) along with faculty, be regularly involved in consultative activity;

    (7) provide patient-care consultations which should be both intra- and inter-departmental;

    (8) perform at least 200 intraoperative consultations during the program;

    (9) be considered integral members of the staff of the Department of Pathology, and must have the opportunity to participate in discussions related to management of the department; and,

    (10) when operating under appropriate supervision, be given direct responsibility to make decisions in the laboratory.

D01152

AA-260

*(e) Professionalism* - Residents must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles. Residents are expected to demonstrate the following attitudes and attributes:

    (1) compassion, integrity, and respect for others;

    (2) responsiveness to patient needs that supersedes self-interest;

    (3) respect for patient privacy and autonomy;

    (4) accountability to patients, society and the profession; and,

    (5) sensitivity and responsiveness to diverse patients: gender, age, culture, race, religion, disabilities, and sexual orientation +.

*(f)   Systems-based Practice* -Residents must demonstrate an awareness of and responsiveness to the <u>larger context</u> and system of health care, as well as the <u>ability to call effectively on other resources in the system</u> to provide optimal health care. Residents are expected to attain the following performance objectives:

    (1) work effectively in various health care delivery settings and systems relevant to their clinical specialty;

    (2) coordinate patient care within the health care system relevant to their clinical specialty;

    (3) incorporate considerations of cost awareness and risk-benefit analysis in patient and/or population-based care as appropriate;

    (4) advocate for quality patient care and optimal patient care systems;

    (5) work in interprofessional teams to enhance patient safety and improve patient care quality; and,

    (6) participate in identifying system errors and implementing potential systems solutions.

With regard and looking forward to your prompt reply to Dr. Jordan's request,

Dr. Firpo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

D01153

AA-261

**From:** Jordan, Adrienne [mailto:adrienne.jordan@mountsinai.org]
**Sent:** Friday, September 09, 2011 2:43 PM
**To:** Varughese, Leena (MSSM-Imail)
**Cc:** Firpo, Adolfo; Morency, Elizabeth (MSSM-Imail); Lento, Patrick (MSH)
**Subject:** Resident Meeting Minutes

Leena,

This is a final reminder that you must either sign the resident meeting minute acknowledgement sheet (for the meeting that took place on August 26) located on the wall by my desk above the coffee maker or respond to this e-mail stating that you have reviewed the minutes and are responsible for their content. Failure to do so by 5pm this evening will result in a letter being placed in your permanent file. Thank you for your attention to this matter.

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology – Box 1194
One Gustave L. Levy Place
New York, NY 10029

Pager (917) 401-5341
Cell (330) 327-7339

D01154

AA-262

Pl. Tr. Ex. 46

AA-263



EXHIBIT
Varughese Ex 35
In Ev. 4/14/11

>> ----- Original Message -----
>> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
>> Date: Monday, September 12, 2011 3:20 pm
>> Subject: Please Respond
>> To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>,
>> "Firpo,Adolfo (MSSM)" <adolfo.firpo@mssm.edu>, "Lento, Patrick"
>> <Patrick.Lento@mountsinai.org>, "Morency, Elizabeth (MSSM-Imail)"
>> <elizabeth.morency@mssm.edu>
>>
>>> Dr. Varughese,
>>>
>>>
>>>
>>> Dr. Morency and I have e-mailed you several times about the
>> following> two issues yet you have failed to respond. Please
>> respond
>>> immediately.
>>>
>>>
>>> 1.   What is your topic for Wednesday conference?  I now, in addition
>> to residents asking, have attendings asking as well.  We must
>> have
>>> thisinformation today.
>>> 2.   Have you asked Jonathan Yao about switching your GI month?  I
>> need to finalize schedules today.  Additionally, if Dr. Yao was
>> unable> to switch with you, did you want me to switch one of your M-
>> VA months
>>> for Hematology as I suggested in an earlier e-mail?
>>>
>>>
>>> Please respond to these two points immediately.  Thank you for your
>>> time.
>>>
>>>
>>>
>>> Adrienne Jordan, M.D.
>>>
>>> The Mount Sinai Hospital
>>>
>>> Department of Pathology - Box 1194
>>>
>>> One Gustave L. Levy Place
>>>
>>> New York, NY  10029
>>>
>>>
>>>
>>> Pager (917) 491-5341
>>>
>>> Cell (330) 327-7339
>>>
>>>
>>>
>>>

PLF
EXHIBIT NO 46   DEFT
FOR ID
           6-17-13   TRN

D01378

AA-264

On Sep 12, 2011, at 6:56 PM, "leena varughese" <leena.varughese@mssm.edu> wrote:

> It's going to be review on grossing of several different types of specimens of interest to me and
> gross pictures of common malignancies.... this is the lecture I am interested in presenting.
>
> ----- Original Message -----
> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
> Date: Monday, September 12, 2011 6:33 pm
> Subject: RE: Please Respond
> To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>
> Cc: "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>, "Firpo, Adolfo
> (MSSM)" <adolfo.firpo@mssm.edu>, "Lento, Patrick" <Patrick.Lento@mountsinai.org>
>
>> Dr. Varughese,
>>
>> That is not an appropriate lecture topic. We have had 8 grossing
>> lectures already where this topic was discussed in great detail.
>> Additionally, the attendings are covering this during their normal
>> histology lectures. Lastly, the policy states that you must give a
>> lecture on a topic that you missed. I have taken the liberty of
>> lookingat your absences and these are areas that you missed:
>> Cytology GYN
>> infections, Cytology GYN dysplasia, Normal GU histology, Acid-Base
>> Chemistry, and Cytology Squamous Cell Carcinoma. Additionally you
>> missed several Autopsy conferences. Several suggestions for topics I
>> have for you are: an interesting cytology case in one of the above
>> mentioned topics, board review of clinical chemistry questions, or
>> follow up of an interesting autopsy case with a good work up,
>> differential diagnosis, etc. I am sorry that you have to create
>> anotherpresentation, but this is why Dr. Morency and I asked you
>> several weeks
>> ago for your topic. Please respond ASAP with what your topic will be.
>>
>> Adrienne Jordan, M.D.
>> The Mount Sinai Hospital
>> Department of Pathology - Box 1194
>> One Gustave L. Levy Place
>> New York, NY 10029
>>
>> Pager (917) 401-5341
>> Cell (330) 327-7339
>>
>>

AA-265

Pl. Tr. Ex. 47

AA-266

from    Firpo, Adolfo adolfo.firpo@mssm.edu
to      "Varughese, Leena (MSSM-lmail)" <leena.varughese@mssm.edu>
cc      "Petersen, Bruce (MSH)" <Bruce.Petersen@mountsinai.org>,
        "Patel, Shema" <shema.patel@exchange.mssm.edu>,
        "Lento, Patrick (MSH)" <Patrick.Lento@mountsinai.org>,
        "Tiger-Paillex, Caryn" <caryn.tiger-paillex@exchange.mssm.edu>
date    Thu, Sep 15, 2011 at 3:51 PM
subject Hematoipathology rotation
signed-by       mssm.edu

PLF
EXHIBIT NO 47
FOR ID        DEFT
         TRN

Dear Dr. Varughese:

I am glad you felt well enough to come to work today. I am also very glad we had an opportunity to discuss your concerns openly and with candor. I was delighted to hear that you had decided to request a leave of absence from the program as I myself had become concerned over the obvious high stress levels that you were experiencing.

As I promised to do I discussed your concerns with Ms. Patel and we together consulted Ms. Tiger-Paillex at the HR office, Dr. Scott Barnet and Ms. Paul Johston of the GME Office, to find information about the appropriate process to follow.

I reiterate to you that everyone's primary concern in our Department and at Mt. Sinai is your wellbeing and health. We wish you well. Ms. Patel obtained the information packet to apply for the leave of absence and she will be happy to go over it with you at your convenience. We also talked with Dr. Bruce Petersen, you faculty mentor and current rotation supervisor at hematopathology who also expressed his concern and willingness to excuse from the rotation for health reasons. I am sorry you could not an appointment with your physician sooner that next week since your health is paramount to all of us. Please meet with Dr. Petersen and discuss the situation candidly. As your advisor he should be able to provide valuable counsel and guidance at this difficult and stressful time. As you asked of me I will wait to instruct the chief residents to remove form the rotation schedule until you obtain and provide your doctor's note. Please, keep in mind that you may be excused from your duties at any time you feel it necessary for your heath and wellbeing, please keep Dr. Petersen informed of your activities and decisions so he make the necessary adjustments in his service responsibilities.

Please take care of yourself and be well,

Dr. Firpo


Adolfo Firpo, M.D.,M.P.A.,FCAP

Professor and Director

Pathology Educational Activities

Department of Pathology,

The Mount Sinai School of Medicine.

The Mount Sinai Hospital

Phone: 212-659-8214

Fax: 212-348-7556

E-mail: adolfo.firpo@mssm.edu

AA-267

Pl. Tr. Ex. 48

AA-268

POF
EXHIBIT NO 48    DEFT
FOR ID                  TRN

**From:** Firpo, Adolfo
**Sent:** Friday, September 16, 2011 11:20 AM
**To:** Varughese, Leena (MSSM-Imail)
**Cc:** Patel, Shema; Johnson, Paul F (GME) (MSSM-Imail); Barnett, Scott; Tiger-Paillex, Caryn; Lowy, Marina (MSH); Petersen, Bruce (MSH)
**Subject:** Request for leave of absence

Dear Dr. Varughese:

I noticed you were absent from this morning's core conference on Autopsy Pathology which is on the regular Friday schedule. After the conference, at 9:00AM, I went up to the resident's room looking for you and you were not there, nor were you with Dr. Bruce Petersen, your current hematopathology rotation supervisor and faculty mentor. However, I was very happy to hear that you had met with him yesterday afternoon as I asked you to do earlier and to learn from him that you were able to sign out the cases of the day. He also mentioned to me that you had talked about your health status and that he offered an alternative, less stressful work arrangement for the remainder of your rotation through his service; he said that you seemed happy with his suggestion. As I emphasized to you yesterday afternoon, and as it must be evident to you by now, the primary Department's concern and that of Mt. Sinai, is for your health and wellbeing.

I am glad we had a brief follow-up discussion in the presence of Ms. Patel yesterday afternoon, where we were able to inform you about how to request the leave of absence. We were both sorry about your inability to perform at the same level than the other residents due to your severe depression and anxiety response to the work demands. I was also very saddened by hearing how these conditions had progressively become worse due to your heightened stress response to the performance expectations of the chief resident, some attendings and faculty, as well as the Program Director, Dr. Patrick Lento. It is a shame that these problems have prevented you to perform and comply with all the newly established policies of the program in the same manner as all the other residents have done without such problems. I was very concerned when you expressed to me that this stress, depression, and anxiety had prevented you form preparing the make-up conference required by the policy for penalty for being absent form 80% or more of the core lectures at Mt. Sinai.

After our last encounter yesterday afternoon I followed up with the GEM Office about your situation and asked for guidance on the best way to proceed. In conformity with federal laws, programmatic and institutional regulations. The fact is that you are required to provide proof of illness for the absences of Monday and Tuesday since they prevented you form fulfilling a professional and academic responsibility of the residency program. You must also provide a medical note to proceed with the application for leave of absence you are requesting. Because of the impact of your absence from the program and the necessity to redo the entire rotation schedule of residents and fellows, I must notify the chief resident of your imminent extended absence for them to begin with the necessary adjustments on the rotations. I must also ask you not to return without the doctor's note and assessment for the leave of absence. There are other administrative details related to or

D00934

AA-269

required for granting a leave of absence and these will be explained to you in detail by Ms. Patel when you meet with her to review the completed forms she handed to you yesterday afternoon.

With my best and sincere wishes for your prompt and full recovery,

Adolfo Firpo, MD

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

D00935

AA-270

Pl. Tr. Ex. 52

AA-271





MOUNT SINAI
SCHOOL OF
MEDICINE



September 21, 2011

To:    Leena Varughese, MD

We are writing to you as the Chair and the Director of Educational Activities of the Department of Pathology to inform you of your summary suspension termination from the Pathology Residency Program. We are taking this action because your performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients.

On December 21, 2010, you were placed on Academic Advisement by Patrick Lento, MD, the Residency Program Director, to address serious deficiencies in your level of professionalism. The Advisement required you to prepare a written self-reflection; to meet with Dr. Lento to assess your progress; and to read a textbook on professionalism.

When Dr. Cordon-Cardo arrived at Mount Sinai as the new Department Chair, he met with you on May 24, 2011, to review your performance under the Advisement. It was evident that you had not satisfied the expectations for your performance during this period. Further, not only was your behavior at this meeting unprofessional, it showed a lack of insight and understanding of your role in the department.

On July 15, Dr. Cordon-Cardo met with you to deliver a final warning, which was a disciplinary action based on your failure to meet professionalism expectations. At that time, you were notified that you would be required to meet biweekly for three months with Dr. Adolfo Firpo, who had recently been appointed as Director of Educational Activities. The purpose of the meetings was to provide you with guidance and to assess your performance using established mechanisms for obtaining feedback from faculty, residents and staff. While Dr. Cordon-Cardo notified you verbally and in writing regarding your right to a hearing, you did not appeal the final warning. On August 1, the Program arranged for you to begin meeting with Dr. Firpo as provided in the final warning letter.

Since the final warning was issued, you have continued to demonstrate unprofessional behavior. Below is a summary of events in this most recent period, including both your actions and the program's response (where applicable).

AA-272

Leena Varughese, MD
September 21, 2011
Page 2

I.   **Duty and Professionalism Concerns during Tumor Cytogenetics Rotation**

From August 1 to August 12, you were assigned to the Tumor Cytogenetics Rotation under the supervision of Dr. Vesna Najfeld. Dr. Najfeld reported that you did not satisfactorily complete the rotation, noting the following issues:

- Your scheduled clinical case conference presentation on August 9 was inadequately prepared even though you were given ample time to complete it. You responded late to Dr. Najfeld's pages and emails communicating the need for you to improve the presentation. As a result, the presentation had to be postponed until the following week. You failed to notify attendees of the cancellation, even though Dr. Najfeld asked you to do so.

- You were absent from the Cytogenetics laboratory numerous times, often without authorization or explanation. For example, on August 10, 2011, Dr. Najfeld noted that you were 90 minutes late; returned 30 minutes late from lunch; and left 60 minutes early. In addition, you did not fulfill your work responsibilities that day.

- You were unprofessional in your interactions with faculty and staff. For example, you repeatedly used your handheld device while staff members were instructing you, and you continued to use it even after you were asked not to do so. You also told a laboratory supervisor that she was "wasting your time."

The Program made its best efforts to help you succeed on this rotation while ensuring that the service continued to function properly. Dr. Najfeld repeatedly attempted to contact you on August 8, 2011, to schedule time to work with you on your presentation. After your late response, Dr. Najfeld worked with you for two hours to improve the presentation. You were allowed to postpone the presentation by one week. During your absences, your work was reassigned to others. Dr. Najfeld and others role-modeled professional behavior and provided guidance to you in this regard. Finally, Dr. Firpo provided feedback from the rotation to you on August 17.

II.  **Duty Concerns Regarding Coverage**

A.  Frozen Section Coverage on August 5

On August 4, Dr. Adrienne Jordan, Chief Resident, assigned you to cover the frozen section room on the afternoon of August 5 for a resident who was out sick. In making this assignment, the chief resident followed current departmental policy regarding coverage for sick calls. You refused this assignment, stating that you had an injury that prevented you from taking the assignment, even though you reported to work in the Tumor Cytogenetics laboratory on the same day (August 5). The Program was forced to deviate from its policy of arranging alternate coverage after your refusal. You were asked on multiple occasions by one of the chief residents (Dr. Jordan) to provide proof of the stated injury that prevented you from taking the

AA-273

Leena Varughese, MD
September 21, 2011
Page 3

assignment, yet you failed to comply with—or even to acknowledge—this request. You then changed your rationale for refusing the assignment, stating that you thought it was unfair for the department to pull you from a Clinical Pathology rotation to cover an Anatomic Pathology service. This claim shows a continued lack of insight or an understanding of your role in the department. Your behavior in this instance can only be considered as both dishonest and insubordinate.

B. Surgical Coverage on August 12

On the morning of August 12, Dr. Jordan informed you by email that you would be assigned to cover the Surgical Pathology service that afternoon for a resident who was out sick. Dr. Jordan informed Dr. Najfeld of the need to excuse you for this coverage, but Dr. Najfeld responded that you were significantly late that day (You arrived 75 minutes late, arriving at 10:15am.) You did not respond to Dr. Jordan's email or to a page from Dr. Lento. Ultimately, Dr. Lento was able to reach you by calling Dr. Najfeld and asking her to bring you to the phone so he could speak with you. Dr. Lento confirmed your coverage assignment and instructed you to contact Dr. Jordan, which you failed to do. While you proceeded to provide the required coverage, your behavior in dealing with this incident demonstrates your unresponsiveness and failure to follow instructions.

III. Unprofessional Response to Request for Change of Elective Rotation

On August 2, you asked Dr. Firpo if you could change your elective rotation from your original choice of GI Pathology to Dermatopathology. After careful consideration by the chief residents, Dr. Lento and Dr. Firpo, the request was denied on September 7 because (1) it was not timely, as the annual schedule had been established before the beginning of the academic year; (2) your elective rotation coincided with necessary coverage of the GI Pathology service; and (3) alternate coverage could not be identified. You raised several concerns about your rotations, all of which have been addressed by Dr. Lento and Dr. Firpo, who have confirmed that your schedule meets all training requirements. You also claimed that you were being singled out in denying this request, which is not the case; the Program has denied 8 of 10 residents' requests for schedule changes since July 1.

You refused to accept that your request had been denied and on September 7, you arrived at Dr. Firpo's office and addressed him in an accusatory manner, stating that he had made a commitment to you to change the rotation, which was untrue. You claimed that another resident, Dr. Mabel Ko, had agreed to cover the GI rotation; yet Dr. Ko later informed Dr. Firpo that she had not agreed to cover the rotation. Your email to Dr. Firpo on September 7—in which you requested reconsideration to avoid, in your words, "elevating this issue to some colossal problem"—shows your unwillingness to accept or to respect the Program's decisions regarding your education. As recently as September 20, you complained to Dr. Firpo about the GI assignment even though it was made

Leena Varughese, MD
September 21, 2011
Page 4

clear that the decision was final. Your behavior related to the Program's handling of the
request has been unprofessional and unacceptable.

## IV.  Poor Conference Attendance and Adherence to Departmental Policy

On August 29, Dr. Morency (Chief Resident) notified you that your attendance at
educational conferences provided by the Program for the preceding block had fallen
below the 80% threshold required by the Department. Consistent with Departmental
policy, you were required to present a lecture on September 14 on a topic of your
choice selected from material missed by your absences. You did not respond to this
email or to two follow-up emails from Dr. Jordan and Dr. Morency. You called out sick
on September 13 and 14, the day prior to and the day of your expected presentation. As
a result, your presentation was rescheduled for September 15. On September 15, you
arrived 15 minutes late to the weekly, 8am Thursday morning conference while one of
your colleagues was giving a presentation and then left after only 15 minutes without
presenting your own talk or addressing anyone at the conference. The program
requested proof of illness for your absences on September 13 and 14, and such proof
was not provided. Your inability to acknowledge or fulfill your obligations reinforces
the Program's concerns about your professionalism.

## V.  Poor Communication Regarding Leave of Absence

After the above-mentioned conference on September 15, Dr. Firpo met with you to
discuss your early departure from the conference without giving your expected
presentation. At that time, you indicated that you did not make your presentation
because you were unwell and unable to fulfill your duties, and you requested a leave of
absence due to a serious medical condition. Dr. Firpo then consulted the GME Office
and the Human Resources Department for assistance regarding the handling of a leave
of absence. On the afternoon of September 15, Dr. Firpo and Ms. Shema Patel, the
Department Administrator, met with you again to express their concern for your health
and well-being, and to inform you of the procedures for requesting a leave of absence.
Later that day, Ms. Patel provided you with materials related to the Family and Medical
Leave Act (FMLA), including written instructions and a blank certification of health
care provider form. (Ms. Patel provided you with a completed designation notice on
September 19.) Ms. Patel offered her assistance in helping you obtain the earliest
possible doctor's appointment. Dr. Firpo excused you from work until you were able to
obtain a medical assessment. However, at the end of the day on September 15, you
informed Dr. Firpo that you wanted to continue working until you could be assessed.
You informed the program that your doctor's appointment would occur the next day
(Friday, September 16).

On the morning of September 16, Dr. Firpo observed that you were not at the scheduled
core Autopsy conference and that you were not in the residents' room or at work on
your scheduled Hematopathology rotation. He sent a follow-up email to you stating that
you should not return to work until your request for leave could be resolved. The GME

Leena Varughese, MD
September 21, 2011
Page 5

Office asked Dr. Daniel Hughes of the Physician Wellness Committee to contact you to coordinate an assessment.

On September 16 and Monday, September 19, Dr. Hughes, Dr. Firpo and Ms. Patel attempted to contact you by phone and email out of concern for your well-being and to follow-up on your request for leave. You did not respond to any attempts to contact you. At the end of the day on September 19, the Program learned that you had reported to your Hematopathology rotation on September 16 and 19 despite your having been directed not to report to duty until you undergo a physician's assessment.

On the morning of Tuesday, September 20, you approached Ms. Patel at Starbucks (off-campus) to discuss your intention to defer your leave of absence and to continue working in the meantime. When you mentioned that you were on your way to the scheduled morning conference, Ms. Patel asked you not to go to Annenberg and instead to accompany her to her office so she could arrange for Ms. Caryn Tiger-Paillex, Director of Human Resources, to meet with you.

After initially refusing, you met with Ms. Tiger-Paillex and Mr. Paul Johnson, Director of Graduate Medical Education, on September 20. At this meeting, you confirmed that your doctor's appointment had been scheduled for September 16, but that the psychiatrist you saw initially referred to an internist for certification of your need for a leave of absence. Your appointment with the second physician was scheduled for the afternoon of September 20. When asked why you reported back to work for two days without following up with Dr. Firpo or Ms. Patel, you responded that you did not feel the need to respond to emails that "only stated facts," and that you would have responded if they had asked if you were working. You confirmed that Dr. Hughes contacted you, but claimed that you did not want to reply because you found the Physician Wellness Committee to be unhelpful in your previous interactions. Mr. Johnson reminded you that cooperation with the Physician Wellness Committee was mandatory, to which you responded that you might be able to respond to Dr. Hughes "at your convenience." During the meeting, Ms. Tiger-Paillex reached Dr. Hughes by phone and you were able to arrange an appointment for September 22.

You were insubordinate and unprofessional in your refusal to follow Dr. Firpo's instructions—which were given in response to your statements regarding your inability to work due to a medical condition—or to respond to the Program's and Dr. Hughes' attempts to contact you.

VI. Incident in Ms. Patel's Office

On September 20, after Ms. Patel brought you to her office and contacted Ms. Tiger-Paillex, Ms. Patel stepped out momentarily to assist a visitor. When she returned, she observed that you were looking through the contents of one of her files on her desk (The file was labeled "Pathology"). Ms. Patel explained that her files are confidential and asked you why you opened the Pathology file. At first you provided no reason, but

AA-276

Leena Varughese, MD
September 21, 2011
Page 6

you ultimately said that you saw the label and wanted to know about Pathology. Ms. Patel continued to question you, asking how you would feel if someone went through your workspace and looked at your files. You replied that Ms. Patel "just had it there," and asked Ms. Patel, "What's the big deal?" You also told Ms. Patel to "chill out." Later, when Ms. Tiger-Paillex and Mr. Johnson asked you about looking at the file in Ms. Patel's office, you initially said, "I don't have anything to say about that." You then denied looking through the file, saying that your coffee was resting close to some documents on her desk, resulting in a misperception. Ms. Tiger-Paillex informed you that Ms. Patel's files were confidential, and you replied that Ms. Patel should not have left someone alone in her office if there are confidential files there. You not only exercised extremely poor judgment in accessing Ms. Patel's file but lied several times when questioned about it. Such behavior is unacceptable and raises serious questions about your professional character.

You are summarily suspended from the Program pending your termination. Your summary suspension is not subject to a hearing.

You have a right to appeal your summary suspension and termination by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. Requests should be directed to Michael Harris, MD, President of the Medical Board, in care of the Medical Staff Office at Box 1116. The summary suspension is without pay and will take effect immediately pending termination. If you do not appeal this disciplinary action it will become final at the end of the appeal period. For your convenience, relevant portions of the House Staff Manual are enclosed.

Sincerely,

Carlos Cordon-Cardo, MD, PhD
Chair, Department of Pathology

Adolfo Firpo, MD
Professor and Director of Educational Activities
Department of Pathology

AA-277

Pl. Tr. Ex. 53

AA-278



Leena Varughese, MD
298 Derby Road
Middletown, NY 10940

T 908 2657536
leenav@gmail.com

September 28, 2011

Michael T. Harris, MD
President of the Medical Board
Mount Sinai Hospital-Mount Sinai School of Medicine
House Staff Affairs Committee
Medical Staff Office, Box 1116
New York, NY 10029



Dear Dr. Harris,

I hereby appeal the decision of summary suspension termination of I, Leena
Varughese, from the Pathology Residency Program, and respectfully request a
hearing on the matter. Numerous inaccuracies exist in the letter, dated
September 21, 2011, which outlined the reasons behind the decision. I believe
that the decision is wholly unwarranted, and I look forward to the opportunity
to make my case in front of the House Staff Affairs Committee of the Medical
Board, and I thank you for that opportunity. Please advise me as to any
practices and procedures applicable in relation to the hearing.


Sincerely,


Leena Varughese, MD

AA-279

Pl. Tr. Ex. 54



The Mount Sinai Hospital
One Gustave L. Levy Place
New York, NY 10029-6574

Tel: (212) 241-6500

December 2, 2011

**BY EMAIL AND BY REGISTERED MAIL**

Dr. Leena Varughese
269 Henry Street, A3
Brooklyn, New York 11201

PLF
EXHIBIT NO 54          DEFT
FOR ID  1-13-13        TRN

Dear Dr. Varughese:

On behalf of the House Staff Affairs Committee (the "Committee") that has been convened to hear your appeal, I am enclosing the Committee's report and decision to uphold the Department of Pathology's decision to suspend and terminate you from the Pathology Residency Program of the Mount Sinai School of Medicine. A copy of this decision is also being provided to Drs. Cordon-Cardo and Firpo and Mr. Wayne Keathley, President of The Mount Sinai Hospital, as provided in the House Staff Manual as well as to Dr. Reich, President of the Medical Board, and Mr. Macdonald, General Counsel.

You may appeal this decision as provided in the House Staff Manual within 15 days of your receipt of this letter transmitting the Committee's report and decision. If you do appeal, please send your notice of appeal in writing to Dr. Reich, with copies to me and to Mr. Macdonald. If you do not appeal the House Staff Affairs Committee's report and decision within the 15-day timeframe, the decision of the House Staff Affairs Committee will be final.

Sincerely yours,

Steven Weinfeld, M.D.
Chairman, House Staff Affairs Committee

cc:     House Staff Affairs Committee:
            Dr. Harold Bronheim
            Dr. Michael Marin
            Dr. Gila Leiter
            Dr. Marissa Raymond-Flesch
            Dr. Melissa Rocco

        Dr. Carlos Cordon-Cardo
        Dr. Adolfo Firpo

        Mr. Wayne Keathley
        Dr. David Reich
        Mr. Michael Macdonald

AA-281

# MOUNT SINAI SCHOOL OF MEDICINE
## HOUSE STAFF AFFAIRS COMMITTEE

### In the Matter of the Appeal of Dr. Leena Varughese

This House Staff Affairs Committee (the "Committee") has been convened pursuant to the House Staff Manual to consider and decide the appeal of Dr. Leena Varughese, a fourth year resident in the Department of Pathology (the "Department"), from the decision of Dr. Carlos Cordon-Cardo, Chairman of the Department, and Dr. Adolfo Firpo, Director of Educational Activities of the Department, to summarily suspend and terminate her from the Pathology Residency Program. The Committee's findings and decision are set forth below.

### Background

The decision of Drs. Cordon-Cardo and Firpo to summarily suspend and terminate Dr. Varughese from the Pathology Residency Program is set forth in their September 21, 2011 letter to Dr. Varughese and her notice of appeal is set forth in her letter of September 28, 2011, which was received on September 30, 2011. This House Staff Affairs Committee consists of the following members: Dr. Steven Weinfeld (Associate Professor, Department of Orthopaedics), who acted as Chairman of the Committee, Dr. Harold Bronheim (Clinical Professor of Psychiatry and Clinical Professor of Medicine), Dr. Michael Marin (Chairman and Professor, Department of Surgery), Dr. Gila Leiter (Assistant Clinical Professor, Department of Obstetrics, Gynecology and Reproductive Science), Dr. Marissa Raymond-Flesch (fourth year Resident, Departments of Medicine and Pediatrics), and Dr. Melissa Rocco (Chief Resident, Department of Anesthesiology). The hearing of Dr. Varughese's appeal was held on Monday, November 14, 2011. Dr. Varughese was assisted

by Dr. Rajit Mallih, a practicing pathologist, and the Department was assisted by Mr. Rory McEvoy, of the law firm of Edwards, Wildman & Palmer. Because this appeal is a peer review proceeding, the roles of Dr. Mallih and Mr. McEvoy were limited as provided by the House Staff Manual. Dr. Firpo presented the case on behalf of the Department. Dr. Firpo also testified, and, in addition, called eight witnesses, including Dr. Cordon-Cardo, and submitted several documents, which were marked and admitted into the record. Dr. Varughese presented her case and called two witnesses in addition to herself and submitted several documents, which were marked and admitted into the record. She also submitted several additional documents after the hearing, which were made part of the record. Dr. Firpo and Dr. Varughese were both given an opportunity to question each other as well as each other's witnesses and to present other relevant evidence. Members of the Committee also actively participated in the questioning of witnesses. All testimony was under oath and a transcript of the hearing was made. At the conclusion of the hearing, Dr. Varughese stated that she had no additional witnesses and no objection to the hearing proceedings. Similarly, the Department presented no additional evidence and had no objection to the hearing proceedings.

<u>Issue Presented</u>

As provided in the House Staff Manual, this Committee is limited to determining whether the action taken by Dr. Cordon-Cardo and Dr. Firpo to summarily suspend and terminate Dr. Varughese from the Pathology Residency Program was arbitrary and capricious.

AA-283

Findings and Conclusions

      The Committee finds that there is ample evidence to demonstrate that the actions taken by Drs. Cordon-Cardo and Firpo in their September 21, 2011 letter to summarily suspend and terminate Dr. Varughese from the Pathology Residency Program was not arbitrary and capricious.

      Prior to turning to the September 21, 2011 letter, it is relevant to consider the events leading up to that notice of suspension and termination.

      On December 21, 2010, Dr. Varughese was notified by Dr. Patrick Lento, Residency Program Director of the Department, that she was being placed on "Academic Advisement." This Notice advised Dr. Varughese that she failed "to demonstrate an appropriate level of professionalism" and identified "patient care related" lapses. (Department, Exhibit 3.) The Notice set forth a plan of action, including "continued performance of assigned resident duties" and a "self-reflection exercise."

      Following the Notice of Academic Advisement, the Department (now under the leadership of Dr. Cordon-Cardo, newly appointed Chairman of the Department), determined that Dr. Varughese failed to fulfill the requirements of the Academic Advisement. Accordingly, on July 1, 2011, Dr. Cordon-Cardo issued a final warning to Dr. Varughese advising, among other things, that "[t]hroughout the period of Academic Advisement you showed a pattern of lack of professionalism," that Dr. Varughese's self-reflection essay, which was submitted long after it was due, "reflects a lack of insight into your . . . behavior", and that "[y]ou have utterly failed this exercise." The warning also recites other failures and that you "continued to be flippant and disrespectful throughout... [the] meeting" that she had with Dr. Cordon-Cardo to discuss her performance.

[Defendant's Exhibit 2.] The final warning issued by Dr. Cordon-Cardo was disciplinary in nature and warned that "any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program." (Defendant's Exhibit 2.) Dr. Varughese did not appeal the Final Warning.

The September 21, 2011 letter from Drs. Cordon-Cardo and Firpo suspending and terminating Dr. Varughese from the Pathology Residency Program recites the foregoing history and in concluding that Dr. Varughese's "performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients," details a number of incidents of unprofessional behavior that occurred since the issuance of the final warning. These include: (1) duty and professionalism concerns during Tumor Cytogenetics Rotation, (2) duty concerns regarding coverage in the frozen section room and on the surgical service, (3) unprofessionalism in responding to the denial of Dr. Varughese's request for a change in elective rotation, (4) poor conference attendance and adherence to Departmental policy, (5) poor communication regarding a request for a leave of absence, and (6) the inappropriate viewing of files on the desk of Ms. Shema Patel when she had left Dr. Varughese momentarily alone in her office.

The underlying facts supporting the Department's conclusions in each of these areas were clearly established by the Department with testimony and documentary evidence. For example, Dr. Vesna Najfeld, Professor of Pathology and Medicine, and Director of the Tumor Cytogenics Laboratory at The Mount Sinai Hospital (the "Hospital"), testified at the hearing and confirmed the facts set forth in the September 21, 2011 letter, including Dr. Varughese's inadequate responses concerning her case conference presentation, her absenteeism, and her unprofessional interactions with faculty and staff,

4

including with herself as laboratory director. As summarized by Dr. Najfeld: "I must tell you I am at Sinai 30 years, this is probably from the educational point of view one of the worst experiences I ever had had[sic]." (Transcript p. 99.)

Dr. Jordan, Chief Resident, and Dr. Lento testified to the facts set forth in the September 21, 2011 letter concerning coverage in the frozen section room and on the surgical service. (Transcript pp. 114-124, 169-173.) Dr. Lento, in particular, described a pattern of non-responsiveness to emails and pages that he sent to Dr. Varughese concerning coverage on the surgical service as well as on other occasions ("[O]ne of the difficulties that I have had with Leena is she virtually never responded to my pages and infrequently responded to my e-mails.") (Transcript p. 170.)

The facts set forth in the September 21 letter concerning Dr. Varughese's request for a change in her elective rotation and her challenge to the denial of her request as unprofessional were testified to by Dr. Firpo and the circumstances relating to her poor conference attendance and her failure to provide proof of illness were established by Dr. Jordan, Dr. Elizabeth Morency, a chief resident, as well as by Dr. Firpo.

The events relating to Dr. Varughese's request for a leave of absence and her wellness are detailed in the September 21, 2011 letter and are fully supported by the testimony of Dr. Firpo, Ms. Shema Patel, Administrator (interim) of the Department, Mr. Paul Johnson, Director, Graduate Medical Education, Ms. Caryn Tiger-Paillex, Director of Human Resources, and Dr. Arthur Figur, Associate Medical Director of the Hospital and Chairman of the Physician Wellness Committee. As the testimony makes clear, there were repeated attempts to follow up with Dr. Varughese concerning her request and to help her undergo a medical assessment, yet these efforts were either ignored or Dr. Varughese failed

5

AA-286

to follow through. Dr. Varughese also admitted that while she had been instructed not to return to work pending medical clearance, she nonetheless attempted to do so. (Transcript p. 316.)

Finally, the event in Ms. Patel's office on September 20, 2011 was confirmed by Ms. Patel in her testimony. As stated by Ms. Patel, Ms. Patel stepped away from her office to help a visitor and upon her return she found Dr. Varughese "going through some of my files." (Transcript, p. 203.) This was clearly inappropriate and indefensible. We note that in response to questioning by Dr. Marin, Dr. Varughese was unable to take responsibility for inappropriately looking through Ms. Patel's files even though in response to a question from Dr. Marin she had admitted that she had opened "one of the files." (Transcript, p. 316.)

Dr. Varughese was given the opportunity to cross-examine each of the Department's witnesses and to present her version of events in her direct testimony. The Committee finds Dr. Varughese's presentation unpersuasive. She took issue with virtually every witness who testified and in some instances questioned their authority to make the decisions they did. Yet the testimony and evidence clearly demonstrate a continuing pattern of unprofessional conduct in the face of a final warning that put her on notice that further incidents of unprofessional conduct could lead to her dismissal. It is clear to the Committee that Dr. Varughese lacks insight into her behavior and her role as a resident in the Department as evidenced by the extensive testimony and documents presented to the Committee. Indeed, at the conclusion of the hearing, Dr. Rocco, one of the two residents on the Committee, asked Dr. Varughese: "[D]o you take responsibility or do you feel remorse involving any of the things that you've talked about...?" (Transcript, p. 321.) Dr.

6

AA-287

Varughese's response was argumentative and she never acknowledged responsibility for any of the events as to which there was ample testimony and evidence. It is also clear from the testimony and other evidence that the Department gave Dr. Varughese multiple opportunities to correct her behavior and to become a constructive part of the Department's Residency Program. This is demonstrated, in part, by Dr. Cordon-Cardo, as a new Chairman, who wished to give her a fresh start and a second chance. (Transcript pp. 262-263; Defendant's Exhibit 2.) Moreover, other offices within the institution were available to help her and to provide guidance on institutional policy, including help in responding to her inquiry about taking a leave of absence. Unfortunately, despite the efforts of the Department and of others, Dr. Varughese's lack of insight into her behavior was such that she was unable to make the constructive changes to her behavior needed to fulfill her responsibilities to remain in the Pathology Residency Program.

In sum, as indicated above, based on the testimony and evidence presented, the Committee unanimously finds and concludes that the Department's actions to suspend and terminate Dr. Varughese from the Pathology Residency Program were clearly supported by the testimony and other evidence and were clearly not arbitrary and capricious.

December 2, 2011                         House Staff Affairs Committee

                                        Dr. Steven Weinfeld, Chairman
                                        Dr. Harold Bronheim
                                        Dr. Michael Marin
                                        Dr. Gila Leiter
                                        Dr. Marissa Raymond-Flesch
                                        Dr. Melissa Rocco

AA-288

Pl. Tr. Ex. 55

AA-289



Office of the General Counsel
Amelie P. Trahant
Associate General Counsel

One Gustave L. Levy Place
Box 1099
New York, NY 10029-6574

Tel 212.659.8105
Fax 212.348.2230

March 7, 2012

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

PLF
EXHIBIT NO 55
FOR ID 6/3/17

DEFT

TRN

Leena Varughese, M.D.
269 Henry Street, A3
Brooklyn, NY 11201

Re:    Appeal of the House Staff Affairs Committee Decision

Dear Dr. Varughese:

As counsel to the Appeal Committee, please find attached the Decision of the Appeal Committee, dated March 7, 2012, providing that there is reasonable basis on which to support the findings and conclusions of the House Staff Affairs Committee.

Sincerely,

Amelie P. Trahant
Associate General Counsel

AT/
Attachments

Distribution List:

Carlos Cordon-Cardo, M.D.
Adolfo Firpo, M.D.
Wayne Keathley

cc:    Russell Moriarty, Esq.
       Rory McEvoy, Esq.
       Steven Weinfeld, M.D.
       Susan Bernstein, LCSW
       Andy Jagoda, M.D.
       Ira Nash, M.D.

D00959

AA-290

Decision of the Appeal Committee
In the Matter of Leena Varughese, M.D.
March 7, 2012

This Appeal Committee was convened following a December 8, 2011 request from Leena Varughese, M.D. to appeal a December 2, 2011 decision of the House Staff Affairs Committee of the Medical Board of The Mount Sinai Hospital (the "HSAC") upholding her termination from the Residency Program (the "Program") of the Department of Pathology (the "Department") of Mount Sinai School of Medicine. Pursuant to the House Staff Manual, the Appeal Committee consisted of the following members:

Ira S. Nash, M.D., Chief Medical Officer and Senior Vice President for Medical Affairs, The Mount Sinai Medical Center (Appeal Committee Chair); Attending Physician, The Mount Sinai Hospital; Professor of Medicine and Professor of Health Evidence and Policy, Mount Sinai School of Medicine;

Susan R. Bernstein, LCSW, Director of the Department of Social Work Services, The Mount Sinai Hospital

Andrew Jagoda, M.D., Attending Physician, The Mount Sinai Hospital; Professor and Chair of Emergency Medicine, Mount Sinai School of Medicine.

Amelie P. Trahant, Associate General Counsel, served as counsel to the Appeal Committee.

In accordance with the House Staff Manual, which governs discipline and appeals, the appeal "shall be limited to the record of the proceedings before the House Staff Affairs Committee, and the scope of review shall be limited to determining whether there is a reasonable basis on which to support the findings and conclusions of the House Staff Affairs Committee." For the reasons set forth below, the Appeal Committee unanimously finds that there is a reasonable basis for the HSAC's decision, and the decision is therefore upheld.

I.    Procedural Background

In a September 21, 2011 letter, Dr. Carlos Cordon-Cardo, Chairman of the Department, and Dr. Adolfo Firpo, then Departmental Director of Pathology Educational Activities and now Director of the Program, notified Dr. Varughese that she was to be summarily suspended and terminated from the Program. The suspension and termination followed a series of events relating to Dr. Varughese's unprofessional behavior, non-performance of duties, absenteeism, poor conference attendance, poor adherence to Departmental policies, poor communication skills, and inappropriate viewing of a Department administrator's office files. As is her right under the House Staff Manual, Dr. Varughese appealed her termination to the HSAC by letter dated September 28, 2011. The HSAC heard the appeal on November 14, 2011 and upheld the discipline in a December 2, 2011 decision.

D00960

AA-291

The Appeal Committee reviewed the record of the HSAC proceeding as well as the written statements and exhibits submitted by Dr. Varughese and the Department.[1] The Appeal Committee then met on February 22, 2012 to hear the appeal. Also present were Drs. Cordon-Cardo and Firpo (on behalf of the Department), Mr. Rory McEvoy, Esq. (the Department's counsel); Dr. Varughese; Mr. Russell Moriarty, Esq. (Dr. Varughese's counsel), and Dr. Steven Weinfeld (Chair of the HSAC).

Dr. Nash explained the standard of review on appeal and the order of the proceedings. Dr. Varughese's attorney then made a statement explaining the basis for her appeal. In essence, Dr. Varughese argued that the reasons stated in the Department's termination letter were not sufficient grounds for Dr. Varughese's suspension and termination. Dr. Varughese maintained that the Department's true and underlying reason for terminating her from the Program was because Departmental administrators simply did not like Dr. Varughese personally and had "personality conflicts" with her.[2]

## II. Findings and Conclusions

The HSAC found that the Department's decision to terminate Dr. Varughese from the Program was neither arbitrary nor capricious. As discussed below, the record amply supports these findings and the HSAC had reasonable basis for its decision.

The Department stated in its September 21, 2011 letter that Dr. Varughese was suspended and terminated from the Program due to her unacceptable performance and conduct and due to the risk that Dr. Varughese's continued presence posed to Mount Sinai and its patients. The letter detailed several recent events that supported the decision. These events included: (1) duty and professionalism concerns during Dr. Varughese's two-week tumor cytogenics rotation from August 1 to 12, 2011; (2) duty concerns regarding Dr. Varughese's refusal or failure to respond to requests to cover for another resident who was absent due to illness on August 5 and 12, 2011; (3) Dr. Varughese's unprofessional actions throughout August and September 2011 after her request to change her scheduled rotation that she previously elected was denied by Departmental administration; (4) Dr. Varughese's failure to adhere to Departmental policy regarding her conference attendance record and her failure to take required remedial steps; (5) Dr. Varughese's poor communication in mid-September 2011 regarding her leave of absence and her refusal to abide by Department administrators' instructions not to come to work pending proper documentation; and (6) a September 20, 2011 incident during which Dr. Varughese looked through files in the office of Ms. Sherna Patel, the Mount Sinai School of Medicine Director of

---

[1] Dr. Varughese did not submit her written statement regarding the basis of her appeal within the time period prescribed by the Appeal Committee, but the Committee nevertheless accepted and reviewed it.

[2] In her written statement, Dr. Varughese argued that the Department's decision constituted retaliation for a complaint she made against a fellow resident in December 2010 and that the Department and witnesses were involved in a conspiracy to see her fail. As this argument was not raised below at the HSAC hearing, the Appeal Committee did not consider the argument.

2

AA-292

Academic Operations and interim Department Administrator, without permission; Dr. Varughese's subsequent denial of the incident and dishonest response; and her complete failure to recognize her inappropriate behavior. The Department's letter concluded that the totality of these actions constituted the basis for her suspension and termination.

On appeal, Dr. Varughese argued that the events the Department raised as the basis for her termination were all cloaked under the guise of the "catch-all" concept of "professionalism" and the incidents, even taken as a whole, were not sufficient grounds for the Department's actions. Dr. Varughese stated that she never committed any wrongdoing, she performed her job duties well, and she adhered to institutional policy at all times. She further argued that the Department used these incidences, which resulted from the Department's own inappropriate and incorrect actions, as excuses or mere pretense because it wanted to terminate her but had no meritorious reasons for doing so. She claimed that she provided the HSAC with sufficient and justifiable responses to the Department's allegations concerning all the events cited in the termination letter.

*A. Period of Review*

The period of the time that the termination letter addressed and which the HSAC reviewed was July 1, 2011 (the date of Dr. Varughese's final warning letter) through September 21, 2011 (the date of Dr. Varughese's suspension and termination letter). Though Dr. Varughese made arguments on appeal that questioned the validity of her academic advisement in December 2010 and her final warning letter, these issues were not before the HSAC or Appeal Committee, as Dr. Varughese did not appeal her final warning. Both the House Staff Manual and the final warning letter gave Dr. Varughese ample notice that she had a right to appeal the final warning letter within ten days of receiving notice, and if she did not do so, the warning would become final.

*B. The Departments' Decision to Terminate*

Dr. Varughese described in detail why she believed each of the Department's reasons for suspending and terminating her were not valid and why she believed the HSAC had no reasonable basis for finding that the Department's decision was neither arbitrary nor capricious.

1. Tumor Cytogenics Rotation

Dr. Varughese disputed the testimony of Dr. Vesna Najfeld, Professor of Pathology and Medicine and Director of the Tumor Cytogenics Laboratory, which the HSAC found credible and supportive of the September 21, 2011 termination letter.

Dr. Najfeld testified that Dr. Varughese was assigned a clinical case to present during the first few days of her Tumor Cytogenics rotation, as were other residents who rotated through the

3

lab. Dr. Varughese did not prepare adequately for the presentation. She did not pick up patient images from Dr. Najfeld's lab as per Dr. Najfeld's instructions, and the presentation that Dr. Varughese emailed Dr. Najfeld in advance of the presentation date was of insufficient quality. Moreover, Dr. Varughese bluntly refused to travel back to Mount Sinai when Dr. Najfeld volunteered to help her with her poor presentation (a fact that Dr. Varughese does not dispute). Dr. Varughese's response to Dr. Najfeld's offer of assistance was unprofessional, and she disrespected a superior who was offering to take time out of her day solely to help Dr. Varughese. (Tr. 69-75; *see also* Dept. Ex. 5).

Dr. Najfeld also testified that Dr. Varughese failed to follow Dr. Najfeld's instructions to notify others that the presentation was to be delayed to another date. While attendees waited assuming that a presentation was to take place, Dr. Varughese (who was also present) failed to inform the attendees that she was the slated presenter but was no longer presenting that day. These actions also showed a lack of respect and professionalism towards Dr. Najfeld and the other attendees who took time out of their busy schedules for Dr. Varughese's presentation. (Tr. 72-73).

The HSAC's decision also referred to Dr. Najfeld's testimony regarding Dr. Varughese's absences. (HSAC Dec. p. 4-5). At the HSAC hearing, Dr. Najfeld recounted that Dr. Varughese was consistently late for work and departed early throughout the two week rotation. Dr. Varughese showed up at the laboratory around 10:30 a.m. instead of the 9:00 a.m. designated start time, and in another instance, she arrived 30 minutes late to a lab meeting. (Tr. 78, 89).

Dr. Najfeld testified about further instances demonstrating Dr. Varughese's general lack of professionalism and discourtesy towards Dr. Najfeld and her staff. For example, Dr. Najfeld recounted that while she was personally giving a tutorial to Dr. Varughese, Dr. Varughese continued to use her blackberry despite Dr. Najfeld asking her to put the device away. (Tr. 81-82). On another occasion, Dr. Varughese announced out loud and within earshot of Dr. Najfeld that she thought a task she was performing was a "waste of [her] time." (Tr. 101). Finally, Dr. Najfeld testified about Dr. Varughese's lack of effort to expand her deficient knowledge base. (Tr. 77, 82).

The HSAC found compelling Dr. Najfeld's statement, "I must tell you I am at Sinai 30 years, this is probably from the educational point of view one of the worst experiences I ever had had [sic]....Anybody who behaved that way, with so little respect for knowledge and so little respect for time we all invest, I would not pass her." (Tr. 99, HSAC Dec. 5).

The Appeal Committee finds that the HSAC had reasonable basis to conclude that the Department was neither arbitrary nor capricious for citing these events as a basis for Dr. Varughese's suspension and termination.

4

AA-294

## 2. Issues Surrounding Coverage and Failing to Respond to Emails and Pages

At the appeal hearing, Dr. Varughese reiterated that she refused to cover frozen section service for a sick resident on August 5 because she injured her arm and was physically unable to perform duties. She also claimed that it was unreasonable for the Department to have concluded that she refused surgical service coverage on August 12 because she did not respond to emails and pages. She stated that the Chief Resident's August 12 emails did not ask her a question nor did the emails ask her to explicitly confirm whether she could cover. She argued that her lack of response should have been interpreted as an affirmative answer (i.e., that she would cover). Dr. Varughese argued that she would have emailed Dr. Jordan if she was not able to cover, just as she did on August 5. She objected to the Department administration making these incidences "into a big deal" and to these events forming a basis for her suspension and termination.

The HSAC heard the testimony of Dr. Firpo, Dr. Adrienne Jordan, Chief Resident, and Dr. Patrick Lento, then Program Director, regarding Dr. Varughese's refusal to cover for a sick resident on August 5 and her lack of response regarding coverage on August 12, and the HSAC found their testimony credible. The HSAC also reviewed emails submitted by the Department as exhibits which supported these witnesses' testimony.

The emails surrounding August 5th coverage revealed that Dr. Varughese was argumentative with Dr. Jordan about the new Departmental policy recently put in place regarding resident coverage, with which Dr. Varughese had been supplied, and showed her unwillingness to accept instructions from those in positions of authority. (Dept. Ex. 6). Moreover, Dr. Varughese never supplied Dr. Jordan or others in the Department with a reason why her alleged arm injury prevented her from covering. (Tr. 139). Department administrators had every right to request a note from a resident explaining why she could not perform her duties and abide by Departmental policies. Dr. Varughese intentionally ignored these instructions.

Drs. Jordan and Lento also gave detailed testimony regarding the efforts they made on August 12, 2011 to contact Dr. Varughese via pages, email, and telephone, and her deliberate disregard of these communications. At 8:50 that morning, Dr. Jordan sent an email to Dr. Varughese and others informing Dr. Varughese that she needed to cover for the same sick resident. (Dept. Ex. 7). As Dr. Varughese had still not responded by 10:30 a.m., Dr. Jordan again emailed Dr. Varughese asking her to confirm she received the email about coverage. (Dept. Ex. 7). Dr. Jordan still received no response. Dr. Jordan then contacted Dr. Lento, who also emailed, paged and called Dr. Varughese. (Tr. 172). Dr. Lento discovered from Dr. Najfeld that Dr. Varughese was in Dr. Najfeld's lab. (Tr. 172). Dr. Najfeld testified that she told Dr. Lento to page Dr. Varughese again and she then witnessed Dr. Varughese ignore the pager when Dr. Lento sent the page. (Tr. 79). Dr. Lento then called the lab again and asked Dr. Najfeld to put Dr. Varughese directly on the phone. (Tr. 172). Dr. Najfeld recounted to the HSAC how shocked she and her lab members were to hear the disrespectful and inappropriate tone Dr. Varughese used with Dr. Lento, her superior. (Tr. 80-81). Dr. Lento also testified that he

5

D00964

**AA-295**

specifically told Dr. Varughese to let Dr. Jordan know that she could indeed cover, but Dr. Varughese failed to do so. (Tr. 173).

Dr. Varughese's claim that her lack of response signified that she affirmatively agreed to cover and that she did not have to respond to emails that simply stated facts is incomprehensible. Dr. Jordan could, under no circumstances, make an assumption that Dr. Varughese would cover surgical service and patient safety and care would be preserved. Patient care could not be left to supposition. The chaos that resulted from Dr. Varughese's inaction is clear from the numerous emails. Moreover, Dr. Varughese's allegation that Dr. Jordan's email contained only statements and did not ask a question is false. Dr. Jordan's email at 10:31 a.m. on August 12, 2011 specifically asked Dr. Varughese to verify that she received the email so that Dr. Jordan could confirm that grossing for surgical service would be properly staffed. (Dept. Ex. 7).

Dr. Varughese stated to the Appeal Committee that she always responded to pages when contacted. However, the testimony of Drs. Lento, Jordan and Elizabeth Morency (Dr. Jordan's fellow Chief Resident) revealed otherwise. Dr. Lento commented that Dr. Varughese "virtually never responded to my pages and infrequently responded to my emails," (Tr. 170) and "I can't remember a single page of mine that Leena has answered this year." (Tr. 185).

The Appeal Committee finds that the HSAC had reasonable basis to conclude that the Department was not arbitrary or capricious for citing these events as a basis for Dr. Varughese's suspension and termination.

### 3. Issues Surrounding Request to Change Elective Rotation

Dr. Varughese argued that her attempts throughout August and September 2011 to switch her elective rotation from GI to Dermapathology should not be considered as a basis for her suspension and termination.

At the HSAC hearing, Dr. Lento explained that residents may request changes to their elective rotations in advance of the finalized schedule, but once the schedule is set, changes are not permitted unless extenuating circumstances exist for doing so. (Tr. 174-75). Dr. Lento explained that this policy was implemented because a change in one resident's schedule had a direct impact on the schedules of other residents. (Tr. 175).

Dr. Varughese originally requested the GI Elective, and she only requested a change after the schedule was finalized. Dr. Lento testified that Dr. Varughese did not give a sufficient reason for the change, so her request was denied. (Tr. 176). Dr. Firpo also testified about his unsuccessful efforts to try to change the rotation schedule and his communications to Dr. Varughese that it was not possible. (Tr. 35-36). Despite these communications, Dr. Varughese repeatedly refused to accept that her request was denied and continued to attempt to change her elective by subverting Drs. Lento and Firpo. (Tr. 36, Dept. Ex. 13 & 14). Her actions were insubordinate, and the Appeal Committee finds that the HSAC had reasonable basis to conclude

6

D00965

that the Department was not arbitrary or capricious for citing these events as a basis for Dr. Varughese's suspension and termination.

4. Poor Conference Attendance Record, Tardiness and Failure to Take Consequent Remedial Steps

Dr. Varughese took issue with having to adhere to a recently enacted Departmental policy requiring 80% attendance at morning conferences and with having to give a presentation as a remedial measure for her poor attendance. Dr. Varughese stated that she remained responsible for her education and career and that, in her opinion, her time was better spent on other duties rather than at morning conferences at Mount Sinai. She stated that she knew better than the Department what was most productive for her education and career. She also stated that Dr. Firpo gave her permission to attend conferences at the Bronx VA in place of the conferences at Mount Sinai. As to the Departmental requirement that she give a presentation to compensate for her absences, Dr. Varughese argued that she should have been allowed to pick the topic of her choice rather than from a list of topics the Chief Residents distributed and which she believed were not suitable. Dr. Varughese also found nothing wrong with the fact that she left the September 15th conference without giving her presentation and without a word to anyone.

Testimony of Drs. Morency, Jordan, Firpo and Lento revealed that the Department instituted the new 80% conference attendance rule to conform with ACGME requirements. The ACGME requires residency programs to establish didactic components of the six ACGME core competencies. An accredited program must maintain records of these educational experiences and institute disciplinary measures for residents who do not attend core competency educational activities. Testimony and documents indicated that Dr. Varughese received the new 80% attendance policy and many emails reminding her of the new policy. (Tr. 38, 125-26, Dept. Ex. 9 & 17) .

On August 29, 2011, Dr. Varughese was notified well in advance by the Chief Residents of her need to give a remedial presentation on September 13, 2011. (Dept. Ex. 10). She failed to respond to Dr. Morency's email about the topic of her presentation. On September 9, 2011, Dr. Jordan informed her that because she had not responded to Dr. Morency's email, a topic could not be posted on the weekly schedule and residents did not have time to do reading in advance of the lecture. (Dept. Ex. 9). Only days before her scheduled presentation date, she finally replied to the Chief Residents. Her emails were argumentative, challenging the 80% conference attendance requirement and the authority of her Chief Residents. (Dept. Ex. 10).

Her continued insistence that Dr. Firpo exempted her from the 80% conference attendance policy, her refusal to adhere to departmental attendance policy, her failure to respond to and recognize the authority of her Chief Residents, her refusal to present on an topic from a list selected by her Chief Residents, and her departure from the September 15 conference without

7

presenting or saying a word to anyone (*see* Dept. Ex. 11 & 12), among other actions, clearly indicate that Dr. Varughese has an issue with authority and an inability to abide by the rules.

The Appeal Committee finds that the HSAC had reasonable basis to conclude that the Department was not arbitrary or capricious for citing these events as a basis for Dr. Varughese's suspension and termination.

5. Events Surrounding FMLA Leave

Dr. Varughese claimed that she did not violate institutional policy when she continued to come to work unbeknownst to Department administrators who had previously told Dr. Varughese not to come back to work until she received a physician's note. Dr. Varughese stated that on the morning of September 15, 2011, when she requested and Mount Sinai subsequently suggested that she take a leave of absence, she was sitting at her desk reviewing slides and not exhibiting any sort of aberrant behavior. She claimed that she did not violate any institutional policies when she came to work in the following days and that institutional policy states that employees may request a leave of absence under the Family Medical Leave Act ("FMLA") up to thirty days in advance. She also argued that the instructions she received from the Department administration stating not to come to work were inconsistent with what she had been told previously and were misleading.

In its decision, the HSAC considered the testimony of Dr. Firpo, Ms. Shema Patel, Mr. Paul Johnson (Director of Graduate Medical Education Department), Ms. Caryn Tiger-Paillex (Director of Human Resources), and Dr. Arthur Figur, Associate Medical Director of the Hospital and Chairman of the Physician Wellness Committee. The HSAC found that this testimony established that Mount Sinai made repeated attempts to follow up with Dr. Varughese regarding her leave and offered to help her obtain a medical assessment, yet she either ignored these attempts or failed to follow instructions. The HSAC pointed to Dr. Varughese's own testimony where she admitted that she was instructed not to come to work, but did so anyway. (HSAC Dec. 5-6).

At the appeal hearing, it was pointed out to Dr. Varughese that the testimony presented at the HSAC hearing clearly illustrated that she did not have capacity to perform her job sufficiently at the time at issue. Dr. Firpo testified at the HSAC hearing that he and others within the Department were so concerned about Dr. Varughese's appearance on September 15, 2011 and that they concluded she represented a threat to herself as well as Mount Sinai employees and patients. He described how the Chief Residents initially contacted him to express their own and other residents' concerns about her behavior that morning. He further described his own conversation with her that day:

...[S]he had come in late, showed a blank affect. She was practically unresponsive and just sitting there.

8

D00967

AA-298

The perception of the residents was that she may be undergoing a major crisis and that she may – they were afraid that this could precipitate some type of radical behavior....

...She first said nothing. Finally I·insisted that I know something is wrong, please tell me, I know you now, what seems to be the problem?

And then she relayed I cannot take it anymore, I feel very bad, I am unable to work, I cannot concentrate, I have not prepared a presentation that I have been asked to prepare many times, not because I really don't want to, but because I feel unable to concentrate and do any work.

And I really feel overwhelmed and I think I need to take a leave of absence, go away for awhile.

Even during her narration, she exhibited behavior which made me suspect that this may be an organic episode, for moments she'll stop her narrative, she'll flicker here eyes, as if having a petit mal seizure then will continue and captured her train of thought.

I was really, really very concerned.

(Tr.16-18).

Though Dr. Varughese disputed Dr. Firpo's account, the HSAC found that Dr. Firpo's testimony, along with the other witnesses' testimony, was credible and that Dr. Varughese represented a risk to herself and to the institution by her continued presence at Mount Sinai.

The Pathology Department at Mount Sinai is the largest in any single comparable academic institution in New York City. Pathology residents are given a great deal of responsibility. Though attending physicians supervise residents, the need for skilled performances by residents cannot be overemphasized. It is clear that Dr. Varghese's impairment could have had a tangible and significant impact on patient safety and care. A physician who admits to feeling overwhelmed and not able to concentrate and who displays physical signs of impairment to a degree that others fear for the physician's wellness and their own well-being clearly should not be charged with such critical responsibilities. Dr. Varughese herself admitted at the time that she was unable to work and indicated that she may need to take a leave. The fact that she lacked and continues to lack insight that her impairment could have posed a risk to others in the work environment, including patients, is extremely problematic.

9

The Appeal Committee does not find that there were any inconsistencies in the Department's instructions to Dr. Varughese. On September 15, 2011, she was given a very light workload for the remainder of the day so that she would remain under the observation of others. Dr. Firpo told Dr. Varughese that he would look into the necessary steps for her to take a leave of absence. (Tr. 18-19). The next morning, Dr. Firpo emailed her that he had since consulted with the GME Office about her situation for "guidance on the best way to proceed in conformity with federal laws, programmatic and institutional regulations....*I must ask you not to return without the doctor's note and assessment for the leave of absence.*" (emphasis added.) (Dept. Ex. 16). It could not be clearer that Dr. Varughese was given direct instructions from her Department administrator to not come back to work until she fulfilled certain requirements. And there cannot be any doubt that Dr. Varughese directly disobeyed these orders, which she freely admits. Dr. Varughese instead took matters into her own hands and decided to do what she thought was best. Such insubordination, especially when patients' safety and care was very clearly at risk, is not tolerable and is in direct violation of institutional policy. Though Dr. Varughese points to Mount Sinai's policy stating that an employee may request FMLA leave up to thirty days in advance, this in no way means that an employee who represents a risk to herself, to her colleagues and to patients may come and work as they please. Such a position is untenable. When an employee represents such risk, the employee will be removed from performing his or her duties.

The testimony also revealed that repeated attempts were made by various Mount Sinai administrators to assist Dr. Varughese with her FMLA leave and to help her get a medical assessment. (*See, e.g.* the testimony of Mr. Johnson, Ms. Patel, Dr. Firpo, and Dr. Figur.) Dr. Varughese deliberately ignored all of these calls and emails, evidencing further insubordination and lack of professionalism.

The HSAC had reasonable basis to conclude that the Department was not arbitrary and capricious in determining Dr. Varughese's actions surrounding these events formed a basis for her suspension and termination.

6. Unauthorized Access to Departmental Files

Dr. Varughese argued that her review of Ms. Patel's files without permission should not be considered as a basis for her suspension and termination. At the appeal hearing, Dr. Varughese argued that she did not go through Ms. Patel's file drawers, but merely flipped through a folder on Ms. Patel's desk with no ulterior motive. Moreover, she argued that Ms. Patel should have locked up any files she did not want someone to view, and she also placed blame on Ms. Patel for leaving her in the office unsupervised.

Dr. Varughese's explanation showed that she continued to fail to grasp the inherent wrongness of her actions. Whether the file was locked away or sitting on Ms. Patel's desk, whether the file was confidential or not confidential, whether Dr. Varughese was left unattended

10

D00969

or not, Dr. Varughese had absolutely no right to go through any files in Ms. Patel's office. Ms. Patel testified at the hearing that Dr. Varughese showed no remorse and failed to understand the basic inappropriateness of her actions. (Tr. 202-04). Though Dr. Varughese apologized at the appeal hearing and stated that she would not repeat her actions, her continued shift of blame to Ms. Patel and her response that she was "sorry if others got upset about it," indicated that she continued to lack insight and still did not comprehend she was entirely at fault for her actions.

The Appeal Committee firmly agrees with the HSAC that the Department's citing of this event as a reason for Dr. Varughese's suspension and termination was not arbitrary and capricious.

III.    Conclusion

In addition to reviewing the underlying record and the HSAC decision, this Appeal Committee considered the HSAC procedures. A review of the record shows that Dr. Varughese was provided with ample opportunity to testify at the hearing, to call witnesses to testify on her behalf, and to submit supporting letters and other documentation in advance. She agreed at the conclusion of the hearing that she had no objections to the proceedings and expressed her confidence in the competence of the HSAC Committee. (Tr. 335, 338). The evidence indicates that the appropriate institutional hearing process was followed and that Dr. Varughese was treated fairly throughout.

The Appeal Committee notes the numerous opportunities that Dr. Varughese was given to change her behavior. A broad group of individuals at Mount Sinai spent significant time and resources trying to assist her, including Dr. Fixpo, Dr. Cordon-Cardo, Dr. Najfeld, and the Chief Residents. The Appeal Committee particularly finds significant Dr. Cordon-Cardo's testimony regarding his first meeting with Dr. Varughese. He explained that shortly after he arrived at Mount Sinai, he wanted to meet with Dr. Varughese personally and give her "the chance of staring fresh and making very clear that what had happened in the Department in the past was not going to happen now." (Tr. 262). Dr. Varughese was given a rare opportunity to start on a new footing with a new Department Chair. Regrettably, even after she was placed on final warning, there is no evidence that Dr. Varughese made any attempt to change her behavior.

Professionalism is one of Mount Sinai's most important core values. The issues that the Department cited in its suspension and termination letter clearly indicate that Dr. Varughese did not meet this standard. The testimony of witnesses, including Dr. Varughese herself, showed her unwillingness to change her behavior, her discourtesy to colleagues and superiors, and her continued belief that she could deliberately ignore directives and policies if she was not in agreement.

11

D00970

AA-301

Having considered the full record before us, we conclude that there is a reasonable basis on which to support the findings and conclusions of the HSAC that the Department's decision was not arbitrary and capricious. The HSAC's decision is upheld.

On behalf of the Committee:

Ira S. Nash, M.D.

Susan Bernstein, LCSW

Andrew Jagoda, M.D.

12

D00971

AA-302

Pl. Tr. Ex. 57

AA-303



**Verification and Summative Evaluation
of Graduate Medical Education/Training**

(TO BE COMPLETED FOR ANY PHYSICIAN TRAINEE)

Physician Trained: Varughese, Leena

National Provider Identifier Number (NPI): 1871756429

Name of Facility:   The Mount Sinai Hospital
One Gustave L. Levy Place
New York, NY 10029

PLF
EXHIBIT NO 57
FOR ID 6/13/13

DEFT

TRN

According to our records, the above-named physician served in the

Pathology

Residency    training program at The Mount Sinai Hospital, New York, NY

from   7   /   1   /   2008   to   9   /   21   /   2011

## Summative Evaluation

The following evaluation is based on demonstrated performance and summative evaluations on file.

|  | Superior | Satisfactory | Unsatisfactory |
|---|---|---|---|
| **Patient Care**<br>Ability to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health |  |  | ✓ |
| **Medical Knowledge**<br>Knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral science, as well as the application of this knowledge to patient care |  | ✓ |  |
| **Professionalism**<br>Commitment to carrying out professional responsibilities and adherence to ethical principles |  |  | ✓ |
| **Practice-based Learning and Improvement**<br>Ability to investigate and evaluate his/her care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning |  | ✓ |  |

AA-304

Resident: <u>Varughese</u>                    , <u>Leena</u>
                    Last Name                    First Name

**Interpersonal and Communication Skills**
Effective exchange of information and collaboration with patients, their
families, and health professionals

**Systems-based Practice**
Awareness of and responsiveness to the larger context and system of health
care, as well as the ability to call effectively on other resources in the
system to provide optimal health care

Explanation of any of the above competency ratings, if needed:

Dr. Varughese's evaluations over the initial portion of her Pathology residency training at Mount Sinai
demonstrated satisfactory development in the six Core Competency domains. In some rotations her
performance was considered superior by individual attendings, particularly in the areas of patient care
(gynecological pathology) and medical knowledge (VA hospital rotations).

However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in
December 2010, in the middle of her third year of training. While the program advanced Dr. Varughese to her
fourth year of training, her substandard performance led the Department Chair to issue her a final warning
notice on July 1, 2011. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was
summarily suspended pending termination from the program on September 21, 2011. Following Mount Sinai's
grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

The resident/fellow has demonstrated sufficient competence to enter practice without direct supervision.
                              YES☐ NO☐ ✓N/A☐

**VERIFICATION AND SUMMATIVE EVALUATION COMPLETED BY:**

<u>Program Director SIGNATURE</u>          <u>Adolfo Firpo-Betancourt, M.D., M.P.</u>
                                              Program Director NAME (Printed)          <u>03/08/2012</u>
                                                                                        DATE

<u>(212) 241-6048</u>                      <u>adolfo.firpo@mssm.edu</u>
Program Director PHONE                   Program Director EMAIL

AA-305

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - -x

5    LEENA VARUGHESE, M.D.,

6                 Plaintiff,

7            -against-

8    MOUNT SINAI MEDICAL CENTER, PATRICK

     LENTO, M.D., CARLOS CORDON-CARDO, M.D.,

9    ADOLFO FIRPO, M.D., IRA J. BLEIWEISS,

     M.D., and ABC CORP. 1-10 and JOHN DOES

10   1-10,

11              Defendants.

12

     - - - - - - - - - - - - - - - - - -x

13

14

                 315 Madison Avenue

15               New York, New York

16               October 18, 2013

                 10:00 a.m.

17

18

19      DEPOSITION of CARLOS CORDON-CARDO,

20   M.D., a Defendant in the above-entitled

21   action, held at the above time and place,

22   taken before Jennifer Brennan, a Notary

23   Public of the State of New York, pursuant

24   to Order.

25   Job No. NJ1751903

Case 15-1328, Document 177, 03/01/2017, 1979654, Page92 of 226

AA-306

```
 1
 2      APPEARANCES:
 3       RONALD J. WRONKO, LLC
         Attorneys for Plaintiff
 4         134 Columbia Turnpike
           Florham Park, New York 07932
 5
        BY:      RONALD J. WRONKO, ESQ.
 6
 7      EDWARDS WILDMAN PALMER LLP
        Attorneys for Defendants
 8         750 Lexington Avenue
           New York, New York 10022
 9
        BY:      RORY J. McEVOY, ESQ.
10
11
        ALSO PRESENT:  VEENA VARUGHESE, M.D.
12
13                   *       *       *
14
15
16
17
18
19
20
21
22
23
24
25
```

AA-307

Page 3

1

2                        STIPULATIONS

3         IT IS HEREBY STIPULATED AND AGREED, by

4    and among counsel for the respective

5    parties hereto, that the filing, sealing

6    and certification of the within

7    deposition shall be and the same are

8    hereby waived;

9         IT IS FURTHER STIPULATED AND AGREED

10   that all objections, except as to form of

11   the question, shall be reserved to the

12   time of the trial;

13        IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be signed

15   before any Notary Public with the same

16   force and effect as if signed and sworn

17   to before the Court.

18                   *        *        *

19

20

21

22

23

24

25

AA-308

```
1            C. Cordon-Cardo, M.D.
2    C A R L O S    C O R D O N - C A R D O,
3    the Witness herein, having first been
4    duly sworn by the Notary Public, was
5    examined and testified as follows:
6    EXAMINATION BY
7    MR. WRONKO:
8        Q    Please state your name for the
9    record?
10       A    Carlos Cordon-Cardo.
11       Q    Please state your address for
12   the record?
13       A    One Gustav Plaza, New York, New
14   York 10029.
15           MR. McEVOY:  Dr. Cordon-Cardo
16       would like the opportunity to review
17       and correct the transcript after the
18       deposition.
19           Also, I have completed the
20       plaintiff's deposition and it's
21       closed.  Whether I choose to pursue
22       the medical records or not, I have no
23       intention of calling her back for a
24       further deposition, so her deposition
25       is closed.
```

1           C. Cordon-Cardo, M.D.

2     meeting was essentially to make very

3     clear that we wanted to put the distance

4     between the past and the problems of

5     administration that was departing.  And

6     what we wanted to do moving into the

7     future.  I was a new chair.  I wanted her

8     to start fresh.

9           And I wanted Dr. Varughese to

10    understand that, that I had an open door

11    and I was going to allow the second

12    self-reflection to be written it because

13    the first didn't reflect what we wanted

14    and wasn't clear to me if she read the

15    book.  Because when asked, did you read

16    the book, who is the author, what is the

17    title, we didn't get the right answers.

18         Q     Was it a prefatory statement

19    that someone gave, saying to Dr.

20    Varughese, we would like to move and the

21    like of what you just described?

22         A     I don't recall at this moment,

23    but that definitely was my message to

24    her.

25         Q     Was that at the beginning of

AA-310

Page 176

1          C. Cordon-Cardo, M.D.

2          MR. McEVOY:  Sorry, can you

3     excuse me a second?

4          MR. WRONKO:  Sure.

5          [At this time, a short recess

6     was taken.]

7          MR. McEVOY:  Sorry.

8     Q     You can proceed.

9     A     So in the beginning of the

10    second meeting, it was not easy again.

11    Dr. Varughese didn't present the essay.

12    She brought the essay, the second revised

13    reflection.  She also brought a book that

14    essentially was throw to the table and

15    was a little bit taken by surprise by the

16    actions.  And I said, you know, let's

17    start fresh again, what's happening here.

18    Q     How did the meeting end?

19    A     I think that the meeting ended

20    by having evidence that she had the book,

21    that she did part of her work, that the

22    reflection was more of the same, in part,

23    but it had some parts of the

24    professionalism, so we wanted to move on.

25    Q     What do you mean, you wanted to

AA-311

Page 240

1          C. Cordon-Cardo, M.D.

2     administrator, at the end of the day of

3     the program, the responsibility for the

4     fiduciary ends of the program, to be

5     involved in it.

6          Q     Did Ms. Castaldi have the same

7     job responsibilities as Ms. Patel?

8          A     When he was with us in the

9     beginning, yes, he was in transition.

10          MR. WRONKO:  Let's take a

11     moment and let's see whether I have

12     anything else.

13          [At this time, a short recess

14     was taken.]

15          MR. WRONKO:  I have no further

16     questions.

17          (Time noted:  3:35 p.m.)

18          ------------------------

19          CARLOS CORDON-CARDO, M.D.

20

21     Subscribed and sworn to before me

22     this    day of          , 20__.

23

24

25     Job No. NJ1751903

AA-312

Page 243

1
2          C E R T I F I C A T I O N
3
4
5      I, JENNIFER BRENNAN, a Shorthand
6   Reporter and a Notary Public, do hereby
7   certify that the foregoing witness, was
8   duly sworn on the date indicated, and
9   that the foregoing is a true and accurate
10  transcription of my stenographic notes.
11     I further certify that I am not
12  employed by nor related to any party to
13  this action.
14
15
16
17     _____
18          JENNIFER BRENNAN
19
20
21
22
23
24
25

AA-313

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      Civil Action No. 12 cv 8812 (CM/JCF)

5      - - - - - - - - - - - - - - - - - - - - - - - - - -x

6      LEENA VARUGHESE, M.D.,

7                          Plaintiff,

8            - against -

9      MOUNT SINAI MEDICAL CENTER, PATRICK LENTO,

10     M.D., CARLOS CORDON-CARDO, M.D., ADOLFO

11     FIRPO, M.D., IRA J. BLEIWEISS, M.D. and

12     ABC Corp. 1-10, and JOHN DOES 1-10,

13                          Defendants.

14     - - - - - - - - - - - - - - - - - - - - - - - - - -x

15                          October 25, 2013
                            10:00 a.m.

16

17

18            Deposition of PATRICK LENTO, M.D.,

19     taken by the Plaintiff, held at the office

20     of Ronald J. Wronko, LLC, 315 Madison

21     Avenue, New York, New York, before Joseph

22     Ravenell, a Court Reporter and Notary

23     Public of the State of New York.

24

25     Job No. NJ1755404

AA-314

```
 1
 2      A P P E A R A N C E S :
 3
 4      RONALD J. WRONKO, LLC
 5      Attorney for Plaintiff
 6      134 Columbia Turnpike
 7      Florham Park, New Jersey 07932
 8      BY:   RONALD J. WRONKO, ESQ.
 9
10
11      EDWARDS WILDMAN PALMER LLP
12      Attorneys for Defendants
13      750 Lexington Avenue
14      New York, New York 10022
15      BY:   RORY J. McEVOY, ESQ.
16
17
18      ALSO PRESENT:
19      AMELIE P. TRAHANT, ESQ.
20      Assistant General Counsel
21      MOUNT SINAI HEALTH SYSTEM
22
23      LEENA VARUGHESE, M.D.
24      RAJ MALLIAH
25
```

AA-315

1

2                    S T I P U L A T I O N S

3

4              IT IS HEREBY STIPULATED AND

5       AGREED by and between the Attorneys for

6       the respective parties hereto that filing

7       and sealing be and the same are hereby

8       waived.

9              IT IS FURTHER STIPULATED AND

10      AGREED that all objections except as to

11      the form of the question, shall be

12      reserved to the time of the trial.

13             IT IS FURTHER STIPULATED AND

14      AGREED that the within examination may be

15      signed and sworn to before any notary

16      public with the same force and effect as

17      though signed and sworn to before this

18      Court.

19

20

21

22

23

24

25

AA-316

1

2    P A T R I C K    L E N T O,  M. D., having

3    first been duly sworn by a Notary Public

4    of the State of New York, was examined and

5    testified as follows:

6    EXAMINATION BY

7    MR. WRONKO:

8        Q.    Good morning, Dr. Lento.  My

9    name is Ronald Wronko.  I represent Leena

10   Varughese in a case she brought against

11   Mount Sinai Medical Center as well as a

12   number of individual defendants.  You, of

13   course, have been named as an individual

14   defendant in the suit.

15           Have you ever been deposed before?

16       A.    Yes.

17       Q.    On how many occasions?

18       A.    Maybe one or two.

19       Q.    Okay.  So you are probably

20   familiar with the process.  But I'm going

21   to give you some ground rules as to how we

22   are going to proceed.

23           We have a court reporter who can

24   only take down verbal responses to my

25   questions and can only take down what is

Page 86

1           PATRICK LENTO, M.D.

2       Q.      Did you speak with Dr. Barnett

3   about the mishandled cytology specimen?

4       A.      I do not recall speaking with

5   Dr. Barnett.  At that time, I did not

6   think that Dr. Barnett needed to be

7   involved.

8       Q.      Do you know whether or not

9   anyone from GME was involved with this

10  incident?

11      A.      I don't know.

12      Q.      When was it that you spoke with

13  Dr. McCash or did you speak with

14  Dr. McCash about this incident?

15      A.      Yes.  I don't know specifically

16  when.  But I did speak with Dr. McCash.

17      Q.      Who was present when you met

18  with Dr. McCash?

19      A.      Just Dr. McCash.

20      Q.      Did you maintain any notes from

21  your meeting with Dr. McCash?

22      A.      Not at the time, no.

23      Q.      What do you mean not at the

24  time?  Did you ever generate any notes

25  about that meeting?

1           PATRICK LENTO, M.D.

2      A.      Yes, I did.  I generated some

3  notes from the meeting with Dr. Varughese

4  and Dr. Maniar.  I jotted down some things

5  that were in a sense a reminder to me

6  about, you know, speaking with Sam.

7      Q.      Did you retain those notes?

8      A.      Yes.

9           MR. WRONKO:  I'll follow up with

10  a letter to make sure those notes were

11  produced.

12      Q.      Tell me what was said at your

13  meeting with Dr. McCash.

14      A.      I don't think I can give you

15  specifically what happened.  We are

16  talking about a number of years ago.

17      Q.      Your best recollection.

18      A.      Sure.  Dr. McCash was chief

19  resident with Dr. Maniar.  He had started

20  officially in July of that year, which was

21  2010.  This incident had happened the

22  beginning of September.  So he was

23  relatively new to the position.  The

24  purpose of the meeting was in a sense to

25  educate Dr. McCash about how to

AA-319

Page 88

1           PATRICK LENTO, M.D.
2    potentially address, you know, similar
3    situations.
4        Q.    Tell me what was said at the
5    meeting.  Do you recall Dr. McCash saying
6    anything to you at the meeting?
7        A.    I don't recall what he said, no.
8        Q.    Did you believe at that point
9    that Dr. McCash had mishandled his
10   interactions with Dr. Varughese?
11       A.    It was his job as the chief
12   resident to oversee the resident pool.  If
13   he did, in fact, yell, that may not have
14   been appropriate.  And my job I felt at
15   that point was to educate Dr. McCash about
16   how to handle similar situations in the
17   future.
18       Q.    Would you consider your
19   conversation with Dr. McCash as being an
20   informal disciplinary meeting, akin to
21   what you had previously described as being
22   an informal process, versus a formal
23   process of discipline?
24       A.    Well, my recollection was that
25   based on my investigation, the facts did

AA-320

PATRICK LENTO, M.D.

2  track her down.

3      Q.    Did you track her down?

4      A.    I did.  I called the

5  cytogenetics lab.  I spoke with

6  Dr. Najfeld.  I asked if Dr. Varughese was

7  there.  She said, "Yes, she is right

8  here."  I said, "Can I speak with her?"

9      Q.    Do you think that it was

10 inappropriate of Dr. Varughese not to have

11 gotten back to those people who were

12 looking for her?

13     A.    Yes, sure.

14     Q.    Do you know that Dr. Najfeld had

15 criticized Dr. Varughese for being on her

16 handheld during the course of that

17 rotation?

18     A.    She may have.

19     Q.    Do you know that Dr. Najfeld

20 gave her an express instruction not to be

21 on her electronics during that rotation?

22     A.    I'm not aware.

23     Q.    So if in fact Dr. Najfeld had

24 given her that instruction, why then would

25 she be criticized by giving Dr. Najfeld

AA-321

Page 304

1           PATRICK LENTO, M.D.

2 recommendation? How would you go about

3 doing it?

4    A.   I think, as I did mention, I

5 don't remember specifically how I handled

6 them.

7        MR. WRONKO: Let's take a very

8 short break. Let me see if I have

9 anything else.

10        (Recess: 6:07 to 6:09 p.m.)

11        MR. WRONKO: Subject to any

12 questions by counsel, I have nothing

13 further.

14        MR. McEVOY: I have no

15 questions.

16        MR. WRONKO: Thank you for

17 staying after 5:00. I appreciate it.

18        (Time noted: 6:09 p.m.)

19        --------------------------

20        PATRICK LENTO, M.D.

21

22 Subscribed and sworn to before me

23 this    day of         , 2013.

24 ------------------------------------.

25 Job No. NJ1755404

AA-322

Page 305

1

2                    C E R T I F I C A T I O N

3

4

5

6         I, JOSEPH RAVENELL, a Court Reporter

7    and a Notary Public, do hereby certify

8    that the foregoing witness, PATRICK LENTO,

9    M.D., was duly sworn on the date

10   indicated, and that the foregoing is a

11   true and accurate transcription of my

12   stenographic notes.

13       I further certify that I am not

14   employed by nor related to any party to

15   this action.

16

17

18

19

20

21       _____

22       JOSEPH RAVENELL

23

24

25

Page 1

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3
     ---------------------------------------x
4
     LEENA VARUGHESE, M.D.,                    :
5
                              Plaintiff,       :
6
                 - against -                   :
7
     MOUNT SINAI MEDICAL CENTER, PATRICK       :
8    LENTO, M.D., CARLOS CORDON-CARDO, M.D.,
     ADOLFO FIRPO, M.D., IRA J. BLEIWEISS,     :
9    M.D. and ABC CORP. 1-10 and
     JOHN DOES 1-10,                           :
10
                              Defendants.      :
11
     ---------------------------------------x
12
13
14                                315 Madison Avenue
                                  New York, New York
15
                                  November 13, 2013
16                                10:10 a.m.
17
18           ORAL DEPOSITION of IRA J. BLEIWEISS,
19   M.D., a Defendant herein, taken by the Plaintiff,
20   pursuant to Notice, held at the above-captioned time
21   and place, before Hanna Roth, Shorthand Reporter and
22   Notary Public of the State of New York.
23
24
25    Job No. NJ1766339

AA-324

Page 2

1
2 A P P E A R A N C E S :
3    LAW OFFICES OF RONALD J. WRONKO, LLC
        Attorney for Plaintiff
4        134 Columbia Turnpike
        Florham Park, New Jersey 07932
5        (973) 360-1001
    By:    RONALD J. WRONKO, ESQ.
6
7
8    EDWARDS WILDMAN PALMER, LLP
        Attorneys for Defendants
9        750 Lexington Avenue
        New York, New York 10022
10        (212) 912-2944
    By:    RORY J. McEVOY, ESQ.
11
12
13    ALSO PRESENT:  Dr. Leena Varughese
            Raj Malliah
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2        F E D E R A L   S T I P U L A T I O N S
3        IT IS HEREBY STIPULATED AND AGREED by and
4    between the attorneys for the respective parties
5    hereto that filing and sealing be one and the
6    same are hereby waived.
7        IT IS FURTHER STIPULATED AND AGREED
8    that all objections except as to the form of the
9    question, shall be reserved to the time of the
10    trial.
11        IT IS FURTHER STIPULATED AND AGREED
12    that the within examination may be signed and
13    sworn to before any notary public with the same
14    force and effect as though signed and sworn to
15    before this Court.
16
17
18
19
20
21
22
23
24
25

Page 3

1
2            I N D E X
            TESTIMONY
3
    WITNESS        EXAMINED BY    PAGE LINE
4
    Dr. Varughese    Mr. Wronko        5  6
5
6
7    BLEIWEISS EXHIBITS FOR IDENTIFICATION
8 NO. DESCRIPTION            PAGE LINE
9  1  E-mail chain, Bates D_ES1011365    20  10
10  2  E-mail chain, Bates D_ES1010258    22  23
11  3  E-mail chain, Bates D_ES1011462-463   23  17
12  4  Series of e-mail, Bates D 02595-623   39  15
13  5  E-mail chain, Bates D_ES1011811-612   43  17
14  6  E-mail chain, Bates D_ES1016036    45  16
15  7  E-mail, Bates D_ES1017924      49  2
16  8  Competency Evaluation Form      76  23
17  9  Copy of e-mail, Bates D 02244     89  10
18  10  Schedule of Meeting, Bates D_ES1016493 100  8
19  11  E-mail chain, Bates D 02724-725    104  5
20    (Exhibits retained by counsel.)
21
22
        REQUEST FOR PRODUCTION OF DOCUMENT
23
    DESCRIPTION            PAGE LINE
24
    Announcement of Dr. Varughese's      87  21
25  presentation on September 15, 2011

Page 5

1
2  I R A   B L E I W E I S S , M.D., appearing as a
3  witness, having been first duly sworn by a Notary
4  Public of the State of New York, was examined and
5  testified as follows:
6  EXAMINATION BY MR. WRONKO:
7    Q.    Good morning, Dr. Bleiweiss.  My name is
8  Ron Wronko.  I represent Leena Varughese in a lawsuit
9  she has brought against Mount Sinai.  You've been
10  named a defendant in the case.  Have you ever had
11  your deposition taken?
12    A.    Yes.
13    Q.    On how many occasions?
14    A.    I have to estimate, probably five or six
15  times.
16    Q.    So you're probably familiar with the
17  process, but I'm going to give you some ground rules
18  and instructions as to how we are going to proceed.
19        We have a court reporter who is only
20  taking down your verbal responses to my questions.
21  If you nod your head or you shake your head, the
22  court reporter can't take that down.  It's important
23  that you verbalize your answers as the court reporter
24  can only take down one person at a time.  It's
25  important that I not interrupt you and that you not

2 (Pages 2 - 5)

Page 58

```
1            Ira Bleiweiss, M.D.
2   Q.    You can answer.
3   A.    I'm not sure I can answer that.
4        MR. McEVOY: To make it easier, it was
5   diagnostic.
6   Q.    With regard to the diagnostic ability,
7   are you able, sitting here today, to say on how many
8   occasions you felt Dr. Varughese was right on target
9   versus the number of times she wasn't on target with
10  her diagnoses?
11  A.    No.
12  Q.    Do you believe that Dr. Varughese was on
13  target or off target more so than her colleagues in
14  the residency program?
15  A.    It's more -- it's not relative to target
16  with her colleagues. It's relative to her level of
17  training. I was very specific. I said relative to
18  her level of training and where I thought she should
19  be in her abilities.
20  Q.    Well, let's talk, then, about relative to
21  her colleagues. Were her colleagues also similarly
22  off target on occasions where, according to your
23  expectations of their level of training, they should
24  have been more advanced and more on target?
25  A.    On occasion.
```

Page 59

```
1            Ira Bleiweiss, M.D.
2   Q.    So back to my question, did you find that
3   Dr. Varughese was off target more or less than her
4   colleagues in the same class year?
5   A.    Probably more, because that would have
6   contributed to my evaluation.
7   Q.    Going to December 8, 2010, do you recall
8   what you were doing at work on that day?
9   A.    No.
10  Q.    Now, just to refresh your recollection, I
11  will represent to you that December 8, 2010 was the
12  date when Dr. Varughese and Dr. McCash had an
13  incident that ultimately was investigated by the
14  Department. Do you recall that?
15  A.    Yes.
16  Q.    So on that date, sitting here today, do
17  you recall just prior to Dr. Varughese coming to you
18  what you were doing?
19  A.    I was in my office.
20  Q.    Prior to Dr. Varughese coming to you,
21  were you on the telephone?
22  A.    It's entirely possible.
23  Q.    Do you have any recollection, sitting
24  here today, of being on the telephone?
25  A.    I remember her coming into my office
```

Page 60

```
1            Ira Bleiweiss, M.D.
2   rather upset and, yes, that I was on the telephone in
3   the midst of some conversation. I can't tell you who
4   I was on the phone with or what the conversation was
5   about.
6   Q.    Do you know whether or not you were on
7   the phone with Dr. Pessin-Minsley?
8   A.    I have no idea.
9   Q.    You have no recollection, sitting here
10  today, what the substance of your telephone
11  conversation was?
12  A.    I don't know who I was on the phone with.
13  Q.    Tell me what you recall when
14  Dr. Varughese came to you.
15  A.    As best I recall, she was upset and it
16  had to do with handling some specimens in the
17  grossing room, and since it had to do with handling
18  grossing specimens, I asked her to go talk to
19  Dr. Jaffer because Dr. Jaffer was the assigned
20  attending dealing with pressed gross specimens at
21  that point, the way we rotated the assignments of her
22  work.
23  Q.    What did Dr. Varughese say to you when
24  she first came?
25  A.    I don't recall specifics.
```

Page 61

```
1            Ira Bleiweiss, M.D.
2   Q.    Do you recall anything of what she said?
3   A.    Not specifically.
4   Q.    What led you to believe that she was
5   upset?
6   A.    She was visibly upset.
7   Q.    How so?
8   A.    She was -- I remember she was practically
9   in tears.
10  Q.    Did you address her while you were still
11  on the telephone?
12  A.    Yes.
13  Q.    Did you terminate the telephone call to
14  speak with her?
15  A.    I don't recall.
16  Q.    In light of the fact that she was in
17  tears, is there a reason why you yourself did not
18  attempt to address whatever the situation was as
19  opposed to delegating it to Dr. Jaffer?
20  A.    I delegated it because it had to do with
21  handling a specimen that Dr. Jaffer would be
22  responsible for.
23  Q.    What was the next time that you became
24  involved in that situation after, I would assume,
25  Dr. Varughese left?
```

16 (Pages 58 - 61)

Page 110

1      Ira Bleiweiss, M.D.
2  regard to Eileen Hauptman's e-mail I had shown you.
3       Had you reviewed the list that she had
4  compiled of the cases that Dr. Varughese had grossed
5  that day?
6     A.   I don't know.
7     Q.   Do you recall how many cases
8  Dr. Varughese had grossed that day?
9     A.   I don't recall.
10     Q.   Do you know whether it would be
11  appropriate for another resident to change the gross
12  description and power path after the resident who had
13  done the grossing had discussed the case with the
14  attending?
15     A.   To change the gross description?
16     Q.   Yes.
17     A.   It could happen.
18     Q.   But the question becomes, if the resident
19  who had done the grossing had discussion with the
20  attending as to how to go about describing it, would
21  it be appropriate for another resident to then go in
22  and change that description?
23     A.   Probably not.
24     Q.   Now, with regard to Goldfarb cases, what
25  are Goldfarb cases?

Page 111

1      Ira Bleiweiss, M.D.
2     A.   They are simply cases that a particular
3  surgeon, Dr. Goldfarb, has performed.
4     Q.   Was there anything more important or less
5  important for that particular surgeon's cases?
6     A.   Not really, only the issue that they
7  almost had a kind of built-in delay in the sense that
8  many of the cases came from outside, an ambulatory
9  surgical facility. They had transport time involved
10  as opposed to the relatively quicker transport time
11  that would be involved in taking the specimen from
12  inhouse operating rooms.
13     Q.   Would that in any way impact on the
14  procedure in the gross room?
15     A.   It could. It could impact the time at
16  which the specimen got there and was ready to be
17  grossed.
18     Q.   How would it impact the actual procedure?
19  Would it hasten the time that the sample would have
20  to be fixed?
21     A.   No, because they are generally fixed
22  already.
23     Q.   Is there a reason why all Goldfarb cases
24  should be performed by the resident as opposed to a
25  moonlighter?

Page 112

1      Ira Bleiweiss, M.D.
2     A.   Only in the sense that they were
3  generally cancer resections. There were occasions,
4  as I have already described, of a simple incision of
5  a fibroadenoma. I wouldn't care.
6     Q.   Did you know Dr. Guarino before 2010?
7     A.   Yes.
8     Q.   When was the first time you met
9  Dr. Guarino?
10     A.   I don't know the specific time he
11  interviewed to be a fellow.
12     Q.   When?
13     A.   I'd have to check.
14     Q.   Was it '90s, 2000?
15     A.   Clearly, just before he did his
16  fellowship.
17     Q.   Do you know when that was?
18     A.   I'd have to check the dates.
19         MR. WRONKO: I have nothing further.
20         (Whereupon, the deposition was concluded
21  at 1:00 p.m.)
22
23
24
25

Page 113

1
2              J U R A T
3       I, IRA J. BLEIWEISS, M.D., the witness
4    herein, do hereby certify that the foregoing
5    testimony of the pages of this deposition to be
6    a true and correct transcript, subject to the
7    corrections, if any, shown on the attached
8    page(s).
9
10
11
         --------------------------
12            IRA J. BLEIWEISS, M.D.
13
14  Subscribed and sworn to before me
15  this _____ day of _____, 2013
16
17  _____
   NOTARY PUBLIC
18
19  _____
   NOTARY PUBLIC of the State of: _____
20
   My Commission expires:_____, 20__
21
22
23
24
25  Job No. NJ1766339

29 (Pages 110 - 113)

Page 114

1
2  STATE OF NEW YORK    ) Page _____ of _____
                        ) ss:
3  COUNTY OF NEW YORK   )
4       I wish to make the following changes, for the
   following reasons:
5  PAGE LINE
6  ____ ____ CHANGE: _____
7       REASON: _____
8  ____ ____ CHANGE: _____
9       REASON: _____
10 ____ ____ CHANGE: _____
11      REASON: _____
12 ____ ____ CHANGE: _____
13      REASON: _____
14 ____ ____ CHANGE: _____
15      REASON: _____
16 ____ ____ CHANGE: _____
17      REASON: _____
18 ____ ____ CHANGE: _____
19      REASON: _____
20 ____ ____ CHANGE: _____
21      REASON: _____
22
23 _____
24    WITNESS' SIGNATURE      DATE
25 Job No. NJ1766339

Page 116

1
2           C E R T I F I C A T E
3
4  STATE OF NEW YORK )
5              : SS:
6  COUNTY OF KINGS  )
7
8       I, HANNA ROTH, a Shorthand
9  Reporter and Notary Public within and for the State
10 of New York, do hereby certify:
11      That IRA J. BLEIWEISS, M.D., the
12 witness whose deposition is hereinbefore set forth,
13 was duly sworn by me, and that such deposition is a
14 true record of the testimony given by such witness.
15      I further certify that I am not related
16 to any of the parties to this action by blood or by
17 marriage, and that I am in no way interested in the
18 outcome of this matter.
19      IN WITNESS WHEREOF, I have
20 hereunto set my hand this 18th day of November 2013.
21
22
   _____
23      HANNA ROTH
24
25

Page 115

1
2       Page _____ of _____
3  ____ ____ CHANGE: _____
4       REASON: _____
5  ____ ____ CHANGE: _____
6       REASON: _____
7  ____ ____ CHANGE: _____
8       REASON: _____
9  ____ ____ CHANGE: _____
10      REASON: _____
11 ____ ____ CHANGE: _____
12      REASON: _____
13 ____ ____ CHANGE: _____
14      REASON: _____
15 ____ ____ CHANGE: _____
16      REASON: _____
17 ____ ____ CHANGE: _____
18      REASON: _____
19 ____ ____ CHANGE: _____
20      REASON: _____
21 ____ ____ CHANGE: _____
22      REASON: _____
23
24
   _____
   WITNESS' SIGNATURE      DATE
25 Job No. NJ1766339

Page 117

1           Veritext Legal Solutions
            290 W. Mt. Pleasant Ave. - Suite 3200
2           Livingston, New Jersey 07039
            Toll Free: 800-227-8440  Fax: 973-629-1287
3
4  _____, 2013
5  To: Rory J. McEvoy, Esq.
6  Case Name: Varughese v. Mount Sinai Medical Center
7  Veritext Reference Number: 1766339
8  Witness: Ira J. Bleiweiss    Deposition Date: 11/13/2013
9
   Dear Sir/Madam:
10
   Enclosed please find a deposition transcript.  Please have the witness
11 review the transcript and note any changes or corrections on the
   included errata sheet, indicating the page, line number, change, and
12 the reason for the change.  Have the witness' signature at the bottom
   of the sheet notarized and forward errata sheet back to us at the
13 address shown above.
14
15 If the jurat is not returned within thirty days of your receipt of
16 this letter, the reading and signing will be deemed waived.
17
18
19
20 Sincerely,
21
22 Production Department
23
24 Encl.
25 cc:  Ronald J. Wronko, Esq.

30 (Pages 114 - 117)

AA-328

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3            Civil Action No.: 12 CIV 8812
 4     - - - - - - - - - - - - - - - -
       LEENA VARUGHESE, M.D.,          :
 5
                   Plaintiff,          :
 6
                                       : DEPOSITION OF:
 7            v.
                                       : ARTHUR FIGUR, M.D.
 8     MOUNT SINAI MEDICAL CENTER,
       PATRICK LENTO, M.D.,            :
 9     CARLOS CORDON-CARDO, M.D.,
       ADOLFO FIRPO, M.D., IRA J.      :
10     BLEIWEISS, M.D., and ABC
       Corp. 1-10, and JOHN DOES       :
11     1-10,
                                       :
12                 Defendants.
                                       :
13     - - - - - - - - - - - - - - - -
14
15            TRANSCRIPT of the testimony as taken by and
16     before LEAH ALLBEE, a Registered Professional
17     Reporter, Certified Court Reporter and Notary Public
18     of the States of New York and New Jersey, at the
19     offices of RONALD J. WRONKO LAW OFFICES, 315 Madison
20     Avenue, New York, New York, on Wednesday, January 8,
21     2014, commencing at 2:05 in the afternoon.
22
23
24
25     Job No. NJ1792048
```

AA-329

Page 2

1  A P P E A R A N C E S :

2

   LAW OFFICES OF RONALD J. WRONKO, LLC
3  BY:  RONALD J. WRONKO, ESQ.
      134 Columbia Turnpike
4  Florham Park, New Jersey 07932
      Attorney for Plaintiff
5  (973) 360-1001
      ron@ronwronkolaw.com
6
7  EDWARDS WILDMAN PALMER, LLP
      BY:  RORY J. McEVOY, ESQ.
8  750 Lexington Avenue
      New York, New York 10022
9  Attorneys for Defendants
      (212) 308-4411
10  rmcevoy@edwardswildman.com
11
12
13
14  ALSO PRESENT:
15  Leena Varughese, M.D.
16  Raj Halliah
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X

2  WITNESS                    EXAMINATION
3  ARTHUR FIGUR, M.D.
4       BY MR. WRONKO            4
5
6           E X H I B I T S
7  NUMBER   DESCRIPTION            PAGE
8  1      Document               26
9  2      Outlook meeting schedules   27
10  3      Document               33
11  4      E-mail document         51
12  5      E-mail document         59
13  6      E-mail document         59
14  7      E-mail document         65
15
16      (Exhibits retained by counsel.)
17
18  INSTRUCTED NOT TO ANSWER
19  PAGE
20  12   "Was that Sarah Blowe?"
21
22
23
24
25

Page 4

1  A R T H U R   F I G U R, M. D., One Gustave Levy
2  Place, New York, New York 10029, having been duly
3  sworn by a Notary Public, testified as follows:
4  EXAMINATION
5  BY MR. WRONKO:
6       Q    Good afternoon, Dr. Figur.
7       A    Good afternoon.
8       Q    My name is Ron Wronko.  I have
9  been retained by Leena Varughese in a case that
10  she has brought against Mount Sinai Medical
11  Center and a number of individual defendants.
12       Have you ever been deposed before?
13       A    Yes.  Once.
14       Q    So you may be familiar with the
15  process, but I am going to give you some ground
16  rules as to how we are going to proceed.  The
17  court reporter can only take down your verbal
18  responses to my questions.  So if you nod your
19  head or shake your head, the court reporter
20  can't take that down.  So you have to verbalize.
21       The court reporter can only take
22  down one person at a time.  So make sure I have
23  finished asking my question before you start
24  your response.
25       If you answer my question, I am

Page 5

1  going to make an assumption that you understood
2  it.  So if you don't understand my question, let
3  me know that, and I will try my best to rephrase
4  the question.
5       You are represented today by
6  Mr. McEvoy.  If he should interpose any
7  objections, allow us to work out that objection,
8  unless he instructs you to answer otherwise,
9  before you start giving your response.
10       Do you understand those
11  instructions?
12       A    Yes.
13       Q    Doctor, are you under the
14  influence of any medication or other substance
15  that would impair your recollection of events?
16       A    No.
17       Q    Are you under the influence of any
18  medication or other substance that would impact
19  on your memory in any way?
20       A    No.
21       Q    With regard to your ability to
22  tell the truth, is it in any way impacted by any
23  medication or condition?
24       A    No.
25       Q    Doctor, you testified that you had

2 (Pages 2 - 5)

**Page 18**

1  physicians to me. The director of a department
2  and the program director for residency training
3  can refer physicians to me. But I am not
4  usually in the process of determining whether
5  people should be referred to me or Physicians'
6  Wellness.
7       Q     Once someone is referred to you,
8  what is your standard -- strike that.
9            Is there a standard procedure that
10 you follow after a referral?
11      A     Yes.
12      Q     What is your standard procedure?
13      A     We initially ask the person who is
14 making the referral what the issues are. I make
15 a list of issues. I request to interview the
16 people who have firsthand interactions with the
17 physician because I don't want second- or
18 thirdhand information.
19           After interviewing the appropriate
20 number of people in what is called a
21 confidential setting where we impress that they
22 do not discuss any of my questions with anyone
23 else, nor will I specifically give out any other
24 information what they told to us, we then ask
25 the physician who is the subject of the

**Page 19**

1  investigation to give us their side of the
2  particular incidents.
3       Q     What is the purpose of getting the
4  side of the physician who is the subject of the
5  referral?
6       A     It's the only way to establish the
7  validity of the incidents which elicited the
8  referral.
9       Q     What are you looking for in your
10 investigation to determine whether or not the
11 person is, in fact, placed into the Physician
12 Wellness Committee?
13           MR. McEVOY: Objection to
14      the form.
15      Q     Or program, I should say.
16           MR. McEVOY: Objection to
17      the form.
18           You can answer.
19           There is no -- never mind.
20      I object to the form.
21           You can answer.
22      A     Physicians' Wellness is here to
23 help physicians improve their academic
24 performance from the point of view of the
25 residents. It's there to improve the

**Page 20**

1  professionalism of the physician. And unless we
2  validate that, the incidents reported to us,
3  we're not certain how to proceed or if they
4  occurred at all.
5       Q     How do you determine whether or
6  not the incidents that are reported to you rise
7  to the level that would warrant the physician
8  having to go through the program?
9            MR. McEVOY: Objection to
10      the form.
11           You can answer it.
12      A     Once a physician is referred, we
13 are obligated to proceed.
14      Q     What do you mean by "obligated to
15 proceed"? Proceed with what?
16      A     To proceed with investigation of
17 the physician's behavior or poor performance.
18      Q     But the purpose of that
19 investigation is to determine whether or not the
20 physician would be placed into the program, is
21 it not?
22      A     No, no. We are not a program. We
23 are a committee that evaluates physicians'
24 behavior and if therapy is necessary. We don't
25 treat the physicians.

**Page 21**

1       Q     So how is it that the program
2  actually assists physicians, then?
3            MR. McEVOY: Objection to
4       the form.
5       A     We make appropriate referrals.
6       Q     Referrals to people in the
7  psychiatric field?
8       A     If a physician is impaired by
9  alcohol, we refer them to the Committee on
10 Physicians Health of the Medical Society of the
11 State of New York. If there is a psychiatric
12 issue, we refer them to an outside psychiatrist
13 for therapy. If there is an organic problem,
14 then we refer them to the appropriate individual
15 for that treatment.
16      Q     When you say "organic problem,"
17 what do you mean by that?
18      A     Physicians whose eyesight may have
19 deteriorated, we need to evaluate that; if they
20 are a surgeon, that they can see the operative
21 field. If a physician has problems typing
22 because of a prior injury, we assure what kind
23 of rehabilitation they may need to fulfill their
24 obligations or provide them with an assistive
25 device.

6 (Pages 18 - 21)

Page 22

1     Q   Is anything from a Physician
2 Wellness investigation ever utilized for
3 purposes of discipline or ultimately termination
4 of a resident?
5     A   The medical board approved the
6 policy of how the Physicians' Wellness Committee
7 functions. We have to follow guidelines. And
8 because one of the important aspects of
9 professionalism and competence -- let me
10 rephrase.
11     If a physician is unprofessional
12 or incompetent, it can lead to bad patient
13 outcomes. We have an obligation to the patients
14 in our institution to assure them of best
15 practices. So if we find a physician has abused
16 drugs, they have to be suspended immediately.
17 And then depending on them going to a program,
18 if they are rehabilitated, depending on the need
19 of the institution, they may be brought back.
20 Similarly with psychiatric illnesses.
21     Q   So in some instances, disciplinary
22 action can arise from the investigation of the
23 Physician Wellness Committee?
24     A   Yes, it can.
25     Q   Do you have any training in

Page 23

1 psychiatry?
2     A   No.
3     Q   Do you have any training in
4 psychology?
5     A   No.
6     Q   Is a toxicology screen universal
7 in terms of the Physician Wellness Committee
8 referrals?
9     A   95 percent.
10     Q   What comprises the other
11 5 percent?
12     A   If a physician is referred because
13 of visual impairment, there is no need to do
14 that. If a physician is impaired because of
15 inability to use their hands or type
16 appropriately and there is nothing in the
17 history that would indicate that they are using
18 pain medication or something, then we don't need
19 to do that.
20     Q   How about a psychiatric analysis?
21 Are you able to identify a percentage of cases
22 where the referred physician undergoes a
23 psychiatric evaluation?
24     A   Within the last, let's say, two,
25 two and a half years, we have a physician on

Page 24

1 staff who is designated to be the physician for
2 house staff, and that physician has two hats:
3 One, house staff can go to that person
4 confidentially, and that has nothing to do with
5 Physician Wellness; or two, if we on Physician
6 Wellness with the investigation of behaviors
7 find that that person needs a referral to a
8 psychiatrist for an evaluation, then we refer
9 that person to the psychiatrist.
10     Q   Who is that physician on staff?
11     A   Dr. Madeleine Fersh.
12     Q   What is her training --
13     A   She is --
14     Q   -- or background?
15     A   She is a psychiatrist.
16     Q   When was the first time that you
17 became aware that there was a referral of
18 Dr. Leena Varughese to the Physician Wellness
19 Committee?
20     A   I received a phone call from
21 Dr. Pessin, and it was probably in December, but
22 I don't recollect the exact day.
23     Q   Were only the two of you on the
24 telephone line, or was there anyone else?
25     A   No. She was the only one on the

Page 25

1 telephone line.
2     Q   Tell me what was discussed between
3 you and Dr. Pessin.
4     A   Dr. Pessin said, I have a
5 pathology resident who needs to be evaluated by
6 you. She was insubordinate, she loses
7 control -- and I may be paraphrasing -- shouts
8 and screams when confronted with issues that she
9 needs to address. And I think there was a third
10 thing she gave me which I don't recall.
11     Q   Did Dr. Pessin give you any
12 specific explanation of what she meant that this
13 resident was insubordinate?
14     A   No. I did not ask her what she
15 meant by insubordinate.
16     Q   How about losing control? Did she
17 give any specific examples?
18     A   Then I asked whom can I interview
19 who witnessed these events so that I could get
20 it firsthand from them rather than filtered from
21 Dr. Pessin.
22     Q   Did she provide names?
23     A   I was able to get names. I am not
24 certain if she herself provided the names or
25 whether it was the program director.

7 (Pages 22 - 25)

Page 30

1  after interviewing all of those people as to
2  whether Dr. Varughese should have been
3  disciplined?
4      A    I don't determine whether an
5  attending or a resident should be disciplined.
6  That belongs to the department.  That's the
7  responsibility of the chair and the
8  responsibility of the program director.
9      Q    Now, did Dr. McCash forward to you
10 any e-mails?
11     A    Yes, he did.
12     Q    What was the content of those
13 e-mails that he forwarded?
14     A    His side of the incident.  And
15 they may have actually been forwarded by
16 Dr. Pessin rather than Dr. McCash, but I don't
17 recall.
18     Q    I am going to show you what was
19 marked as Bleiewss 4, which is a copy of e-mails
20 that Dr. McCash had forwarded.  It appears that
21 there are a number of other e-mails not relating
22 to the December 8, 2010 incident.
23         Do you recall receiving all of
24 those e-mails?
25     A    That's a lot to look at.  All

Page 31

1  right.  (Witness reviewing documents.)
2          I believe I saw all of them,
3  although some were dated after the investigation
4  was completed.  They are in April and May.
5      Q    Did you reach any conclusions upon
6  reading those e-mails?
7          MR. McEVOY:  Objection to
8      the form.
9          You can answer it.
10     A    The ones that gave us information
11 about December helped me reach conclusions.  The
12 ones that came later, I was already basically
13 out of the picture.
14     Q    Well, the e-mails that were
15 forwarded by Dr. McCash that came before the
16 incident, what conclusions did you reach with
17 regard to those?
18     A    It confirmed the pattern of
19 inappropriate behavior.
20     Q    Did you believe that, or did you
21 reach that conclusion that it confirmed a
22 pattern before you had your sitdown with
23 Dr. Varughese?
24     A    I don't recall when I received
25 these e-mails.  But I don't make a conclusion --

Page 32

1  we don't make a conclusion until after we meet
2  with Dr. Varughese.
3      Q    If you could refer to the exhibit,
4  when did Dr. McCash forward to you those
5  e-mails?
6      A    Well, on the first page,
7  Dr. McCash forwarded the e-mails January 13,
8  2011.  But...
9      Q    When was Dr. Varughese
10 interviewed?
11     A    In January.
12     Q    When in January?
13     A    After -- it would have had to have
14 been after we finished interviewing Dr. Jaffer,
15 Dr. Bleiweiss, and so on.  So at least the date
16 I see here would be -- let me look at this.
17     Q    Just to make it easier, the notes
18 for resident LV, referring to Leena Varughese,
19 indicates January 19, 2011.
20         Does that refresh your
21 recollection?
22     A    Well, apparently it doesn't.  But
23 the date here for Leena and Paul and me would be
24 1/24/2011.
25     Q    But when you look at the notes,

Page 33

1  there are notes with D02303 in what has been
2  marked -- there you go.  Your counsel has put it
3  in front of you.
4      A    Okay.
5      Q    Does that refresh your
6  recollection as to having met with her initially
7  on January 19th with a follow-up meeting on the
8  24th?
9      A    I would have to say yes.
10     Q    So Dr. McCash forwarded the
11 e-mails here on January 13th, which preceded the
12 meeting with Dr. Varughese; is that accurate?
13     A    Yes.
14         MR. WRONKO:  Let's mark
15     this.
16         (Document was marked Exhibit
17     Figur 3 for identification.)
18     Q    Sir, I am showing you what has
19 been marked as Figur 3.  I will give you a
20 moment to review the document.
21     A    (Witness reviewing document.)
22         It's my document.
23     Q    Can you identify the document for
24 me, please?
25     A    It says, "From Arthur Figur, QA

9 (Pages 30 - 33)

AA-333

Page 34

1  work product, privileged and confidential, to
2  Paul Johnson time line." Well, the date is
3  January 18th. But the time line I put down was
4  for December 8th.
5      Q    This e-mail was sent the day
6  before you met with Dr. Varughese?
7      A    Yes.
8      Q    You had previously described in
9  your standard procedure that you would create
10  bullet points for your interviews.
11      Are these, in fact, bullet points
12  that you created for your interview with
13  Dr. Varughese?
14      A    No. These are not the bullet
15  points that we created for the interview.
16      Q    What was the purpose of this
17  particular e-mail to Paul Johnson?
18      A    I am not a pathologist. I had to
19  understand the process of what occurs in the
20  pathology department at the time of the
21  incident. I was not, until we interviewed
22  people and got this information, aware of the
23  various responsibilities of the individuals in
24  the department -- how the rotation works for the
25  residents, what their responsibilities are when

Page 35

1  specimens come in, what grossing means, what
2  taking specimens of tissues to look under the
3  microscope for, what the time line of that is,
4  and how the residents function.
5      And this was the first time I have
6  heard that house staff are allowed to moonlight
7  in the department, and we had to establish what
8  the role of the moonlighter is, how they
9  interact with the attendings and the house
10  staff. And so this was basically clarification
11  for both of us, to the best of our knowledge,
12  how things would work when a specimen arrives in
13  the laboratory, in the pathology laboratory.
14      Q    Looking at the second page, the
15  full paragraph that begins, "In addition, all of
16  the e-mails that Dr. McCash sent us last week,"
17  and it goes on for that paragraph, is it true
18  that this paragraph makes reference to the
19  e-mails marked as Bleiwess 4?
20      A    Bleiwess 4?
21      Q    Right there.
22      A    Oh, these (indicating)?
23      Q    Yes.
24      A    Well, somewhere in April, which is
25  after this was written, but it does apply to the

Page 36

1  ones that predated this note.
2      Q    Now, you had previously testified
3  that you didn't make any conclusions until you
4  met with Dr. Varughese. Reviewing this
5  document, it appears to contradict that.
6      Did you, in fact, reach a
7  conclusion as of January 18, 2011, prior to
8  meeting with Dr. Varughese, that she should have
9  been disciplined based on the e-mails that
10  Dr. McCash forwarded?
11      MR. McEVOY: Objection to
12      the form.
13      You can answer.
14      A    All right. The department has
15  responsibilities for improving performance,
16  meeting with house staff to explain to them what
17  needs to be improved; if they fail to improve
18  their performance, to give appropriate academic
19  advisement or discipline.
20      Independent of that, all of these
21  issues, what I said in there and meant to say is
22  all of these issues should have been addressed
23  prior to our becoming involved. Nevertheless,
24  we felt she needed to be seen by the Physicians'
25  Wellness. We don't discipline. All I said

Page 37

1  there is the department should have done what
2  they didn't do.
3      Q    Well, why is it that you did not
4  first confront Dr. Varughese with the McCash
5  e-mails to get her side of the story before
6  writing that the department should have acted
7  upon and met with discipline because of what is
8  contained in those e-mails?
9      A    All right. You had asked me
10  before about whether we determine -- Physicians'
11  Wellness determines whether a physician should
12  be sent to us. We don't do that, except in this
13  instance we did, and that's why I met with
14  Mr. Johnson.
15      The department was in flux at that
16  time. Dr. Schiller had resigned. Dr. Pessin
17  was the acting director. They were recruiting a
18  new director. Apparently, the GME office was
19  involved because the house staff, or somebody
20  else anonymously, reported to the Oversight
21  Committee for Graduate Medical Education in the
22  Department of Pathology, and they were being
23  investigated. So there was a whole to-do up
24  there, which I think we can use the word turmoil
25  because of all of these different things.

10 (Pages 34 - 37)

**Page 38**

1  So I wanted to establish that her
2  behavior needed Physicians' Wellness. So we did
3  in her case, and that's the only case I can ever
4  remember that we did a preliminary investigation
5  to make certain that the referral was
6  appropriate. And my conclusion was, at the end,
7  that the referral was appropriate.
8  Q  Why was this the only case where
9  you conducted an investigation to determine
10  whether the referral was appropriate?
11  A  Because the department was in
12  turmoil. And if different people disagree and
13  disagree and they didn't perform their function
14  appropriately, according to the house staff, we
15  needed evidence based on our interviews that --
16  Physicians' Wellness is here to help doctors.
17  So if she has difficulties, we are here to help.
18  We felt she had difficulties; we are here to
19  help. And that it was not an administrative
20  disciplinary type of issue, but something that
21  could possibly be corrected.
22  Q  However, if the physician chooses
23  not to participate with the Physician Wellness
24  Committee, they can be terminated for that; is
25  that accurate?

**Page 39**

1  A  Not by us but by the hospital,
2  yes.
3  Q  Now, you had previously indicated
4  that you were conducting the investigation in
5  order to establish that Dr. Varughese's conduct
6  warranted the attention of the Physician
7  Wellness Committee?
8  A  Yes.
9  Q  Is that accurate?
10  A  That's accurate.
11  Q  Why wouldn't you be conducting the
12  investigation to determine not what -- strike
13  that.
14  So in all other instances -- since
15  you indicated that Dr. Varughese's investigation
16  was the exception to the rule, what's the point
17  of the investigation in all other instances
18  where the referral is made and it's simply
19  accepted?
20  A  Because usually it is absolutely
21  straightforward with no other mitigating issues
22  that arose. And in this particular instance,
23  there were so many changes going on in the
24  department that we felt we needed to evaluate
25  that.

**Page 40**

1  Q  Were you aware when you were
2  conducting your investigation that Dr. Varughese
3  had made a complaint to human resources?
4  A  I was aware of it when she
5  informed me and may be included in some of the
6  e-mails.
7  Q  What did she tell you about what
8  she reported to human resources?
9  A  I don't specifically recall, but
10  she certainly felt she was being targeted by the
11  house staff. I don't specifically recall any
12  attending. And that may have been part of the
13  reason for saying, well, let's find out what
14  really happened, as far as we can determine, by
15  interviewing specific people.
16  I don't deal in human resources,
17  so I can't tell you about that. But certainly
18  there are mechanisms, and she used one
19  mechanism. I remember she saw Dr. Stimmel, who
20  is the ombudsman. She had interaction with HR
21  through Caryn Tiger-Paillex. But I am not the
22  HR individual and I don't follow that.
23  Q  Were you familiar with the fact
24  that Dr. Varughese had made a complaint of
25  discrimination?

**Page 41**

1  A  I don't recall.
2  Q  On what grounds did you conclude
3  that the referral to the Physician Wellness
4  Committee for Dr. Varughese was, in fact,
5  justified?
6  A  After establishing certain facts
7  that, number one, the chief residents had been
8  delegated authority to schedule rotations to
9  deal with vacations; to let the residents know
10  what their responsibilities are and make certain
11  that they adhere to the responsibilities; that
12  they assign a variety of things, especially when
13  other residents are sick and they need to call
14  in someone to replace them; that this is clearly
15  outlined within the department, that members
16  know this; that Dr. McCash, as the responsible
17  chief resident on that particular day had the
18  authority granted to him by the chair of the
19  program director to instruct Dr. Varughese what
20  her responsibilities are and what she should be
21  doing. And when we got those facts from
22  everybody we interviewed, then we established
23  that we could possibly be of help.
24  Q  Did you have the authority, if
25  your investigation bore this out, to self-refer

AA-335

Page 42

1 someone else to the Physician Wellness
2 Committee?
3     A   I have never self-referred.
4 That's not my role.
5     Q   So if in the course of your
6 investigation you had found that another
7 resident had acted unprofessionally, you would
8 not have had the power to then refer them to the
9 Physician Wellness Committee?
10    A   Within the way it's organized,
11 it's not written that I have the authority to do
12 that.
13        I do have the authority as a staff
14 member, that if I see something, to report it to
15 a chairman that somebody behaved
16 inappropriately. But not to the Physician
17 Wellness Committee.
18    Q   Did you report Dr. McCash's
19 behavior on December 8th to his department
20 chair?
21    A   No.
22    Q   Why not?
23    A   As far as I was concerned,
24 everyone we interviewed was aware of the
25 incident and some were witnesses that were

Page 43

1 present at the time.
2     Q   Did you find evidence in your
3 investigation that Dr. McCash was loud with
4 Dr. Varughese?
5     A   Yes, he was loud.
6     Q   Did you find evidence in your
7 investigation that he berated Dr. Varughese?
8     A   What do you mean by "berated"?
9     Q   Well, did he continue to press the
10 issue until Dr. Varughese left for the grossing
11 area?
12    A   He pressed the issue that she
13 should be responsible and perform her duties,
14 yes.
15    Q   Did your investigation bear out
16 any evidence to show that Dr. McCash had
17 assailed Dr. Varughese in front of other members
18 of the staff?
19        MR. McEVOY: Objection to
20 form.
21        You can answer.
22    A   Clarify assailed.
23    Q   Let me rephrase the question. Did
24 your evidence bear out that Dr. McCash was loud
25 with Dr. Varughese in front of other members of

Page 44

1 the staff?
2     A   Yes.
3     Q   And did your investigation
4 disclose that Dr. McCash was loud with
5 Dr. Varughese when she was in the middle of
6 patient care responsibilities?
7     A   She wasn't fulfilling her patient
8 care responsibilities, and that is why he was
9 telling her she should fulfill those.
10    Q   Well, let's talk about that for a
11 minute.
12    A   Okay.
13    Q   How was delegating a breast margin
14 to a presumably competent moonlighter not
15 fulfilling patient care responsibilities?
16    A   We interviewed several people
17 about what the moonlighters should be doing,
18 what the delegated residents should be doing.
19 And specifically, if I remember, in this
20 instance the attending surgeon of this
21 particular patient always wanted the resident to
22 do a section of the margins. So it was the
23 responsibility of the resident and not the
24 moonlighter to do that particular process.
25    Q   Who was the attending?

Page 45

1     A   Of the patient?
2     Q   Yes.
3     A   I think it was Dr. Gold --
4 Goldfarb.
5     Q   Was Dr. Goldfarb interviewed
6 during your investigation?
7     A   No.
8     Q   How did you reach the conclusion
9 that Dr. Goldfarb wanted the breast sections to
10 be done by the resident versus the moonlighter?
11    A   If I -- again, I may be wrong, but
12 several people mentioned it, including, if I am
13 not mistaken, Dr. Bleiweiss, who does a lot of
14 the breast reviews.
15    Q   Did your investigation bear out
16 whether there was a practice where -- well,
17 strike that.
18        Did your investigation bear out
19 whether or not breast margins were sometimes
20 separated from the prime breast sample or
21 specimen?
22    A   Breast margins are critical to the
23 care of a patient and therefore, they should
24 always be analyzed by microscopic evaluation.
25    Q   But were they always evaluated

12 (Pages 42 - 45)

### Page 78

1  because she failed to call in on time before she
2  was out sick. She was referred to that because
3  of her outbursts that were, in our opinion,
4  unprovoked.
5      Q   So let me return to my question.
6  Outside of December 8th when Dr. McCash raised
7  his voice with her in the middle of the gross
8  room in front of other members of the staff --
9      A   Correct.
10     Q   -- what are the other outbursts
11 that you are referring to?
12          MR. McEVOY: Objection. You
13     asked him that question.
14          DR. VARUGHESE: No.
15          MR. McEVOY: I will let him
16     answer it one more time and then we
17     are done.
18          MR. WRONKO: He hasn't
19     answered it. He made reference to
20     coming in late and all the rest.
21     But I want know what other outbursts
22     there were.
23     Q   Were there?
24          MR. McEVOY: So, Dr. Figur,
25     if you recall other outbursts in

### Page 79

1      response to Mr. Wronko's question.
2      If you don't, you should tell him.
3      A   I don't recall.
4      Q   Did Dr. Varughese request that she
5  be permitted to go to New York State's Physician
6  Wellness Committee as opposed to going to the
7  internal Physicians' Wellness Committee at Mount
8  Sinai?
9      A   Yes, she did.
10     Q   Did you deny that request?
11     A   Yes.
12     Q   Why?
13     A   That's not the appropriate place
14 to go when we need to evaluate a resident.
15     Q   Why not?
16     A   The psychiatrists that work for
17 Physicians' Wellness are independent
18 psychiatrists, and they see the physician as a
19 patient and not as their responsibility to
20 evaluate patients for us.
21     Q   So is there a reason why having
22 Dr. Varughese seen as a patient would somehow be
23 less ideal than having her examined by
24 Dr. Fersh? How is Dr. Fersh viewing her not as
25 a patient?

### Page 80

1      A   Dr. Fersh is evaluating her for
2  performance issues in the workplace. Regular
3  psychiatrists have a different approach to that
4  kind of evaluation.
5      Now, I did not stop her from
6  seeing a psychiatrist. She could have seen
7  anybody she wanted to. And that person, if she
8  gave permission, could have sent us an
9  evaluation.
10     Q   Why was Paul Johnson involved in
11 your interviews? Why did you not, since you
12 were conducting the interviews for the Physician
13 Wellness Committee, conduct those independent of
14 the GME office?
15     A   Okay. We have to go back to the
16 beginning. The interviews I did with Paul
17 Johnson were to establish whether or not we need
18 to see her at Physician Wellness, and that was
19 because he works in the GME office which deals
20 with the double -- with Graduate Medical
21 Education. And he was obviously involved with
22 interviews or whatever went on by the people who
23 come in from the department of pathology to
24 interview the department members about the
25 issues that were raised.

### Page 81

1      Q   Do you know whether or not Paul
2  Johnson had his own purpose for being involved
3  in the interviews --
4          MR. McEVOY: Objection.
5      Q   -- than yours?
6          MR. McEVOY: Objection.
7      A   No.
8          MR. McEVOY: Note my
9      objection.
10     Q   Were you aware of Dr. Varughese's
11 request for mediation with Dr. McCash?
12     A   Mediation. No, I was not.
13     Q   Do you know why Dr. Jordan was not
14 referred to the Physician Wellness Committee?
15     A   I do not.
16          MR. McEVOY: Objection to
17     the form.
18     Q   Did you conduct any investigation
19 into an allegation that --
20          MR. McEVOY: Excuse me one
21     second.
22          (Pause.)
23     Q   Did you conduct an investigation,
24 Doctor, into an allegation that Dr. McCash had
25 alcohol on the job, had drunk alcohol on the

21 (Pages 78 - 81)

**Page 82**

1 job?
2    A    I did not investigate whether
3 Dr. McCash drank alcohol. What we did was go
4 up to the residents' room, and next to the
5 residents' room there is a little other kind of
6 room where there is a couch and a cabinet. And,
7 yes, we found that there was alcohol in that
8 cabinet. That's the extent of my investigation.
9 Then that gets turned over to human resources or
10 other people to deal with.
11    Q    Would drinking on the job be a
12 basis for a referral to the Physicians' Wellness
13 Committee?
14    A    Yes.
15    Q    Now, you had also referenced that
16 Dr. Varughese had incidents with regard to not
17 respecting authority.
18         Were there any authority figures,
19 besides Samuel McCash, who your investigation
20 turned up that she in some way disrespected?
21    A    When a resident is not following
22 necessary responsibilities of notifying the
23 chief residents of absences, lateness, illness,
24 and being difficult and argumentative about
25 altering schedules, that is difficulty with

**Page 83**

1 authority.
2    Q    But I was asking for names. Was
3 there anyone besides Samuel McCash who your
4 investigation turned up?
5    A    I don't recall. Except that there
6 are in some of the e-mails statements about
7 this, but I don't recall names of any particular
8 person.
9    Q    Do you recall the date that
10 Dr. Varughese was referred to you for you to
11 conduct your investigation as to whether she
12 should be referred to Physician Wellness?
13    A    I don't recall the date that I
14 received the telephone call from Dr. Pessin. So
15 it may have been early in January.
16    Q    Are you friends with Dr. Pessin
17 outside of Mount Sinai Medical Center?
18    A    No, no.
19    Q    Would you consider her to be a
20 personal friend?
21    A    No.
22    Q    Do you have experience as a
23 hematologist?
24    A    Yes.
25    Q    Do you still work as a

**Page 84**

1 hematologist?
2    A    I retired in 1998.
3    Q    Now, if an individual is found
4 to -- strike that.
5         If a resident has a friend who
6 dies of a drug overdose and has to go to grief
7 counseling, is that a basis for referral to
8 Physician Wellness?
9         MR. McEVOY: Objection to
10      the form.
11         You can answer.
12    A    I am not sure what you mean.
13    Q    Well, if a resident has a
14 traumatic event, whether it be a friend who dies
15 of a drug overdose or a relative who is killed,
16 can that form the basis for a referral to
17 Physician Wellness?
18    A    Can it form the basis? Usually
19 these are recommendations made by friends of the
20 resident or an attending in the department or so
21 on. If then the resident refuses to go, that
22 probably is not what somebody would refer --
23 would not necessarily refer to us. If they feel
24 that the depression or whatever is occurring is
25 severe enough to interfere with work in the

**Page 85**

1 workplace, then it is an indication for a
2 referral.
3    Q    Subject to any further questions,
4 I don't have anything further.
5         Oh, I am sorry. One last
6 question. Famous last words.
7         Who is on the Physician Wellness
8 Committee?
9         MR. McEVOY: When?
10    Q    During this period of January 2011
11 through --
12    A    Back then it was --
13         MR. McEVOY: You can tell
14      him.
15    A    -- Dr. Dan Hughes. And I did the
16 interviews.
17         MR. McEVOY: The question is
18      who was on the committee, not who
19      did what. Who was on the committee.
20    Q    Correct.
21    A    The committee consists of the
22 members of QCC, which is the Quality Control
23 Committee of the board of trustees.
24    Q    And how many members are there?
25    A    At least 11 or 12.

22 (Pages 82 - 85)

AA-338



Page 86

1    DR. VARUGHESE: That's --
2    MR. WRONKO: Subject to any
3    further questions --
4    MR. McEVOY: I have no
5    questions. We are done.
6    DR. VARUGHESE: On the QCC,
7    members of the board of committee,
8    but who are these people?
9    Q    Who are the members of the QCC?
10    A    Okay. Let me try to recollect.
11    So this was three years ago.
12    DR. VARUGHESE: Have a seat,
13    please.
14    A    To the best of my recollection,
15    the dean may have sat on it at that time. He no
16    longer is on it.
17    MR. McEVOY: Dr. Figur, to
18    make this easier, I think what you
19    have to say is -- you have been
20    asked what are the names of the
21    people who sat on the committee, not
22    what job they had, what position
23    they had, now or later. So just
24    think to yourself. Just give
25    Mr. Wronko the names, just the names

Page 87

1    of the people that you recall being
2    on the committee in roughly January
3    of 2011.
4    Ron?
5    MR. WRONKO: Sure.
6    A    Let me think. Dr. Nash,
7    Dr. Drayer, Ms. Lowy, Ms. Porter, Ms. Colgan,
8    Dr. Jagoda. That's all I can recall. But there
9    must have at least been four more.
10    Q    Were any of the details of your
11    interactions or Dr. Fersh's interactions with
12    Dr. Varughese shared with those members of the
13    QCC?
14    A    Dr. Fersh's things were not
15    shared. I don't think I ever brought it forward
16    to the rest of the committee because at the time
17    the department was going to start afresh.
18    MR. WRONKO: Okay. I have
19    nothing further.
20    (Time noted: 4:35 p.m.)
21
22
23
24
25

Page 88

C E R T I F I C A T E

1
2
3    I, LEAH ALLBEE, a Registered Professional
4    Reporter, Certified Court Reporter and Notary Public
5    of the States of New York and New Jersey, do hereby
6    certify that prior to the commencement of the
7    examination this witness was sworn by me to testify the
8    truth, the whole truth and nothing but the truth.
9
10    I do further certify that the foregoing is a
11    true and accurate transcript of the testimony as taken
12    stenographically by and before me at the time, place,
13    and on the date hereinbefore set forth.
14
15    I do further certify that I am neither of
16    counsel nor attorney for any party in this action, and
17    that I am not interested in the event nor outcome of
18    this litigation.
19
20
21
22
23    New York certificate No.: 01AL5001396
24    New Jersey certificate No.: 2366766
25

Page 89

ERRATA SHEET
VERITEXT/NEW JERSEY REPORTING COMPANY
1    800-227-8440
2    ASSIGNMENT NO. NJ1792048
3    CASE NAME: Varughese v. Mount Sinai Medical Center
DATE OF DEPOSITION: 1/8/2014
4    WITNESS' NAME: Arthur Figur
5
PAGE/LINE(S)/ CHANGE    REASON
6    ___/___ /_____
7    ___/___ /_____
8    ___/___ /_____
9    ___/___ /_____
10    ___/___ /_____
11    ___/___ /_____
12    ___/___ /_____
13    ___/___ /_____
14    ___/___ /_____
15    ___/___ /_____
16    ___/___ /_____
17    ___/___ /_____
18    ___/___ /_____
19    ___/___ /_____
20    ___/___ /_____
Arthur Figur
21
SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS ____ DAY
OF _____, 2014.
23
24    NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____

23 (Pages 86 - 89)

AA-339

Figur Tr. Ex. 3

AA-340

FIGUR 3

From: "Figur, Arthur" <arthur.figur@mountsinal.org>
Subject: QA-WORK-PRODUCT, PRIVILEGED AND CONFIDENTIAL
Date: January 18, 2011 3:54:50 PM EST
To: "Johnson, Paul F (MSSM-imail)" <Paul.F.Johnson@mssm.edu>

Timeline December 8, 2010

It is clear that the chief residents have responsibility in assigning work loads and ensuring that they are carried out
It is also clear that the head-moonlighter makes the decisions if moonlighting is necessary based on work load

1. Leena was assigned to gross specimens that day.

2. Moonlighters come in late afternoon and head-moonlighter assigns one or two moonlighters to assist the resident who is doing the grossing for the day.

3. Adrienne was the head-moonlighter.

4. Several months before they switched from 2 residents to split the grossing to have one resident gross.

5. The resident who grosses can ask for help if the load is heavy and the head-moonlighter's responsibility is to assess the load and to ensure that moonlighters work only when needed so as to save funds for the department.

6. There was a disagreement between the head-moonlighter and Leena about the moonlighters assignment.

7. Chief resident came in and clearly within his responsibility assigned Leena to certain breast cases and chief moonlighter to (prostates) others.

8. Leena's schedule was checked and it was a light day.

9. Later they noted that the second moonlighter was doing case/s assigned to Leena.

10. The chief resident, who was upset by Leena's not following direction and lying, in a stern loud voice admonished Leena.

11. Leena approached Dr. Bielweiss, who being on the phone had asked Dr. Jaffer for help because of the loud shouting in the hall by Leena.

12. Witnesses confirmed the loud stern voice of chief resident, but all informed us that Leena was shouting, out of control, enraged and threatening.

13. The next day one of the breast specimens which Leena said she finished grossing was hidden under the table not grossed. Dr. Bielweiss had found no orders for that specimen and when Leena was asked about it she said "what specimen?"

14. When presented with academic advisement she refused to accept it. THIS IS NOT A RESIDENT'S

D02379

AA-341

OPTION

I am giving this time frame to anchor tomorrow's interview.
Add, delete or correct before tomorrow's interview.

In addition all the emails that Dr.McCash sent us last week, should have been acted upon and met with discipline by the department after the events occurred. So that is out of our hands, unless when writing our report, we might want to put her behavior in context as a pattern and explain the frustrations her fellow house staff had with her past performance as a house officer and unprofessional behavior.

Art

Arthur M. Figur, MD
Associate Medical Director
The Mount Sinai Hospital
ext 88544

D02380

Page 1

1                UNITED STATES DISTRICT COURT

               SOUTHERN DISTRICT OF NEW YORK

2               Civil Action No.:  12 CIV 8812

3

    ----------------------------

4   LEENA VARUGHESE, M.D.,        :

5              Plaintiff,         :

6      v.                         :   DEPOSITION OF:

7   MOUNT SINAI MEDICAL CENTER, :   ADOLFO FIRPO, MD

    PATRICK LENTO, M.D.,

8   CARLOS CORDON-CARDO, M.D., :

    ADOLFO FIRPO, M.D., IRA J.

9   BLEIWESS, M.D., and ABC       :

    Corp. 1-10, and JOHN DOES

10  1-10,                         :

11             Defendants.        :

    ----------------------------

12

13

14         TRANSCRIPT of testimony as taken by and

15   before PATRICIA A. SANDS, a Shorthand Reporter

16   and Notary Public of the States of New York and

17   New Jersey, at the offices of RONALD J. WRONKO

18   LAW OFFICES, 315 Madison Avenue, New York, New

19   York, on Wednesday, October 30, 2013,

20   commencing at 10:02 in the forenoon.

21

22

23

24

25   Job No. NJ1758232

```
                                              Page 2
1        A P P E A R A N C E S:
2
3

         LAW OFFICES OF RONALD J. WRONKO, LLC
4        134 Columbia Turnpike
         Florham Park, NJ 07932
5        BY:  RONALD J. WRONKO, ESQ.
         For the Plaintiff
6        973 360-1001
         ron@ronwronkolaw.com
7
8
9        EDWARDS WILDMAN PALMER LLP
10       750 Lexington Avenue
         New York, New York 10022
10       BY:  IRA G. GREENBERG, ESQ.
11       For the Defendant
         212 308-4411
12       igreenberg@edwardswildman.com
13
14
15       ALSO PRESENT:
16         Amelie P. Trahant, Associate General Counsel
            Mount Sinai
17         Leena Varughese
           Raj Halliah
18
19
20
21
22
23
24
25
```

Veritext/NJ Reporting Company

800-227-8440

973-410-4040

AA-344

1
2                          I N D E X
3      WITNESS                      EXAMINATION
4      ADOLFO FIRPO, MD
5        Mr. Wronko                           5
6
7                        E X H I B I T S
8      NUMBER       DESCRIPTION                    PAGE
9      Firpo
10
11      1      CV                                10
12      2      Email                             61
13      3      Email                            131
14      4      Email                            141
15      5      Email                            161
16      6      Evaluation                       181
17      7      Email                            184
18      8      Email                            196
19      9      Re minutes acknowledgment        197
20     10      Email                            208
21     11      Email                            210
22     12      Email                            234
23
24
25

AA-345

Page 4

1                    E X H I B I T S, continued.

2          NUMBER          DESCRIPTION                    PAGE

3          Firpo

4

5          13      Email                          236

6          14      Email                          250

7          15      Email                          253

8          16      Email                          257

9          17      Email                          264

10         18      Email                          283

11         19      Notes                          288

12         20      Email                          293

13         21      Email                          307

14

15

16

17

18         Confidential portions ... 71-100, 299-300

19

           (Exhibits retained by counsel.)

20

21

22

23

24

25

AA-346

Page 28

1      Q     Okay, who else did you communicate

2  with?

3      A     Dr. Cordon-Cardo.

4      Q     Did Dr. Cordon-Cardo identify to you

5  any problems with any specific residents?

6      A     No.

7      Q     Who was it who extended you the

8  formal job offer?

9      A     Dr. Cordon-Cardo.

10     Q     When did that occur?

11     A     I don't remember exactly.

12     Q     Do you remember the month?

13     A     Yes, it was in June.

14     Q     How was the offer conveyed?

15     A     In writing.

16     Q     Did you accept the offer?

17     A     Yes.

18     Q     Did the offer identify a specific

19  position that you would be assuming?

20     A     Director of educational activities in

21  pathology.

22     Q     Prior to receiving the formal written

23  offer had anyone explained to you what your job

24  responsibilities would be in that position?

25     A     Not exactly.

AA-347

Page 29

1     Q   When was it that you received a --

2  well, did you ever receive a description as to

3  what your job responsibilities would be in that

4  position?

5     A   They described the general areas of

6  responsibilities.

7     Q   What were the general areas of

8  responsibilities?

9     A   Supervise and implement whatever

10  actions were necessary to ensure a high quality

11  training program.

12     Q   And assuming this position, was it

13  your understanding that you were becoming a

14  director of the residency program?

15     A   No.

16     Q   Who was the director at the time?

17     A   Dr. Patrick Lento.

18     Q   Was Dr. Lento staying on while at the

19  same time that you would be acting as the

20  director of educational activities?

21     A   Yes.

22     Q   Did you have an understanding as to

23  whether any of your job responsibilities would

24  overlap with Dr. Lento's?

25     A   Obviously.

AA-348

1    Q    How would they overlap?

2    A    The graduate medical educational

3  program is an educational activity formalized

4  under the requirements of ACGME.

5    Q    I understand it's a formal

6  educational activity, but I'm talking about

7  your specific job responsibilities.  How would

8  your job responsibilities overlap with those of

9  Dr. Lento?

10    A    What do you mean by "overlap"

11  exactly?

12    Q    Well, were the two of you performing

13  the same job responsibilities at any point?

14    A    Not at all.

15    Q    Okay.  So what were you charged with

16  doing?

17    A    Support and oversight.

18    Q    So support of what?

19    A    Of whatever was needed to satisfy the

20  requirements of the accreditation council.

21    Q    And when you say "oversight", what

22  exactly were you doing by way of oversight?

23    A    Revise the curriculum that was in

24  place against the standard established by the

25  requirement.

Page 31

1    Q    When was it that you accepted the

2    offer and assumed the position -- well, strike

3    that.  When was it that you assumed the

4    position of director of education?

5    A    Of educational activities?

6    Q    Yes.

7    A    On July 1, 2011.

8    Q    What became of your contract with the

9    DOD?

10   A    I -- it was cancelled without

11   prejudice.

12   Q    So you were able to move back to New

13   York as of July 1, 2011?

14   A    Yes.

15   Q    Were you working full time as the

16   director of educational activities as of

17   July 1, 2011 for Mount Sinai?

18   A    Yes.

19   Q    Upon assuming that job

20   responsibility, did you have an understanding

21   that you would have any job role over residents

22   in the residency program of pathology?

23   A    What do you mean?

24   Q    Well, you had indicated that you had

25   responsibilities to ensure that the ACGME

AA-350

1    policy apply to?

2        A    All of the things which are itemized

3    there, which are derived from the citations as

4    violations to the ACGME requirements.

5        Q    Excluding the plaintiff, do you know

6    during the time period that you were -- that

7    you began at the institution through the

8    present, of any residents who were put on steps

9    one through five, any one of those steps?

10       A    Yes.

11       Q    What residents?

12           MR. GREENBERG:  We are designating

13       this confidential.

14           MR. WRONKO:  Certainly.

15           MR. GREENBERG:  The portion dealing

16       with the names of the individuals.

17

18               - - -

19    This marks the beginning of a confidential

20           portion of the transcript.

21               - - -

22

23

24

25

AA-351

Page 72

1

2      A     Can I disclose the names?

3            MR. GREENBERG:  Yes, you can.  And

4      should.

5      A     Jackie Hechtman.

6      Q     Anyone else?

7      A     Dr. Jonathan Yao.

8      Q     Anyone else?

9      A     And Dr. Paul Azar.

10     Q     Let's start with Dr. Azar first --

11     well, strike that.

12         Can you think of anyone else besides

13     Dr. Hechtman, Dr. Yao and Dr. Azar?

14     A     No.

15     Q     Dealing first with Dr. Azar, can you

16     tell me what you recall in terms of how he was

17     disciplined under the resident misconduct

18     policy?

19     A     He received a verbal warning.  He did

20     not comply with what was expected to him.  He

21     received a second written warning, following

22     which he appealed that to me directly.

23         I referred him to Dr. Lento, who was the

24     program director.  They came to an agreement

25     that he would satisfy the requirement.  He came

Page 73

1   back and told me that everything was settled

2   and he will do it.  He did, and that was the

3   end of it.

4       Q    Going back to the verbal warning with

5   Dr. Azar, what did he not comply with?

6       A    I think it was making a morning

7   presentation on two occasions.  He missed

8   attendance at the required didactic conference

9   for more than 20 percent, or something like

10  that.  And he was required to do a make-up, and

11  he failed to do the make-up, so he got a second

12  infraction.  And then he agreed to make them

13  up, and he gave two make-up conferences.  It

14  was as simple as that.

15      Q    When did he receive the second

16  written warning?

17      A    Oh, I don't remember.

18      Q    Okay.  When you say that he appealed

19  the written warning, was that formal or

20  informal?

21      A    Informal.  They all knew that this

22  was open to discussion.  It was that each

23  resident has a faculty mentor with whom they

24  discuss any -- any issue.  I was there as a

25  neutral person to assist problems, and I always

AA-353

1     made that very clear to them that they could

2     come to me if there was any problem.  And there

3     was officially Dr. Lento, who was the program

4     director.

5          Q     Okay.  Now do you know what the

6     agreement was between Dr. Azar and Dr. Lento?

7          A     Yes, to make up the conference.

8          Q     Do you know whether Dr. Azar did, in

9     fact, make up the conference?

10         A     Yes, he did.  I was present at the

11    conference.  In those days I went to every

12    conference.

13         Q     When was it that he made up the

14    conference?

15         A     I don't remember.

16         Q     But you indicate that there was a

17    written warning.  Do you recall who issued the

18    written warning?

19         A     The written warning meaning that he

20    was given -- sent an email formally reminding

21    him that you have failed to satisfy the

22    requirements of the verbal warning, let this be

23    a written warning to you that you still in

24    lack, are not in compliance.  This will go into

25    your file, and if you make the remedial action

AA-354

1    this will be forgotten.

2        Q    Okay.

3        A    And he did.  And when he received

4    that in writing, he came in and mentioned to

5    me.  And I said, well, that's not a big issue,

6    just make it up.

7        And then he went and see Dr. Lento, which

8    I thought was the appropriate thing to do.

9    They negotiated how he would fulfill it.

10       Dr. Lento notified the chief resident, he

11   was scheduled, he did the conference, he did a

12   good job.  And that was it.  It was not a big

13   issue.

14       Q    Okay.  With regard to the agreement

15   that was ultimately satisfied, was that

16   confirmed in writing?

17           MR. GREENBERG:  Was what confirmed in

18       writing?

19       Q    The agreement between Dr. Azar and

20   Dr. Lento, that Dr. Azar would have a

21   conference in order to satisfy the requirement.

22       A    All of these things were being done

23   sort of informally, just to document that we

24   are indeed taking steps to make sure that the

25   requirements were being satisfied.

AA-355

1   MR. GREENBERG: The question was, was

2   it confirmed in writing.

3   THE WITNESS: No.

4   Q   Well, let me make sure that we

5   understand what a writing is.

6   You had indicated before that there were

7   emails. Was there an email as to the

8   understanding that Dr. Azar would present a

9   conference?

10   A   No.

11   Q   But there was, in fact, an email

12   reflecting the written warning?

13   A   Yes.

14   MR. GREENBERG: Okay. So I will

15   follow up with a letter that any emails or

16   documentation with regard to either the

17   verbal warning or the written warning with

18   regard to Dr. Azar be produced.

19   Q   How about Dr. Jonathan Yao, tell me

20   how he was disciplined under the resident

21   misconduct policy.

22   A   He was disrespectful towards one of

23   the female clerical staff members of the

24   department.

25   Q   When was that that Dr. Yao was

Page 77

1    disrespectful --

2         A    I don't --

3         Q    -- to a female clerical staff member?

4         A    -- remember exactly, but it was

5    somewhere around that time before December or

6    shortly thereafter.

7         Q    Were you still the director of

8    educational activities at that point?

9         A    Yes.

10        Q    How was he disrespectful towards a

11   member of the female clerical staff?

12        A    He went to do his task, his machine

13   wasn't working, he started yelling.  The staff

14   member walked in and tried to fix it.  He had a

15   temper tantrum, threw the things on the floor,

16   broke it, yelled at her.  She started to cry.

17        And somebody came and told me and said,

18   look what the resident did.  So I called up --

19   think I called Dr. Lento and I said this isn't

20   acceptable, you know, this is not the right way

21   people should behave.

22        Q    Now with regard to the machine that

23   was broken, what did he throw on the floor?

24        A    This, uhm --

25        Q    What did he throw on the floor?

Page 78

```
 1         A     The, uhm -- what do you use for
 2    dictation?
 3         Q     The dictaphone?
 4         A     Yeah.
 5         Q     So he threw a dictaphone on the
 6    floor?
 7         A     It was either that or the battery
 8    pack.  It had to do with the dictation
 9    equipment in the room.
10         Q     What was done -- was there anything
11    done to investigate that incident?
12         A     Of course.
13         Q     How was it investigated?
14         A     It was referred to Dr. Lento, it was
15    referred to HR, because it was a grievance of
16    an employee.  And they take it from there.
17         Q     Was this situation referred to the
18    graduate medical education office?
19         A     Of course.  That's lack of
20    professionalism.
21         Q     Was it referred to either Dr. Figger
22    (phonetic) or to Mr. Johnson?
23         A     Mr. Johnson.
24         Q     What discipline was administered to
25    Jonathan Yao?
```

AA-358

1       A   He was in academic advisement for

2  several months, and he was required to write a

3  letter of apology to the employee to her

4  satisfaction.  And to reflect on his behavior.

5       Q   Do you know whether or not Dr. Yao

6  was referred to the Physician Wellness

7  Committee?

8       A   No.  I mean, I know he was not

9  referred.

10      Q   Do you know whether there was any

11  investigation to determine whether he should be

12  referred to the Physician Wellness Committee?

13      A   No.

14      Q   Do you know whether or not Dr. Yao

15  was given a toxicology screening?

16      A   No.

17      Q   Do you know whether or not Dr. Yao

18  was given any type of psychiatric assessment?

19      A   I don't know.  Whatever was

20  investigated as part of the process in HR, is

21  HR.  I am not privy to all details.

22      All I know is that he did what he was

23  expected to do.  He fulfilled the requirement.

24  He wrote the letter, which he had to write

25  three times.  The employee was satisfied, he

AA-359

Page 80

1    was satisfied, and the faculty said that he had

2    complied and could go back to duty as usual.

3         Q    What did he have to write three

4    times?

5         A    The letter of apology to the employee

6    to whom he was disrespectful.

7         Q    Why did he have to write the letter

8    three times?

9         A    Because the first was not

10   sufficiently -- was not sufficient to express

11   acknowledging that his behavior was not

12   appropriate towards another employee.

13        Even though she is not a doctor, as a

14   doctor, you're supposed to treat everyone with

15   respect.  And he just -- his first letter just

16   say, I understand that you were offended by my

17   behavior, that's too bad, I'm sorry.

18        And that was not enough.  We wanted him to

19   acknowledge that his behavior was wrong.

20        Q    Okay.

21        A    And that he had to reflect on that.

22        And once he did that, and he gave an

23   apology for his behavior and what his behavior

24   was, then the employee was happy, he

25   acknowledged that.  And that was it.

AA-360

Page 81

1      Q    Well, you also indicated that he had

2    to reflect on his behavior.

3         How was he required to reflect on his

4    behavior?

5      A    He met with the designated faculty

6    member for over three or six months.

7      Q    Did he have to write a self

8    reflection?

9      A    His reflection was the actual letter

10   as he was evolving and discussing why was his

11   behavior not appropriate, how it could have

12   been better, what is a more professional

13   attitude to assume in situations like that.

14     Q    So his letter of apology and the self

15   reflection were, in your mind, one and the

16   same?

17     A    Yeah.

18     Q    Was he required to read any materials

19   on professionalism?

20     A    I don't know.

21     Q    Who was the faculty member who he had

22   to meet with?

23     A    Dr. Tamara Kalir.

24     Q    Was the academic advisement placed in

25   writing?

AA-361

Page 84

1       Q    Now, do you know whether or not

2   whatever he threw on the floor broke into

3   pieces or not?

4       A    I don't know.

5       Q    Were there any witnesses besides Ida

6   White to this particular conduct?

7       A    I am not sure, I believe there were.

8       Q    Did ever review any summary of this

9   incident or any results of an investigation?

10      A    No.

11      Q    Do you know who in HR conducted the

12   investigation?

13      A    No.

14      Q    Do you know whether or not GME

15   conducted their own investigation into the

16   incident?

17      A    I don't know.

18      Q    You had indicated that academic

19   advisement in this instance was minor.  Why do

20   you believe it was minor?

21      A    It's the first step of any misconduct

22   of any kind to any resident in any program.

23      Q    In your mind is academic advisement

24   disciplinary?

25      A    No.

AA-362

1       Q    Why isn't it disciplinary?

2       MR. GREENBERG:  In his mind?

3       A    On his mind?

4       Q    Well, let me ask you, your

5  understanding of academic advisement, is it

6  disciplinary, as the director of educational

7  activities?

8       A    It's advisement.  It's part of our

9  responsibility to make sure that they

10  understand the implications of their behavior

11  interactions, that some people do because they

12  are young and they are immature and they don't

13  know.  So you call them in and you advise them.

14      It's an academic advisement.  It's part of

15  your growth, it's part of the training.  If

16  they accept it and they respond to your point,

17  then you want to monitor that they follow that

18  advisement and that they cooperate with the

19  recommendations and that they do make an effort

20  to change, then that's it.  It's part of the

21  growing process.

22       Q    Is there a reason why Dr. Yao was not

23  required to read a book on professionalism?

24       MR. GREENBERG:  I object to the

25       foundation.  You may answer.

Page 210

1    to her that they would follow Dr. Jordan's

2    instructions?

3         A    (Reviewing document.)  What was the

4    question?

5         Q    The question was, did Dr. Jordan

6    request that either Dr. Najfeld or

7    Dr. Varughese respond and acknowledge the

8    request for coverage on that particular day?

9         A    No.  She said, let me know if there

10   is any problems.

11        Q    Okay.

12             MR. WRONKO:  Let's mark this.

13             (Exhibit 11 marked for

14        identification.)

15        Q    Okay, Dr. Firpo, I'm showing you

16   what's been marked as Firpo 11.  Please tell me

17   when you are ready.

18        A    (Reviewing document.)  Yes.

19        Q    All right.  So if we turn to the last

20   page of this exhibit, and that is, in fact, the

21   email that Dr. Jordan had sent which you had

22   indicated didn't request any followup from

23   Dr. Najfeld or Dr. Varughese.

24             And then at 10:31 a.m. Dr. Jordan sends a

25   followup email to Dr. Varughese asking her to

AA-364

Page 255

1       THE WITNESS:  No.

2       Q    Now, why was it that Dr. Varughese's

3   request for the change in elective was denied?

4       A    All of the residents are invited to

5   request their program before the new year

6   begins in July.  She explicitly requested to go

7   to GI as an elective.

8           Once the program, which is made for the

9   entire year, goes into effect and it's loaded

10  with new innovations, it's very difficult to

11  make changes, because it has a ripple affect.

12  So if you change someone, it affects everybody

13  else.  So the only way to make a change is by

14  agreement of everybody who is going to be

15  affected.  So the policy is not to accept to

16  make changes to the program.

17      Q    Was Dr. Varughese terminated in part

18  because of anything relating to her request for

19  a change from the GI rotation to the dermopath

20  rotation?

21      A    Not at all.

22      Q    Was there anything with regard to her

23  communications with you or with Dr. Lento that

24  resulted in any discipline arising out of her

25  request for the change in elective?

AA-365

1     A    Yes.

2     Q    What was it?

3     A    Her failure to follow instructions

4  and orders and established policy.

5     Q    Okay.  How does that relate to her

6  request for a change in her elective?

7     A    She made a request.  I explained to

8  her what the requirements were.  I agreed to do

9  everything possible.  To see if it was

10  possible.

11     I said the first thing should be let's be

12  to make sure that if you're going to go to

13  derm, there is going to be room for her there.

14  That's why I contacted Dr. Birge.  She said if

15  she's to come, it's okay.

16     Then I explained to her that the ultimate

17  decision was the chief residents, who had to

18  make all of the changes to the schedule and

19  discuss it with the program director.

20     Instead she went directly to Dr. Harpaz,

21  who then contacted Dr. Lento.  And the rest is

22  what is documented.

23     Q    Well, was it the issue that she went

24  to Dr. Harpaz, or was it the issue that she had

25  confronted you about the fact that the change

AA-366

1    had not been made?

2        A   Not at all.  They are all invited to

3    question and raise issues.  The fact that she

4    didn't follow instructions when the decision

5    had been made final by the program director,

6    after taking into account all of the

7    dimensions.  And this had already been done

8    even before she talked to me.

9        Q   So it had nothing to do with any

10    accusatory tone that she had taken with you?

11        A   Not at all.

12        MR. WRONKO:  Let's mark this.

13        (Exhibit 16 marked for

14    identification.)

15        Q   I will give you a moment to review

16    that email.

17        A   (Reviewing document.)  Yes.

18        Q   Okay.  With regard to the email that

19    appears on the very first page, was this your

20    summary of a meeting that you had with

21    Dr. Varughese?

22        A   Yes.

23        Q   When did that meeting take place?

24        A   Wednesday, September 7th.

25        Q   And is this everything that occurred

AA-367

Page 294

1    A    Let's go through due process.

2    Q    Who responded to that?

3    A    I think everybody.

4    Q    Okay.

5    A    Paul, Tiger Felix.

6         MR. WRONKO:  Okay, I will ask for the

7    response to that email to be produced.

8    Q    And were you supportive

9    of Dr. Varughese in terms of her taking a leave

10   of absence?

11   A    I actually suggested it.

12   Q    Did you make any observations of

13   Dr. Varughese on either September 15th or

14   September 16th with regard to her health

15   condition?

16   A    Yes.

17   Q    Okay.  What observations did you

18   make?

19   A    She was having difficulty fulfilling

20   her responsibilities that day.  She sat in her

21   desk, she was not responding.  I was called, I

22   came in, I asked to speak to her.  We went

23   private.  I said, what's wrong?

24        She told me that she was so distraught

25   that she was unable to function, and that's why

AA-368

1   she wouldn't be able to do -- to make the

2   presentation.

3           At that point I was very concerned about

4   her.  I said, you know if this is interfering

5   with your ability to perform, this may be

6   serious.  You have to look into this more

7   carefully.

8           Q     So with regard to those observations,

9   did you notice whether or not she looked like

10  she was having any type of a seizure?

11          A     Yes.

12          Q     So when was that, September 15th or

13  September 16th?

14          A     I don't remember exactly which of

15  those two days, but during our conversation I

16  observed that her eyes went blank and started

17  clicking, which is a typical representation of

18  what we learn in medical school, petit mal.

19          Q     So it was definitely on either

20  September 15th or September 16th --

21          A     One of those days.

22          Q     -- when that occurred?

23          A     I think.

24          Q     Now is there a reason -- strike that.

25          Do you know whether or not, uhm --

AA-369

1  Had you met with her on September the --

2  on both days, September the 15th and September

3  the 16th?

4  A  I know for sure I met with her on the

5  15th.

6  Q  Okay.  So let me show you what was

7  marked as Defendants' 47.  And this was an

8  email that you had sent to Dr. Varughese, and

9  in that email you don't tell her that she is

10  not to return without a doctor's note, an

11  assessment, for the leave of absence; right?

12  A  Not at three o'clock in the

13  afternoon.

14  Q  Okay.  So then the following day at

15  11:20 a.m. in Defendants' 48 is the email in

16  which you tell her that she's not permitted to

17  come back to the premises; is that accurate?

18  Until she has a doctor's note and an

19  assessment for the leave of absence.

20  A  Yes.

21  Q  Do you know whether or not she ever

22  got the doctor's note?

23  A  I don't remember.

24  Q  And did she ever get assessed for the

25  leave of absence, to your knowledge?

Page 297

```
 1          A    I don't remember exactly.

 2          She was -- there were two things going on

 3     at the same time.  The fact that she had been

 4     physically ill, in my opinion.  And I advised

 5     her to get -- to seek medical counsel because

 6     she said, I feel so bad and so distressed I am

 7     unable to function.  She was assigned to a

 8     responsibility of patient care in a clinical

 9     rotation.

10          So I said if you unable to function, this

11     is very important.  We care about you -- I was

12     so worried about her that day, that I asked her

13     to take it easy, don't stress herself.  And I

14     went and talked to the attending who was

15     working with her.  I said, you know, don't

16     overload her Dr. Varughese today with all of

17     her responsibilities, she's not feeling well.

18          And that's why I wanted her to stay,

19     because I wasn't sure if she was alone, if

20     anything would happen.

21          So I came in the afternoon, I saw that she

22     was okay, everything seems to be better, and

23     the next morning she came.  But then I had to

24     check with ACGME.  I wanted to present the

25     issue that she felt that she was unable to
```

AA-371

1    fulfill clinical responsibilities.  Then it was

2    decided that anybody in that condition was not

3    allowed to return, to assume responsibilities,

4    without a medical assessment.  At that same

5    time she said that she wanted to go on leave of

6    absence, a leave of absence related to health.

7         So both things became sort of intertwined.

8    She was not supposed to be there until she gave

9    proof that she was able to respond -- to return

10   to service.  At the same time, she was seeking

11   medical attention to evaluate if she was

12   qualified to go to leave of absence.  So there

13   were two different things.

14        The leave of absence issue was handled by

15   Human Resources as the due processes.  My

16   concern was should she be here physically,

17   doing service responsibilities, which she, in

18   her own opinion, was not fit to function.

19        Q    Okay.  Doctor, with regard to FMLA

20   for other residents, are you aware of any

21   residents, any other residents who took FMLA,

22   who before their FMLA was approved, were not

23   permitted to come into the workplace?

24        A    Yes.

25        Q    Who?

Page 311

1    say, which is that Dr. Firpo will read and

2    sign.

3        And the second is, since I am not

4    privy, was not privy and still am not

5    privy to the prior proceedings in the

6    case, what I said was, we would be ending

7    for the day now anyhow.  I suggest that my

8    colleague, Mr. McEvoy who is in charge of

9    the case, consult, and if he and

10   Mr. Wronko have the same understanding or

11   if Judge Francis has made a prior ruling,

12   then we will do whatever is appropriate.

13       But, having no knowledge of that, my

14   position is he is has had the seven hours,

15   and in any event we are not going past

16   6:10 anyway.  So if there is to be further

17   questioning, as to which I will deal with

18   it at a later time.  It's not going to be

19   today in any event.

20       MR. WRONKO:  Okay.  Thank you.

21       Thank you, Doctor.

22

23   (Deposition adjourned at 6:10 p.m.)

24

25

**AA-373**



1

ERRATA SHEET

VERITEXT/NEW JERSEY REPORTING COMPANY

2

800-227-8440

ASSIGNMENT NO. NJ1758232

3   CASE NAME: Varughese v. Mount Sinai Medical Center

DATE OF DEPOSITION: 10/30/2013

4   WITNESS' NAME: Adolfo Firpo

5

PAGE/LINE(S)/     CHANGE        REASON

6 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

7 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

8 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

9 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

10 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

11 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

12 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

13 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

14 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

15 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

16 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

17 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

18 \_\_\_\_/_____/ _____/_____

\_\_\_\_/_____/ _____/_____

19 \_\_\_\_/_____/ _____/_____

20

_____

Adolfo Firpo

21

SUBSCRIBED AND SWORN TO

22   BEFORE ME THIS_____DAY

OF_____, 2013.

23

_____

24     NOTARY PUBLIC

25   MY COMMISSION EXPIRES_____

Page 313

1                    C E R T I F I C A T E

2

3       I, PATRICIA A. SANDS, a Shorthand Reporter

4   and Notary Public of the States of New York and

5   New Jersey, do hereby certify that prior to the

6   commencement of the examination the witness was

7   sworn by me to testify the truth, the whole

8   truth and nothing but the truth.

9

10      I do further certify that the foregoing is

11  a true and accurate transcript of the testimony

12  as taken stenographically by and before me at

13  the time, place, and on the date hereinbefore

14  set forth.

15

16      I do further certify that I am neither of

17  counsel nor attorney for any party in this

18  action, and that I am not interested in the

19  event nor outcome of this litigation.

20

21

22  _____

23  New York Certificate No.:  01SA4974309

24  New Jersey Certificate No.:  2109345

25

AA-375

Page 314

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2           Civil Action No.:  12 CIV 8812

3

           ----------------------------
4     LEENA VARUGHESE, M.D.,        :

5               Plaintiff,          :

                                        CONTINUED
6       v.                        :  DEPOSITION OF:

7     MOUNT SINAI MEDICAL CENTER, :  ADOLFO FIRPO, MD

      PATRICK LENTO, M.D.,
8     CARLOS CORDON-CARDO, M.D.,  :

      ADOLFO FIRPO, M.D., IRA J.
9     BLEIWESS, M.D., and ABC      :

      Corp. 1-10, and JOHN DOES
10    1-10,                        :

11              Defendants.         :

      ----------------------------
12

13

14          TRANSCRIPT of testimony as taken by and
15    before PATRICIA A. SANDS, a Shorthand Reporter
16    and Notary Public of the States of New York and
17    New Jersey, at the offices of RONALD J. WRONKO
18    LAW OFFICES, 315 Madison Avenue, New York, New
19    York, on Wednesday, December 17, 2013,
20    commencing at 10:01 in the forenoon.

21

22

23

      Job No. NJ1783774
24

25

1    A P P E A R A N C E S :

2

3

     LAW OFFICES OF RONALD J. WRONKO, LLC

4    134 Columbia Turnpike

     Florham Park, NJ 07932

5    BY:  RONALD J. WRONKO, ESQ.

     For the Plaintiff

6    973 360-1001

     ron@ronwronkolaw.com

7

8

9    EDWARDS WILDMAN PALMER LLP

     750 Lexington Avenue

10   New York, New York 10022

     BY:  IRA G. GREENBERG, ESQ.

11   For the Defendant

     212 308-4411

12   igreenberg@edwardswildman.com

13

14

15   ALSO PRESENT:

16     Leena Varughese

       Raj Halliah

17

18

19

20

21

22

23

24

25

Page 316

1

2                        I N D E X

3     WITNESS                          EXAMINATION

4     ADOLFO FIRPO, MD

5       Mr. Wronko                        317

6

7                      E X H I B I T S

8     NUMBER        DESCRIPTION                    PAGE

9     A. Firpo

10

11

12

13

14

15

16

17

18

19              (Exhibits retained by counsel.)

20

21

22

23

24

25

AA-378

Page 317

1    A D O L F O   F I R P O,

2       having been sworn, was examined

     and testified as follows:

3

4    CONTINUED EXAMINATION

5    BY MR. WRONKO:

6       Q    Good morning, Dr. Firpo.  You're

7    appearing here for your second day of

8    deposition.  You were previously sworn.

9       Do you need me to repeat any of the

10   instructions I had given to you on the first

11   day of your deposition?

12      A    Good morning.  No, I don't.

13      Q    Dr. Firpo, did you draft a summative

14   evaluation for Dr. Leena Varughese?

15      A    Yes, I did.

16      Q    I'm going to show you what was

17   previously marked at the plaintiff's deposition

18   as Defendants' 57, and ask you just simply to

19   identify whether that is, in fact, the

20   summative evaluation that you drafted for the

21   plaintiff.

22      A    (Reviewing document.)  Yes.

23      Q    When was it that you drafted that

24   summative evaluation?

25      A    I don't exactly recall the date.

AA-379

Page 329

1        A    No.

2        Q    Are you under the influence of any

3 medication or substance that would impact your

4 recollection of such communications?

5        A    No.

6        Q    Now when you had testified on your

7 first day of deposition you had indicated that

8 Dr. Azar had received some disciplinary action.

9      Do you recall that testimony?

10       MR. GREENBERG:  Objection.

11       You can answer.

12       THE WITNESS:  Yes.

13       Q    Are you aware of the fact that he was

14 put on a final warning?

15       A    Yes.

16       Q    Why was he placed on a final warning?

17       A    I don't exactly remember the details.

18       Q    Do you remember any details at all as

19 to why he was placed on a final warning?

20       A    Yes.

21       Q    Please share them with me.

22       A    His behavior was considered

23 unprofessional in some aspects.  He was

24 reprimanded.  He did not respond to the warning

25 right away.  He was put in final warning, which

AA-380

Page 330

1   was immediately followed by a complete

2   rectification of his behavior.  He made all

3   corrective actions, fulfilled the requirements

4   and was allowed to proceed.

5          Q    You said that he did not respond to

6   the warning right away.

7          What warning was he given?

8          A    Oral.  He was called in private and

9   told -- it was called to his attention his

10  behavior wasn't acceptable.

11         Q    Who spoke with him in private?

12         A    I did.

13         Q    When did you speak with him?

14         A    I don't remember the exact dates.

15         Q    Do you recall the date of his final

16  warning?

17         A    No.

18              MR. WRONKO:  Okay, let's mark this.

19              (Exhibit 3 marked for

20         identification.)

21         Q    I'm showing you what has been marked

22  as A. Firpo 3.

23         I'll certainly give you a moment to review

24  that, but I -- I will let you review that.

25         Let me know when you are ready.

AA-381

1         A      (Reviewing document.)

2         Q      Okay, sir, are you ready?

3         A      Yes.

4         Q      Do you recognize this document?

5         A      Yes.

6         Q      Okay.  What is that document?

7         A      It's a disciplinary action notice to

8    Dr. Paul Azar.

9         Q      This is dated April 27, 2012.

10        Does that refresh your recollection as to

11   when he was placed on final warning?

12        A      Yes.

13        Q      And was this, in fact, an accurate

14   date as to when he was placed on final warning,

15   April 27, 2012?

16        A      I believe so.

17        Q      Okay.  Now does that refresh your

18   recollection as to when he was given his oral

19   warning prior to this notice?

20        A      Not really.

21        Q      Was it a matter of weeks, was it a

22   matter of months prior to this that he was

23   given an oral warning?

24        A      Maybe two weeks before.

25        Q      You indicated that he did not respond

AA-382

Page 342

1  strike that.

2      Do you know how many mandatory conferences

3  he failed to -- make-up conferences that he

4  failed to give?

5      A    No, I don't remember.

6      Q    Was it more than two?

7      A    Probably.

8      Q    So how was it that Dr. Azar did not

9  get placed on to final warning much earlier

10 than this with regard to the failure to give

11 make-up conferences?

12     A    I don't remember.

13     Q    Was Dr. Azar being given preferential

14 treatment by not being put on final warning

15 much earlier than this?

16     A    No.

17     Q    There is also a reflection here that

18 he refuse -- on the second page -- he refused

19 to cover for absent residents on the surgical

20 pathology service.

21     On how many occasions did he refuse to

22 cover for absent residents?

23     A    I don't know.

24     Q    Now with regard to the actions

25 necessary to improve the deficiencies, there is

Page 343

1    a reflection that he was supposed to daily

2    check in and check out with rotation

3    supervisors.

4         Did he for the remainder of his time in

5    the program check in and check out on a daily

6    basis?

7         A    Yes, he did.

8         Q    Did he, in fact, submit attendance

9    sheets for each and every day for you to review

10   and to sign?

11        A    Yes.

12             MR. GREENBERG:  Okay, I will follow

13        up with a letter.  I'll ask that those

14        attendance sheets be produced.

15        Q    Did he respond to all pages no later

16   than ten minutes after the page?

17        A    I don't remember.

18        Q    Did he write a ten-page double space

19   self-reflection?

20        A    I don't remember, I believe he -- I

21   don't remember.

22        Q    Do you know whether he submitted a

23   self-reflection by May 15, 2012?

24        A    I don't remember.

25        Q    Did he graduate from the program?

AA-384

Page 344

1          A    Yes.

2          Q    When did he graduate from the

3    program?

4          A    At this stated time, June 30th of

5    that year.

6          Q    Did he give a presentation with

7    acceptable presentation of educational value to

8    his peers prior to May 15, 2012?

9          A    Yes.

10         Q    What was the subject of the

11   presentation?

12         A    I don't remember.

13         Q    When was it that he gave the

14   presentation?

15         A    I don't remember.

16              MR. WRONKO:  Okay, I will ask that

17         documents reflecting that presentation be

18         produced.

19         Q    Did he attend all future resident

20   meetings following this final warning?

21         A    I don't know.

22         Q    Why was it that he was told how his

23   progress would be assessed?

24         A    For the sake of clarity.

25         Q    Going back to Dr. Varughese's final

AA-385

1        requirements as they existed at the time.

2        The requirements were in the process of

3        being refined and transitioning to a new

4        form.

5        Q    Dr. Azar on April 27, 2012 was a

6    fourth year resident; correct?

7        A    Yes.

8        Q    Did you draft his summative

9    evaluation?

10        A    Yes.

11        Q    Did he receive a satisfactory rating

12    in all of the categories?

13        A    Yes.

14        Q    In light of the fact that very deep

15    into his fourth year he had shown a pattern of

16    absenteeism from rotations, was habitually

17    failing to respond to pages and emails, had

18    shown a defined attitude and response to

19    remediation efforts, had refused to cover for

20    absent residents on the surgical pathology

21    service, had poorly prepared didactic

22    presentations, and shown a lack of regard for

23    his peers' education, why was it that he was

24    given a satisfactory rating on his summative

25    evaluation for professionalism?

1      A    He followed through all of the

2  required conditions, and he was considered to

3  have met and satisfied the expectations of all

4  of the faculty who had been involved in his

5  training from the beginning.

6      Q    Looking at the rather lengthy list on

7  the disciplinary action notice for Dr. Azar, do

8  you believe that Dr. Azar's infractions, in

9  terms of professionalism, were less severe than

10 those that were alleged to have been attributed

11 to Dr. Varughese?

12     A    No.

13     Q    So they were just as severe?

14     A    Yes.

15     Q    Why was he not terminated from the

16 program?

17     A    The impact of his behavior never

18 reached the level of her behavior, because he

19 was always able to be reached, to follow

20 through and to make up whatever was required.

21 He always admitted wrongdoing, and made every

22 effort to correct his behavior.

23     Q    Well, that isn't true --

24          MR. GREENBERG:  Excuse me.  You know

25 what I am going to say next, so I won't

AA-387

1      Q    Was there an assessment by his

2  advisers and peers of the quality of his oral

3  presentation?

4      A    Yes.

5      Q    Who gave him that assessment?

6      A    At the end of his lecture an

7  evaluation form was distributed and everybody

8  rated him.

9          MR. WRONKO:  Okay, let's mark this.

10        (Exhibit 4 marked for

11      identification.)

12      Q   Sir, I'm showing you what's been

13  marked as A. Firpo 4.

14     On the first day of your deposition you

15  had testified to an academic advisement issue

16  to Dr. Yao.  I'm showing you that academic

17  advisement.

18     Take a moment to familiarize yourself with

19  it.  When you are ready let me know.

20         MR. WRONKO:  In the interim I'm going

21      to mark another exhibit.

22     (Exhibits 5 through 7 marked for

23        identification.)

24      A   (Reviewing document.)  Yes.

25      Q   Okay, Doctor, do you recognize this

AA-388

1    document?

2            A    Yes.

3            Q    What is this document?

4            A    It's a notice of academic advisement

5    issued to Jonathan Yao on 25 January 2012.

6            Q    On the last page of the document is

7    that your signature?

8            A    Yes, it is.

9            Q    Did you draft this document?

10           A    Most of it, yes.

11           Q    Who else contributed to drafting the

12   document?

13           A    The institutional GME office,

14   Mr. Paul Johnson director of GME.

15           Q    Looking at this document do you

16   know -- strike that.

17           Looking at this document, was Dr. Yao

18   placed on academic advisement in part because

19   of any patient care related lapse?

20           A    Yes.

21           Q    How many patient care related lapses

22   did Dr. Yao have?

23           A    The ones stated in the document.

24           Q    And how many are there?

25           A    Two or three.

AA-389

Page 361

1    Q    Looking at those two or three patient
2  care related lapses, did you consider those
3  patient care related lapses to be serious?
4    A    Yes.
5    Q    Why did you consider them to be
6  serious?
7    A    Totally unacceptable behavior for a
8  senior resident at this level of training.
9    Q    What year of training was Dr. Yao in
10 at the point in time that he was placed on
11 academic advisement?
12   A    It was towards the second part of his
13 second year.
14   Q    Has Dr. Yao since graduated from the
15 program?
16   A    Yes.
17   Q    Have you prepared a summative
18 evaluation for Dr. Yao?
19   A    Yes.
20   Q    Was Dr. Yao given an acceptable score
21 or a passing score for professionalism?
22   A    Yes.
23   Q    Was he given a passing score for
24 patient care?
25   A    Yes.

AA-390

1       Q   Was there any category in which he

2   was marked as unsatisfactory?

3       A   No.

4       Q   Looking at the remediation plan for

5   Dr. Yao, there is an indication here that he

6   was to write a self-reflection statement of at

7   least four double-spaced pages in length

8   concerning his actions in each of the three

9   incidences described above.

10     Did he ever draft that self-reflection

11  statement of four double-spaced pages?

12      A   Yes.

13      Q   Was it four pages, the document that

14  he submitted?

15      A   I don't remember.

16      Q   Did he address each of the three

17  incidences described in this document?

18      A   Yes.

19      Q   The three incidences described in

20  this document, can you break them down -- what

21  were the three incidences?

22      A   Inadequate handling of the biopsy

23  specimen while in the neuropathology rotation.

24  His emotional outburst and abusive tone towards

25  an employee.  And failure to follow chief

AA-391

1    residents' instructions to help a subordinate

2    resident.

3         Q    In terms of the incidents, you had

4    indicated that there were two or three patient

5    care related lapses.

6         Are you lumping all of the patient care

7    lapses into one category or one incident, so to

8    speak?

9         A    Two incidents.  The first one with

10   the biopsy and the last one with helping

11   another resident with a dissection.

12        Q    Tell me what happened with the

13   biopsy.

14        A    During processing, the biopsy was

15   misplaced.

16        Q    For what length of time?

17        A    It was found ten days later.

18        Q    How would that impact patient care?

19        A    It delays the pathological diagnosis

20   of the specimen.

21        Q    What was the issue with helping

22   another resident?

23        A    Part of the responsibility of a

24   senior resident who is on call with a junior

25   resident is to supervise them, to make sure

Page 364

1     that they do handle the specimens properly and

2     obtain the necessary sections.  While he was

3     on-call, the junior resident, Dr. Lee, a

4     first-year resident, was dissecting what is

5     considered a more difficult, complicated

6     specimen.  He was expected to engage and guide

7     this resident, and yet he was not.  As noted by

8     the chief resident.  It was brought to his

9     attention when the chief resident left and came

10    back later and found out that he again had

11    dismissed it.

12         Q    Doctor, let me show you what was

13    marked as A. Firpo 5.

14              MR. GREENBERG:  Do you have one for

15         me?

16              MR. WRONKO:  Yes, I do.

17              MR. GREENBERG:  Thank you.

18              MR. WRONKO:  Sure.

19         Q    Can you identify what's been marked

20    as A. Firpo 5?

21         A    An email from Dr. Jonathan Yao

22    addressed to me, dated February 23rd, 2012,

23    including a copy of his reflection and letter

24    to Mrs. White.

25         Q    Why is it that you categorize the

AA-393

1    attachment as a "reflection"?

2        A    That's how he refers to it:  "I have

3    had the chance to deeply reflect on the

4    incidence in the gross room."

5        Q    Was this the self-reflection that was

6    required under the academic advisement for

7    Dr. Yao?

8        A    It was part of it.

9        Q    When you say it was part of it, do

10   you mean that this document is part of his

11   self-reflection?

12       A    This document is his reflection on

13   the incident involving Mrs. White.

14       Q    Was there a separate document

15   prepared by Dr. Yao reflecting on the other two

16   incidents?

17       A    I don't know.

18       Q    Why is it that you don't know that?

19       A    Dr. Kalir was a faculty advisor

20   assigned to work with him through this process.

21       Q    I will represent to you that the

22   court in this case has entered an order stating

23   that all documents relating to the

24   implementation of this academic advisement be

25   produced.  And in response this document with

AA-394

Page 366

1    the attachment of the letter to Ms. White was

2    produced, but there was no other reflection

3    produced.

4         Are you aware, sitting here today, of any

5    other self-reflection prepared by Dr. Yao

6    besides what was contained in this document?

7              MR. WRONKO:  Objection to form.

8              You can answer.

9              THE WITNESS:  No.

10   Q    Did you take any responsibility to

11   implement this notice of academic advisement?

12             MR. GREENBERG:  I'm sorry.  What do

13             you mean by implemented?

14   Q    To determine whether or not Dr. Yao

15   had met the remediation plan requirements.

16   A    I delegated that, the execution, to

17   Dr. Kalir.

18   Q    So is it your testimony that only

19   Dr. Kalir would know whether or not this

20   individual had satisfied the remediation plan?

21   A    Dr. Kalir determined at the end of

22   the advisement period that he had fulfilled all

23   of the requirements as specified in the

24   remediation plan.  She notified me of such, and

25   the case was closed.

Page 367

1     Q    Okay.  When you look at this document

2     on the first page, this is an email from

3     Dr. Yao to you.

4     A    Yes.

5     Q    And in it Dr. Yao writes:

6     "I have had made the corrections you

7     suggested for Ms. White."

8     So did you play an active role in terms of

9     implementing this academic advisement

10    remediation plan?

11    A    As Dr. Kalir was receiving the

12    document, particularly with Mrs. White, which

13    was my primary concern, we discussed how he was

14    responding to the advisement and we made

15    discussions what else should be expected of him

16    for this to be satisfactory.

17    He reviewed his thoughts, his wording

18    several times.  There was a final one that was

19    considered to be fully satisfactory.  She

20    informed him that this was satisfactory, and he

21    was sharing with me the fact that, you were

22    right, this is what I came up with.

23    Q    And is there a reason why, Doctor,

24    you would not see any other self-reflection

25    that Dr. Yao may have prepared?

AA-396

Page 402

1    be made do we make the schedule or not.  I said

2    assume she's not going to be here.  That's what

3    I'm referring to.

4        Q    You were not making reference to her

5    being terminated by that point?

6        A    No, not at that point.

7            MR. WRONKO:  Okay, unless your

8        counsel has any questions I have nothing

9        further.

10           MR. GREENBERG:  Not a chance in the

11       world.  We will read and sign.

12

13    (The deposition was concluded at 12:15 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

AA-397

Page 403

1   ACKNOWLEDGMENT OF DEPONENT

2           I, _____,

3   do hereby certify that I have read the

4   foregoing transcript of my testimony taken on

5   _____, 2013, and have signed it subject

6   to the following changes:

7

    PAGE LINE      CHANGE            REASON

8

9

10

11

12

13

14

15

16

17

18

19

20                        _____

21

    Sworn and subscribed to before me on this

22

    _____ day of _____, 2013.

23

24

25

AA-398

Page 404

1          C E R T I F I C A T E
2
3          I, PATRICIA A. SANDS, a Shorthand Reporter
4     and Notary Public of the States of New York and
5     New Jersey, do hereby certify that prior to the
6     commencement of the examination the witness was
7     sworn by me to testify the truth, the whole
8     truth and nothing but the truth.
9
10         I do further certify that the foregoing is
11    a true and accurate transcript of the testimony
12    as taken stenographically by and before me at
13    the time, place, and on the date hereinbefore
14    set forth.
15
16         I do further certify that I am neither of
17    counsel nor attorney for any party in this
18    action, and that I am not interested in the
19    event nor outcome of this litigation.
20
21
22    _____
23    New York Certificate No.:  01SA4974309
24    New Jersey Certificate No.:  2109345
25

AA-399

Firpo Tr. Ex. 11

AA-400

Firpo, Adolfo

| | |
|---|---|
| **From:** | Lento, Patrick <Patrick.Lento@mountsinai.org> |
| **Sent:** | Friday, August 12, 2011 12:26 PM |
| **To:** | Jordan, Adrienne (MSH) |
| **Cc:** | Firpo, Adolfo |
| **Subject:** | RE: Sarah Out Sick |

She said she would cover. I asked her to respond to your email so that you (as chief resident) could coordinate the rest of the day appropriately.

Pat Lento

-----Original Message-----
**From:** Jordan, Adrienne
**Sent:** Friday, August 12, 2011 12:18 PM
**To:** Lento, Patrick; Firpo, Adolfo (MSSM)
**Subject:** RE: Sarah Out Sick

I'm sorry, I am having difficulty interpreting that e-mail. Does that mean she will cover?

```
Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339
```

**From:** Lento, Patrick
**Sent:** Fri 8/12/2011 12:05 PM
**To:** Firpo, Adolfo (MSSM)
**Cc:** Najfeld, Vesna (MSSM); Jordan, Adrienne
**Subject:** RE: Sarah Out Sick

She did not respond to my page so I called her directly in the cytogenetics lab to speak with her. She indicated to me that since she did "not" say that she wouldn't cover that, in essence, meant she would cover. I indicated that this was not an appropriate approach and I asked her to please respond to the chief resident's (Dr. Jordan) email about coverage for this afternoon.

Pat

**Patrick Lento, M.D.**
Associate Professor, Departments of Pathology,
Internal Medicine, Division of General Internal Medicine
and Medical Education
Residency Program Director, Pathology
Mount Sinai Medical Center and School of Medicine
Box 1194
One Gustave Levy Place
New York, NY 10029
Tel: 212-241-9157
Fax: 212-876-4036
email:patrick.lento@mountsinai.org

This email and any attachments may contain confidential information which are intended for use solely by the addressee(s). If you are not the intended recipient of this email, please be aware that any dissemination, distribution, copying or other use of the email in whole or in part is strictly prohibited. If you have received this email in error, please notify the sender and permanently delete the original and all copies of the email, attachments and any printouts. Thank you.

15

D02196

AA-401

-----Original Message-----
**From:** Firpo, Adolfo [mailto:adolfo.firpo@mssm.edu]
**Sent:** Friday, August 12, 2011 11:47 AM
**To:** Lento, Patrick
**Cc:** Najfeld, Vesna (MSSM); Jordan, Adrienne; Varughese, Leena (MSSM-Imail)
**Subject:** RE: Sarah Out Sick
**Importance:** High

Dr. Lento:

This is very disconcerting. Do you mean that a resident, in this case Dr. Varughese, has not responded to
a page from you? The Residency Program Director?

Dr. Firpo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8ᵗʰ Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1612
ATTN: Dr. Firpo
New York, New York 10029-6574

---

**From:** Lento, Patrick [mailto:Patrick.Lento@mountsinai.org]
**Sent:** Friday, August 12, 2011 11:33 AM
**To:** Jordan, Adrienne (MSH); Varughese, Leena (MSSM-Imail); Firpo, Adolfo
**Subject:** RE: Sarah Out Sick

I spoke to Dr. Najfeld who said Leena is there and would be released at noon. I tried paging Leena to
confirm with her that she was to help cover on surgicals today since Sarah was out sick but she has not
returned my page yet.

Pat

-----Original Message-----
**From:** Jordan, Adrienne
**Sent:** Friday, August 12, 2011 10:31 AM
**To:** Varughese, Leena (MSSM-Imail); Grunes, Dianne; Lento, Patrick; Firpo, Adolfo (MSSM);
Najfeld, Vesna (MSSM); Bleiweiss, Ira; Morency, Elizabeth (MSSM-Imail)
**Subject:** RE: Sarah Out Sick

Leena,

16

D02197

AA-402

It is 10:30am. Please verify that you are in reciept of this e-mail so that I know coverage is taken care of and I can focus on my own rotation as well as let the rest of the surgical team know.

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339

**From:** Jordan, Adrienne
**Sent:** Fri 8/12/2011 8:50 AM
**To:** Varughese, Leena (MSSM-Imail); Grunes, Dianne; Guarino, Robert; Lento, Patrick; Firpo, Adolfo (MSSM); Najfeld, Vesna (MSSM); Bleiweiss, Ira; Morency, Elizabeth (MSSM-Imail); Klapper, Jeremy; Rosario-quinones, Frances; Ko, Mabel (MSSM-Imail)
**Subject:** Sarah Out Sick

Leena,

Sarah is out sick today. According to the "Policy on Absence/Coverage" you are the next resident up to be pulled to cover. She is assigned to grossing today on the Surgical service. I understand that this is your last day of cytogenetics and you must do an exit interview with Dr. Najfeld. Fortunately, Sarah is on the G2 service which is very light grossing. I am also asking that Bob Guarino possibly help by grossing extra breast specimens if he is able. This should dramatically reduce the amount you have to gross and allow you to meet with Dr. Najfeld when she has time.

Dr. Najfeld,
I understand that pulling a resident from your rotation is not ideal because your rotation covers a large amount of material in a very short amount of time. Unfortunately we have a resident who has called out sick several days this month and because of that I have had to pull numerous residents for coverage. Please believe me when I say Dr. Lento, Dr. Firpo, and myself do not consider pulling the resident on your rotation unless we are in dire need, and unfortunately at this point we are. I am deeply sorry for this. Leena will be able to meet with you this morning, however, for her exit interview and any final teaching you may have planned with her.

To everyone else,
I spoke with Dianne this morning. Apparently Sarah still has a significant amount of cases to sign out from yesterday. Dianne is going to try and sign out as much as she can in between grossing today. The remainder she will have to give to either the attendings directly or to the team on sign out today. Because Dianne is trying to keep up with her own service as well as ensure that Sarah's cases get signed out in a timely fashion, I am also asking the resident on GI to help Dianne with some of her GI specimens should the need arise today. Hopefully if we can all work together as a team the work load will be evenly distributed. Thank you all.

Let me know if there are ANY problems

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339

17

D02198

AA-403

Firpo Tr. Ex. 16

AA-404



EXHIBIT

Dept Ex. 14
Int Ex 11/14/11

From: "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>
Date: Wed, 7 Sep 2011 15:21:43 -0400
To: "Barnett, Scott" <scott.barnett@exchange.mssm.edu>, "Johnson, Paul F (GME) (MSSM-imail)"
<paul.f.johnson@mssm.edu>
Cc: "Cordon-cardo, Carlos" <carlos.cordon-cardo@exchange.mssm.edu>, "Patel, Shema"
<shema.patel@exchange.mssm.edu>
Subject: RE: Meeting - Dr. Leena Varughese - New developments today

Scott and Paul:

She showed up here in my office initially friendly but claiming that she was once more she was being treated unfairly. Eventually the denial of her request to drop off the GI elective surfaced. She explained that Dr. Harpaz had told her that she could drop off the rotation if she found a replacement because he had no one else to gross GI since his fellows were away that week. She said that she intended to contact all the other residents directly to see if someone else was willing to take her place in the GI elective. I told her that doing that would be inappropriate since her request had already been denied by everyone. She said that it was her right to seek a change in her schedule as she had made it known a long time ago that she wanted out of the elective GI rotation. She claims that she had requested to drop this elective at a resident's meeting and Dr. Mabel Ko had taken her place in it, she said that she was originally scheduled to do the elective in September and not in October and claims that she was placed on the rotation in October not knowing it; she said she brought this to the attention of one of the chief residents when the official schedule came out and had insisted on being taken off the rotation but was denied that option. She assumed that I would make it happen despite the fact that she was not following the policy of making her formal request to the chief residents. She was ccd the e-mail in which I asked the chief residents to consider her request objectively and fairly. She acknowledges having received it but insists that I had committed to make it happen for her since I had mentioned that it may be possible when we first talked about it as a possibility. I reminded her that at all times I made her fully aware that there was a process to follow and that I would only intervene on her behalf; the final decision would depend on the feasibility of altering the schedule, finding a replacement, having the agreements of both attendings. At no time did I guarantee that the change would be made, much less by my decision alone.

During quite a heated discussion I happened to glance at Scott's e-mail and told her that I would look into it over the next two days and would get back to her. She finally left my office but still insisting that denial of her right to substitute a rotation for another rotation was unfair and discriminatory of her as a resident whose training was being paid by the Federal government. I assured her that my intentions were to be objective and fair towards everyone, but made it clear that I would not make a unilateral decision in favor of her or anyone else, nor violate established policies and not consider the potential impact on the rest of the program and all involved.

Thanks for your support and guidance,

Firpo 16

D01170

AA-405

Adolfo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

**From:** Barnett, Scott
**Sent:** Wednesday, September 07, 2011 2:17 PM
**To:** Firpo, Adolfo; Johnson, Paul F (GME) (MSSM-Imail); Barnett, Scott
**Subject:** Re: Meeting - Dr. Leena Varughese - Any ideas to reply to her?
**Importance:** High

I suggest telling her you need a day or two to think this over and we will discuss tomorrow
Scott

Scott H. Barnett, M.D.
Associate Professor of Medical Education and Pediatrics
Associate Dean for GME
President, Faculty Council
Mount Sinai School of Medicine
(P) 212-241-6694
(f) 212-426-7748

**From:** "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>
**Date:** Wed, 7 Sep 2011 14:09:25 -0400
**To:** "Johnson, Paul F (GME) (MSSM-Imail)" <paul.f.johnson@mssm.edu>, "Barnett, Scott"
<scott.barnett@exchange.mssm.edu>
**Subject:** FW: RE: Meeting - Dr. Leena Varughese - Any ideas to reply to her?

Paul and Scott:

I had to officially notify her that her request to drop the elective in GI had been denied. I never told her that it would be fine to do so. I mentioned to her that requests for changes to the schedule were processed by the chief residents and that the attending had to agree to the change. Dr. Harpaz did not agree to allow her to drop off the rotation and actually reminded her that this had to be processed by the Chief residents when she approached him directly despite our discussion and recommendations on how to approach this issue.

D01171

AA-406

Should I wait until tomorrow to respond to her?

Adolfo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

**From:** leena varughese [mailto:leena.varughese@mssm.edu]
**Sent:** Wednesday, September 07, 2011 1:46 PM
**To:** Firpo, Adolfo
**Subject:** Re: RE: Meeting - Dr. Leena Varughese
**Importance:** High

Dr. Firpo,

I attempted to call you several times and only to be connected to say hello and then for the call to be dropped promptly afterwards.

I will discuss with Dr. Petersen any of the specifics regarding the HP rotation. Do you mind emailing me a copy of the objectives for the Hemepath rotation?

Three, I don't understand why Dr. Harpaz wants to deny me from switching from GI to Dermpath. If the concern is finding a resident to gross for the month as Dr. Harpaz had mentioned to me when I discussed this issue with him earlier last month, then it would be possible to look at the schedule and perhaps transfer another resident on CP rotation to that slot.

At this point in the training, I really need more exposure to Dermpath and I want Dermpath as my elective. This is most certainly not an unreasonable request by any means. In fact, many of the residents are granted away rotation/electives already and even while they were supposed to be on duty at the hospital. I find all of this to be rather egregiously unfair towards me and partiality or favoritism towards some individuals. This is very unacceptable as this is affecting my training in pathology at this hospital. In fact, I would like to point out the lack of rotation asssignment to Hematology over the past 4 years,

AA-407

excess number of Microbiology at the VA and additionaly months at Englewood despite my lack of interest in this rotation. The implication that this is simply all acceptable because Dr.Lento finds this to alright does not translate immediately to adequate or sufficient training or comparable training to other residents in my cohort, and those who graduated las t year or those immediately junior to my year.

Finally, I have made plans to attend the Osler in Tampa, Fl next month and have made all the necessary arrangements. I will be submitting the forms for reimbursement and will be away for the first week of October. You also said that it should not be a problem for me to switch my elective. I appreciate your time and look forward to coming to an amicable resolution.

Regards,

Dr. Varughese

----- Original Message -----
From: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
Date: Wednesday, September 7, 2011 12:07 pm
Subject: RE: Meeting - Dr. Leena Varughese
To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>

> Dr. Varughese:
>
> 1.     Thank you for your e-mail. I don't understand what the
> problem was with the phone and why the communication was lost each
> of the two times you called this morning. It is fine to meet next
> week, Wednesday 14 September  at 9:00AM in my office.
>
> 2.     I understand this week you started a new rotation in
> Hematopathology.*     Have you met with your supervisor yet?
> *     Were you made aware of the goals and objectives of this
> rotation?*     Were you given a detailed schedule describing
> your daily responsibilities and work hours?
> *     Are there any special tasks that will be assigned to you
> as a 4th year resident?
> *     Were all your questions answered and any concerns you
> might have had properly addressed?
>
> 3.     I must also inform you that your request for dropping off
> the elective GI rotation with Dr. Harpaz was denied. You will
> report to begin that rotation as scheduled.
>
> Sincerely,
>
> Dr. Firpo
>
> Adolfo Firpo, M.D.,M.P.A.,FCAP
> Professor and Director
> Pathology Educational Activities
> Department of Pathology,
> The Mount Sinai School of Medicine.
> The Mount Sinai Hospital

D01173

AA-408

> Phone: 212-659-8214
> Fax: 212-348-7556
> E-mail: adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>
>
>
> Office Address:
> Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
> 1425 Madison Avenue and E98th Street
> New York, New York 10029-6574
>
> Mailing address:
> One Gustave L. Levy Place, Box 1619
> ATTN: Dr. Firpo
> New York, New York 10029-6574
>
>
>
>
> -----Original Message-----
> From: leena varughese [mailto:leena.varughese@mssm.edu]
> Sent: Wednesday, September 07, 2011 11:46 AM
> To: Firpo, Adolfo
> Subject: Meeting
>
> Dr. Firpo,
>
> I am emailing to apologize for not being able to meet with you
> this morning at 9am. I attempted to call you and have a
> conversation over the telephone several times this morning but the
> call was dropped every single time. Anyway, I was wondering if we
> could reschedule for another time this week or the next. I usually
> sign out around 2 pm and go to the GI conferences around 4 pm.
> Thank you.
>
> Dr. Varughese
>
>

D01174

AA-409

Firpo Tr. Ex. 3

(Day 2)

AA-410



Disciplinary Action Notice

27 April 2012

To:    Paul Azar, M.D.

It has been brought to the attention of the Department of Pathology that you are not meeting expectations for your performance as a senior Pathology resident. In order to address the deficiencies outlined below, we have developed a remediation plan that delineates our expectations for your performance.

1. **Type of Disciplinary Action:**

   This disciplinary action notice represents a Final Warning.

2. **Observed Deficiencies:**

   A.  Professionalism
       Your behavior and performance raise questions about your professional development and growth during your final year of residency training. You have repeatedly failed to meet standards of professionalism as evidenced by, but not limited to, the following examples:

   - Failure to report to the blood bank rotation. During a Blood Bank rotation ((November 18 to December 15, 2011) you were assigned to the service responsible for the transfusion reaction workups and you were expected to attend blood bank rounds, but you neglected to do so for one week. In your absence, the blood bank attending provided coverage for your clinical responsibilities and repeatedly attempted to contact you via pager and e-mail. You did not respond to any of the attempts to contact you. When you were confronted, you claimed to have been "in the library" and that your pager "did not work" in the library.

   - General failure to respond to pages and emails. Residents are expected to carry their pagers on their person during work hours and to respond to pages and emails in a timely fashion. You have habitually failed to adhere to this requirement. You have been unresponsive to pages so frequently that attendings trying to reach you have opted to page one of the chief residents to inquire as to your whereabouts. Your lack of responsiveness is inexcusable and creates an unnecessary burden on faculty, staff, the chief residents, and your peers.

   - Habitual absenteeism and tardiness. On Clinical Pathology rotations, you have been frequently absent or tardy. Your pattern of absence from the Clinical Pathology laboratories has been so extreme that attending physicians have actually called chief residents and me to inquire whether you were still a resident in our program.

   - Defiant attitude in response to remediation efforts. On several occasions when you were scheduled to give make-up presentations (as a consequence of your persistent poor attendance of mandatory conferences), you exhibited an insubordinate and unprofessional attitude toward the chief residents; made

CONFIDENTIAL

*Afirgo  3*

D02927

AA-411

excuses for your failures to make the presentations; and simply failed to give the presentations altogether.

B.    Systems-Based Practice

There are multiple documented instances of your purposeful disregard for established policies and procedures, including the following:

- Absenteeism from required morning didactic activities, including conferences, and disregarding reminders from chief residents, me, and Dr. Scott Barnett, the Associate Dean for Graduate Medical Education.
- Refusal to cover for absent residents on the Surgical Pathology service in violation of the established policy.
- Poorly prepared didactic presentations and lack of regard for your peers' education. Although some of your presentations at recent CP case presentation conferences have been very good and praised by faculty, you have not devoted sufficient time or thought to your didactic presentations to your peers, which have been of poor quality. Your presentations on average have been only 10-15 minutes long (when residents are given a 25-minute time slot), consistently lack depth, and appear to have been prepared at the last minute.

3.    **Actions Necessary to Improve on These Deficiencies:**

A.    Professionalism

- Daily check-ins and check-outs with rotation supervisors to ensure that you satisfactorily fulfill all of your assigned tasks and duties. You will come to work every day and remain productively engaged until the end of the work day. You will sign in and out each work day, and the attendance sheets must be submitted to me for review and signature.
- You are required to respond no later than 10 minutes after any page. You will respond to all work related e-mails on the same day you receive them with a copy to me. You are required to provide your cell phone number to your rotation supervisors, so that you may be reached directly at all times without involving the chief residents.
- You are required to write a 10-page, double-spaced self-reflection on the anticipated demands and challenges of Pathology practice. This self-reflection must also describe what you have learned from this final warning and the impact of this warning on your readiness to enter independent Pathology practice upon graduation from the program. The self-reflection must be submitted to me no later than May 15, 2012.

B.    Systems-Based Practice

- You are required to review your presentations with your rotation supervisors well in advance so that you will have sufficient time to prepare at least one acceptable presentation of educational value to your peers before May 15, 2012.
- You must attend all future resident meetings and may no longer claim ignorance about departmental and program policies and procedures. Your attendance at resident meetings will reinforce your understanding of these policies and will eliminate any potential confusion regarding performance expectations.

CONFIDENTIAL

AA-412

4. How Progress Will Be Assessed:

    A.   Multisource feedback. Weekly reports from your rotation supervisors, sign-in and out sheets, and other feedback obtained by the program.

    B.   A review of the self-reflection exercise due May 15, 2012.

    C.   An assessment by your advisors and peers of the quality of your oral presentations.

5. Deadline for Demonstration of Improvement:

You must improve your performance immediately.

6. Consequences of Failure to Show Improvement:

If you are unable to improve your performance, you will be subject to further disciplinary action, up to and including termination from the program. Your performance during this final period will also be factored into your summative performance evaluation, which may in turn impact the determination of your eligibility for board-certifying examinations.

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. Requests should be directed to David Reich, MD, President of the Medical Board, in care of the Medical Staff Office at Box 1116. If you do not appeal this action, it will become final at the end of the appeal period.

Sincerely,

Adolfo Firpo-Betancourt, M.D., M.P.A., F.C.A.P.

Please sign below to attest that you have read and understood the above content and consequences.

Resident Signature: _____

CONFIDENTIAL

D02929

AA-413

Firpo Tr. Ex. 4

(Day 2)

AA-414



MOUNT SINAI
SCHOOL OF
MEDICINE

The Lilian and Henry M. Stratton-Hans Popper
Department of Pathology

One Gustave L. Levy Place
Box 1194
New York, NY 10029-6574

Phone: (212) 241-0014
Facsimile: (212) 289-2899

25 January 2012

Dr. Jonathan Yao, MD
PGY-2 Resident
Department of Pathology

RE: Notice of Academic Advisement

Dear Dr. Yao,

I am writing as Director of the Pathology Residency Program (the "Program") of the
Department of Pathology ("the Department") at The Mount Sinai Hospital to inform you
that that you are being placed on academic advisement. On several recent occasions, your
performance has not met departmental standards for Professionalism, Interpersonal and
Communication Skills, Practice-Based Learning and Improvement, and Patient Care.

Summary of Unsatisfactory Performance:

On October 7, 2011, a temporal artery biopsy was performed by Dr. Harry Schanzer,
Clinical Professor of Vascular Surgery. As a Resident on a Surgical Pathology rotation,
you were assigned to handle this specimen, and your dictation stated that you submitted
the specimen after cross-sectioning in a single cassette. However, you did not submit the
cassette, and the specimen was missing for ten days. On October 13, 2011, Dr. Susan
Morgello, Professor of Pathology and Neuroscience, wrote to you to express her concern
over the missing specimen and asked you to participate in the search. On October 17,
2011, Ms. Liuba Correa, Senior Laboratory Aide, found the missing specimen in a plastic
container where you had grossed it. The specimen was desiccated when it was found, but
staff were able to process it despite the significant delay. The discovery of the specimen
in the area where you had worked on it indicates that you did not respond adequately to
Dr. Morgello's request, did not take any responsibility for the specimen, and did not
communicate with others regarding its possible whereabouts. Your actions jeopardized
Patient Care. Moreover, your failure to participate in the search for the specimen, to
acknowledge your role, and to identify and address your own errors demonstrates serious
deficiencies in Professionalism, Interpersonal and Communication Skills, and Practice-
Based Learning and Improvement.

On December 21, 2011, you were assigned to a rotation in Surgical Pathology. Ms. Ida
Ross-White, Records Processing Supervisor, was assisting you with the Voicebrook
dictation device when you became agitated, cursing in a loud voice and slamming down

CONFIDENTIAL

D02930

*Afigo Y*

**AA-415**

the device, which caused the battery pack to break off. On December 22, 2011, I met with you to discuss this incident in the presence of Ms. Shenna Patel, Department Administrator, at which time you acknowledged having difficulty with the dictation software, but denied raising your voice or throwing or slamming the device. I asked you to write a detailed account of the incident. That afternoon you sent me an email simply stating, "My conduct in the gross room is always professional. Nothing was thrown. Nothing was broken. I expressed frustration at situation *[sic]*." I responded with an email informing you that your account was insufficient in detail, and asked me to send me a more substantial statement by December 27, 2011. You never submitted this statement to me. Residents are expected to demonstrate compassion, integrity, and respect for others, and to communicate effectively with their colleagues. Your outburst in the gross room displayed a lack of Professionalism and poor Interpersonal and Communication Skills. Your subsequent denial of your actions and failure to follow my instructions also demonstrate serious deficiency in these competency areas.

On December 30, 2011, you and Dr. Alice Li, a Pathology PGY-1 Resident, were assigned in Surgical Pathology to gross surgical specimens as partners. One of the specimens to be grossed was a Whipple specimen to rule out duodenal carcinoma. Because this was a GI specimen that was too complex for a PGY-1 Resident to dissect independently, you were responsible for grossing it. (Dr. Li had never grossed such a specimen before, with or without direct supervision.) However, you reassigned the case to Dr. Li and left the grossing area. When Dr. Adrienne Jordan, a Chief Resident in the Program, came to the area and found Dr. Li working alone on this specimen, she paged you to ask you to return to your assigned tasks. You did not respond to the page. Dr. Jordan was finally able to reach you by calling the Division of Dermatopathology office. When she reminded you of the need to complete your assigned tasks in Surgical Pathology, you responded that "it wasn't [Dr. Jordan's] business" and that she "needed to stay out of it." Dr. Jordan then reminded you that you were responsible for grossing the Whipple specimen, and you told her that you understood. Despite these explicit instructions, Dr. Jordan returned to the gross room approximately two hours later to find Dr. Li completing the gross dissection of the same Whipple specimen by herself. (Before Dr. Jordan returned, Dr. Hongfa Zhu, Assistant Professor of Pathology and Attending Pathologist, had voluntarily intervened to provide Dr. Li with guidance during the case.) Your absence from the grossing room and failure to fulfill your responsibilities on the Surgical Pathology service constitute a serious lapse in Patient Care and Professionalism. In refusing to accept the instructions of Dr. Jordan, you exhibited an unacceptable lack of Professionalism and poor Interpersonal and Communication Skills. Of greatest concern to the Program, you essentially forced a more junior Resident to assume tasks that had been assigned to you, even though the junior Resident lacked sufficient experience and supervision to safely complete these tasks. Your poor judgment is especially concerning given the ACGME requirement that mandates direct supervision of PGY-1 Residents when they perform their first three procedures of any kind.

Each of these incidents is serious. Taken together, they form a pattern of unprofessional and irresponsible behavior, and indicate that your professional growth in the Program is below departmental standards. Because of these deficiencies, you will be required to take action in order to meet expectations for your performance.

2

CONFIDENTIAL

AA-416

**Remediation Plan:**

I have designed the following plan to help you in achieving acceptable performance in Patient Care, Medical Knowledge, Practice-based Learning and Improvement, Interpersonal and Communication Skills, and Professionalism.

1. You must follow all departmental policies and procedures, and you must ensure that all of your clinical activities meet the standard of care.
2. You must respond in a timely and professional fashion to instructions from your supervisors, and must be present to complete tasks associated with your assigned rotations.
3. You must provide appropriate supervision of more junior learners.
4. Your conduct must be professional and respectful at all times.
5. You must write a self-reflection statement (of at least four double-spaced pages in length) concerning your actions in each of the three incidents described above. You are expected to detail how you could have approached each situation in a better fashion, to comment on Professionalism and its role in these circumstances, and to identify areas for your future professional growth. You must submit this self-reflection to me (with a copy to Dr. Tamara Kalir, Associate Professor of Pathology and Director, Division of Gynecologic Pathology) by March 1, 2012.
6. You must write a letter of apology to Ms. Ross-White acknowledging the inappropriateness of your behavior on December 21, 2011. This letter must be delivered to Ms. Ross-White by February 17, 2012, with a copy sent to me and Dr. Kalir.
7. You must meet monthly with Dr. Kalir to review your progress with respect to the ACGME competencies.

During the advisement period, your performance will be closely monitored in each of the areas outlined above. In three months, I will meet with you to review your performance while under academic advisement. This review will include but will not be limited to written evaluations of your performance. The Department is committed to providing as much direction and support as possible to help you meet our expectations.

You have many strengths, and we are hopeful that this remediation plan will allow you to overcome these difficulties and to realize your full potential as a pathologist. We must make it clear, however, that if you are unable to improve your performance you will be subject to disciplinary action, up to and including termination from the Program.

Sincerely,

Adolfo Firpo-Betancourt, MD, MPA, FCAP
Residency Program Director
Department of Pathology

Resident Acknowledgment:

Jonathan Yao, MD

3

CONFIDENTIAL

D02932

AA-417

Page 1

```
 1
 2                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 3               Civil Action No.:  12 CIV 8812
 4
                 ----------------------------
 5    LEENA VARUGHESE, M.D.,          :
 6                    Plaintiff,      :
 7        v.                          :     DEPOSITION OF:
 8    MOUNT SINAI MEDICAL CENTER,  :     SHEMA PATEL
      PATRICK LENTO, M.D.,
 9    CARLOS CORDON-CARDO, M.D.,     :
      ADOLFO FIRPO, M.D., IRA J.
10    BLEIWESS, M.D., and ABC        :
      Corp. 1-10, and JOHN DOES
11    1-10,                          :
12                    Defendants.    :
                 ----------------------------
13
14
15            TRANSCRIPT of testimony as taken by and
16    before PATRICIA A. SANDS, a Shorthand Reporter
17    and Notary Public of the States of New York and
18    New Jersey, at the offices of RONALD J. WRONKO
19    LAW OFFICES, LLC, 315 Madison Avenue, New York,
20    New York, on Wednesday, November 20, 2013,
21    commencing at 10:00 in the forenoon.
22
23
24
25    Job No. NJ1766343
```

**Page 2**

```
 1  A P P E A R A N C E S :
 2
 3  LAW OFFICES OF RONALD J. WRONKO LLC
    134 Columbia Turnpike
 4  Florham Park, New Jersey 07932
    BY:  RONALD J. WRONKO, ESQ.
 5  For the Plaintiff
    973 360-1001
 6  ron@ronwronkolaw.com
 7
 8
    EDWARDS WILDMAN PALMER LLP
 9  750 Lexington Avenue
    New York, New York 10022
10  BY:  IRA G. GREENBERG, ESQ.
    For the Defendants
11  212 308-4411
    igreenberg@edwardswildman.com
12
13
14
15  ALSO PRESENT:
16
      Leena Varughese
17    Raj Halliah
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2
 3
 4
 5
 6
 7        IT IS HEREBY STIPULATED AND AGREED, by
 8  and between the attorneys for the respective
 9  parties hereto, that this examination may be
10  sworn to before any Notary Public.
11
12        IT IS FURTHER STIPULATED AND AGREED
13  that the sealing and filing of the said
14  examination shall be waived.
15
16        IT IS FURTHER STIPULATED AND AGREED
17  that all objections to questions except as to
18  form shall be reserved for trial.
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2            I N D E X
 3  WITNESS           EXAMINATION
 4
 5  Mr. Wronko           5
 6
 7          E X H I B I T S
 8  NUMBER   DESCRIPTION        PAGE
 9  Patel
10
11  1   Email              75
12  2   Email              75
13  3   Drawing            99
14
15  Confidential portions ... 46-50, 62-66
16
17
18
19  (Exhibits retained by counsel.)
20
21
22
23
24
25
```

**Page 5**

```
 1  S H E M A  P A T E L ,
 2    Mount Sinai Medical Center
      1425 Madison Avenue,
 3    New York, New York 10029,
      having been sworn, was examined
 4    and testified as follows:
 5        MR. WRONKO:  Usual federal
 6    stipulations?
 7        MR. GREENBERG:  Whatever we have been
 8    using.
 9  EXAMINATION
10  BY MR. WRONKO:
11    Q   Good morning, Ms. Patel.
12    A   Good morning.
13    Q   My name is Ronald Wronko, I'm an
14  attorney who has been retained by Dr. Varughese
15  in a suit that she has brought against Mount
16  Sinai Medical Center and a number of individual
17  defendants.
18    Have you ever been deposed before?
19    A   No.
20    Q   So this is a new experience for you.
21    As you can tell, we have a court reporter,
22  who can only take down your verbal responses to
23  my questions.  So that means that if you nod
24  your head or you shake your head, the court
25  reporter can't take that down.  So you have to
```

Page 94

1  at a subsequent date?
2      A   I don't recall.  I don't recall the
3  day, if you're referring to September 19th or
4  20th.
5      Q   Okay.  Well, let's deal with
6  September 19th first.  You said that she came
7  to your office.
8      What do you recall about that?
9      A   I recall she just had a brief
10  question about the FMLA paperwork, or we had to
11  do a designation form.
12      Q   Do you know whether or not she came
13  to your office in response to any message you
14  may have left on her cell phone?
15      MR. GREENBERG:  Objection.
16      You can answer that.
17      THE WITNESS:  It could have been from
18  my message I left her regarding the FMLA
19  paperwork, yes.
20      Q   What was the designation form?
21      A   It's a form that states she's
22  requesting asking an FMLA.
23      Q   Did there come a point where you ran
24  into Dr. Varughese at a Starbucks prior to
25  going to work in the morning?

Page 95

1      A   Yes.
2      Q   When was that, what was the date of
3  that?
4      A   It was either the morning of
5  September 19th or the 20th.
6      Q   So tell me what occurred at the
7  Starbucks.
8      A   I was with my husband, and she
9  approached me saying she had a question about
10  the FMLA.
11      Q   Did she ask you the question at the
12  Starbucks?
13      A   Yes.
14      Q   And what was her question?
15      A   About deferring her FMLA, and that
16  she had felt better and that she did not want
17  to take it.
18      Q   How did she appear to you?
19      A   Fine.
20      Q   What else was said in the Starbucks?
21      A   That was it.
22      Q   Did you stay with her upon leaving
23  Starbucks, or did you go your own separate way?
24      A   I was walking out and she was still
25  speaking to me about her FMLA, and that was it.

Page 96

1      Q   So what happened next, did you go to
2  work?
3      A   She came back with me to my office.
4      Q   Why is it that she came back to your
5  office?
6      MR. GREENBERG:  Note my objection.
7      You can answer.
8      MR. WRONKO:  Strike that.
9      Q   Do you know why she came back with
10  you to your office?
11      A   No.
12      Q   Had Dr. Varughese told you during
13  that walk or in the Starbucks that she was
14  going to be reporting back to work?
15      A   She did.
16      Q   Did you have any problem with that?
17      A   I knew she wasn't supposed to report
18  to work.  So, you know, as she was walking with
19  me I told her I would ask Dr. Firpo where you
20  were supposed to report to.
21      Q   Was it in any way confrontational
22  between the two of you?
23      A   No.
24      Q   Was Dr. Varughese fine with following
25  you to your office?

Page 97

1      A   Yes.
2      Q   Where was your office located?
3      A   It's in Ichan building, first floor.
4      Q   How large is your office?
5      A   It's about 400 square feet,
6  approximately.
7      Q   What furniture was in your office at
8  that time?
9      A   A desk, a chair, two side chairs --
10  or actually only one side chair at the time.
11      Q   Where did Dr. Varughese sit in your
12  office?
13      A   She sat across from me on the side
14  chair.
15      Q   She was on the side chair?
16      So I would ask for you to, if you could,
17  can you draw for me the layout of your office.
18      A   Sure.
19      Q   And we'll mark it once you draw it.
20      A   (Witness complies.)
21      Q   And so I see on here in terms of what
22  you have drawn, a door, a side chair, your
23  desk, another chair and cabinets.
24      Now is the chair that you have marked, not
25  the side chair, but the chair that you have

25 (Pages 94 - 97)

AA-420

**Page 102**

1　written, you have the computer -- I would
2　assume you put the computer and the keyboard on
3　the far right-hand side, almost on the edge.
4　　You didn't have your computer right on the
5　edge of the desk; right?
6　　A　Correct. It was like --
7　(Indicating.)
8　　MR. GREENBERG: Indicating toward the
9　end.
10　　Q　Towards the end. And how about the
11　keyboard, was that on the desk or to the side?
12　　A　It was on the desk, right in front of
13　the keyboard. Or the desktop, excuse me.
14　　Q　And you have your phone sort of
15　floating in mid-air. Where exactly was your
16　phone?
17　　A　It was here. (Indicating.)
18　　Q　So you did your desk -- you've
19　extended the length of the right-hand side of
20　the desk now, making it a full L.
21　　Did your desk connect with the cabinets in
22　the back?
23　　A　Yes.
24　　Q　All right. On that particular day
25　when Dr. Varughese was there, what files were

**Page 103**

1　on your desk?
2　　A　I don't recall.
3　　Q　What was the subject matter of the
4　files on your desk?
5　　A　I don't recall.
6　　Q　How many files were on your desk?
7　　A　At any given time I have 20, 30 files
8　on my desk.
9　　Q　Well, I'm not asking any given time,
10　I'm asking about that morning. How many did
11　you have?
12　　A　I don't recall.
13　　Q　What was the color of the -- well,
14　strike that.
15　　Were the files, were the contents of the
16　files in folders, were the contents of the
17　files freestanding -- how were they organized
18　on your desk?
19　　A　They're in the folders.
20　　Q　What were the color of the folders?
21　　A　I don't recall.
22　　Q　Did you have color-coded folders?
23　　A　No.
24　　Q　Once Dr. Varughese sat down, did you
25　have any conversation with her?

**Page 104**

1　　A　Excuse me?
2　　Q　Once Dr. Varughese sat down, did you
3　have any conversation with her?
4　　A　The conversation was that I would
5　find out where she was supposed to report to.
6　　Q　What did you do in that regard, if
7　anything?
8　　A　I reached out to Dr. Firpo.
9　　Q　How did you reach out to him?
10　　A　I don't recall if it was phone or
11　email.
12　　Q　Did you reach out to anyone else?
13　　A　No.
14　　Q　Was there a point in time when you
15　left the room?
16　　A　Yes.
17　　Q　Why did you leave?
18　　A　There was a visitor to see
19　Dr. Davis's administrative assistant, because
20　he or she had a meeting with Dr. Davis.
21　　Q　So first, who was the visitor?
22　　A　I don't recall who it was.
23　　Q　How did you know there was a visitor?
24　　A　They came to my office.
25　　Q　Who was Dr. Davis's administrative

**Page 105**

1　assistant?
2　　A　Joanne Fink.
3　　Q　Was Joanne Fink there that day?
4　　A　She was.
5　　Q　Where was her office in relation to
6　yours?
7　　A　It's in the very back of the suite.
8　　Q　All right, so let's back up.
9　　You mention a suite. Was your office
10　located in an office suite?
11　　A　Yeah, on the first floor.
12　　Q　All right. So what do you mean by
13　that? So if I'm walking on to the first floor,
14　would all of the offices be enclosed within --
15　would all of the offices be enclosed?
16　　A　Enclosed --
17　　Q　In a suite?
18　　A　Yes.
19　　Q　So you would have to enter a door in
20　order to get into the suite of offices?
21　　A　Yes.
22　　Q　How many offices were there?
23　　A　I don't know how many offices there
24　are in the suite.
25　　Q　Can you estimate?

27 (Pages 102 - 105)

AA-421

Page 106

1    A    Sure, 15 to 20 approximately. I
2    mean, I don't know.
3    Q    Where was your office in relation to
4    the entrance to the suite?
5    A    My office is towards the front.
6    Q    Where was Ms. Fink's office located?
7    A    In the very back.
8    Q    How many -- well, strike that.
9    Did you escort this visitor to the back of
10   suite?
11   A    No.
12   Q    Where did you escort the visitor?
13   A    Just to the walkway that would lead
14   to her office.
15   Q    Where was that walkway in relation to
16   your office?
17   A    It was right outside my office.
18   Q    Did you have any conversation with
19   the visitor?
20   A    Other than showing the visitor where
21   the office was, no.
22   Q    How long were you gone from your
23   office?
24   A    Probably like thirty seconds.
25   Q    And what happened upon your return?

Page 107

1    A    I found Dr. Varughese going through
2    my files.
3    Q    And when you say "going through your
4    files," what exactly was she doing?
5    A    She had opened a file and was looking
6    inside of it.
7    Q    Now, when you say "opened a file," I
8    would assume you mean that one of your file
9    folders was turned open. Were any of the
10   papers moved that were contained within the
11   folder, or had just the file folder been
12   opened?
13   A    She was sifting through the papers
14   that were inside of the file folder.
15   Q    All right. So you said that she
16   opened a file and was looking inside of it, so
17   you say now she was sifting through it.
18   So when you say she was sifting through
19   it, what exactly was she doing?
20        MR. GREENBERG: Objection to form.
21        You can answer.
22        THE WITNESS: She had the folder open
23   and she was looking at the papers that
24   were inside of it.
25   Q    So she was turning through pages in

Page 108

1    the folder?
2    A    Correct.
3    Q    Sitting here today, do you know what
4    those pages pertained to?
5    A    No, I do not know.
6    Q    Do you know how the folder was
7    labeled?
8    A    No.
9    Q    Since you were only gone for
10   seconds -- well, strike that.
11   How long -- strike that again. Third
12   strike and I'm out.
13   How deep was the folder, in terms of
14   paperwork?
15   A    I don't recall.
16   Q    So you don't know whether it was ten
17   inches thick or a millimeter thick?
18   A    No.
19   Q    How many pages had she gone through?
20   A    I don't recall.
21   Q    Had she gone deep into the file in
22   the seconds you were gone?
23   A    No.
24   Q    What did you say to Dr. Varughese?
25   A    I asked Dr. Varughese what she was

Page 109

1    doing, why she was going through my files. She
2    claimed she wasn't.
3    Q    Was anything else said?
4    A    Yes, I said, you know, you're in
5    someone else's office, you don't go through --
6    it's unprofessional for you to go through
7    anyone's files when you're in someone else's
8    office. And then she said, "Chill out, what's
9    the big deal?"
10   Q    So did you use the term
11   "unprofessional" when you spoke with her?
12   A    Yes.
13   Q    Had you ever read the final written
14   warning that had been issued to Dr. Varughese?
15   A    I don't recall.
16   Q    Did anyone tell you in department
17   leadership to keep tabs on Dr. Varughese?
18   A    No.
19   Q    Up until that point when that
20   occurred, were you aware that there were
21   discussions to terminate Dr. Varughese?
22   A    Can you repeat the question.
23   Q    Were you aware of any discussions to
24   terminate Dr. Varughese when that occurred?
25   A    The event in my office?

28 (Pages 106 - 109)

**Page 118**

1  A  No.
2  Q  Did you have any conversations with
3  Dr. Davis about Leena Varughese?
4  A  No.
5  Q  Do you know whether anyone else did?
6  A  No.
7  Q  Did Dr. Davis participate in any
8  meetings about Dr. Varughese?
9  A  No.
10  Q  Did Dr. Davis ever get notified, to
11  your knowledge, that Dr. Varughese was being
12  terminated?
13  A  To my knowledge, no.
14  Q  Do you have any knowledge as to why
15  Dr. Davis would have acted in a very surprised
16  manner when Dr. Varughese appeared at a
17  convocation the night before she was
18  terminated?
19  MR. GREENBERG:  Objection.
20  Foundation.  You can answer.
21  THE WITNESS:  No.
22  Q  Did you ever speak to your
23  supervisor, Mr. Silverstein, about
24  Dr. Varughese?
25  A  No.

**Page 119**

1  Q  Were you ever in -- well, strike
2  that.
3  Do you know whether or not Dr. Silverstein
4  was aware of issues with Dr. Varughese?
5  A  No.
6  Q  Did you have more than one office?
7  A  No.
8  MR. WRONKO:  Okay, I don't think I
9  have anything further.
10  MR. GREENBERG:  No questions.
11  We'll read and sign.
12
13  (Deposition concluded 12:20 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

**Page 120**

1
2  ACKNOWLEDGMENT OF DEPONENT
3  I, _____,
4  do hereby certify that I have read the
5  foregoing transcript of my testimony taken on
6  _____, 2013, and have signed it subject
7  to the following changes:
8
PAGE LINE     CHANGE          REASON
9
10
11
12
13
14
15
16
17
18
19
20
21
22
_____
Sworn and subscribed to before me on this
23
_____ day of _____, 2013.
24
25

**Page 121**

1  C E R T I F I C A T E
2
3  I, PATRICIA A. SANDS, a Shorthand Reporter
4  and Notary Public of the States of New York and
5  New Jersey, do hereby certify that prior to the
6  commencement of the examination the witness was
7  sworn by me to testify the truth, the whole
8  truth and nothing but the truth.
9
10  I do further certify that the foregoing is
11  a true and accurate transcript of the testimony
12  as taken stenographically by and before me at
13  the time, place, and on the date hereinbefore
14  set forth.
15
16  I do further certify that I am neither of
17  counsel nor attorney for any party in this
18  action, and that I am not interested in the
19  event nor outcome of this litigation.
20
21
22
_____
23  New York certificate No.: 01SA4974309
24  New Jersey certificate No.: 2109345
25

31 (Pages 118 - 121)

AA-423

Page 1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2          Civil Action No.:  12 CIV 8812
3
           --------------------------------
4     LEENA VARUGHESE, M.D.,        :
5               Plaintiff,          :
6        v.                         :   DEPOSITION OF:
7     MOUNT SINAI MEDICAL CENTER, :     CARYN TIGER
      PATRICK LENTO, M.D.,
8     CARLOS CORDON-CARDO, M.D.,   :
      ADOLFO FIRPO, M.D., IRA J.
9     BLEIWESS, M.D., and ABC       :
      Corp. 1-10, and JOHN DOES
10    1-10,                         :
11              Defendants.         :
      --------------------------------
12
13
14          TRANSCRIPT of testimony as taken by and
15    before PATRICIA A. SANDS, a Shorthand Reporter
16    and Notary Public of the States of New York and
17    New Jersey, at the offices of RONALD J. WRONKO
18    LAW OFFICES, 315 Madison Avenue, New York, New
19    York, on Wednesday, December 17, 2013,
20    commencing at 12:49 in the forenoon.
21
22
23
24
25

AA-424

---

Page 2

APPEARANCES:

LAW OFFICES OF RONALD J. WRONKO, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
BY: RONALD J. WRONKO, ESQ.
For the Plaintiff
973 360-1001
ron@ronwronkolaw.com

EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue
New York, New York 10022
BY: IRA G. GREENBERG, ESQ.
For the Defendant
212 308-4411
igreenberg@edwardswildman.com

ALSO PRESENT:
Leena Varughese
Raj Halliah

---

Page 3

**INDEX**

WITNESS          EXAMINATION

Mr. Wronko              4

**EXHIBITS**

NUMBER   DESCRIPTION          PAGE
Tiger

| 1 | Meeting notes | 29 |
| 2 | Email | 61 |
| 3 | Email | 71 |
| 4 | Meeting notes | 76 |
| 5 | Meeting notes | 81 |
| 6 | Meeting notes | 90 |
| 7 | Email | 92 |

Confidential portions ... 21-24, 140-141

(Exhibits retained by counsel.)

---

Page 4

CARYN TIGER-PAILLEX,
having been sworn, was examined
and testified as follows:

EXAMINATION
BY MR. WRONKO:

Q   Good afternoon.
Do you prefer Tiger-Paillex, or Tiger or
Paillex?

A   Tiger is fine.

Q   Okay, Ms. Tiger, my name is Ronald
Wronko.  I have been retained by Dr. Varughese
in a suit that she has brought against Mount
Sinai Medical Center as well as a number of
individual defendants.

Have you ever had your deposition taken
before?

A   Once.

Q   What type of a matter was it?

A   I don't recall.  It was a long time
ago.

Q   Okay.

A   Employment, but I don't recall.

Q   Was it in connection with your
employment with Mount Sinai Medical Center?

A   Yes.

---

Page 5

Q   Do you recall what the allegation was
in the case?

A   No.

Q   So you may be familiar with what's
going to go on here today.

We have a court reporter who can only take
down your verbal responses to my questions.
That means that if you nod your head or you
shake your head, the court reporter can't take
that down.  So you do have to verbalize.

A   Okay.

Q   If you answer my question I will make
an assumption that you understood it.  So it is
important that you tell me that you don't
understand my question so that I can rephrase
the question.

The court reporter can only take down one
person at a time.  So it is important that even
if my voice trails off, make sure that I have
finished my question before you give your
answer.

You're represented by counsel, so if there
is an objection placed on the record, allow us
to work out that objection before you begin
your response.

---

2 (Pages 2 - 5)

**AA-425**

Page 50

1    A   At that meeting?
2    Q   Yes.
3    A   Uhm, she told me about who was
4    present at the meeting based on my meeting with
5    her. She advised me of people that were there
6    and who she spoke with.
7    Q   Let me show you what was previously
8    marked as Pessin 14 at Dr. Pessin's deposition.
9    A   Okay. (Reviewing document.)
10   Q   Tell me when you are ready.
11   A   (Reviewing document.) Okay.
12   Q   Have you seen Pessin 14 before?
13   A   Yes.
14   Q   And what is Pessin 14?
15   A   It's an email from Dr. Pessin to me
16   on January 3rd.
17   Q   And does this email reflect that
18   Dr. Pessin-Minsley was aware of Dr. Varughese's
19   complaint as of January 3rd, 2011?
20   A   Yes.
21   Q   Do you recall specifically notifying
22   Dr. Pessin of the complaint?
23   A   If I contacted her before I got this
24   email?
25   Q   Yes.

Page 51

1    A   I don't recall.
2    Q   Do you have any knowledge as to how
3    Dr. Pessin found out about the complaint if it
4    wasn't through a communication with you?
5        MR. GREENBERG: He's asking you for
6    knowledge. He's not asking you to
7    speculate.
8        THE WITNESS: Yeah.
9    A   No.
10   Q   Now a list of witnesses is provided
11   below.
12   A   Uhm hmm.
13   Q   Did you defer to this list of
14   witnesses when conducting your own
15   investigation?
16   A   Are you asking if I met with all of
17   these people?
18   Q   I'm asking whether or not you used
19   this list as the basis upon which you decided
20   who you would interview?
21   A   No.
22   Q   Who did you interview?
23   A   I interviewed Dr. McCash. I
24   interviewed Dr. Lento. I met with Dr. Pessin
25   at some point, I don't recall when, but I met

Page 52

1    with her regarding this. And Dr. Bleiwess.
2    Q   When you met with Dr. McCash was
3    anyone else present?
4    A   No.
5    Q   Tell me what was said at your meeting
6    with Dr. McCash.
7    A   I would have to refer to my notes. I
8    don't --
9    Q   You have no recollection sitting here
10   today?
11   A   Well, I can tell you that I spoke
12   with him about Dr. Varughese's complaint, but
13   not the details specifically.
14   Q   Did you find that any of the
15   allegations that Dr. Varughese had reported
16   were corroborated by Dr. McCash?
17   A   That any of the allegations that
18   Dr. Varughese had complained about?
19   Q   Yes. Were any of her allegations
20   corroborated?
21   A   The one allegation that was
22   corroborated was that it was not clear as to
23   the responsibility of who assigns the
24   moonlighters or the PAs.
25       There is a person responsible for

Page 53

1    assigning the moonlighters, there is a chief
2    and then there is a resident. But who is
3    responsible for determining who uses the
4    moonlighters and how was a question. Everybody
5    thought somebody differently.
6    Q   From your meeting with Dr. McCash did
7    you find or did you obtain any information to
8    indicate that Dr. McCash was in any way
9    unprofessional in his dealings with
10   Dr. Varughese on December the 8th, 2010?
11   A   Yes.
12   Q   What's the basis of your answer?
13   A   Uhm, he admitted to raising his voice
14   out of frustration, and that he had claimed
15   that he worked out the assignment of what
16   Dr. Varughese would be responsible for, what
17   the others in the lab would help with.
18       He had asked her to do specific duties,
19   and from his point -- from his claim, he was
20   advised that when he left after it was all
21   agreed upon who was going to do what, when he
22   left the room Dr. Varughese had asked one of
23   the moonlighters or PA assistants, one of the
24   people there to do some of the work that was
25   assigned to her by Dr. McCash. When he found

14 (Pages 50 - 53)

Page 118

1    A    I don't recall if I drafted that one.
2    Q    You don't know whether you drafted
3  it?
4    A    I don't remember. I know I was
5  involved, I don't remember if I drafted it.
6    Q    Did Dr. Firpo keep you in the loop in
7  terms of what was going with Dr. Varughese
8  through August of 2011?
9    A    I don't recall.
10    Q    Were you at all involved with
11  Dr. Varughese's request to change her elective
12  in late August into September of 2011?
13    A    At some point I was, I don't recall
14  when.
15    Q    What involvement did you have?
16    A    Just made aware that she wanted to
17  change. I don't recall the specifics in how I
18  was involved.
19    Q    Did you participate or did you
20  conduct an investigation into a complaint that
21  Adrian Jordan had made about Dr. Varughese in
22  terms of her not feeling safe in the workplace?
23    A    I met with Adrian Jordan in regards
24  to her not feeling safe in the workplace.
25    Q    How were you initially made aware of

Page 119

1  that complaint by Dr. Jordan?
2    A    She spoke with Dr. Firpo.
3    Q    Did Dr. Firpo then communicate with
4  you?
5    A    I don't remember if it was him
6  directly.
7    Q    Well, you did speak with Dr. Jordan
8  then?
9    A    Yes.
10    Q    Was anyone present when you met with
11  her?
12    A    No.
13    Q    Tell me what happened during the
14  meeting.
15    A    I don't recall. I would have to look
16  at my notes.
17    Q    So you have no independent
18  recollection of the substance of the meeting
19  without referring to your notes?
20    A    I don't want to misspeak. I know she
21  was concerned, and asked -- spoke with
22  Dr. Firpo. And somehow it got to me meeting
23  with her.
24    Q    Well, I will show your notes,
25  Firpo 19.

Page 120

1    A    Okay.
2    Q    If you can just as a matter of
3  procedure identify those notes.
4    A    These are my notes.
5    Q    From your meeting with Dr. Jordan on
6  September the 14th, 2011?
7    A    Yes.
8    Q    Now, what was your understanding
9  prior to you interviewing Dr. Jordan of what
10  the complaint was that Dr. Jordan was making?
11    A    I'm sorry, what was the question?
12    Q    What was your understanding of the
13  complaint, what complaint was Dr. Jordan
14  making?
15    A    That she was afraid of
16  Dr. Varughese's behavior and she felt
17  threatened.
18    Q    Now felt threatened in what way --
19  physically threatened or threatened
20  professionally -- or how did she feel
21  threatened?
22    MR. GREENBERG: How did she say she
23  felt threatened?
24    A    She was afraid of her erratic
25  behavior, that she allegedly berates residents.

Page 121

1  And she was also concerned that she had made
2  threats to go after her license based on her
3  allegations against Dr. Jordan regarding
4  drinking on the job.
5    Q    Had you investigated the allegation
6  of drinking on the job?
7    A    I did look at -- I did not conduct
8  the initial complaint, because it wasn't
9  brought to my attention until later on.
10    Q    But did you play any role in terms of
11  interviewing either Dr. McCash or Dr. Jordan
12  about that issue?
13    A    Yes.
14    Q    So when you interviewed Dr. Jordan,
15  did she deny drinking during working hours?
16    A    Yes.
17    Q    How about Dr. McCash?
18    A    Yes.
19    Q    Did you find any evidence that there
20  had been drinking during periods of time when
21  either Dr. Jordan or Dr. McCash still had
22  patient care responsibilities?
23    A    I'm sorry, repeat that question.
24    Q    Did you find any evidence in the
25  course of your interviews of those individuals,

31 (Pages 118 - 121)

Page 122

1  or anything else that you did that they had
2  been drinking at a point in time when they
3  still had patient care responsibilities?
4      A   No.
5      Q   Did the fact that Dr. Jordan raised
6  this issue about Dr. Varughese going after her
7  license due to the alcohol incident raise any
8  concern with you that Dr. Jordan, as chief
9  resident, was retaliating against Dr. Varughese
10 for having made that complaint?
11     A   No.
12     Q   What was Dr. Jordan making reference
13 to with regard to the Facebook issue?
14         MR. GREENBERG:  Objection to form.
15     You can answer.
16         THE WITNESS:  Dr. Varughese was
17     making comments on Facebook and posting
18     information on Facebook about people at
19     Mount Sinai.
20     Q   Did you independently attempt to
21 verify whether Dr. Varughese had posted
22 anything on Facebook?
23     A   I did.
24     Q   Did you go on Dr. Varughese's
25 Facebook page?

Page 123

1      A   No, I did not.
2      Q   Did you ever see any printouts from
3  her Facebook page?
4      A   Yes.
5      Q   And who supplied the printouts?
6      A   I don't recall who.
7      Q   What was the issue that Dr. Jordan
8  was raising about where it says, "Asked her to
9  send email to junior resident rather than
10 discuss it.  She is intimidating."
11     What was that about?
12     A   She did not -- "she", Dr. Jordan, did
13 not want to meet with Dr. Varughese, and asked
14 her to send an email.
15     Q   On the next page there is reference
16 in the middle of the page to -- well, strike
17 that.
18     Going to the top of the page there is a
19 reference to "yelling, screaming, get the F out
20 of frozen room."
21     Was this referring back to the issue that
22 was the subject matter of your first
23 investigation with Dr. Varughese?
24     A   Yes.
25     Q   Was there any concern that Dr. Jordan

Page 124

1  was still carrying this issue in her dealings
2  with Dr. Varughese to the point where she might
3  retaliate against Dr. Varughese because of
4  their original disagreements dating back to
5  that incident?
6          MR. GREENBERG:  Form.
7      You can answer.
8          THE WITNESS:  Was there a concern
9      that Dr. Jordan had?
10     Q   No.  Was there a concern that you had
11 that Dr. Jordan might retaliate against
12 Dr. Varughese because she was still apparently
13 upset about their interaction dating back to
14 the December 8, 2010 incident?
15     A   No.
16     Q   Is there a reason why -- strike that.
17     Do you know why she was rehashing issues
18 of the alcohol incident and the McCash incident
19 in this interview?
20         MR. WRONKO:  Objection.
21     You may answer.
22         THE WITNESS:  She was upset about the
23     allegations made against her.
24     Q   So even though she was apparently
25 upset about those allegations, you had no

Page 125

1  concern that now since she was in a position of
2  power she might misuse that power as to
3  Dr. Varughese?
4      A   No.
5      Q   What was her reference to "slowly
6  deteriorating mental health", what was that
7  about?
8      A   (Reviewing document.)  Slowly
9  deteriorating mental health was referring to
10 Dr. Varughese.
11     Q   Now did Dr. Jordan provide any
12 support for her allegation that Dr. Varughese
13 was having slowly deteriorating mental health?
14     A   It was just based on her own
15 perception.
16     Q   Did Dr. Jordan identify who the
17 resident was at the bottom of the page who left
18 the area afraid of Dr. Varughese?
19     A   No.
20     Q   What was the reference on the next
21 page where it says "Dr. Kalir" in the margin,
22 and it says, "I am Jewish, I need to be
23 passive."
24     A   Dr. Jordan wanted Dr. Kalir to
25 address Dr. Varughese, and Dr. Kalir did not

32 (Pages 122 - 125)

AA-428

Page 150

1  A  I didn't make a decision on academic
2  advisement, so I can't answer that question.
3  Q  So you were not a decision maker as
4  to whether Dr. Varughese would be continued on
5  or taken off of academic advisement?
6  A  No.
7  Q  Did you interview Renato Valentine
8  with regard to your original investigation of
9  the December 8th incident?
10  A  No.
11  Q  Why is it that you did not interview
12  Mr. Valentine?
13  A  I don't know who that is.
14  Q  Did anyone ever advise you that
15  Mr. Valentine was present in the gross room
16  that day?
17  A  No.
18  Q  Did you ever express any concerns
19  directly to Dr. Varughese about Adrian Jordan
20  becoming the chief resident following the
21  December 8th, 2010 incident and her likely of
22  having interaction with Dr. Varughese?
23  A  Did I have concerns?
24  Q  Yes.
25  A  No.

Page 151

1  Q  As a result of your investigation was
2  either Dr. Lento or Dr. McCash removed from
3  interacting with Dr. Varughese?
4  A  Not my me.
5  Q  By anyone else, to your knowledge?
6  A  To my knowledge Dr. McCash --
7  Dr. Varughese did not have to deal with
8  Dr. McCash.  If she had an issue, she could
9  speak with the other chief so she didn't have
10  to deal with Dr. McCash.
11  Q  Do you know who conveyed that message
12  to Dr. Varughese that she could communicate
13  through the other chief?
14  A  I know we talked about it.  I don't
15  recall who else spoke with her about that.
16  Q  Was there any limitation or
17  restriction on her having to speak with
18  Dr. Lento?
19  MR. GREENBERG:  Do you understand
20  that question?
21  MR. WRONKO:  Yeah, I'm not sure I
22  understand that question.  Let me withdraw
23  it and rephrase.
24  Q  Was there any decision made that
25  Dr. Varughese would not have to interact with

Page 152

1  Dr. Lento after your investigation was
2  concluded?
3  A  Not that I'm aware of.
4  Q  Was Dean Charney kept informed about
5  any of the issues relating to Dr. Varughese?
6  A  In terms of what, anything?
7  Q  Well, in terms of her being placed on
8  final warning, her termination -- was he
9  involved in any of these decisions?
10  A  Oh, involved in it, no.
11  Q  Was he kept apprised about those
12  disciplinary actions?
13  A  Of the disciplinary actions, no.
14  Q  Well, was he advised about anything
15  else about Dr. Varughese?
16  A  Just in my presentation of things I'm
17  working on.
18  Q  Was Dr. Davis kept informed or in the
19  loop about anything about Dr. Varughese?
20  A  By me?
21  Q  Yes.
22  A  No.
23  Q  Was he kept informed by anyone else,
24  to your knowledge?
25  A  I have no idea.  Not to my knowledge.

Page 153

1  Q  Did Scott Barnett oppose
2  Dr. Varughese's termination?
3  A  I don't know.
4  Q  Do you know whether or not
5  Dr. Barnett felt that Dr. Varughese was being
6  mistreated?
7  A  Not that I know of, no.
8  Q  At his deposition Dr. Cordon-Cardo
9  suggested that Human Resources had made the
10  decision to terminate Dr. Varughese.
11  Was he mistaken in that regard?
12  MR. GREENBERG:  Objection to form.
13  You can answer.
14  THE WITNESS:  I cannot -- I can only
15  advise based on the facts that are
16  presented to me.  It's not a decision I
17  make to terminate or not.
18  Q  What advice did you give on the
19  decision to terminate Dr. Varughese?
20  A  It was a recommendation based on the
21  facts that they had presented.
22  Q  Well, did you supply anything other
23  than a recommendation that she be terminated,
24  any other counsel or advice?
25  A  No.

39 (Pages 150 - 153)

**AA-429**

---

Page 154

1    Q   You had made reference to
2  Dr. Varughese having reviewed a file on Sheema
3  Patel's desk.
4        Prior to Dr. Varughese was there any other
5  employee of the medical center who had been
6  terminated for looking at a folder on
7  somebody's desk?
8        MR. GREENBERG:  Objection to form and
9     foundation, but you can answer.
10       THE WITNESS:  I don't know.
11   Q   Do you know what Dr. Varughese had
12  looked at on Ms. Patel's desk?
13   A   I only know what she told me.
14   Q   Well, what did Ms. Patel tell you?
15   A   No, I only know what Dr. Varughese
16  told me.
17   Q   What did Dr. Varughese tell you?
18   A   That she saw a file that said
19  something about pathology, and she wanted to
20  see it.
21   Q   Do you believe that that incident, by
22  itself, would form the grounds for termination?
23   A   No.
24   Q   Why not?
25   A   Based on the information, if it was

---

Page 155

1  by itself it would not have risen to the
2  decision of termination.
3    Q   Was Dr. Varughese's request for FMLA
4  a basis for termination?
5    A   No.
6        MR. WRONKO:  All right, subject to
7     any shocking questions from your counsel,
8     I have nothing further.
9        MR. GREENBERG:  You would be shocked.
10    I have no questions.  We will read and
11    sign, however.  Please note that.
12       MR. WRONKO:  Okay, thank you very
13    much.
14       THE WITNESS:  Thank you.
15
16  (The deposition was concluded at 4:59 p.m.)
17
18
19
20
21
22
23
24
25

---

Page 156

1
2        ACKNOWLEDGMENT OF DEPONENT
3        I, _____,
4  do hereby certify that I have read the
5  foregoing transcript of my testimony taken on
6  _____, 2013, and have signed it subject
7  to the following changes:
8
  PAGE LINE     CHANGE              REASON
9
10
11
12
13
14
15
16
17
18
19
20
21        _____
22
  Sworn and subscribed to before me on this
23
  _____ day of _____, 2013.
24
25

---

Page 157

1    C E R T I F I C A T E
2
3    I, PATRICIA A. SANDS, a Shorthand Reporter
4  and Notary Public of the States of New York and
5  New Jersey, do hereby certify that prior to the
6  commencement of the examination the witness was
7  sworn by me to testify the truth, the whole
8  truth and nothing but the truth.
9
10   I do further certify that the foregoing is
11  a true and accurate transcript of the testimony
12  as taken stenographically by and before me at
13  the time, place, and on the date hereinbefore
14  set forth.
15
16   I do further certify that I am neither of
17  counsel nor attorney for any party in this
18  action, and that I am not interested in the
19  event nor outcome of this litigation.
20
21
22        _____
23  New York certificate No.:  01SA4974309
24  New Jersey certificate No.:  2109345
25

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Julie L. Weber
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com
jlweber@edwardswildman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

LEENA VARUGHESE, M.D.,

             Plaintiff,

      v.

MOUNT SINAI MEDICAL CENTER, PATRICK
LENTO, M.D., CARLOS CORDON-CARDO, M.D.,
ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D., and
ABC Corp. 1-10, and JOHN DOES 1-10,

             Defendants.
_____

12 Civ. 8812 (CM) (JCF)

**DECLARATION OF**
**KRUTI MANIAR, M.D.**

     KRUTI MANIAR, M.D., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury

that the following is true and correct:

     1.     I am currently an Assistant Professor in Pathology at Northwestern University

Feinberg School of Medicine, a position I have held since 2013.  Between July 1, 2007 and

June 30, 2011, I was a resident in The Mount Sinai School of Medicine's ("Mount Sinai")

Pathology Department (the "Department") Residency Program (the "Program").  I graduated

from the Program in June 2011.  I am fully familiar with the matters discussed herein based on

my own personal knowledge and my review of files maintained by Mount Sinai's Department of

Pathology and Mount Sinai's Office of Graduate Medical Education.  I make this declaration in

support of Defendants' motion for summary judgment.

2.      I am female.

3.      My national origin is Indian.

4.      I attended the Icahn School of Medicine at Mount Sinai for medical school and

graduated in 2007.  I applied for and was accepted into the Program in 2007.  After I graduated

from the Program in June 2011, I completed a fellowship at Johns Hopkins University School of

Medicine, Department of Pathology, and graduated from this program in 2013.  A copy of the

Summative Evaluation that I received from Mount Sinai is attached as Exhibit 1 to the

Declaration of Dr. Patrick Lento.

5.      Throughout my tenure at Mount Sinai, both as a medical student and as a resident,

I felt encouraged and supported by faculty, administration and my colleagues.  I never felt

discriminated against by anyone at Mount Sinai for any reason, including my gender and

national origin.

6.      Between May 2010 and May 2011, I acted as Co-Chief Resident of the Program

with Dr. Samuel McCash ("McCash").  It is my understanding that I was recommended to be

Co-Chief Resident by faculty members in the Department.  In this role, my job duties and

responsibilities included creating resident schedules, addressing coverage issues when residents

were unable to report to work and serving as an intermediary between faculty members and

residents.

7.      I first met McCash when I was a first year resident at Mount Sinai.  I got along

well with McCash throughout the four-year Program and my time working as a Co-Chief

Resident with him.  I found him to be a good person and a hard worker.  During the many times

that I observed McCash interact with other residents, including while he was Co-Chief Resident,

he treated all residents equally and always tried to be fair.  I never had any reason to believe that

2

AA-432

McCash harbored any discriminatory animus towards me or any other female resident because of our gender or, in my case, because I am a woman of Indian descent.

8.      My relationship with Plaintiff Leena Varughese ("Plaintiff") was cordial. However, when I was Co-Chief Resident, there were several incidents with Plaintiff where she had trouble taking responsibility.  For example, on several occasions, Plaintiff would call out sick unexpectedly and for multiple days and it would be difficult for me to find coverage for her. I also remember one occasion where I asked Plaintiff if she would cover for another resident who had previously covered for her, and before I even told her the date of the coverage, she told me that she was unavailable.

9.      At some point in 2011, I became aware that Plaintiff had a disagreement with McCash and was told that she should communicate with me in my role of Chief Resident instead of McCash.  I do not have any knowledge about the details of their disagreement or Plaintiff's discussions with anyone at Mount Sinai about McCash.

10.      Plaintiff never made any complaint to me about discrimination of any kind or told me that she believed that she was being retaliated against by anyone at Mount Sinai for any reason.

Dated: New York, New York
      July 18, 2014

Kruti Maniar, M.D.

3

AA-433

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Julie L. Weber
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com
jlweber@edwardswildman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEENA VARUGHESE, M.D.,

                Plaintiff,

v.

MOUNT SINAI MEDICAL CENTER, PATRICK
LENTO, M.D., CARLOS CORDON-CARDO, M.D.,
ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D., and
ABC Corp. 1-10, and JOHN DOES 1-10,

                Defendants.

12 Civ. 8812 (CM) (JCF)

**DECLARATION OF**
**VESNA NAJFELD, PH. D.**

---

      VESNA NAJFELD, Ph.D., pursuant to 28 U.S.C. § 1746, declares under penalty of

perjury that the following is true and correct:

      1.      I am currently a Professor of Pathology and Medicine in the Department of

Pathology at The Mount Sinai Medical Center ("Mount Sinai" or the "Hospital") and the

Director of the Tumor Cytogenetics Laboratory at Mount Sinai, positions I have held since 2005.

I am also a Professor in the Mount Sinai School of Medicine, a position I have held since 2005.

Prior to this, I was an Associate Professor and an Assistant Professor in Mount Sinai's Division

of Hematology, Department of Medicine, from 1981 to 2005.  I am fully familiar with the

matters discussed herein based on my own personal knowledge and my review of files

maintained by Mount Sinai's Department of Pathology and Mount Sinai's Office of Graduate

**AA-434**

Medical Education.  I make this declaration in support of Defendants' motion for summary judgment.

2.      Plaintiff Dr. Leena Varughese ("Plaintiff") completed a two week rotation in the Tumor Cytogenetics Laboratory under my supervision from August 1 to August 12, 2011.

3.      During this time, Plaintiff did not take her responsibilities as a resident seriously and engaged in a variety of unprofessional behavior.

4.      On the second or third day of her rotation, Plaintiff was assigned a clinical case conference presentation, which was scheduled to be presented to faculty and other residents on August 9, 2011 at 9:00 a.m.  I instructed Plaintiff to send me the presentation ahead of time so that I could review it to ensure that it was appropriate for Plaintiff to present.  Plaintiff did not send me the presentation to review until 4:18 p.m., on August 8, 2011.  In her email, which attached the presentation, Plaintiff said "[p]lease let me know if you want me to change anything in a major way."  A copy of the email from Plaintiff to me, dated August 8, 2011, is attached as Ex. 1.

5.      As soon as I received Plaintiff's email, I reviewed the presentation and determined that there were numerous problems and it could not be presented.  For example, Plaintiff did not include actual patient images in the presentation and instead used images that appeared to have been downloaded from the internet.  The presentation was also more akin to the level of presentation that would be expected of a medical student as opposed to a fourth year resident because at the end of the presentation she included the clinical and laboratory finding of the case, which is the opposite order that cases are reported.

6.      At 4:23 p.m., I emailed Plaintiff and told her to come to my office.  Five minutes later, I sent Plaintiff another email and said "[t]here are some major problems with your

2

presentation. Please come over asap." Copies of my emails, dated August 8, 2011, are attached

as Exs. 2 and 3, respectively.

7.      After receiving no response from Plaintiff, at 4:49 p.m. I sent Plaintiff another

email and said "[p]lease call me. This presentation cannot go as is." A copy of my email, dated

August 8, 2011, is attached as Ex. 4.

8.      I also sent Plaintiff a page, but she did not respond to me. I called Dr. Adolfo

Firpo ("Dr. Firpo") because I was concerned that I still had not heard from Plaintiff and Dr.

Firpo gave me the phone number for the residents' room. I then called and left a message for

Plaintiff. Thirty minutes later, Plaintiff called me. During our phone conversation, I told

Plaintiff that the presentation was not of sufficient quality to be presented the next day and asked

if she would come to my office to work on it so that it could be presented. Plaintiff said that she

had already left Mount Sinai and was not willing to come back to work on the presentation with

me. Due to Plaintiff's unwillingness to return to Mount Sinai and meet with me to revise her

presentation, I told Plaintiff that the presentation could not take place the following day and that

she would need to inform the faculty and other residents that the presentation was cancelled.

9.      At 5:42 p.m., I sent Plaintiff another email that again informed her that "a lot

more work needs to go into this presentation" and that it would not go forward the next day. In

my email, I reminded Plaintiff that although she had left Mount Sinai at 5:00 p.m. that day, I had

been willing to work on the presentation with her until 6:00 p.m. A copy of my email, dated

August 8, 2011, is attached as Ex. 5.

10.     The next day, at 6:21 a.m., I emailed Plaintiff again to remind her to send an

email to faculty and residents to inform them that the presentation would not be going forward.

A copy of my email, dated August 9, 2011, is attached as Ex. 6.

3

11.     In response, Plaintiff sent me an email two hours later that said "I won't be doing the Cytogenetics presentation until next week." Plaintiff did not copy anyone else other than me on this email. A copy of Plaintiff's email to me, dated August 9, 2011, is attached as Ex. 7.

12.     Because Plaintiff failed to inform the attendees that the presentation was cancelled, faculty and residents showed up for the presentation and waited, assuming that a presentation was going to take place. Even though Plaintiff was present in the room while the attendees sat and waited for the presentation, she failed to announce that she would not be presenting.

13.     During her rotation, Plaintiff was also absent from or late to the Cytogenetics Laboratory without authorization or explanation on numerous occasions. For example, on August 10, 2011, Plaintiff was ninety minutes late to work; returned thirty minutes late from lunch; and left sixty minutes early. As a result, Plaintiff did not fulfill her work responsibilities for that day.

14.     Plaintiff was also unprofessional in her interactions with faculty and staff. For example, Plaintiff repeatedly typed on her blackberry while staff members, including myself, were instructing her and giving tutorials. On one occasion, I told Plaintiff that this was disrespectful and rather than listen to me and put her blackberry away, Plaintiff ignored me and continued to use the blackberry while I was giving her a tutorial.

15.     Plaintiff also exhibited little enthusiasm for learning and showed no willingness to work. While I was in the Laboratory, I even overheard her tell the supervisor of the Laboratory that "[s]he is wasting her time." This was upsetting to me and I found it to be very disrespectful and unprofessional.

4

AA-437

16.     During her rotation, Plaintiff also failed to complete the work expected of her and all residents that do a rotation in the Cytogenetics Laboratory.  Although Plaintiff had been told from the first day of her rotation that she was to karyotype ten cells, by the end of her rotation, she had only managed to karyotype five cells.  Karyotyping cells means to put chromosomes in chronological order.

17.     On August 12, 2011, the last day of Plaintiff's rotation, I was informed by Chief Resident, Dr. Adrienne Jordan ("Dr. Jordan"), that Plaintiff would need to cover in the grossing room for another resident who was out sick.  Later that day, Dr. Patrick Lento ("Dr. Lento"), the Program Director, called me in the Laboratory because he said that he and Dr. Jordan had not been able to reach Plaintiff to confirm that she would be providing coverage.  I told Dr. Lento that Plaintiff was in the Laboratory and he should page her.  After I spoke to Dr. Lento, I observed Plaintiff and heard her pager go off.  Plaintiff did not answer the page.  Thereafter, Dr. Lento called the Laboratory again in an attempt to speak to Plaintiff and I put her on the phone. Plaintiff then proceeded to speak to Dr. Lento in a disrespectful tone in front of the entire Laboratory.

18.     Later that day, I drafted a memorandum for my files, titled Notes Regarding rotation of Dr. Leena Varughese in Tumor Cytogenetics Laboratory, which summarized my experience with Plaintiff during her rotation.  A copy of my memorandum, dated August 12, 201[1], is attached as Ex. 8.

19.     During my thirty years (and now nearly thirty-three years) at Mount Sinai, my experience with Plaintiff was the worst teaching experience I have ever had.

Dated: New York, New York
       June 27, 2014

Vesna Najfeld, M.D.

5

Exhibit 1

From: leena varughese
(mailto:leena.varughese@mssm.edu) Sent:
Monday, August 08, 2011 4:18 PM
To: Najfeld, Vesna
Subject: Presentation

Dr, Najfeld,

I am including the CML presentation for CP case conference. It is pretty much complete but I will have to
polish it up a bit before tomorrow morning. Please let me know if you want me to change anything in any
major way. Thank you.

Dr. Varughese

PLF
EXHIBIT NO 28
FOR ID 6-11-13

DEFT
TRN

D00882

Exhibit 2