expressed any bias toward Varughese or anyone else on the basis of national origin. Gender, of course, is irrelevant where Jordan's promotion is concerned. [10] Finally, at the time Jordan was promoted, Varughese was on an Academic Advisement (with which she was not cooperating), was the subject of numerous complaints and had been referred to the PWC. There is no evidence that Jordan labored under similar constraints.[11] Under those circumstances, no reasonable trier of fact could find that the promotion of Jordan ahead of Varughese was the product of discrimination, in whole or in part.

Defendants' motion for summary judgment dismissing Counts 1, 2, 5, 6 and 18 is GRANTED insofar as addressed to plaintiff's assertion that the failure to promote her was discriminatory.

### December 8, 2010 Incident with McCash

Varughese's first claim of gender discrimination was her statement to HR in April 2011 that McCash would not have acted the way he did on December 8, 2010 – yelling at her and moving toward her in a way she found threatening (though she makes no claim that McCash touched her) – but for her gender. She has added a claim that the December 8 incident was motivated by racism in the course of this lawsuit.

---

[10] Lento appears to have been responsible for Jordan's selection as Chief Resident. Varughese submits only her own conclusory assertions of bias as against him. There is no evidence that McCash had anything to do with the decision, and Schiller was no longer acting as Chair.

[11] These facts could also demonstrate that Varughese failed to meet her burden, at McDonnell-Douglas Stage One, of proving, as part of her prima facie case, that she was qualified for the position. It really does not matter, however, whether one analyzes this as a Stage One or a Stage Three issue: there were significant differences between Jordan and Varughese that easily overcame her lesser experience.

Under federal and New York State antidiscrimination laws, "yelling at an employee . . . does not amount to an adverse action." *E.E.O.C. v. Bloomberg, L.P.*, 967 F. Supp. 2d 816, 873 (S.D.N.Y. 2013) (citing *Sekyere v. City of N.Y.*, No. 05 Civ. 7192, 2009 WL 773311, at *3 (S.D.N.Y. Mar. 18, 2009)).  Therefore, Defendants are entitled to summary judgment dismissing Counts 1, 2, 5, 6, and 18 insofar as those counts relate to the December 8, 2010 incident.

As I have explained, the NYCHRL has a more lenient definition of what constitutes an "adverse action" for purposes of establishing a *prima facie* case of discrimination than federal law has.  Judge Gleeson has explained that, "A plaintiff who is treated worse, in a nontrivial way, because of [her race or gender] is subject to an adverse employment action for purposes of the CHRL." *Forgione v. City of New York*, No. 11-CV-5248, 2012 WL 4049832, at *6 (E.D.N.Y. Sept. 13, 2012).  In *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 78-79 (N.Y. App. Div. 1st Dep't 2009), the New York Appellate Division, First Department, held that "a focus on unequal treatment based on gender regardless of whether the conduct is 'tangible' (like hiring or firing) or not—is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute."  Thus, many acts that would not constitute "adverse actions" under federal law have been held to suffice under the NYCHRL. *See Kellman v. Metro. Transp. Auth.*, No. 07 Civ. 3561, 2014 WL 1243698 (S.D.N.Y. Mar. 26, 2014) (denial of training constituted an adverse action under the NYCHRL even though it did not affect plaintiff's wages or chances of promotion); *Williams*, 836 F. Supp. 2d at 175–76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); *see also Forgione v. City of New York*, No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept. 13, 2012) (holding that defendants' referral of plaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely

trivial" under NYCHRL); *Sotomayor v. City of New York,* 862 F. Supp. 2d 226, 255, 257–58 (E.D.N.Y.2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

However, the NYCHRL, like Title VII, is not a "general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013). Thus, one state court found that the NYCHRL's "adverse action" requirement was not met even where an employer "(i) told [plaintiff] that his "medicine was wrong"; [and] (ii) made fun of his accent." *Hanna v. New York Hotel Trades Council*, 18 Misc. 3d 436, 440-41 (Sup. Ct. 2007). The state trial court found that, "Although making fun of an employee's accent is offensive and inappropriate, it does not constitute an adverse employment action [under the NYCHRL]." *Id.*

Varughese has not managed to make out a *prima facie* case, even under the extremely lenient standard of the City Human Rights Law. A single instance of being addressed publicly in an inappropriate fashion (assuming that yelling at a subordinate is always inappropriate) does not rise to the level of being "treated worse in a non-trivial way" – especially in light of the hospital's immediate corrective action of removing Varughese from McCash's supservision.[12]

---

[12] One might ask whether the hospital's immediate corrective action is enough to save it from liability under the NYCHRL. After all, it immediately removed Varughese from McCash's supervision and separated them moving forward. The answer is no, at least in the context of sexual harassment. *See Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 477, 928 N.E.2d 1035, 1037-38 (2010). In *Zakrzewska*, the state high court returned to the language of the city statute to find that "the affirmative defense to employer liability articulated in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) [does not] apply to sexual harassment and retaliation claims under section 8–107 of the New York City Administrative Code." *Id.* (answering certified question from the Second Circuit in the negative). Of course, there is no Faragher-Ellerth defense under federal law to claims of discrimination, as opposed to harassment/retaliation CHECK; the pertinence of the Hospital's action is that the employer did not discriminat

76

However, even if Varughese were able to make out a *prima facie* case under city law, her claim still would fail.

Defendants articulate a legitimate and non-discriminatory reason for McCash's behavior: Varughese earned his ire by disobeying a direct instruction from a supervisor. The burden thus shifts back to Varughese to prove both (1) pretext; and (2) that the real reason McCash yelled at her was her membership in a protected class.

To prove pretext, Varughese (1) claims that no clear instruction was given as to the need for her to do the work; and (2) points to some direct evidence of McCash having a discriminatory bias against her: his December 8, 2010 complaint regarding her "work ethnic."

There is no genuine issue of fact as to the first of these issues. The slides in question came from a Dr. Goldfarb, and that doctor had a standing instruction that the resident on duty, not a moonlighter, was to examine all of his breast slides. Varughese was the duty resident; Azar was a moonlighter. Varughese, like all residents, was charged with knowing about standing orders from doctors and obeying them. She offers no evidence to the contrary. Therefore, the issue is not whether McCash was sufficiently specific; he did not need to be, because no resident, not even the Chief Resident, could countermand Dr. Goldfarb.

As to the second: rather than discussing this issue in the context of a *prima facie* case, where the plaintiff's burden is light, I will skip to the third *McDonnell Douglas* step – where I conclude that there is simply no genuine issue of fact as to the question whether discriminatory animus motivated McCash on December 8, 2010. Drawing all inferences in Varughese's favor,

no reasonable trier of fact could possibly conclude that McCash yelled at Varughese because she was a woman or because she was of Indian descent.

This is not a close question.

The only evidence offered by Varughese to show that there was any discriminatory animus behind McCash's behavior on December 8, 2010 is the "n" in "work ethnic" in McCash's e-mail. I must draw all *reasonable* inferences in Varughese's favor, but the only *reasonable* inference here is that McCash made a very unfortunate typo. His lengthy e-mail is rendered offensive by the insertion of a single letter. The Court has reviewed *many* e-mails from McCash, to Varughese and to others, and this is the only one with any language that is even arguably discriminatory. There is no reference at all to Varughese's gender in the e-mail, and when she complained of McCash's behavior, she believed it to be motivated by her sex. There is no evidence in the record that McCash ever said or did anything derisivie about persons of Indian ancestry; indeed, the record reveals no instance in which he so much as commented about anyone's ancestry.

Furthermore, McCash sent this particular e-mail to numerous recipients, including Shabnam Jaffer, a woman of Indian descent who was an attending physician *and his supervisor*. Without some other evidence, there is no reason to believe that McCash decided to do something that might amount to professional suicide by uttering a slur that would have tended to be offensive to someone who shared membership in Varughese's protected classes. (Incredibly, McCash was not asked about this e-mail at his deposition by either side, and Defendants did not submit any declaration from him except one explaining that he is Filipino, so we have no way of knowing what he would say about it).

Moreover, McCash's conduct on December 8 is colored by the history he shared with Varughese: they had a difficult relationship. There had been a confrontation between them in

September, and she was repeatedly insubordinate to him. "Mere personality conflicts must not be mistaken for unlawful discrimination." *Taylor v. New York Univ. Med. Ctr.*, 871 N.Y.S.2d 568, 571-72 (N.Y. App. Term 1st Dep't 2008).

There is no evidence that McCash had any problems working with other women, other people of Indian descent, or with women who were also of Indian descent. There certainly is no evidence that he had any problems with his co-Chief Resident, a woman of Indian descent; she has averred that he was never discriminatory toward anyone. The only fair inference is that McCash had a problem with Varughese – the same problem lots of other people had.

In short, no reasonable jury could find by a preponderance of the evidence that discriminatory animus, whether based on race or gender, was behind McCash's loss of temper. So even under city law, the claim that this outburst was an instance of either gender-based or national origin-based discrimination must be dismissed.


The December 21, 2010 Academic Advisement

Varughese alleges that Defendants placed her on Academic Advisement on account of her sex and her race.

I assume without deciding that an Academic Advisement could constitute an adverse employment action under city, state and federal law. This is not immediately apparent under federal and state law. *See Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) ("courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."); *Uddin v. City of N.Y.,* 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (quotation omitted); *see also Weeks v. New York State,* 273 F.3d 76, 86 (2d Cir. 2001) ("It

hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds, National R.R. Passenger Co. v. Morgan*, 536 U.S. 101, 122 (2002).

On the question whether Defendants have offered a legitimate, non-discriminatory reason for that Advisement, Judge Cote's analysis in *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441 (S.D.N.Y. 2012), *aff'd sub nom. Nolley v. Swiss Reinsurance Am. Holding Corp.*, 523 F. App'x 53 (2d Cir. 2013), a case brought under the same suite of city, state and federal anti-discrimination laws at issue here, is instructive. The employer placed Nolley on a "Performance Improvement Plan" ("PIP") after customers complained that Nolley was aggressive and confrontational. The PIP required Nolley to improve his professionalism, or else. When he did not improve, but rather, reacted to the PIP with yet more hostility and aggressively confronted his superior, he was terminated. Once in court, Mr. Nolley contested the truth of the customer complaints but could not dispute that they had in fact been made – that customers had deemed his conduct offensive and unprofessional. The fact of the complaints alone was enough to constitute a legitimate, non-discriminatory justification that satisfied the employer's burden at the second stage of the *McDonnell Douglas* analysis – even if, as Nolley insisted, the complaints were entirely unwarranted.

So too here. Defendants received multiple reports that Varughese was erratic and disruptive. Administrators received reports that Varughese lost the faculty of cogent speech on December 8, 2010, that she accosted Jordan on December 10, 2010, and that she refused to address her own role in the December 8 fracas. They also heard that she had been insubordinate to McCash, ignoring a clear instruction to do certain work herself, which instruction was grounded

in a general need to cut costs and also the instructions of a particular surgeon.  Varughese disagrees that her conduct was worthy of complaint, but she does not raise any genuine issue about whether complaints were in fact made.

The receipt of these complaints that Varughese was disruptive and insubordinate – from her fellow residents, her two Chief Residents, two attending physicians, a lab technician and a medical student – are enough to satisfy Defendant's burden at the second stage of the *McDonell Douglas* analysis, even if they are unfounded, and without considering in any way Varughese's admission that she raised her voice and swore on December 8, 2010.

In sum, Defendants offer what the Second Circuit has found to be a legitimate and non-discriminatory reason for adverse employment actions against an employee: "gross insubordination." *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991); *see also Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 172 (E.D.N.Y. 2011) (recognizing insubordination as a legitimate non-discriminatory reason in the NYCHRL context).

Because defendants have produced a legitimate, nondiscriminatory reason for the Advisement, the presumption of discrimination raised by her *prima facie* case simply "drops out of the picture." *Cifra v. General Electric*, 252 F.3d 205, 215 (2d Cir. 2001) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)); *see also See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 553 (2d Cir. 2010).

The question now is whether Varughese has provided sufficient evidence for a factfinder to conclude that Defendants' purported rationale for the Advisement was actually a pretext for discrimination on the basis of either her gender or her national origin. *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 158-59 (S.D.N.Y. 2011).  The plaintiff must not simply produce "some" evidence, but "sufficient evidence to support a rational finding that the

legitimate, nondiscriminatory reasons proffered by the defendant[s] were false, and that more likely than not [discriminatory animus] was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir. 1994)). Alternatively, the plaintiff may show that the defendants' non-discriminatory justifications for the adverse action "were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotation and citation omitted).

In order to show pretext, a plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the relevant adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer" to undertake it. *Dhar v. NYC Dep't of Transp.*, No. 10-CV-5681, 2014 WL 4773965, at *10 (E.D.N.Y. Sept. 24, 2014) (internal citations omitted).

Varughese again fails to raise any genuine issue of material fact as to whether it is more likely that a discriminatory reason motivated Defendants to place her on Academic Advisement. After the December 8 incident with McCash, witness after witness came forward to complain, not only that Varughese had completely lost control of herself, but also to voice apparently longstanding complaints about her reliability and work ethic. Varughese may and obviously does disagree with those assessments, but she cannot deny that hospital administrators had to weigh her word alone against the word of at least five witnesses (not including McCash or Jordan), all of whom attested that she was out of control. Whether those witnesses were right is not the point. The point is that the hospital had every non-discriminatory reason in the world to be concerned about Varughese's behavior, and so to place her on an Academic Advisement.

82

Varughese complains that Defendants took everyone else's word over her own because Lento and others "wanted to believe" that McCash, a white male (only according to Varughese – recall that he self-identifies as an Asian Pacific Islander of Filipino descent, and that this Court does not find any genuine dispute that he is correct), had done nothing wrong. But she offers no *evidence* to support that wholly conclusory assertion. None whatever.

Disparate treatment – which may serve to both raise an inference of discrimination in the first step of the *McDonnell Douglass* burden-shifting analysis and establish pretext at the third[13] – occurs where an employer "treat[s] [the plaintiff] . . . less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (*citing Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15 (1977)).

To benefit from a disparate treatment analysis, however, the plaintiff needs someone to whom she can reasonably compare herself. She need not show that the person to whom she compares herself is identical to her, but she must show that she and her proposed comparator are similarly situated in "all material respects." *Id.* at 39–40; *see also Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997); *Shah v. Wilco Systems, Inc.*, 27 A.D.3d 169, 169 (N.Y. App. Div. 1st Dep't 2005) (applying same standard to NYCHRL claims). Where there is too much dissonance between a plaintiff's circumstances and her proposed comparator's, the employer's "treatment of th[at] [other] employee[] ha[s] no logical relevance to the plaintiff's claims" and thus cannot give rise to an inference of discrimination. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also LeBlanc v. United Parcel Service*, No. 11 Civ. 6983, 2014 WL 1407706,

---

[13] *McDonnell Douglas*, 411 U.S. at 804; *see also Ellis v. Long Island Rail Road Co.*, No. 05–CV–3847, 2008 WL 838766, at *4 (E.D.N.Y. Mar. 31, 2008) (*citing Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002)).

at *15 (S.D.N.Y. Apr. 11, 2014) (applying same standard to analysis whether plaintiff has raised triable issue regarding a "similarly situated" coworker under the NYCHRL).

In the particular context of this motion, a court examining a discrimination claim only compares two employees' treatment when those employees are "similarly situated in all material respects." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (*citing Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15 (1977)). The Circuit has recognized that "[w]hat constitutes 'all material respects' [ ] varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40.

Varughese argues that Defendants showed their discriminatory hand by placing her on Academic Advisement while failing to place McCash on Academic Advisement. But McCash ws not similarly situated to Varughese in all material respects. McCash was Varughese's *supervisor* at that time. Leaving aside the disputed factual question of who yelled more loudly or struck more fear into coworkers' hearts on December 8, 2010, a supervisor yelling at his subordinate is something quite different from a subordinate yelling at her supervisor. Varughese admits that she yelled at McCash. She also admits to yelling at coworker Jordan – while McCash is not alleged to have yelled at anyone other than his subordinate (Varughese). Any workplace's standard regarding insubordination will inherently be more onerous toward a subordinate's behavior, because the supervisor cannot be "insubordinate" to the subordinate.

Moreover, there is no dispute that the evidence before the Hospital decision-makers did not indicate that Varughese's and McCash's conduct was of comparable seriousness. The

unbiased third party witnesses all told administrators that Varughese's behavior was more seriously out of line than McCash's. Again, the issue is not whether or not that is true; it is whether the evidence to that effect was given to the Hospital.

Finally, in the fortnight between the December 8, 2010 incident and the December 21 advisement, McCash acknowledged wrongdoing and submitted to counseling. Varughese, by contrast, categorically refused to do so. During those same 12 days, Varughese interfered with the investigation by getting into a confrontation with Jordan; McCash did no such thing.

So McCash and Varughese are simply not "similarly situated in all material respects." For that reason the decision to discipline McCash more leniently (and remember, he was disciplined), while placing Varughese on Academic Advisement, does not lend itself to an inference of either gender or national origin discrimination.

There is evidence in the record of an instance when the hospital put a male resident on Academic Advisement when the male resident behaved in a manner similar to Varughese. In the summer of 2011, a male resident of Asian descent threw a temper tantrum and yelled at a technician who was trying to help him with a dictation machine. That resident  was placed on Academic Advisement.  He did not react to being on Advisement in the same way as Varughese, however; he apologized profusely, revised his written apology twice to make it more personal and self-reflective, and met with supervisors for months to talk about professionalism.

Varughese also seeks to raise an inference that discrimination motivated the Academic Advisement by pointing to Schiller's comments from 2008-2009 and McCash's December 2010 "work ethnic" e-mail. Assuming arguendo that Schiller's comments can be deemed evidence of ethnic bias (I have already address why McCash's email with its obvious typo cannot), this argument gets plaintiff nowhere, because Schiller played no role in the December 8 incident and

there is no evidence that he was involved in the decision to put Varughese on Academic Advisement. Melissa Pessin-Minsley had taken over as Interim Chair of the Department by that time. There is no evidence in the record that Schiller was even consulted about the Advisement. Nor is there any evidence that anyone involved in the decision to place Varughese on Advisement knew about Schiller's comments; Varughese herself had not yet complained about them.

As for McCash, the Chief Resident, he too played no role in making the decision about Academic Advisement, and Varughese was removed from his supervision.

Schiller's stray remarks and McCash's email, assuming any of them to be offensive, thus have no bearing on attitudes displayed by anyone who actually made the decision to place Varughese on Academic Advisement. That means they are not evidence of pretext on the part of those decisionmakers and Mount Sinai. "Statements by nondecisionmakers or statements by decisionmakers unrelated to the decision process itself" are insufficient to establish discriminatory intent, even under city law, and certainly under federal and state law. *Taylor v. New York Univ. Med. Ctr.*, 871 N.Y.S.2d 568, 572 (N.Y. App. Term 1st Dep't 2008) (quoting *Forrest v. Jewish Guild*, 3 N.Y.3d at 308); *Bir v. Pfizer, Inc.*, 510 F. App'x 29, 31-32 (2d Cir. 2013) (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).

Ultimately, Varughese's attempt to prove pretext through a disparate treatment analysis fails with respect to the Academic Advisement because she relies on only on her own conclusory accusations of bias and a disparate treatment analysis that fails for lack of a real comparator. She offers nothing else, and the Court's exhaustive review of the record reveals nothing else.

By contrast, Defendants have presented voluminous evidence from multiple sources to show that Varughese was placed on Advisement for perfectly legitimate reasons having nothing whatever to do with her membership in any protected class.

86

AA-613

No reasonable jury could find that the Advisement was imposed as a pretext for discrimination. Plaintiff fails to carry her burden at Step 3. Counts 1, 2, 5, 6, 9, 10, 16 and 18 are dismissed insofar as they are predicated on Varughese's allegation that the Academic Advisement was imposed as an act of discrimination.

Referral to the PWC

Varughese also suggests that she views her referral to the PWC as a distinct discriminatory act.

The referral is not cognizable under state or federal antidiscrimination law because it is not "materially" adverse. She was required to meet with Dr. Figur and Dr. Fersh, and to submit to a toxicology screen. The referral did not cause her to lose any benefits, to lose any responsibilities, to have a lesser title, to disclose the fact of her referral to coworkers, or indeed do anything beyond meet with a few doctors whose job it was to help her. Forcing someone to seek medical or psychological help is not itself an adverse employment action where it is not accompanied by any diminution of the benefits or responsibilities of employment or some actual adverse consequence to the terms or conditions of employment. To the extent that Varughese claims that the referral itself constituted discrimination in violation of state or federal statutes, that claim is dismissed because it was not an adverse employment action.

However, Judge Gleeson has specifically found that referring a plaintiff for psychological evaluation, while not materially adverse under federal or state law, is not "merely trivial" under the NYCHRL. *Forgione v. City of New York*, No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept. 13, 2012). I must agree.

Nevertheless, I cannot agree that Varughese's claim should proceed to trial because, in support of her claim that the referral was *discriminatory*, Varughese has presented only her own conclusory allegations. *See, e.g.*, Varughese 56.1 at ¶ 32.3 ("The PWC is paranoid about their illegal fraudulent conduct against minority women . . . "). She has not presented any evidence.

In particular, on this claim Varughese has presented no testimony that anyone was similarly situated to her – i.e. any other resident or doctor who behaved in the erratic and disruptive way that multiple witnesses described to Hospital administrators – was not referred to the PWC. The hospital has submitted evidence that it referred a black female resident to the PWC when she persisted in making inappropriate advances towards another employee.

Varughese's unconvincing "comparator" analysis asks the Court to conclude that her referral to the PWC was discriminatory insofar as Dr. Najfeld was not also referred to the PWC. Varughese claims that the PWC should have been called to investigate Najfeld after Najfeld criticized Varughese for her failure to prepare an adequate presentation. It should go without saying that a supervisor reprimanding Varughese for her deficient performance does not constitute "erratic" behavior but rather, a natural consequence of Varughese's own performance problems.

Further, Varughese has not presented any direct evidence that the person who made the referral (Pessin-Minsley) or the person who did his own research to confirm the propriety of the referral (Figur) harbored any discriminatory animus against her, based on either her gender or her national origin. Notwithstanding Varughese's unsupported assertions in her Rule 56.1 statement that Figur has been the subject of some unspecified other litigation, there is no evidence in the record of gender or ethnicity-based comments or prior actions by either of them.

88

**AA-615**

No reasonable jury could find fault with the decision to refer a physician who had exhibited obvious signs of distress, and whose behavior was causing severe disruptions in her department, to an administrative body designed to assist troubled physicians,.

Varughese's claim that her referral to the PWC constituted gender or national origin discrimination is dismissed under the City Human Rights Law as well.

<u>The July 15, 2011 Final Warning</u>

Next, Varughese alleges that Defendants discriminated against her on the basis of her sex and her national origin by issuing her a Final Warning on July 1, 2011.

Defendants' reasons for issuing the Final Warning – detailed in the warning itself (*see supra* at 43-45) – are on their face perfectly legitimate and completely nondiscriminatory. They are also entirely true. The Department accused her of failing to comply with the terms of her Academic Advisement; Varughese admits that she failed to comply with the terms of her Academic Advisement. The Department accused her of missing required appointments; she admits that she missed appointments required under her advisement. The Department accused her of failing to submit her self-reflective essay; she admits that she submitted her essay on professionalism two and a half months late, and that she also submitted the revised essay after its due date. The Department accuses her of failing to respond to pages, refusing to cover for other residents, being late with assignments, and being late to work; she admits to it all. The list goes on and on.

That she has excuses and what seem to her explanations matters not. Defendants' burden of production at this second stage of the *McDonnell Douglass* analysis is satisfied.

At Stage Three, Varughese offers no evidence that those stated reasons are pretextual. She submits a sampling of e-mails showing that other residents were sometimes late, or could not cover

a shift. The most notable thing about those e-mails, however, is that they are proof that other residents actually communicated to others about when they would be absent, when Varughese routinely failed to do so. Varughese also submits the admissions of Morency, Jordan, and others that they were not always in perfect health and sometimes took time off and were unable to cover for other residents. This is unsurprising, to say the least.

Varughese presents *no* evidence that any other resident had an extensive history of stubborn insubordination and absenteeism without notice, i.e. a history comparable to her.

Varughese also fails to come to grips with the difference between her behavior when counseled by administrators and the behavior of others. After the December 8, 2010 incident, McCash accepted counseling and apologized; Varughese did not. The male resident was placed on Academic Advisement, apologized profusely and met with supervisors for months to talk about professionalism; Varughese refused to acknowledge that she had ever exhibited unprofessional behavior.

Varughese is similar to the plaintiff in *Shekhem' El-Bey v. City of New York, et al.*, 419 F. Supp. 2d 546 (S.D.N.Y. 2006). In that case, Mr. Shekhem' El-Bay complained that his termination must have been the product of discrimination discriminatory because, even though he filed fraudulent tax returns, others who did so were not fired. The Court found him to be without comparators, because:

> not one of the DOC employees cited in plaintiff's complaint was even remotely similarly situated to plaintiff with respect to the disciplinary action taken by the DOC. Mr. El–Bey, in addition to having filed fraudulent tax documents, was found guilty of numerous other disciplinary violations while employed with the DOC, *e.g.,* countless sick leave violations and excessive absenteeism. Nowhere does the complaint allege that even one of the purportedly similarly situated corrections officers was guilty of committing a single act of misconduct other than filing fraudulent tax documents.

419 F. Supp. 2d at 551 (internal citations omitted).  Varughese has too many strikes against her to compare her to those with just a one or even a few.

It also bears noting that, according to the record, the only other resident who was persistently absent without an adequate excuse – a white male – was also put on final warning.  He improved his punctuality and attendance, and successfully graduated from the residency program.

Varughese's claim that Defendants subjected her to illegal discrimination by issuing the Final Warning is dismissed.

Fall 2011 Refusal to Transfer

Varughese also alleges that Defendants discriminated against her by refusing her request to allow her to switch rotations in October 2011.  This incident would not seem to be of any moment; since Varughese was kicked out of the residency program nine days prior to October 2011, so she could not have assumed a different rotation even if the switch had been authorized.

The However, the Department's refusal was communicated to her multiple times – including on September 7, 2011, and certainly before she was sent a Termination Letter, so I will analyze whether she has raised a genuine issue of fact about the reason why her rotation was not changed.  She has not.

I will accept, for purposes of this analysis, that not being allowed to change rotations could be an adverse employment action – although I can think of many reasons why that might not be so.  However, the Hospital has advanced a legitimate and non-discriminatory reason why it did not authorize the change in her schedule: Varughese missed the July 1, 2011 deadline to request a scheduling change (a fact that is not in dispute) and granting her request would have had a ripple effect on the schedules of others that would have been too difficult to manage, since no one could

be found to cover the rotation to which Varughese was assigned – which, by the by, was the rotation she had requested during the period when requests were being accepted.

The question then becomes, at Step Three, whether Varughese has raised a genuine issue of fact going to either pretext or to the real reason for the decision's being discrimination. She has not. Varughese submits no evidence that the decision to deny her change of schedule request was a mere pretext for anything, let alone for discrimination. Defendants note, as they did when they denied the request in in September 2011, that 8 out of 10 residents' requests for schedule changes" that came after that July 1, 2011 deadline were denied. (Termination Letter of Sept. 21, 2011, Docket #205-7 at 38.)  Varughese has not submitted any evidence that Defendants granted any transfer requests that were as untimely as hers.  Her own conclusory assertion that her request must have been denied because of her gender and/or national origin is woefully insufficient.

Varughese's claim that Defendants violated federal, state, and local antidiscrimination law by refusing her belated schedule change request is dismissed.

<u>The September 21, 2011 Termination</u>

I come now to the heart of Varughese's claim: that Defendants should not have kicked her out of Mount Sinai's residency program on September 21, 2011.

I will assume that she makes out a *prima facie* case and ignore the obvious argument that her performance issues rendered her unqualified for her position.

The letter notifying her of her summary suspension reveals multiple, independent, legitimate and nondiscriminatory reasons to have terminated Varughese.

I begin with the most obvious: she rifled through an administrator's files when left alone in that administrator's office.  Varughese admits (reluctantly) that she did so.  There can be little

dispute that this conduct would provide a legitimate, nondiscriminatory reason for termination in any workplace.

There is no evidence that Varughese's secret examination into the file on Patel's desk was simply seized on as pretextual cover for an action Defendants were prepared to take for reasons related to Varughese's gender or her national origin. No one else who was guilty of similar misconduct has even been identified;  Cordon-Cardo has testified, without contradiction, that there is no such person.  It thus stands to reason that no one has ever been allowed to get away with such serious misconduct.

Varughese offers no evidence, direct or even circumstantial, that anyone involved in the decision to fire her (a group that does not include either Schiller or McCash) had ever exhibited any sort of discriminatory attitude, toward her or anyone else.  The fact that she was in Patel's office only by accident (because Patel encountered her at Starbucks that morning) negates any notion that she might have been "set up;" the fact that she was caught in the act eliminates any possible suggestion that she was singled out. Where, as here, a plaintiff fails

> to rebut specific, credible evidence offered in support of an employer's articulated reason for their firing, [she] cannot maintain claims that [her] firing[s] w[as] discriminatory.

*Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 310 (S.D.N.Y. 2000) (internal citations omitted) (analyzing case brought under Title VII, the NYSHRL, and the NYCHRL).

Varughese's argument that she should have kept her job despite her snooping relies on her own conclusory and unsubstantiated assertions that Defendants were engaged in a discriminatory "conspiracy" of some kind.  But her unsubstantiated and conclusory allegations that there was discrimination "in the air," and that Defendants engage in "plantation politics," do not meet her third stage burden of producing evidence to raise any genuine issue of fact that would require a trial. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to

AA-620

defeat a properly supported motion for summary judgment." *Bickerstaff*, 196 F.3d at 451–52 (restating principle that to defeat summary judgment, plaintiffs', "affidavits must be based upon concrete particulars, not conclusory allegations") (citing, *inter alia, BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996)). *See also Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence); *Lytle*, 2012 WL 393008, at *19 ("the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.").

The analysis might stop there. But inquiring into the hospital's other justifications for terminating Varughese – and her rejoinders – only strengthens Defendants' case.

The termination letter cited six additional reasons why she was being fired. First, there was her disastrous performance on Najfeld's rotation. Varughese admits that, during that rotation, she disobeyed instructions to stop fiddling with her phone, failed to follow Najfeld's instructions on how to prepare a presentation, provided Najfeld with an incomplete presentation only an hour before the close of business the day before the presentation was to be made, and failed to notify others that the presentation conference was being canceled. Varughese submits no evidence that anyone else engaged in similar conduct. Nor does she submit any evidence that Najfeld, a woman, complained about Varughese because of plaintiff's gender or her national origin, rather than because of her admitted bad conduct.

Next is Varughese's insubordinate behavior towards Jordan on August 5, 2011 and August 12, 2011. Varughese admits that, on those dates, she failed to respond to Jordan's e-mails and pages. Indeed, she admits that she failed to respond to Jordan even after Lento explicitly told her to do so. Varughese submits no evidence that anyone else was allowed to engage in a similar

pattern of disobeying instructions and failing to communicate with supervisors regarding coverage. Nor does she submit any direct evidence that Jordan, Lento or Najfeld – the three persons who testified about these incidents – had any bias against her because of her gender or national origin.

Third is Varughese's "Unprofessional Response to Request for Change of Elective Rotation," referring to Varughese's refusal to accept the Department's decision not to consent to her untimely request to switch rotations. Varughese does not dispute that, when one administrator denied her request, she went to supervisor after supervisor to renew her request, failing in each instance to tell anyone that it had already been denied by others. Varughese points to no one else who engaged in similar conduct. Nor does she submit any direct evidence of discriminatory animus by any of the administrators involved, i.e. Firpo, a Dr. Harpaz, Scott Barnett, and Paul Johnson.

Fourth, the Department cited her for her poor conference attendance. When a male resident was told that he was below the 80% conference attendance requirement, he gave a make-up presentation without complaint. (*Id.* at 72-73). When Varughese was told the same thing, she procrastinated, objected, and then walked out of her scheduled presentation with neither explanation nor apology. She never made the presentation.

Fifth is Varughese's "poor communication regarding leave of absence." Varughese does not dispute that she herself asked about taking F.M.L.A. leave on September 15, 2011. Nor she does dispute that Defendants encouraged her to take a leave and gave her materials so she could make such a request. In the days that followed, several hospital administrators tried to reach Varughese to inquire about whether she would in fact be making a leave request, as well as to ask about her health. She did not respond to any of these queries, although she admits that she read them. She showed up at work despite having been being told – by Lento, in writing – *not* to come

to work. Varughese submits no evidence that anyone else engaged in similar behavior. Nor does she submit evidence that Lento or anyone else demonstrated animus toward women or anyone because of national origin.

Sixth, all of this behavior occurred in the brief six week period following Varughese's receipt of a Final Warning telling her that she had to start acting more professionally or she would be fired. None of this behavior is particularly professional. All of it is either petulant or insubordinate.

Varughese may take issue with what it meant to behave "professionally" at Mount Sinai, but she cannot get around the fact that, "an employer is permitted to set its own performance standards" including standards . . . so long as they are not discriminatory." *Nolley*, 857 F. Supp. 2d at 441 (analyzing case under federal law, state law, and the NYCHRL). As neither the Final Warning nor the Advisement was discriminatory, Defendants cannot be faulted for firing Varughese when she failed to abide by their terms.

Whether summary judgment is appropriate always depends on "'the strength of the plaintiff[s'] *prima facie* case, the probative value of the proof that the [defendants'] explanation is false, and any other evidence' that supports the defendants' case." *Lizardo v. Denny's, Inc.*, 270 F.3d at 103 (2d Cir. 2001) (quoting *Reeves*, 530 U.S. at 148–49). Having reviewed the entire record as submitted by Varughese, I conclude that Varughese has failed to mount an evidentiary carry her burden of production at the third stage of the analysis and her ultimate burden of persuasion. On the evidence in the record, no reasonable juror could find Varughese to have overcome the overwhelming evidence that Defendants disciplined and terminated her, not because of her sex or her ethnicity, but because of her own admitted behavior – behavior that her employer found unprofessional and inappropriate.

In *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141 (S.D.N.Y. 2011), the

Court dismissed a Title VII plaintiff's claims because it was not disputed that she

> engaged in a loud argument with her boss and called her a "racist" and a "liar."
> Whatever occurred, it required the presence of building security, the NYPD, and
> EMS. This is not acceptable office behavior, and a complaint of racial
> discrimination does not shield an employee from termination when she acts
> inappropriately.

*Id.* at 161 (analyzing claims brought under, *inter alia*, the NYCHRL). Throughout the final year

of her residency, Varughese engaged in unacceptable workplace behavior. By her own admission,

she yelled, she swore, she interrupted, she rolled her eyes, she was late, absent, and – in

conversations she recorded and submitted to the Court – by turns confrontational and evasive. The

very tape recordings she made – and the pacing and aggressive tone of voice they reveal – confirm

the testimony of others about her attitude and her behavior. This court can hardly ignore what is

on the tapes for anyone to hear. *See Scott v. Harris*, 550 U.S. 372 (2007) (appropriate for a court

to take judicial notice of facts regarding intangible circumstances of encounter preserved in audio-

visual recordings if court reviews said recordings).

Yet despite her protracted confrontational conduct, Defendants appear to have bent over

backwards to assist Varughese. She received counseling from the Department, from the hospital's

overarching Office of Graduate Medical Education, from Human Resources, and from the PWC.

Several administrators came in from outside Mount Sinai and were prepared to offer her a clean

slate, which she promptly sullied. Even if the Department was, at times, in disarray, anti-

discrimination law "does not make [defendants] liable for doing stupid or even wicked things; it

makes them liable for *discriminating*." *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998)

(analyzing ADEA claim) (emphasis in original). There is no evidence on which a reasonable jury

could conclude that Defendants *discriminated* against Varughese on the basis of her race or her

gender.

*Nolley* again proves instructive.  When Mr. Nolley was given a PIP and told to improve his professionalism, he broke the standards set forth in that PIP by aggressively confronting his superior about what he thought were lies in the customers' complaints that had prompted the PIP in the first instance.  He ultimately was fired because he could not handle professionally the complaints about professionalism.  It did not matter whether the initial complaints were truthful, it mattered that he was unable to resolve his differences with his employer peacefully and professionally.

Varughese's case suffers from the same defect.  As in *Nolley*, "Any deceitful conduct by [Jordan or McCash] or deficiencies in [her supervisors'] performance *do not create an issue of fact regarding [Varughese's] own performance* during [the months-long disciplinary process] or [Defendants'] motives in firing [her] for [her] failure to perform as [her] employer expected and as outlined in the [Academic Advisement."(emphasis added).  She has therefore failed to raise a genuine issue of material fact that her termination or any of the supposedly adverse actions preceding it were pretextual or that they were motivated, in whole or in part, by any desire to discriminate against her, on any ground. She   *Nolley*, 857 F. Supp. 2d at 460.

Varughese has also been unable to point to any circumstantial evidence of discriminatory animus because she has identified *no one* who was similarly situated to her in all material respects – material respects including being on Academic Advisement, having been referred to the PWC, and being on Final Warning.  No one else whose existence is disclosed in the record had a similarly pockmarked record of chronic lateness, absenteeism, refusal to follow instructions, and explosive anger.  No one else simply refused to comply with the terms of an Academic Advisement or made up silly excuses for not doing so, like "I complained to HR so I don't have to comply."  Any

mistakes made by other residents to which Varughese points are either less severe, less frequent, or more willingly remedied by their perpetrators – and in most instances, all three.

Rather than point to others outside her protected class who engaged in similar conduct and received preferential treatment, Varughese blames others for her own conduct. She failed to plan an acceptable presentation? That was Najfeld's fault, for not telling her soon enough that it was unacceptable – never mind that Varughese did not send it to her supervisor until an hour before the close of business on the day before she was scheduled to present. (Varughese Dep. at 384.) Varughese was caught going through the files on someone else's desk? That was Patel's fault, for leaving her in an office with files on the desk. (Internal Appeal Hearing, Docket #205-31 at 60.) Varughese failed to confirm that she could not cover for a sick resident? That was Jordan's fault, for asking her to provide coverage in the first place – the very request constituted "outrageous harassment." (Varughese Dep. at 465-66.)

There is no evidence in the record that any other resident acted out in such a way. Moreover, even under the NYCHRL, a plaintiff cannot "establish pretext "by rationalizing her errors or by blaming others." *Melman*, 98 A.D.3d at 121 (N.Y. App. Div. 1st Dep't 2012) (internal citations omitted).

There are a few instances when Varughese is able to point to other residents who engaged in single bad acts, or who had bad weeks. But the record contains no evidence that anyone else had her lengthy record of persistently bad behavior. While other residents were cited for inappropriate attitudes or isolated angry outbursts, Varughese's lapses in professionalism were chronic and cumulative. (Firpo Dep. at 43, 170-74.) Varughese submits no evidence of anything different.

As the New York Court of Appeals has found, "it matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory." *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 308 n. 5 (N.Y. 2004).   Varughese has submitted no evidence that discrimination played any part – even a small part – in the decisions to discipline or terminate her.   *Kerman–Mastour v. Fin. Indus. Regulatory Auth.,* 814 F.Supp.2d 355, 367 (S.D.N.Y.2011) ("[E]ven under the more liberal NYCHRL, summary judgment will still be appropriate where a plaintiff does not adduce sufficient evidence of a link between her termination and a discriminatory motive . . . "); *see also Jeune v. City of New York*, No. 11 Civ. 7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (collecting cases).   She has done little more than recount that she was subjected to adverse actions and that she was a member of two protected classes. More is required. *Dhar*, 2014 WL 4773965, at *7.

The motion for a summary judgment of dismissal is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18.

### V.   The Motion for Summary Judgment is GRANTED as to Counts 3, 7, 8, and 11 (Hostile Work Environment under Title VII, NYHRL and NYCHRL).

Varughese claims – in counts 3, 7, 8 and 11 – that Defendants subjected her to a hostile work environment on the basis of her race and gender, in violation of state, local and federal law.

A.   Varughese's State and Federal Claims

To defeat a motion for summary judgment on a claim of racially or sexually hostile work environment under federal and state law, a plaintiff must produce evidence that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be," *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006), "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions

of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment, but may if sufficiently severe. *See id.*; *Kemp v. A & J Produce Corp.*, 164 Fed. Appx. 12, 14 (2d Cir. 2005); *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000).

In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Varughese's hostile work environment claims are based on an accumulation of discrete indignities. In addition to the matters she assigned as discrimination – all of which make up part of her hostile work environment claims – these include (1) Schiller's few sporadic comments during the first two years of her residency, (2) her desk was broken into (although she does not know by whom), (3) the lab slowed processing of her patient slides, (4) other people whispered about her, (5) McCash yelled at her before she was removed from his supervision, and "stomped around" afterward. For purposes of this motion, I will presume that all of these things happened.

101

*Varughese Has Failed to Present Any Evidence Connecting These Any of These Events to Her Membership in a Protected Class.*

The principal reason why the Hospital is entitled to summary judgment dismissing Varughese's hostile work environment claim under federal and state law. Varughese has not presented any evidence from which a reasonable jury could infer that that any of those events – let alone all of them collectively – occurred under circumstances giving rise to an inference of discrimination.

While "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. Coll. of Staten Island,* No. 01–CV–7550, 2003 WL 21143076, at *2 (E.D.N.Y. Mar.23, 2003) (citing *Gregory v. Daly*, 243 F.3d 687, 694– 95 (2d Cir. 2001)). "Everyone can be characterized by . . . race . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id.* at 378.

Varughese points to no evidence that would allow a jury to conclude that she was subjected to any purported indignity because of either her race or her sex. As discussed above, when analyzing Varughese's discrimination claims, there is no evidence in the record to connect any of the eight adverse actions she identified as discriminatory to Varughese's being a woman or being

of Indian descent. That lack of evidence does not change when those activites are viewed through the prism of hostile work environment analysis.

Varughese also submits no evidence connecting the other incidents described – such as the broken lock on her desk, or the lab's pace in processing her slides – to her membership in any protected class. None whatever.

So her hostile work environment claim under state and federal law rises and falls on whether Schiller and McCash's comments created a hostile work environment for her. They do not. They were the quintessence of "stray remarks" – neither so many nor so frequent as to alter her workplace in any material way. This is without regard to the fact that at least two of the comments – Schiller's DNA remark and McCash's "work ethnic" e-mail – could not be understood by any reasonable trier of fact as the ethnic slurs Varughese makes them out to be.

It is not clear that these allegedly scurrilous remarks were made more than 300 days before plaintiff filed her charge with the EEOC: Schiller's remarks were made during the first two years of her residency. Nevertheless, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)).

Schiller's alleged comments about the "crazy things you'll find in India" were perhaps impolitic but they are hardly "severe" or "pervasive" enough to create a hostile work environment, since they are alleged to have occurred four times over the course of her employment. That is by definition not "pervasive."

103

Schiller's DNA remark was made early in Varughese's second year of residency, in the fall of 2009. It was a one-off remark. It contained no reference to her ethnicity or national origin. In context, it was a remark about the genetic basis of depression, which was the subject under discussion – Varughese's mental health, her perceived depression. Schiller directed Varughese to obtain mental health counseling, not because of her gender or her ethnicity, but because she presented as depressed in the workplace. Many people, including doctors, believe that there is a genetic (i.e., DNA-based) component to depression. *See, e.g.*, Eileen P. Ryan, D.O., "What Psychiatry, Developmental Psychology, and Neuroscience Can Teach Us About at-Risk Students," 17 Wash. & Lee J. Civil Rts. & Soc. Just. 59, 64-65 (2010).  Schiller's comment cannot reasonably be understood in any manner other than this.

As for McCash's e-mail, it was discussed extensively above. It does not refer to Varughese's status as a person of Indian descent. The insertion of the letter "n" into the phrase "work ethic" is an obvious typographical error.  For that reason it does not evidence a hostile work environment on any forbidden basis.

But there is another reason why this email is not evidence of a hostile work environment. Varughese did not become aware of it until long after she stopped working for Defendants. Varughese was not carbon copied on the "work ethnic" e-mail. At her deposition (which occurred after her termination), she denied knowing about any discriminatory comments ever uttered by McCash.  Only now does she allege that this email contributed to the purportedly hostile environment she faced.

A plaintiff need not herself be the target of discriminatory comments in order for those comments to contribute to a hostile work environment; nor does the plaintiff need to hear such comments first-hand. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69-70 (2d Cir.

104

2000); *see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir. 1997) ("Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."); *Cruz,* 202 F.3d at 571 (finding that, even if plaintiff were not present when some comments were made, "a jury plausibly could find that [defendant's] persistently offensive conduct created an overall hostile or abusive environment" which "exacerbated the effect of the harassment [plaintiff] experienced individually" (internal quotation marks and citations omitted))..

But, to rely on discriminatory comments in pursuit of a hostile work environment claim, a plaintiff must at least have been generally *aware* that such comments were uttered. The *Whidbee* court examined the totality of the circumstances and found that "the plaintiffs were subjected to, *or at the very least aware of*, a stream of racially offensive comments." 223 F.3d at 70 (emphasis added). The *Whidbee* court relied on *Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997). In *Schwapp*, the court explained that, "The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim" *because* "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." 118 F.3d at 111.

Here, Varughese did not learn of the "work ethic" comment even second-hand. She was not aware of the email at all during the period while she was a resident at Mount Sinai. It would be difficult indeed for a comment to alter the conditions of Varughese's employment if she was unaware of it until well after she stopped being employed. "A plaintiff need not be the recipient of [racially] offensive material for it to contribute to a hostile work environment. Nevertheless, if the material is not publicly displayed or disseminated, and is not something [she was] . . . generally

aware of, its contribution to a hostile work environment may be negligible. *Ortiz-Moss v. New York City Dep't of Transp.*, 623 F. Supp. 2d 379, 401 n.19 (S.D.N.Y. 2008); *cf. Patane v. Clark*, 508 F.3d 106, 114 (2d Cir.2007) (plaintiff's regular observation of male employee watching pornographic videos, and her being required to handle pornographic material herself in opening supervisor's mail, were relevant to assessing whether her work environment was objectively hostile to women). Here, where there is literally no other evidence of ethnic slurs (as there was in *Whidbee*), and no other evidence of compromised behavior on McCash's part, the probative value of the email is not just negligible; it is nil.

The "work ethnic" e-mail is the *only* comment with any nexus whatsoever to the treatment she describes as hostile that occurred within the statutory period, in that it has a connection to the December 8, 2010 incident. There is no other evidence of discriminatory comments or other direct evidence of animus that relates to the treatment of which she complains. I therefore cannot consider the comment as but one instance of a general atmosphere of discriminatory hostility, particularly in view of the circumstances under which the comment was made – i.e. that it would be reasonable to consider it a scrivener's error.

Moreover, when Varughese complained about McCash's behavior in December (i.e., at the time he composed the e-mail), Defendants removed her from his supervision and ensured that they did not have to work together, even as colleagues, thus shielding her from whatever hostility she alleges. She now claims that McCash "stomped around" her desk on a subsequent rotation, but admits that she did not have to work with him and that she never notified anyone that she was still having problems with him.

Under federal and state laws, to prevail on a hostile work environment claim, plaintiffs must show not only severe or pervasive harassment but also "a specific basis . . . for imputing the

106

conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir. 1996). Because the "stomping" was by a co-worker (as she no longer reported to him) and not a supervisor, Varughese must demonstrate that Defendants "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (internal quotation marks omitted). "[A]n employer will be liable in negligence for a racially . . . hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson*, 180 F.3d at 446 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, (1998)); *see Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir. 1998).

In the end, "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Cruz,* 202 F.3d at 570. Here, the totality of the circumstances do not even remotely suggest that Varughese was the victim of a hostile work environment, either because she was a woman or because she was of Indian descent. If there is any suggestion of hostility at all – a proposition very much in dispute – the entirety of the evidence points to Varughese's uncooperative, insubordinate attitude as its root cause. The statutes she invokes do not protect Varughese from the consequences of her own behavior. Varughese has failed to provide evidence from which a reasonable jury could conclude that any dislike was based on her race or her sex.

Consideration of the totality of Varughese's employment does not yield any evidence of an environment severely or pervasively infected with discriminatory hostility on the basis of her gender and/or her race. It merely reveals that, when she acted out, there were consequences, and that she happened to be a woman of Indian descent. But again, "I am a member of a protected class; my workplace was hostile; it must have been because of my protected class," is a logical

fallacy that does not insulate a plaintiff from summary judgment where the undisputed facts warrant dismissal of her claims as a matter of law.

While "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999), Varughese's evidence of McCash's e-mail, Schiller's interest in India, and Schiller's concern that her depression might be DNA-based are neither "severe" nor "continuous" nor "concerted," *Cruz,* 202 F.3d at 570 (internal quotation marks omitted) – and so will not sustain a hostile work environment claim under federal or state law. There is *no* evidence in this record that Varughese was subjected to repeated indignities (or even to one particularly egregious indignity) *because of either her race or her gender*.

Not a single piece of evidence even *alludes* unfavorably to Varughese's gender. Plaintiff did not complain that she was experiencing a hostile work environment based on her gender until April 2011. But when she did so, she accused McCash of creating the hostile work environment. But the record contains evidence of only two run-ins between McCash and Varughese – in September 2010 and again in December 2010 – which is too sporadic to create a hostile work environment. After that, the hospital removed Varughese from McCash's supervision – five months before she uttered her first complaint. In short, there is not a scintilla of support for her claim of a gender-based hostile work environment.

And so we turn to national origin. Schiller's comments about things one might find in India were, *at worst*, subject to interpretation – and both few in number and sporadic. They were also made well before Varughese's workplace problems began. Even if these were racially insensitive remarks, his comments cannot be attributed to others, and he ceased being chairman of the

Pathology Department before the December 8 incident, the Academic Advisement or the PWC referral.

Schiller's comment about depression's being associated with DNA cannot logically be construed as a comment on Varughese's national origin except under some sort of utterly unreasonable, Oliver Stone-like "conspiracy theory" And McCash's "work ethnic" e-mail almost certainly contains a typographical error, given the complete lack of any other evidence suggesting that McCash was insensitive or worse toward anyone on the basis of their race or national origin. At worst, it is at worse a single stray remark – which, under federal and state law, is insufficient to prove hostile work environment. And of course, Varughese *never* complained that she was being subjected to a hostile work environment on the basis of her race during her tenure at Mount Sinai. Even when she retained counsel in June 2011, her lawyers claimed that the hospital was discriminating against her because of her *gender.*

What remains are only Varughese's conclusory allegations that everyone in the hospital was a racist, a sexist, or both. That is not enough.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 3, 5, and 18, i.e. Varughese's state and federal hostile work environment claims.


B. Varughese's Hostile Work Environment Claim under the NYCHRL

Having dismissed Varughese's hostile work environment claim under state and federal law, I now consider whether Varughese's city law claim of hostile work environment can survive Defendants' motion for summary judgment.

The NYCHRL has a more forgiving standard for hostile work environment claims than federal or state laws do. There is no "severe or pervasive" requirement under city law, and "while

courts may still dismiss 'truly insubstantial cases,' even a single comment may be actionable in the proper context." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (citing *Williams*, 872 N.Y.S.2d at 41 & n.30).

Nevertheless, the NYCHRL "is not a general civility code," and "summary judgment is still appropriate in NYCHRL cases . . . if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Id.* (internal citations omitted). In this case, the record establishes precisely that. Varughese offers no evidence connecting the incidents she now perceives as hostile to bias related either to her race or to her gender. Her wide-ranging, conclusory assertions that there was discrimination in the air do not withstand any level of scrutiny.

Count 11 is dismissed.

## VI.     The Motion for Summary Judgment is GRANTED as to Counts 4, 8 and 12 (Retaliation under Title VII, NYHRL and NYCHRL).

Varughese alleges – in counts 4, 8 and 12 of her Second Amended Complaint – that she was disciplined and terminated in retaliation for engaging in the protected activity of complaining about discrimination.

Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any . . . employee [ ] . . . because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). Retaliation claims are cognizable under § 1981. *See Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 43–44 (2d Cir. 1984).

To survive summary judgment with respect to her claim of retaliation, Varughese must raise a genuine issue of fact whether "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there existed

a causal connection between the protected activity and the adverse action." *Patane,* 508 F.3d at 115 (citing *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004)). The NYCHRL against has no "materiality" requirement; it forbids any form of retaliatory action.

It is well-established that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks omitted). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Moreover, as the Supreme Court has explained, any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" may constitute retaliation. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

In this Circuit, the analysis of a retaliation claim follows the same *McDonnell-Douglas* framework discussed in Part III, *supra*. *Kemp v. A & J Produce Corp.*, 164 F. App'x 12, 15-16 (2d Cir. 2005). Thus, "once the plaintiff has made out a *prima facie* case of retaliation, the defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the challenged action. If the defendant meets that burden, the plaintiff must then demonstrate that there is sufficient evidence upon which a reasonable jury could find the proffered legitimate reason merely a pretext for impermissible retaliation." *Id.* (citing *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998)).

With respect to retaliation, Varughese does not get past the first step of the inquiry.

111

Varughese's 56.1 Statement repeatedly claims that she complained about "discrimination" earlier than April 2011, but *nothing* in the record supports that assertion. Certainly she complained about a "hostile environment" at work as early as September 2010, and described others' behavior as "offensive," but she never gave anyone any reason to suspect that the hostile or offensive environment she was complaining about had anything to do with either her race or gender. She did not mention her sex or her ethnicity in her complaints. She did not complain about any allegedly racist or sexist comments. She did not ascribe what she perceived as mistreatment to her membership in any protected class. She did not compare the way she was being treated to the way Caucasians or males were treated. The people explicitly contradicting her versions of events were often members of one or both of the same protected categories as she – including Drs. Jaffer and Maniar, women of Indian descent, both of whom were outranked her and one of whom outranked McCash. Maniar, who Varughese believes would support her version of events, denied that Varughese had ever complained to her about discrimination or retaliation. (Docket #163 at ¶10.)

When Varughese complained about "retaliation" before April 2011, she explicitly linked the alleged retaliation to non-protected activities - principally to having given Lento's rotation a negative internal review or making general allegations about unfair treatment and workplace bullying. Her first reflection explicitly declined to ascribe McCash's behavior to any motive at all: "*I will not claim to know why Samuel McCash treats me the way he does*, nor will I need to understand why . . . But I feel that he is resentful of any success or well-being I may exhibit." (Self-Reflection Essay #1, Docket #205-10 at 19.)(emphasis added) Not until April 25, 2011 did Varughese explicitly assert that McCash's behavior toward her was based on her gender. (E-mail from Varughese to Tiger-Paillex of Apr. 25, 2011, Docket #205-10 at 2.) The letter written by her attorney to Mt Sinai in June 2011 (*See* Docket #205-10 at 12) identifies a December 23, 2010

email as containing an earlier complaint that she was being discriminated against on the basis of her gender and/or some perceived disability (which is not a claim asserted in this lawsuit). However, that December 23 email asserts nothing about discrimination: she complained about what she characterizes as abusive behavior and public humiliation. Neither her gender nor her national origin is mentioned; there is nothing in the email to alert the recipient (Tiger-Paillex) that these were the basis of her complaint.

Thus, notwithstanding Varughese's conclusory assertions in her 56.1 Statement, there is no *evidence* that she engaged in any protected activity prior to being placed on Academic Advisement.

Instead, all of her statutorily protected activity began in April 2011 – well after her December 21, 2010 Academic Advisement, well after McCash's and Jordan's promotions to Chief Resident, and well after Pessin-Minsley's referral of Varughese to the PWC. None of those issues can be chalked up to retaliation for any complaint about discrimination based on gender or national origin.

Of course, her Final Warning and ultimate termination occurred after Varughese engaged in protected activity. But those adverse actions cannot be chalked up to retaliation, either, because they were part and parcel of a course of conduct that began well before any protected activity took place. Under federal and state law, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery,* 248 F.3d at 95. The same is true under the NYCHRL. *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 129, 946 N.Y.S.2d 27, 42 (2012) ("an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because,

in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct . . .") (internal citations omitted).

Varughese thus "cannot establish a *prima facie* case of retaliation based on the temporal proximity between the adverse employment actions and her protected activity, even though some of the things about which [she] complains occurred after she engaged in protected activity" in April 2011. *Williams v. Woodhull Med. & Mental Health Ctr.*, 891 F. Supp. 2d 301, 315 (E.D.N.Y. 2012).

Bending over backward to try to find some way to keep Varughese's claim of retaliation alive, the Court has considered whether her off-hand question to Tiger-Paillex in late December 2010 or January 2011 whether McCash wanted to micromanage her "because he is a guy?" qualifies as protected activity. First, let us assume that this actually qualifies as a complaint of gender-based treatment, rather than evidence of Varughese's own gender bias. However, even assuming that it qualifies as protected, Varughese only raised the concern *after she had already been placed on Academic Advisement.* It does not get her out from under the rule announced above.

The totality of the evidence simply does not admit of an inference that Defendants retaliated against Varughese for engaging in any protected activity.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 4, 8 and 12.

### VII.   The Motion for Summary Judgment is GRANTED as to Count 17 (Whistleblower Retaliation).

Varughese claims that Defendants violated New York Labor Law § 740, New York's whistleblower statute, by penalizing her for reporting McCash and Jordan for drinking on the job.

114

Presumably, Varughese invokes § 740 because it provides the only private right of action for enforcing § 741, New York's Health Care Whistleblower statute.

Section 741 specifically protects healthcare providers who "disclose[] or threaten[] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer . . . that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or objects to, or refuses to participate in" any such activity, policy or practice. N.Y. Labor Law § 741(a)-(b).   An employer may not take any adverse personnel action against an employee "because" she engages in protected activity. N.Y. Labor Law § 740.

Relying on a 2010 Appellate Division decision, Defendants argue that Varughese's whistleblower retaliation claim should be dismissed because she has "failed to identify a specific law, rule or regulation" that the alleged drinking purportedly violated. *See* Defs. Mem., Docket #172 at 24-25, *citing Deshpande v. Medisys Health Network, Inc.*, 70 A.D.3d 760, 762 (2d Dep't 2010).

The case on which Defendants rely is no longer good law. The New York Court of Appeals expressly directed that it not be followed two months before Defendants filed their brief. *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448, 451 (2014) ("there is no such [identification] requirement. . . [and] Appellate Division authority. . . should no longer be followed for that proposition.").

The Court of Appeals cautioned that "*recover[y]* under a Labor Law § 740 theory" requires an actual violation of law, 23 N.Y.3d at 452-53, but, were Varughese's accusations true, there would have been a violation of actual law.  Undertaking the liberal review that I must for a *pro se* plaintiff, it is not difficult to find a regulation that would be violated if Defendants' physicians – the need for whose "skilled performances . . . cannot be overemphasized" (Docket #205-8 at 11)

115

– were becoming intoxicated before assessing whether, say, someone had cancer.  Specifically, New York Public Health Law § 230 *et seq.* is clear that a physician "practicing the profession while impaired by alcohol" has committed "professional misconduct" that can lead to the revocation of his or her medical license. N.Y. Pub. Health Law § 230(1) (incorporating by reference the definition of professional misconduct in N.Y. Educ. Law § 6530); *see also* N.Y. Educ. Law § 6530(7).

Defendants' better objection is that there is no evidence that Plaintiff was terminated in retaliation for engaging in conduct protected by the statute.

New York "enacted Section 741 of the Labor Law to encourage employees to report hazards to their supervisors and to protect them from retaliatory personnel actions when they make such reports." *Pal v. New York Univ.*, No. 06 CIV.5892, 2007 WL 4358463, at *7 (S.D.N.Y. Dec. 10, 2007) (citing Sponsor's Mem. (Oct. 23, 2001), N.Y. Bill Jacket, L.2002, ch. 24); *see also Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 263 (S.D.N.Y.2001) (citing *Rodgers v. Lenox Hill Hosp.*, 211 A.D.2d 248, 250-51 (1st Dep't 1995)).

However, to fall afoul of the statute, the adverse action must be taken "because" the employee engaged in protected activity. § 740.  In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity.

No reasonable jury could conclude that Defendants took any adverse action to retaliate against Varughese for reporting residents' drinking.  Indeed, Varughese herself has specifically disclaimed any idea that there is any causal link between her reports of drinking and any adverse action she experienced:  "I don't see it as retaliation for a complaint about people drinking on the job." (Varughese Dep. at 748.)

116

Even if Varughese had not waived reliance on this theory, however, the record does not support it.

Every time Varughese reported Dementia rounds or other alcoholic activity, she had just been taken to task for her own behavior – not the other way around. She made the first allegation about drinking after she was placed on Academic Advisement and around the time she was referred to the PWC. Varughese brought the issue up again in April, two days after Tiger-Paillex told her that HR could not substantiate her claims regarding the December 8 incident. Her third allegation – specifically claiming that McCash and Jordan had been drinking while involved with patient-care duties – came two days after her contentious May 3, 2011 meeting with Cordon-Cardo, in which she was told to rewrite her self-reflection.

At the follow-up meeting on May 24, when Varughese submitted her self-reflection late, rolled her eyes and allegedly threw a book on the table, Cordon-Cardo said: "the best way. . . to move on is not with this attitude. You can come here with another attitude and to say. . . I'm going to drop all of this nonsense of people drinking. . ."

> We are addressing these people. . .we are taking these matters very seriously today. We . . . have a lot of work to do . . . but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems . . .You can't keep going back and forth . . . coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking . . ."

(Docket #205-24 at 40-41). When he said that they were indeed taking these matters seriously, he was not kidding. He was obviously referring to Figur's involvement, which led to finding a bottle of Captain Morgan on hospital premises. This in turn led to a hospital-wide e-mail admonishing people to stop bringing alcohol to work. Varughese was not punished for her "whistleblowing" activity; to the contrary, it was followed up on, and things improved. But as with her claims of retaliation under Title VII and the state and city human rights laws, we must look at the totality of

117

the circumstances, as demonstrated by the admissible evidence, rather than conclusion or conjecture.

The totality of the circumstances of this case would not permit any reasonable juror to conclude that the hospital was reacting to Varughese's complaints about alcohol with adverse actions, rather than the other way around. Before she uttered a word about alcohol, Varughese had been put on Academic Advisement, so that very serious disciplinary action cannot be attributed to her whistleblowing. The evidence is undisputed that she failed to comply with the conditions of her Advisement; that was misconduct on her part, which was in no way excused by her whistleblowing. Ample evidence of her behavior at work justifies her being referred to the PWC. And her termination was occasioned by admitted instances of misconduct, the last straw being her admitted rifling through a file on the desk of an HR employee. Engaging in whistleblowing does not insulate an employee from being disciplined or fired for misconduct, and here, there is no genuine issue of fact that misconduct warranting discipline occurred.

The motion for summary judgment is GRANTED as to Varughese's §§740-741 claim (Count 17).

### VIII.  The Motion for Summary Judgment Dismissing Count XIX (Family and Medical Leave Act) is GRANTED.

Varughese's FMLA claim is an unusual one.

In September 2011, Varughese herself suggested she might take a leave of absence from work. Defendants encouraged her to do so, provided her with the materials necessary to apply for FMLA leave, and followed up to see how Varughese was doing when she failed to submit an application. Several days after her initial inquiry and (according to her Rule 56.1 Statement) before she had even made a formal request to take leave, she said she wanted to take some leave at a later date and and come back to work. Her FMLA claim is based on the hospital's refusal to allow her

118

to come back to work until she obtained a doctor's assessment that she was fit to return, essentially forcing her to take involuntary leave. *See* Docket #66 at ¶ 56. The undisputed facts also establish that she disobeyed her employer's orders and came to work without permission for several days.

This is not a violation of the FMLA. The claim is dismissed.

FMLA was enacted because Congress believed "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods . . ." 29 U.S.C. § 2601(a)(4). FMLA therefore provides employees with certain substantive rights, with which employers cannot interfere. *Sarno v. Douglas–Elliman*, 183 F.3d 155 (2d Cir. 1999). The Act provides eligible employees the right to take unpaid leave for up to twelve weeks for a serious medical condition as defined by the Act. 29 U.S.C. § 2612(a)(1). It further provides that at the end of that leave the employee is entitled to reinstatement to the former position or an equivalent position. 29 U.S.C. § 2614(a). To ensure the availability of these rights, section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

Forced leave, however, "by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006). The FMLA establishes certain rights, including, inter alia, "to take leave, to restoration of position, and to maintain a civil action," but it "does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress." *Id.*

The Second Circuit has allowed that a cause of action "might" lie under the FMLA if such a forced leave "interfered with, restrained, or denied the exercise or attempted exercise of a right

provided under the FMLA." But Varughese does not allege that the requirement that she not come

back without a doctor's note interfered with her ability to take leave under the FMLA, or with her

ability to communicate with Defendants' HR department and submit her FMLA forms. It didn't

even interfere with her ability to work; she ignored orders and reported to work anyway.

There can be no question that the Defendants wanted Varughese to exercise her rights under

FMLA; they believed she was unstable and needed to take some leave. They did nothing to prevent

her from taking FMLA leave; they encouraged her to take a leave.

There is no evidence in the record that would permit a reasonable juror to conclude that

Defendants interfered with any right guaranteed by FMLA by requiring Varughese – who, by her

own admission, had been ill frequently to the point of absence, and was extremely anxious – to

provide a doctor's certification that she was fit for duty before she returned to making assessments

that could affect patients' health. *See Robertson v. Amtrak/Nat'l R.R. Passenger Corp.*, 400 F.

Supp. 2d 612, 614 (S.D.N.Y. 2005) (Chin, J.)

Further, even if Varughese had exercised her right to take leave under FMLA, "an employer

is entitled to a certification of fitness to return to duty for such absences up to once every 30 days

if reasonable safety concerns exist regarding the employee's ability to perform his or her duties,

based on the serious health condition for which the employee took" a leave. 29 C.F.R. § 825.312.

For a hospital to require a doctor's note certifying the fitness of a physician who has taken, or

indicated a desire to take FMLA leave, is a prudent measure for the protection of the public.

To the extent that Varughese claims that Defendants did not require doctors' certifications

of fitness from persons not in her protected class, her claim does not lie under the FMLA.

The motion for a summary judgment is GRANTED as to count 19.

IX.   **The Motion for Summary Judgment Dismissing Count XV and XVI (Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing) is GRANTED.**

Varughese claims that her termination breached her employment contract. The Second Amended Complaint does not specify the alleged breach, but the gravamen of Varughese's contractual claim at her deposition and in her *pro se* papers has been that she was terminated without cause.

Varughese's employment contract provided that: "The Program Director [or] the Department Chair . . . may take disciplinary action, including termination for cause, against any [resident] who . . . fails to demonstrate an acceptable level of . . . professionalism."

Varughese has *admitted* to, *inter alia*, screaming, swearing, rolling her eyes, being absent, being late, ignoring pages, ignoring e-mails, ignoring calls, ignoring instructions, going through the files on someone else's desk, canceling a presentation without notice, and submitting an essay on professionalism two months late. The hospital concluded that the admitted behavior did not demonstrate an acceptable level of professionalism. Two appeals boards upheld that determination.

The hospital, not Dr. Varughese and not a jury, has the right to decide which behavior in a resident physician is sufficiently unprofessional to constitute cause for termination. She was terminated for cause. Her contract was not breached.

Her breach of the covenant of good faith and fair dealing fares no better.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (N.Y.2002); *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir.1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the

121

contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). While the implied covenant of good faith and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244 F.R.D. 204 (S.D.N.Y. 2007) (quoting *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y. 1983); *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (N.Y. 1978)).

To avoid redundancy, "Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes,* 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243–44 (S.D.N.Y.1997); *Murphy,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (holding that the implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties."); *Madison Capital Co., LLC v. Alasia, LLC,* 615 F.Supp.2d 233, 239 (S.D.N.Y.2009).

Here, Varughese has not provided any separate set of facts to support her breach of covenant claim, and the Court's own review of the record suggests none.

The motion to dismiss counts 15 and 16 is GRANTED.

122

X.    **The Motion for Summary Judgment is GRANTED as to Count 13 (Tortious Interference with Business Relations).**

Varughese alleges that, by failing to provide a summative evaluation to prospective employer RWJ hospital in January of 2011, Defendants engaged in the New York common law tort of interference with business relations, also known as tortious interference with prospective economic advantage.

"To state a claim for tortious interference with prospective economic advantage, a Plaintiff must show that '(1) the Plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *Doe v. White Plains Hosp. Med. Ctr. (WPHMC)*, No. 10 CIV. 5405 GBD, 2011 WL 2899174, at *4 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French*, 458 F. App'x 21 (2d Cir. 2012) (quoting *Catskill Dev., LLC v. Park Place Entm't*, 547 F.3d 115, 132 (2d Cir. 2008)).

Varughese's claim founders on the third element. She has provided nothing other than her own conclusory assertions to prove that Mount Sinai "acted for a wrongful purpose or used dishonest, unfair, or improper means" when it refused to provide RWJ Hospital with a summative evaluation while her appeals were pending.

The Second Circuit has explained that, under New York law, the phrase "wrongful means"

represent[s] 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract.' " *NBT Bancorp,* 664 N.E.2d at 497, 641 N.Y.S.2d at 586 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632 (N.Y.1980)).

*Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 216 (2d Cir. 2003)

There is neither an allegation nor any evidence that Mount Sinai used the means described in *Scutti Enterprises*. Defendants did not wish to release any summative evaluation of Varughese's employment until her internal appeals of her termination had concluded. This decision actually was to Varughese's benefit; when the request was made her status was "terminated for cause," so if her appeal had been successful in overturning that determination, the information Mount Sinai would have provided would have been incorrect. The hospital was prudent to abide the final resolution of the appeals; prudence does not amount to fraud or any of the other improper means listed above.

The motion to dismiss Count 13 is GRANTED.

### XI.   The Motion for Summary Judgment is GRANTED as to Count 14 (Defamation and Defamation Per Se).

Varughese alleges that Defendants' act of forwarding the "summative evaluation" to a potential employer would constitute defamation and defamation *per se*. She seeks an injunction preventing Defendants from sending the "summative evaluation" to anyone.

To recover for defamation in New York, Varughese must prove that the Defendants made:

(1) a false statement about the plaintiff, (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher, (4) that either constitutes defamation *per se* or caused 'special damages.'

*Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 173 (E.D.N.Y. 2014), *reconsideration denied* (May 14, 2014) (quoting *Thai v. Cayre Grp., Ltd.,* 726 F.Supp.2d 323, 329 (S.D.N.Y.2010) (internal citations omitted).

124

The claim must be dismissed because there is no evidence in the record that Defendants have actually published the summative evaluation to anyone except plaintiff. Unless there is publication to a third party, there is no defamation.[14]

Varughese's real goal is to obtain an injunction prohibiting Mount Sinai from publishing the evaluation to anyone in the future on the ground that it is defamatory. That claim fails because the statements in the summative evaluation she protests are not statements of fact. They are thus not actionable as defamation.

The "threshold issue which must be determined, as a matter of law, [in a defamation case] is whether the complained of statements constitute fact or opinion." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986): *Cohen v. Google, Inc.*, 25 Misc.3d 945, 887 N.Y.S.2d 424 (N.Y. Sup. 2009). In determining whether a statement constitutes fact or opinion, a court should consider: "(1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (N.Y. 1993) (quoting *Steinhilber*, 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550). A court is to consider the context of the statement as a whole. *Sandals Resorts Intern. Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5 (N.Y. 2011).

---

[14] The evaluation was shown to persons who were deposed, including Dr. Fyfe of Robert Wood Johnson Hospital, but that is a privileged act, taking place in the context of a lawsuit, where the witness (who was identified by Varughese) was being questioned about whether RWJ would have been willing to employ Varughese if the evaluation had been sent (it had not even been written yet when Varughese was discussing possible employment at RWJ). It is not actionable.

125

If the statements are "pure opinion," then they are not defamatory as a matter of law even if they are false and libelous. *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Rinaldi v. Holt, Rinehart & Winston, Inc.* 42 N.Y.2d 369, 380–81, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (Ct.App.1977). "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based." *Steinhiber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550.; *see also Sandals Resorts Intern. Ltd.*, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5. Such statements are not actionable because "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Gross*, 80 N.Y.2d at 154, 589 N.Y.S.2d 833, 603 N.E.2d 938.

The Summative Evaluation is a two-page document consisting of checked boxes marking Varughese as "satisfactory" or "unsatisfactory" in six categories, plus two explanatory paragraphs:

> Dr. Varughese's evaluations over the initial portion of her Pathology residency training at Mount Sinai demonstrated satisfactory development in the six Core Competency domains. In some rotations her performance was considered superior by individual attendings, particularly in the areas of patient care (gynecological pathology) and medical knowledge (VA hospital rotations).

> However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in December 2010, in the middle of her third year of training. While the program advanced Dr. Varughese to her fourth year of training, her substandard performance led the Department Chair to issue her a final warning notice on July 1, 2011. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was summarily suspended pending termination from the program on September 21, 2011. Following Mount Sinai's grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

(Docket #162-6 at 39-40.) The evaluation then checks "no" in response to the prompt "The resident/fellow has demonstrated sufficient competence to enter practice without direct supervision." (*Id.* at 40.)

126

The only factual assertions in that document are ones with which Varughese does not take issue. They recount what other people thought, the dates of various actions that unquestionably took place, and the results of Varughese's appeals.

What Varughese objects to are the characterizations of her work as "unsatisfactory" "unprofessional" and "substandard." But these are matters of *opinion*, not actionable assertions of fact. *See Tasso v. Platinum Guild Int'l*, No. 94 Civ. 8288, 1998 WL 841489, at *5 (S.D.N.Y. Dec. 3, 1998) (finding statements that plaintiff was "unethical, untrustworthy, unprofessional" and "incompetent" to be non-actionable opinion) (citing *Gavenda v. Orleans County*, No. 95–CV–0215E, 1997 WL 65870, at *8, (W.D.N.Y. Feb. 10, 1997) (statements that plaintiff was "incompetent," and "there had been problems with her before and she wasn't doing her job right" were non-actionable statements of opinion); *Miller v. Richman*, 184 A.D.2d 191, 592 N.Y.S.2d 201, 203 (App. Div. 1992) (statements criticizing plaintiff's performance and comparing her unfavorably to other employees as "one of the wors[t]" nonactionable as a matter of law); *Amodei v. N.Y. State Chiropractic Ass'n*, 160 A.D.2d 279, 553 N.Y.S.2d 713, 715–16 (App. Div. 1990), *aff'd*, 77 N.Y.2d 891, 571 N.E.2d 70, 568 N.Y.S.2d 900 (1991) (statement accusing chiropractor of "unprofessional conduct" fails to state an action in defamation); *Hollander v. Cayton*, 145 A.D.2d 605, 606, 536 N.Y.S.2d 790, 792 (App. Div. 1988) (statements allegedly made by president of professional staff that plaintiff-physician was "immoral," "unethical," and had "mismanaged cases" were non-actionable)).

Moreover, as Judge Daniels has explained, "New York courts have consistently held that subjective job evaluations, including those in connection with an employee's termination, are non-actionable opinion." *Doe v. White Plains Hosp. Med. Ctr. (WPHMC)*, No. 10 Civ. 5405, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French*, 458 F. App'x 21 (2d

Cir. 2012) (citing *Williams v. Varig Brazilian Airlines*, 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dep't 1991) (memorandum of one supervisor to another and a termination letter from supervisor to Plaintiff are non-actionable opinion); *Ott v. Automatic Connector, Inc.*, 193 A.D.2d 657, 598 N.Y.S.2d 10 (2d Dep't 1993) (unfavorable assessment of work performance in termination letter amounted to a non-actionable expression of opinion). Such statements are non-actionable because "[a]n employer has the right to assess an employee's performance on the job without judicial interference."*Ott*, 193 A.D.2d at 658, 598 N.Y.S.2d 10 (citing *Miller v. Richman*, 184 A.D.2d 191, 592 N.Y.S.2d 201 (4th Dep't 1992); *Williams*, 169 A.D.2d 434, 564 N.Y.S.2d 328; *Goldberg v. Coldwell Banker*, 159 A.D.2d 684, 553 N.Y.S.2d 432 (2d Dep't 1990)). While not a per se rule, courts are reluctant to sustain a claim for defamation for statements made in the context of an employee evaluation or termination because "no workplace . . . can operate effectively unless the employers and employee who work there have the ability to speak freely in evaluating the actions of their employees and co-employees." *Albert v. Locksen*, 239 F.3d 256, 268 (2d Cir. 2001)).

There is no reason to depart from that rule here. Indeed, Varughese presented testimony from her prospective employer essentially discounting the importance of the Summative Evaluation as a mere opinion. Had RWJ Hospital received it earlier, it would have investigated the underlying *facts*. That testimony merely confirms the wisdom of the rule in New York: end-of-job evaluations are generally not actionable in defamation suits.

Defendants' motion for a summary judgment of dismissal is GRANTED as to Count 14.

### XII.   The Motion for Summary Judgment is GRANTED as to Count 21 (Individual Liability against Defendants Cordon-Cardo, Firpo, and Lento).

As I have found that Varughese cannot withstand summary judgment on any of her claims, no individual liability can attach as to those claims.

The motion for summary judgment is GRANTED as to count 21's claim for individual liability as against defendants Cordon-Cardo, Firpo, Lento and Bleiweiss.

### CONCLUSION

For the foregoing reasons, Defendants' motion for a summary judgment of dismissal as to all counts is GRANTED and the case is dismissed.

The Clerk of the Court is directed to remove Docket No. 161 from the Court's list of pending motions and to close the file.

Dated: March 27, 2015

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

129

Case 15-1328, Document 178, 03/01/2017, 1979659, Page57 of 57

AA-656

Case 1:12-cv-08812-CM-JCF   Document 226   Filed 04/24/15   Page 1 of 1
Case 1:12-cv-08812-CM-JCF   Document 223-1   Filed 03/31/15   Page 2 of 10

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Leena Varughese, M.D.
_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

Mt. Sinai Medical Center, Adolfo Firpo-Betancourt,

Patrick Lento, Ira Bleiweiss, Carlos Cordon-Cardo
_____
(List the full name(s) of the defendant(s)/respondent(s).)

____12__CV___8812____ ( CM )( JCF )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties:   Leena Varughese, M.D.
_____

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the   ☑ judgment   ☐ order   entered on:   March 27, 2015
_____
(date that judgment or order was entered on docket)

that:   Memorandum decision and order granting Defendants' motion for summary

judgement
_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

04/22/2015
_____        _____
Dated                              Signature*

Varughese, Leena
_____
Name (Last, First, MI)

904 River Road          Piscataway      New Jersey          08854
_____   _____   _____   _____
Address                  City         State            Zip Code

9082657536                             leenav@gmail.com
_____                _____
Telephone Number                       E-mail Address (if available)

_____

*Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13